# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

COX ENTERPRISES, INC.,
a Delaware corporation,

                    Plaintiff,

*VS.*

                    CASE NO. 6:04-cv-698-Orl-28KRS

NEWS-JOURNAL CORPORATION,
a Florida corporation,
HERBERT M. DAVIDSON, JR.,
MARC L. DAVIDSON, JULIA
DAVIDSON TRUILO, JONATHAN
KANEY, JR., DAVID KENDALL,
ROBERT TRUILO, GEORGIA
KANEY, PMV, INC., a Florida
corporation, and LIVELY ARTS
CENTER, INC.,a Florida corporation,

                    Defendants.

## REMAINING DEFENDANTS' TRIAL BRIEF

       Pursuant to case management and scheduling order entered by the Court on December 27,

2004 the remaining Defendants, NEWS-JOURNAL CORPORATION, HERBERT M. DAVIDSON,

JR., MARC L. DAVIDSON, JULIA DAVIDSON TRUILO, JONATHAN KANEY, JR., DAVID

KENDALL, ROBERT TRUILO, GEORGIA KANEY, and PMV, INC. (hereafter, "Defendants")

submit this Trial Brief.

029650-470 : BHANN/HGREE : 00470166.WPD; 1

| PRELIMINARY STATEMENT OF DEFINITIONS AND SHORT NAMES | |
|---|---|
| **Short Names of Frequently Mentioned Parties and Entities** | |
| **Short Name** | **Party or Entity** |
| **COX** | Cox Enterprises, Inc., a Delaware corporation and the plaintiff herein. |
| **NJC** | News-Journal Corporation, a Florida corporation and a defendant herein. |
| **PMV** | PMV, Inc., a Florida corporation, a defendant herein, and majority shareholder of NJC. |
| **TIPPEN** | Herbert M. Davidson, Jr., a citizen of Florida, a defendant herein, CEO, President, and Co-Editor, and a director of NJC, and father of MARC and JULIA . |
| **MARC** | Marc L. Davidson, a citizen of Florida and a defendant herein, son of TIPPEN and an officer, director, and employee of NJC. |
| **JULIA** | Julia Davidson Truilo, a citizen of Florida, a defendant herein, daughter of TIPPEN and an officer, director, and employee of NJC. |
| **BOB TRUILO OR BOB** | Robert Truilo, a resident of Volusia County, Florida and a defendant herein, husband of JULIA.  He is named as Robert Truilo in the complaint. |
| **Davidson family** | The group consisting of TIPPEN, MARC, and JULIA and their spouses and children at the relevant times.  When the reference is to such times as they were living, this term also includes HMD and his father,Julius Davidson. |
| **DAVID KENDALL OR KENDALL** | David R. Kendall, a citizen of Florida, a defendant herein and Chief Financial Officer and director of NJC .He is named as David Kendall in the complaint. |
| **GEORGIA KANEY OR GEORGIA** | Georgia M. Kaney, Publisher and General Manager of NJC . She is named as "Georgia Kaney" in the complaint. |
| **Jay Smith or Smith** | Jay Smith is the president of Cox Newspapers, Inc., the Cox subsidiary that operates its newspapers. Since the annual meeting of 1993, he has represented Cox in its relations with NJC. |
| **JON KANEY OR JON** | Jonathan D. Kaney Jr., a citizen of Florida, a defendant herein, and Secretary, General Counsel and a director of NJC. He is named as "Jonathan Kaney Jr." in the complaint. |

| | |
|---|---|
| **LACI** | Lively Arts Center, Inc., a Florida corporation not for profit formerly a defendant herein but previously dismissed. |
| **HMD** | Herbert M. Davidson, Sr., deceased, the former editor of *The Daytona Beach News-Journal* and father of TIPPEN. |
| **SMT** | Seaside Music Theater, Inc., a Florida corporation not for profit which operates a professional musical theater company |
| **CFCE** | Central Florida Cultural Endeavors, Inc., a Florida corporation not for profit which promotes cultural events in Volusia and Flagler Counties. |
| **FIF** | Florida International Festival, a division of CFCE, which produces a biennial cultural festival featuring the London Symphony Orchestra and other artists. |
| **Cultural Entities** | Collectively, SMT, CFCE, LACI, and CFCE d/b/a FIF. |
| **Board** | Collectively, the members of the board of directors of NJC as it was constituted from time to time after resignation of COX representatives in 1985 |
| **Short Names for Phrases Describing Key Concepts** | |
| **Fair Value** | This term as defined as a matter of law by Fla. Stat,, § 607.1430 (2003) as construed and defined by the relevant case law of Florida, including that which Florida cases have adopted from New York. |
| **Alleged Misconduct** | Those allegations in Count III, ¶ 72 of the Complaint that charge the Defendants with waste and misapplication of corporate assets. |
| **Cultural Promotions** | NJC's expenditures made to the various Cultural Entities that are included in the charge of Alleged Misconduct , including the NRA Payment. |
| **NRA Payment** | The amount of $13 million paid from NJC to LACI on March 26, 2004 in consideration of the right to name the new performing arts center in Daytona Beach the News-Journal Center and other considerations as provided in the Naming Rights Agreement. |
| **Naming Rights Agreement** | That certain agreement made by and between NJC and LACI on January 1, 2004. |

# STATEMENT OF THE CASE AND OF THE FACTS

## STATEMENT OF THE CASE

NJC is a privately-held corporation engaged primarily in the business of publishing an independent morning daily newspaper, *The Daytona Beach News-Journal*, circulating in Volusia and Flagler Counties, Florida. NJC has one class of voting common stock outstanding, of which 2100 shares (52.5%) are held by defendant, PMV, Inc., and 1900 shares (47.5%) are held by plaintiff, COX.

PMV is a closely-held corporation controlled by defendant, Herbert M. ("Tippen") Davidson, Jr. COX also is a privately-owned corporation controlled by descendants of James Middleton Cox. In addition to its minority shares in NJC, COX owns and operates 17 daily newspapers as well as a diverse group of media and other businesses.

On May 10, 2004[1], COX filed suit against the Defendants and LACI in eleven counts, alleging various acts fraud, waste, and mismanagement and seeking relief in Count III under Fla. Stat. §§ 607.1430(2) and 607.1434. (2003).

The Court granted final judgment for LACI and against COX on Counts IV and V. Then, because these were the only counts against LACI , it dismissed LACI from the suit. COX did not

---

[1] Until August 19, 2005, this Court's docket identified the filing date of Cox's complaint as May 10, 2004 resulting in a valuation date of May 9, 2004. On August 19, 2005, the docket entry was amended to reflect a filing date of May 11, 2004 resulting in a valuation date of May 10, 2004. The amendment to this Court's docket occurred after the close of discovery and several months after expert witnesses in this case formed their opinions, completed their Rule 26 reports and provided their deposition testimony. However, as a practical matter, the experts whose opinions depend upon the filing date of the lawsuit each testified that their opinions would be no different whether the valuation date was May 9, 2004 or May 10, 2004. Accordingly, the same result would be reached in this case regarding the Fair Value of Cox's interest in NJC regardless of whether May 9, 2004 or May 10, 2004 is used as the statutory valuation date.

appeal.

The Defendants moved to dismiss all counts except Court III and answered Count III. Subsequently, NJC timely filed its irrevocable election "to purchase all shares owned by the petitioning shareholder [COX] at the fair value of the shares," pursuant to Fla. Stat. § 607.1436 (2003). On the representation of the parties that they, in good faith, believed the valuation trial would resolve or moot the other counts of the complaint, the court denied the motions to dismiss without prejudice to re-file if necessary following the valuation trial. The Court has now set the case for trial on the sole issue of valuation of the shares of NJC held by COX as required by Fla. Stat. § 607.1436 (2003). *See* Judge John Antoon II's Endorsed Order dated January 1, 2005, stating, "The trial, scheduled for the trial term beginning November 1, 2005, will apply to the valuation issue and is a NON-JURY trial scheduled to last five (5) days."

### STATEMENT OF THE FACTS[2]

#### *Davidson Family Control of NJC*

The Davidson family has controlled and operated NJC as an independent newspaper for 77 years. The corporation was organized in 1925 when Eugene C. Pulliam and T.E. Fitzgerald merged their respective morning and evening newspapers– with Pulliam taking 60% of the resulting entity and Fitzgerald taking 40%.[3] In 1928, Julius Davidson and his son, Herbert M. Davidson ("HMD"),

---

[2] Certain privileged communications and documents are referenced in this brief. These references are necessary in light of rulings made throughout this lawsuit, however, the references to these communications does not constitute a waiver of the privilege which Defendants assert protect these communications against disclosure.

[3] Fitzgerald was a local citizen and historian who wrote "Volusia County, Past and Present" published in 1937. See http://www.rootsweb.com/~flvolusi/volhist.htm (visited on August 29, 2005). Pulliam was then in the early stages of building a newspaper empire that he later consolidated as Central Newspapers, Inc., a chain that would include the Arizona Republic,

purchased Pulliam's shares but were unable to acquire Fitzgerald's shares.

Julius was a businessman who had accumulated certain capital as a dealer in bulk chemicals in Kansas City. HMD was a journalist, who covered the Scopes trial for the *Chicago Daily News* in 1925 before he and his father came to Florida to buy the newspaper. Immediately upon their purchase of control, Julius became publisher and HMD became editor. Julius continued as publisher until his retirement in 1962. He died in 1963.

HMD served as editor from 1928 until his death in 1985. After Julius retired, HMD also served as publisher.

All members of the Davidson family have been engaged in the operation and management of the newspaper. HMD's wife, Lilliane was a reporter and editor. Their only child TIPPEN came to work for the newspaper in 1950. After holding jobs as reporter and city editor of the evening edition, TIPPEN succeeded Julius as General Manager and served in that position until HMD's passing in 1985, when he became Publisher and Co-Editor. Soon after coming back to work at the newspaper, TIPPEN married a reporter, Josephine Field (Jo), who continued to work as a reporter and editor. Jo had become the first woman editor of the UCLA Daily Bruin when she took her bachelor's degree there. When HMD died, Jo became editor with TIPPEN as co-editor and continued in this position until her death in 1995. At that time, the board named TIPPEN CEO, president, and co-editor and appointed GEORGIA KANEY as Publisher, the first to come from

---

Indianapolis Star, and other newspapers. Like Cox (see http://en.wikipedia.org/wiki/Cox_Enterprises and http://en.wikipedia.org/wiki/James_Middleton_Cox (visited August 29, 2005), Central Newspapers, Inc. was a family business that employed Pulliam's son, Eugene C. Pulliam, son-in-law, James C. Quayle, and grandson (and future Vice-President of the United States) Dan Quayle. See: http://en.wikipedia.org/wiki/Eugene_Pulliam. (visited on August 29,2005).

outside the family. GEORGIA had been employed at NJC since 1981 as an assistant general manager and then as General Manager.[4]

TIPPEN and Jo had two children, MARC and JULIA. MARC has been employed at NJC for most of his adult life, and today he is editor of the newspaper's successful free-access online edition. When she was younger, JULIA pursued a stage career with some success in New York City, but in the early 1990's she went back to school at Columbia and earned a Master of Journalism degree, worked as an editor for a suburban newspaper in the New York City area, and prepared herself to return to the newspaper. In 1996, JULIA and her husband, BOB TRUILO, moved back home. After the birth of her second child, Julia came to work for NJC. She took a position in the community relations department and agreed to spend volunteer time overseeing NJC's interests with Seaside Music Theater. BOB TRUILO, who had extensive experience with information technology and finance in New York City, has worked for the paper since he came to Daytona Beach in 1996. One of his early responsibilities was the successful management of the Y2K conversion. Today, BOB is a member of the board and business manager of the corporation.

The Davidson family has no intention to sell the assets or shares of NJC at any time in the future even after NJC has retired the COX shares. TIPPEN, MARC, JULIA, and BOB have mutually agreed that the family's goal is to retain NJC and operate the newspaper according to its usual business practices for so long as it is possible to continue. JULIA and BOB have two sons,

---

[4]GEORGIA KANEY and JON KANEY have been married since 1965. Each came into her and his respective roles with NJC independently. JON was a partner at the law firm of Cobb & Cole and worked as understudy to the firm's late senior partner, Tom Cobb, NJC's long-time general counsel. JON succeeded as general counsel when Mr. Cobb retired in 2000. TIPPEN and Jo recruited GEORGIA into the newspaper management without prior consultation with either Mr. Cobb or JON. Neither GEORGIA nor JON are related to any member of the Davidson family.

Michael and David.  They are still youngsters, but the family hopes they will continue the family tradition in *The Daytona Beach News-Journal*.  TIPPEN has arranged his estate plan to preserve family control and retention of NJC. [5]

### *The Early Years and the Competition with Gore*

"About three years [after Julius and HMD acquired the NJC majority], R. H. Gore, himself a newspaper man of wide experience, was importuned by a group of citizens to establish a newspaper, rival to the one then published [by NJC] and as a consequence [Gore] became a competitor of [NJC]." *News-Journal Corporation v. Gore*, 2 So. 2d 741, 742 (Fla. 1941).  In an oral history interview published in Julian M. Pleasants, ORANGE JOURNALISM: VOICES FROM FLORIDA NEWSPAPERS (University Press of Florida: 2003) at 83 (hereafter "ORANGE JOURNALISM"), TIPPEN recalled that, "The politicians here convinced Mr. Robert Gore, the proprietor of the *Fort Lauderdale Daily News*, that this was a fertile field and that there would be no trouble running us out of it.  There was a great deal of trouble running us out."[6]  The Supreme Court noted that "[the] competition

---

[5]For historical background on the Davidson family's management of this newspaper, see "Julius Davidson:The businessman was a visionary" http://www.news-journalonline.com/special/75th/juliusdavidson.htm (visited August 29, 2005), "Making history" http://www.news-journalonline.com/special/75th/makinghistory.htm (visited August 29, 2005) (Tr. Ex. 594 and Tr. Ex. 592). For background on the family's patronage of the arts, See the publication of Stetson University entitled "The Davidson Legacy–quality and commitment." (Tr. Ex. 32) and "Davidson family cultural heritage has been a given for decades" http://www.news-journalonline.com/special/75th/culturalheritage.htm (visited August 29, 2005) (Tr. Ex. 593).  References in this brief to "Tr. Ex. __" will indicate reference to Defendants' previously filed list of trial exhibits attached to the Joint Final Pretrial Statement."

[6]For an example of the reasons why "local politicians" wanted to be shed of Julius and HMD, see the records of HMD's prolonged battle to gain access to the financial records of the Daytona Beach city government.  *See State ex rel. Davidson v. Couch*, 161 So. 431 (Fla.1935)*; State ex rel. Davidson v. Couch*, 158 So. 103 (Fla. 1934); *State ex rel. Davidson v. Couch*, 156 So. 297 (Fla. 1934); *State ex rel. Davidson v. Couch,* 155 So. 153 (Fla.1934) (HMD sued for

between the two papers was lively from its inception and as time progressed it grew into bitterness."*News-Journal Corporation,* 2 So. 2d at 742.  In the midst of this competition, in July of 1937, Gore acquired Fitzgerald's minority shares in NJC.  Two years later, Gore folded his competing newspaper and filed a shareholder suit against NJC.  Though the Supreme Court granted partial relief, it reversed a trial court judgment of dissolution.  *See News-Journal Corporation,* 2 So. 2d at 742.  Among Gore's reasons for seeking involuntary dissolution was that the company had not made a profit nor paid a dividend.  The Court rejected this as a ground for involuntary dissolution and said, "It seems pertinent to observe here that for a period of approximately ten years the plaintiff published his [competing] newspaper at a loss many times greater than that of the defendant."  *Id.* at 746.

Tippen reported that while NJC made a profit in 1928, "[t]hat was the last profit they saw until after World War II.  It was pretty desperate." ORANGE JOURNALISM at 83.  He explained that his father and grandfather sustained the newspaper during these years "on the money that my grandfather made in the bulk materials business in the Midwest.  He had a few hundred thousand dollars put away, and that sufficed to keep them going."  *Id.  (Financial statements for this period reflect the financing).*

In 1955, Gore sold his NJC shares to a corporation controlled by John Perry, which then also

---

access to the financial records of the City of Daytona Beach under the public records law.  Final disposition of the case required four decisions of the Florida Supreme Court involving several interlocutory appeals.  Ultimately, HMD gained access to the records, but the City provided the records encrypted in code.  HMD then prevailed on his demand for access to the code, and that decision became the precedent from which Florida courts concluded that computer programs were accessible public records.  *Seigle v. Barry*, 422 So.2d 63 (Fla. 4th DCA 1982) (*citing Davidson* 158 So. at 103).

owned the *Palm Beach Post*.  TIPPEN recalled that "[w]hen John Perry owned the minority he had buzzards flying around the place trying to trick us into selling the stock or get us in a position where we would be forced to sell the stock." *Id.* at 87.  In 1963 Perry increased his holding from 40% to 47.5%, when Sarah Davidson, the second wife of Julius, sold certain shares she had received from Julius' estate to Perry's corporation.

When Perry sold the *Palm Beach Post* to COX in 1969, he required COX also to purchase his NJC shares.  The true consideration given by COX for the NJC shares is not determinable today because current executives do not remember the transaction.  The single purchase agreement for both the *Post* and NJC shares "allocated" $5 million to the NJC stock.

It is obvious COX acquired the NJC stock because Perry required it as a condition of COX's acquisition of the *Post*.  Though the purchase agreement included representations regarding NJC, Cox made no inquiries of NJC management and otherwise performed no due diligence to determine the accuracy of the representations prior to closing the purchase.  Cox executives then appeared, unannounced, at NJC's annual meeting that year and introduced themselves as representatives of the new minority shareholder.  At their request, Davidson family shareholders voted in favor of electing two COX executives to the board.

### *The Uneasy Relationship Between NJC and COX*

Like Gore and Perry before them, COX has coveted the majority shares in NJC from the earliest days of their ownership, but unlike the previous minority shareholders, COX did not initally exhibit this ambition in an overtly hostile manner.  As recently as November 15, 2000, during the interview that became a chapter in ORANGE JOURNALISM, TIPPEN could say, "It was a relief when the Cox people took [the minority shares] because they became good working partners and have

remained good working partners." *Id.* at 87.  He made that statement a few months after the annual

meeting in 2000 where Jay Smith had complimented the board on its work with FIF and the London

Symphony Orchestra.

Despite Tippen's hopeful belief that COX people were "good working partners," his

management team and lawyers did not share his feeling.  Tom Cobb, JON KANEY, GEORGIA

KANEY, and DAVID KENDALL believed at all relevant times that COX was motivated solely by

its desire to acquire the majority shares and further believed that COX's words and actions with

respect to NJC were governed not by a sincere interest in the well-being of the independent

newspaper but by their desire to gain the majority shares.

Discovery has proved this distrust well-founded.  At all times, COX has only played at being

a "good working partner."  In the early years, COX played the role of "worthy successor" to the

Davidson family.  Its representatives presented themselves as sympathetic with the Davidson

family's values as community and service-oriented stewards of the ownership of the newspaper.

They encouraged the Davidson family to believe that COX would carry on in the same tradition if

they acquired the majority shares.  In April, 1987, after adjournment of the annual meeting, COX

verbally offered to purchase the majority shares for approximately $70 million.  TIPPEN declined

but assured COX representatives that COX would be the family's first choice if the time for selling

should come.  During this period COX continued to relate to the Davidsons in a role that one COX

executive later characterized as "Mr. Nice Guy."

That pose changed in 1993.  On January 21, TIPPEN made a speech to the Halifax Historical

Society regarding the history and future of his family's control of NJC. The next day's edition of *The

News-Journal*, reported that TIPPEN had said that the family's control of the newspaper would

"continue . . . well into the 21ˢᵗ Century." It quoted TIPPEN saying, "The next generation is already serving its apprenticeship and will, I assure you, be ready when the time comes." He said that MARC would "eventually assume the helm."

David Easterly, who was then president of Cox Newspapers, Inc., and one of COX's representatives to NJC, read a clipping of this story on January 31, 1993. In his words, the story sent him into "a fit of anger." Under a handwritten note, he conveyed a draft of a letter to Jim Kennedy, the grandson of James Middleton Cox, who was then, and is now, the CEO of COX. In the draft letter addressed to TIPPEN, Easterly wrote, in part, "Certainly it has been obvious to you that we have continued to hold our minority position with the hope that you and your family would choose to take cash from the business at some point by selling your shares to Cox." Easterly's draft continued that TIPPEN's speech had dashed that hope and "[b]y this letter, I am informing you COX will now begin the process of locating interested buyers of our shares in the company." Only if the majority increased the dividend might COX refrain from auctioning its shares, the draft concluded. In the covering note to Kennedy, Easterly said, "I don't propose sending [the letter] as is. However, I do suggest this approach to Tip Davidson. No more Mr. Nice Guy!" (emphasis in original). "We don't want to be a long term Partner with his silly and smartass son Marc."

Kennedy noted this reply on Easterly's message. "I agree with this! Perhaps we should talk to his lawyer before we piss him off!" (emphasis in original).

In March 1993, Richard Braunstein, a partner in Dow, Lohnes, and Albert and a lawyer for COX, telephoned Tom Cobb to request a conference. NJC records show that Braunstein said his purpose was to discuss the fact that Jim Kennedy was "unhappy" with the relationship. The meeting took place in Mr.Cobb's office on March 23. Braunstein said COX was not happy with the return

on its investment.  He paid lip service to the goals of the Davidson family and suggested that the family cede operating control of the newspaper to COX while retaining editorial control and the ability to continue their community service.  He warned that COX otherwise might sell its shares to a hostile "corporate raider," naming the Bass Brothers of Texas as an example.  The Bass Brothers were then well-known in the newspaper business because they had acquired minority shares in Times Publishing Company, publisher of the *St. Petersburg Times*, filed a shareholder suit, and settled for an amount that was known as "greenmail" in business jargon popular at the time.

After consulting with TIPPEN and NJC management, Mr. Cobb wrote to Braunstein on March 26.  He devoted considerable attention to distinguishing the goals and philosophy of the majority and minority shareholders. Mr. Cobb told Braunstein that COX and the Davidson Family simply had "a fundamental difference in strategic thinking."  Whereas Cox was focused on short term profitability and evaluated its investments in this newspaper against its numerous other newspapers and other properties, Mr. Cobb said, the majority took a longer view and was constrained to consider only the interests of the shareholders of NJC as a class.  He explained that the majority shareholder believed COX was motivated by its separate interest as a shareholder concerned not by the long term interest of the shareholders of NJC as a class but by its separate interest as a communications conglomerate desiring to maximize earnings extracted from NJC for investment elsewhere.  Accordingly, Mr. Cobb said, the majority declined the request to cede operating control to COX because that would be tantamount to electing a board of directors whose goals conflicted with those of the majority shareholder.

On April 13, 1993, the parties gathered for the annual meeting regarding the fiscal year 1992.  For the first time, Jay Smith who was a vice-president of Cox Newspapers, Inc. attended with

Easterly and Bryan Cooper, a financial officer at COX.  Easterly then unveiled the "<u>No More Mr. Nice Guy</u>!" strategy by launching into an extended criticism of the operating results of NJC over the years.  He concluded by saying that COX wanted to "unbundle" the relationship and would be looking to sell its shares to someone like the Bass Brothers or Tribune Company, publisher of the NJC 's competitor, *The Orlando Sentinel*. Easterly did not attend another meeting of NJC, and Jay Smith has attended all subsequent meetings.

At the time, the Board considered COX's report that it was considering a sale to Tribune as a feint designed to frighten the Davidson family.

COX continued to feign its interest in selling out to a competitor or raider in 1994. Richard Braunstein telephoned JON KANEY to say that COX was discussing a sale of its shares to the Tribune Company.  He requested that the majority open the plant to Tribune officials for a due diligence inspection of the facilities.  JON told Braunstein, in a telephone call on August 2, 1994, that TIPPEN declined to open the company to inspection by its competitor.  JON also said to Braunstein that in light of the intense competition with the *Sentinel*, he believed that such disclosure to a competitor was not consistent with management's duty of loyalty to the shareholders as a class. He also said that the COX representatives who attended the annual directors meeting and received the same information they had received before they resigned as directors were "de facto" directors standing in a confidential relationship to the corporation and charged with the same duty of loyalty as directors.

Nothing further was heard of the sale to *Tribune*. Nor did NJC receive any further notice that a buyer was interested in acquiring COX's NJC shares.  COX officers have testified that COX never has received an offer to purchase its NJC shares.

In his deposition, Jay Smith indirectly referred to the "<u>No More Mr. Nice Guy</u>!" approach when he reiterated that he had been instructed to be professional and polite at annual meetings but to press the majority with hard questions. When asked if he required such admonition to be polite, Smith said he did not. Nevertheless, Smith has been called the "Paper Tiger" and touts himself as a tough fighter.

The records of the annual meetings following 1993 show that Smith constantly harped on the operating profits and the dividend level. From year to year, he made radically inconsistent claims, warning ominously at one point that the *Sentinel* would swallow NJC whole if it entered competition and at other times disdaining the expense of competing with the *Sentinel* in West Volusia on the inconsistent ground that the *Sentinel* was not interested in that market or that competing was an impossible task. He counseled retreat from West Volusia and explained that in Palm Beach County, his *Palm Beach Post* had abandoned Boca Raton to the Tribunes' *Sun-Sentinel* and retreated to the core circulation area.

The Board generally discounted Smith's counsel as unwise and offered in bad faith for the purpose of furthering his game of acquiring the majority shares by unsettling the Davidson family's confidence in NJC's sustainability. In reports to his superiors on the annual meetings, Smith revealed this was exactly his purpose. In one report, he boasted he had ventured a "gambit" to discomfit the majority with a veiled threat that WFTV would come into the market and compete with NJC for automotive advertising revenue. He expressed disappointment that no one "blinked."

Obviously, Smith was not aware that his "gambits" were transparent to the board. Indeed, during annual meetings (and in his deposition testimony) Smith protested that his "suggestions" had fallen on deaf ears, even though his suggestions were vague (*e.g.*, "make more profit") and insincere

(*e.g.*, the "gambit").

But the Board did not turn a deaf ear to Smith in these meetings. Members paid careful
attention to what he said, but generally regarded it as subversive. As his internal memoranda show,
Smith was engaged in a campaign to unseat the majority through whatever means he felt appropriate
from time to time. Sometimes he ventured "gambits" to frighten TIPPEN, MARC, JULIA, and BOB
and at other times, he sought to convince the family (and especially MARC, JULIA, and BOB) that
the company was destined for financial ruin unless the family sold out to COX.

Sometimes, he gave advice that the Board regarded as downright foolhardy. At the top of
this list, members place Smith's counsel that NJC abandon West Volusia to the *Sentinel*.

While not turning a deaf ear, Board members never confronted or debated Smith when he
made his "suggestions." He was allowed to have his "say" in both the shareholders' meeting and
in the directors' meeting. Members did not argue with him because they believed that to do so
would have stirred him to anger and would not have served any useful purpose in the interest of the
corporation.

In his post-meeting reports, Smith showed further bad faith. Though he posed as a "friend"
of the Davidson family in these discussions, he wrote the most vicious slurs against them in his
memoranda.

Even as Smith continued his "gambits" in the annual meetings, COX ventured another effort
to play the role of "Mr. Nice Guy." In early 1999, Richard Braunstein wrote a lengthy letter to JON
KANEY and sent a copy directly to TIPPEN. In this letter, he offered unsolicited legal advice to the
Davidson family regarding estate planning. He proposed a plan for the family to save substantial
estate and income taxes upon a transfer of control to COX. The plan called for the Davidson family

members to transfer their remainder interests in a certain trust holding NJC control stock to a limited partnership. The partnership would sell part of this expectancy to COX, and "upon the demise of Mr. Davidson, Cox by virtue of its remainder interest purchase would receive approximately 55% of [NJC] stock held by [the trust]." This would give COX control, and Braunstein further proposed that the family have the right to put the remaining interest to COX on agreed terms.

At the outset of this plan, and before "the demise of Mr. Davidson," Braunstein said the shareholders would enter into the now-familiar "operating agreement" under which COX would "assume the principal responsibility for the business operations of the Daytona newspaper and the Davidson family would assume the principal responsibility for the editorial policy and other non-business aspects of the paper. . . . Accordingly, the Davidson family would continue to be the publisher of the Daytona paper and continue their direction and supervision of the newsroom and editorial pages. Further, budgets would be agreed upon so that (i) the Daytona paper would continue to be a quality publication, and (ii) the level of community support will not be diminished." (emphasis added).

### *The Dividend Policy*

Before 1995, the Board had no defined policy regarding dividends. After losses incurred in an ill-fated commercial printing venture had curtailed dividends, the Board paid extraordinary dividends in the years immediately before 1995. In that year, the Board resolved to correlate the dividend to the earnings of the corporation. Also this decision came into effect in the annual meeting in 1993, coinciding with the No More Mr. Nice Guy! challenge by COX, it was not adopted in response to Braunstein's conference with Mr. Cobb. Board members had been discussing correlating dividends to earnings for several years. In 1995, the board formalized its dividend policy by

adopting a resolution stating its intent to pay a dividend in a range of 40% to 50% of earnings each year. The Dividend History shows that the board followed this policy until 2003, when it raised the dividend was 60% of earnings, a result of maintaining the dividend level in a year with lower earnings.

### *The NJC "Business Strategy"*

Long before the outbreak of the <u>No More Mr. Nice Guy</u>! approach by COX, the Board of NJC had been aware of the sharp difference between the majority and minority in philosophy and strategy regarding the business.  The family's legal counsel, Mr. Cobb and JON KANEY, advised the Board that these differences were questions of business judgment and the Board was authorized to manage the newspaper according to the Davidson family's preferred strategy so long as the Board continued to make a profit adequate to sustain the business and carry out its goal of long term preservation of *The Daytona Beach News-Journal*, as an independent newspaper embedded in the community, provided that it paid out a fair dividend and disclosed to COX  both its philosophy and strategy and the results of operations.

In March of 1993, when Mr. Cobb communicated the majority's rejection of Richard Braunstein's proposal that the Davidson family cede operational control to COX, he took pain to explain the family's philosophy and business strategy as follows:

> In accord with the will of its majority shareholder, this management believes it must manage this property consistently with its long range best interest as a stand-alone property in a market that is growing away from the historic center of circulation and is characterized by downscale demographics. The short term quest for profits must be tempered by due regard for management practices that protect the quality of the product, control over the market, the goodwill of the corporation in its community, the morale of the work-force (one of the largest in this market), the integrity of its news and editorial voice,

and the ability to mount the strongest possible response to competitive threats whenever and wherever they arise. The long term best interest of the shareholders is thus best served because this strategy protects the value of the property and its ability to continue generating profits year after year, as the long-standing history of this property through generations of dramatic change in this marketplace will attest.

When GEORGIA KANEY began writing the annual report of the General Manager in the mid-eighties, she took care to set forth full details of the operations and to explain the Board's business strategy by pointing out various ways in which it had been implemented during the year. After the Braunstein meeting with Mr. Cobb in March of 1993, and consistent with the careful explication of the Board's business strategy in his follow-up letter, GEORGIA KANEY took the trouble to formulate a "mission statement" expressing this strategy, which she included in the introductory section of the report in 1993 concerning the fiscal year of 1992. Since then, she has reiterated that statement in each successive annual report. The statement is as follows:

In 1992, as in previous years, we pursued our goal to operate a newspaper publishing company which sustains profitability over the long term by protecting our market, growing our circulation, improving the quality and strength of our product, and building corporate goodwill by nurturing the cultural spirit and economic body of our market.

COX has never objected to this statement. In fact, Jay Smith often endorsed this statement and said COX had the same philosophy and differed only in a strategic sense. Because the Board believed (and continues to believe) that these professions of "common cause" were part of the game COX was playing, the Board has not taken these statements at face value. Moreover, the Board does not believe that the difference between COX and the Board is, or could be, merely strategic. Members believe there is a core difference between the goal of COX, the owner of a communications

conglomerate, which would be to extract earnings by cutting the newspaper expenses in the interest of other investments as opposed to the goal of the Davidson family, which is to sustain the newspaper as an independent embedded in the community.

After COX filed this suit and alleged that the board had not managed NJC according to the "industry standards," the board wrote up a summary of its business strategy.  (Tr. Ex. 32).  The purpose of reducing this strategy to writing was to enable the Board to seek expert opinions that the Business Strategy is reasonable and within the Board's business judgment.  Stacey Cowles and John Mennenga will testify that the Business Strategy is reasonable and appropriate for this property. COX will adduce the testimony of Frank Daniels, who will say that the board has expended too much of the corporate funds on its cultural promotions, and Barbara Cohen will express some certain disagreements with the Board's judgment.  Neither of these witnesses, nor any other witness, will testify that the Business Strategy is outside the boundaries of the Board's business judgment.  Both of COX's experts focused their criticism on the promotional expenditures of the corporation, which addresses the Cultural Promotions.  This segment of NJC expenses is not a material factor in accounting for the difference between the historic profit margins of NJC and the margins that COX insists the company should make.

Throughout the time that COX has held the minority share, the board has successfully implemented this strategy.  From a average daily circulation of 35,937 in 1969, the paper has grown to an average daily circulation of 107,449 in 2004.  It has increased its revenues from $4.8 million in 1969 to $80.3 million in 2003.  Over these years, it has paid COX a total of $21 million in common and preferred dividends plus $475,000 in redemption of preferred stock held by COX.  This return should be compared to COX's putative investment of $5 million in 1969.

*Equity and Expectations*

The Davidson family served NJC as managers through three generations and sustained it through the loss years of the depression, competition with Gore, and the war by the use of Julius' fortune. At all times in this history, the family has labored with the expectation that NJC would continue as an independent newspaper serving the community values of the Davidson family, and providing the family with employment and income.

On the other side, COX acquired the minority shares only for the purpose of positioning itself to acquire the majority shares, change the business strategy, and absorb NJC into its chain of newspaper holdings. COX did not perform due diligence nor even interview the Davidson family members before it acquired the shares, and its hope to acquire the majority has never been a reasonable expectation. Moreover, COX never has contributed capital or services in this corporation. It is true that COX has included NJC in its bulk purchases of newsprint and that COX makes wildly exaggerated claims as to the benefit this conferred on NJC. Still, it has charged NJC a fee for its purchasing services, has itself benefitted from the added buying power by combining NJC volume with its own, and has suffered no detriment of its own from this practice. Moreover, NJC's studies of the market and other bulk purchasing alternatives have shown that it could get the same price considerations from other sources. In fact, NJC recently has negotiated a purchasing agreement with another newspaper group that provides even greater savings than the arrangement with COX.

*Cultural Promotions, Disclosure, and Acquiescence*

From the earliest days of the Davidson family's control of NJC, the family has caused the

corporation to pursue a strategy of promoting the cultural environment in its market. The family believes that NJC Cultural Promotions serve the interest of the corporation by improving the competitive environment, building the community, and building goodwill for the corporation. NJC has directed its Cultural Promotions toward the commercial goal of advertising and promoting the newspaper.

This practice began soon after Julius and HMD arrived in Daytona Beach. Julius surveyed the community and identified the performing arts as the one great need in the community that no one was addressing. Other businesses promoted tourism, racing, and sports, but no one then promoted the performing arts. Julius was interested in the arts and therefore especially aware of this void in the community. As publisher, Julius led the newspaper into this field with gusto. NJC helped to build the amateur Daytona Playhouse, which could not have been built without Julius and the newspaper's support. Julius persuaded the City to sponsor local performances of the Florida symphony and founded the symphony society.

TIPPEN was raised within this family tradition and it developed that he possessed great musical talent and deep interest in the classics and musical theater. As general manager, publisher, and CEO of the newspaper in his turn, TIPPEN has continued the newspaper's tradition of cultural promotion.

In the 1960's Tippen led the newspaper to provide strong financial support for a program that brought the London Symphony Orchestra to Daytona Beach for a series of concerts in the summer. This has proven to be an enormous success. After surviving on heavy subsidies from NJC in its early years, the LSO concerts have now spawned a two-week cultural festival known as the Florida International Festival which takes place every two years. LSO has designated Daytona Beach as its

official summer home, and a few years ago, the late Governor Lawton Chiles called FIF the most significant cultural event in Florida. Today, FIF has a biennial budget in excess of $2 million, but due to community "buy-in," NJC support has now diminished to less than one percent of that amount. The Board characterizes the community's adoption of FIF as a "spin-off" to the community. Despite its diminished support for FIF, NJC continues to enjoy substantial goodwill as the corporation that made it possible.

In 1974, TIPPEN founded CFCE. This is a foundation whose purpose is to promote cultural events of all sorts in the community. The FIF operates as an unincorporated division of CFCE under the control of an independent board of directors. Apart from its support of FIF, CFCE produces a wide variety of entertainment events in the newspaper market. TIPPEN manages these activities of CFCE, which is housed in NJC facilities and supported by NJC staff. TIPPEN will testify that CFCE operates as a division of NJC, and is organized as a tax exempt organization to facilitate its eligibility for grants and other sources of support. No member of the Davidson family performs in CFCE productions.

In 1977, TIPPEN founded a professional musical theater company originally named Summer Music Theater. His purpose in founding this company was to create entertainment opportunities for the community in a season that lacked other such entertainment. His motive in founding the theater was service to the community. He invested personal funds and his considerable talent as a musician and impressario in the venture, and he caused NJC to support the theater as well. NJC support has been provided in furtherance of its Cultural Promotions strategy. In time JULIA performed in the theater and MARC sometimes played roles in its performances.

Before 1994, NJC treated its expenditures for Cultural Promotions as charitable

contributions. These contributions were reported as such on the financial reports and tax returns. Because of the limitations on the corporate income tax deduction for charitable contributions, the size of NJC cultural support created a substantial excess of charitable contributions over the allowable deduction. In 1993, on advice of JON KANEY, NJC took the position for tax and financial purposes that these expenditures were not merely charitable contributions but actually business expenses for corporate promotion, which are deductible without limit, and the parties entered into a sponsorship agreement. In years beginning with 1992, the cultural promotions were claimed on financial statements and tax returns as promotional expenses allowable as a charge to income for financial accounting purposes and as a deduction for Federal income tax purposes. The Internal Revenue Service approved this deduction after a comprehensive audit of NJC for the 1994 year including a review of the cultural promotions and sponsorship agreement. During the years since 1993, both Arthur Anderson and KPMG, as successive independent auditors have approved this same treatment for financial purposes.

In return for its expenditures to SMT, FIF, and CFCE, NJC receives promotional credit that translates into measurable "exposures" and other advertising benefits. However, the Board's purpose and objectives in these promotional endeavors is broader than merely gaining the measurable exposures. These promotions are the key components of the company's stated mission of "building corporate goodwill by nurturing the cultural spirit and economic body of our market."

The conviction that promoting the performing arts is a way of "investing in the market" has been the judgment of four generations of the Davidson family (and its nonfamily managers). It is also the measured opinion of scholars in the field. In the vocabulary of one such scholar, NJC cultural endeavors serve "to improve the competitive context–the quality of the business

environment in the location or locations where [the corporation] operates." *See* Michael E. Porter and Mark R. Kramer, "The Competitive Advantage of Corporate Philanthropy," Harvard Business Review (2002). Porter and Kramer say that "using philanthropy to enhance context brings social and economic goals into alignment and improves a company's long-term business prospects. [A]ddressing context enables a company not only to give money but also to leverage its capabilities and relationships in support of charitable causes." *Id.* at 5. When the Davidson family decided many years ago to devote corporate resources to the performing arts, they were enacting that same strategy that Michael Porter today calls "improving the competitive context."

Hank Fishkind, a noted economist, will testify that NJC's investment in the cultural improvement of the community improves the competitive context and provides ascertainable benefits to the newspaper as a business. He will explain to the Court how he has quantified the economic benefit to the newspaper.

In the business judgment of the NJC Board, its Cultural Promotions improve the competitive context in ways that defy the algorithms of the naming rights appraisals. The value measured by these appraisals certainly is part of the benefit, but it is not the only dimension of value. This activity improves the cultural environment of the community and counters the dreary external image of this community, as well as the low self-image of its residents. It enhances the ability of businesses in this market to recruit employees. It stimulates economic activity in the market, which redounds to the benefit of the newspaper. It fosters a sense of goodwill toward the newspaper, which increases the community's respect for the medium and softens its sometimes harsh editorial coverage and criticism. Porter says, as Tippen also often says, that the purpose of such philanthropy is not merely to enhance corporate reputation but to build social value, improve the market, and do so in such a

way that enhanced reputation is a by-product.

All expenditures by the newspaper are credited to the newspaper in every public forum. No member of the Davidson family or other defendant has derived any financial or other tangible benefit from any such expenditures. Family members who lend their talents in these efforts do so as volunteers. The considerable personal honors bestowed on TIPPEN derive not from the money the newspaper gives but from his talent and effort as a volunteer and from his leadership of the newspaper's cultural endeavors. Moreover, the Board is of the considered opinion that any goodwill or recognition bestowed on TIPPEN reflects favorably on NJC and inures to its benefit. In this market, the identity of the Davidson family and the newspaper are closely interwoven.

An example of this equivalent identity occurred in 2005 at the "Pops Concert" of the London Symphony Orchestra during the FIF. More than 7,200 filled the Ocean Center to capacity to hear the LSO play selections from musical scores, most of which the LSO had performed in the movies. In the introductions of sponsors, the crowd rose to its feet in a standing ovation as Tippen was introduced individually. A few seconds later, the announcer gave credit to NJC for its sponsorship, and the crowd again rose in a rousing standing ovation.

### History of NJC Relations With SMT

As the artistic quality of SMT improved and its artistic successes grew, NJC found it necessary to increase its support for this project. As this support increased, members of the Board became concerned with the financial and tax treatment of this support, as well as with the expense management of SMT. In March of 1993, an informal committee of the board consisting of GEORGIA KANEY, DAVID KENDALL, and JON KANEY met in JON's office to discuss these

concerns.  The committee concluded that NJC support for SMT was in the best interest of the corporation and served the valid business purpose of improving the market, promoting the newspaper, and building goodwill.  It further concluded that the relationship between SMT and NJC should be documented by a contract.  Subsequently, JON supervised the drafting of a contract, and the parties signed a "sponsorship agreement."  (Tr. Ex. 143).

The committee in 1993 further decided that NJC's ultimate goal with regard to its support of SMT was to endow SMT to the community as a self-supporting cultural institution.  The committee agreed that continued support from NJC was necessary while the theater worked toward that goal.  It adopted the short-hand phrase "spin-off" to describe the strategy of nurturing SMT until it could attract support from patrons and donors in the community.  Herein, this is referred to as the "spin-off strategy."

In adopting the "spin-off strategy," the committee had in mind and discussed a specific and successful precedent –the project under which the London Symphony Orchestra was recruited to perform a series of biennial concerts in connection with a wide-ranging musical festival–the FIF. From a beginning in which NJC was quite nearly its sole source of support, FIF has grown into a large and broadly supported cultural event.  It still bears the imprimatur of NJC's initial nurturing, but for many years in the immediate past, NJC actually has received more credit than its current contributions alone would merit. The NJC Board regarded the early start-up expenses of FIF as an investment that continues to yield rich promotional and goodwill returns.  Thus, the committee and subsequently all Board members adopted the metaphor of a "spin-off." The goal was to spin off SMT to the community in the same way that NJC had spun off FIF for the purpose of achieving the same continuing promotional and goodwill benefits that FIF yields.

At the time that JULIA returned to the community in 1996, the Board was concerned with the progress of SMT along the spin-off trajectory and concerned that SMT's expenses were not well managed. Over the course of several weeks and through various informal meetings and consultations among directors, the Board reached four basic conclusions.

First, it considered but rejected terminating NJC support, which would effectively shut down the theater. The board did not believe this was in the best interest of the corporation. By 1996, SMT had become a grand artistic success in which NJC had made a significant investment and from which NJC had reaped large measures of goodwill. That investment consisted not only of the monies spent on its support but also the very goodwill that this patronage begat. The Board was not willing to "write off" either its pecuniary or the intangible investment in SMT. It continued to believe that greater success and the greater interest of the company lay in staying with SMT as the Board worked toward the spin-off goal.

Second, the Board further resolved that NJC required better management of the expenses of SMT. Through experience, the Board had learned that such management must come from a person with artistic background because of the necessity to gain "buy-in" from the working artists. The return of JULIA DAVIDSON TRUILO to the community afforded an opportunity. GEORGIA KANEY was first to see this opportunity, and she requested that JULIA postpone her journalism career, take a position in community promotions, and devote volunteer time to looking after the company's interest in managing SMT finances while keeping the spin-off strategy viable. JULIA was tasked to assist in the company's project to manage SMT expenses well, improve its product, and hasten the time of the spin-off. JULIA has rewarded this decision with substantial improvement in financial control and discipline of SMT.

Third, the Board determined that continued pursuit of the spin-off strategy required greater investment in the near term. Its goal of sparking the creation of a performing arts center to house SMT required that it keep the theater company growing and prospering while the community leaders pursued the creation of the Center. Accordingly, the Board agreed to boost NJC support as necessary to add another production to SMT's summer season.

Finally, the Board agreed that the most important step that could be taken toward the spin off goal would be creating a proper venue for SMT. The dream of creating such a venue had long been discussed among business, civic, and political leaders. At this time, the Board concluded that it was time to act on the vision. Thus it resolved to get serious about this dream, and from that germ ultimately grew News-Journal Center. Regardless of its name (a point not considered at that time) the Center would serve the NJC's spin-off strategy by broadening the audience and donor appeal of SMT. The Board regarded such a new venue as an essential step in the SMT spin-off strategy.

The Board had no doubt that SMT was a unique, high-quality arts organization of the sort hardly ever found in a community of our size. Yet SMT had no proper venue. It performed in an auditorium on the campus of Daytona Beach Community College which lacked the capacity for properly staging performances, was hidden deep within the campus and lacked amenities for theater-goers, and SMT studies showed, was mistaken by many as an amateur student production. The Board regarded the creation of such a Center as the ultimate victory for NJC's promotional efforts with SMT. TIPPEN envisioned the Center as a community asset providing a venue for a wide array of performances, and the Board agreed that the corporate promotional interest required such a Center and not merely a new house for SMT alone.

The relationship between the Center and SMT would be symbiotic. SMT would provide an

anchor tenant and the Center would allow SMT to achieve needed visibility and accommodations. Thus the board encouraged TIPPEN to begin stirring to see if the community could support the creation of the Center and to deploy resources of NJC in organizing and pursuing that goal.

### LACI and the News-Journal Center

The project to create a performing arts center in Daytona Beach was initially adopted by the NJC board to further the interests of NJC in carrying out its longstanding goal of spinning off SMT as a self-supporting institution. When LACI, the not-for-profit created to carry out this project, was first organized in 1996, its board consisted of TIPPEN, GEORGIA, JULIA , and MARC. Later, in recognition of the fact that the project required broad community support, the membership of the LACI board was expanded to include a broad assembly of business, civic, and political leaders of Volusia County. At that time, JON also joined the LACI board.

LACI was established as an implement of the NJC spin-off strategy, and the participation of NJC directors on the board of LACI was in service of the NJC interest. Other LACI board members understand and accept this role by NJC directors. Indeed, many members of this board consider themselves the representatives of their own businesses and community interests cooperating to create a betterment for the community. In effect, LACI is a coalition of persons and entities who seek to create the performing arts center in the service of various separate interests of the participants.

The project to create a performing arts center was not envisioned by the NJC board nor by its community backers solely as a theater for SMT performances but rather as a mid-sized venue that would serve a wide variety of community purposes. The project attracted support from the University of Central Florida which will house a unique graduate program in live theater in the

building and from numerous other supporters.  In the end, SMT became essential to the project as an "anchor" tenant along with UCF.

In light of the SMT Memo, in late 2000, the Board again reviewed NJC support for SMT with concern.  It concluded that despite JULIA's management, the decision to increase support of SMT pending completion of the Center had led to unwelcome inflation of NJC's promotional support.  Again, the Board considered whether NJC should abandon SMT, and again it rejected this as contrary to the business interests of NJC. By this time, the movement to create a performing arts center was well under way and many businesses, citizens, and government agencies had invested in the project.  Withdrawal of NJC support for SMT would not only write off NJC's investment in this promotional activity but would bring an end to the project to create the Center, which the Board judged to be a disastrous outcome that would cause great harm to the goodwill of NJC.  The Board continued to judge that NJC 's best interest was to stay the course and work  to get the Center erected.  Meanwhile, however, the board made two decisions.

First, it required SMT to elect a new board of directors.  Ultimately SMT elected Tom Kelly, retired county manager, Bill Gillespie, attorney and former state senator, and Linda Hargreaves, realtor and former theater professional who once managed SMT.

Second, it determined that NJC support to SMT should be reduced to $500,000 per annum in consideration of equivalent promotional credits.  The board unanimously agreed this goal would be achieved over a 5 year time period, with a reduction in support of at least $170,000 per year.  In the years following that decision, SMT has achieved its cost reductions through a variety of measures that did no apparent harm to the artistic quality of its productions.  Included in this decision was the board's resolve to exert stronger control over the budgetary process.

During the summer of 2003, key LACI directors expressed concern that SMT was dependent on NJC for support and asked TIPPEN to explain how donors and leaders of the project could be assured SMT would perform its lease if NJC support waned.  TIPPEN responded by setting up a foundation called The Fiddler Foundation and agreeing to vest that foundation with a substantial endowment of Davidson family monies which would be dedicated to the underwriting of SMT.  This endowment is consistent with TIPPEN's estate plan which provides generously for support of such artistic endeavors.  When SMT's need for such support diminishes according to the spin-off strategy, the endowment may be expended for other similar purposes.

### *The Naming Rights Agreement*

When the events of the Fall of 2003 raised the prospect of extensive delay in the creation of the Center, members of the Board met to discuss the prospects.  Because management had built its long-range strategy of promotion through the arts upon the premise that the Center would be erected, the Board recognized that NJC's interest and its spin-off strategy for SMT were in jeopardy.  During the informal meeting, JON proposed that the board consider either having the newspaper acquire the naming rights or suggesting that LACI sell these rights to another bidder.

In this preliminary discussion, the NJC board quickly concluded that the naming rights would be especially valuable to NJC.  It concluded that NJC could carry a $500,000 charge to earnings from amortization of prepaid naming rights, provided that an equivalent reduction in support of SMT coincided.  Davidson family members agreed to accelerate PMV's support of SMT to achieve the goal of reducing NJC support for SMT to not more than $500,000 (which had been established in 2000), thereby giving the board of NJC assurance that a charge to earnings for amortization of the naming rights would have no negative effect on profits, dividend payment capacity, or future cash

flow.

Following that meeting JON and DAVID KENDALL studied the question of whether the value of the Naming Rights Agreement would be sufficient to support an advance payment for the naming rights in an amount sufficient to assure completion of the project.  In his letter of August 28, 2003, JON advised TIPPEN that he believed the value was there.  In this letter, JON stressed what he called the "tangible and intangible" benefits of the arrangement. In his usage, tangible benefits were those commercial advertising benefits that were susceptible of measurement by professional appraisers of such contracts.  Intangible benefits were those benefits that also were provided but were not measurable by such appraisers and had to be determined by the board as a matter of business judgment.

Subsequently, KENDALL conferred with KPMG, the outside auditors and was advised that the value was reasonable and would be accounted for as a promotional charge amortizable at $500,000.

Laren Ukman will testify that her valuation of $7.2 million for the NRA is based on the strict assumption that the corporation's purpose was purely commercial in nature.  She will testify that if IEG had valued the News-Journal deal assuming the primary motivation was to generate goodwill and good community relations, the valuation would have been $9,961,715.  In fact that was the primary purpose of the NRA transaction and the purely commercial value was secondary.

Robert Duffy will testify that the present value of the tax "shield" afforded by the amortization of the Naming Rights Agreement is $3.2 million to account for the present value of future tax deductions arising from amortization of the naming rights agreement.

Hank Fishkind will testify that the outlay for the Naming Rights Agreement falls within the purview of expenditures that enhance the competitive environment, create a positive economic impact in the community, and add to the value of a local newspaper. Ukman will testify that her appraisal does not take into account such economic impact considerations.

In the business judgment of JON, as expressed in his letter, the value of the Naming Rights Agreement includes is at least $13 million. The addition of Ukman's goodwill-based value to Duffy's present value of tax benefits is approximately $13.2 million, and there remains the economic impact benefit beyond that.

In JON's analysis of the feasibility of the $13 million figure as a number adequate to "save" the project, JON also was concerned with the tax treatment to LACI of the receipt of this payment. In this case, NJC's interest in seeing that the Center would be constructed if it made the acquisition required that it be certain that the lump sum payment to LACI would not be treated as unrelated business taxable income to LACI but rather as exempt function income and that the payment would not eliminate LACI from treatment as a publicly supported charity. If NJC's $13 million payment to LACI gave rise to a corporate tax liability of roughly $5.2 million, the funding gap would only be half-closed and the board would not have achieved its goal. JON therefore requested a tax associate in this firm, Elan Holtzclaw, to analyze this issue in detail, and she prepared a memorandum verifying that the NRA Payment would not result in adverse tax treatment to LACI. Before NJC closed on the naming rights deal, both KPMG and the independent auditor of LACI had reviewed and approved this tax opinion.

### *Disclosure and Acquiescence*

As NJC's support for SMT increased in the mid-eighties, Mr. Cobb and JON  KANEY

advised the Board that the personal participation of TIPPEN, MARC, and JULIA raised the very

conflict of interest or improper personal benefit issue that has now been alleged in the Complaint.

Because COX representatives frequently assured the Davidson family that they shared the family's

community-based values, Mr. Cobb and JON believed that COX was aware of the family

participation in these activities and was acquiescing as part of the game it played.  Nevertheless, the

attorneys advised TIPPEN that NJC should disclose the family's participation in these activities and

forthrightly state the family's business justification for such Cultural Promotions and endeavor to

establish a record showing that COX acquiesced in the family's participation.

The attorneys did not advise TIPPEN that the Cultural Promotions were improper

expenditures.  Their legal opinion was that COX had ratified these actions by acquiescence and that

so long as this continued, any additional question was moot.  On the contrary, in every year of SMT's

existence, support for SMT by NJC has been approved by all non-family directors, including Mr.

Cobb, GEORGIA KANEY, DAVID KENDALL, and JON KANEY.

This advice to disclose both the family participation and the amounts of promotional

expenditures has been followed at all relevant times.  As early as 1989, for example, the annual

report stated:

> The newspaper has always emphasized programs that promote the
> arts and quality of life in the community. Thus it is an honor to the
> newspaper that Tippen Davidson received the Florida Theater
> Conference's lifetime achievement award for professional theater in
> 1989, which in part recognizes his work with Seaside Music Theater
> in our community.  Tippen is the fourth recipient of this award, after
> Burt Reynolds, Richard Fallon, and Michael Hall.

1989 GM Report dated April 12, 1990.

Pertinent excerpts from Annual Reports beginning with the annual report for 1986.  (Tr. Ex.

220).

All expenditures for promotions have been identified as line items on monthly "in-house" financial statements faithfully delivered to COX every month.  The report for each December shows the total of promotional expenditures for the year.  Throughout all these years, NJC has provided Cox with these monthly financial statements, audited annual statements, the annual reports of the General Manager, and answers to questions propounded on any issue of business management.  The financial details of cultural promotion have been reported in full on the financial reports as promotional expenditures, and the substantive content of the promotional activities has been described in full in the annual reports.  In the annual meetings, Cox has never objected to any such activities, never disputed the expressions of management's business judgment in respect to these activities, and only once (an occasion to be mentioned below) has even asked a question about the Cultural Promotions.

COX representatives raised questions and objections that concentrated on other aspects of the business, including circulation pricing, the amount devoted to the news operation, including newsroom staffing and the allocation of space in the newspaper between advertising and news, the costs of competing with the *Sentinel* in West Volusia, and various other business judgment issues. Before it filed the suit, however, COX had never voiced objection to the Davidson family or the Board concerning the participation of Davidson family members in the Cultural Entities.

The obvious purpose of the Cultural Promotions strategy is promotional.  Consequently, the activities of NJC in promoting the FIF, SMT, and the various performances promoted by CFCE have been prominently and publicly disclosed.  At no time has NJC or any director, officer, or employee

concealed any aspect of the Cultural Promotions, including the widely touted participation by the Davidson family.

With one exception that occurred when Jay Smith had become angry over the amount of the dividend, COX has voiced approval of the annual report and voted for re-election of the incumbent directors.

The decision to boost support of SMT reflected on NJC financial statements for 1995. In late April, 1996, Buddy Solomon, an accounting officer at Cox, telephoned David Kendall for an explanation. David Kendall explained the Board's strategy regarding cultural promotions in a letter of May 3, 1996:

> The best place to gain information about how the company spends its promotional funds would be the annual reports of the General Manager over the years. These describe in detail the company's cultural promotions strategy and activities. The expenditures in 1995 represent a continuation of this strategy.
>
> The increase from 1994 is due primarily to expenses associated with the company's support of expanded programming by Seaside Music Theater. The company agreed to support this as part of a strategy to get the theater in a position where it can attract broad-based community and foundation support. A similar strategy with regard to the Florida International Festival (FIF), which sponsors the London Symphony Orchestra, allowed this series to grow from a program underwritten largely by the company into a self-supporting cultural event that continues to yield substantial goodwill to the company.

Although, NJC has now discovered that this response gave rise to great consternation within COX management ranks, this consternation was never communicated to NJC. After DAVID KENDALL told Buddy Solomon that any further details on these expenditures would have to be requested by Jay Smith of TIPPEN, NJC heard nothing further on this question from COX.

Less than two years after COX failed to pursue its question concerning cultural promotions,

Braunstein submitted his estate plan for the Davidson family. In this proposal, he continued to present COX as supportive of the Davidson family's values. He assured TIPPEN that if COX assumed operational control of the newspaper, "community support would not be diminished."

After Cox abandoned this inquiry on cultural promotions in 1996, neither Solomon nor any other representative of COX responded in substance to KENDALL's 1996 letter, objected to the spin-off strategy therein set forth, or otherwise questioned the Board's judgment that Cultural Promotions carried on by the company with participation by TIPPEN and his family were consistent with the best interest of the company. In the 2000 Stockholders Meeting, in fact, Jay Smith complimented the board for its work with FIF, a comment from which TIPPEN took false comfort but which JON interpreted as hinting a shift in Cox's acquiescent posture.

In this 2000 meeting, Smith for the first time in his tenure on the board questioned the Cultural Promotions. As his internal communications now reveal, this was not the first time that Smith had expressed disapproval of the Cultural Promotions strategy. In his May 18, 1994 report to his managers, Smith said that he could, but did not, question the expenditure of "God-knows-how-much" on the LSO. In 1998, he sneered that TIPPEN was off to Washington to receive an award relating to his work with the LSO. In fact, the British Ambassador, on behalf of Queen Elizabeth, conferred the Order of the British Empire on Tippen in recognition of his work in creating the special relationship between Daytona Beach and the LSO. In 1996, when Kendall flatly told Buddy Solomon that the increase of $200,000 in cultural promotional expenses was primarily due to an increase in NJC support for SMT and explained the spin-off strategy, Smith fumed to his subordinates that he wanted a "dollar for dollar" accounting for the SMT expenditures, but he never asked TIPPEN for this accounting. Aside from the abandoned inquiry in 1996, then, neither Smith

nor any other COX representative had raised objection to the Cultural Promotions nor to the obvious and patently disclosed fact that TIPPEN and his children actively participated in some of these events.

Smith was obviously only pretending to support the Cultural Promotions of the Davidson family.  In the report for 1991, for example, GEORGIA said:

> Reviewing the [FIF] festivities in 1991, a Ft. Lauderdale Sun-Sentinel reporter reflected on the role of The News-Journal Publisher Tippen Davidson with this comment ". . . the only publisher in the United States who actually knows classical music, can introduce a concert with remarks about the repertoire and has the good taste to be associated with the LSO, Rostropovich, et. al. I find it simply amazing; I find him simply amazing."

In a subsequent report to his superiors on the annual meeting, he sarcastically referred to the "amazing Davidson."

Although his attorneys continued to express concern with the vulnerability of the Cultural Promotions strategy to attack by COX, they did not advise TIPPEN to cease this program.  In light of COX's obvious acquiescence in the Cultural Promotions, the attorneys could not say that the Cultural Promotions were inappropriate.  As his statement in ORANGE JOURNALISM showed, TIPPEN had been convinced that COX was a "good working partner" which shared his belief in the value of the Cultural Promotions.  Although the attorneys and nonfamily directors believed that COX's acquiescence was playful, stemming from its predominant interest in being regarded as the worthy successor, and not from sincere agreement with the corporate strategy, they nevertheless concluded that COX was acquiescent.

Thus, in 2000, when Jay Smith questioned the expenditure on promotion of the LSO, JON interpreted this as a signal that the acquiescence (whatever its motivation may have been) was about

to come to an end.  Because Jay had ended his comment by congratulating the board on the LSO program, TIPPEN interpreted his comment exactly the opposite.

In light of Smith's signal and what he believed was TIPPEN's misinterpretation of the signal, JON concluded that the Davidson family could no longer act on the basis that COX was ratifying by acquiescence the Cultural Promotions, including SMT.  He determined that it was necessary to advise the family of the potential consequences of defending this program in the absence of acquiescence.

Especially because TIPPEN firmly believed that his work with Cultural Promotions was proper and that it had the blessings of COX, JON took a harsh approach in a letter to TIPPEN (the "SMT memo").  He outlined the worst case scenario based on the assumption that an attack on the Cultural Promotions in the future could not be defended on the ground of acquiescence.

JON advised the family to reform the practice by taking three steps.  The family accepted this advice and in the discussion of implementing this approach, the family members agreed that the recommended curtailment of NJC support would be made up, as necessary, by PMV, i.e., with the Davidson family's separate funds.

Contrary to the bald assertions by COX in pretrial argument, nothing in the SMT memo advises the family to conceal NJC's support of SMT. It is noteworthy that when COX baldly asserts that the SMT memo counseled concealment, it never cites the Court to a passage in the letter that supports that claim.

# ARGUMENT

I.    **THE FAIR VALUE OF THE COX SHARES MUST BE DETERMINED ON THE PREMISE THAT NJC IS A GOING CONCERN THAT WILL CONTINUE DOING BUSINESS IN THE FUTURE SUBSTANTIALLY AS IT HAS IN THE RECENT PAST, I.E. ACCORDING TO THE BUSINESS STRATEGY**

    A.    **Following New York Law, Florida provides that the fair value of the minority shares is their proportionate share of the corporation valued as a going concern.**

Although neither the Florida statute nor case law defines Fair Value or provides criteria by which Fair Value may be measured, the objective of a Fair Value determination pursuant to Fla. Stat. §607.1436 has been articulated.  *G&G Fashion Design, Inc. v. Garcia*, 870 So. 2d 870, 871 (Fla. 3d DCA 2004).  That objective is "to determine what a willing purchaser in an arm's length transaction would offer **for petitioners' interest in the company as an operating business**." *G&G Fashion*, 870 So. 2d at 871 (quoting *Matter of Seagroatt Floral Co., Inc.*, 583 N.E. 2d 287, 290 (1991)) (emphasis added).  "In that the valuation proceeding avoids dissolution and allows the continuation of an operating business, the value to be ascertained is that of an interest in a going concern rather than a share of a business in the throes of liquidation." *Seagroatt* at 290.

Florida courts look to New York law for guidance in determining Fair Value.  *See Munshower v. Kolbenheyer,* 732 So. 2d 385, 386 (Fla. 3d DCA 1999); *G&G Fashion*, 870 So. 2d at 871.  In ruling on a discovery motion earlier in this case, Magistrate Judge Spalding acknowledged that "[b]ecause New York has an election statute similar to the Florida election statute that has been invoked in this case, Florida courts look to New York law in resolving issues under the Florida election statute. *See Munshower v. Kolbenheyer*, 732 So. 2d 385, 386 (Fla. 3d DCA 1999)." (Order Granting Cox's First Motion to Compel, p.8, fn1).

**B.    Discussion of the appraisal issue requires precision of usage and careful distinction between questions of law and questions of fact.**

In determining Fair Value, the courts are required to deal with the application of principles of law to principles of the appraisal profession. The Court is called upon to determine the **Fair Value** of the minority shares as their proportionate share of NJC valued as a **going concern**.    In both the legal and appraisal professions, the emphasized terms are freighted with artful meaning that is dispositive of key issues in this case, and the meaning of these terms, in turn, is expressed in terms that are themselves laden with artful meaning.  Neither profession has succeeded in creating a uniform vocabulary in this area, and so the work of appraisers as well as of the courts and commentators must be interpreted carefully, as identical concepts are identified by different terms from case to case and from commentary to commentary.  At this intersection (overlap) of the vocabularies of the legal and appraisal profession, therefore, it is necessary to begin by giving attention to the question of vocabulary and usage.

The problem of usage arises immediately. The issue of the Fair Value of the minority shares is a mixed question of law and fact, and precision in usage of terms is critical to the distinction between questions of law and questions of fact. So far in this case, COX and its appraiser hopelessly have confused the two, which is due in no small part to inconsistency in the use of key terms relevant to the appraisal.

In an effort to bring order to the discourse, the appraisal profession has devoted a great deal of attention to developing a consistent vocabulary to denominate well-accepted concepts–The International Glossary of Business Valuation Terms–2001.("Glossary").[7] ( Tr. Ex.596).  Though the

_____

[7]This glossary has been adopted by the American Institute of Certified Public Accountants, American Society of Appraisers ("ASA"), Canadian Institute of Charter Business

ASA does not require its members to use the Glossary, it does require them to specify any deviation in usage.

Certain terms that are critical to this discussion can be taken from the Glossary and are set forth in hierarchal order on the following page.

(The rest of this page is intentionally left blank).

---

Valuators, National Association of Certified Valuation Analysts, and The Institute of Business Appraisers. The Glossary is published at, *inter alia*: http://www.bvresources.com/defaulttextonly.asp?f=downloads  (Shannon Pratt's website); and http://www.bvappraisers.org/glossary/ (The website of the American Society of Appraisers).

| Term | International Glossary of Business Valuation Terms |
|---|---|
| **Standard (or Definition) of Value** | The identification of the type of value being used in a specific engagement, *e.g.* fair market value, Fair Value, investment value |
| **Premise of Value** | An assumption regarding the most likely set of transaction circumstances that may be applicable to the subject valuation; *e.g.*, going concern, liquidation |
| **Valuation Approach** | A general way of determining a value indication of a business ownership interest, security, or intangible asset using one or more valuation **methods.** |
| Asset Approach | A general way of determining a value indication of a business, business ownership interest, or security, using one or more **methods** based on the value of the assets net of liabilities |
| Income Approach | A general way of determining a value indication of a business, business ownership interest, security, or intangible assets using one or more **methods** that convert anticipated economic benefits into a present single amount |
| Market Approach | A general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more **methods** that compare the subject to similar businesses, business ownership interests, or intangible assets that have been sold. |
| **Valuation Method** | Within approaches, a specific way to determine value. |
| Discounted Cash Flow Method | A method within the **income approach** whereby the present value of future expected cash flows is calculated using a discount rate. |
| Guideline Public Company Method | A method within the **market approach** whereby market multiples are derived from market prices of stocks of comparable companies that are engaged in the same or similar lines of business, and that are actively traded on a free and open market. |
| Merger and Acquisition Method. | A method within the **market approach** whereby pricing multiples are derived from transactions of significant interests in companies engaged in the same or similar lines of business. |
| **Valuation Procedure** | The act, manner, and technique of performing the steps of an appraisal **method**. |

In the interest of clarity, this brief follows the Glossary and attempts to correlate the usage in Cox's arguments, the cases, and the literature to the Glossary.

**C.    The standard of value and the premise of value are questions of law and not of fact.**

COX has argued in pretrial proceedings that no legal standards control the determination of Fair Value.  In its opposition to NJC's Motion for Partial Summary Judgment, COX took the anarchical position that determination of Fair Value is not bounded by any controlling legal standard, that "this Court is free to accept or reject all or any part of any expert's valuation, methodology, reasoning or conclusions." OPMPSJ at 9.

This argument is entirely without merit because, as NJC stated at the outset, it is founded on confusion concerning the vocabulary of the law of appraisal. The question of Fair Value is a mixed question of law and fact. At the outset, settled law establishes determinate legal standards within which to frame the appraisal judgment.  Only within these standards does the law open the determination of value to the realm of fact-finding and expert judgment.

By referring to terms defined in the Glossary and placing them in hierarchical order from the general to the specific, the distinction between questions of law and questions of fact can be clarified and the confusion between questions of law and fact can be resolved:

| Hierarchy of Generalization |
| --- |
| Standard of Value |
| Premise of Value |
| Valuation Approach |
| Valuation Method |
| Valuation Procedure |

As one descends the hierarchy, one crosses the line between questions of law and questions of fact. The *standard of value* and the *premise of value* are intertwined questions of law that must

be determined prior to the application of approaches, methods, and procedures of value. As defined in the Glossary, the *standard of value* is "the identification of the type of value being used in a specific engagement, *e.g.* fair market value, Fair Value, investment value" and the *premise of value* is "an assumption regarding the most likely set of transaction circumstances that may be applicable to the subject valuation; *e.g.*, going concern, liquidation."

*Pace* COX, the standard and premise of value are intertwined questions of law. Determining the appropriate premise of value is the key step in defining the Fair Value standard. It is not possible for either an appraiser or a court rendering the ultimate judgment of value to select and compare various approaches, methods, and procedures without first knowing the controlling standard and the premise of value applicable to that standard. Nor is it appropriate or lawful for an appraiser, in the guise of exercising his "professional" judgment, to impose either a standard or premise of value in determining a business valuation. These are dictated by the law, a field of expertise in which the opinions of the appraiser are of no assistance to the Court. *See, e.g., City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F. 3d 548, 567, n. 27 (11th Cir. 1998) (economist's "opinions regarding the legal standards applicable to the case are outside of his competence as an economist (and are erroneous) and should be excluded").

To be sure, once the standard and premise of value have been determined, the remaining elements of the analysis are fact intensive and subject to expert judgments and opinions. When considering judicial opinions expressing the open texture of the appraisal judgment, however, it must be recalled that these opinions refer, by whatever terms, to those concepts defined in the Glossary as "approach," "method," and "procedure" and not to questions of "standard of value" and "premise of value." Thus when COX infers from case law that the "expert's valuation, methodology,

reasoning or conclusions" are disputable points of judgment, it has drawn this conclusion from judicial discussions within the framework of the legally dictated standard and premise of value. Owing to the differences in vocabulary between two professions, of course, the distinction between the legal questions of the standard and premise of value and the factual questions regarding the approach, method, and procedure is not always explicit in such terms. Nevertheless, the courts explicitly or implicitly proceed from the premise that the concepts denominated here as standard of value and premise of value are legal "givens."

Courts agree that the meaning of a particular valuation standard is a question of law. In the context of a dissenter's rights case, a Colorado court recently held that "the meaning of 'fair value' is a question of law, not an issue of fact to be opined on by appraisers and decided by the trial court" on a case by case basis. *Pueblo Bankcorporation v. Lindoe, Inc.*, 63 P.3d 353, 358 (Col. 2003). That court's recent determination is consistent with similar rulings in a variety of cases and jurisdictions.

In addressing the issue of the Tax Court's selection of a valuation methodology the Third Circuit Court of Appeal concluded that:

> In choosing one method of valuation the Tax Court set a legal standard, which is to be reviewed as such. [*citations omitted*]. The criteria to be employed in determining "value" necessarily must differ somewhat in respect to the kinds of property to be valued under the statute. A question of law is presented therefore as to the standard to be applied.

*Amerada Hess Corp. v. Commissioner of Internal Revenue*, 517 F.2d 75, 82 (3d Cir. 1975) (quoting *Powers v. C.I.R*, 312 U.S. 259, 260 (1941)).

Similarly, in an unreported opinion, a Federal District Court in Tennessee determined that:

> The valuation of stock, involves a mixed question of law and fact and
> it has been held that the bankruptcy court's selection and application
> of valuation methodology is primarily a legal matter, whereas the
> findings made under the selected valuation standard are factual.[8]

*Gilliam v. Southern Cooperative Development Fund Investment Cooperation*, 1994 WL

682659 *3 (W.D. Tenn 1994) (citing *National Rural Utilities Cooperative Finance Corp. v. Wabash*

*Valley Power Assn.*, 111 B. R. 752, 766 (S.D. Ind. 1990), citing, *In re: King Resources Co.*, 651 F.2d

1326, 1335 (10th Cir. 1980) and *Amerada Hess Corp.,* 517 F.2d at 82).

**D.     The Pro Rata Rule: As a matter of law, the Fair Value of the minority shares is
their pro rata share of the value of the corporation as a whole and not the value
of the shares standing alone as a minority block.**

The first rule of law defining Fair Value can be called the Pro Rata Rule. That rule requires

that  "in fixing fair value, courts should determine the minority shareholder's proportionate interest

in the going concern value of the corporation as a whole, that is, 'what a willing purchaser, in an

arm's length transaction, would offer for the corporation as an operating business.'" *Friedman v.*

*Beway Realty Corp.*, 87 N.Y. 2d 161, 168 (N.Y. 1995) (citing  *Matter of Pace Photographers*

*[Rosen]*, 71 N.Y.2d 737, 748 (N.Y. 1988) (quoting *Matter of Blake v. Blake Agency,* 486 N.Y.S. 2d

341, 347 (N.Y. App. Div. 1985)).

This standard protects the minority shareholder in a closed corporation from the hardship it

would incur if its separate interest in the corporation were valued at fair market value because there

is no "fair" market for such shares.  The Pro Rata Rule allows the minority shareholder to obtain the

value of its  proportionate interest in the going concern and not merely the separate fair market value

---

[8]Typical of the varied usage in this field, the Third Circuit and District Court here use
"method" as a synonym for "standard of value" and "premise of value" as these terms are defined
by the Glossary. This illustrates the need to interpret the language of the cases carefully to
determine their intended extensive meaning.

of its holding.

E.    **The Going Concern Rule: As a matter of law the Fair Value of the minority shares is their pro rata share of the value of the corporation determined on the premise of the going concern doing business as usual.**

Florida and New York courts require that the value of the corporation be determined on the premise of a going concern. The *G&G Fashion* court identified this premise of the valuation as ". . . what a willing purchaser in an arm's length transaction would offer for petitioners' interest in the company **as an operating business**." *G&G Fashion,* 870 So. 2d at 871 (quoting *Seagroatt*, 583 N.E. 2d at 290 (1991)) (emphasis added). These courts use the terms "operating business" and "going concern" interchangeably. *See Friedman* at 168, *Seagroatt* at 290. New York rejects the premise of "liquidation value." ". . . [T]he value of the corporation should be determined on the basis of what a willing purchaser, in an arm's length transaction, would offer for the corporation as an operating business, rather than as a business in the process of liquidation." *Blake* at 347.

F.    **The Going Concern Rule requires the court to value the going concern in accord with the operative reality of the extant corporation on the valuation date unaffected by the plans or strategies of an assumed acquirer.**

Despite its contention that Fair Value is an indeterminate non-legal concept, COX has no difficulty in accepting the Pro Rata Rule as a matter of law. It has failed, however, to perceive the Going Concern Rule as a concurrent rule of law defining Fair Value. It is here that the key issue is framed for the Court– whether the Going Concern Rule is a rule of law, and if so, what this rule entails for the determination of Fair Value of the COX shares.

COX is wrong to disregard the legal boundary set by the Going Concern Rule on the imagination of its appraiser. It is a rule of law, and it specifically requires that the minority shares be valued at their pro rata share of the value of NJC determined on the basis of the operative reality

of the corporation as it existed on the valuation date and without consideration of changes that could be made by an assumed acquirer.  This is what "going concern" means, and it is what NJC means by Going Concern Rule.

In the language of the law, the term "going concern" has a settled meaning:

> An enterprise which is being carried on as a whole, and with some particular object in view. The term refers to an existing solvent business, which is being conducted in the usual and ordinary way for which it was organized.  When applied to a corporation, it means that it continues to transact its ordinary business.

Black's Law Dictionary (Abridged 6th ed) (1991) at 475.[9]

New York courts, as well as courts in other states, consistently use the term by this plain meaning, but courts outside of Delaware rarely have had occasion to state this definition.[10]  In appraisal cases, the courts use the term as a plain meaning term, as stated in Black's Law Dictionary. No court in New York or Florida has found it necessary to specify the definition of this term in its frequent use in Fair Value cases.

Not surprisingly, though, the Delaware courts often have been required to specify the

---

[9]In the language of appraisers, the going concern premise may imply other sets of valuation assumptions.  *See Pratt* at 11, describing four alternative going concern premises of value. Nevertheless, the courts use the term "as a going concern" in stock appraisal cases only to signify what NJC has named the Going Concern Rule.  The legal meaning of the term is controlling here.

[10]For a rare example of an explicit definition of "going concern," *See M Life Insurance Co. v. Sapers & Wallack Insurance Agency, Inc*., 40 P.3d 6, 12 (Colo. App.2001) (quoting Black's Law Dictionary 691 (6th ed.1990)) (explaining that "[t]he term "going concern" refers to "an existing solvent business, which is being conducted in the usual and ordinary way for which it was organized." "Going concern value" means "[t]he value of a firm, assuming that the firm's organization and assets remain intact and are used to generate future income and cash flows").

meaning of "going concern" in Fair Value cases.  These cases have made clear what is, and what is <u>not</u>, included in the definition of a going concern.

Delaware law is pertinent.  Florida courts "look to the law of Delaware for guidance because '[t]he Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines.'" *Boettcher v. IMC Mortgage Company*, 871 So. 2d 1047, 1052, n. 5 (Fla. 2d DCA 2004) (explaining that "Delaware cases have equated Fair Value to 'the true or intrinsic value of the shareholders' proportionate interest in the company, valued on a going-concern rather than a liquidated basis').  Also, New York courts cite Delaware Fair Value cases as authoritative on the meaning of Fair Value.  *See, e.g.*, *Cawley v. SCM Corporation*, 530 N.E. 2d 1264, 1269 (N.Y. 1988) (*citing Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983) and *Tri-Continental Corp. v. Battye*, 74 A.2d 71 (Del.Ch. 1950) as authority on the meaning of Fair Value).

Because Delaware does not provide an election in dissolution cases, as does New York and Florida, the Delaware Fair Value cases consider Fair Value in the context of minority shareholders dissenting from corporate transactions.  Insofar as the meaning of Fair Value is concerned, there is no difference between the dissenting shareholder case and the election cases. *Friedman*, 87 N.Y. 2d at 168 (holding there is "no difference in stock fair value" under either statute).

Delaware's Going Concern Rule traces to the 1950 decision of the Court of Chancery in *Tri-Continental Corp.*  In this dissenters appraisal case, the Chancellor developed the doctrine that a shareholder's interest in a company is a pro rata share of the value of the shareholders' equity in the corporation as a going concern. "The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, *viz.*, his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate

enterprise is meant the true or intrinsic value of his stock which has been taken by the merger."[11] *Tri-Continental*, 74 A.2d at 72.

The *Tri-Continental* court referred to its decision in *Chicago Corp. v. Munds*, 172 A. 452, 455 (Del. Ch. 1934), which had observed that "[w]hen a stockholder buys stock it is to be supposed that he buys into a corporation as a going concern. He does not buy on the theory that he is about to participate in a contemplated liquidation of the corporation's assets. He buys an aliquot share of a business, and he probably takes into account, or should at least take into account, not alone its present asset condition and earning power but as well its future prospects as a continuing enterprise."

In *Bell v. Kirby Lumber Corp.*, 413 A.2d 137 (Del. 1980), a substantial disparity existed between the net asset value and the market value of a firm. Rejecting attempts to appraise the stock as it proportionate share of the net asset value on the ground the corporation was not liquidating, the court held that the corporation must be valued on a going concern basis continuing to do business in the ordinary way, relying on *Tri-Continental* for the proposition that the shareholder is to be compensated for her proportionate interest in a going concern. It rejected the petitioner's asset value because it "presupposes an acquisition value based upon the very fact that the company will not continue in business on the same basis that existed immediately prior to the merger. It introduces

---

[11]The Glossary defines "Intrinsic Value" as the "value that an investor considers, on the basis of an evaluation or available facts, to be the "true" or "real" value that will become the market value when other investors reach the same conclusion." That is not what the appraisal cases mean when they say "intrinsic value." In these cases, "intrinsic value" is synonymous with "Fair Value as a going concern." It is not used subjectively as in the Glossary. *See e.g.*, *In re Watt and Shand*, 304 A.2d 694, 697-98 (Pa. 1973) ("[T]he object of an appraisal proceeding is to determine the **value of the dissenter's shares on a going concern basis**. In determining what figure represents this **true or intrinsic value**, consideration must be given to all factors and elements which reasonably might enter into the fixing of value." (citations omitted, emphasis added). This different usage is among the several important differences in vocabulary between appraisers and courts.

another element, namely the value another would place upon it as a price for merger as opposed to

the corporation's independent value as a going concern." *Id.* at 142.

Consistent with *Mund, Tri-Continental*, and *Bell*, Delaware cases have defined the "going

concern" premise to refer to the going concern continuing to do business as it has in the recent past

and rejecting the acquisition value.  This was aptly expressed by the Chancellor whose opinion was

reviewed in *Cede & Co. v. Technicolor, Inc.*, 684 A. 2d 289, 295 (Del. 1995), when he stated:

> Delaware law traditionally and today accords to a dissenting
> shareholder "his proportionate interest in a going concern" and that
> going concern is the corporation in question, with its asset
> deployment, business plan and management unaffected by the plans
> or strategies of the acquirer.   When value is created by substituting
> new management or by redeploying assets "in connection with the
> accomplishment or expectation" of a merger, that value is not, in my
> opinion, a part of the "going concern" in which a dissenting
> shareholder has a legal (or equitable) right to participate.

 *Cede & Co.. v. Technicolor, Inc.*, 1990 WL 161084 at *21 (Del. Ch. 1990), reversed on

other grounds, *Cede & Co. v. Technicolor, Inc.*, 684 A. 2d 289, 295 (Del. 1995).

*Cede* concerned the rights of a shareholder who dissented from a two-step merger, i.e. a

merger that occurred only after the acquirer had first acquired controlling shares through a tender

offer.  Whereas the Chancellor had fixed the date of valuation as prior to the time the acquirer

acquired control, the Supreme Court held that the value of the going concern must be determined as

of the time the second-step cash-out merger was triggered.  Therefore, the new and more profitable

business plan of the acquirer should have been considered in defining the going concern.  Because

the first step had been taken and the acquirer had acquired control and taken steps to implement its

new plan, the acquirer's plan was the "operative reality" of the corporation at the valuation date. *Id.*

Citing *Bell* and numerous other cases (citation of which is omitted here), the Court explained:

> [T]he dissenter in an appraisal action is entitled to receive a proportionate share of Fair Value in the going concern on the date of the merger, rather than value that is determined on a liquidated basis. Thus, the company must first be valued as an operating entity. In that regard, one of the most important factors to consider is the "nature of the enterprise" that is the subject of the appraisal proceeding.
>
> In a two-step merger, to the extent that value has been added following a change in majority control before cash-out, it is still value attributable to the going concern, i.e., the extant "nature of enterprise," on the date of the merger. The dissenting shareholder's proportionate interest is determined only after the company has been valued as an operating entity on the date of the merger. Consequently, value added to the going concern by the "majority acquirer," during the transient period of a two-step merger, accrues to the benefit of all shareholders and must be included in the appraisal process on the date of the merger.

*Cede*, 684 A. 2d at 298-299.

The Supreme Court did not disapprove of the Chancellor's articulation of the going concern premise but only with the valuation date to which the Chancellor applied it. *See* Jesse A. Finklestein and Russell C. Silberglied, Technicolor IV: Appraisal Valuation in a Two-Step Merger, 52 Business Lawyer 801, 808 (1997) (noting that the Supreme Court did not reverse the Chancellor's "analysis that, in a one-step transaction, the acquirer's plans are irrelevant to the Fair Value of the company's stock . . . [T]hese plans are neither an "operative reality" of the company nor susceptible to proof").

Consistently, Delaware courts define the going concern value applicable in dissenting shareholder cases as the extant concern "with its asset deployment, business plan and management unaffected by the plans or strategies of the acquirer." *Cede* at 684 A. 2d at 295. *See, e.g.*, *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 ( Del. 1989) ("[T]he company must be first valued as an operating entity by application of traditional value factors, weighted as required, but without regard to post-merger events or other possible business combinations"); *Gonsalves v. Straight Arrow*

*Publishers, Inc.*, 701 A.2d 357, 362 (Del. 1997) ([A]ny sale of corporate control affords the buyer the opportunity to affect a variety of cost savings measures which may impact earnings. But. . .a petitioner in the appraisal process is entitled to a pro rata proportion of going business value of the corporation at the moment before the merger. That value does not include the capitalized value of possible changes which may be made by new management"); *The Union Illinois 1995 Investment Limited Partnership v. Union Financial Group, Ltd.*, 847 A.2d 340, 356 (Del. Ch. 2004) (explaining that "[t]he exclusion of synergy value . . . derives from the mandate that the subject company in an appraisal be valued as a going concern. Logically, if this mandate is to be faithfully followed, this court must endeavor to exclude from any appraisal award the amount of any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a stand-alone going concern, but as a part of a larger enterprise, from which synergistic gains can be extracted"); *In re Radiology Associates, Inc.*, 611 A.2d 485, 494 (Del. Ch. 1991) (holding "'the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred.' Plaintiff is not entitled to the proportionate sales value of Radiology. Plaintiff is entitled to the proportionate value of Radiology as a *continuing shareholder*. The discounted cash flow analysis, as employed in this case, fully reflects this value without need for an adjustment." (quoting *Cavalier Oil Corp.*, 564 A.2d at 1145)).[12]

---

[12]In comments to Section 7.22 of the ALI Principles of Corporate Governance ("Standards for Determining Fair Value"), the reporter explains that the Fair Value standard "does not necessarily imply ... that Fair Value should be determined by the presumed outcome of a hypothetical competitive auction." 2 PRINCIPLES OF CORP. GOVERNANCE § 7.22 (1994) cmt. d. The comment adds "[i]n general, the justification for disregarding the auction standard is strongest in the context of parent-subsidiary transactions . . . where the parent has long held control of the subsidiary and had consistently indicated its intent not to sell." *Id.* As the

Pratt summarizes going concern as follows:  "If valuing on a minority interest basis, the appraiser is more likely to value on the assumption of 'business as usual' – that is, as a going concern." *See* Shannon Pratt, The Lawyer's Business Valuation Handbook, 12.

When New York courts have defined Fair Value as the minority shareholder's proportionate share of the corporation as a going concern, *Seagroatt*, they have not found it necessary to specify a definition of the term.  Nevertheless it is clear that New York follows the going concern doctrine (business-as-usual) articulated by the Delaware courts, which is its lexical meaning.  This is clear on two grounds.

First, even though a New York court has not found it necessary to explain the going concern doctrine in these terms, no New York case has ever applied the going concern doctrine inconsistently with this Delaware standard.  The cases consistently deal with the value of the "going concern" as it exists on the valuation date. New York law makes clear that the appropriate "base" valuation is the value of  the corporation as a going concern and not as if winding up in liquidation. *See, e.g., Seagroatt,* at 834 (stating: "In that the valuation proceeding avoids dissolution . . . the value to be ascertained is that of an interest in a going concern rather than a share of a business in the throes of liquidation")).  But this reference to "willing buyer/willing seller" does not imply resort to the strategic value.  On the contrary, the cases utilizing New York's "investment value"approach, generally apply accepted valuation techniques to the actual earnings and other financial numbers of the corporation as they exist as of the date of valuation, and not to some hypothetical value based

---

comment notes, the same result should obtain where a stockholder has held outright control over a long period of time.

on a more profitable or different management style.[13]  *See Blake* (basing investment value on the actual commissions earned for the previous year, and then discounting petitioner's pro-rata share for lack of marketability); *Seagroatt* (accepting petitioner's expert investment value based on the corporation's actual average annual earnings, taking into consideration the certainty with which those earnings could be counted upon to continue); *see also Lawson Mardon Wheaton, Inc. v. Smith,* 734 A.2d 738, 743 (Sup. Ct. NJ 1999) (in determining Fair Value of a minority interest, the court accepted the application of a discount to the corporation's projected earnings figures because the result was "more consistent with previous actual earnings").

Second, and most importantly, in the only case to have tested the issue, New York has made it abundantly clear that Fair Value is the minority shareholder's proportionate share of the corporation on the premise of a going concern continuing to do business as usual–unaffected by the potential of an acquisition or change of management.  The Court specifically and expressly rejected a valuation which included a premium based on the prospect that an acquirer would pay a premium for the entirety of the corporation (an "acquisition premium").  *See In Re: Dissolution of Gift-Pax, Inc.*, 475 N.Y.S. 2d 324 (N.Y. 1984). In *Gift-Pax*, the petitioner challenged a Referee's report because it failed to allow an acquisition premium in determining the Fair Value of petitioner's stock. *See id.* at 329.  The Referee's expert in that case opined that an acquisition premium would be appropriate if there were a sale of the entire corporation to a willing buyer.  *See id*. The Referee's expert, however, did not include an acquisition premium since only the petitioner's shares (an not

---

[13]In *Blake*, the New York court used the term "investment value" to denominate the value of the corporation as a going concern determined on the income approach. The difference between the courts' use of the term "investment value" and the definition accorded by the Glossary is one of the most dramatic examples of the "vocabulary gap."

the entire corporation) were being valued.  *See id.*  The *Gift-Pax* court upheld the Referee's exclusion of the acquisition premium in determining the value of petitioner's shares, as a matter of law, stating:

> This is precisely the point as to why an acquisition premium is not appropriate.  Pursuant to the statute, the evaluation of the corporation itself is not being made, but rather an evaluation of the petitioner's shares.  Indeed, an acquisition premium itself contemplates a sale of the entire corporation to an outside third party who is a willing buyer and who generally might be assumed to pay a somewhat inflated price or an acquisition premium in exchange for his "capturing" the assets of the corporation and in obtaining a target corporation's entire business.  In this case, however, the entire corporation is not being sold but rather the petitioner's shares, and it is these shares which have to be valued. It can hardly be said that one would be willing to pay an acquisition premium to acquire one-third of the stock in Gift Pax.  There simply would be no incentive for this on the part of a willing buyer.  Accordingly, the Referee's report on this issue is confirmed.

*Id.*

In excluding the acquisition premium, the *Gift-Pax* court recognized that it is not appropriate to determine the Fair Value of a petitioning party's shares by contemplating the sale of the entire corporation to an outside third party. The court rejected the notion that Fair Value may be determined by a hypothetical sale of the entire corporation since the buyer would presumably pay an inflated price attributable to his capturing all of the assets and obtaining control of the corporation's entire business.  Since the entire corporation was not being sold but only the petitioner's shares, the *Gift-Pax* court concluded that the value of those shares could not be determined by reference to a sale of the entire corporation.  *See Gift Pax* at 329.

The Appellate Division upheld the trial court's determination stating "[t]he record clearly indicates that such premiums [acquisition premiums] are paid only when 100% of the stock or

controlling interest in the stock of a corporation is acquired.  In the case at bar, Gift Pax is acquiring

only one third of its common stock.  Therefore, ***no premium*** should be added." *In re: Matter of

Fleischer (Gift Pax, Inc., et al., Appellants-Respondents)*, 486 N.Y.S.2d 272, 275 (N.Y. App. Div.

1985) (emphasis added).

Gift Pax falls squarely within the Delaware Going Concern Rule.  What the *Gift Pax* court

called an "acquisition premium" is equivalent to what the Delaware Supreme Court in *Cavalier Oil*

described as "post-merger events or other possible business combinations" and in *Gonsalves* called

"the capitalized value of possible changes which may be made by new management."

### G.     The decisive issue is the legal question of the appropriate premise of value because the failure of COX's appraiser, Van Essen, to value NJC on the going concern premise accounts for substantially all difference between the parties' appraisals.

Owen Van Essen, the sole appraiser proffered by COX, has opined that the Fair Value of the

shares of NJC held by COX is **$145,350,000** whereas Robert Duffy, the highest of the two appraisers

proffered by NJC, has opined that the value of these shares is **$29,410,000**. This vast difference

(**$115,890,000**) in valuations does not result from a difference of opinion as to the valuation

approach, method, or procedure.  Rather, the appraisers have arrived at these widely disparate results

because they have employed radically different premises of value.

On the advice of NJC counsel, Duffy determined Fair Value on the premise  that NJC is a

going concern that will continue to do business in the future substantially as it has in the recent past.

COX says that Duffy's reliance on legal instructions is improper, but COX is clearly mistaken.

Because the standard and premise of value are questions of law, it would not be within the expertise

of the appraiser to determine these questions all by himself.  *See, e.g., City of Tuscaloosa v. Harcros*

*Chemicals, Inc.*, 158 F. 3d 548, 567, n. 27 (11th Cir. 1998) (economist's "opinions regarding the legal standards applicable to the case are outside of his competence as an economist (and are erroneous) and should be excluded").

By contrast, Van Essen arrived at his ultimate opinion on the meaning of Fair Value and the appropriate premise of value through the uninformed exercise of his own "legal" judgment. Neither COX lawyers nor any other legal authority guided Van Essen in establishing the meaning of the standard and the premise on which the Fair Value was determined. Van Essen's methodology is flawed at the outset because he purported to render a legal opinion, which is beyond his qualifications.

Not surprisingly, Van Essen's legal opinion is not only unauthorized but also wrong. In his appraisal report, he stated the premise awkwardly as follows:

> [D]etermining the Fair Value of a shareholder's stock starts with a determination of the fair market value of the company. In this case, the NJC is a functioning business that is expected to continue to operate into the future, and has many intangible elements of a going concern. These include a long history and well established name in the community, a trained work force as well as a dominant position in its business of being the primary carrier of news and information in Volusia and Flagler Counties. Thus an appropriate measure of its fair market value is a Going Concern Value.

Tr. Ex. 177 at 6.

Van Essen's definition of "going concern value" assumes that the concern would be sold at auction, in a hypothetical sale, to a publicly traded chain or other "special interest purchaser" and the purchaser would make changes to the operation of NJC.[14] (Tr. Ex. 177, p. 49, l.10-14). His value

---

[14]The Glossary defines "special interest purchasers" as acquirers who believe they can enjoy post-acquisition economies of scale, synergies, or strategic advantages by combining the acquired business interest with their own."

is based on the assumed changes this purchaser would make in the existing Business Strategy, i.e.

the ordinary and usual operation of NJC.  He does not assume that NJC will be managed in the future

as it had been in the recent past. (Van Essen, p.48, l25- p.49, l.9).  Quite obviously, Van Essen did

not value NJC on the premise that it is a going concern that will continue to conduct business in the

usual and ordinary way for which it was organized, as the Going Concern Rule requires.

In his Report, Van Essen attempts a cursory description of the approach and method of his

appraisal. Confusing the vocabulary, he said that the market "approach" was his "method" of

valuation–usage that cannot be reconciled with the Glossary.  Nevertheless, it is possible to translate

Van Essen's explanation into the language of the Glossary: he used the "market approach" and

within that approach he used the "merger and acquisition method" i.e., "[a] method within the

**market approach** whereby pricing multiples are derived from transactions of significant interests

in companies engaged in the same or similar lines of business." *See* Glossary.

In another sleight of terminology, Van Essen applies the label "fair market value" to a term

the Glossary labels "investment value."  The Glossary says "investment value" is the value of a

business to a particular investor in light of his particular situation.  Pratt explains that:

> The primary distinguishing characteristic of investment value is that
> it denotes value to a particular investor or owner.  This is in contrast
> to fair market value, which is a concept of value in exchange,
> assuming hypothetical, typically motivated buyers and sellers.

Pratt at 8.

Among the reasons that investment value may exceed fair market value is "synergies with

other operations owned or controlled" and "differences in estimates of future earning power and/or

perception of degree of risk." *Id.*  In the milieu of appraisal terminology, as opposed to that of the

New York courts, "investment value is synonymous with "strategic value" or "synergistic value."

Pratt defines these terms, which do not appear in the Glossary, as follows:

> A *strategic or synergistic value* reflects added benefits to a particular acquirer because of synergies with the acquiree. That is, it is a price or potential price reflecting all or some portion of the value of synergistic benefits created through the combination of the respective entities for which a buyer might be willing to pay. Such benefits could include, for example, increasing market share, reducing costs by combining operations, and/or raising prices by eliminating a competitor.
>
> Synergistic value generally reflects some added value above fair market value. Because it reflects the value of benefits available to a particular buyer, it is usually considered to fall within the concept of *investment value*.

Pratt at 14.

In his deposition, Van Essen rattled off a litany of the strategic and synergistic benefits available to a newspaper chain that acquires an independent.

Obviously, the "added value" over the value of the company as a going concern doing business as usual is an "acquisition premium" as the term is used in *Gift Pax*. Pratt says that the term "acquisition value means the value to a particular acquirer, very much the same as strategic value." Pratt at 12. Van Essen has arrived at an "acquisition value" contrary to the Going Concern Rule. *See Bell,* 413 A.2d at 142 (rejecting an appraisal that "presupposes an acquisition value based upon the very fact that the company will not continue in business on the same basis that existed immediately prior to the [valuation date]").

By adopting the premise that the value of NJC should be determined by the merger and acquisition method and using comparable sales of newspapers to publicly traded newspaper chains, Van Essen obviously did not adhere to the going concern premise of value. His premise is that the

company is to be valued as if it had been sold in its entirety to a publicly traded newspaper chain. His value impermissibly includes "the capitalized value of possible changes which may be made by new management." *Gonsalves*, 701 A.2d at 363. Thus he did not derive the Fair Value of COX's shares in NJC. In fact, Van Essen did not even derive the "fair market value" that would be paid for NJC by a hypothetical buyer.[15] Instead, he arrived at the higher value known as an acquisition, strategic, or synergistic value, a value he based on his assumption as to the price certain carefully identified specific acquirer would pay for 100% of the NJC stock. This includes an acquisition premium over and above the going concern value.

Unlike the mistaken appraiser in *Gift Pax,* Van Essen used a slightly different technique to add an acquisition premium to the going concern value of NJC. In an effort to reconcile his strategic value with the true going concern value of NJC, he injected the acquisition premium through the device of "[AB]normalizing" NJC's EBITDA. The practical impact of this "premium" is that while NJC had an actual operating margin of 9.3% in 2003, Van Essen valued NJC on the basis that the hypothetical acquirer might achieve a 28.3% operating margin beginning on the first day after the acquisition. (Tr. Ex. 176, p.96, l. 19 - p.97, l. 7). His assumption that NJC instantly could increase its EBITDA from its historic levels without loss of revenue is nothing more than his prediction of the premium that a strategic buyer would add to the going concern value. "Indeed, an acquisition premium itself contemplates a sale of the entire corporation to an outside third party who is a willing buyer and who generally might be assumed to pay a somewhat inflated price or an acquisition

---

[15]The Glossary defines *fair market value* as "the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."

premium in exchange for his 'capturing' the assets of the corporation and in obtaining a target corporation's entire business." *Gift Pax,* 475 N.Y.S.2d at 329.

Because the newspaper industry is a rapidly consolidating industry in which a small number of newspaper chains vigorously compete to acquire the scant few remaining independent newspapers, the merger and acquisition method of valuing NJC yields a value inflated by the acquisition premium. When Van Essen used the artifice of "[AB]normalizing" NJC earnings in order to raise the going concern value of NJC up to the strategic value that Van Essen's method produced, he injected an acquisition premium into NJC's value. It matters not that Van Essen calls this premium a "normalizing" adjustment. He could call it a Rose if he chose, but by whatever name he may call it, it is still an acquisition premium.

The difference in premise of value employed by the respective appraisers is responsible for the radical difference between the COX appraisal and the NJC appraisals. The question of which premise is correct is a question of law. The answer to this question is not to be found in the "dismal science" or in the mysterious metrics of the discipline of appraisal, but in the open and obvious rule of law that governs the relationship of these parties.

As a matter of law, Van Essen's premise of value is erroneous. *See generally, Gift Pax*, 475 N.Y.S.2d 324. By his own admission, "[t]he proper definition of [Fair Value] is absolutely critical to determining the proper value for the block of stock in question. It is the foundation of the report and without the proper foundation everything built upon it is tenuous at best." (Tr. Ex. 177 at 3.)

**H.    Duffy's appraisal properly adopts the DCF method within the income approach and derives a Fair Value with the Pro Rata Rule and the Going Concern Rule.**

1.    Duffy appraised NJC in accordance with the Going Concern Rule using the DCF method under the income approach.

In reaching his opinion that the COX shares have a Fair Value of **$29,410,000**, Duffy applied the correct premise of value. He determined this Fair Value by assuming the company would be operated in the future as it is currently being operated. (Duffy, p.37, l.15 - 20). Duffy defined Fair Value squarely in compliance with the Going Concern Rule as follows:

> The going concern premise should be followed.
>
> The current controlling shareholder group and the current business model are assumed to remain intact.
>
> The relative marketability of the subject interest should be considered.
>
> A sale of the entire company to a strategic buyer was not an outcome considered in the valuation process.
>
> No material change in the Company's operations, capital structure, or profitability was assumed.
>
> The lack of an organized, ready market for the 47.5% interest was a factor considered in estimating the fair value.

Tr. Ex. 188 at 3.

Duffy used the Discounted Cash Flow (DCF) method over a three year period beginning with the valuation date and ending on December 31, 2006 and computed the terminal value according to the constant growth method. Duffy considered NJC as a mature company temporarily out of equilibrium. He used a three year period to bring the company back into equilibrium and then determined the terminal value by assuming constant growth after the third year.

In projecting the income of the corporation, Duffy made the following adjustments to what otherwise would have been the immediate history of NJC.

> He corrected for the "down" years of 2003 and 2004 by assuming that NJC would return to its historically normal level of profitability (an operating margin of roughly 14%) by 2006.

> He reduced future cultural promotions expenditures relating to SMT, which resulted in an increase of the EBITA margin from 17.1% to 18.3%.

> He took account of the reduced cash balance on the valuation date by charging cash flow to return to the "normal" cash balance of approximately one month of expenses, which resulted in a decrease in cash flow in 2004 of roughly $1.1 million and a decrease in 2005 and 2006 of roughly $1.7 million.

> He increased aggregate value of the minority stock on a marketable basis by $3.2 million to account for the present value of future tax deductions arising from amortization of the naming rights agreement.

> He applied a discount for lack of marketability in the amount of 20% at the entity level.

Duffy's DCF analysis indicated the aggregate value of NJC, assuming marketability, was **$77,386,000**. To test the reasonableness of his conclusion, Duffy used a guideline public company analysis, referring to seven publicly traded newspaper chains to derive guideline market multiples for Revenue, EBITA, and EBIT. He found that NJC's implied revenue multiple was approximately 70% less than the median of the group, and that the EBITA and EBIT multiples are approximately 55% and 51% less than the median of the group. Duffy then accounted for these differentials by observing differences between NJC and the guideline companies in growth rate, risk, and profitability. When he adjusted the comparison to account for these differences, the NJC multiples were in line with the guideline companies, showing that his indicated value for NJC was reasonable.

From the aggregate marketable value of NJC, Duffy determined to apply a discount of 20% at the entity level. Thus he concluded that the aggregate value of NJC, valued as a going concern on a non-marketable basis, is **$61,909,000**. COX's pro rata share of this value is **$29,410,000**.

> 2.    New York courts hold that the income approach is most appropriate for valuing shares of a closely held corporation as a going concern.

In Fair Value cases, New York courts recognize the general validity of the three basic approaches to value: asset, market, and income. These "approaches" to determining fair value are methodological and not definitional. They do not define fair value but rather describe methods of approaching the question of fair value. In closely held companies that are viable as going concerns, the New York cases generally agree that neither the asset nor market approach is appropriate and concentrate on the income approach, the result of which is a value which New York (and many other) courts call the "investment value." Sometimes the New York courts interchange "investment value" with "intrinsic value." These legal synonyms are used in a radically different sense than the same terms are used in the appraisal literature (and other cases which follow the usage of the literature).

In the landmark case determining Fair Value of the shares of a closely held corporation, the court explained that neither the market approach nor the asset approach was useful in valuing a closely held corporation actively engaged in business. *Blake v. Blake Agency, Inc.*, 486 N.Y.S.2d 341 (1985). Rather, the court said, "With a corporation like the one in issue herein, (a closely held going concern) investment value will usually be the primary criterion upon which 'fair value' is based." *Id.* at 347. The court defined investment value as follows:

> Investment value is usually a function of the earning power of the corporation. Thus, acceptable methods of determining investment value include (1) a "discounted income approach", by which either average earnings of the corporation measured over a number of years, or a weighted average of corporate earnings (giving greater weight to corporate earnings of the most recent years) is capitalized at a predetermined percentage, and using the capitalization rate, a multiplier is developed and that multiplier is then applied to earnings; (2) capitalization of dividends, if the corporation has a history of payment of dividends;  or (3) a "comparative appraisal" approach, which utilizes a comparison with the price-to-earnings ratios of publicly traded stocks in similar industries and financial situations of the closely held corporation.

*Id.* (Citations omitted).

Each of these methods seeks to determine the present value of the expected income to be generated by the company. A recent Supreme Court decision involving a closely held going concern elaborated on the standard as follows:

> [T]he only realistic approach by which to evaluate petitioner's shares is by the investment method. That is to find what a prudent informed investor would be willing to pay to buy the entire business as a going concern considering all the factors indicated by the nature of the business, the risks involved, the expected projected return.

*In the Matter of the Dissolution of Bambu Sales, Inc.,* 177 Misc. 2d 459, 463-64 (N.Y. 1997) (e. s.).

The court explained further that:

> Both experts agree that the investment value method capitalizes the adjusted income stream of the business entity as well as an average assumed rate of return on the owner's investment to establish the valuation. The income stream is determined by adjusting the historical earning of the company, certain nonrecurring or unusual expenses, interest expenses and the add-back of the owner's compensation and benefits.

*Id.* at 465.

Since the DCF method is based on modern financial theory concerning the value of money and money is a fungible metric, courts frequently approve use of the DCF method.  Since the Delaware Supreme Court held that its courts were no longer bound by the rigid block method, Delaware courts have frequently used the DCF method. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983)(determining the Delaware Block approach was too rigid and requiring chancery courts to allow proof of value "by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court"); American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 7.22(a) (The American Law Institute 1992) (reporter explaining that "[s]ince *Weinberger*, the Delaware courts have increasingly turned to a discounted cash flow technique").

3.    Duffy's opinion does not include an implied minority discount because he adjusted the projected income stream to a "control" level.

COX has argued that application of the Going Concern Rule results in an implied minority discount because it does not take into consideration the acquisition premium that could be obtained by selling the company to a publicly traded newspaper chain. This argument is without merit because it incorrectly assumes that the absence of an acquisition premium is a minority discount.

A "minority discount" is a percentage, and it cannot be applied without knowing the base against which it is to be applied.  Under New York law, the determination of fair value begins with the determination of the going concern value in accord with the Going Concern Rule.  When that going concern value is the base, New York forbids the application of a discount to reduce the shareholder's pro rata share of this value.  *See Blake, 486 N.Y.S.2d* at 347-349.

At the same time that the New York courts have held that a minority discount may not be

applied to reduce fair value determined under the Going Concern Rule in a dissolution buyout case, these courts also have rejected the addition of premiums representing "a somewhat inflated price or an acquisition premium in exchange for . . . 'capturing' the assets of the corporation." *Gift Pax*, 475 N.Y.S.2d at 329.

In *In the Matter of the Dissolution of Penepent Corporation, Inc.*, 96 N.Y. 2d 186, 194 (N.Y. 2001), the Court explained:

> The referee correctly observed that, in determining fair value, a minority shareholder's stock should not be further discounted because of its minority status (*see, Matter of Cawley v SCM Corp.*, 72 NY2d 465, 471). To impose upon petitioning minority shareholders a penalty because they lack control would violate two "central equitable principles of corporate governance." First, a minority discount would deprive minority shareholders of their proportionate interest in the corporation as a going concern. Second, it would result in shares of the same class being treated unequally (*see Matter of Friedman v Beway Realty Corp.*, 87 NY2d 161, 169).

*Penepent* holds against application of a minority discount because it "would deprive minority shareholders of their proportionate interest in the corporation as a going concern." *Penepent* at 194. But the "proportionate interest in the going concern" must first be determined consistently with *Blake Agency, Gift Pax*, and the authorities who require that the interest be valued as a share of the going concern doing business as usual. Once the petitioner's interest has been valued on a "minority basis," i.e. without injection of premiums for control or synergy, then a discount for lack of control would, indeed, deprive the minority of its "proportionate interest in the going concern," as New York has defined that phrase. As applied to the facts of this case, *Penepent* forbids the application of a discount to the "fair value" as determined in accord with the Going Concern Rule, 96 N.Y.S.2d at 194 and *Gift Pax* forbids the addition of an acquisition or strategic premium, 475 N.Y.S.2d at 329.

A determination of Fair Value under New York law includes making adjustment for abuse of such perquisites of control as excessive compensation of management. *See Blake*, 486 N.Y.S.2d at 348. Such adjustments eliminate the potential that Fair Value under New York law will include an implied discount for minority control. Thus it is appropriate that no so-called "control premium" is applied to the pro rata share of the going concern value determined in accordance with New York law.

The Glossary defines the discount for lack of control as "an amount or percentage deducted from the pro rata share of value of 100% of an equity interest in a business to reflect the absence of some or all of the powers of control," and control premiums as eliminating this discount. A minority discount reflects a discount from the interest's proportionate share of the entire firm, and the control premium applies to the minority value to remove its discount and arrive at the value of a 100% equity. When Fair Value has been determined in accord with New York law, there is no occasion to correct for the absence of the "powers of control."

The DCF method is especially appropriate in Fair Value cases because it can be applied to arrive at a value for minority shares which does not imply a minority discount. One commentator explains that:

> [Weinberger's suggestion that courts use] discounted cash flow (DCF) (rather than GAAP earnings) was . . . revolutionary (even though standard practice in the financial community) because it is fundamentally inconsistent with the notion that a non-controlling stockholder cannot dictate distributions. To be sure, it is fair to presume that the stockholders will eventually receive distributions equal to the value of the company, but **DCF is based on the idea that the corporation will distribute available cash as soon as it becomes available.** Richard A. Booth, Minority Discounts and Control Premiums in Appraisal Proceedings, 57 Business Lawyer 127, 133, n. 27 (November 2001).]

Of course, the DCF method does not assume cash will be immediately distributed but it ascribes a value to minority shares that "looks through" the corporate entity and excludes any effect on Fair Value that could arise from the control party's decision to retain earnings.

This is illustrated by *In re Radiology Associates, Inc.*, 611 A. 2d 485, 494 (Del. Ch. 1991), where the Chancellor explained:

> The discounted cash flow method purports to represent the present value of Radiology's cash flow. The calculation arguably may have left out a premium that normally accrues when shareholders sell a company. However, "the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred."[citing *Cavalier Oil*, 564 A.2d 1137, 1145 (Del 1989)]. Plaintiff is not entitled to the proportionate sales value of Radiology. Plaintiff is entitled to the proportionate value of Radiology as a continuing shareholder. The discounted cash flow analysis, as employed in this case, fully reflects this value without need for an adjustment.

In view of that inherent "look through" premise in a DCF method, an appraiser can arrive at a "control value" by making adjustments to the inputs in the model to eliminate historic practices that abused control and lessened the minority value. Pratt explains that an appraiser using the income approach may adjust the income stream to eliminate abuses of control and then use the income approach without applying a premium.  *See* Pratt at 218.  Such adjustments correct abuses like excessive salaries and other discretionary expenses that would not exist in an objectively managed company.

The adjustments made by Duffy to the projected income stream of NJC eliminate the only expense that has been disputed as abusive by COX– the SMT promotional expenditures, and this adjustment increased the EBITDA margin in his projections by 1.2%.  Because the appraiser adjusted

the inputs to the model to eliminate the effect of the alleged excessive promotional expenses, the resulting value is not discounted for lack of control. COX is wrong to contend that the failure to inject an acquisition premium is tantamount to implying a minority discount.

> **I.      The Business Strategy followed by NJC is reasonable, appropriate to this independent newspaper, consistently profitable, and protective of the business over the long term.**

Inherent in the Going Concern Rule is the legal principle that a disgruntled minority shareholder is not entitled a Fair Value award based on a strategic value that might be achieved if the company were sold in its entirety. Where a business is being managed profitably and according to a reasonable business model, the minority is not entitled to force the majority out of control by effectively demanding that the company be sold to a strategic buyer in order to satisfy the minority's desire to be compensated as if it had invested in an entirely different company. The NJC Business Strategy, according to which the corporation has been managed successfully for more than three-quarters of a century, is well-within the discretion accorded to the board by the business judgment rule. The minority shareholder has no right to "remodel" this strategy for purposes of obtaining an inflated value. COX invites the Court into error when it argues that the Court should pass adverse judgment on this strategy, lay it aside, "remodel" the strategy, and appraise the COX shares on the basis of a different (but undefined) business strategy.

*Arguendo*, if the Court determines for any reason that all or any part of the Cultural Promotions are improper, that decision should not adversely affect the Fair Value as determined by Duffy because he prepared his DCF valuation on the assumption that Cultural Promotions going forward will be sharply curtailed. Thus, an "add-back" of the much-debated Cultural Promotions is built into the DCF appraisal by Duffy.  Insofar as the expenditures might affect the appraised value

of COX shares, they already have been taken into account.

In any case, even if the entire amount of Cultural Promotions were eliminated, the EBITDA of NJC would still be far below the "norm" posited by Van Essen.  In other words, the comparably low profitability of the NJC measured against Van Essen's comparables is only in small part attributable to Cultural Expenditures.  Instead, the difference is due to the difference in business judgment between the Board and COX.

## II.    AS A MATTER OF LAW  A MARKETABILITY DISCOUNT MUST BE APPLIED TO REFLECT THAT LACK OF MARKETABILITY OF NJC'S STOCK.

### A.    Applicability of a Marketability Discount as a Matter of Law.

The determination of whether a "marketability discount" is applicable to the Fair Value of COX's shares is a question of law.  *See Balsamides v. Protameen Chemicals, Inc*. 734 A.2d 721, 732 (N.J. 1999) (citing *Lawson Mardon Wheaton, Inc. v. Smith*, 734 A.2d 738 (N.J. 1999)).   A marketability discount is a discount which reflects the illiquidity of shares of stock in a closely held corporation in that shares of a closely held corporation cannot be readily sold on a public market. *See Munshower v. Kolbenheyer*, 732 So.2d 385, 386 (citing *Blake v. Blake Agency,* 486 N.Y.S.2d 341, 349 (N.Y. App. Div. 1985); *Hall v. King,* 675 N.Y.S.2d 810 (N.Y. Sup. Ct. 1988)).  NJC is a closely held corporation.

A discount for lack of marketability and a discount based solely on minority status are two distinct concepts; the former being required in a valuation of shares of stock in a closely held corporation, the latter being prohibited because it would deprive the minority of its proportionate share of the going concern value of that closely held  corporation.  *See e.g., Blake,* 486 N.Y.S.2d at 349 (noting that a discount for lack of marketability "bears no relation to the fact that the petitioner's

shares in the corporation represent a minority interest.").

A discount for lack of marketability accurately reflects the lesser value of shares that cannot be freely traded, whether they be a minority or a majority of the shares, and as such is an appropriate adjustment. *See Raskin v. Walter Karl, Inc.,* 514 N.Y.S.2d 120, 122 (N.Y. App. Div. 1987). A discount for lack of marketability is applicable at the entity level, and when viewed in terms of the ability of a holder of shares in a close corporation to convert those shares to cash, the discount is equally as applicable to a controlling block of shares as it is to a minority interest. *See id.*

Both Florida and New York expressly approve the application of a lack of marketability discount. *See Munshower,* 732 So.2d at 386 (quoting *Blake:* "'[a] discount for lack of marketability is properly factored into the equation because the shares of a closely held corporation cannot be readily sold on a public market.'"); *In re Joy Wholesale Sundries, Inc.,* 508 N.Y.S.2d 594, 595 (App. Div. NY 1986) (holding that the "Judicial Hearing Officer erred in failing to apply a discount to reflect the lack of marketability of the petitioner's shares of stock in a closely-held corporation."); *Hall v. King,* 675 N.Y.S.2d 810, 814 (Sup. Ct. NY 1998) ("A lack of marketability discount is utilized in the valuation of the stock of closely held corporations. . . . '[T]o reflect the illiquidity of [a] petitioner['s] shares. i.e., that a potential investor would pay less for shares in a close corporation because they could not be readily liquidated for cash.'") (citation omitted); *In re Brooklyn Home Dialysis Training Center, Inc.,* 741 N.Y.S.2d 280, 281 (App. Div. NY 2002) (finding that the trial court properly applied a discount for lack of marketability to one-third of the shares of a closely held corporation).

The New York courts have specifically found it to be error to reject a discount for lack of marketability on the basis that the electing corporation is a willing buyer, since the appropriate

valuation date is the date immediately prior to the filing of the petition, and as of such date, there is no election which establishes a readily available market for such shares. *See Gift Pax,* 475 N.Y.S.2d at 328.

In the present case, the issue of the marketability of NJC stock is determined as of the valuation date. Even if NJC can be said to have become a "willing buyer" upon its filing of its election to purchase, that election was not made until July 29, 2004 - months after the valuation date regardless of either May 9, 2004 or May 10, 2004. As a result, NJC's filing of its election did not create a "readily available market" for COX's shares **as of the valuation date** so as to warrant a rejection of a marketability discount.

Florida's Third District Court of Appeal, adopting the standards utilized by the State of New York, held that it was appropriate in determining the fair value of shares in a closely held corporation to apply a discount for lack of marketability. *See Munshower,* 732 So.2d at 386 (quoting *Blake v. Blake Agency, Inc.,* 486 N.Y.S.2d 341, 349 (N.Y. App. Div. 1985) ("'[a] discount for lack of marketability is properly factored into the equation because the shares of a closely held corporation cannot be readily sold on a public market.'")).

In *In re Fleischer (Gift Pax, et al.)*, the petitioner appealed the trial court's determination of the fair value of his shares because, among other things, the court permitted application of a twenty-five percent discount for lack of marketability. *See In re Fleischer (Gift Pax, et al.),* 486 N.Y.S.2d at 274. The Appellate Division found no error by the trial court stating that in "determining the 'fair value' of the shares of a closely held corporation, discounts for the lack of marketability of such shares are appropriate and do not provide a windfall to the majority shareholders merely because the shares to be purchased by the majority pursuant to their election . . . constitute a minority interest in

the corporation." *Id.* at 275 (citing *Blake*).

Because the applicability of a discount for lack of marketability is a question of law and because NJC is a closely held corporation, a marketability discount must be applied to reflect the illiquidity of its stock which cannot be sold in a public market.

**B.      The Amount of the Marketability Discount is a Matter of Appraisal Judgment.**

While the applicability of the discount is well settled as a matter of law, the amount of the discount is a question of appraisal judgment. *See Matter of Seagroatt Floral Co.,* 576 N.Y.S.2d 831 (N.Y. 1991). While the court in *Hall v. King*, 675 N.Y.S. 2d 810 (N.Y. Sup. Ct.1998) applied  a 25% lack of marketability discount to shares in a closely held corporation because a "'potential investor would pay less for shares in a close corporation because they could not readily be liquidated for cash,'" the defendant's appraisers testified that the appropriate range for a lack of marketability discount is  between 25% and 70% . *See Hall,* at 814 (quoting *Matter of Friedman v. Beway Realty Corp.,* 638 N.Y.S.2d 399 (N.Y. 1995)).

In this case, COX experts will testify that no marketability discount ought to apply or, if one is, the discount ought to be small.  COX asserts that a small or non-existent discount is warranted given its contention that there exists a "ready market" for 100% of NJC stock.  Apart from the fundamental fact that 100% of NJC's stock is not being negotiated as a block,   COX's assertion misapprehends that a marketability discount is applicable to reflect the distinction between stock which is publicly traded and, therefore marketable, and stock in a closely held corporation which is illiquid by comparison.

Even if it were true that a "ready market" exists for 100% of NJC's stock, neither PMV nor COX is able to place 100% of NJC's stock in this "ready market" and COX's experts will be unable

to testify as to any mechanism that exists whereby 100% of NJC's stock could be assembled into a single block absent the parties' agreement.    Given the numerous and substantial other disputes between COX and NJC, it is nearly certain that they could not reach the agreement necessary to assemble 100% of NJC's stock for sale within this "ready market" within the same time period as a share of publicly-traded stock could be negotiated.

Furthermore, this "ready market" which COX asserts exists for 100% of NJC's stock is not the liquidity counterpart to the exchanges in which publicly traded stock are negotiated.  The time which would be necessary to negotiate, perform due diligence, and close a sale to a third-party would under all circumstances greatly exceed the time period in which a block of publicly-traded stock could be negotiated.

NJC's appraiser, Robert Duffy, applies a 20% marketability discount in this case.  Mr. Duffy will testify that this discount reflects that the NJC shareholders have no access to an active public market for their common shares and marketability cannot be created by the holders of non-controlling shares.  Without market access, an investor's ability to control the timing of potential gains, to avoid losses, and to minimize the opportunity cost associated with alternative investments is severely impaired.  For two investment instruments identical in all other respects, the market will accord a considerable premium to the one that can be liquidated into cash instantly, especially without risk of loss in value.  For this reason a share in a privately-held company usually is worth less than an otherwise comparable share in a publicly-held company.  Mr. Duffy's conclusion that a 20% marketability discount ought to be applied is based on the fact that discounts in the range of 20% to 40% are usual for stock that can be freely-traded  in as little as 24 months.

## III.    THE FAIR VALUE OF THE COX SHARES SHOULD NOT BE INCREASED TO ADJUST FOR AN ADVERSE IMPACT ON FAIR VALUE DUE TO EXPENDITURES FOR CULTURAL PROMOTIONS.

COX asks that this Court increase the "fair value" of its shares by an amount equal to that which COX contends constitutes "improper" expenditures.  COX contends that the defendants received "improper personal benefits" as a result of NJC's support of the arts organizations in which the family participates.  Although they allege only a vague, non-pecuniary "benefit" to the Davidson family, COX's allegations are essentially premised on the idea that the majority is "self-dealing."

### A.  The Cultural Promotions were not and are not improper.

Rather than "benefits" to the family, NJC's Cultural Promotions are in fact part of a long-standing, open and disclosed business strategy of which COX was aware, and from which NJC has derived considerable benefit and goodwill in its community.  As set forth in detail above, NJC has for many decades provided promotional support to SMT, a professional theatrical company in Daytona Beach,  and CFCE. which presents a variety of entertainment events including the biennial Florida International Festival, a cultural festival which includes a concert series by the internationally acclaimed London Symphony Orchestra ("LSO").  NJC's strategy of supporting cultural endeavors to improve the Daytona Beach community and promote NJC is a multiple-decade practice and tradition of NJC which substantially predates COX's acquisition of its shares of NJC stock.  The most cursory and superficial act of due diligence would have revealed that fact to COX in 1969.

The Board manages NJC according to its historical business strategy which includes support of cultural activities.  The strategy has been very successful, and while it benefits from the Davidson family's involvement and expertise, it is also made up of independent components with little or no

family involvement.

CFCE operates as an arm of NJC promoting various cultural events that do not involve participation by Davidson family members or NJC directors.  Likewise, the FIF operates as an unincorporated division of CFCE, but under the actual control of a strong and disinterested board of directors.  The FIF program sponsors a wide variety of programs in which the family and NJC directors have no personal participation.  As to the LSO, the gratification that Tippen derives from this sponsorship is not an improper personal benefit. It is a voluntary act of leadership and devotion.

Similarly, COX cannot demonstrate that expenditures for the benefit of SMT result in improper personal benefits to the directors.  Although Tippen, Julia, and Marc participate in its activities, they work as volunteers and contribute their time, service, and talent to this promotional enterprise.  It is NJC which benefits from the tireless and uncompensated efforts of the Davidson family rather than the reverse.

As for the Naming Rights Agreement, NJC's "spin-off" strategy is set forth in full above and in order to advance its spin-off of SMT, NJC identified the need for SMT to have a permanent venue.  The project to create a performing arts center in Daytona Beach ("Center") was initially adopted by the NJC Board to further the interests of NJC in carrying out its longstanding goal of spinning off SMT as a self-supporting institution. When LACI, the not-for-profit created to carry out this project, was first organized in 1996, its board consisted of TIPPEN, GEORGIA, JULIA, and MARC, all of whom are officers and directors of NJC. Later, in recognition of the fact that the project required broad community support, the membership of the board was expanded to include a broad assembly of business, civic, and political leaders of Volusia County.  LACI was established as an implement of the NJC spin-off strategy, and the participation of NJC directors on the board of

LACI was in service of the NJC interest.

The Naming Rights Agreement, particularly, does not result in improper personal benefit to the Davidson family.  In agreeing to stand good for the operating deficit of SMT out of family, not corporate, funds in order to make possible the naming transaction and the implementation of the "spin-off" strategy (clearly articulated to COX as early as 1996), indeed, the Davidson family incurred a detriment, not a benefit.  Finally, NJC director participation on the board of LACI does not give rise to a conflict of interest because these directors were deployed to the LACI board by NJC for the express purpose of advancing NJC's corporate interest in the "spin-off" strategy. (See David Kendall's communication to Buddy Solomon May 3, 1996, Tr. Ex. 110).

### B.    COX has acquiesced in the Davidson family's involvement with the Cultural Entities and the NJC Business Strategy.

Florida law has long recognized the doctrine of acquiescence as a bar to certain shareholder actions.  *See e.g., Redstone v. Redstone Lumber & Supply Co., et al,* 133 So. 882, 883 (Fla. 1931) (noting that "[a] court of equity will not grant relief to a minority stockholder or minority director who for years acquiesced in the salaries fixed." (Citing 1 Morawetz on Private Corporations (2d Ed.) § 262; *Brown v. De Young,* 167 Ill. 549)).  In conjunction with the foregoing, if a shareholder or director has knowledge of material facts related to the actions of the corporation, such shareholder or director may be barred by laches if he or she waits an unreasonable time to complain. *See Patchen v. Robertson,* 200 So. 400, 401 (Fla. 1941) (holding that where parties are charged with notice of a company's action, they may be estopped from later complaining of such acts).  "It appears to be well settled that the right to relief against a director of a private corporation for breach of trust is barred by laches, where the complainant, with full knowledge of the material facts, waits an unreasonable

time before seeking relief." *Chipola Valley Realty Co. V. Griffin,* 115 So. 541, 542  (Fla. 1927)

Acquiescence need not involve some  form of express ratification, but rather from acquiescence will be inferred assent, and from assent will result estoppel.  *See Sommers v. Apalachicola Northern R. Co., et al.,* 96 So. 151, 155 (Fla. 1923) ("The rule generally is that stockholders who participate in and assent to acts of corporations will not afterwards be heard to complain, but will be held estopped to question the validity of the proceedings.").

The doctrine of acquiescence is well recognized in the corporate laws of not only Florida, but of other jurisdictions as well.  The Supreme Court of Massachusetts has said that it "is a familiar principle of equity jurisprudence that long-continued acquiescence in a course of conduct by one interested in it, especially when the rights of others are affected thereby, will induce the court to refuse him relief upon his subsequent complaint of it."  *Ucello v. Golden Foods, Inc., et al.,* 90 N.E.2d 530, 535 (Mass. 1950) (quoting *Dunphy v. Traveller Newspaper Association,* 16 N.E. 426, 432).  In *Ucello,* the Massachusetts court denied a minority shareholder relief when he complained of salaries being paid to other stockholders where there was an express finding that the plaintiff knew that the defendants were receiving salaries and the amounts.  *See id.*  The Court found that there had been a practice of dividing earnings as "salary" in proportion to stockholdings, and since the defendant has accepted the benefits of such practice, he was estopped from challenging it.  *See id.* The Court stated that "'if there has been actual or passive acquiescence  in the performance of the act complained of, then equity will ordinarily refuse her aid for the establishment of an admitted right . . . .  It would be contrary to equity and good conscience to enforce such rights when a defendant has been led to suppose by the word, or action by the plaintiff that there was no objection to his operations.'" *Id.* (citations omitted). *See also, Pavlidis v. New England Patriots Football Club, Inc.,*

675 F.Supp 696, 698 (US Dist. Ct. Mass. 1987) (quoting *Ucello*: "Acquiescence  is conduct from which may be inferred assent with a consequent estoppel or quasi estoppel.").

As noted above, NJC provided support for local arts organizations and activities for many years prior to the date on which COX acquired its shares of NJC stock.  The slightest act of due diligence would have revealed that fact to COX before it acquired its shares of NJC stock in 1969.

After COX acquired its NJC stock, NJC's support of arts organizations and the Cultural Entities continued and grew between 1969 and 1985.  Those years are significant because during that entire time period, two COX employees sat on the NJC Board of Directors.  As a result, COX knew, or in any event, is charged with the knowledge that NJC's business model between 1969 and 1985 included promotional support for the Cultural Entities and activities, and knew or is charged with the knowledge that certain members of the Davidson family personally participated in the activities of the Cultural Entities receiving NJC support.  *See Redstone Lumber,* 133 So. at 884 (stating that directors are charged with knowledge of corporate affairs and of the facts which the corporate books and records disclose).  Moreover, until the changes effected for the 1992 fiscal year, NJC had reported its Cultural Promotions as charitable contributions separately identified on its financial and tax records.  COX was actually aware of this fact and never raised a question.

Even after COX chose to cease sitting on NJC's Board of Directors, NJC provided COX with monthly profit and loss statements disclosing the total amount of promotional support attributed to the newspaper.  For all time periods examined by COX's expert forensic accountant, William Jennings ("Jennings"), the amount he determined to be related to NJC's promotional support of the Cultural Entities was actually less than the amount of promotional support disclosed to COX by NJC through the monthly profit and loss statements.

In April and May of 1996 COX communicated with NJC's CFO, David Kendall regarding certain questions regarding NJC's promotional expenditures. Although COX's internal documents indicate an objection by COX to NJC's increased level of promotional expenses, the correspondence between NJC and COX fails to reveal any objection by COX to those expenses. The communications between the parties indicate only that COX requested information. Regardless of whether COX objected to or questioned NJC's Cultural Promotions, COX did not further pursue either its questions or objections subsequent to May of 1996.

As a result of its knowledge of the level of NJC Cultural Promotions through its receipt of the monthly profit and loss statements, and its silence regarding the level of expense of the Cultural Promotions between 1996 and the filing of this suit, COX acquiesced to the level of NJC promotional expenses.

Since at least 1992, NJC's Annual General Manager's Report revealed that NJC was a "major sponsor" of the Cultural Entities. It is not disputed that COX received a copy of NJC's General Manager's Report each and every year. Although COX's internal documents reveal its concern in 1996 that NJC's promotional support of Cultural Entities was not suited to a "blue collar" audience, that concern was never communicated by COX to NJC. As a result of its knowledge that NJC was a major sponsor of the Cultural Entities and COX's silence regarding those sponsorships since, at least 1992, COX has acquiesced to NJC's sponsorship of the Cultural Entities.

TIPPEN was personally involved in the activities of the Cultural Entities receiving NJC support during the time that COX employees sat on NJC's Board of Directors. Indeed, he founded one of the organizations, SMT, in 1977 and sat on SMT's board of directors continuously until 2000. TIPPEN's personal interest and participation in SMT, CFCE and FIF were consistently set forth in

NJC's Annual General Manager's Report which COX has received annually for decades.  As a result of its knowledge that TIPPEN was personally involved in the activities of the Cultural Entities which received NJC support, and its silence since at least 1977 regarding that personal involvement, COX acquiesced to any conflict of interest which might have otherwise existed as a result of TIPPEN'S personal involvement in the activities of SMT.  As a result of its silence regarding TIPPEN's personal involvement in the activities of CFCE and FIF, COX has acquiesced to any conflict of interest which might have otherwise existed as a result of TIPPEN's personal involvement in the activities of those Cultural Entities.

By letter dated May 3, 1996, NJC's CFO informed COX that it had previously implemented, executed, and completed a "spin-off" strategy in connection with the FIF which sponsors the LSO's biennial visit to Daytona Beach.  NJC largely underwrote the FIF and LSO until the point at which it became a self-supporting cultural event.  Notwithstanding decreases in NJC support, the FIF continues to yield substantial goodwill to NJC.  In the same letter, NJC informed COX that it had implemented a similar strategy as to SMT,  and that its current increase in its promotional expenses related to that strategy.  COX did not object to NJC's announced "spin-off" strategy either as to FIF or SMT from at least 1996 through the date of this lawsuit.  As a result of its knowledge of NJC's strategy regarding the support of SMT and FIF, and its silence since at least 1996, COX has acquiesced to NJC's previous strategy of supporting the FIF until the point at which it became self-supporting, and to NJC's strategy of supporting SMT until the point at which it becomes self-supporting.

Such notice was sufficient to require COX to investigate further or take action if they felt that there was misconduct on the part of the majority.  *See Sickler v. Melbourne State Bank,* 159 So. 678,

679 (Fla. 1935) (stating: "It is too well settled to require the citation of authorities that one who has either actual or constructive information and notice sufficient to put him on inquiry is bound, for his own protection, to make that inquiry which such information or notice appears to direct should be made, and, if he disregards that information or notice which is sufficient to put him on inquiry and fails to inquire and to learn that which he might reasonably be expected to learn upon making such inquiry, then he must suffer the consequence of his neglect.").

The management of the NJC at no time made any attempt to conceal the extent of the company's Cultural Promotions or the Davidson family's involvement in the organizations which the company was supporting.  *See Chipola Valley Realty,* 115 So. at 542 (upholding dismissal of corporation's complaint against a director in connection with his purchase of certain of the corporation's property because the director made no attempt to conceal the purchase and the complainant waited an unreasonable time before seeking relief).

At all times relevant to this lawsuit, COX knew: (1) that NJC supported various arts organizations and activities; (2) that it was a major sponsor of the Cultural Entities; (3) that members of the Davidson family were personally involved in the activities of the Cultural Entities; and (4) the total amount of the newspaper's promotional expenses.  Although discovery in this case revealed that COX grumbled about some of these things internally, COX never voiced any objection regarding any of these things to NJC.   Accordingly, COX has acquiesced to the participation of the Davidson family members in activities of organizations which received NJC promotional support.  It has acquiesced to NJC's promotional support of the Cultural Entities and it has acquiesced to NJC's strategy to support SMT until such time as it becomes self-supporting.

### C.    The Business Judgment Rule applies.

Absent proof of conflict of interest or self-dealing, the business judgment rule ("BJR") will protect board decisions made in connection with corporate transactions. *See Kloha v. Duda,* 246 F. Supp.2d 1237, 1244 (US Dist. Ct. M.D. Fla. 2003) (noting that the BJR "prevents a court – which may possess less business expertise than the corporate directors – from calling upon the directors to account for their actions, no matter how poor their business judgment, absent a showing by the plaintiff of abuse of discretion, fraud, bad faith, or illegality.").

Because COX has acquiesced in the family's involvement with the arts organizations that NJC supports, and that involvement is the only fact upon which COX bases its claims of self-dealing and conflict, all of the transactions by and between NJC and the various Cultural Entities fall within the purview of the BJR. *See Yarnall Warehouse & Transfer, Inc. v. Three Ivory Moving Brothers Moving Company,* 226 So.2d 887, 890-91 (Fla. 2nd DCA 1969) (noting that Florida courts have given directors "wide discretion in the exercise of business judgment in the performance of their duties."). The BJR creates a presumption that the directors have acted "in good faith and in the honest belief that the action taken was in the best interests of the corporation." *See Kahn v. Sullivan,* 594 A.2d 48, 59 (Del. 1991).

Given the presumption that the directors acted in good faith and in the honest belief that the action taken was in the best interests of the corporation, COX cannot meet its burden of challenging each transaction and demonstrating that no reasonable business person would have entered into such transactions. *See Gagliardi v. Tri-Foods International, Inc.,* 683 A.2d 1049, 1051 (Del. Ch. 1996) (holding that absent improper motive or self-dealing, directors could not be held liable for their transactions no matter how foolish the transactions in question turned out to be). Indeed the testimony of Stacey Cowles, John Mennenga and Dr. Fishkind establishes that a newspaper's

business model which incorporates a component of support of cultural entities and activities, is not only reasonable, but improves the economic environment of a community which, in turn, results in an economic benefit to the newspaper. Conversely, COX's expert witnesses do not establish that the Cultural Promotions were patently unreasonable. In fact, COX's own experts admit that NJC's Cultural Promotions do have value to NJC. (Tr. Ex. 170).

As for NJC's purchase of the "News-Journal Center" ("NJ-Center") naming rights from LACI, there was no conflict of interest created by reason of the NJC directors simultaneously sitting on the LACI Board of Directors that would cause NJC's directors to lose the protection of the BJR. Before the creation of LACI, the existence of a performing arts center was viewed by the Board as necessary to achieve NJC's goal of "spinning off" SMT. The Board's unrebutted testimony is that their purpose for facilitating the creation of LACI and sitting on its board of directors was to advance and ensure NJC's "spin off" goal. A conflict of interest analysis cannot be performed after the creation of LACI since its very creation resulted from an NJC decision. At the time NJC made its decision to assist in creating an entity for the purpose of constructing a performing arts center to assist NJC in accomplishing its "spinoff strategy," no conflict of interest existed. Pursuant to the BJR, NJC's later decision to purchase the naming rights of the Center in order to facilitate its spin-off strategy is protected by the presumption that the directors acted "in good faith and in the honest belief that the action taken was in the best interests of the corporation."

**D.    The Cultural Promotions do not Constitute Corporate Waste.**

COX contends that NJC promotional support of the Cultural Entities and its purchase of the naming rights to NJ-Center constitutes waste.

Waste has been found by Florida courts where a transaction served no corporate purpose,

involved a disposition of corporate assets for no consideration, and was motivated by the directors own personal motives.  *See South End Improvement Group, Inc. v. Mulliken,* 602 So.2d 1327 (4th DCA 1992).   A transaction constitutes waste only if it involves "a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received."  *See Brehm v. Eisner,* 746 A.2d 244, 263 (Del. 2000).  "A waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Id.*

A shareholder alleging corporate waste bears a very high burden.  *See Texlon Corporation v. Bogomolny,* 792 A.2d 964,  975 (Del. Ch. 2001) (noting that "Waste is an extremely difficult claim to prove").  Accordingly, it is COX's burden to establish that the consideration received by NJC in exchange for the amount of its promotional support of the Cultural Entities and the amount of the NRA Payment was so disproportionately small that no reasonable person would have entered into the transaction.

NJC paid $13 million in a lump sum payment in exchange for the naming rights to NJ-Center for 26 years.  COX's naming rights expert, Dean Bonham, opined that the present value of the naming rights is no greater than $2,996,006.(Tr. Ex. 169).  NJC's naming rights expert, Laren Ukman, opined that the present value of the naming rights is $7,209,436 if it is assumed that NJC's primary motivation for entering into the agreement was commercial, and $9,961,715 if it is assumed that NJC's primary motivation for entering into the agreement was to generate good will and good community relations. (Tr. Ex. 192).    Ukman further opined that $13 million was not an extraordinary amount to pay for the naming rights to NJ-Center but rather an amount on the high end of a reasonable range.  (Tr. Ex. 192).

Both Bonham and Ukman valued the advertising and marketing benefits associated with the Naming Rights Agreement. Neither expert attempted to determine the value of benefits not associated with advertising and marketing. Nevertheless, it is not disputed that, in entering into the Naming Rights Agreement, NJC sought to accomplish objectives far beyond the mere advertising and marketing benefits resulting from the agreement. It is not disputed that, by entering into the Naming Rights Agreement, NJC sought to accomplish its "spin-off" of SMT thereby allowing NJC to reduce its support of SMT to $500,000 per year. Neither Ukman nor Bonham attempted to measure the value to NJC in accomplishing its spin-off or the economic benefit to NJC as a result of its reduced economic support of SMT. It is not disputed that NJC sought to entrench itself in its community by placing its name on the state-of-the-art performing arts landmark, in part, to gain a competitive advantage over the *Orlando Sentinel* thereby advancing its goal of long-term sustainability and survivability. Neither Ukman nor Bonham attempted to place a value on the impact of the Naming Rights Agreement on that objective. It is not disputed that, by causing the NJ-Center to be completed, NJC sought to favorably impact the economy of the community in which it does business, thereby improving its own long-term economic future.

Given that Ukman opines that the $13 million paid by NJC was not extraordinary and that neither expert attempted to determine the value of the Naming Rights Agreement beyond the advertising and marketing benefits, COX cannot satisfy its burden of proving that the consideration received by NJC in exchange for the naming rights was so disproportionately small that no reasonable person would have entered into the transaction so as to constitute a waste of corporate assets.

COX contends that NJC's support of the Cultural Entities constituted waste. Jennings

testified that the amount of such support by NJC between 1999 and 2004 was approximately $10

million  exclusive of the amount paid for the naming rights.  (Tr. Ex. 170).   Jennings opined that

the entire amount spent on promotional support by NJC constituted waste.  (Tr. Ex. 171).

Jennings did not opine that the amount of consideration received by NJC in exchange for the

amount of promotional support was so disproportionately small that no reasonable person would

have entered into the transaction.  Instead, Jennings defined waste as the arithmetic excess of the

consideration paid over the benefit realized.  Accordingly, Jennings opinion regarding waste did not

incorporate the legal definition of waste.

Jennings testified that the benefit received by NJC was greater than zero. (Tr. Ex. 170)

However, he did not calculate the amount of the benefit received by NJC in exchange for its

promotional support. (Tr. Ex. 171).  Contrary to his testimony that NJC received a benefit greater

than zero, Jennings calculation of waste assumed that NJC received a benefit in the amount of zero.

Conversely, it is undisputed that through its promotional support to the Cultural Entities, NJC

sought to solidify its position in its marketplace and improve the competitive context in which it

operates its business.  Dr. Fishkind, an economist, opined that NJC received value both directly and

indirectly from its promotional support of the Cultural Entities. (Tr. Ex. 190).  Dr. Fishkind testified

that NJC's promotional support had a direct positive impact on the circulation of NJC's newspaper

and an indirect positive impact on NJC in the form of the enhancement of NJC's reputation and

goodwill in the community in which it operates its business and the improvement of its competitive

context which Dr. Fishkind defined as the quality of its business environment.  (Tr. Ex. 189).

Further, Stacey Cowles and John Mennenga, experts familiar with the business models of

independent newspapers, testified that NJC's business model including NJC's support of local

cultural organizations, is consistent with the business models of independent, family-managed

newspapers throughout the country. (Tr. Ex. 185 and Tr. Ex. 193). The success of NJC's business

model including its promotional support of the Cultural Entities is similarly confirmed by COX's

expert appraiser, Owen Van Essen,who confirmed quality of NJC's marketplace, as well as, NJC

dominance within it.

COX cannot satisfy its burden of establishing that the transactions in question were

completely bereft of any benefit that no reasonable business person would have entered into the

transactions and, accordingly, cannot establish that Defendants wasted corporate assets.

## IV.    COX IS NOT ENTITLED TO RECOVER "DAMAGES" FOR THE ALLEGED MISCONDUCT, BUT ONLY TO RECOVER THE FAIR VALUE OF ITS SHARES

### A.    The Impact of the Alleged Misconduct on the Fair Value of COX's Shares.

COX contends that it is entitled to the Fair Value of its interest in NJC together with 47.5%

of the amount which it asserts NJC wrongfully spent on the Naming Rights Agreement and certain

organizations and activities. New York law does not support the notion that a petitioner may recover

both the Fair Value of its interest in a corporation, and an award of damages relating to alleged

wrongful conduct.

A proceeding to determine "fair value" is a no-fault proceeding. Allegations of fault or

wrongdoing by either party are irrelevant in a valuation proceeding. *See Matter of Pace*, 71 N.Y.2d

at 746; *Friedman v. Beway Realty Corp.,* 87 N.Y.2d 161 (N.Y. 1995); *Gerzof v. Coons*, 168

A.D.2d 619 (N.Y. App. Div. 1990). "[T]he trial court's findings on the issue of wrongdoing were

superfluous in light of the fact, recognized by both courts, that respondent had elected to buy

petitioner's shares pursuant to Business Corporation Law §1118.   Fixing blame is material under 1104-a [New York's dissolution statute] but not under 1118 [New York's election statute]." *Matter of Pace*, 71 N.Y.2d at 746.

However, New York courts recognize a single exception to the general rule that allegations of wrongdoing are superfluous in an election to purchase case.  Alleged misconduct underlying a petition for dissolution may be relevant in an election to purchase case if it is established by expert testimony to have impacted the Fair Value of the petitioning shareholder's shares.  *See Gerzof v. Coons*, 563 N.Y.S.2d 458, 459 (N.Y. App. Div.1990).  In *Gerzof*, the Appellate Court found that the plaintiff was entitled to discovery related to alleged wrongdoing and announced that:

> [T]he question as to whether the alleged misconduct by Coons, if proven, adversely impacted upon the 'fair value' of the corporation, should be developed by expert testimony before the referee for his consideration and determination in accordance with accepted valuation methodologies.

*Id.*

Pursuant to *Gerzof*, the impact of Alleged Misconduct is limited to the impact, if any, of such wrongdoing on the Fair Value of COX's interest in NJC.  Any adjustment to that Fair Value is dependent upon: (1) COX establishing wrongdoing; and (2) COX establishing the impact of such wrongdoing on the Fair Value of NJC by expert testimony using accepted valuation methodology.

COX seeks to recover its pro rata share of the amount of money which NJC allegedly spent improperly together with the Fair Value of its interest in NJC by: (1) proving its allegations of wrongdoing; and (2) establishing the amount of money which was allegedly improperly spent. To that end, COX's expert, Jennings, determined the amount of NJC's promotional support of the

Cultural Entities between 1999 and 2004, and to that amount, added the value of the Naming Rights Agreement as determined by Dean Bonham.

*Gerzof* clearly articulates the burden on a petitioner seeking to recover for alleged misconduct and there is no support in Florida or New York case law for the proposition that a petitioner may circumvent the *Gerzof* burden of establishing by expert testimony using accepted valuation methodology, the impact of the alleged wrongdoing on Fair Value by merely by establishing the amount of money allegedly improperly spent.

Accordingly, there can be no recovery relating to the defendants' Alleged Misconduct beyond the amount, if any, of the adverse impact of such conduct on the Fair Value of NJC as established by expert testimony using accepted valuation methodology.

### B.  Developing, by Expert Testimony, the Impact of the Alleged Misconduct on Fair Value.

No expert witness in this case will opine as to the extent, if any, to which the fair value of COX's shares of NJC stock was adversely impacted by NJC's promotional support of the Cultural Entities or its purchase of the naming rights to NJ-Center.  Instead, COX's forensic accountant merely identifies the total amount of NJC cultural support and adds to that amount the value of the Naming Rights Agreement as determined by Dean Bonham.  COX asserts that it is entitled to recover 47.5% of this amount, approximately $20.7 million dollars.  That Jennings appreciates the fact that his "adding up" is not equivalent to determining the impact on the Fair Value of the stock is evident from his opinion that "I have not quantified the impact on the going concern value of the business of that amount of waste." (Tr Ex. 170 at 81).

Even if it were assumed, *arguendo*, that NJC wasted $20.7 million in these expenditures, Jennings' ventures far beyond his own acknowledged limitations when he opines that this "waste" adversely impacted the Fair Value of the COX shares by that amount or by any other amount. Jennings cannot opine as to the value of the COX shares before or after taking account of the "waste" because an opinion as to the impact of this variable (i.e. the assumption that the "waste" had not occurred) on the Fair Value of the COX shares would require the expertise of a "business valuator," which Jennings admits he does not possess.

Assuming there were $20.7 million in what Jennings calls "waste," the "adverse impact" on the value of COX shares would be the excess of the value of:

> the COX shares valued on the premise that the "waste" had not
>
> occurred ("X")
>
> over the value of the COX shares on the premise that the "waste" did
>
> occur ("Y").

Thus "X" minus "Y" equals "adverse impact" under *Gerzof*. This requires the expert to give an opinion as to the difference between "X" and "Y." This is an opinion that Jennings admits he cannot offer because he does not possess the expertise to determine either the value of "X" or the value of "Y." Since he cannot opine as to the value of either "X" or "Y," he cannot opine as to the value of X minus Y, i.e., the "adverse impact."

Jennings admits not only that he cannot assess that value but actually that he has not even attempted to do so. "I have not quantified the impact on the going concern value of the business of that amount of waste." (Tr. Ex. 170 at 81 )  Under *Gerzof*, that impact is the only relevant fact. Jennings cannot derive the value of this impact because he is not qualified as a "business valuator"

and further because he has not even purported to reach that opinion.

Thus, COX can offer no relevant testimony on the issue of the Alleged Misconduct and its impact on the Fair Value of its shares. In fact, COX's own valuation expert, Van Essen, even though he has improperly appraised the COX shares according to the premise that 100% of the stock would be sold to a strategic or synergistic buyer who would change the business strategy, he nevertheless attributes value to the results of the Cultural Promotions. (Tr. Ex. 177 at 23) COX should be bound by this testimony if he is allowed to testify in their behalf.

**C.    Appraisal Methodology in the Context of *Gerzof*.**

It is patently erroneous to determine Fair Value by applying disparate methods of valuation. Thus, the opinion that the Fair Value of the shares should be ascertained by the comparable sales method or the income method may not be combined with an opinion that, but for the improper Cultural Promotions, the asset value of the corporation would be higher.

Even if it were assumed that through his forensic audit, Jennings had correctly determined that NJC had expended $20.7 million for which it received no benefit, that forensic opinion would not translate into a valid conclusion that the Fair Value of the COX shares has been diminished by its proportionate share of that amount. The counterfactual assumption that NJC had not expended that sum implies that the value of the <u>assets</u> of NJC would have been higher on the valuation date by some amount, but it does not imply that the value of the <u>shares</u> would have been higher. There are numerous reasons for this.

First, no appraiser in this case has opined on the "net asset value" of NJC because that valuation method is not appropriate for this going concern. *See, e.g., Blake Agency,* 107 A.D.2d at 146 (holding income approach is best for such corporations). The going concern value does not take

account of variations in asset value, and it is an improper mixture of valuation methods to add the value of a discrete asset within the corporation (or assumed to be within the corporation) to the going concern value of the shares of the corporation.

Second, even if he attempted to add this component of asset value to the going concern values, Jennings is not qualified to offer an opinion that this increment would be $20.7 million or any other amount because his assumption that $20.7 million was "wasted" on Cultural Promotions and the Naming Rights Agreement is not equivalent to an assumption that the asset value of NJC would be greater by that amount if the "waste" had not occurred. Jennings has expressed no opinion as to what the tax consequences of not deducting $12 million for Cultural Promotions with SMT, CFCE, and FIF would have been. Further Jennings has expressed no opinion as to the present value of the tax benefit of the tax shield afforded by future amortization of the NRA payment.

Third, and most importantly, even if Jennings knew the effect on NJC's asset value of these variables, he would not be qualified to opine on the impact this increase in asset value would have on the Fair Value of the COX shares. It requires expertise far beyond the admitted limitations of Jennings to correlate an assumption concerning the net proceeds of the nonexpenditure of "waste" with an opinion on its effect on the share value. This is so, because, regardless of the what the net proceeds of not "wasting" these funds might have been, the net proceeds would not be worth face value in the valuation of the shares. Owen Van Essen testified that there is a substantial differential between the internal value of the assets versus the external value of the corporate stock, and this testimony referred to the going concern value determined on the income basis of both assets and stock. (*See* Tr. Ex.176 at 58-59) (testifying that the aggregate value of assets would be a premium over the value of the shares). Moreover, Frank Daniels testified that the so-called "waste" may not

have any adverse impact on the value since he would probably value the newspaper (as Van Essen obviously did) based on its revenue. *(See* Tr. Ex. 179 at 54-55).   Moreover, in the opinions of the experts adduced by NJC, the value is based on projected earnings of the corporation and not on the premise of what past earnings were or should have been.

Jennings testified that the Cultural Promotions would adversely impact the stock value because it would affect investors' expectation as to future earnings, but he did not disclose an opinion as to the amount of that impact.  Moreover, it is clear that he is, by his own admission, not qualified to opine on the value of that "impact." Anyway, COX cannot offer any testimony concerning investors' diminished expectations of earnings.

In addition, it is patently erroneous, as COX now argues, to call upon the Court to exercise that appraisal expertise which it has failed to supply by analyzing the raw data amassed by Jennings and translating that into an appraisal of the adverse impact.

### D.    COX is not Entitled to "Damages."

COX has failed to connect the Alleged Misconduct to the Fair Value of the COX shares primarily because its case is infected with the erroneous theory that "damages" for wrongdoing may be recovered in addition to the Fair Value of the shares in this election appraisal under the statute. As a matter of law, COX may only recover to the extent that it can show that the Fair Value of its shares was adversely affected by any of the Cultural Promotions with respect to which it shows were both improper and as to which COX has not acquiesced.

In *In the Matter of Taines*, the New York Supreme Court analogized the remedy available pursuant to the New York corporate dissolution statute to a marital dissolution statute.  *See In the Matter of Taines,* 444 N.Y.S.2d 540, 544 (NY Sup. Ct. 1981).  The court in *Taines* noted that while

a Massachusetts court awarded damages in a case involving minority shareholder oppression, the New York dissolution statute contained no "provision for damages, only an authorization for a 'divorce and property settment.'" *Id.*  Likewise, the Florida dissolution statute contemplates that a shareholder who petitions for dissolution of a corporation is entitled only to the Fair Value of his or her shares, nothing more.

By its requests for "damages" related to the Alleged Misconduct, COX asks this Court for a remedy that is not available to it under the controlling Florida statute.   Florida Statutes Section 607.1436(5) provides that upon determination by the court of the Fair Value of the petitioning shareholder's shares, the court shall enter an order ordering the electing shareholder to purchase such shares at their Fair Value.  While Section 607.1436 contemplates that the court may order payment of "costs, fees, and expenses," it does not contemplate an award of damages in addition to, or over and above, the Fair Value determined by the court.   COX may be entitled to demonstrate the extent to which the Alleged Misconduct impacts the Fair Value of its shares, but it is not entitled to recover damages related to the Alleged Misconduct in the context of this dissolution proceeding.

COX relies on the comments to the provision of the Model Business Corporation Act that is equivalent to the Florida's election statute which provides that "If the court finds that the value of the corporation has been diminished by the wrongful conduct of controlling shareholders, it would be appropriate to include as an element of fair value the petitioner's proportional claim for any compensable corporate injury."

This comment does not endorse an award of damages in addition to the determined Fair Value.  It is a codification of *Gerzof,* and the threshold requirement is consistent with *Gerzof* in that the petitioner must establish that the value of the corporation has been diminished.  That can only

be done according to *Gerzof* by establishing the adverse impact by an expert witness using established valuation methodology. The comment further recognizes situations in which a proportional claim for a compensable corporate injury may be an appropriate component of Fair Value. For example, it would certainly be appropriate in those circumstances in which the asset approach is used to determine the Fair Value of the corporation. However, in the present case, no expert utilized an asset approach to valuing COX's interest in NJC. Accordingly, it is incumbent upon COX to establish the adverse impact of the alleged wrongdoing on the Fair Value of COX's interest in NJC in relation to the valuation approach that COX employed to make that determination. COX's expert appraiser has testified that his valuation was not impacted by the alleged acts of wrongdoing.

Finally, COX's claim for an award of damages in addition to the fair value of its shares is an attempt to circumvent the scope of recovery in a derivative action. Had COX been allowed to pursue its derivative actions and had it been successful, the recovery would have belonged to NJC. This is true because a derivative action is brought by a shareholder for the benefit of the corporation. In no event, could COX have made a direct recovery in connection with its derivative actions. NJC's filing of the election to purchase will result in COX receiving the fair value of its shares, but that is all. The election statute does not expressly or implicitly authorize a conversion of the underlying derivative action into a direct recovery action.

## V.    COX HAS NOT ESTABLISHED ANY GROUND SHOWING IT HAD GOOD CAUSE TO BELIEVE THAT ITS ACTION IN COUNT III WAS WELL FOUNDED.

NJC has not engaged in any action that would justify dissolution or an alternative remedy under Florida law. The Florida Supreme Court has found the remedy of dissolution to be

inappropriate where "[t]here is no showing that the corporation has reached such a stage that the purposes for which it was formed are impossible of attainment, or that the corporation has practically discontinued all its business, or that there is such a deadlock between stockholders that the affairs of the corporation may not be legally transacted." *Hanes v. Watkins,* 63 So.2d 625, 628 (Fla. 1953).

Florida law is settled that dissolution is an extreme remedy and is only available where the corporation has practically discontinued all of its business and is incapable of accomplishing the purpose for which it was chartered. *See Mills Development Corporation v. Shipp & Head, Inc.,* 171 So. 533 (Fla. 1937); *News-Journal Corporation v. Gore,* 2 So.2d 741 (Fla. 1941); *Freedman v. Fox,* 67 So.2d 692 (Fla. 1953). NJC is continuing to engage in its day-to-day business affairs, and COX can prove no facts that would rise to the requisite level of deadlock or waste that would be required for judicial dissolution to be an appropriate remedy under Florida law. In fact, COX's valuation expert noted that it is a particularly attractive and viable business. (Tr. Ex. 177 at 9-10). This may be one reason why COX opted instead to plead its alternative theory. While it is clear from the language of Section 607.1434 that the "alternative" remedies are available at the discretion of the court in a proceeding pursuant to 607.1430, there are no Florida cases that indicate that Section 607.1434 creates a separate cause of action, independent from an action for dissolution. In this case, COX can prove no set of facts which would have warranted judicial dissolution.

COX contends that it may be entitled to recover attorneys fees if it can establish wrongful conduct on the part of NJC or its directors. Notwithstanding such contention, section 607.1436 actually only entitles COX to fees if this Court finds that COX had "probable grounds for relief" under the dissolution statute.

Fla. Stat. § 607.1436(5) provides in relevant part:

. . . If the court finds that the petitioning shareholder had probable grounds for relief under § 607.1430(3), it may award to the petitioning shareholder reasonable fees and expenses of counsel and of any experts employed by petitioner.

Fla. Stat. § 607.1430(3) authorizes the court to dissolve a corporation (or order an alternative remedy pursuant to § 607.1434):

(3) [i]n a proceeding by a shareholder . . . in a corporation having 35 or fewer shareholders if it is established that:

(a) The corporate assets are being misapplied or wasted, causing material injury to the corporation; or

(b) the directors or those in control of the corporation have acted, are acting, or are reasonably expected to act in a manner that is illegal or fraudulent[16].

As set forth above, COX cannot establish that NJC's promotional support of the Cultural Entities or its purchase of the naming rights to NJ-Center constituted waste or a misapplication of assets.   Further, in light of NJC's consistent profitability and the absence of any testimony that the fair value of NJC was adversely impacted by those expenditures, COX failed to meet its burden of establishing that any injury to NJC resulting from the promotional support or naming rights agreement was a material injury.

COX's entitlement to reasonable fees and expenses of its counsel and experts pursuant to Fla. Stat. § 607.1430(3)(b) requires COX to establish that it had probable grounds for relief under Fla. Stat. § 607.1436 based on illegal or fraudulent acts by those in control of the corporation.

---

[16]  It is noteworthy that, unlike a majority of states and unlike the Model Business Corporation Act, Florida does not include "oppression" as a basis for dissolution and, therefore, a showing of "oppression" cannot result in an award of attorneys fees in this case.

COX did not seek an alternative remedy to judicial dissolution in its complaint on the basis that NJC directors engaged in any "illegal act." "Illegal acts" in the context of an election to purchase are those acts which are subject to criminal penalties. *See Munshower*, 732 So.2d at 386 (quoting *Gates v. Chrysler Corp.*, 397 So. 2d 1187, 1190 (Fla. 4th DCA 1981)). COX has not established that any decision made or act performed by NJC directors subject those directors to criminal penalties.

COX failed to establish that it took any action in reliance upon any representation or omission by NJC directors regarding NJC's promotional support of the Cultural Entities or purchase of the naming rights to NJ-Center. Accordingly, COX failed to establish an essential element of an action sounding in fraud. In any event, COX did not seek an alternative remedy to judicial dissolution on the basis of fraudulent conduct pursuant to Fla. Stat. § 607.1430(3)(b).

Accordingly, COX is not entitled to recover its reasonable fees and expenses of counsel and experts on the basis of Fla. Stat. § 607.1430(3)(a).

## CONCLUSION

For the reasons set forth above, the Court should make the findings of facts and conclusions of law as set forth in Defendants Proposed Findings of Fact and Conclusions of Law filed herewith.

COBB &  COLE
By: _____s/ Bruce A. Hanna_____
BRUCE A. HANNA
FLA. BAR NO. 867683
THOMAS J. LEEK
FLA. BAR NO. 116408
150 Magnolia Avenue
Post Office Box 2491
Daytona Beach, FL  32115-2491
Telephone (386) 255-8171
Facsimile: (386) 248-0323

E-mail: bhann@ccb.com
ATTORNEYS FOR DEFENDANTS
NEWS-JOURNAL CORPORATION;
HERBERT M. DAVIDSON JR.; MARC L.
DAVIDSON; JULIA DAVIDSON TRUILO;
JONATHAN KANEY JR; DAVID
KENDALL; ROBERT TRUILO; GEORGIA
KANEY; and PMV, INC.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th day of September, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following Service List unless otherwise indicated.

/s Bruce A. Hanna
Attorney

## SERVICE LIST

Peter C. Canfield, Esq.
Dow, Lohnes & Albertson, PLLC
One Ravinia Drive, Suite 1600
Atlanta, GA 30346-2108
E-mail: pcanfield@dlalaw.com
Attorneys for Plaintiff

Richard J. Ovelman, Esq.
Jorden Burt LLP
777 Brickell Avenue, Ste. 500
Miami, FL 33131
E-mail: rjo@jordenusa.com
Co-counsel for Defendant, News-Journal Corporation

John A. DeVault III, Esq.
Courtney K. Grimm, Esq.
Bedell, Dittmar, DeVault, Pillans & Coxe
The Bedell Building
101 East Adams Street
Jacksonville, FL 32202
E-mail: jdevault@bedellfirm.com
E-mail: cgrimm@bedellfirm.com
Attorneys for Plaintiff