# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**COX ENTERPRISES, INC.,**

**Plaintiff,**

**-vs-**                                              **Case No.  6:04-cv-698-Orl-28KRS**

**NEWS-JOURNAL CORPORATION,
HERBERT M. DAVIDSON, JR., MARC L.
DAVIDSON, JULIA DAVIDSON TRUILO,
JONATHAN KANEY, JR., DAVID
KENDALL, ROBERT TRUILO, GEORGIA
KANEY, PMV, INC., and LIVELY ARTS
CENTER, INC.,**

**Defendants.**
_____

## ORDER

Plaintiff Cox Enterprises, Inc. ("Cox"), the lone minority shareholder in Defendant

News-Journal Corporation ("NJC"), initiated the instant action by filing a multi-count

complaint against NJC, its officers, directors, and majority shareholder, PMV, Inc. ("PMV"),

pursuant to sections 607.1430 and 607.1434, Florida Statutes.  Cox alleged in its Complaint

that Defendants misused the corporate funds and wasted the corporate assets of NJC to the

detriment of Cox's interests as a minority shareholder in NJC.  Cox requested relief

principally in the form of money damages, but also sought, in the alternative, judicial

dissolution of NJC.  Defendants responded to Cox's request for judicial dissolution by filing

an irrevocable notice of election to purchase Cox's shares pursuant to section 607.1436,

Florida Statutes.

Upon the parties' failure to reach an agreement on the "fair value" of Cox's shares, the responsibility fell to this Court to determine the "fair value" of Cox's shares "as of the day before the date on which [Cox's original petition] was filed."   Fla. Stat. § 607.1436(4). Beginning on December 6, 2005, I held an eight-day bench trial during which the parties presented evidence relating to the fair value of Cox's shares.   After careful consideration of this evidence and pertinent legal authority, I now issue the following opinion setting forth my determination of the fair value of Cox's shares.

## I.  BACKGROUND AND FINDINGS OF FACT

### A.  THE PARTIES

Cox is a Delaware corporation with its principal place of business in Atlanta, Georgia. It is a large, privately-held corporation which owns seventeen daily newspapers, including *The Atlanta-Journal Constitution*, *Austin American-Statesman, Dayton Daily News,* and *Palm Beach Post*.

NJC is a closely-held Florida corporation with its principal place of business in Daytona Beach, Florida.   NJC publishes the *Daytona Beach News-Journal*, a daily newspaper circulated primarily in Volusia and Flagler Counties.  NJC has one wholly-owned subsidiary, the Volusia Pennysaver, Inc. ("Pennysaver"), which publishes six local shopping guides.  NJC has one class of common stock of which 4000 shares are outstanding.  PMV presently owns 2100, or 52.5%, of NJC's shares.  Cox owns the remaining shares.

NJC's directors are Herbert M. Davidson Jr. ("Tippen Davidson"), Marc Davidson, Julia Truilo, Robert Truilo, Georgia Kaney, Jonathan Kaney Jr., and David Kendall.  Tippen Davidson also serves as the president and CEO of NJC.   The remaining directors hold

various positions in NJC and other related entities.   Their various activities and responsibilities are described below.

### B.  HISTORY OF NJC AND THE *DAYTONA BEACH NEWS-JOURNAL*

Eugene C. Pulliam originally organized NJC in 1925 when he acquired two small Daytona Beach newspapers–the *Morning Journal* and the *Evening News*–and merged them into a single newspaper which he named the *Daytona Beach News-Journal* ("the *News-Journal*").   Instead of paying cash for the *Evening News*, Pulliam gave its owner, T.E. Fitzgerald, a 40% interest in NJC.   Two years later, Tippen Davidson's grandfather, Julius Davidson, and Tippen's father, Herbert M. Davidson, purchased Pulliam's interest, giving the Davidson family a majority of NJC's shares.

A few years after the Davidsons' purchase of NJC, Fitzgerald sold his 40% interest in NJC to R.H. Gore, a newspaper publisher from Fort Lauderdale.   Gore held his shares in NJC until 1955, when he sold them to a corporation controlled by John H. Perry Sr., the then-owner of the *Palm Beach Post*.   In 1963, Perry's son and successor, John H. Perry Jr., purchased an additional 7.5% interest in NJC from Julius Davidson's second wife, leaving Perry Jr. with 47.5% of NJC's shares.   Six years later, Perry Jr. sold the *Palm Beach Post* and his interest in NJC to Cox.   Ever since then, Cox has maintained a 47.5% interest in NJC.

### C.  THE DAVIDSON FAMILY

After acquiring a majority of NJC's shares in 1927, Julius Davidson served as the *News-Journal*'s publisher until relinquishing control of the paper to his son Herbert in 1962. Herbert, a graduate of Columbia University School of Journalism and an experienced and

well-known reporter, remained as the paper's publisher until his death in 1985.  Under Julius and Herbert's leadership, NJC established a tradition of supporting local cultural activities.

As a young man, Tippen Davidson studied music at the Juliard Conservatory and enjoyed a brief career as a professional musician.  True to family tradition, however, he eventually gave up his aspirations of a career in music and returned to Daytona Beach to work as a reporter and city editor for the *News-Journal*.  Upon his father's death, Tippen became the paper's general manager and publisher.  To this day, ultimate control over the paper's operation rests in his hands.

Tippen's wife, Josephine, has also worked as a reporter and editor at the *News-Journal*.  Their two children, Marc Davidson and Julia Davidson Truilo, are currently members of the *News-Journal* staff and the NJC board of directors.  Julia's husband, Robert Truilo, serves on the board of directors and as the *News-Journal*'s business manager.

**D.  RADIO STATION WNDB-FM**

In 1944, NJC amended its corporate charter by adding a section authorizing the corporation to own and operate one or more radio stations and to engage in certain related activities.  See Certificate as to Amendment of Certificate of Incorporation of NJC (hereinafter "1944 Amendment to Charter"), Defs.' Ex. 141.  NJC subsequently acquired WNDB-FM, which NJC operated until selling the station in 1972.  During the period in which WNDB-FM was owned by NJC, it was treated as a distinct division of the corporation.

**E.  THE CULTURAL ENTITIES**

Although Tippen Davidson ultimately abandoned his career as a professional musician, he has continued to pursue his passion for music and the performing arts in his

capacity as CEO of NJC.  Like his grandfather and father before him, Tippen has sought to make cultural activities accessible to the citizens of Daytona Beach and Volusia County.  To this end, Tippen helped to create several non-profit organizations, including the Florida International Festival ("FIF"), Central Florida Cultural Endeavors ("CFCE"), and Lively Arts Center, Inc. ("LACI") (hereinafter referred to collectively as the "Cultural Entities").

The FIF was founded for the purpose of raising money to bring the London Symphony Orchestra ("LSO") to Daytona Beach.  Through the support of FIF, the LSO has performed in Daytona Beach once every other year since 1966.  Initially, NJC served as the guarantor of the project and was also its major contributor.  Local fundraising for the organization eventually improved, however, enabling NJC to reduce its contributions.[1]

In 1974, Tippen founded CFCE to present a variety of musical performances in Daytona Beach.  CFCE has since presented musical programs ranging from bluegrass to classical music and remains active in providing live entertainment to the people of Central Florida.  The FIF is now a division of CFCE.

Three years after the founding of CFCE, Tippen organized the Seaside Music Theater ("SMT").  Despite occasional efforts by NJC management to wean SMT off of the financial support of NJC, SMT has consistently depended on funding from NJC.  After NJC pledged $1.8 million to SMT in 1993, NJC management developed a "spin-off strategy" which called for NJC to reduce its contributions to SMT by $180,000 annually until its contributions totaled no more than $500,000 per year.  This goal was never realized.  In 1999, NJC's total

---

[1] NJC loaned FIF $100,000 for the LSO's last appearance.  Tippen does not know whether the loan was repaid.

contribution to SMT totaled $1.4 million.  By the following year, NJC's contributions rose once more to $1.8 million.  Over the eight-year period from 1992 to 2000, NJC's contributions to SMT tripled.

In 1996, NJC's directors organized LACI as a part of the SMT spin-off strategy. Tippen, Georgia Kaney, Marc Davidson, and Julia Truilo comprised the original LACI board of directors.  Their goal was to build and operate an independent and upscale performing arts center for SMT, thereby enhancing the stature of SMT and increasing its revenue.  The projected cost for the center was $29 million.  NJC provided $13 million of this amount as part of a naming rights agreement with LACI.

Early on, NJC treated its contributions to the Cultural Entities as charitable tax deductions.  Over time, however, the donations began to exceed the maximum allowed for charitable deductions.  As result, in 1993, NJC began to classify its contributions as business expenses for the purpose of corporate promotion.[2]

NJC's characterization of its contributions is belied by a meticulously drafted twenty-four-page letter in which NJC counsel Jonathan Kaney Jr. gave his opinion on what result would obtain if a minority shareholder brought suit against NJC, its officers, and directors for "dereliction of duty" based on NJC's contributions to SMT and the other Cultural Entities. Letter from Jonathan Kaney to Tippen Davidson, Nov. 9, 2000, Pl.'s Ex. 125 (hereinafter "Kaney Letter").  Kaney observed that NJC's so-called promotional expenditures–one-half of which were made up of its $1.8 million contribution to SMT–equaled "twice the industry

---

[2]  Such expenses are deductible without limitation.

average."  Id. at 3.   Quite apart from concluding that the contributions were legitimate expenditures for the promotion of NJC, Kaney opined that they "had a material adverse effect on corporate profits and thus on shareholder value."  Id. at 6.   He concluded that NJC's expenditures could not "be justified in terms of promotional consideration [or] as reasonable corporate philanthropy."  Id.

### F.  THE MANAGEMENT OF THE CULTURAL ENTITIES

Tippen Davidson serves as director and vice-chair of LACI, as a producer and an advisory board member of SMT, and as director and president of CFCE.  He founded CFCE in 1974, SMT in 1977, and LACI in 1996.  He also served on the board of directors for SMT until 2001.

Marc Davidson serves as director, treasurer, and assistant secretary of NJC and as director and secretary of CFCE.  He served as director and secretary of SMT from 1996 to 2001 and as director of LACI from 1996 to 2001.  He is also currently the editor of the *News-Journal Online*.

Julia Davidson Truilo serves as director and assistant secretary of NJC, as director of LACI, as managing director of SMT, and as director and vice-president of CFCE.  She served as director and vice-president of SMT form 1996 to 2001.  Her husband, Robert Truilo, serves as director and assistant treasurer of NJC.  He is also director of CFCE and has check-signing authority for CFCE and SMT.

Jonathan Kaney's wife, Georgia Kaney, serves as director, vice-president, and assistant secretary of NJC, as director of LACI, as an advisory board member of SMT, and as director, treasurer, and assistant secretary of CFCE.  She was an initial director and

treasurer of SMT and served as treasurer, assistant secretary, and director of SMT from 1996 to 2001.  Jonathan Kaney serves as director, secretary, and general counsel for NJC and as director, secretary, and treasurer of LACI.  Besides serving as counsel to NJC, Jonathan Kaney has also represented SMT, CFCE, PMV, LACI, and Tippen Davidson in his personal capacity.

David Kendall serves as director and vice-president of NJC, as CFO of LACI, as an advisory board member and CFO of SMT, and as CFO of CFCE.  He served as director of LACI from 2001 to 2005.  Kendall is also the CFO of the *News-Journal.*

Over the five-year period leading up to the filing of this action, seventeen CFCE employees, thirty-eight SMT employees, and three LACI employees were on the NJC payroll.  Many of the Cultural Entities employees also worked in the *News-Journal* building and received the same benefits as *News-Journal* employees.

In his November 9, 2000 letter, Jonathan Kaney noted how overlapping membership on the boards of NJC and SMT resulted in conflicts of interest.  Kaney explained that "[a]s directors of SMT," Tippen Davidson, Marc Davidson, Julia Truilo, and Georgia Kaney each "owe[] a fiduciary duty of loyalty to SMT, but that duty directly conflicts with the correlative duty of loyalty these same directors owe NJC."  Id. at 9.  This prompted Kaney to inquire: "When the parties who control NJC authorize expenditures for SMT, in whose interest are they acting?"  Id.  To Kaney, the ethical dilemma was complicated by the Davidson family's personal involvement with SMT:

> By showing how the family members participate in the artistic management of
> the theater and play significant roles in its performances and by showing how
> the theater is a deep and abiding passion of the family, the minority would

-8-

> likely convince the trier of fact that the controlling shareholder is expending NJC resources for personal gratification in a way that is functionally no different than other forms of personal aggrandizement at minority expense.

Id.

At the conclusion of his letter, Kaney advised Tippen to radically alter the relationship between NJC and SMT.  He suggested that he appoint a new board of directors for SMT consisting entirely of persons other than Davidson family members or NJC officers, directors, or employees.  Id. at 20.  He also recommended that NJC "reform" its "internal business practices relating to the allocation of funds to SMT" and achieve proportionality in its contributions to the theater.  Id. at 22-23.  In the end, Tippen heeded Kaney's advice only to the extent of appointing a new and independent board of directors for SMT.

At trial, Kaney insisted that he did not intend his opinion letter to function as an objective legal assessment of NJC's relationship with SMT.  Rather, Kaney maintained that he wrote the letter from a one-sided perspective simply in order to reflect Cox's views as minority shareholder.  Trial Tr. at 908-09.[3]  Kaney's advice to Tippen Davidson that Tippen should fundamentally change NJC's relationship with SMT suggests, however, that Kaney actually believed that NJC and its representatives were acting in contravention of their fiduciary duties to Cox.  Elsewhere in the letter, Kaney is straightforward and objective in his tone.  For example, Kaney remarked that NJC's behavior, if left uncorrected, "would lead

_____

[3]  The trial transcript consists of eight consecutively paginated volumes in the record. Docs. 236-243. Citations to the trial transcript in this Order is by page number and line only. The page breakdown for each of the docketed volumes is as follows: Doc. 236: 1-167; Doc. 237: 168-312; Doc. 238: 313-496; Doc. 239: 497-679; Doc. 240: 680-893; Doc. 241: 894-1105; Doc. 242: 1106-1279; Doc. 243: 1280-1350.

directly to disastrous legal consequences for NJC, SMT, the Davidson family and all NJC directors." Kaney Letter at 9-10.  This statement is phrased not as an indication of what Cox would likely argue in a suit against NJC and its directors but instead as clear and succinct summation of the legal vulnerability of NJC and its representatives.

### G.  THE DETERIORATION OF COX AND NJC'S RELATIONSHIP

Although Cox and NJC's relationship had long been hampered by Cox's desire to gain control of the *News-Journal*, it was not until recently that their relationship began to unravel. Present complications were likely set in motion when Jay Smith, president of Cox Newspapers, began attending NJC's annual shareholder and board meetings.  Based on his interactions with the NJC board, Smith came to believe that the *News-Journal* suffered from severe mismanagement.  Of particular concern to Smith were the moneys NJC spent on cultural promotions, advertisement, and sponsorships.  Smith attempted to determine the precise extent of NJC's contributions to SMT and FIF, but NJC's financial reports did not contain the details of NJC's contributions.[4]  Moreover, at the time of his inquiry, Smith was

---

[4]  As Georgia Kaney's testimony made clear, NJC's goal of building the arts in Daytona Beach was certainly no secret:

> The goodwill of [NJC] is one of its strongest assets.  Within the realm of promotions, we pursue activities designed to enhance the long-term institutional goodwill of the newspaper as well as activities having more immediate focus.

> In 1993, the corporation continued its strong programs to build goodwill. We provided support to the Florida International Festival and Seaside Music Theater.  These activities are flagships of our promotional programs and the crown jewels of cultural life in this area.  As noted in previous reports, "we continue to believe it is good business to support and promote programs that enhance the arts and quality of life in the community."

unaware that LACI even existed.  Indeed, it was not until NJC entered into the naming rights agreement with LACI that Smith and Cox finally learned of the relationship between the two entities.

The events surrounding the naming rights agreement are emblematic of the troubles which prompted Cox to file suit against Defendants.  Jonathan Kaney first proposed the idea of the agreement to Tippen Davidson on August 28, 2003, in direct response to a $14 million shortfall in funding for LACI's project to build a performing arts center for SMT.[5]  Under Kaney's proposal, NJC would compensate for nearly all of the shortfall by paying LACI an up-front, lump-sum cash payment of $13 million (more than NJC's net income for the prior two years combined) in return for the rights to name the performing arts center.  Undoubtedly aware of potential charges of conflict of interest, Kaney attempted to justify the proposed payment of $13 million as a valid business expenditure.  His effort, however, amounted to little more than idle speculation that the naming rights would yield a return of $500,000 per year over the course of twenty-six years.  Kaney did not enlist a valuation expert, nor did he consider that the *Florida Times-Union* had recently paid a mere $3 million for the rights to name a performing arts center in Jacksonville.  Finally, Kaney failed to discount the proposed $13 million payment to present value.

On September 15, 2003, the NJC board held a "special meeting" to consider Kaney's

Trial Tr. at 154:7-18.  The secret was instead precisely how much NJC was spending in pursuit of its goal.

[5]  The LACI directors had originally counted on $14 million in funding from the state, but that funding never materialized.

proposal.  Mins. of the Special Meeting of Bd. of Dirs. of NJC, Pl.'s Ex. 142.  Contrary to an earlier promise to grant Cox's "representatives . . . the same access and voice in corporate meetings as . . . [NJC] directors," the board failed to provide Cox notice of the "special meeting."  Trial Tr. at 1291:14-22.  Absent the corporation's largest minority shareholder, NJC's board voted to approve Kaney's proposal.  Three weeks later, when David Kendall asked Kaney whether NJC should disclose the naming rights agreement to Cox, Kaney simply responded that it was unnecessary to do so.

Less than two weeks after the "special meeting," Tippen Davidson made a formal offer to LACI's board of directors.  The minutes of the meeting simply state: "Tippen Davidson advised the group of the purchase of the naming rights for the Lively Arts Center building by the News-Journal Corporation."  Mins. of LACI Bd. Meeting, Pl.'s Ex. 311, at 1.  There was no discussion of value, no negotiation, no suggestion that the LACI board seek the advice of independent counsel, nor so much as a vote by the LACI board.  See id.; Trial Tr. at 1269-75.

NJC and LACI formally executed the naming rights agreement on March 2, 2004 with an effective date of January 1, 2004.  The agreement enables SMT to stage performances in the center for "more than twenty-seven (27) years."  NJC Naming Agreement, Pl.'s Ex. 189, at 1.

The only reasonable explanation for the seemingly careless decision making by Kaney, Tippen, and the rest of the NJC directors is that their principal, if not their exclusive, motivation was to ensure the construction of a performing arts center for SMT.  Kaney's proposal made as much clear: "In the worst case, the shortfall [for the theater] would be

$19.5 million.  Either way, we can arrange a naming rights transaction *that will justify covering the gap and 'saving' the Center.*"  Kaney Proposal for Naming Rights Agreement, Aug. 28, 2003, Pl.'s Ex. 134, at 5 (emphasis added).  Kaney further emphasized that the naming rights agreement would protect the long-term viability of SMT and put "the excellent work of the SMT into the spotlight position (and location, location, location) that will make it shine."  Id. at 10.

Cox first learned of the naming rights agreement on March 10, 2004, when, by mere happenstance, Jay Smith read an article about the agreement in *Columbia Journalism Review.*  The article noted that Tippen Davidson and his daughter were the producers of a "theater group that would be one of the center's major tenants."  Gloria Cooper, *Darts & Laurels*, Colum. Journalism Rev., March/April 2004, Pl.'s Ex. 191.  After locating NJC and LACI's contract, Smith contacted NJC to determine whether the review's article was accurate.  David Kendall confirmed that NJC and LACI had, in fact, entered into a naming rights agreement and that NJC intended to pay LACI $13 million within the next one to two months.

At the direction of Jonathan Kaney, Kendall subsequently gathered additional information for Cox.  While preparing the information, Kendall became concerned that mention of NJC's financial support of the arts would invite Cox to question NJC's past contributions.  When Kendall expressed these concerns to Kaney, Kaney responded: "I do not see any way around broaching the question and I am counting on you to give an answer that they do not understand."  E-mail from Jonathan Kaney to David Kendall (March 12, 2004, 17:58 EST), Pl.'s Ex. 203 (hereinafter "Kaney E-mail").

In the packet of information which Kendall sent to Cox, he attached a letter from Tippen Davidson to Jay Smith dated March 12, 2004.  The letter, which was actually drafted by Jonathan Kaney, explained some of the details of the naming rights agreement.  Also included in the information which Kendall sent to Cox was a redacted version of Kaney's proposal for the naming rights agreement.  The proposal, or "favorable opinion letter," that Kendall sent was missing the last five pages of the original proposal containing Kaney's explanation of the advantages of the naming agreement to the Davidson family and SMT.  See Attach. to Letter from David Kendall to Buddy Solomon, Apr. 26, 2004, Pl.'s Ex. 226.  Cox first learned of the redaction when, during pre-trial discovery in this case, NJC produced a copy of an e-mail in which Kaney specifically instructed Kendall to perform the redaction.  See Kaney E-mail.

After receiving the information packet from Kendall, Cox asked Kendall to provide additional information regarding the naming rights agreement.  In particular, Cox asked Kendall to disclose the specific date on which NJC intended to make the payment of $13 million to LACI.  In response to Cox's inquiry, Kendall sent a letter stating that "actual payment was made on March 26, 2004."  Letter from David Kendall to Buddy Solomon.  This marked the end of any hope of continued relations between Cox and NJC.  On May 11, 2004, Cox filed suit against Defendants.

## II.  TESTIMONY REGARDING THE VALUATION OF COX'S SHARES

At trial, both sides presented expert testimony on the fair value of Cox's shares.  Because the methodologies and conclusions of each side's experts vary considerably, evaluation of the fair value of Cox's shares must begin by weighing each expert's testimony

in light of relevant legal authority.

### A. PLAINTIFF'S EXPERT

Cox's expert, Owen D. Van Essen, was plainly qualified to provide testimony regarding the fair value of Cox's shares.  Van Essen is presently a partner in Dirks, Van Essen, & Murray, a firm which specializes in the valuation of newspapers.  Van Essen's firm has valued in excess of ten billion dollars worth of transactions in its twenty-five year history and more than fifty percent of the daily newspaper transactions in the United States over the past decade.  Trial Tr. at 387:8-9.  Prior to joining Dirks, Van Essen, & Murray, Van Essen spent his entire career in the newspaper business.

Van Essen's starting point in valuing Cox's shares was the fair market value of the *News-Journal* as a "going concern."[6]  In determining fair market value, Van Essen used a comparable sales analysis, which measures the market value of a newspaper primarily in relation to the purchase prices of comparable newspapers.  Id. at 394:7-11; 395:7-9.[7]  Van Essen began his analysis by comparing NJC's Earnings Before Interest, Taxes, Depreciation,

---

[6]  A "going concern," in Van Essen's view, is a "dominant business in its market, [with] an assembled group of employees, [which is] in no danger of going out of business."  Trial Tr. at 392:24-393:1.  Although Van Essen, like Defendants, believes that a going concern is a business which "is going to continue into the future," he does not subscribe to the position that the valuation of a going concern must necessarily rest on an assumption that the business will continue to operate under the same management (regardless of how deficient that management might be).  Id. at 392:19-393:11.

[7]  The *News-Journal* has the 99th largest circulation of all daily newspapers in the United States.  It is the 11th largest independently owned paper in the United States and the second largest in Florida; only the *St. Petersburg Times*, which is owned by a trust, is larger than the *News-Journal*.  Expert Report of Owen Van Essen at 10.

and Amortization ("EBITDA") margin[8] to the average EBITDA margin of eleven publicly traded newspaper companies.  In comparison to NJC's EBITDA margin of 9.3%, the eleven publicly traded newspaper companies had an average EBITDA margin of 28.3%.  Relying on this data, Van Essen normalized NJC's EBITDA margin to 28.3%.

From a database of 1200 newspaper transactions, Van Essen proceeded to select seven transactions involving newspaper companies comparable to the *News-Journal*.  Van Essen selected the comparables based on 150 different measures, including growth, circulation, financial metrics, and market characteristics.  He then set out to determine the average purchase price-to-revenue and purchase price-to-EBITDA ratios of the comparable companies.  After excluding two comparables based on their abnormally high ratios,[9] Van Essen determined that the remaining comparables had an average purchase price-to-revenue ratio of 4.1:1 and an average purchase price-to-EBITDA ratio of 14.4:1.  Id. at 407:6-10.

Had Van Essen employed his standard approach to valuing newspapers, he would have based his assessment of the *News-Journal's* fair market value strictly on the average ratios of the comparables.  This would have required Van Essen to simply multiply the *News-Journal's* 2004 gross revenue of $66,039,483 by 4.1 and its normalized EBITDA by 14.1.

---

[8]  The EBITDA margin is calculated as the ratio of EBITDA to net revenue (EBITDA is divided by net revenue).

[9]  Van Essen excluded Vero Beach's and Naples's newspapers, which respectively had purchase price-to-EBITDA ratios of 25.5:1 and 23.4:1.  Trial Tr. at 406:1-10.  Had Van Essen factored in the sales of these two comparables, his estimate of NJC's value would have only been higher.

However, in a slight departure from his standard approach, Van Essen adjusted the multipliers downward in order to account for NJC's capital expenditures and a possible reduction in NJC's growth rate. Id. at 407:14-24.   Applying the slightly adjusted multipliers, Van Essen determined that the *News-Journal*'s fair market value as of May 10, 2004 was $270 million.   Under a similar analysis, Van Essen further determined that the fair market value of Pennysaver was $36 million.   Accordingly, Van Essen concluded that NJC's fair market value was $306 million and that Cox's 47.5% share of that total–and thus its fair value–equaled $145,350,000.

As a check on the market approach, Van Essen conducted a discounted cash-flow analysis of NJC.   Critical to this analysis was Van Essen's determination that the projected revenue growth rate of NJC was 6%.   Using this figure as well as the *News-Journal*'s normalized EBITDA of 28.3%, Van Essen concluded that NJC's fair value under the discounted cash-flow analysis was $289 million.[10]

## B. DEFENDANTS' EXPERT

Defendants' expert, Robert E. Duffy ("Duffy"), was also qualified, though appreciably

---

[10]   Prior to NJC's election to purchase Cox's shares, David Kendall contacted Van Essen to obtain a rough estimate of NJC's value.   Kendall provided Van Essen with various data including the amount of NJC's gross revenue.   Based on this data, Van Essen estimated that NJC was worth approximately $320 million, $14 million less than the estimate he reached in his formal valuation.

Jay Smith, who has many years of experience in pricing newspapers, also testified as to the fair market value of NJC.   It is his opinion that, had NJC been operating efficiently in 2004, it should have had a revenue of approximately $100 million and cash flow of approximately $25 million.   Based on these figures, Smith applied a rule of thumb multiple to the cash flow and determined that NJC had a value of $325 million.   Trial Tr. at 95-96.

less so than Van Essen, to provide testimony on the fair value of Cox's shares.[11]  Duffy is a certified public accountant and partner in the firm of Grant Thornton.  He is also accredited as a senior appraiser by the American Society of Appraisers.  Id. at 1161:8-17.  Unlike Van Essen, however, Duffy has had little experience in valuing newspapers.  His specialty instead is in the fields of gift taxation and complex dissolutions of marriage.  Id. at 1207:12-1208:4.  Approximately 90% of Duffy's practice, in fact, is devoted to dissolutions of marriage.  Id. at 1207:12-16.

In assessing the value of NJC, Duffy relied on discounted cash-flow analysis, a valuation method which estimates the value of a company according to the present value of its anticipated future cash flow.  Id. at 1174:8-1176:11.  The discounted cash-flow model has four components: (1) estimated earning capacity; (2) cash flow adjustments to the earning capacity; (3) a discount rate to discount future cash flow to present value; and (4) a long-term growth rate to reflect growth in earnings and cash flow beyond the end of the forecast period.  Expert Report of Robert Duffy (hereinafter "Duffy Report"), at 30-31.

Like Van Essen, Duffy operated from the premise that NJC should be valued as a going concern.  Duffy's definition of a going concern was colored, however, by Jonathan Kaney's "advice" that valuing a company as a going concern rests on the assumption that a company will operate in the future as it did in the past.  Trial Tr. at 1168:17-1169:1.  From this basic assumption, Duffy also assumed in his analysis that, in a hypothetical sale of NJC, (1) the "current controlling shareholder group and current business model [of NJC would]

---

[11]  Defendants also submitted a report by Jeffrey Gordon.  They did not, however, offer his testimony at trial or rely on his report in their arguments.

remain intact,"; (2) a "strategic buyer" would not have been available to purchase NJC; and (3) "no material change to [NJC's] operations, capital structure . . . or profitability" would have resulted from the sale. Id. at 1171:6-14.

Duffy began his analysis by estimating the future projected cash flow of NJC from May 9, 2004 onward. He then predicted, on the basis of conversations with NJC management, that NJC would operate for two-and-a-half years at its presently low EBITDA margin of roughly 12% but would thereafter operate at a higher EBITDA margin comparable to the margins the company enjoyed during the five-year period from 1998 through 2002. After accounting for an anticipated reduction in NJC's corporate contributions,[12] Duffy determined that NJC would eventually operate at an 18.3% EBITDA margin. Based on these EBITDA projections, Duffy concluded that NJC's cash flow in 2012 would be approximately $8.2 million.

Using the *Gordon Growth Model* and applying a capitalization rate of 10%,[13] Duffy then determined that the value of NJC's future cash flow would be $82 million. Id. at 1189:13-1190:11. After discounting this amount to a present value of $61,984,031, Duffy added back the present value of the initial "discrete two and a half year cash flow" and concluded that the aggregate value of NJC was $72,967,000. Id. at 1188:12-21. Duffy used the following diagram to illustrate his calculations:

---

[12]  Duffy accounted for contributions of $500,000 per year.

[13]  Duffy arrived at a capitalization rate of 10% by subtracting NJC's projected 4% long-term growth rate from a discount rate of 14%.

|  | May 9 to December 31, 2004 | 2005 | 2006 | Perpetuity |
|---|---|---|---|---|
| Equity cash flow | $2,215,115 | $4,831,252 | $6,226,658 | $8,210,128 |
| Perpetuity capitalization rate |  |  |  | 10.0% |
| Value of perpetuity |  |  |  | $82,101,275 |
| Discount factor @ 18.7% | 0.9586 | 0.8607 | 0.7550 | 0.7550 |
| Present value of future cash flows | $2,123,439 | $4,158,095 | $4,700,942 | $61,984,031 |
| Aggregate marketable, minority value | $72,967,000 |  |  |  |

Duffy added $3,269,000 to account for a tax shield related to the depreciation of NJC's naming rights and another $1,150,000 for a tax shield related to building depreciation. This resulted in an adjusted aggregate value of $77,386,000. See id. at 1188:22-1189:1. Based on studies of restricted stock, Duffy then applied a 20% lack of marketability discount to NJC's value, yielding a final estimated value of $61,909,000. Id. at 1195:7-1198:17. Finally, Duffy multiplied NJC's value by the percentage value of Cox's interest in NJC, yielding $29,410,000. Id. at 1198:18-20. This was Duffy's final estimate of the fair value of Cox's shares as of May 10, 2004.

## III.  ANALYSIS

My principal responsibility in this case is to determine the fair value of Cox's shares as of the day before Cox filed its suit against NJC. As a secondary issue, I must also decide whether Cox is entitled to "reasonable fees and expenses of counsel and of any experts."

See §§ 607.1436(5), 607.1430(3), Fla. Stat.  Resolution of this second issue depends on whether or not Cox had probable grounds for its original claim that Defendants were misapplying or wasting NJC's corporate assets to the detriment of NJC and its shareholders.[14]  See id.

## A.  VALUATION OF COX'S SHARES

"Section 607.1436(4) and Florida case law neither define 'fair value' nor provide criteria by which 'fair value' may be measured."  G & G Fashion Design, Inc. v. Garcia, 870 So. 2d 870, 871 (Fla. 3d DCA 2004).  In determining the fair value of a dissenter's shares, courts should thus consider "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court.  This may include net asset values, market price, earnings, and the like."  Boettcher v. IMC Mortgage Co., 871 So. 2d 1047, 1054 n.6 (Fla. 2d DCA 2004) (internal quotations and citation omitted).

## 1.  METHOD OF VALUATION

Defendants contend that Van Essen's fair market method of valuation is as at odds with the fair value standard.[15]  However, while the legislature's use of the term fair value

_____

[14]  Cox contends that I should also award it damages in an amount equal to Defendants' corporate waste.  As I later explain, I do not find that such an award is either necessary or appropriate in this case.

[15]  NJC has also objected to Van Essen's failure to adjust his valuation to account for the fact that not all of the comparable sales he used were sales of corporate stock shares (some were asset sales).  The experts in this case have agreed that the sale of 100% of the assets of a corporation would likely have a higher value than a sale of 100% of the shares of the same corporation.  Neither side, however, has provided me with a means of adjusting the evaluation to account for this factor.

implies that courts are not bound to base *fair value* strictly on the *fair market value* of a corporation, the terms are not mutually exclusive.  Rather, the flexibility of the fair value standard merely recognizes the fact that a closely-held corporation may have value to its owners even in the absence of a viable market in which the corporation might be sold.  See G & G Fashion, 870 So. 2d at 871-73; see also Blake v. Blake Agency, Inc., 486 N.Y.S.2d 341, 347 (App. Div. 1995) ("Within the context of a closely held corporation, market value is *usually* of little or no significance because the shares of stock are not traded on any public market.") (emphasis added).  The flexibility of the standard also protects minority shareholders by allowing courts to make adjustments accounting for the misconduct of majority shareholders.

By contrast, when the shares of a marketable corporation are being valued, the flexibility of the fair value standard cuts in favor of the fair market method of valuation.  See, e.g., G & G Fashion Design, 870 So. 2d at 871 ("[T]he value of the corporation should be determined on the basis of what a willing purchaser, in an arm's length transaction, would offer for the corporation as an operating business, rather than as a business in the process of liquidation.") (quoting Blake, 486 N.Y.S.2d at 347)); see also Shannon Pratt, Robert F. Reilley, & Robert P. Schweihs, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 352 (4th ed. 2000) (noting that fair value has been interpreted to mean fair market value without a noncontrolling ownership interest discount); Charles W. Murdock, The Evolution of Effective Remedies for Minority Shareholders and its Impact Upon Valuation of Minority Shares, 65 Notre Dame L. Rev. 425, 442 (1990) ("The notion of fair price is predicated upon the model of arm's length bargaining between a willing buyer and a willing

seller."). This valuation method, as employed by Van Essen, begins by valuing the corporation as a whole and ends by determining the percentage value of the dissenting shareholder's shares.

Based on the evidence presented at trial, I am convinced that NJC is a marketable corporation. The *News-Journal* and Pennysaver are profitable, viable businesses that would command an attractive price on the open market. There is, therefore, no cause in this case to refrain from considering Van Essen's testimony. The fair market value method of valuation is, at a minimum, a generally accepted method of valuation in the financial community and one that is appropriate for use when valuing a clearly marketable corporation such as NJC.

The fair market value method is, moreover, not only an acceptable method of valuation, it is also the most equitable method available for use in this case. If an alternative method were used, Defendants – and particularly PMV – would be rewarded by being able to purchase Cox's shares at a bargain price. Such a result, not the use of the fair market value method, would be plainly at odds with the Florida legislature's goal of protecting the interests of minority shareholders. I conclude, therefore, that the fair market value method is the proper method of valuation in this case and weight the testimony of the parties' experts accordingly.

## 2. VALUING NJC AS A GOING CONCERN

While the parties agree that NJC should be valued as a going concern, they disagree as to the term's meaning. Generally defined, a going concern is "[a] commercial enterprise actively engaging in business with the expectation of indefinite continuance." Black's Law Dictionary 699 (7th ed. 1999). For valuation purposes, this means that the business should

be deemed "as an operating business, rather than as a business in the process of liquidation." G &G Fashion Design, 870 So. 2d at 872.  On this much, the parties agree. Defendants argue, however, that the valuation of a corporation as a "going concern" should assume that it will be conducted in the future as it had been conducted in the past.  This requires the appraiser to ignore any changes that a potential purchaser would likely make to the operations of the corporation.

Defendants are correct to the extent that valuation of a company as a going concern must at least assume that the corporation will continue to operate the same type of business–in this case, the publication of a newspaper and shopping guides.  Also, the valuation cannot be based on a contemplated merger or liquidation.  See Bell v. Kirby Lumber Corp., 413 A.2d 137 (Del. 1980).

I do not, however, otherwise accept the proposition that valuing NJC as a going concern means that I must assume that the corporation will operate in the future as it has in the past.  Acceptance of this definition of a going concern would, in essence, create an incentive for those with control over corporations to violate fiduciary duties, waste corporate assets, and drive down the value of minority shares.  As one court has put the perversity of the incentive: "the greater the misconduct by the majority, the less they need to pay for the minority's shares."  Friedman v. Beway Realty Corp., 661 N.E.2d 972, 976 (N.Y. 1995) (quotations and citation omitted).

The better definition of a going concern in my view assumes that a corporation will be managed in a reasonably prudent manner going forward, regardless of how poorly it may have been run in the past.  This allows for an appraiser to normalize the financial data of a

poorly operated corporation before determining what the corporation would sell for in an arm's-length transaction.  In keeping with this view, I find that, given NJC's abnormally poor performance relative to comparably situated newspapers, Van Essen was justified in normalizing the *News-Journal*'s EBITDA margin.

I do not find, however, that normalizing the *News-Journal*'s EBITDA margin according to the EBITDA margins of publicly traded corporations was the best course.  Van Essen could have just as easily used the slightly lower 24.8% average EBITDA margin of the comparables.  There is simply no good reason why NJC's EBITDA margin should not be normalized according to similarly situated newspapers.  Accordingly, I find that Van Essen's fair value assessment must be adjusted to account for a normalized EBITDA margin of 24.8%.[16]

### 3.  RECALCULATION OF NJC'S FAIR MARKET VALUE

Applying a 24.8%–rather than a 28.3%–normalized EBITDA margin to the *News-Journal*'s revenue of $66 million yields a product of $16.4 million.  This figure, multiplied by 14.4, equals $236 million–the fair market value of the *News-Journal*.  This amount, combined with the $36 million value of the Pennysaver, equals $272 million–the fair market value of NJC as of May 10, 2004.

---

[16]   The independent papers included among the comparables had a slightly lower EBITDA margin of 23.5%.  Although the *News-Journal* is also an independent newspaper, I do not find that normalizing its EBITDA margin according to the average EBITDA margin of the independent comparables is appropriate.  The independence of a newspaper is only one factor among many which renders it sufficiently similar to another newspaper to be considered its comparable.

### 4.  THE SUITABILITY OF A DISCOUNT FOR LACK OF MARKETABILITY

In <u>Munshower v. Kolbenheyer</u>, Florida's Third District Court of Appeal held that "in determining the 'fair value' of [a petitioner's shares], as required by section 607.1436(1), Florida Statutes [], a discount for lack of marketability is properly factored into the equation because the shares of a closely held corporation cannot be readily sold on a public market." 732 So. 2d 385, 386 (Fla. 3d DCA 1999); <u>see also</u> <u>Hall v. King</u>, 675 N.Y.S.2d 810, 814 (N.Y. Sup. Ct. 1998) ("A lack of marketability discount is . . . a discount to reflect the illiquidity of a petitioner's shares, i.e., that a potential investor would pay less for shares in a close corporation because they could not readily be liquidated for cash.") (internal quotations and bracketing omitted); <u>Blake</u>, 486 N.Y.S.2d at 349.  Defendants, relying on <u>Munshower</u>, contend that a lack-of-marketability discount *must* be applied where, as in this case, the shares of a closely-held corporation are being valued.  The court in <u>Munshower</u> merely determined, however, that courts *may* apply a lack-of-marketability discount when valuing shares in a closely-held corporation; it did not determine that they *must* do so.  732 So. 2d at 386 ("[A] discount for lack of marketability is *properly factored* into the equation . . . .").  The distinction is critical.  Absent a requirement that a lack-of-marketability discount be applied in this case, the discretion remains with me to apply or not apply the discount based on the arguments and evidence I have before me.

Defendants argue that the fair value of Cox's shares should reflect a 20% lack-of-marketability discount.  Their rationale, consistent with <u>Munshower</u>, is that the shares of a closely-held corporation are less liquid, and therefore less marketable, than the shares of a publicly traded corporation.  While this theory generally rings true, Defendants still had the

burden of showing the degree to which the liquidity of Cox's shares varies from the liquidity of publicly traded shares.[17]  It is a burden that they wholly failed to satisfy.

Defendants' only evidence regarding the alleged illiquidity of Cox's shares was Robert Duffy's unconvincing testimony that a lack-of-marketability rate of 20% should be applied in this case simply because discount rates of 20-40% are commonly applied to restricted stock.[18]  Trial Tr. at 1195:7-1198:12.   Duffy made no attempt to compare, or otherwise meaningfully relate, the illiquidity of restricted stocks to the illiquidity of Cox's shares.  Nor did he attempt to estimate the length of time it would have taken Cox to convert its shares to cash.  Left as I am with no principled basis to measure the illiquidity of Cox's shares, I cannot apply a discount for lack of marketability in this case.

## B. CORPORATE WASTE

Based on its allegations that Defendants wasted and misapplied NJC's assets, Cox seeks: (1) reasonable fees and expenses of its counsel and experts; and (2) damages equal to the amount of Defendants' waste.  The first of these requests is proper; the latter is not.

Once a corporation elects to purchase the shares of a shareholder which has

---

[17]   Curiously, Defendants actually seemed to argue not so much that Cox's shares lacked marketability but that *NJC's shares as a whole* lacked marketability.  Although Robert Duffy occasionally referred to the illiquidity of minority shares in his expert report and testimony, he applied the discount for lack of marketability to NJC's (and not Cox's) shares. This approach is not only out of step with <u>Munshower</u>'s focus on the value of the petitioner's shares, it is also devoid of any basis in the record.  All the evidence in this case indicates that NJC has the potential to be a highly profitable business.  As such, I have no cause to believe that the shares of the corporation as a whole lack liquidity or otherwise lack marketability.

[18]   Restricted stock can only be sold after a one-year holding period.  Duffy Report at 42.  Prior to 1997, the requisite holding period was two years.  <u>Id.</u>

petitioned for dissolution of the corporation, there are only two forms of relief for the petitioner which are authorized by Florida's election-to-purchase statute.  The principal form of relief is, of course, an award commensurate with the fair value of the petitioner's shares.  The only other form of relief which is sometimes allowable is an award of "reasonable fees and expenses of counsel and . . . experts."  Fla. Stat. § 607.1436(5).  This latter relief may only issue if, prior to the corporation's election to purchase, the petitioner "had probable grounds" to make out a claim for dissolution of the corporation on the basis that the assets of the corporation were being misapplied or wasted.  See id. ("If the court finds that the petitioning shareholder had probable grounds for relief under s. 607.1430(3), it may award to the petitioning shareholder reasonable fees and expenses of counsel and of any experts employed by petitioner."); Fla. Stat. § 607.1430(3)(a) ("A . . . court may dissolve a corporation or order such other remedy . . . [i]n a proceeding by a shareholder or group of shareholders in a corporation having 35 or fewer shareholders if it is established that . . . [t]he corporate assets are being misapplied or wasted, causing material injury to the corporation.").

In light of section 607.1436(5), I undoubtedly possess discretion to award reasonable fees and expenses of counsel and experts to Cox.  Cox originally filed a claim for dissolution of NJC pursuant to section 607.1430(3)(a) and has since consistently maintained that Defendants wasted and misapplied NJC's corporate assets.  In determining whether to award Cox fees and expenses, I need only determine whether Cox "had probable cause" to prove that assets were, in fact, being wasted to the detriment of NJC.

In contrast to Cox's request for fees and expenses, Cox's claim for damages has no basis in Florida's election-to-purchase statute.  The principal form of relief under the statute,

as already noted, is the fair value of the petitioner's shares.  Cox has argued that the fair

value of its shares is 47.5% of the fair market value of NJC.  Absent a reliable evidentiary

basis upon which to apply a discount to the value of Cox's shares, such that the fair value

of its shares would more closely approximate the fair market value of its shares, I have

accepted Cox's argument.  To now award Cox anything over and above that amount would,

by the terms of its own argument, exceed the fair value of its shares.  I decline, therefore, to

award Cox damages equal to the amount of Defendants' waste.[19]

Turning now to the question of whether Cox had probable cause to establish that

Defendants wasted and misapplied NJC's assets, I find that the facts giving rise to this case,

particularly those surrounding the naming rights agreement, largely speak for themselves.

As Dean Bonham, Cox's expert on the valuation of NJC's corporate waste, substantiated,

NJC's decision to enter into the naming rights agreement made little sense from a business

perspective.  Since the agreement was plainly born not of NJC's legitimate commercial

interests, but of Tippen Davidson's desire to build a performing arts center, NJC and LACI

neglected to engage in any negotiations.  Instead, Jonathan Kaney unilaterally determined

the price of the agreement without so much as considering a discount for present value.

Kaney did not request an outside assessment of the agreement's worth to NJC and neither

he nor anyone else contacted Cox–a 47.5% shareholder–to get its opinion on the proposed

deal.  In the end, Tippen simply appeared at a meeting of the LACI board and triumphantly

--------

[19]  Cox contends that I must consider Defendants' waste as one factor among many in determining the fair value of its shares.  I agree and, in fact, I already have.  By using a normalized EBITDA of 24.8% to value NJC's shares, I ultimately valued Cox's shares as a proportion of what NJC's shares would be worth if it did not engage in wasteful activities.

announced that NJC agreed to make up the $13 million shortfall for the performing arts center.  According to Bonham, the net result was an overpayment by NJC of approximately $9 million.[20]

This might have been Defendants' worst abuse, but it was hardly their first.  The record is replete with evidence of corporate waste and questionable conduct by Defendants.  Kaney's opinion that NJC's expenditures could not "be justified in relation to promotional expenditures [or] in relation to reasonably allowable corporate philanthropy" shows that, in fact, Kaney and the other defendants were perfectly aware of their misdeeds.  Yet, rather than altering their behavior as Kaney urged, they persisted in using NJC as a means to indulge their personal interests in the arts.

Notwithstanding the candid admissions contained in Kaney's letter, Defendants now maintain that their promotion of the arts inured to NJC's benefit by improving the cultural environment of Daytona Beach and Volusia County and thereby attracting new businesses and residents to the area.  They also claim that promotion of the performing arts has the

---

[20]   Bonham concluded that Jonathan Kaney should have applied a discount for present value based on the following risk factors: (1) the performing arts center had not yet been built as of the time that NJC paid LACI the $13 million; (2) lease agreements with potential tenants had not been signed; and (3) the performing arts center was projected to enjoy only marginal profitability and marginal financial stability.  Trial Tr. at 332:16-333:6.  I find that Bonham properly took these risk factors into account and, as a consequence, arrived at a reasonable estimate of the amount NJC overpaid to enter into the naming rights agreement with LACI.

Like Kaney, Defendants' expert on the corporate waste, Laren Ukman, did not account for the risk factors that Bonham considered.  As Bonham testified, this oversight was essential to Ukman's conclusion that NJC did not overpay for the rights to name the performing arts center.

additional benefit of enhancing reader loyalty and goodwill.  Although Defendants' rationale is not without some plausibility, the record indicates that the predominant factor motivating Defendants in their various activities was their personal interests in the arts.  By creating and supporting the Cultural Entities, Tippen and the others provided themselves with a ready vehicle for their aesthetic pleasures.

Defendants offer three additional, and equally unavailing, defenses to Cox's charge of corporate waste.  First, Defendants claim that Florida's business judgement rule forbids me from substituting the judgment of a minority shareholder–or, for that matter, my own judgment–for the judgment of the NJC board of directors.  See Lobato-Bleidt v. Lobato, 688 So. 2d 431, 434 (Fla. 5th DCA 1997).  The business judgment rule only applies, however, when a business is operating according to a reasonable business model.  It is not intended to serve as a shield for those who, like Defendants, have acted in their own personal self-interest.  Sonny Boy, L.L.C., v. Asnani, 879 So. 2d 25 (Fla. 5th DCA 2004).

Defendants also claim that Cox acquiesced to much of the corporate waste.  With respect to perhaps a small portion of Defendants' activities, such as their efforts to bring the LSO to Daytona Beach, their defense is well-taken.  Yet, even if some of Defendants' misdeeds may be justified by the defense of acquiescence, the greatest and most wasteful amongst them cannot.  There can be no doubt, for instance, that Cox did not acquiesce to NJC's decision to enter into the naming rights agreement.

Finally, and least convincingly, Defendants argue that their contributions are authorized by a provision in the 1944 amendment to NJC's corporate charter which created WNDB-FM.  The provision states that NJC may "engage in the business of producing,

performing and transmitting by electrical or mechanical means, plays and musical compositions." 1944 Amendment of Charter.[21]  If the amendment consisted only of this provision, it would perhaps justify at least some of NJC's cultural contributions.  It is clear, however, that, when viewed in the larger context of the 1944 amendment, the provision simply functions to justify expenditures related to plays and musical compositions performed on or by WNDB-FM.  Until recently, this interpretation of the provision was presumably also Defendants' interpretation of it, as there is absolutely no indication anywhere in the record that Defendants ever believed, prior to this case, that NJC's generous support of the Cultural Entities was justified by the corporate charter.  Defendants' reliance on the charter can only be seen, therefore, as a post hoc attempt to justify their conduct.

Having rejected all of Defendants' proffered justifications for NJC's extravagance, I find that Cox plainly had probable cause to establish that the assets of NJC were being misapplied and wasted by Defendants.  Upon this finding, I further determine that Cox is entitled to reasonable fees and expenses of its counsel and experts.

**CONCLUSION**

---

[21]  The full text of this provision, as set forth in the 1944 amendment, states:

To engage in the business of originating, producing, reproducing, exploiting, exhibiting, presenting, performing and transmitting (by electrical and/or mechanical means, with or without wires) plays, musical compositions, and all other manner of entertainment of interest or of educational value; to manufacture, produce, adapt, prepare, buy, sell, distribute, license and otherwise deal in any materials, articles, devices, processes, or things required or useful in connection therewith or incidental thereto; and to employ actors, artists, singers, performers, artisans, mechanics, and other persons in connection therewith.

## A. FAIR VALUE

I find that the fair value of Cox's 47.5% interest in NJC is $129,200,000.  NJC will be required to pay this amount to Cox in return for Cox's shares in NJC.

## B. TERMS OF PURCHASE

Section 607.1436(5), Florida Statutes, provides that:

Upon determining the fair value of the shares, the court shall enter an order directing the purchase upon such terms and conditions as the court deems appropriate, which may include payment of the purchase price in installments, when necessary in the interests of equity, provision for security to assure payment of the purchase price and any additional costs, fees, and expenses as may have been awarded.

Prior to the entry of this order, the parties obviously did not know the amount I would designate as the fair value of Cox's shares of NJC and were thus not prepared to  argue their positions regarding the reasonable terms for the transfer of Cox's interest.  Now that the parties have been apprised of my fair value determination, they will have twenty (20) days from the date of this order to provide me with written memoranda no more than fifteen (15) pages in length setting forth their respective positions on–*and only on*–what would constitute reasonable terms of purchase in this case.  Oral argument on this issue shall also be scheduled at a date and time to be named later.

Following oral argument, I will enter final judgment based on terms which I deem to be equitable.  For the time being, I reserve judgement.

## C. FEES AND EXPENSES OF ATTORNEYS AND EXPERTS

I find that Cox is entitled to reasonable fees and expenses of its attorneys and experts.

Cox's motion for fees and expenses shall be filed no more than fourteen (14) days following the entry of final judgment in this case.  Local Rule 4.18.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 30th day of June, 2006.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party