UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

COX ENTERPRISES, INC., a
Delaware corporation,

       Plaintiff,

v.

NEWS-JOURNAL CORPORATION, a
Florida corporation, HERBERT M.
DAVIDSON, JR., MARC L. DAVIDSON,
JULIA DAVIDSON TRUILO, JONATHAN
KANEY, JR., DAVID KENDALL,
ROBERT TRUILO, GEORGIA KANEY,
and PMV, INC., a Florida corporation,

       Defendants.
_____\

CASE NO. 6:04-CV-698-ORL-28-KRS

**INTERVENOR LEWEEN JONES' MEMORANDUM IN OPPOSITION
TO COX'S MOTION TO SET ASIDE KEY MANAGER AGREEMENTS
(ADDRESSED TO THE MERITS)**

      Intervenor, LEWEEN JONES, who believes she is party to one of the twenty-seven "Key Manager" Agreements COX has moved to set aside, opposes COX's motion on the merits. JONES has previously moved to dismiss COX's claim against JONES on jurisdictional grounds. This memorandum states JONES' position on the merits, should the Court entertain such.

**BACKGROUND**

      Evidence will show that Jones has been employed at NJC since July 25, 1996 as its Retail Advertising Manager. Advertising is the lifeblood of the newspaper, and her role is critical to its success. In November, 2004, JONES was presented with a Key Manager agreement to execute, which she did. JONES is neither a Director nor an Officer of NJC; therefore COX does not and cannot contend that she engaged in self-

1

dealing in breach of fiduciary duty.  Instead, COX's argument rests on the premise that the top executives and Board of Directors breached their fiduciary duties to NJC and to COX.

JONES' agreement provides no incentive for her to leave employment.  Instead, it incents and has in fact incented her to remain employed during the four-year dispute between COX and NJC.  Throughout this period it was uncertain--despite NJC's assurances and intent--whether a change in control of the newspaper would occur (to either COX or a third party), or whether it would be dissolved, or whether it would fail as an operating enterprise because of the turmoil.

JONES' Agreement provides no benefit to her in the case of a corporate dissolution, or if a change in control does not occur.  Instead, JONES understands that unless and until a change of control occurs she is an at-will employee who may be terminated at any time with no guaranteed severance.  She understands that she will only receive compensation under the Agreement if a change in control occurs and if she thereafter suffers an adverse employment action within three years of the change, a so-called "double trigger" contingency.  Contrary to COX's assertion, JONES' Agreement cannot realistically be construed to provide her with compensation if she voluntarily leaves employment after a change in control, absent an "adverse employment action."

Evidence will show that, based on the assurance of continued stability of employment while COX, the Davidsons,  the Board of Directors, and the top executives were litigating their differences, and thereby incented to continue her exemplary efforts to help the newspaper continue to succeed and prosper as an ongoing enterprise,  JONES declined to pursue or accept other employment opportunities, including an opportunity to

accept a position as Retail Advertising Manager at Florida Today newspaper in May, 2008, mere weeks before COX filed its motion.

This background establishes that Jones is an innocent third party who has already fulfilled her part of the bargain, to her detriment. If Cox's motion is granted, JONES will suffer actual reliance damages caused by this Court, as COX's tool. With this background, JONES opposes COX's motion on the merits. Not only is the motion baseless in fact and in law; but in addition COX's remedy is in damages against the Board members and/or the Executives.

## SUMMARY OF THE ARGUMENT

1. This case does not involve either a takeover defense or self-dealing. Therefore, the business judgment rule applies.

2. In applying the rule, the courts presume that the directors acted properly and in good faith. Therefore, the burden is on COX to prove abuse of discretion, fraud, bad faith, or illegality. COX's "fraud" claim is baseless and self-defeating.

3. With regard to parachute payments, COX must prove "corporate waste"; that is, that the payments are without "adequate consideration." Adequacy is left to the sound discretion of the directors.

4. The judgment of the directors will not be invalidated so long as the compensation bears a "reasonable relationship" to the services rendered by JONES. The test is passed if the payment insures that the benefit provided by the services will inure to the corporation. Continued employment as a precondition to payment passes the test as a matter of law. JONES' Agreement passes the test because it incents her to remain

employed, and she has remained employed, thereby providing stable management and added value to the newspaper as an ongoing enterprise.

5. The "reasonable relationship" analysis requires the court to examine (a) whether NJC benefited from JONES' services; (b) whether the compensation is "so unreasonably disproportionate to the benefit" that no reasonable person would think the corporation received a quid pro quo; and (c) whether the services rendered triggered the payments. The burden is on COX to prove that JONES' agreement fails these inquiries.

6. Under Florida law, the federal tax standard for evaluating "reasonableness" of parachute payments (the present value of the parachute does not exceed three times the employee's annual salary) is used as a guide for application of the "quid pro quo" analysis. JONES' agreement (2.99 times her salary) is "reasonable" within that standard.

7. The creation of a parachute payment system designed to retain key executive employees and thereby insure continued stability of management is valid as a matter of law. JONES' agreement and the agreements of the other 26 key executives has in fact accomplished that purpose and has thereby provided added value to the newspaper as an ongoing enterprise.

8. No payments have been made to JONES, or are yet due, since JONES has suffered no adverse employment action. COX's claim that the value of the newspaper has been diminished by 8 million dollars as the result of the key manager agreements is rank speculation.

9. The value of the newspaper to a prospective purchaser has been increased by the key manager agreements, because they insure that a purchaser will buy an ongoing

successful enterprise with a proven, stable management team; and that stability will continue after the acquisition. The purchaser is free thereafter to perform a cost-benefit analysis to determine whether it wishes to remove some, all, or none of the managers within three years, or to negotiate separate "buyouts" on an individual basis pursuant to mutual agreement. Conversely, granting COX's motion would incent Jones and the other key managers to jump ship prior to a sale, thereby threatening the continued viability of the newspaper and diminishing its value as an ongoing enterprise.

10. Any breach of fiduciary duty to COX, the disgruntled challenging shareholder, was by the Board of Directors and/or Executives who had the authority to enter into the agreements on behalf of NJC. COX's remedy is in damages against them, precluding the equitable relief it seeks against JONES--an innocent third party who has fulfilled her part of the bargain by remaining employed with NJC and declining other employment opportunities.

## **ARGUMENT**

This case is on all fours with, and its disposition governed by, the Eleventh Circuit's decision in International Insurance Co. v. Johns, 874 F. 2d 1447 (11th Cir. 1989). COX seems to agree, having offered Johns prominently (but misguidedly) in support of its motion. Although Johns was decided in a far different context from our case, the Court definitively analyzed the conditions under which parachute payments could be invalidated under Florida law. Under circumstances virtually identical to ours, both the lower court and the Eleventh Circuit upheld the validity of the parachute payments at issue.

Unlike in our case, (1) the payments in Johns were actually made after a change in control, pursuant to an incentive plan designed to induce key executives of the issuing bank to remain employed for a period of five years, at a time when the bank had become an attractive takeover target; (2) the Johns parachutes were to be opened in any event, either after five years had expired or when a change of control occurred; and (3) Johns involved an inquiry into the self-interest of directors who approved the parachutes, which does not apply to Jones and other key managers who had no authority to commit NJC to the agreements. In these respects, the Johns parachutes were far more questionable than the key manager agreements here; yet the Court determined that they were not corporate waste. The same result is required here; and COX's motion must be denied.

1. Florida law applies to this diversity case because NJC is incorporated within Florida. Johns, 874 F. 2d at 1458. Under Florida law, when the parachutes do not implicate questions of self-dealing or a takeover defense, a review of parachutes is governed by the business judgment rule. Johns, 874 F. 2d at 1458-61. The gist of the rule is that the board of directors has wide discretion over matters vested in it by Florida law; and courts will not generally substitute their judgment for that of the directors. It is a rule of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges; and that courts are ill-equipped to solve, or even grapple with, compensation problems. Johns, 874 F. 2d at 1458 n. 20 and 21. JONES, and the other key managers, did not and could not engage in self-dealing; and COX itself asserts that the parachutes were executed at a time when no real threat of change of control existed (Motion, ¶8). Therefore, the business judgment rule applies.

2. Under the business judgment rule, courts presume that directors have acted properly and in good faith. Unless a party challenging a board's action can prove either abuse of discretion, fraud, bad faith, or illegality, the court will not substitute its judgment for that of the board so long as the action taken was rational. Johns, 874 F. 2d at 1461. COX avers that the agreements are fraudulent because NJC had "irrevocably" elected to purchase COX's shares, and the agreements were entered into on the eve of mediation to determine their value, and had the effect of reducing their value (Motion, ¶8). This argument is specious, and must fail.

Contrary to COX's argument, the agreements had the actual effect of enhancing the value of the newspaper as an ongoing enterprise in the event (which occurred) that agreement could not be reached and extensive litigation would ensue, with the real possibility that worried managers would, as a result, jump ship. That is a rational basis for implementing them. The Johns court specifically noted the benefit of stable, experienced management to a corporation, and the value of parachutes toward that end, at 874 F. 2d 1463-67, commenting that

> "a corporation always desires to have a talented and specialized management. An efficient and profitable management depends upon specialized executives. to become specialized, executives must acquire firm-specific knowledge. To gain this knowledge, executives must expend human capital learning the day to day operations of the firm. Generally, the longer an executive remains with a company the more firm-specific knowledge that executive acquires. Loyal executives, therefore, become increasingly specialized as time passes resulting in the corporation's management becoming more efficient." Johns, 874 F. 2d at 1463

More to the point, COX's "fraud" argument defeats itself precisely BECAUSE the parachutes were enacted after NJC had elected to purchase COX's shares; and NO parachute payments were due in that event. Hence, the parachutes had NO EFFECT on

the value of COX's shares in determining the price at which NJC was to purchase them. If NJC's directors were to have truly acted with fraudulent intent, they would have disclosed the parachutes at the mediation and used them as an argument to lower the purchase price--but they did not: COX itself avers that it only recently discovered the existence of the parachutes.  Accordingly, COX cannot meet its legal burden; the board's judgment was rational as a matter of law;  and the board's judgment cannot therefore be disturbed.

    3.  Under the business judgment rule, courts will not invalidate parachutes unless they constitute corporate waste. Corporate waste exists when the payment is afforded without "adequate" consideration. Adequacy of consideration is left to the sound discretion of the directors.  Johns, 874 F. 2d at 1461.  COX argues that the key manager agreements were entered into for "no" consideration;  but COX is wrong in fact and law. JONES, and the other managers, have remained employed by NJC to this day, even though the agreements expressly recite that they are terminable at will.   As Johns expressly notes, continued performance under a termination at will contract furnishes sufficient consideration for a deferred bonus.  Johns, 874 F. 2d at 1463, citing with approval Royal Crown Cos. v. McMahon, 183 Ga.App. 543, 359 S.E.2d 379 (Ga.Ct.App. 1987).

    4.  Compensation plans, including parachutes, will not be invalidated by the courts so long as the compensation the executive receives bears a "reasonable relationship to the services rendered". This test is passed if the payment insures that the benefit provided by the services rendered will inure to the corporation.  As noted above, the compensation is based on the continued employment of an intact, experienced

management team, particularly when the managers remained at-will employees who were induced to remain employed by the promise of a benefit based on a contingency which might never have occurred but for the happenstance of the subsequent agreement of COX and NJC to sell the newspaper, four years later. Moreover, the at-will nature of the employment relationship absent change in control induced the managers to continue to perform at the highest level, to avoid termination with no compensation whatsoever. All this inured to the benefit of NJC; and JONES' key manager agreement passes the "reasonable relationship" test as a matter of fact and law.

     5. The "reasonable relationship" analysis requires the court to conduct three inquiries. First, the court must determine whether the corporation benefited from the services rendered. If the corporation received no benefits in exchange, the payments insured nothing, and the compensation system is corporate waste. Second, a court should examine whether the compensation was so "unreasonably disproportionate to the benefit" created by the exchange that a reasonable person would think the corporation did not receive a "quid pro quo", and would therefore constitute a "gift". Finally, a court must conclude that the services rendered triggered the payments. Johns, 874 F. 2d at 1461. As the challenging shareholder, COX bears the burden of proof on these inquiries, which would establish that the key manager agreements are corporate waste. Johns, 874 F. 2d at 1462, note 31.

    As discussed above, JONES' agreement satisfies the first inquiry in fact and in law. The third inquiry is also satisfied because it is continued employment which triggers the payments. Nevertheless, COX argues that the agreements provide for an "excessive amount of compensation, compensating the employees beyond what their services would

normally command." As with all its other arguments, COX is simply wrong and cannot meet its burden of proof, discussed below.

      6. As <u>Johns</u> specifically notes, parachute agreements are extremely common in the corporate world. In fact, they are so common that Congress has established a standard for determining their "reasonableness" for tax purposes, in the Deficit Reduction Act of 1984, Pub.L. No. 98-369, codified within the Internal Revenue Code. That standard imposes tax penalties on both providers and beneficiaries of parachutes when the present value of a parachute exceeds three times the beneficiary's average annual salary. <u>Johns</u> held that the "three times" standard should be a "guiding factor in determining waste rather than an absolute rule" ONLY because it would create a ceiling which would hinder a board's range of choices, when valid corporate reasons could "legitimize" a parachute in excess of the standard. <u>Johns</u>, 874 F.2d at 1462, note 30. Jones' agreement provides for 2.99 times her annual salary, which fits within the standard.

      The value of a stable, experienced, management team to a company as an ongoing enterprise is "priceless". Poor, inexperienced, or unstable management can ruin a company. The standard erected by COX, i.e., "beyond what their services would normally command" (a euphemism for "we can hire someone else for less") demonstrates a myopic "bean counter" view of corporate operations which ignores the intangibles of individual talent, dedication, relationships with customers, and the chemistry of a collection of individuals as a team, with resulting demonstrated effectiveness through long, successful service - - factors which NJC's board, not the courts, are suited to

evaluate.[1]  A smaller parachute based on whatever COX asserts is what the managers "would normally command" would conceivably be insufficient to induce a highly successful, marketable manager to stay with NJC if another opportunity with a stable company presented itself, as in JONES' case.  COX points to no Florida law which adopts its asserted "standard";  and it must therefore be rejected as unsupported and unrealistic.

Unless this Court is prepared to rule that Congress and the IRS are "unreasonable" under the tax standard, JONES' agreement satisfies the "reasonable person" inquiry. Cox cannot prove that <u>no</u> reasonable person could conclude that NJC did not receive a quid pro quo for JONES' services, and that the compensation within the agreement was a "gift".  Indeed, JONES and the other managers have already provided the "quid" of continued service, while COX seeks to deprive them of the "quo" they have earned. <u>Johns</u> instructs that the fact that the corporation has "actually received these benefits" (of keeping its management team intact) was of the "utmost importance" in defeating the argument that the parachutes in that case were not corporate waste. <u>Johns</u>, 874 F. 2d at 1462-63.  The same result is demanded here.

7. The creation of a bonus system to retain key employees is a proper corporate purpose, as a matter of law.   These systems assure that key employees will forgo other employment opportunities and remain with the company.  <u>Johns</u>, 874 F. 2d at 1463. JONES' agreement fulfills that purpose, because it requires her to remain employed with NJC and fulfill the duties of her position as a condition precedent to receipt of any compensation (¶ 4);  it requires her to remain employed subsequent to a "change in

---

[1] <u>Campbell v. Potash Corp. of Saskatchewan, Inc.</u>, 238 F.3d 792, 800 (6th Cir. 2001): "In short, evaluating the costs and benefits of golden parachutes is quintessentially a job for corporate boards, and not for federal courts."

11

control" of NJC for a period of three years as a condition precedent to receipt of any compensation (¶ 6); AND it requires that an "adverse employment action" must be taken by the company within the three-year period AFTER the change in control as a condition precedent to receipt of any compensation (id.). Construed collectively, these provisions demonstrate that the agreement is specifically designed to retain Jones as an employee of NJC.

The provisions of the agreement square perfectly with the Affidavit of David Kendall attached to NJC's memorandum in opposition to COX's motion (Doc. 352, Ex. 1), which states that the purpose of the key manager agreements was to "retain talented and key managers of NJC during the uncertain period of litigation between COX ENTERPRISES, INC. and NJC" (par. 3), which purpose was accomplished because all of the key managers who have not retired or passed away remain working at the company (id.) That purpose has inured to the benefit not only of NJC, but of COX, through time, by preserving and enhancing the value of the newspaper as an ongoing enterprise. If all of the key managers were to quit now, the newspaper's operations would be thrown into chaos, and its sale value would plummet.

COX fails miserably in its burden to prove an improper purpose. The facts prove otherwise. Because the agreements were enacted for a proper purpose as a matter of law, and because they have accomplished that purpose to the benefit of NJC, JONES' agreement must be upheld as valid.

8. No payments have been made to JONES or the other managers, and none are due because no adverse employment action has yet occurred. There has been no sale, no offers, and therefore no way to know the impact of the agreements upon a sale price

12

EXCEPT if a purchaser were to make two (non-orchestrated) alternative offers: one price if the agreements are in place, and another price if they are not. Even after a sale including the agreements, there is no way to ascertain their economic impact until the purchaser decides to take adverse employment actions against the managers. It is foreseeable that a purchaser would value the services of the existing management team, and no adverse adjustment of a sale price would occur at all. COX's argument that the value of the newspaper has been reduced by 8 million dollars by virtue of the agreements is therefore mere rank speculation, and its claim premature.

9. Moreover, COX's value-loss claim fails to take into account the demonstrated benefit which the agreements have provided by maintaining the newspaper as an ongoing enterprise as opposed to a collection of assets, thereby preserving value to a purchaser. The agreements insure that the stability of management which preserved the newspaper's value to this point will continue up to and after the acquisition. The purchaser may then perform a cost-benefit analysis to determine whether it wishes to remove some, all, or none of the managers within three years, or to negotiate individual "buyouts" pursuant to mutual agreement with the employee. Conversely, granting COX's motion would instantly incent the managers to scramble to find new jobs at other companies, throwing the newspaper's value, and conceivably its viability, as an ongoing enterprise into uncertainty. In short, the value of the newspaper has actually been enhanced, rather than diminished, by virtue of the agreements.

10. Accepting COX's claim at face value, the value of the newspaper has been diminished by 8 million dollars by virtue of the key manager agreements. COX's interest in that amount as a 40% shareholder of NJC is $3.2 million. The harm is capable of

ascertainment in damages. Assuming, as COX asserts, that Jones' agreement is worth approximately $300,000 (Blazek Declaration (Doc. 333-2) par. 3), COX's 40% stake in her agreement is worth only $120,000. As mentioned, JONES has declined other employment opportunities in reliance on the agreement. Balancing the equities, the potential harm to JONES if her agreement is "set aside" outweighs the harm to COX if it is not.

On an individualized basis which MUST be considered if the Court is to invalidate EACH of the manager agreements, the same result applies: the potential, speculative harm to COX caused by EACH agreement is greatly outweighed by the potential harm to each manager, who acted in detrimental reliance on the agreement by remaining employed. Equity demands that the key manager agreements should not be "set aside".

Conversely, accepting at face value COX's argument that the manager agreements are "corporate waste", COX has an adequate remedy at law for damages against the directors and/or executives who breached their fiduciary duties and are therefore responsible to the shareholders for the waste. The requested remedy of "setting aside" the manager agreements requires the exercise of equity, which requires the lack of an adequate remedy at law to trigger it. Moreover, in order to trigger equitable relief the potential harm must be "irreparable"--that is, "only if it cannot be undone through monetary redress." Cate v. Oldham, 707 F. 2d 1176,1189 (11th Cir. 1983), citing Deerfield Medical Center v. City of Deerfield Beach, 661 F. 2d 328, 338 (5th Cir. Unit B, 1981) and Spiegel v. City of Houston, 636 F. 2d 997 (5th Cir. 1980).

Because COX's claim is easily susceptible of monetary redress against those who may have breached their fiduciary duties and caused the alleged corporate waste, it is insufficient to trigger the equitable relief which it now seeks--against JONES and the other innocent managers who relied on the agreements and provided value to the corporation which the parties have now agreed, four years later, to sell - - for its own selfish purposes.

## CONCLUSION

COX's motion to set aside Jones' key manager agreement is specious, and unsupported in fact and law.  It must therefore be denied.  JONES reserves the right to seek sanctions against COX pursuant to appropriate statutory authorities, and the inherent power of this Court.  JONES also reserves the right to seek indemnity for her defense costs from NJC pursuant to Section 607.0850, Fla. Stats.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been filed electronically with the Clerk of the Court this 1st day of August, 2008 by using the CM/ECF system which will send a notice of electronic filing to John A. DeVault, III, Esq. (jad@bedellfirm.com) and Courtney Kneece Grimm, Esq. (cgrimm@bedellfirm.com), BEDELL, DITTMAR, DEVAULT, PILLANS & COXE, P.A., The Bedell Building, 101 E. Adams Street, Jacksonville, FL  32202; Peter C. Canfield, Esq. (pcanfield@dowlohnes.com), DOW LOHNES, 6 Concourse Parkway, Suite 1800, Atlanta, GA  30328-6117; Bruce A. Hanna, Esq. (Bruce.Hanna@CobbCole.com), COBB COLE, P. O. Box 2491, Daytona Beach, FL 32115-2491; Franklin G. Burt, Esq. (fgb@jordenusa.com), JORDEN BURT, LLP, 1025 Thomas Jefferson Street, NW, Suite 400 E, Washington, DC  20007-5208; Richard J.

Ovelmen, Esq. (rjo@jordenusa.com), JORDEN BURT, LLP, 777 Brickell Avenue, Suite 500, Miami, FL 33131-2803; and David I Spector, Esq. (dspector@schwartzberglaw.com), SCHWARZBERG, SPECTOR, DUKE & ROGERS, 222 Lakeview Avenue, Suite 210, West Palm Beach, FL  33401.

        THOMAS J. PILACEK & ASSOCIATES
        5844 Red Bug Lake Road
        Winter Springs, FL  32708
        Phone:  (407) 660-9595
        Facsimile:  (407) 660-8343
        Email:  tpilacek@pilacek.com

        By:  __/s/ Thomas J. Pilacek_____
            Thomas J. Pilacek
            Fla. Bar No. 143576

        Counsel for Intervenor
            LEWEEN JONES