# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**COX ENTERPRISES, INC.,**

              **Plaintiff,**

**-vs-**                               **Case No.  6:04-cv-698-Orl-28KRS**

**NEWS-JOURNAL CORPORATION,
HERBERT M. DAVIDSON, JR., MARC L.
DAVIDSON, JULIA DAVIDSON TRUILO,
JONATHAN KANEY, JR., DAVID
KENDALL, ROBERT TRUILO, GEORGIA
KANEY, and PMV, INC.,**

                        **Defendants.**

_____

# ORDER

The conflict-ridden saga of Defendant News-Journal Corporation's ("NJC") relationship with Plaintiff Cox Enterprises, Inc. ("Cox") has moved to what portends to be its final chapter. The latest battle comes in the form of Cox's Motion to Set Aside Certain Severance Agreements (Doc. 333)[1] allegedly entered into between NJC and two of NJC's officers and directors, David Kendall ("Kendall") and Georgia Kaney ("Kaney"[2]).  Cox contends that these executive severance agreements, also referred to as "golden parachute agreements,"[3]

---

[1]In its motion, Cox also sought to set aside agreements that were entered into with twenty-seven "key managers."  However, Cox has since withdrawn its motion insofar as it pertains to the key manager agreements (see Docs. 412 & 438); thus, the only issue remaining with regard to this motion is whether David Kendall's and Georgia Kaney's executive severance agreements should be set aside.

[2]In this Order, unless otherwise specifically indicated the use of the name "Kaney" refers to Georgia Kaney and not her husband, Jonathan Kaney.

[3]A golden parachute agreement is "[a]n employment-contract provision that grants an upper-level executive lucrative severance benefits—including long-term salary guarantees

diminish the marketability of NJC and impose upon it a significant liability.  Cox asks that the

agreements be set aside because they were unauthorized, fraudulent, and wasteful.  I held

a hearing on the motion on September 24 and 25, 2008 (see Mins., Docs. 444 & 447; & Trs.,

Docs. 470 & 471) and now conclude that the motion is well taken and must be granted.

## I.  Procedural Background

In March 2004, Cox, the owner of 47.5% of NJC, discovered that NJC had entered into

a contract obligating NJC to pay more than $13 million for the naming rights of a performing

arts center in Daytona Beach, Florida.  Thereafter, Cox learned the extent to which NJC was

spending unreasonable sums in support of other local cultural arts programs.  On May 11,

2004, Cox, the only NJC minority shareholder, sued NJC, its officers, and its majority

shareholder, PMV, Inc. ("PMV") pursuant to sections 607.1430 and 607.1434, Florida

Statutes.  (Doc. 1).  The suit sought, inter alia, dissolution of NJC, with Cox alleging that NJC

officers and directors—Herbert M. "Tippen" Davidson, Marc L. Davidson, Julia Davidson

Truilo, Jonathan Kaney, Robert Truilo, and Georgia Kaney (the "Individual Defendants" in the

initial action)—had misused and wasted corporate assets of NJC to the detriment of NJC and

Cox.  Defendants responded to the demand for corporate dissolution on July 29, 2004 by

filing an Irrevocable Notice of Election to purchase Cox's shares pursuant to section

---

or bonuses—if control of the company changes hands (as by a merger)."  Black's Law
Dictionary 713 (8th ed. 2004).  Technically, the agreements at issue here are not true golden
parachute agreements because the terms of the agreements do not require a change of
control, only an "adverse employment action," for the agreements to be triggered.  However,
the parties have referred to the agreements as golden parachute agreements, and I use
"golden parachute agreements" interchangeably with "executive agreements" and
"severance agreements" in this Order.

607.1436, Florida Statutes.  (Doc. 51).  In light of the election to purchase, the actions against the NJC officers and directors and PMV were stayed.

The statute required that the parties attempt to agree as to the value of the shares to be purchased, but the parties in this case were unable to reach agreement.  A mediator was appointed to assist the parties in valuing the shares, and a mediation was held in  November 2004.  The mediation resulted in an impasse, leaving it up to me to determine the "fair value" of Cox's shares "as of the day before the date on which [Cox's original petition] was filed." § 607.1436(4), Fla. Stat.  Following an eight-day bench trial, an Order was entered on June 30, 2006 determining that Defendants had wasted NJC assets and establishing the value of Cox's shares.  (Doc. 251).  On September 27, 2006, another Order was entered setting the terms and conditions for NJC's purchase of Cox's shares.  (Doc. 262).

NJC requested that I allow payments of the fair value in installments.[4]  The September 27, 2006 Order allowed payment by installment but required that NJC abide by an exhaustive list of mandatory and restrictive covenants for the obvious purpose of curbing waste, preserving corporate assets, and providing Cox transparency with regard to NJC's business transactions.  Certain covenants prevented the continued support of cultural arts programs by NJC.  The goal of the Order was to preserve the value of Cox's shares of NJC pending appeal.  The parties appealed, and on December 21, 2007 the Eleventh Circuit Court of Appeals affirmed the Orders.  Cox Enters., Inc. v. News-Journal Corp., 510 F.3d 1350 (11th Cir. 2007).  After the appellate court issued its mandate, it was discovered that Kendall, on

---

[4]  See § 607.1436(5), Fla. Stat. (providing that terms of payment "may include payment of the purchase price in installments").

behalf of NJC, had continued to pay the salaries of employees of Seaside Music Theater in violation of the September 27th Order.  As a result, NJC was found to be in willful contempt of court for violating the covenants.  (See Doc. 303).  In defense of his conduct, Kendall stated that he did not believe the covenants applied until the Orders were affirmed by the appellate court.

As it turned out, NJC was unable to purchase Cox's shares in the corporation.  Accordingly, the parties agreed to cooperate in the pursuit of a sale of the company to a third party, and to that end, they entered into a Joint Sale Agreement ("JSA") (Defs.' Ex. 3).[5]  The JSA provided that Cox would have exclusive control over the sales process, (id. ¶ 2.1), and that Cox would be entitled to proceeds from the sale in an amount greater than its 47.5% proportional interest in NJC, (id. ¶ 5.1).  Significantly, the JSA also provided that Cox would waive its claims against the Individual Defendants, including Kendall and the Kaneys.  (Id. ¶¶ 5.1 & 11).  The parties agreed that James W. Hopson, a professional selected by Cox, would assist in positioning NJC for sale to a third party.  (Id. ¶ 6.2).

In accordance with the JSA, Hopson was employed to manage the company in preparation for sale.  During the course of his management of the company, Hopson discovered the existence of the golden parachute agreements that NJC had ostensibly entered into with Kendall and Kaney as well as severance agreements between NJC and twenty-seven of its key managers.[6]  Hopson promptly brought his discovery to the attention

---

[5]References to exhibits are to the exhibits submitted at the evidentiary hearing held on September 24 and 25, 2008.  (See Ex. Lists, Docs. 448 & 449).

[6]As noted earlier, only the executive agreements with Kendall and Kaney—not the key

of Cox.  After reviewing the agreements, Cox filed its motion to set them aside (Doc. 333), and Kendall and Kaney filed their motion to intervene (Doc. 395).

## II.  Facts Pertinent to the Motion to Set Aside

Once Hopson made his discovery in May 2008, it came to light that in November 2004—six months after Cox initiated the suit against NJC and the Individual Defendants for corporate waste—Herbert M. "Tippen" Davidson ("Tippen Davidson" or "Tippen"), the Chief Executive Officer of NJC and sole owner of PMV, had presented Kendall and Kaney with golden parachute agreements.  At the time, Kendall was NJC's Chief Financial Officer, and Kaney was the company's Vice-President, General Manager, and Publisher.  Both were longtime management employees of NJC.  Kendall began his employment with NJC in 1982 and was appointed to the board of directors in 1998.  Kaney started with NJC in 1981 and has served on the NJC Board of Directors since 1983.

As explained by Kendall, from the time this lawsuit was instituted by Cox in 2004, it was anticipated that NJC would purchase Cox's shares no matter what value was assigned to those shares.  (See Kendall Dep., Pl.'s Ex. 10, at 11).  Prior to NJC's election to purchase Cox's shares, Kendall had one estimate as to the value of the shares, (see Doc. 251 at 17 n.10), and that estimate was slightly higher than the value I ultimately determined to be fair, (see id. at 25).  According to Kendall, Tippen began expressing concern regarding the continuity of management after the suit was filed, and eventually Tippen announced that he had asked the Cobb Cole law firm to give key managers severance agreements to boost their

_____

 manager agreements—are at issue here.

confidence that they would remain employed as litigation with Cox loomed.  (Kendall Dep. at 29-30).  After identifying twenty-seven key managers who would benefit from severance agreements promising them payments of a multiple of 2.99 times their annual salary, Tippen reportedly told Kendall and Kaney that he also wanted them to have golden parachutes. Kendall testified that Tippen later called Kendall and Kaney into his office and presented them with the golden parachute agreements, which they signed and for which they thanked him.

The agreements acknowledged Kendall's and Kaney's current employment with NJC and provided for specific relief should they suffer "adverse employment action" in the future. "Adverse employment action" was broadly defined as:

> (i) termination by the Company of Executive's employment without "Cause" . . . ; (ii) a material reduction in Executive's compensation not triggered by then prevailing economic factors generally; or (iii) a material adverse change by Company in Executive's corporate office, executive responsibilities and authority, or position, and succession . . . .

(Pl.'s Exs. 1 & 2 ¶ 1(a)).  The agreements provide that should any of these contingencies occur, Kendall and Kaney would be entitled to terminate their employment with NJC and receive severance pay in an amount equal to six times their annualized base pay.  (Id. ¶ 6(a)).  These executive severance payments were also to be "grossed up"[7] for tax purposes, increasing the cost to NJC and the benefit to Kendall and Kaney.  The net result should the agreements be triggered would be payments to Kendall and Kaney of amounts equal to approximately thirteen times their annualized base pay.  In the event that they were to suffer

---

[7]"Grossed up" means that NJC increases the amount paid so that Kendall and Kaney would receive, on an after-tax basis, the full amount of six times their annualized base pay.

an "adverse employment action" as defined by the agreement, Kendall's severance pay would be approximately $2.6 million and Kaney's would be approximately $2.9 million.  (See Blazek Decl., Pl.'s Ex. 6, ¶ 2).  The agreements contained no expiration date and were apparently intended to be in effect as long as Kendall and Kaney remained employed by NJC.  Kaney's severance agreement contained an important additional term, providing that she would become CEO upon Tippen no longer serving in that capacity (Pl.'s Ex. 1 ¶ 4), and she indeed assumed that role when Tippen died in January 2007.

Up until Hopson's discovery, the golden parachute agreements—as well as the key manager severance agreements—had remained closely held secrets, and neither Cox nor the disinterested members of the NJC Board of Directors knew of their existence or their terms.  These disinterested members of the NJC Board of Directors were relatives of Tippen Davidson—his son Marc Davidson, his daughter Julia Davidson Truilo, and his son-in-law Robert Truilo.  Even NJC's auditors were not advised of the existence of the agreements until 2007.

Kendall and Kaney have presented changing explanations as to precisely how the agreements came about.  Prior to the filing of the motion to set aside the agreements, Kendall, Kaney, and NJC were all represented by the Cobb Cole law firm in Daytona Beach, Florida.  Jonathan Kaney, a partner in that firm and the husband of Georgia Kaney, served as NJC's general counsel.[8]  In its initial Opposition (Doc. 352) to Cox's motion, NJC argued that the decision of the NJC Board of Directors to enter into the golden parachute agreements

---

[8]The Cobb Cole law firm has represented NJC throughout these proceedings.

was protected by the business judgment rule, "a policy of judicial restraint"[9] insulating individual directors from liability in making decisions that the corporate boards believe to be in the best interests of the corporation.  NJC argued that "'evaluating the costs and benefits of golden parachutes is quintessentially a job for corporate boards, and not for federal courts.'"[10]  The Opposition stopped short, however, of including a direct representation that the NJC Board of Directors actually made the decision to enter into the golden parachute agreements.

On July 7, 2008, NJC responded to Cox's request to produce documents pertaining to the golden parachute agreements.  The response included a single page of handwritten notes prepared by Kendall.  Much of what was written on the page appears to have been redacted, but the page is titled "BOD Mtg" and the notes are dated October 22, 2004.  Just below the date are the names of members of the NJC Board of Directors—"Tip, Marc, Bob, Julia, DRK, Ga."  The notes included these entries:

> NJC BOD discussed Tin and Golden
> Parachute plans.
>
> BOD approved both types of parachute.

(Pl.'s Ex. 3).  These notes corroborate the position NJC took in its Opposition to the Motion to Set Aside (Doc. 352), giving the distinct impression that there was a meeting of the NJC

---

[9]Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1458 n.20 (11th Cir. 1989) ("The business judgment rule is a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges.").

[10](Doc. 352 at 5 (quoting Campbell v. Potash Corp. of Sask., Inc., 238 F.3d 792, 799-800 (6th Cir. 2001))).

Board of Directors and that the board had approved the golden parachute agreements in question.[11]

After the initial Opposition to the Motion to Set Aside (Doc. 352) was filed, Kendall and Kaney obtained independent counsel who filed a Memorandum in Opposition (Doc. 397) solely on their behalf.  The memorandum repeated the argument alluded to earlier by the Cobb Cole firm that I could not set aside the golden parachute agreements because the decision to enter into the agreements was made exclusively by a disinterested NJC Board of Directors.  The second memorandum states in part that the "Agreements were entered into . . . based on a decision of disinterested members of the board of directors of NJC" and refers to the agreements as "Executive Severance Agreements between NJC, Kaney, and Kendall, entered into by NJC at the behest of disinterested board members."  (Doc. 397 at 8-9).

As it turned out, however, Kendall's notes and the argument made in the Memorandum in Opposition (Doc. 397) were inaccurate and misleading because there never was an NJC Board of Directors meeting during which the golden parachute agreements were discussed.[12]  (Robert Truilo Dep., Pl.'s Ex. 9, at 42).  After the Memorandum in Opposition (Doc. 397) was filed and Kendall's handwritten notes (Pl.'s Ex. 3) memorializing what

---

[11]The "Tin Parachute plan" ostensibly refers to the agreements between NJC and its key managers.

[12]This observation is in no way a negative reflection on current counsel for Kendall and Kaney.  It is evident that counsel was straightforward and honest with this Court.  When he discovered that the representations were inaccurate, he promptly took action to correct the inaccuracy.  This observation is also not intended as criticism of NJC's prior trial counsel, who has been a responsible officer of this Court throughout this litigation.  There is no reason to conclude that his assertions regarding Kendall's notes were not made in good faith.

appeared to be an NJC Board of Directors meeting had been disclosed, Cox took the oral depositions of Kendall and Robert Truilo—another member of the NJC Board—on August 14, 2008.   Truilo's deposition was taken first, with Kendall present as NJC's corporate representative.   Truilo testified that he had no recollection of an NJC board meeting on October 22, 2004 and that he, his wife Julia Davidson Truilo, and his brother-in-law Marc Davidson—Davidson family members of the board—learned of the agreements for the first time in February 2007, when the NJC Board of Directors met to elect a CEO to replace Tippen after his death a month earlier.  (Truilo Dep. at 35-36, 44-45).  Prior to that time, the only NJC Board members with knowledge of the golden parachute agreements were Kendall and the Kaneys.

After hearing Truilo's denial that the golden parachute agreements were ever considered by the NJC Board of Directors, Kendall was deposed and given an opportunity to provide his own account of events leading to the agreements.  Despite the statements made in the Memorandum in Opposition (Doc. 397) and his handwritten notes seemingly indicating that the board had approved the agreements at an October 22, 2004 Board of Director's meeting (Pl.'s Ex. 3), Kendall admitted that the golden parachute agreements were never disclosed to or approved by the NJC Board.  (Kendall Dep. at 79-81).  Instead, Kendall asserted that the notes referred to a management meeting attended by members of the Board of Directors at which the ongoing litigation was discussed.  Kendall's story regarding his handwritten notes is tenuous.

In his final account of the events leading up to the signing of the golden parachute agreements, Kendall said that the agreements were solely Tippen's idea.  According to

Kendall, Tippen privately and unilaterally offered Kendall and Kaney the golden parachute agreements even though neither of them had ever given Tippen reason to believe that they would leave NJC.  (Id. at 52-55).  Despite the clear statements to the contrary contained in his handwritten notes, Kendall admits that the NJC Board of Directors never approved the golden parachute agreements.  (Id. at 81).  He also admits that at the time he says this management meeting took place, there was no draft of the agreements for board members to review (Mot. Hr'g Tr. Sept. 24, 2008, Doc. 470, at 211-12).  Additionally, the NJC Board was never informed that Kaney's golden parachute agreement would include a provision promoting her to CEO upon Tippen's death.  (Kendall Dep. at 67-68).

Kendall also failed to tell the NJC auditors about the severance agreements until sometime in 2007.  Kendall, an experienced C.P.A. and NJC's CFO, explained that it never occurred to him to make the disclosure to the NJC auditors until after the Eleventh Circuit Court of Appeals affirmed this Court's Orders determining the value of Cox's shares in NJC and setting the terms of the sale.  He testified that it was that decision that prompted him to reveal the existence of the agreements to the auditors.  Even then it is not clear what Kendall told the auditors, who referenced severance agreements in a footnote contained in the 2007 audit report of NJC.  The footnote simply provided that there were employment agreements allowing certain NJC employees to receive payments of between three and six  times their annual compensation upon termination and change of control of NJC.  (See Mot. Hr'g Tr. Sept. 25, 2008, Doc. 471, at 26).  The footnote did not specifically refer to the executive severance agreements to which Kendall and Kaney were parties, and it did not accurately describe those agreements.  There was no indication in the audit report that NJC had entered

into golden parachute agreements providing that upon experiencing "adverse employment action" Kendall and Kaney would receive six times their annual salary plus a tax gross-up, for a total sum equal to thirteen times their annual compensation regardless of whether there was change of control of NJC. Kendall was the person responsible for providing the auditors with information used in their report, and it was Kendall who approved the auditors' misleading footnote describing the agreements. Kendall's explanation of the disclosure of the golden parachute agreements to NJC auditors is vague and not credible.

Several witnesses provided testimony regarding the reasonableness of the golden parachute agreements. Kendall testified in his deposition that NJC had never entered into employment agreements before, let alone any of the magnitude of the Kendall and Kaney golden parachutes. (Kendall Dep. at 12-13). Ordinarily, the typical practice of NJC had been to pay the equivalent of two weeks' salary as severance to a discharged employee. (Id. at 15-16). In the history of NJC, no employee had ever received severance pay in excess of $50,000. (Id. at 17). According to Owen Van Essen, an experienced broker of newspapers, "[t]he most common rule of thumb for golden parachute agreements in the newspaper industry is to pay an amount equal to two weeks' salary for each year of an employee's service" and "capped at one year['s salary]." (Mot. Hr'g Tr. Sept. 24, 2008, Doc. 470, at 57). Van Essen further testified that he had never seen a golden parachute agreement which provided six times an executive's average annualized salary, that had no change-of-control or term-limit provisions, or that had not been approved by the board of directors. (Id. at 60).

Cox presented the Declaration of Charles J. Blazek III. Mr. Blazek received a B.S. degree in mathematics from Georgetown University. He is a professional actuary, a Member

of the Academy of Actuaries, and a Member of the American Society of Pension Professionals and Actuaries.  Blazek explained that upon suffering "adverse employment action" after the sale of NJC or change of control as contemplated by section 280G of the Internal Revenue Code, Kendall would be entitled to approximately $2.6 million and Kaney would be immediately entitled to approximately $2.9 million.  (Pl.'s Ex. 6 ¶ 2).  Under these circumstances, NJC would not be entitled to a federal income tax deduction for any portion of the payment over the executive's Includible Base Amount, which in this case is less than $200,000 for each executive.  (Id.).

Kendall, Kaney, and NJC presented the testimony of Paul J. McConnell.  McConnell was qualified as an expert in the field of executive compensation and was allowed to express his opinion of the golden parachute agreements in question even though he had never before determined the appropriateness of compensation for the CEO or CFO of a newspaper and had never given expert opinion testimony regarding severance agreements of an executive in any industry.  McConnell reluctantly admitted that the severance agreements calling for payment of a sum equal to six times average total compensation were unusual and that he had never seen "one like that" before.  (Mot. Hr'g Tr. Sept. 24, 2008, Doc. 470, at 130).  Even large media companies ordinarily did not enter into severance agreements for more than double an employee's salary until the tax laws were amended to allow companies to deduct up to 2.99 times the salary of an employee paid pursuant to the terms of a golden parachute arrangement.  (See id. at 133-34).  Since enactment of the amendment, newspapers rarely enter into executive severance agreements providing for payment of more than an amount equal to 2.99 times the executive's annual compensation.  In fact, the common practice is to

use multiples of not more than three to take advantage of available income tax deductions. Notwithstanding this admission, however, McConnell maintained that the agreements were reasonable.  He explained this seemingly irrational conclusion on the basis that Kendall and Kaney received less compensation than executives of major media companies who also frequently receive stock options as part of their compensation.[13]

### III.  Discussion

Cox contends that the golden parachute agreements are void because they were entered into without corporate authority and without ratification by the NJC Board of Directors. Kendall, Kaney, and NJC contend, however, that the agreements were made in accordance with Tippen's authority and are protected under the business judgment rule.

### A.  Lack of Authority

As no party continues to assert that the disinterested members of the Board of Directors entered into the agreements with Kendall and Kaney, the question of whether the agreements are void because they were entered into by Tippen without authority and without ratification by the board of directors must be addressed.  Corporate officers have actual authority as granted by the corporate bylaws to act in the ordinary, day-to-day operation of the business.  See § 607.0841, Fla. Stat.[14]  To the extent duties of officers are not set forth

---

[13]McConnell's analysis was complicated by the fact that he included in his calculations the twenty-seven key manager agreements, which are no longer at issue here.

[14]Section 607.0841 is entitled "Duties of officers" and provides:  "Each officer has the authority and shall perform the duties set forth in the bylaws or, to the extent consistent with the bylaws, the duties prescribed by the board of directors or by direction of any officer authorized by the bylaws or the board of directors to prescribe the duties of other officers."

in the bylaws, the board of directors may authorize officers to take specific action in the best interest of the corporation.  Id.

Generally, the president or chief executive officer of a corporation does not have the power to enter into extraordinary contracts absent authorization set forth in the corporate bylaws or granted by the board of directors.  See Sw. Forest Indus., Inc. v. Sharfstein, 482 F.2d 915, 925 (7th Cir. 1972); Behrstock v. Ace Hose & Rubber Co., 449 N.E.2d 954, 958 (Ill. App. Ct. 1983); Ennis Bus. Forms, Inc. v. Todd, 523 S.W.2d 83, 85-86 (Tex. Civ. App. 1975). This principle extends to extraordinary employment agreements even when the corporate officer is otherwise authorized under the bylaws to make employment decisions such as hiring, firing, and setting salaries of corporate employees.  Heaman v. E.N. Rowell Co., 185 N.E. 83, 84 (N.Y. 1933) (stating that a corporate executive's granted general powers do not confer the authority to enter into employment contracts for life); Lee v. Jenkins Bros., 268 F.2d 357, 367 (2d Cir. 1959) (holding that "employment contracts for life or on a 'permanent' basis are generally regarded as 'extraordinary' and beyond the authority of any corporate executive if the only consideration for the promise is the employee's promise to work for that period"); Liebermann v. Princeway Realty Corp., 233 N.Y.S.2d 1001 (App. Div. 1962) (finding corporation not bound by president's promise to pay plaintiff a bonus for all his good work because such an agreement was not customary or necessary).

What constitutes an "extraordinary" agreement necessarily turns in part on the business's history of conduct.  See 2A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations § 597 (2008).  The obvious inquiries are whether the corporation entered into similar contracts in the past, and, if so, how frequently.  If the corporation has

never before entered into a contract similar to the one in question, the contract would by definition be extraordinary. See Sacks v. Helene Curtis Indus., Inc., 91 N.E.2d 127, 132 (Ill. App. Ct. 1950). Other factors bearing on whether an employment agreement is extraordinary include the reasonableness of the contract compared to those entered into by competitors in the same or similar industry and whether the contract was negotiated at arm's length or was the product of self-dealing. An extraordinary contract entered into by a corporate president may later be ratified by a corporate board of directors. See, e.g., Sharfstein, 482 F.2d at 925. Without such ratification, however, such contracts are considered void. Id.

The golden parachute agreements were extraordinary in both nature and degree. NJC had never before entered into written employment agreements, let alone lucrative severance agreements. (Mot. Hr'g Tr. Sept. 24, 2008, Doc. 471, at 7). Additionally, the agreements were extraordinary in the benefits they conferred upon Kendall and Kaney. The salaries NJC paid its executive managers, including the CEO, COO, and CFO, were reasonable, but the same cannot be said about the amounts provided for in the golden parachute agreements with Kendall and Kaney. There was little benefit gained by NJC as a result of the severance agreements. At the time the agreements were executed, it was the singular intention of Tippen and the other NJC managers that NJC purchase Cox's interest in the corporation, and there was no indication that either Kendall or Kaney was considering other employment. The sums to be paid to Kendall and Kaney pursuant to the agreements were proportionately much greater than severance payments made by other newspapers. Finally, the agreement with Kaney went so far as to name her the successor CEO upon Tippen no longer occupying that position. These facts illustrate the extraordinary nature of Tippen's action of creating the

agreements.

Under the bylaws, the Board of Directors was vested with the responsibility for setting salaries for corporate officers and key managers.  (Amended NJC Bylaws, Pl.'s Ex. 7, at 4). Initially, Kendall and Kaney argued that this grant of authority to the Board was sufficiently broad to cover the severance agreements because the severance agreements related to the compensation that they were to receive under the agreements.  This argument unraveled, however, when Truilo revealed that the other board members had not approved, and knew nothing of, the terms of the agreements.

Once it was clear that the Board had not approved the agreements, Kendall and Kaney argued that the bylaws granted Tippen express authority to enter into the agreements. The bylaws state that "[t]he President shall be the Chief Executive Officer of the corporation, shall have general and active management of the business and affairs of the corporation, subject to directions of the Board of Directors; and shall perform all such other duties as are incumbent to his office."  (Id. at 5).  Additionally, Article IV, section 8 of the bylaws states that "[t]he directors shall elect the officers of the corporation and fix the salaries, which election is to be held at the directors meeting following each annual stockholders meeting," (id. at 4-5), clearly reserving for the Board the right to elect officers and fix their salaries.  Tippen overstepped his authority under the bylaws by entering into the executive severance agreements, especially regarding the appointment of Kaney as his successor.  I find that the bylaws do not expressly permit Tippen to enter into agreements of this nature.

Alternatively, Kendall and Kaney argue that Tippen had implied authority because he made other employment decisions in the past, including the setting of salaries for key

managers. They note that Tippen was acting as he always had with regard to executive compensation, unilaterally. He had set salaries in the past and there had never been any objections from the Board. Now Kendall and Kaney contend that because Cox failed to object to this practice in the past, Cox cannot now insist on enforcement of the bylaws. This argument fails.

There is little similarity between Tippen's preemption of the board's prerogative of setting the salaries of his key employees and his entering into the golden parachute agreements. The most obvious difference is that the board members knew that Tippen set the salaries each year. If for some reason the board members did not know the amount of the salaries, they could have easily found out by reviewing the corporation's financial records. The golden parachute agreements, on the other hand, were kept secret from the minority shareholder as well as the disinterested directors. Also, unlike the officers' salaries, there was no way to discover the existence of the documents in the corporate records. NJC had never before entered into employment contracts of this nature, and the board of directors had no reason to believe that it had done so in November 2004. I find that Tippen did not have the implied authority to enter into these severance agreements on behalf of NJC.

Finally, board members cannot be considered to have ratified golden parachutes agreements that they did not know—and had no reason to suspect—existed. Since these agreements were never presented for board approval, the argument cannot stand that the board ratified Tippen's actions. The agreements represent an extraordinary transaction, outside the authority granted to the corporate president. While the extraordinary contracts *could* have been ratified by the board of directors, they were not. Therefore, the agreements

are void.

I find that the golden parachute agreements were extraordinary; that Tippen lacked authority to enter into the agreements with Kendall and Kaney because of the agreements' extraordinary nature; and that the agreements were never ratified by the NJC directors or shareholders.  Tippen, as President and CEO of NJC, did not have authority—either express or implied—to enter into these extraordinary agreements.  Express authority would have come from the bylaws of the corporation or specific authorization from the board to enter into the agreements, but neither was present.  Additionally, there is no basis upon which to conclude that the board impliedly authorized Tippen to enter into the agreements by remaining silent during Tippen's past actions setting salaries of the corporate executives. Finally, I find that the Board of Directors did not ratify Tippen's extraordinary act of entering into the golden parachute agreements.  Therefore, I find the agreements void.

### B.  Business Judgment Rule

Assuming that the golden parachutes are not void due to Tippen's lack of authority and failure of the disinterested members of the board or shareholders to ratify Tippen's decision, Kendall and Kaney argue that the executive severance agreements are valid under the business judgment rule.  Cox, however, asserts that the business judgment rule is inapplicable because NJC committed corporate waste when it entered into the golden parachute agreements.  Even if the agreements had not been deemed void for lack of authority, they would not be protected under the business judgment rule because they constitute corporate waste.

The business judgment rule[15] acknowledges the broad discretion of a corporate board of directors in taking action in the best interest of the corporation and discourages courts from substituting their judgment for that of the directors.  See Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1458 & n.20 (11th Cir. 1989).  The rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1987), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  Transactions that constitute waste, however, are not entitled to the protection of the business judgment rule and are generally considered void. Michelson v. Duncan, 407 A.2d 211, 217, 223 (Del. 1979); see also Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.), 906 A.2d 27, 74 (Del. 2000); S. End Improvement Group, Inc. By and Through Bank of N.Y. v. Mulliken, 602 So. 2d 1327, 1333 (Fla. 4th DCA 1992) (affirming trial court's conclusion that the business judgment rule was no defense to director's decision to donate land which constituted corporate waste and was a breach of fiduciary duties).

"Corporate waste exists when the payment is afforded without 'adequate'

---

[15]Some confusion exists regarding the distinction between the business judgment rule and the business judgment doctrine.  Although the two are closely intertwined, "the business judgment *rule* shields individual directors from personal liability . . . , whereas the business judgment *doctrine* protects the decision itself." Joseph Hinsley, IV, Business Judgement and the American Law Institute's Corporate Governance Project: The Rule, The Doctrine, and the Reality, 52 Geo. Wash. L. Rev. 609, 611-12 (May-Aug. 1984).  Here, Cox challenges only the validity of the agreements themselves without addressing the personal liability of either Kendall or Kaney.  While a distinction between the business judgment rule and the business judgment doctrine may exist, the underlying rationale of protecting a director or officer's decision from post-hoc review by the courts remains the same, and herein the term "business judgment rule" applies to both the protection from personal liability and the protection of the decision from court review.

consideration." <u>Johns</u>, 874 F.2d at 1461.   Under the business judgment rule, what is

adequate is largely left to the discretion of the board of directors; however, consideration will

not be construed as adequate if there is no reasonable relationship between the

compensation an executive receives and the services rendered.  <u>Id.</u>  Considerations in

assessing whether a "reasonable relationship" exists between the executive compensation

and the services rendered include "whether the corporation benefited from the services

rendered" and "whether the compensation was so unreasonably disproportionate to the

benefits created by the exchange that a reasonable person would think the corporation did

not receive a *quid pro quo*."  <u>Id.</u>

Assessment of the "benefit to the corporation" and "unreasonably disproportionate"

considerations here leads to the firm conclusion that Kendall and Kaney's golden parachute

agreements constitute waste, and the decision to enter into them—again, assuming that

Tippen had authority to bind the corporation to them on his own—is therefore not protected

by the business judgment rule.  While Kendall, Kaney, and NJC maintain that the golden

parachute agreements enhanced the value of NJC by assuring their continued employment,

Cox takes the position that the agreements diminish NJC's value by creating liabilities.[16]  Cox

has the better argument on this point, and as noted earlier I find that the agreements were

---

[16]Indeed, in Kendall and Kaney's view, the golden parachute agreements have already been triggered.  As soon as Mr. Hopson took control of NJC, Kendall and Kaney believed that they were entitled to payment under the terms of the golden parachute agreements because placing Hopson in charge constituted an adverse action under the terms of the agreements.  At that point, both executives signed a document referred to as a certificate and waiver in which they agreed not to enforce their rights under the contract at that time.  Kendall cannot recall who prepared the waiver documents but believes it was Jonathan Kaney or a member of his firm.

of little benefit to NJC.  There is no evidence indicating that either Kendall or Kaney had any intention of leaving employment with NJC at the time the agreements were signed.  Both Kendall and Kaney had enjoyed long and loyal service to NJC and to Tippen, who clearly was happy with their performance.  It is obvious that the three executives enjoyed a close professional relationship and were proud of their independent newspaper and the corporation's contributions to cultural arts in the community.  Since neither Kendall nor Kaney had any intent to leave NJC, and especially in light of NJC's stated intent to purchase Cox's shares at the time the agreements were entered into, little, if any, benefit inured to NJC in exchange for the liability incurred.  The golden parachute agreements were not part of the agreed-upon consideration for initial employment, nor were they in a meaningful way consideration for additional services to be performed in the future.  The agreements required nothing of Kendall and Kaney but provided *them*, not NJC, with great benefits should their employment circumstances change.

Additionally, even assuming that NJC was marginally benefitted by entering into these agreements with these two executives, the compensation provided for by these agreements is clearly "unreasonably disproportionate to" any such benefit.  This conclusion is supported by McConnell—the expert witness presented by Kendall, Kaney, and NJC—who testified regarding severance agreements in the newspaper industry.  The NJC agreements were unlike any others in the industry relied upon by McConnell.  The compensation to be paid to Kendall and Kaney under the NJC agreements was far greater than that paid by those major media companies that had executive severance agreements. Golden parachute agreements between single newspapers and their executives, when offered, customarily provide for 26

to 52 weeks' compensation upon severance.  Many companies do not offer severance agreements at all. Those large media corporations that offer severance agreements to executives do not ordinarily provide for more than 2.99 times the executive's annual salary. The agreements in question here provide for far greater compensation proportionately.

The NJC agreements were also distinctive in that they contained no expiration dates after which the executives could no longer enforce the terms.  Kaney's agreement went so far as to guarantee her automatic succession as CEO of the corporation.  And, again, the golden parachute agreements were not offered as an incentive to begin employment, and when they were executed there was no likelihood that either Kendall or Kaney would leave NJC's employment.

Although Kendall, Kaney, and NJC contend that McConnell's testimony supports their position that the agreements were reasonable and not disproportionate, this argument does not hold.  There are many problems with McConnell's testimony.  He did not speak with Tippen or any member of the Cobb Cole law firm that drafted the agreement.[17]  He also failed to speak to NJC's general counsel, Jonathan Kaney.  These are the only people who might have discussed the agreements prior to their being presented to Kendall and Kaney. Moreover, he had not read the Order of this Court discussing the performance of NJC in connection with the valuation of Cox's shares or the appellate court's opinion reviewing that Order.  Surprisingly, he also had not read the NJC Bylaws and did not have any

---

[17]Of course, it would have been impossible to speak with Tippen, who was deceased by the time McConnell was hired, but there is no reason that McConnell could not have spoken to others regarding the decision to offer the golden parachutes.

understanding of the powers granted to NJC's officers and directors.

Also calling McConnell's opinion into question is his use of only large, publicly held media corporations as comparators in assessing the reasonableness of the golden parachute agreements.  (See Ex. B to McConnell Report, Defs.' Ex. 2).  These comparators included Belo, Dow Jones, Gannett, Knight Ridder, New York Times, and other national media companies.  (See id.).  Only one of the fifteen comparators had severance agreements providing for more than 2.99 times the executive's annual pay, and that was Gannett, which used a multiple of four for its CEO only.  (Id.).  In concluding that the agreements were reasonable, McConnell determined that the multiple of six—thirteen if taking the tax gross-up into account—was justified because in his opinion Kendall and Kaney were undercompensated when compared to officers of much larger media employers.[18]  Finally, the agreements of the comparators provided for payment only upon change of control of the employing corporation.

McConnell's conclusions are unreliable, and, taken in its entirety, his testimony supports the conclusion that the compensation provided for in the golden parachute agreements awarded to Kendall and Kaney does not bear a reasonable relationship to the services rendered by these two executives.  McConnell did not consider the severance agreements of single-newspaper businesses which, when offered, provide much less compensation in relation to annual salary.  Even the severance agreements between the large media corporations and their executives that McConnell did consider in his analysis

---

[18]Kendall's annual compensation was $201,000 and Kaney's was $222,000.

provide for significantly less compensation relative to the executives' annual salaries.

Because there was no reasonable relationship between the services rendered by Kendall and Kaney and the benefits received by NJC, I find that the executive severance agreements constitute corporate waste, and as a result, the agreements are not entitled to the presumption of validity provided by the business judgment rule. The only way to ratify corporate waste is through a unanimous stockholder vote,[19] which none of the parties suggests has occurred here. Therefore, I find that the business judgment rule does not apply and the corporate waste has not been justified.

## IV. Conclusion

The golden parachute agreements are void because Tippen Davidson lacked authority to enter into the agreements on behalf of NJC. The NJC Bylaws did not grant him the authority to enter into these extraordinary employment contracts, and such authority was not conferred by the NJC Board of Directors. The golden parachute agreements were not ratified by the NJC shareholders or the disinterested members of the NJC Board of Directors. Because the agreements are void, the business judgment rule does not apply, and Plaintiff's Motion to Set Aside must be granted.

The result would be the same had the golden parachute agreements not been determined void for lack of authority and ratification. The argument of Kendall and Kaney that the business judgment rule guards against court action fails because the rule does not apply

---

[19]Payment plans that constitute waste are not subject to ratification by the board of directors or even by a majority of shareholders. Johns, 874 F.2d at 1460 n.25. Only *unanimous* shareholder approval will serve as ratification of a payment plan that constitutes waste. Id.

to protect agreements that constitute waste.  Although such agreements constituting waste could survive if ratified by a unanimous vote of the NJC shareholders, no such vote has occurred.

It is therefore **ORDERED** that Plaintiff's Motion to Set Aside Certain Severance Agreements (Doc. 333) is **GRANTED**.  The agreement signed by David Kendall and Herbert M. Davidson, dated November 3, 2004, and the agreement signed by Georgia Kaney and Herbert M. Davidson, dated November 4, 2004, are hereby set aside and shall have no force and effect on NJC. I reserve jurisdiction to award costs and fees upon motion and notice.

**DONE** and **ORDERED** in Orlando, Florida this 5th day of December, 2008.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party