ASSET PURCHASE AGREEMENT

BY AND AMONG

NEWS-JOURNAL CORPORATION,

VOLUSIA PENNYSAVER, INC.

HALIFAX MEDIA ACQUISITION LLC

AND

STEPHENS INVESTMENTS HOLDINGS LLC

DATED

December 30, 2009



EXHIBIT

A

**TABLE OF CONTENTS**

Page

1. DEFINITIONS ................................................................................................. - 1 -
   1.1 Certain Definitions ............................................................................ - 1 -
   1.2 Certain Additional Definitions ........................................................ - 6 -
2. SALE AND PURCHASE OF TRANSFERRED ASSETS ............................ - 7 -
   2.1 Agreement to Sell and Purchase .................................................... - 7 -
   2.2 Excluded Assets .............................................................................. - 8 -
   2.3 Purchase Price; Indemnification Escrow ........................................ - 9 -
   2.4 Working Capital; Purchase Price Adjustments ................................ - 9 -
   2.5 Allocation of Purchase Price .......................................................... - 10 -
   2.6 Assumption of Assumed Liabilities; Retained Liabilities ............... - 10 -
3. REPRESENTATIONS AND WARRANTIES OF SELLER ....................... - 11 -
   3.1 Organization, Standing and Authority ............................................ - 11 -
   3.2 Authorization and Binding Obligation ............................................ - 11 -
   3.3 Absence of Conflicting Terms; Consents ........................................ - 12 -
   3.4 Financial Statements ....................................................................... - 12 -
   3.5 Tangible Personal Property ............................................................. - 12 -
   3.6 Real Property ................................................................................... - 12 -
   3.7 Material Business Contracts ............................................................ - 14 -
   3.8 Intellectual Property ........................................................................ - 14 -
   3.9 Tax Matters ..................................................................................... - 15 -
   3.10 Conduct in the Ordinary Course; Absence of Changes or Events ... - 16 -
   3.11 Insurance ......................................................................................... - 16 -
   3.12 Employee Benefit Plans .................................................................. - 16 -
   3.13 Labor Relations ............................................................................... - 17 -
   3.14 Licenses; Compliance with Laws; Legal Proceedings ..................... - 17 -
   3.15 Environmental Matters .................................................................... - 18 -
   3.16 Circulation; Advertising and Reports .............................................. - 18 -
   3.17 Transactions with Affiliates ............................................................ - 19 -
   3.18 Bonds; Letters of Credit .................................................................. - 19 -
   3.19 Brokers of Seller ............................................................................. - 19 -
   3.20 Inventory ......................................................................................... - 19 -

| | | | |
|---|---|---|---|
| | 3.21 | Accounts Receivable; Working Capital | - 19 - |
| | 3.22 | Sufficiency of Transferred Assets | - 19 - |
| 4. | | REPRESENTATIONS AND WARRANTIES OF BUYER | - 20 - |
| | 4.1 | Organization, Standing and Authority | - 20 - |
| | 4.2 | Authorization and Binding Obligation | - 20 - |
| | 4.3 | Absence of Conflicting Terms; Consents | - 20 - |
| | 4.4 | Availability of Funds | - 20 - |
| | 4.5 | Regulatory Matters | - 20 - |
| | 4.6 | Brokers of Buyer | - 21 - |
| 5. | | CERTAIN COVENANTS OF THE PARTIES | - 21 - |
| | 5.1 | Conduct of the Business Prior to Closing | - 21 - |
| | 5.2 | Consents | - 22 - |
| | 5.3 | Tax Matters | - 24 - |
| | 5.4 | Bonds; Letters of Credit | - 24 - |
| | 5.5 | Covenants Regarding Employee Matters | - 24 - |
| | 5.6 | Access to Properties, Books and Records | - 27 - |
| | 5.7 | Confidentiality | - 27 - |
| | 5.8 | The Sale Approval Order | - 27 - |
| | 5.9 | Further Actions; Cooperation | - 28 - |
| | 5.10 | Title Insurance Commitments | - 28 - |
| | 5.11 | Title Insurance Policies | - 28 - |
| | 5.12 | Surveys | - 29 - |
| | 5.13 | Yonge Street Property | - 29 - |
| | 5.14 | Buyer's Loan Agreement | - 29 - |
| 6. | | CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER AND SELLER TO CLOSE | - 29 - |
| | 6.1 | Conditions Precedent to Obligations of Buyer to Close | - 29 - |
| | 6.2 | Conditions Precedent to Obligations of Seller to Close | - 30 - |
| 7. | | CLOSING AND CLOSING DELIVERIES | - 31 - |
| | 7.1 | Closing | - 31 - |
| | 7.2 | Deliveries by Seller | - 32 - |

2967748_1

| | | | |
|---|---|---|---|
| | 7.3 | Deliveries by Buyer | - 33 - |
| 8. | | TERMINATION | - 33 - |
| | 8.1 | Method of Termination | - 33 - |
| | 8.2 | Effect of Termination | - 34 - |
| | 8.3 | Other Termination Provisions | - 35 - |
| 9. | | SURVIVAL OF REPRESENTATIONS AND WARRANTIES AND INDEMNIFICATION | - 35 - |
| | 9.1 | Representations, Warranties and Covenants | - 35 - |
| | 9.2 | Indemnification by Seller | - 35 - |
| | 9.3 | Indemnification by Buyer | - 35 - |
| | 9.4 | Procedure for Indemnification | - 35 - |
| | 9.5 | Limitation on Indemnification; Exclusive Remedy; Time Period | - 36 - |
| 10. | | MISCELLANEOUS | - 37 - |
| | 10.1 | No Other Representations or Warranties | - 37 - |
| | 10.2 | Disclosure | - 38 - |
| | 10.3 | Notices | - 38 - |
| | 10.4 | No Assignment; Benefit and Binding Effect | - 39 - |
| | 10.5 | Bulk Transfer | - 39 - |
| | 10.6 | Governing Law | - 39 - |
| | 10.7 | Waiver of Jury Trial | - 39 - |
| | 10.8 | Submission to Jurisdiction; Venue | - 40 - |
| | 10.9 | Heading; Interpretation | - 40 - |
| | 10.10 | Gender and Number | - 40 - |
| | 10.11 | Entire Agreement | - 40 - |
| | 10.12 | Further Assurances | - 40 - |
| | 10.13 | Waiver of Compliance | - 40 - |
| | 10.14 | Severability | - 41 - |
| | 10.15 | Enforcement of Agreement | - 41 - |
| | 10.16 | Counterparts | - 41 - |
| | 10.17 | No Third Party Beneficiaries | - 41 - |
| | 10.18 | Construction | - 41 - |

# TABLE OF CONTENTS
(continued)

**Page**

10.19  Public Announcements ................................................................. - 41 -

10.20  No Personal Liability ................................................................. - 42 -

10.21  Expenses ................................................................................... - 42 -

10.22  Buyer Guarantee ....................................................................... - 42 -

2967748_1

# EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Newspapers |
| Exhibit B | Pennysavers |
| Exhibit C | Directories |
| Exhibit D | Reference Working Capital Statement; Working Capital Procedures |
| Exhibit D-1 | Example of Calculation of Purchase Price Adjustment |
| Exhibit E | Form of Sale Approval Order |
| Exhibit E-1 | Sale Approval Order Motion Notice List |
| Exhibit F | Bill of Sale |
| Exhibit G | Assignment of Business Intellectual Property |
| Exhibit H | Assumption Agreement |
| Exhibit I | Escrow Agreement |
| | |
| Schedule 1.1(a) | Seller Knowledgeable Individuals |
| Schedule 1.1(c) | Certain Permitted Encumbrances |
| Schedule 2.2.5 | Excluded Contracts |
| Schedule 2.2.10 | Certain Excluded Assets |
| Schedule 3.3 | Certain Seller Consents |
| Schedule 3.4 | Financial Statements |
| Schedule 3.5 | Exceptions to Operating Condition of Tangible Personal Property |
| Schedule 3.6(a) | Owned Real Property |
| Schedule 3.6(b) | Leased Real Property |
| Schedule 3.7.1 | Material Business Contracts |
| Schedule 3.7.2 | Exceptions to Material Contracts |
| Schedule 3.8.1 | Intellectual Property Complaints |
| Schedule 3.8.2 | Owned Business Intellectual Property |
| Schedule 3.8.2(iv) | Owned Business Intellectual Property Indemnification Obligations |
| Schedule 3.8.3 | Licensed Business Intellectual Property |
| Schedule 3.8.3-2 | Exceptions to Delivery of License Agreements |
| Schedule 3.8.3(iv) | Sublicense of Licensed Business Intellectual Property |
| Schedule 3.8.3(v) | Loss of Right to Use Licensed Business Intellectual Property |
| Schedule 3.10 | Exceptions to Conduct in the Ordinary Course |
| Schedule 3.12 | Employee Benefit Plans |
| Schedule 3.13.1 | Business Employees |
| Schedule 3.13.2 | Labor Disputes |
| Schedule 3.13.3 | Collective Bargaining Agreements |
| Schedule 3.14.1 | Licenses |
| Schedule 3.14.2 | Compliance with Legal Rules |
| Schedule 3.14.3 | Legal Proceedings |
| Schedule 3.15 | Environmental Matters |
| Schedule 3.16.2 | Changes in Circulation Policies |
| Schedule 3.17 | Transactions with Affiliates |
| Schedule 3.18 | Bonds; Letters of Credit |
| Schedule 5.1 | Conduct of the Business Prior to Closing |
| Schedule 5.5.6 | Seller's Severance Benefit Plans |

2967748_1

Schedule 5.5.7     Certain Severance Benefits for Certain Former Employees of Seller.
Schedule 6.1.4     Required Consents
Schedule 6.1.8     Buyer's Loan Agreement and Related Documents

2967748_1

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is dated as of December 30, 2009 (this "**Agreement**"), by among the News-Journal Corporation, a Florida corporation ("**NJC**"), Volusia Pennysaver, Inc., a Florida corporation ("**VPI**") (VPI, together with NJC, as their interests may appear, collectively "**Seller**"), and Halifax Media Acquisition LLC, a Delaware limited liability company ("**Buyer**"), solely for purposes of Section 10.22, Stephens Investments Holdings LLC, an Arkansas limited liability company ("**Buyer Guarantor**").

**R E C I T A L S**:

A.     NJC owns the newspapers and related community publications listed on **Exhibit A** (collectively, the "**Newspapers**") and is in the business of publishing, distributing and operating the Newspapers and related online publications (such ownership and operations collectively, the "**Newspaper Business**").

B.     VPI is a wholly owned subsidiary of NJC. VPI owns and operates the periodical publications listed on **Exhibit B** (collectively, the "**Pennysavers**") and is in the business of publishing, distributing and operating the Pennysavers (such ownership and operations collectively, the "**Pennysaver Business**").

C.     Seller owns and operates the directories listed on **Exhibit C** (collectively, the "**Directories**") and is in the business of publishing, distributing and operating the Directories (such ownership and operations collectively, the "**Directory Business**")(the Newspaper Business, the Pennysaver Business and the Directory Business, collectively, the "**Business**").

D.     In response to an action brought on June 30, 2006 by the minority shareholder of Seller, Cox Enterprises, Inc. against Seller, its officer, directors, and majority shareholder, PMV, Inc., pursuant to sections 607.1430 and 607.1434, Florida Statutes (the "**Cox Case**"), Seller was ordered by the United States District Court, the Middle District of Florida, Orlando Division (the "**Court**") to purchase all of the shares owned by Cox Enterprises, Inc. By order dated April 17, 2009, the Court appointed James W. Hopson (the "**Receiver**") as a receiver for Seller with such power and authority as is set forth in such order.

E.     Buyer desires to purchase from Seller and Seller desires to sell to Buyer, all of the assets used or held for use by Seller to conduct the operations of the Business (other than the Excluded Assets), and in connection therewith, Buyer has agreed to assume certain liabilities of Seller relating to the Business, all upon the terms and subject to the conditions set forth herein.

**A G R E E M E N T S**:

In consideration of the above recitals and the covenants and agreements contained herein, Buyer and Seller agree as follows:

1.     <u>DEFINITIONS</u>

1.1     <u>Certain Definitions</u>. For all purposes of this Agreement, the following terms have the respective meanings set forth below:

"**Accrued Vacation**" means with respect to any Business Employee who becomes a Transferred Employee, the accrued vacation and personal days to which such Business Employee is entitled under the plans or policies of Seller as of the Closing Date.

"**Adjustment Time**" means 11:59 p.m., local time, on the day prior to the Closing Date.

"**Affiliate**" means with respect to a Person, any Person directly or indirectly controlling, controlled by or under common control with such first-specified Person. For purposes of this definition, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or partnership interests, by contract or otherwise.

"**Assumed Business Contract**" means any Business Contract (other than an Excluded Contract) (a) that is in effect on the date hereof and on the Closing Date and is a Material Business Contract listed on **Schedule 3.7.1**; (b) that is in effect on the date hereof and on the Closing Date, was entered into in the ordinary course of business and is not required to be listed as a Material Business Contract on **Schedule 3.7.1** pursuant to the terms of Section 3.7.1; (c) that is entered into between the date hereof and the Closing as permitted by and subject to the terms of this Agreement; or (d) that Buyer agrees to assume, including pursuant to Section 2.6.3.

"**Business Contract**" means any Contract to which Seller is a party and which is used in the Business.

"**Business Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which national banking institutions in either Daytona, Florida or New York, New York are authorized or obligated by law or executive order to be closed.

"**Business Employee**" means any employee of Seller who works at or for the Business.

"**Business Intellectual Property**" means the Intellectual Property that is either owned by Seller or that Seller is permitted to use (by license or otherwise) that is used in the operation of the Business.

"**Closing**" means the consummation of the transactions contemplated by this Agreement in accordance with the provisions of Article 7.

"**Closing Date**" means the date on which the Closing occurs.

"**Closing Date Working Capital**" means the Working Capital as of the Adjustment Time.

"**Code**" means the Internal Revenue Code of 1986, as amended, or any subsequent legislative enactment thereof, each as in effect from time to time.

"**Consent**" means any consent, permit, authorization or approval of any Governmental Authority or other third party that Seller is, under the terms of any Contract, Legal Rule or License, required to obtain for Seller to transfer to Buyer the Transferred Assets at the Closing.

- 2 -

"**Contract**" means any legally binding contract, agreement, lease or non-governmental license.

"**Employee Benefit Plan**" means any employee benefit plan, within the meaning of Section 3(3) of ERISA, and each written stock option, stock appreciation right, restricted stock, stock purchase, stock unit, incentive, bonus, profit-sharing, savings, deferred compensation, health, medical, dental, life insurance, disability, accident, supplemental unemployment or retirement, severance or benefits continuation or fringe benefit plan, program or agreement that provides benefits to Business Employees.

"**Encumbrance**" means any security interest, pledge, mortgage, lien, charge, defect of title, or other encumbrance.

"**Environmental Law**" means any Legal Rule relating to the handling, treatment, transportation or disposal of Hazardous Substances.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder, as in effect from time to time.

"**Escrow Agent**" means PNC Bank, National Association.

"**Escrow Agreement**" means the indemnification escrow agreement among, Seller, Buyer and Escrow Agent, substantially in the form attached hereto as **Exhibit I**.

"**Escrow Amount**" means an amount equal to 10 percent (10%) of the Purchase Price.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time.

"**Governmental Authority**" means the United States government or any state government, or other political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions on their behalf.

"**Hazardous Substance**" means any pollutant, contaminant, waste, hazardous or toxic substance, constituent, or material, including petroleum products and their derivatives, or other substances regulated under or pursuant to Environmental Law.

"**Intellectual Property**" means any or all of the following and all common law and statutory rights in, arising out of, or associated therewith: (a) patents and applications therefor; (b) inventions, trade secrets, proprietary information, know-how, technical data and subscriber and advertiser lists; (c) copyrights, copyright registrations and applications therefor; (d) software and software programs; (e) domain names, uniform resource locators and other names and locators associated with the Internet; (f) trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor; (g) trade dress (including banners, flags, nameplates, and mastheads); and (h) databases and data collections and all rights therein.

2967748_1

"**Knowledge**" means, with respect to Seller, the actual knowledge of the individuals set forth on **Schedule 1.1(a)**, after reasonable investigation under the circumstances.

"**Leased Real Property**" means the leasehold interests in real estate held by Seller which are set forth on **Schedule 3.6(b)**. The term "Leased Real Property" does not include any Excluded Asset.

"**Legal Rule**" means any applicable statute, ordinance, code or other law, rule, regulation, order, or other written requirement enacted, adopted, promulgated, applied or followed by any Governmental Authority.

"**Liability**" means any debt, obligation or liability of any kind or nature, whether accrued or fixed, absolute or contingent, determined or determinable, matured or unmatured, and whether due or to become due, asserted or unasserted, or known or unknown.

"**License**" means any license, authorization, franchise or permit used in connection with the operation of the Business granted or issued to Seller by any Governmental Authority, including all amendments thereto and renewals or modifications thereof.

"**Losses**" mean any and all costs, expenses, damages, liabilities, losses, claims, judgments or settlements, including reasonable attorney and professional fees, imposed on or otherwise suffered by a Person.

"**Material Adverse Effect**" means a material adverse effect on (a) the assets, operations or financial condition of the Business, taken as a whole, or (b) the ability of Seller to perform its obligations under this Agreement, in each case other than an effect resulting from an Excluded Matter. "**Excluded Matter**" means (i) any event, change, state of facts or circumstances or development arising from actions taken by Buyer or its Affiliates or related to attributes of Buyer or its Affiliates; (ii) any event, change, state of facts or circumstances or development in general economic or political conditions or financial or capital markets, including changes in interest rates or currency rates; (iii) any change to GAAP or any Legal Rule; (iv) any event, change, state of facts or circumstances or development resulting from factors, conditions or trends generally affecting the newspaper publishing business (including legislative or regulatory matters); (v) any failure, in and of itself, by the Business to meet estimates, projections or forecasts of revenue or earnings for any period ending on or after the date of this Agreement; (vi) any event, change, state of facts or circumstances or development resulting from natural disasters, hostilities, acts of war, sabotage or terrorism or military actions; (vii) any event, change, state of facts or circumstances or development resulting from changes in competition affecting the Business; or (viii) consequences of taking any action contemplated or required by this Agreement or arising from the announcement of the transactions contemplated by this Agreement; provided, however, that with respect to clauses (ii), (iii), (iv) and (vi), "Excluded Matter" shall not include any such event, change, state of facts or circumstances or development that disproportionately affects the Business in any material respect compared to similar newspaper publishing businesses.

"**Material Business Contract**" means a Business Contract (other than an Excluded Contract) meeting any of the following criteria: (a) a Business Contract for goods or services pursuant to which Seller is required to pay or is entitled to receive more than $100,000 annually

- 4 -

or $250,000 in the aggregate over the remaining term of such Contract, except for (i) advertising Contracts entered into in the ordinary course of business or (ii) Contracts providing for the licensing of generally available software applications (*e.g.*, productivity and web browsing software applications); (b) an employment or management Contract between Seller, on the one hand, and any Business Employee, on the other hand, which cannot be terminated by Seller upon thirty (30) days' notice without penalty or continuing financial obligations; or (c) a collective bargaining agreement.

"**Multiemployer Plan**" means a plan, as defined in ERISA Section 3(37) or 4001(a)(3), to which Seller or any trade or business which would be considered a single employer with Seller under Section 4001(b)(1) of ERISA or part of the same "controlled group" as Seller under Section 302(d)(8)(C) of ERISA, contributed, contributes or is required to contribute that provides benefits to Business Employees.

"**Naming Rights Agreement**" means that certain Naming Agreement effective as of January 1, 2004, by and between the Lively Arts Center, Inc. and NJC, as may be amended from time to time.

"**Other Real Property Interest**" means any interest in real property (other than Owned Real Property or Leased Real Property) held by Seller and used exclusively in connection with the ownership and operation of the Business, including easements, licenses, rights to access and rights-of-way. The term "Other Real Property Interest" does not include any Excluded Asset.

"**Owned Real Property**" means the fee simple interests in the parcels of real estate and the buildings and improvements thereon owned by Seller which are set forth on **Schedule 3.6(a)**. The term "Owned Real Property" does not include any Excluded Asset, Other Real Property Interests or Leased Real Property.

"**Permitted Encumbrances**" mean any of the following Encumbrances: (a) landlord's liens; (b) liens for current Taxes, assessments and governmental charges not yet due or being contested in good faith by appropriate proceedings; (c) liens arising out of judgments or awards against Seller with respect to which there shall be a prosecution for appeal or there shall be a proceeding to review or the time limit has not yet run for such an appeal or review with respect to such judgment or award; (d) liens of carriers, warehousemen, mechanics, laborers, and materialmen and other similar statutory liens incurred in the ordinary course of business for sums not yet due or being diligently contested in good faith; (e) liens incurred in the ordinary course of business in connection with worker's compensation and unemployment insurance or similar Legal Rules; (f) with respect to Real Property, leases, easements, rights to access, rights-of-way, mineral rights or other similar reservations, Encumbrances, defects of title, or other matters of record or matters revealed by a current survey of the Real Property, in each such instance any of which individually or in the aggregate, does not materially impair the use or occupancy of the Real Property in the operation of the Business as currently operated; (g) Encumbrances which are, or are related to, Assumed Liabilities including liens on leased personal property; (h) leasehold interests in real property leased to third parties by Seller; (i) restrictions set forth in, or rights granted to Governmental Authorities as set forth in the Licenses or Legal Rules; and (j) Encumbrances set forth on **Schedule 1.1(c)**.

"**Person**" means any individual, corporation, limited liability company, partnership, company, sole proprietorship, joint venture, trust, estate, association, organization, Governmental Authority or other entity.

"**Proposed Transactions**" means all of the transactions contemplated by this Agreement, including the transfer, sale, conveyance, assignment and delivery by Seller to Buyer, and the acquisition by Buyer from Seller, of substantially all of the assets of Seller as contemplated herein and the performance by the parties of their respective covenants and obligations hereunder.

"**Real Property**" means the Owned Real Property, Leased Real Property and Other Real Property Interests.

"**Reference Working Capital Statement**" means the statement setting forth the determination of the Working Capital as of September 30, 2009, a copy of which is attached hereto as part of **Exhibit D**.

"**Related Agreements**" mean all exhibits, certificates, instruments and other agreements required to be executed and delivered by a party to this Agreement at Closing.

"**Sale Approval Order**" means an order of the Court authorizing, among other things, the Proposed Transactions and sale of the Transferred Assets to Buyer.

"**Seller Working Capital Statement**" has the meaning set forth in Section 2.4.

"**Severance Agreements**" mean any and all agreements between Seller and any Business Employees providing for the payment of any severance benefits.

"**Taxes**" mean all federal, state, local or foreign income, sales, use, ad valorem, value added, net or gross proceeds, gains, profits, capital, withholding, payroll, employment, unemployment, social security, excise or real or personal property taxes, together with any interest thereon and any penalties, additions to tax or additional amounts applicable thereto.

"**Working Capital**" means the excess, if any, of current Transferred Assets (other than barter and trade assets) over current Assumed Liabilities (other than barter and trade liabilities), determined in accordance with the guidelines set forth on **Exhibit D** and GAAP applied on a basis consistent with past practices; provided, however, that to the extent **Exhibit D** is inconsistent with GAAP or past practices, **Exhibit D** shall control.

1.2   Certain Additional Definitions.  For all purposes of and under this Agreement, the following terms shall have the respective meanings ascribed thereto in the respective sections of this Agreement set forth opposite each such term below:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Assignment of Business Intellectual Property | 7.2.1 |
| Assumed Liabilities | 2.6.1 |

| | |
|---|---|
| Assumption Agreement | 7.2.2 |
| Bill of Sale | 7.2.1 |
| Business | Recitals |
| Business Insurance Policies | 3.11 |
| Buyer | Preamble |
| Buyer Guarantor | Preamble |
| Buyer's Loan Agreement | 6.1.8 |
| CIM | 10.1.2 |
| Claimant | 9.4.1 |
| COBRA | 5.5.4 |
| Court | Recitals |
| Cox Case | Recitals |
| Deductible | 9.5.1 |
| Directory Business | Recitals |
| Excluded Assets | 2.2 |
| Excluded Contracts | 2.2.5 |
| Financial Statements | 3.4 |
| Improvements | 3.6.7 |
| Indemnifying Party | 9.4.1 |
| Material Leased Real Property | 5.10 |
| NDA | 5.6.1 |
| Newspaper Business | Recitals |
| Newspapers | Recitals |
| Pennysaver Business | Recitals |
| Projections | 10.1.1 |
| Purchase Price | 2.3 |
| Receiver | Recitals |
| Required Consents | 6.1.4 |
| Retained Liabilities | 2.6.2 |
| Returns | 5.3.1 |
| Seller | Preamble |
| Seller's Business Employee Schedule | 5.5.1 |
| Surveys | 5.12 |
| Title Commitments | 5.10 |
| Title Company | 5.10 |
| Title Policies | 5.11 |
| Transferred Assets | 2.1 |
| Transferred Employees | 5.5.1 |
| Upset Date | 8.1.4 |
| WARN Act | 5.5.1 |
| Yonge Street Lease | 5.13 |

2.    <u>SALE AND PURCHASE OF TRANSFERRED ASSETS</u>

2.1    <u>Agreement to Sell and Purchase</u>.  Subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell, transfer and deliver to Buyer at the Closing, and Buyer hereby agrees to purchase from Seller at the Closing, all right, title and interest of Seller

and its Affiliates in and to the assets listed below, free and clear of all Encumbrances, other than Permitted Encumbrances (collectively, the "**Transferred Assets**"):

2.1.1   the Assumed Business Contracts;

2.1.2   the Real Property;

2.1.3   the Business Intellectual Property;

2.1.4   to the extent legally transferable, the Licenses;

2.1.5   all inventories of merchandise, newsprint, ink and other raw materials, work in process, finished goods and supplies (including photo supplies, composition supplies, camera supplies, pressroom supplies, pressroom plates, mailroom supplies, plant supplies and route and circulation supplies) used or held for use in connection with the Business;

2.1.6   all tangible materials included within the library (*i.e.*, the "morgue") of each of the Newspapers, including all clippings, art, photographs (including, digital files and film, negatives and positives), historical facts and memorabilia, bound files of back issues, electronic archives, and microfilm and microfiche reproductions of back issues, but excluding, any Intellectual Property described in Section 2.2.6 or Section 2.2.10;

2.1.7   all motor vehicles, furniture, fixtures, equipment, machinery and other tangible personal property used or held for use in connection with the Business;

2.1.8   subject to Section 2.2.3, all books of account and financial records, invoices, shipping records, sales and promotional literature, supplier, customer and circulation lists, correspondence and other documents, records, data, files and service manuals relating to the Business and located on the premises of any of the Real Property

2.1.9   current assets included in the Closing Date Working Capital;

2.1.10  the Naming Rights Agreement; and

2.1.11  all goodwill relating to the Business.

2.2   Excluded Assets.  Notwithstanding anything set forth in this Agreement to the contrary, the Transferred Assets shall not include the following assets (collectively, the "**Excluded Assets**"), which shall be retained by Seller:

2.2.1   all cash and cash equivalents, including without limitation certificates of deposit, commercial paper, treasury bills, marketable securities, bank accounts, money market accounts, other depositary accounts and all such similar accounts or investments, except to the extent included in the Closing Date Working Capital as set forth on **Exhibit D**;

2.2.2   all bonds, surety instruments, insurance policies and all rights and claims thereunder, letters of credit or other similar items, including those listed on **Schedule 3.18**, and any cash surrender value in regard thereto;

2.2.3 any books and records that Seller is required by Legal Rules to retain or is otherwise prohibited by Legal Rules to disclose and any correspondence, memoranda, books of account, Tax reports and Returns and the like related to the Business and Seller's corporate minute books and other books and records related to internal company matters and financial relationships with Seller's lenders or Affiliates;

2.2.4 any claims, rights and interest in and to any refunds of Taxes or fees of any nature for periods prior to the Adjustment Time or any choses in action owned by Seller relating to such refunds;

2.2.5 the Severance Agreements and the Contracts set forth on **Schedule 2.2.5** (the "**Excluded Contracts**");

2.2.6 all names, trademarks, trade names, domain names, service marks, service names, logos and similar proprietary rights of Seller or its Affiliates using the names "Davidson" or "PMV", and any derivations of any of the foregoing whether or not used (and whether or not exclusively used) in the business or operations of the Business;

2.2.7 all rights to receive fees or services from Seller or any of its Affiliates and any Contracts between Seller and any of its Affiliates;

2.2.8 any Employee Benefit Plan and any related assets;

2.2.9 all claims, rights, interests and choses of action of Seller, whether mature, contingent or otherwise, against third parties (a) with respect to the Business and the Transferred Assets, to the extent arising during or attributable to any period prior to the Adjustment Time, or (b) with respect to the Retained Liabilities or the Excluded Assets; and

2.2.10 the real property, artwork and other assets identified on **Schedule 2.2.10**.

2.3     Purchase Price; Indemnification Escrow.  The purchase price for the Transferred Assets shall be $20,074,000.00 (the "**Purchase Price**").  At the Closing, Buyer shall deliver to Seller, via wire transfer of immediately available funds in U.S. Dollars in accordance with Seller's written instructions provided at least two (2) Business Days prior to the Closing, the excess of the Purchase Price over the Escrow Amount, and Buyer shall deposit the Escrow Amount, in immediately available funds, with Escrow Agent in an interest-bearing account in accordance with the terms of the Escrow Agreement dated as of the Closing Date, which shall serve as the sole source from which Seller's indemnification obligations pursuant to Article 9 shall be satisfied  from and after the Closing.  The Escrow Agreement shall terminate July 1, 2011, and final disbursement of the funds then held by Escrow Agent shall be made by Escrow Agent to Seller or Buyer, as the case may be, subject to any indemnification claims then pending, pursuant to and in accordance with the terms and conditions of the Escrow Agreement.

2.4     Working Capital; Purchase Price Adjustments.

2.4.1 The Transferred Assets and the Assumed Liabilities shall include the Closing Date Working Capital.  As promptly as practicable, but in any event within sixty (60) days following the Closing Date, Seller shall deliver to Buyer a statement setting forth Seller's

- 9 -

calculation of the Closing Date Working Capital (the "**Seller Working Capital Statement**"), prepared on a basis consistent with the preparation of the Reference Working Capital Statement and in accordance with the procedures and principles set forth in **Exhibit D** hereto. The Seller Working Capital Statement and Seller's calculation of the Closing Date Working Capital shall not be binding on Buyer and Buyer shall be entitled to dispute any matter set forth on the Seller Working Capital Statement and Seller's calculation of the Closing Date Working Capital in accordance with the terms of this Agreement.

2.4.2    In the event the Closing occurs on or before January 15, 2010, Buyer shall be entitled to a reduction to the Purchase Price in an amount equal to the "Net Cash From the Operation of the Business" for the period from January 1, 2010 through the Closing Date, if any. In the event the Closing occurs after January 15, 2010 and on or before January 31, 2010, there shall be no reduction to the Purchase Price. In the event the Closing occurs after January 31, 2010 and on or before March 31, 2010, Buyer shall be entitled to a reduction to the Purchase Price in an amount equal to the "Net Cash From the Operation of the Business" for the period from February 1, 2010 through the Closing Date, if any. In the event the Closing occurs after March 31, 2010, there shall be no reduction to the Purchase Price. The definition of "Net Cash From the Operation of the Business" and an example of the calculation of the adjustment to the Purchase Price described in this Section 2.4.2 are set forth on **Exhibit D-1**.

2.5    Allocation of Purchase Price. Seller and Buyer agree to use good faith efforts to agree to an allocation of the aggregate purchase consideration among the Transferred Assets in a manner consistent with Section 1060 of the Code and the United States Treasury Regulations promulgated thereunder within sixty (60) days after the Closing Date and, if Seller and Buyer reach such agreement, then Seller and Buyer agree to file all income Tax forms and Returns (including IRS Form 8594 or any successor form) in accordance with such allocation and agree not to take any position before any taxing authority that is inconsistent with such allocation. If Seller and Buyer shall not have agreed on such allocation by the sixtieth (60th) day following the Closing Date, then Seller and Buyer shall have no further obligations pursuant to this Section 2.5, and each of Seller and Buyer shall make its own determination of such allocation for financial and tax reporting purposes.

2.6    Assumption of Assumed Liabilities; Retained Liabilities.

2.6.1    At the Closing, Buyer shall assume and timely pay and perform and discharge the following Liabilities (collectively, the "**Assumed Liabilities**"):

(i)    all Liabilities of Seller and the Business under the Assumed Business Contracts attributable to the period after the Adjustment Time;

(ii)    all Liabilities arising out of any fact or circumstance which relates to the ownership or operation of the Business and the Transferred Assets after the Adjustment Time

(iii)    all current Liabilities included in the Closing Date Working Capital; and

(iv)    all Liabilities to be assumed by Buyer as set forth in Section 5.5.

- 10 -

2.6.2   Buyer shall not assume any Liabilities of Seller or its Affiliates other than the Assumed Liabilities (the "**Retained Liabilities**"), including the following:

(i)      all Liabilities of Seller to the extent not arising out of or relating to the business and operations of the Transferred Assets or the Business;

(ii)      all Liabilities arising out of or relating to the ownership, operation or conduct of the Business or the Transferred Assets accrued prior to the Adjustment Time, except to the extent included in the Closing Date Working Capital;

(iii)      all Liabilities relating to any of the Excluded Assets, except with respect to Liabilities assumed by Buyer pursuant to Section 5.5; and

(iv)      all Liabilities arising out of or relating to Taxes of Seller or any of its Affiliates or any Tax attributable to the Business or Transferred Assets prior to the Adjustment Time, except (a) to the extent included in the Closing Date Working Capital or (b) to the extent set forth in Section 5.3.2.

2.6.3   If, prior to or after the Closing, Seller notifies Buyer that Seller omitted a Material Business Contract from **Schedule 3.7.1** that was entered into by Seller or any of its Affiliates in the ordinary course of business, then subject to Buyer's consent (which consent shall be subject to Buyer's reasonable discretion), such Business Contract shall for all purposes of this Agreement be deemed to be an Assumed Business Contract.

2.6.4   Change of Corporate Names.  As soon as reasonably practicable following the Closing, each of NJC and VPI shall cause its company name to be changed to a name which is not confusingly similar with its current name.

3.      REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows:

3.1      Organization, Standing and Authority.  NJC is a corporation validly existing and in good standing under the laws of the State of Florida.  NJC is duly authorized, qualified or licensed to do business as a foreign corporation and is in good standing under the Legal Rules of each jurisdiction in which the nature of its activities makes such qualifications necessary.  VPI is a corporation validly existing and in good standing under the laws of the State of Florida.  VPI is duly authorized, qualified or licensed to do business as a foreign corporation and is in good standing under the Legal Rules of each jurisdiction in which the nature of its activities makes such qualifications necessary.

3.2      Authorization and Binding Obligation.  Subject to obtaining the Court approval pursuant to the Sale Approval Order, (i) Seller has the corporate power and authority to execute and deliver this Agreement and the Related Agreements to which it is a party and to carry out and perform all of its other obligations under the terms of this Agreement and the Related Agreements to which it is a party, (ii) the execution and delivery of, and performance of the obligations contained in, this Agreement and the Related Agreements to which Seller is a party and the transactions contemplated hereby and thereby have been, or solely with respect to the

- 11 -

Related Agreements to which Seller is a party as of the Closing will be, duly authorized by all necessary corporate action on the part of Seller, and (iii) this Agreement has been, and all Related Agreements to which Seller is a party as of the Closing will be, duly executed and delivered by Seller, and this Agreement constitutes, and the Related Agreements to which Seller is a party will, as of the Closing, constitute, the valid and legally binding obligation of Seller, enforceable against it in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency or similar Legal Rules affecting the enforcement of creditors' rights generally, and as the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding thereunder may be brought.

3.3     *Absence of Conflicting Terms; Consents.*  Except as set forth on **Schedule 3.3** or as would not impair the ability of Seller to perform its obligations under this Agreement and the Related Agreements to which it is a party, the execution, delivery and performance by Seller of this Agreement and the Related Agreements to which it is a party (with or without the giving of notice, the lapse of time, or both): (a) assuming receipt of the Sale Approval Order and all Consents listed on **Schedule 3.3**, do not require the Consent of, notice to, or filing with, any Governmental Authority; (b) will not conflict with any provision of the certificate of incorporation or bylaws of Seller; (c) assuming receipt of the Sale Approval Order and all Consents listed on **Schedule 3.3**, will not in any material way conflict with, result in a material breach of, or constitute a material default under any Material Business Contract, or any material Legal Rule applicable to Seller or to the Business with respect to the Transferred Assets; and (d) assuming receipt of the Sale Approval Order and all Consents listed on **Schedule 3.3**, will not result in the creation upon the Transferred Assets of any Encumbrances other than Permitted Encumbrances.  Notwithstanding the foregoing, Seller makes no representation or warranty regarding any of the foregoing that may result from the specific legal or regulatory status of Buyer or any of its Affiliates or as a result of any other facts that specifically relate to the business or activities in which Buyer or any of its Affiliates is or proposes to be engaged.

3.4     *Financial Statements.*  Attached as **Schedule 3.4** hereto are complete and correct copies of the following financial statements:  News-Journal Corporation and subsidiary consolidated financial statements as of December 31, 2008, 2007, 2006, 2005 and 2004 (collectively, the "**Financial Statements**").  Also attached hereto as part of **Schedule 3.4** is the management report dated September 2009 for News-Journal Corporation for 2009 through September 30, 2009.  The Financial Statements were derived from the books and records of the Business, have been prepared in accordance with GAAP (except as set forth on **Schedule 3.4**) consistently applied, and fairly present, in all material respects, the financial position and results of operations and cash flows of the Business as of the respective dates thereof and for the respective periods indicated therein, except as set forth on **Schedule 3.4**.

3.5     *Tangible Personal Property.*  Seller owns or leases, as applicable, all tangible personal property included in the Transferred Assets, free and clear of all Encumbrances, other than Permitted Encumbrances.  Except as disclosed on **Schedule 3.5**, all tangible personal property included in the Transferred Assets is, in the aggregate, in operating condition, subject to normal wear and tear.

3.6     *Real Property.*

2967748_1

3.6.1 **Schedule 3.6(a)** sets forth the address of each parcel of Owned Real Property. With respect to each parcel of Owned Real Property:

(i) Seller has good and indefeasible fee simple title, free and clear of all Encumbrances, except Permitted Encumbrances;

(ii) except as set forth in **Schedule 3.6(a)**, or except as may be a Permitted Encumbrance, Seller has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and

(iii) other than the right of Buyer pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein arising under Seller.

3.6.2 **Schedule 3.6(b)** sets forth the address of each parcel of Leased Real Property, and a true and complete list of all Leases for each such Leased Real Property. Seller has delivered to Buyer a true and complete copy of each such Lease document. Except as set forth in **Schedule 3.6(b)**, with respect to each of the Leases:

(i) each Lease creates a valid leasehold interest in the Leased Real Property (subject to the expiration of a lease in accordance with its terms);

(ii) Seller's Knowledge, there are no disputes with respect to any Lease;

(iii) to Seller's Knowledge, neither Seller nor any other party to the Leases is in material breach of or default under any Lease, and, to Seller's Knowledge, no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a breach or default under any Lease;

(iv) Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property or any portion thereof; and

(v) Seller has not collaterally assigned or granted any other Encumbrance in any Lease that exists as of the date hereof.

3.6.3 The Real Property comprises all of the real property necessary for Seller to conduct the operations of the Business as conducted as of the date hereof.

3.6.4 Seller has not received written notice of any condemnation, expropriation or other proceeding in eminent domain affecting any parcel of Owned Real Property or any portion thereof or interest therein. To Seller's Knowledge, other than the Cox Case, there is no injunction, decree, order, writ, or judgment outstanding, or any claim, litigation, administrative action or similar proceeding, pending or threatened, relating to the ownership, lease, use or occupancy of the Owned Real Property or any portion thereof.

2967748_1

3.6.5   Seller has not received any written notice of violation of applicable building, zoning, subdivision, health and safety and other land use laws, including the Americans with Disabilities Act of 1990, as amended,

3.6.6   Each parcel of Owned Real Property, and to Seller's Knowledge the Leased Real Property has legal and practical access to a public street and is served by utilities and services necessary for the conduct and operation of the Business as presently conducted.

3.6.7   All principal buildings, principal structures, material fixtures, material building systems and equipment, and all material components thereof, included in the Real Property (the "**Improvements**") are in reasonable operating condition and repair for purposes of conducting the operations of the Business as currently conducted (normal wear and tear and required maintenance excepted).

3.7   Material Business Contracts.

3.7.1   **Schedule 3.7.1** includes a list, as of the date hereof, of the Material Business Contracts.  Seller has made available to Buyer complete and correct copies of all the Material Business Contracts.

3.7.2   Except as set forth on **Schedule 3.7.2**, (a) each Material Business Contract is in full force and effect and constitutes a valid, binding and enforceable obligation of Seller in accordance with the respective terms thereof, except as the enforceability of such obligation of Seller may be limited by principles of public policy, any Legal Rules of general application relating to bankruptcy, reorganization, insolvency, moratorium or similar Legal Rules affecting creditors' rights and relief of debtors, and general principles of equity, and, to Seller's Knowledge, represents a valid, binding and enforceable obligation of each of the other parties thereto, except as the enforceability of such obligation may be similarly limited; and (b) there exists no material breach or material default (or event that with notice or the lapse of time, or both, would constitute a material breach or material default) on the part of Seller, or, to Seller's Knowledge, on the part of any other party thereto under any Material Business Contract.

3.8   Intellectual Property.

3.8.1   The operation of the Business as currently conducted does not, in an material way, interfere with, infringe upon, misappropriate, or otherwise come into conflict with, any Intellectual Property rights of third parties; and, to Seller's Knowledge, there are no facts indicating a likelihood of the foregoing. Except as set forth on **Schedule 3.8.1**, as of the date hereof, there is no current charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or conflict (including any claim that Seller must license or refrain from using any Intellectual Property rights of any third party). To Seller's Knowledge, no third party is interfering with, infringing upon or misappropriating any Business Intellectual Property rights of Seller.

3.8.2   **Schedule 3.8.2** identifies, as of the date hereof, all material items of Business Intellectual Property owned by Seller. With respect to each item of Intellectual Property required to be identified in **Schedule 3.8.2**:

2967748_1

(i)     Seller possesses all right, title and interest in and to the item, free and clear of any security interest, pledge, mortgage, lien or defect of title (excluding rights Seller has granted to third parties in the ordinary course of business);

(ii)     Other than injunctions, judgments, orders, decrees, rulings or charges arising from the Cox Case (which pursuant to the Sale Approval Order will not attach to the Transferred Assets), the item is not subject to any outstanding injunction, judgment, order, decree, ruling or charge;

(iii)     No action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or, to Seller's Knowledge, is threatened that challenges the legality, validity, enforceability, use, or ownership of the item; and

(iv)     Except as disclosed on **Schedule 3.8.2(iv)**, Seller does not have any current obligations to indemnify any Person for or against any interference, infringement, misappropriation, or other conflict with respect to the item.

3.8.3     **Schedule 3.8.3** identifies, as the date hereof, each material item of Business Intellectual Property that Seller uses pursuant to license, sublicense, agreement, or permission, other than Contracts providing for the licensing of generally available software applications. Except as set forth on **Schedule 3.8.3-2**, Seller has delivered to Buyer correct and complete copies of all such written licenses, sublicenses, agreements, and permissions (as amended to date).   With respect to each such item of Intellectual Property required to be identified in **Schedule 3.8.3**:

(i)     the license, sublicense, agreement, or permission covering the item is legal, valid, binding, enforceable, and in full force and effect in all material respects;

(ii)     Seller is not, and to Seller's Knowledge no other party to the license, sublicense, agreement, or permission is, in material breach or default, and no event has occurred that with notice or lapse of time would constitute a material breach or default thereunder;

(iii)     no party to the license, sublicense, agreement, or permission has repudiated any material provision thereof;

(iv)     Except as disclosed on **Schedule 3.8.3(iv)**, Seller has not granted any sublicense or similar right with respect to the license, sublicense, agreement, or permission (excluding rights Seller has granted to third parties in the ordinary course of business); and

(v)     Except as disclosed on **Schedule 3.8.3(v)** and assuming receipt of all Consents listed on **Schedule 3.3**, to Seller's Knowledge, no loss or expiration of the Seller's right to use the item is threatened, pending, or reasonably foreseeable as a result of any fault by Seller, including without limitation, a failure by Seller to pay any required maintenance fees.

3.9     <u>Tax Matters</u>.  Seller has filed or caused to be filed all federal, state and local Tax Returns it was required to file with respect to the operation of the Business, and all such Tax Returns are correct in all material respects.   All Taxes which are due and payable on such

- 15 -

Returns in connection with the operation of the Business have been properly accrued or paid. Except for Permitted Encumbrances, there are no Encumbrances for Taxes on any of the Transferred Assets.

3.10    Conduct in the Ordinary Course; Absence of Changes or Events.  Except as set forth on **Schedule 3.10**, from September 30, 2009, through and including the date hereof, other than the Cox Case and acts related thereto, (a) Seller has conducted the Business in the ordinary course of business and (b) there has not been any event, change, state of facts or circumstances or development that has had or would reasonably be expected to have a Material Adverse Effect. Specifically, but not in limitation of the foregoing, except as set forth on **Schedule 3.10**, from September 30, 2009, through and including the date hereof, other than the Cox Case and acts related thereto, Seller has not:

3.10.1 amended or terminated any Material Business Contract, except in each case by reason of the occurrence of a contractually specified termination date or otherwise in the ordinary course of business;

3.10.2 made any change in accounting principles, practices or methods of the Business;

3.10.3 created or assumed any Encumbrances on the Transferred Assets other than Permitted Encumbrances;

3.10.4 paid, discharged or satisfied any material Liability relating to or arising in connection with the Business, other than the payment, discharge, or satisfaction of Liabilities in the ordinary course of business; or

3.10.5 made any sale, assignment, lease, transfer or other disposition of any material asset of the Business, other than in the ordinary course of business.

3.11    Insurance.  Seller maintains insurance in respect of the Transferred Assets and the Business covering such risks, in such amounts, with such terms and with such insurers as Seller has determined is appropriate in light of the Business and consistent with industry practice (such insurance, the "**Business Insurance Policies**").  All of the Business Insurance Policies are in full force and effect.  Seller is not in default with respect to any material provision contained in any such Business Insurance Policy held by or on behalf of it.  Seller has not received any notice of cancellation or non-renewal of any such Business Insurance Policy.

3.12    Employee Benefit Plans.

3.12.1 Set forth on **Schedule 3.12** is a complete and correct list, as of the date hereof, of each material Employee Benefit Plan.  Copies of all written Employee Benefit Plans have been made available to Buyer.  Except as disclosed on **Schedule 3.12**, there is not now in effect or to become effective after the date of this Agreement and until the Closing Date, any new Employee Benefit Plan or any amendment to an existing Employee Benefit Plan which, in either case, will materially affect the benefits of Business Employees (other than customary merit and performance pay increases and other than as required by Legal Rules) and that will on or after the Closing Date impose liability on Buyer.

- 16 -

3.12.2 Each Employee Benefit Plan has been administered in compliance without material exception with its own terms and, where applicable, with ERISA, the Code and any other Legal Rules.

3.12.3 Each Employee Benefit Plan which is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service and, to Seller's Knowledge, no event has occurred and no condition exists which would reasonably be expected to result in the revocation of any such determination.

3.12.4 Seller contributes to the Multiemployer Plan set forth on **Schedule 3.12** with respect to Business Employees.

3.13    Labor Relations.

3.13.1 **Schedule 3.13.1** lists all Business Employees (indicating primary business location) as of the date set forth in **Schedule 3.13.1**, including any such employee who is an inactive employee on paid or unpaid leave of absence or short-term disability.

3.13.2 Except as set forth on **Schedule 3.13.2**, as of the date hereof, there is not pending or, to Seller's Knowledge, threatened against the Business, any material labor dispute, picketing, lockout, strike, work slow-down or stoppage, and the Business has not experienced any such material labor dispute, picketing, lockout, strike, work slow-down or stoppage within the twelve (12) months preceding the date of this Agreement. Except as set forth on **Schedule 3.13.2**, Seller, with respect to the Business, has complied in all material respects with all labor and employment Legal Rules applicable to the Business. Except as set forth on **Schedule 3.13.2**, as of the date hereof, there is not pending or, to Seller's Knowledge, threatened against the Business any material action or any order, decree or judgment relating to the employment of the Business Employees.

3.13.3 **Schedule 3.13.3** contains a complete and correct list, as of the date hereof, of (a) each collective bargaining agreement that covers any Business Employee and (b) all material pending grievances arising under each such collective bargaining agreement. Except for the collective bargaining agreements listed on **Schedule 3.13.3**, neither Seller, nor its Affiliates have agreed to recognize any union or other collective bargaining representative to represent any Business Employees and, to Seller's Knowledge, no union or other collective bargaining representative has been certified as representing any Business Employees. To Seller's Knowledge, as of the date hereof, there is no union campaign threatened or being conducted to attempt to gain recognition or certification of any union or other collective bargaining representative with respect to any Business Employees.

3.14    Licenses; Compliance with Laws; Legal Proceedings.

3.14.1 **Schedule 3.14.1** lists all material Licenses, as of the date hereof, that are held by Seller. Except as set forth on **Schedule 3.14.1**, each of the Licenses is in full force and effect in accordance with its terms in all material respects. As of the date hereof, no legal action or other formal proceeding is pending or, to Seller's Knowledge, threatened, to revoke, terminate, suspend, or cancel any of the Licenses or to impose any material forfeiture or penalty with respect to any of the Licenses.

- 17 -

3.14.2 Except as disclosed on **Schedule 3.14.2**, the Business is in compliance, in all material respects, with all Legal Rules.

3.14.3 **Schedule 3.14.3** contains a complete and correct list, as of the date hereof, of all suits, claims, actions, arbitrations, judgments, orders, injunctions, decrees, awards and investigations pending or, to Seller's Knowledge, threatened, which would reasonably be expected to materially and adversely affect the Business or the Transferred Assets.

3.15 <u>Environmental Matters</u>. Except as disclosed on **Schedule 3.15**:

3.15.1 To Seller's Knowledge, the Owned Real Property is in compliance, in all material respects, with all Environmental Laws applicable to the Owned Real Property.

3.15.2 As of the date hereof, Seller has not received any written notice of any action by any Governmental Authority alleging Seller is not in compliance under any Environmental Law with respect to the Business or the condition of the Owned Real Property which action has not been resolved and for which all payments, fines or other amounts payable in connection therewith have not been paid in full.

3.15.3 Seller has not transported or arranged for the treatment, storage or disposal of any Hazardous Substances at any parcel of Real Property that has resulted in a material Liability which has not been resolved and for which all payments, fines or other amounts payable in connection therewith have not been paid in full.

3.15.4 Notwithstanding any other provision of this Agreement, the parties to this Agreement acknowledge and agree that the representations and warranties contained in this Section 3.15 are the only representations and warranties given by Seller with respect to environmental matters or compliance with Environmental Laws, and no other provision of this Agreement shall be interpreted as containing any representation or warranty with respect thereto.

3.15.5 To Seller's Knowledge, Seller has furnished to Buyer all material environmental audits, reports, and other material environmental documents relating to its past or current properties, facilities, or operations which are in its possession, custody, or under its reasonable control.

3.16 <u>Circulation; Advertising and Reports</u>.

3.16.1 Complete and correct copies of the annual reports filed with the Audit Bureau of Circulation for the Newspapers for the years ended December 31, 2006, December 31, 2007 and December 31, 2008 and a complete and correct copy of each Newspaper's publisher's statement submitted to the Audit Bureau of Circulation for the 6-month period ended March 31, 2009 have been made available to Buyer. Upon receipt from the Audit Bureau of Circulation of the final September 30, 2009 statement, Seller will make a complete and correct copy of same available to Buyer. All information contained in such reports was true and correct in all material respects as of the date of such reports.

- 18 -

3.16.2 Since March 31, 2009, Seller has not made any material change in its policies for the pricing of circulation or advertising for any Newspaper, except as set forth on **Schedule 3.16.2**.

3.16.3 All reports filed by Seller with the United States Postal Service in connection with, and second class mail postal permits applicable to, any Newspaper, were complete and correct, in all material respects, at the time of their filing.

3.17    Transactions with Affiliates.  Except to the extent disclosed in the Financial Statements and the notes thereto or as set forth **Schedule 3.17**, Seller is not a party to any material business arrangement or material business relationship with any of its Affiliates with respect to the Transferred Assets or operation of the Business, and none of its Affiliates owns any material property or material right, tangible or intangible, that is used in Seller's operation of the Business.

3.18    Bonds; Letters of Credit.  Except as set forth on **Schedule 3.18**, as of the date hereof, there are no material construction, fidelity, performance, or other bonds, guaranties in lieu of bonds or letters of credit posted by Seller or its Affiliates in connection with Seller's operation or ownership of the Business.

3.19    Brokers of Seller.   There is no investment banker, broker, finder or other intermediary or advisor that has been retained by or is authorized to act on behalf of Seller or its Affiliates who might be entitled to any fee, commission or reimbursement of expenses for which Buyer or its Affiliates will be responsible or have any Liability as a result of the transactions contemplated by this Agreement.

3.20    Inventory.  The inventory of Seller is merchantable and fit for the purpose for which it was procured or manufactured, and none of such inventory is slow-moving, obsolete, damaged, or defective, subject only to the reserve for inventory writedown set forth on the face of the most recent balance sheet (rather than in any notes thereto) included within the Financial Statements as adjusted for operations and transactions through the Closing Date in accordance with the past custom and practice of Seller.

3.21    Accounts Receivable; Working Capital.  All accounts receivable of Seller are reflected properly on its books and records, have arisen solely out of bona fide transactions, are valid receivables and, to Seller's Knowledge, are not subject to any setoffs or counterclaims.  In the opinion of Seller, the Working Capital set forth on the Reference Working Capital Statement is sufficient to operate the Business as conducted as of the date hereof.

3.22    Sufficiency of Transferred Assets.  Except (a) for the Excluded Assets, (b) for such assets described on **Schedule 3.17** and (c) to the extent disclosed in the Financial Statements and the notes thereto, the Transferred Assets comprise all the assets reasonably necessary for Seller to conduct, in all material respects, the operations of the Business as conducted as of the date hereof.

4.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

4.1    _Organization, Standing and Authority_.  Buyer is a limited liability company validly existing and in good standing under the laws of the State of Delaware.  Buyer is duly authorized, qualified or licensed to do business as a foreign corporation and is in good standing under the Legal Rules of each jurisdiction in which the nature of its activities makes such qualifications necessary.

4.2    _Authorization and Binding Obligation_.  Buyer has the limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to carry out and perform all of its obligations under the terms of this Agreement and the Related Agreements to which it is a party.  The execution and delivery of, and performance of the obligations contained in, this Agreement and the Related Agreements to which Buyer is a party and the transactions contemplated hereby and thereby have been, or solely with respect to the Related Agreements to which it is a party as of the Closing will be, duly authorized by all necessary limited liability company action on the part of Buyer.  This Agreement has been, and all Related Agreements to which it is a party as of the Closing will be, duly executed and delivered by Buyer, and this Agreement constitutes, and the Related Agreements will, as of the Closing, constitute, the valid and legally binding obligation of Buyer, enforceable against it in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency or similar Legal Rules affecting the enforcement of creditors' rights generally, and as the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding thereof may be brought.

4.3    _Absence of Conflicting Terms; Consents_.  Except as would not impair the ability of Buyer to perform its obligations under this Agreement and the Related Agreements to which it is a party, the execution, delivery and performance by Buyer of this Agreement and of the Related Agreements to which it is a party (with or without the giving of notice, the lapse of time, or both): (a) do not require the consent of, notice to, or filing with, any Governmental Authority; (b) will not conflict with any provision of the certificate of formation of Buyer, or the limited liability company operating agreement of Buyer; (c) will not in any material way conflict with, result in a material breach of, or constitute a material default under any Legal Rule applicable to Buyer; and (d) will not conflict with, constitute grounds for termination of, result in a material breach of, constitute a default under, or accelerate or permit the acceleration of any performance required by the terms of, any material Contract, license or permit to which Buyer is a party or by which Buyer may be bound, such that Buyer could not perform hereunder or acquire or operate the Transferred Assets.

4.4    _Availability of Funds_.  Buyer will have at the Closing the financial capability to enable it to consummate the transactions contemplated by this Agreement taking into account the condition precedent set forth in Section 6.1.8.

4.5    _Regulatory Matters_.  There are no facts relating to Buyer (or an Affiliate thereof) under any Legal Rule that would disqualify it (or any Affiliate or assignee thereof) from

- 20 -

obtaining control of the Newspapers or the Business or the ownership of the Transferred Assets or that would prevent, delay or limit it (or any Affiliate or assignee thereof) from consummating the transactions contemplated by this Agreement.

4.6　　Brokers of Buyer.　There is no investment banker, broker, finder or other intermediary or advisor that has been retained by or is authorized to act on behalf of Buyer or its Affiliates who might be entitled to any fee, commission or reimbursement of expenses for which Seller or its Affiliates will be responsible or have any Liability as a result of the transactions contemplated by this Agreement.

5.　　CERTAIN COVENANTS OF THE PARTIES

5.1　　Conduct of the Business Prior to Closing.　Except (a) as required by Legal Rules, (b) as contemplated by this Agreement, (c) as set forth on **Schedule 5.1** or (d) as consented to by Buyer (which consent shall not be unreasonably withheld or delayed), between the date hereof and the Closing Date, Seller shall operate the Business in the ordinary course of business (subject to, and except as modified by, compliance with the following negative and affirmative covenants):

5.1.1　　Negative Covenants.　Seller shall not do any of the following between the date hereof and the Closing Date:

(i)　　enter into, materially amend, materially modify or terminate (other than at the expiration of their respective terms or due to a default of the other party thereunder) any Material Business Contract, except in the ordinary course of business;

(ii)　　sell, assign, lease, swap or otherwise transfer or dispose of any material asset that would otherwise constitute part of the Transferred Assets, except for such assets consumed or disposed of in the ordinary course of business (and provided that nothing herein shall prohibit or restrict the payment by Seller of cash dividends);

(iii)　　create, assume or permit to exist any Encumbrance upon the Transferred Assets, other than Permitted Encumbrances;

(iv)　　increase annual compensation by more than 5%, on average, for Business Employees, except for (a) customary merit or seniority increases for qualifying employees or otherwise in accordance with the terms of any employment Contract or any collective bargaining agreement or with the employee policies of Seller and (b) changes to existing Employee Benefit Plans or implementation of new Employee Benefit Plans that in either case do not impose any Liability upon Buyer;

(v)　　waive any material right relating to the Business or the Transferred Assets; or

(vi)　　take or fail to take any action that would be reasonably expected to impair the amount of the Closing Date Working Capital, including, but not limited to, delaying payment of accounts payable, accelerating the collection of accounts receivable, delaying purchases of inventory, or taking or failing to take any other action in a manner inconsistent with past practices.

- 21 -

5.1.2 <u>Affirmative Covenants</u>.  Seller shall do the following between the date hereof and the Closing Date:

        (i)     use commercially reasonable efforts to preserve and maintain in all material respects the goodwill of the Business and the current relationships of Seller with employees, independent contractors, customers, suppliers and others with significant and recurring business dealings with the Business;

        (ii)    maintain the insurance coverage set forth in the Business Insurance Policies with respect to the Business and the Transferred Assets (or comparable replacement coverage); and

        (iii)   comply in all material respects with all Legal Rules applicable to the operation of the Business.

5.2    <u>Consents</u>.

    5.2.1   Seller and Buyer covenant and agree that as soon as practicable after the execution of this Agreement, Buyer and Seller shall make appropriate requests and shall use commercially reasonable efforts to obtain any Consents required under the Business Contracts set forth on **Schedule 3.3**, which requests shall include a request that Seller and its Affiliates be unconditionally released from all Liabilities (including all guarantees, bonds or sureties) relating to the Business Contracts attributable to the period after the Adjustment Time, and Buyer and Seller shall use commercially reasonable efforts to obtain such releases.  If any Business Contract requires Buyer to assume such Contract or the Liabilities of Seller thereunder in connection with the consummation of the transactions contemplated by this Agreement, Buyer shall, effective as of the Adjustment Time, assume any such Contract and Liabilities pursuant to an instrument reasonably acceptable to all parties thereto.  Buyer, on the one hand, and Seller, on the other hand, shall each be responsible for and pay one-half of all administrative or processing fees imposed by any Person pursuant to the terms of the relevant Business Contract or otherwise as a condition to processing any Consent requests.  If, notwithstanding its commercially reasonable efforts, Seller is unable to obtain one or more of the Consents involving a Business Contract, Seller, in its sole discretion, may either assign the Business Contract to Buyer notwithstanding the absence of a Consent therefor or use commercially reasonable efforts to cooperate with Buyer in effecting a commercially reasonable arrangement permitted by Legal Rules and not inconsistent with such Business Contract under which Buyer shall receive benefits under the Business Contract from and after the Adjustment Time, and, to the extent of the benefits received, Buyer shall pay and perform Seller's Liabilities arising under the Business Contract from and after the Adjustment Time in accordance with its terms; provided that Seller shall not be liable or have any further responsibility to Buyer for the failure of such Consents to be obtained, and, in connection with any such assignment or arrangement, Seller shall not be responsible for any Liabilities relating to such assignment or arrangement, and Buyer shall indemnify and hold harmless Seller from and against any Losses arising out of or related to any such Liabilities.  Except as expressly set forth in Section 5.2.2 below, nothing in this Section 5.2.1 shall require the expenditure or payment of any funds (other than in respect of normal and usual attorneys fees, administrative fees, processing fees, filing fees or other normal costs of

- 22 -

doing business) or the giving of any other consideration by Buyer or Seller or any adjustment to the Purchase Price.

5.2.2    Seller and Buyer agree that if in connection with the process of obtaining any Consent, a Governmental Authority or other Person purports to require any adverse condition, change or additional or different adverse terms to a License or Business Contract, to which such Consent relates as a requirement for such Governmental Authority or other Person granting its Consent, Seller may accept any such conditions, changes or additional or different terms without Buyer's consent or approval so long as (a) any conditions, changes or additional or different terms would not reasonably be expected to materially and adversely affect the Business or Buyer, or (b) any conditions, changes or additional or different terms are customary in the industry for newspaper publishing operators similarly situated to Buyer in terms of size and financial and operating qualifications.  Buyer agrees that any of such conditions, changes or additional or different terms falling within any of clauses (a) or (b) of the previous sentence shall be deemed commercially reasonable for purposes hereof.

5.2.3    Buyer shall promptly furnish to any Person from whom a Consent for a License or Business Contract is requested such complete and correct information regarding Buyer, including financial information concerning Buyer and other information relating to the newspaper and other media operations of Buyer, as a Person may reasonably require in connection with obtaining any Consent for a License or Business Contract, and Buyer shall promptly furnish to Seller a copy of any such information provided to a Person, and any other information concerning Buyer as Seller may reasonably request in connection with obtaining any such Consent.

5.2.4    Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges and agrees that Seller shall control and manage the process of obtaining Consents and neither Buyer nor any of its employees, agents, representatives or any other Person acting on behalf of Buyer shall contact any Person from whom a Consent is sought for the purpose of seeking any amendment, modification or change to any License or Business Contract, for the purpose of waiving or extending the time period in which such Person is required to act on the request for Consent, or for any other purpose that could have the result of hindering or delaying the receipt of any Consent; provided, however, it is understood and agreed that nothing herein shall prevent Buyer (or its employees, agents, representatives or any other Person acting on behalf of Buyer) from responding to requests initiated by Persons from whom a Consent is sought so long as such response does not relate to any of the foregoing prohibited matters, and Buyer shall apprise Seller of all such requests.  Seller shall keep Buyer apprised of any request for any conditions, changes or additional or different terms to any License or Business Contract for which a Consent is sought.

5.2.5    Buyer agrees that if any Consent related to a License or Business Contract that includes a guarantee (including any continuing Liability as assignor), bond or surety by Seller or its Affiliates of any of Seller's or its Affiliates' Liabilities or performance thereunder does not include an unconditional release thereof, from and after the Adjustment Time, Buyer shall indemnify and hold harmless Seller and its Affiliates from and against any and all Losses arising out of any such guarantee, bond or surety arising after the Adjustment Time.

- 23 -

5.3     Tax Matters.

5.3.1   Seller and Buyer shall provide each other with such cooperation and information as either of them may reasonably request in preparing and filing any Tax return, report or form ("**Returns**"), amended Return or claim for refund, determining or contesting a liability for Taxes or a right to a refund of Taxes, participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings or other determinations by Tax authorities.  Seller and Buyer shall make their respective officers, employees, agents and representatives available on a basis mutually convenient to Buyer and Seller, to provide explanations of any documents or information provided hereunder.  Seller and Buyer shall each retain all Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the Transferred Assets for each taxable period first ending after the Closing Date and for all prior taxable periods until the later of (a) the expiration of the statute of limitations of the taxable periods to which such Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods, or (b) six (6) years following the due date (without extension) for filing such Returns.

5.3.2   Buyer and Seller shall each be responsible for one-half of all sales, use, transfer and purchase Taxes and fees, filing fees, recordation fees and application fees, if any, arising out of the transfer of the Transferred Assets pursuant to this Agreement.

5.4     Bonds; Letters of Credit.  Buyer shall take all steps and execute and deliver all documents to ensure that, on the Closing Date, Buyer has delivered such bonds, letters of credit, indemnity agreements and similar instruments in such amounts and in favor of such Persons requiring the same in connection with the Licenses and Business Contracts, including such bonds, letters of credit and similar instruments set forth on **Schedule 3.18**.

5.5     Covenants Regarding Employee Matters.

5.5.1   Seller has provided to Buyer a schedule of each Business Employee and the terms and conditions of employment by Seller of such individual ("**Seller's Business Employee Schedule**").  Seller's Business Employee Schedule also contains a statement as to the maximum number of Business Employees to whom Buyer can fail to make offers of employment without giving rise to a duty to provide notice under the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. § 2101 et. Seq (the "**WARN Act**").  Not less than one (1) Business Day prior to Closing, Buyer shall give Seller notice of the Business Employees that Buyer intends to offer employment to as of the Adjustment Time (Business Employees whom Buyer hires as of the Closing Date, collectively the "**Transferred Employees**").  Buyer agrees that it will exclude at most the number of Business Employees from said list as set forth in Seller's Business Employee Schedule.  After the Closing, Buyer shall cooperate with Seller as necessary for Seller to settle, respond to, or otherwise address any employment-related or benefits-related claim that is a Retained Liability, including making reasonably available to Seller any Transferred Employee involved with any such claim in a manner that shall not unreasonably disrupt Buyer's business.  Buyer shall be responsible for, and shall indemnify and hold Seller harmless from, any Liability arising out of Buyer's employment

of any Transferred Employee; Seller shall be responsible for, and shall indemnify and hold Buyer harmless from, any Liability arising out of any adverse employment action taken by Seller against any Business Employee that is not a Transferred Employee.

5.5.2   Except to the extent included in the Closing Date Working Capital, Seller shall be responsible for and shall cause to be discharged and satisfied in full amounts owed to any Transferred Employee in respect of wages, salaries, or any Liabilities accrued under any of the Employee Benefit Plans, which shall be payable in accordance with the terms of such plans, in each case accrued prior to the Adjustment Time.

5.5.3   As of the Closing, Buyer shall offer and provide health plan coverage which shall be effective as of the Closing Date and continue for a period of at least one (1) year thereafter, to all of the full-time Transferred Employees on terms and conditions similar in all material respects to the health plan coverage provided to similarly-situated employees of Buyer as of the Adjustment Time.  For purposes of providing such coverage, Buyer shall waive all preexisting condition limitations for all such employees of the Business covered by Seller's health care plan as of the Adjustment Time and shall provide such health care coverage effective as of the Adjustment Time without the application of any eligibility period for coverage.  In addition, Buyer shall cause Buyer's health care plan to credit all employee payments toward deductible and co-payment obligation limits under Seller's health care plan for the plan year that includes the Adjustment Time as if such payments had been made for similar purposes under Buyer's health care plan during the plan year that includes the Adjustment Time, with respect to Transferred Employees.

5.5.4   Buyer shall assume full responsibility and liability for offering and providing "continuation coverage" to any "M&A qualified beneficiary" and to any "covered employee" and any "qualified beneficiary" who is covered by a "group health plan" sponsored or contributed to by Seller and who has experienced a "qualifying event" or is receiving "continuation coverage" on or prior to the Closing. "Continuation coverage," "M&A qualified beneficiary," "covered employee," "qualified beneficiary," "qualifying event" and "group health plan" all shall have the meanings given such terms under the Consolidated Omnibus Budget Reconciliation Act of 1956, and the regulations promulgated thereunder ("COBRA").  For purposes of this Section 5.5.4, each person employed by Seller who experiences a loss of health care coverage as the result of the transactions contemplated by this Agreement, together with his or her spouse and dependents, if any, shall be deemed eligible for continuation coverage as provided herein.  Seller shall provide as of the day immediately preceding the Closing Date, a list of each individual requiring continuation coverage as of such date, together with a list of individuals in the continuation coverage election period (including any extended election period).

5.5.5   For each Transferred Employee, Buyer shall give past service credit for all crediting purposes under each of its employee benefit plans that, on or after the Adjustment Time, provides coverage to Transferred Employees to the same extent such employment service was credited for similar purposes under Seller's Employee Benefit Plans prior to the Adjustment Time.  To the extent Accrued Vacation is included in the Closing Date Working Capital, Buyer shall permit Transferred Employees to use and shall grant Transferred Employees credit for and shall assume and be responsible for any Liability with respect to Accrued Vacation.

5.5.6 Buyer shall be responsible for and provide severance benefits to any Transferred Employees discharged by Buyer without cause within six (6) months after the Closing in an amount to which such Transferred Employees would have been entitled to pursuant to Seller's severance benefits plan if such Transferred Employees had been discharged without cause by Seller immediately prior to the Closing and had not been hired by Buyer as of the Closing. A description of Seller's severance benefits plan as of the date hereof is attached hereto as **Schedule 5.5.6**.

5.5.7 Set forth on **Schedule 5.5.7** is a list of former employees of Seller who, as part of their severance benefits from Seller, are entitled to (a) continue receiving active group health coverage under Seller's group health insurance plans, without payment of any premiums, through the date set forth opposite each such former employee's name, and (b) thereafter elect to continue such group health insurance coverage through COBRA continuation coverage at their own expense. From and after the Closing, Buyer agrees to assume these obligations of Seller and provide such group health coverage to such former employees of Seller under the group health plan provided by Buyer to the employees of the Business. Seller shall pay Buyer the monthly insurance premium for providing the group health care coverage identified in clause (a) hereof; the former employees of Seller shall be responsible for paying the monthly insurance premium for the COBRA coverage identified in clause (b) hereof (less any applicable federal COBRA subsidy).

5.5.8 As soon as practicable after the Closing, at the direction of Seller, Buyer shall be obligated to either accept (a) a transfer from Seller's 401(k) plan to Buyer's 401(k) plan of the Liability for the account balances of the Transferred Employees under Seller's 401(k) plan, together with cash and promissory notes evidencing outstanding loans made to the Transferred Employees from Seller's 401(k) plan equal to such Liability, or (b) rollovers to Buyer's 401(k) plan of cash and promissory notes evidencing outstanding loans made to the Transferred Employees from Seller's 401(k) plan with respect to any Transferred Employee that elects to make such a rollover. Buyer's 401(k) plan shall be substituted as the obligee of such promissory notes, and, except as permitted by Legal Rules, no other changes shall be made with respect to the terms of the notes. Buyer shall effect such transfer or rollovers in a manner that will ensure that such action(s) does not result in the recognition of taxable income by the Transferred Employees, and shall take, or shall cause its 401(k) plan to take, any actions that are necessary to effect such transfer or rollovers and to ensure that any such transfer or rollovers conform to the applicable requirements of ERISA and the Code. With respect to any plan-to-plan transfer effectuated in accordance with this Section 5.5.7, the account balances of the Transferred Employees shall be determined as of the Closing Date, but shall include any income, gains or losses properly allocable to such accounts from the Closing Date to the date of such transfer.

5.5.9 As of the Closing Date, Buyer agrees (a) except as may be prohibited by Legal Rules, to continue to recognize the unions listed on **Schedule 3.13.3** as the collective bargaining agent for covered Business Employees and (b) to assume, be bound by, and comply with, the terms and conditions of the collective bargaining agreements listed on **Schedule 3.7.1** (as the same may be amended from time to time after the Closing in accordance with the terms thereof) applicable to Business Employees.

5.5.10 This Section 5.5 shall operate exclusively for the benefit of the parties to this Agreement and not for the benefit of any other Person, including any current, former or retired employee of Seller or spouse or dependents of such employee.

5.6     Access to Properties, Books and Records.

5.6.1   Subject to the Confidentiality Agreements between representatives of Buyer and NJC dated July 22, 2009 and July 23, 2009 (collectively, the "**NDA**"), and to the extent permitted by Legal Rules, Seller agrees that on and after the date hereof, during normal business hours, it shall permit Buyer and its authorized agents and representatives reasonable access, upon reasonable notice and during normal business hours, to the Transferred Assets and Seller's books, records and documents to the extent related to the Business and the Transferred Assets. Any examination or request for information shall be conducted in such a manner so as not to interfere with the business or operations of Seller or its Affiliates.

5.6.2   Buyer agrees that on and after the Closing, during normal business hours, it shall permit Seller and its auditors and attorneys, through their authorized representatives, to have access to and to examine all books, records and documents provided by Seller to Buyer in connection with the transactions contemplated by this Agreement and reasonably related to events occurring prior to the Closing. Any examination or request for information shall be conducted in such a manner so as not to interfere with the business or operations of Buyer or its Affiliates.

5.6.3   Each party shall direct its representatives to render any assistance which the other party may reasonably request in examining or utilizing records referred to in this Section 5.6. Each party agrees to preserve all files and records which are subject to this Section 5.6 for a period of three (3) years after the Closing Date, provided, however, each party may destroy or otherwise dispose of any such records during such three (3) year period after first giving thirty (30) days' notice thereof to the other party, and within thirty (30) days of receipt of such notice, such other party may cause to be delivered to it the records intended to be destroyed, at such other party's expense.

5.7     Confidentiality.  The terms of the NDA between NJC and Buyer are hereby incorporated by reference. The NDA shall continue in full force and effect until the Closing, at which time the NDA shall terminate with respect to the Company Information (as defined in the NDA) relating to the Business, the Transferred Assets, the Assumed Liabilities, the Newspapers, Pennysavers and Directories and transactions contemplated by this Agreement, and all other provisions of the NDA shall continue in full force and effect in all respects. If this Agreement is, for any reason, terminated prior to the Closing, the NDA shall continue in full force and effect in all respects.

5.8     The Sale Approval Order.

5.8.1   Seller shall diligently seek the entry of a Sale Approval Order substantially in the form and substance of the order attached hereto as **Exhibit E** authorizing the Proposed Transactions, and Buyer shall reasonably cooperate with the Seller in connection therewith. Seller shall provide copies of the Sale Approval Order and any other motion or order

- 27 -

relating to the approval of the Proposed Transactions. In the event the entry of the Sale Approval Order shall be appealed, Seller and Buyer shall use their respective reasonable best efforts to defend such appeal.

5.8.2   Attached hereto as **Exhibit E-1** is a list of those Persons to whom Seller will give notice of the motion to the Court seeking the entry of the Sale Approval Order. Seller represents and warrants to Buyer (a) that said list includes all Persons entitled to receive such notice and (b) that notice has been given to all Persons described in paragraph J of the form of Sale Approval Order attached hereto as **Exhibit E-1**.

5.9   <u>Further Actions; Cooperation</u>. Subject to the other provisions of this Agreement, which may impose additional or different obligations, Seller and Buyer shall each use commercially reasonable efforts to take, or cause to be taken, all appropriate actions and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable to satisfy as soon as practicable all of the conditions required to be satisfied by it hereunder and to consummate the transactions contemplated hereby as expeditiously as possible. Each of Seller and Buyer further understands and agrees that it shall not take, or cause to be taken, any action that is materially inconsistent with the terms of this Agreement, nor shall a party take any action that might delay or hinder the timely consummation of the transactions contemplated hereby (including the Buyer entering into any agreement or arrangement with any television station, or the attributable owner of any television station, in the same market as any Newspaper).

5.10   <u>Title Insurance Commitments</u>. Buyer may obtain, at Buyer's sole cost and expense, prior to the Closing Date, a commitment for an ALTA Owner's Title Insurance Policy Form or other form of policy acceptable to Buyer and Buyer's lenders for each Owned Real Property and each Leased Real Property identified by Buyer (the **"Material Leased Real Property"**), issued by a title insurance company satisfactory to Buyer (the **"Title Company"**), together with a copy of all documents referenced therein (the "Title Commitments"). At Buyer's request, Seller agrees to use commercially reasonable efforts to assist Buyer in obtaining the Title Commitments; provided that Seller is not required to incur any costs in connection therewith.

5.11   <u>Title Insurance Policies</u>. Buyer may obtain, at Buyer's sole cost and expense, title insurance policies from the Title Company (which may be in the form of a mark-up of a pro forma of the Title Commitments) in accordance with the Title Commitments, insuring Buyer's fee simple title to each Owned Real Property or Buyer's legal, valid, binding and enforceable leasehold interest in each Material Leased Real Property (as the case may be), as of the Closing Date (including all recorded appurtenant easements, insured as separate legal parcels), in a form of policy acceptable to Buyer and Buyer's lenders, subject only to Permitted Encumbrances, in such amount as Buyer reasonably determines to be the value of the Real Property insured thereunder and which may include such endorsements as Buyer elects (the **"Title Policies"**). At Buyer's request, Seller agrees to use commercially reasonable efforts to assist Buyer in obtaining the Title Policies; provided that (i) Seller is not required to incur any costs in connection therewith and (ii) Seller is not required to execute any affidavits or other documents in connection with obtaining the Title Policies that would increase Seller's liability to Buyer or the Title Company or that is otherwise inconsistent with the representations, warranties and

- 28 -

indemnities contained herein. With respect to Material Leased Real Property, Buyer shall obtain the consent of Seller prior to contacting any landlord of Seller regarding obtaining a memorandum of lease or any other matter.

5.12 Surveys. Buyer may obtain, at Buyer's sole cost and expense, prior to the Closing Date, a survey for each Owned Real Property and Material Leased Real Property, dated no earlier than the date of this Agreement, prepared by a surveyor licensed in the jurisdiction where the real property is located, satisfactory to Buyer, and conforming to 2005 ALTA/ACSM Minimum Detail Requirements for Land Title Surveys, including Table A Items Nos. 1, 2, 3, 4, 6, 7(a), 7(b)(1), 7(c), 8, 9, 10, 11(b), 13, 14, 15, and 16, and such other standards as the Title Company and Buyer require as a condition to the removal of any survey exceptions from the Title Policies, and certified to Seller, Buyer, Buyer's lender, and the Title Company, in a form and with a certification satisfactory to each of such parties (the "**Surveys**"). At Buyer's request, Seller agrees to use commercially reasonable efforts to assist Buyer in obtaining the Title Commitments; provided that Seller is not required to incur any costs in connection therewith.

5.13 Yonge Street Property. At Closing, Seller and Buyer will enter into a lease agreement with respect to the real property located at 454 South Yonge Street, Ormond Beach Florida 32174 (the "**Yonge Street Lease**") upon such terms and conditions as shall be mutually agreed to by the parties.

5.14 Buyer's Loan Agreement. Between the date hereof and the Closing, Buyer shall not amend, modify or terminate Buyer's Loan Agreement. Buyer shall use commercially reasonable efforts to (i) satisfy on a timely basis all terms, covenants and conditions to closing applicable to Buyer in Buyer's Loan Agreement; (ii) enforce its rights under Buyer's Loan Agreement; and (iii) consummate the financing pursuant to Buyer's Loan Agreement no later than the Closing. In the event that the amount of the financing available to Buyer at Closing pursuant to Buyer's Loan Agreement is insufficient for any reason to fund, in the full, the Purchase Price, Buyer covenants and agrees to provide the balance in cash at Closing to enable the payment by Buyer of the Purchase Price, in full, at Closing.

## 6. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER AND SELLER TO CLOSE

6.1 Conditions Precedent to Obligations of Buyer to Close. The obligations of Buyer to consummate the transactions contemplated by this Agreement to occur at the Closing shall be subject to the satisfaction, on or before the Closing Date, of each and every one of the following conditions, all or any of which may be waived in writing, in whole or in part, by Buyer:

6.1.1 Representations and Warranties of Seller. The representations and warranties of Seller set forth in this Agreement shall be true and correct as of the Closing Date, as though made on the Closing Date (except for representations or warranties which expressly relate to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be true and correct has not had and would not reasonably be expected to have a Material Adverse Effect.

- 29 -

6.1.2 <u>Seller's Covenants and Conditions</u>. Seller shall have performed and complied in all material respects with the covenants and agreements required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

6.1.3 <u>No Governmental Proceeding or Injunction</u>. No suit, action or administrative proceeding shall have been instituted by any Governmental Authority which questions the validity or legality of the transactions contemplated by this Agreement (which has not been subsequently dismissed, settled or otherwise terminated). On the Closing Date there shall be no effective injunction, preliminary restraining order or any other order of any nature issued by a court of competent jurisdiction directing that the Closing not be consummated.

6.1.4 <u>Consents</u>. The Consents listed on **Schedule 6.1.4** (the "**Required Consents**") shall have been obtained.

6.1.5 <u>Sale Approval Order</u>. The Sale Approval Order approving the Proposed Transactions in form and substance consistent with the order attached hereto as **Exhibit E** shall have been entered by the Court and shall not have been reversed, stayed, materially modified or materially amended.

6.1.6 <u>No Material Adverse Effect</u>. Since the date of this Agreement, no event, change, state of facts or circumstances or development shall have occurred and be continuing as of the Closing which constitutes or would reasonably be expected to constitute a Material Adverse Effect.

6.1.7 <u>Deliveries</u>. Seller shall have made or stand willing and able to make all the deliveries to Buyer set forth in Section 7.2.

6.1.8 <u>Financing</u>. Buyer shall have closed, or shall close simultaneously, the financing contemplated by the loan agreement and related documents attached hereto as **Schedule 6.1.8** ("**Buyer's Loan Agreement**").

6.2 <u>Conditions Precedent to Obligations of Seller to Close</u>. The obligations of Seller to consummate the transactions contemplated by this Agreement to occur at the Closing shall be subject to the satisfaction, on or before the Closing Date, of each and every one of the following conditions, all or any of which may be waived in writing, in whole or in part, by Seller:

6.2.1 <u>Representations and Warranties of Buyer</u>. The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects as of the Closing Date, as though made on the Closing Date (except for representations or warranties which expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

6.2.2 <u>Buyer's Covenants and Conditions</u>. Buyer shall have performed and complied in all material respects with the covenants and agreements required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

6.2.3 <u>No Governmental Proceeding or Injunction</u>. No suit, action or administrative proceeding shall have been instituted by any Governmental Authority which

- 30 -

questions the validity or legality of the transactions contemplated by this Agreement (which has not been subsequently dismissed, settled or otherwise terminated). On the Closing Date there shall be no effective injunction, preliminary restraining order or any other order of any nature issued by a court of competent jurisdiction directing that the Closing not be consummated.

6.2.4 <u>Consents</u>. The Required Consents shall have been obtained.

6.2.5 <u>Sale Approval Order</u>. The Sale Approval Order approving the Proposed Transactions in form and substance consistent with the order attached hereto as **Exhibit E** shall have been entered by the Court and shall not have been reversed, stayed, materially modified or materially amended.

6.2.6 <u>Deliveries</u>. Buyer shall have made or stand willing and able to make all the deliveries set forth in Section 7.3.

7. <u>CLOSING AND CLOSING DELIVERIES</u>

7.1 <u>Closing</u>.

7.1.1 <u>Closing Date</u>.

(i)     Subject to satisfaction (or, to the extent permitted by Legal Rules, waiver) of the closing conditions described in Article 6, and subject to Sections 7.1.1(ii)-(iv), the Closing shall take place on the date specified by Seller by written notice to Buyer, which specified date shall be no earlier than two (2) Business Days and no later than five (5) Business Days after satisfaction or waiver of the conditions set forth in Sections 6.1.4 and 6.1.5 and Sections 6.2.4 and 6.2.5.

(ii)     Notwithstanding Section 7.1.1(i), if, on the date otherwise scheduled for the Closing in accordance with this Agreement, the conditions set forth in Section 6.1.3 and Section 6.2.3 have not been satisfied, then either Seller or Buyer may, by written notice given to the other, on the date otherwise scheduled for the Closing, elect to postpone the Closing, and the Closing shall thereafter take place on the third (3rd) Business Day after satisfaction and fulfillment of the conditions set forth in Section 6.1.3 and Section 6.2.3, but in any event no later than the Upset Date.

(iii)     Notwithstanding Section 7.1.1(i), if, on the date otherwise scheduled for the Closing in accordance with this Agreement, the conditions to the Closing set forth in Section 6.1 cannot be satisfied due to the loss of or damage to any of the Transferred Assets, Seller, in its sole discretion, may elect, by written notice delivered to Buyer at any time prior to the time scheduled for Closing in accordance with Section 7.1.1(i), to either (i) repair or replace such Transferred Assets sufficiently to permit the conditions to the Closing set forth in Section 6.1 to be satisfied, in which case the Closing shall be postponed for a period designated by Seller but no later than the Upset Date; or (ii) terminate this Agreement. In the event that Seller elects to terminate this Agreement pursuant to the immediately preceding sentence, Buyer may elect by written notice delivered to Seller within two (2) Business Days after receipt of Seller's notice, to waive the conditions to the Closing not satisfied as a result of such loss or damage, in which case, Seller shall be required to make promptly all appropriate insurance

claims relating to such loss or damage and to assign to Buyer all insurance proceeds of Seller payable in respect of such loss or damage (which shall not be the basis of any adjustment to the Purchase Price), and Seller shall have no further responsibility for such loss or damage, including with respect to any attempted claim made under Section 9.2. If Buyer makes such election to waive such conditions to the Closing, the Closing shall take place on the third (3rd) Business Day after Seller receives the notice of such election from Buyer.

(iv)     Notwithstanding Section 7.1.1(i), if the Closing has not occurred because any notice period required by this Section 7.1.1 has not lapsed, the Upset Date shall be extended until one (1) Business Day after the lapse of such period.

7.1.2   Closing Place.  The Closing shall be held at the offices of Dow Lohnes PLLC, Six Concourse Parkway, Suite 1800, Atlanta, Georgia 30328, commencing at 10:00 a.m. or at such other location or time as Seller and Buyer may mutually agree.

7.2   Deliveries by Seller.  Prior to or on the Closing Date, Seller shall deliver to Buyer the following, in form and substance consistent with the terms of this Agreement and reasonably satisfactory to Buyer and its counsel:

7.2.1   Transfer Documents.   A duly executed bill of sale and assignment, substantially in the form attached hereto as **Exhibit F** (the "**Bill of Sale**"), limited or special (but not general) warranty deeds (subject to Permitted Encumbrances), FIRPTA certificates, motor vehicle titles, assignments providing for the transfer of the Transferred Assets, which shall include assignments and assumptions of rights in and to Business Intellectual Property to be delivered by Seller substantially in the form attached hereto as **Exhibit G** (the "**Assignment of Business Intellectual Property**") and a limited power of attorney in the form previously presented to Seller by Buyer with respect to the endorsement of Seller's name on checks and similar forms of payment from customers;

7.2.2   Assumption Agreement.   A duly executed assumption agreement, substantially in the form attached hereto as **Exhibit H** (the "**Assumption Agreement**");

7.2.3   Consents.  The originals or copies of the Required Consents and any other Consents received on or before the Closing Date;

7.2.4   Sale Approval Order.  A copy, certified by the Clerk of the Court, of the Sale Approval Order;

7.2.5   Escrow Agreement.  The Escrow Agreement duly executed by Seller;

7.2.6   Officer's Certificate.  A certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller, certifying, without personal liability, that the conditions set forth in Sections 6.1.1 and 6.1.2 are satisfied;

7.2.7   FIRPTA Certificate.   An affidavit stating, under penalties of perjury, Seller's taxpayer identification number and that Seller is not a foreign person in accordance with Section 1445(b)(2) of the Code and the Treasury Regulations promulgated thereunder; and

7.2.8    Yonge Street Lease.  The Yonge Street Lease duly executed by Seller.

7.3    Deliveries by Buyer.  Prior to or on the Closing Date, Buyer shall deliver to Seller the following, in form and substance consistent with the terms of this Agreement and reasonably satisfactory to Seller and its counsel:

7.3.1    Purchase Price; Escrow Amount.  The portion of the Purchase Price to be paid to Seller pursuant to Section 2.3, the Escrow Agreement duly executed by Buyer and the Escrow Amount to Escrow Agent;

7.3.2    Assumption Agreement.  A duly executed Assumption Agreement, pursuant to which Buyer shall assume and undertake to perform the Assumed Liabilities;

7.3.3    Secretary's Certificate.  A certificate, dated as of the Closing Date, executed by Buyer's secretary, without personal liability, certifying that the resolutions, as attached to such certificate, were duly adopted by Buyer's board of managers or members, as applicable, authorizing and approving the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions were duly adopted and remain in full force and effect;

7.3.4    Officer's Certificate.  A certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer, certifying, without personal liability, that the conditions set forth in Sections 6.2.1 and 6.2.2 are satisfied; and

7.3.5    Yonge Street Lease.  The Yonge Street Lease duly executed by Buyer.

8.    TERMINATION

8.1    Method of Termination.  Subject to Section 8.2 and Section 8.3, this Agreement may be terminated prior to the Closing only as follows:

8.1.1    By the mutual written consent of Buyer and Seller;

8.1.2    By Buyer, provided that Buyer is not in default or breach in any material respect of its obligations under this Agreement, if Seller breaches its representations or warranties or defaults in the performance of its covenants contained in this Agreement and any closing condition in Section 6.1 would not be satisfied by the date scheduled for Closing in accordance with this Agreement (as such date may be postponed pursuant to Section 7.1.1) as a result of such breach or default by Seller;

8.1.3    By Seller, provided that Seller is not in default or breach in any material respect of its obligations under this Agreement, if Buyer breaches its representations or warranties or defaults in the performance of its covenants contained in this Agreement and any closing condition in Section 6.2 would not be satisfied by the date scheduled for Closing in accordance with this Agreement (as such date may be postponed pursuant to Section 7.1.1) as a result of such breach or default by Buyer;

8.1.4   By Seller or Buyer, if the Closing does not occur within six (6) months following the date hereof (the "**Upset Date**"); provided that the right to terminate this Agreement under this Section 8.1.4 shall not be available to a party if the failure of the Closing to have occurred was primarily due to the failure of such party to perform any of its obligations under this Agreement;

8.1.5   Automatically, if the Court enters an order denying the Sale Approval Order; or

8.1.6   By Seller, pursuant to Section 7.1.1(iii), if Buyer has not delivered a notice of waiver in accordance with Section 7.1.1(iii).

The party seeking to terminate this Agreement pursuant to this Section 8.1 (other than Section 8.1.1) shall give prompt written notice of such termination to the other party.  Each party shall give the other party prompt written notice upon learning of any breach or default by the other party under this Agreement or any other event that would lead to a condition to the Closing not being satisfied.

8.2     Effect of Termination.

8.2.1   In the event of a termination of this Agreement pursuant to Section 8.1.5 and Seller enters into a binding agreement with respect to a transfer of the Business (regardless of the form of such transaction) within six (6) months of the date of termination pursuant to Section 8.1.5, Seller shall reimburse Buyer for its documented out-of-pocket costs and expenses incurred by Buyer and paid to independent third parties in Buyer's due diligence review of the Business and the negotiation, preparation, and review of this Agreement (which costs and expenses, together with reasonable supporting documentation, shall be delivered to Seller within five (5) Business Days of a termination pursuant to Section 8.1.5), and Seller shall pay Buyer a fee of $500,000.  In the event of a termination of this Agreement pursuant to Section 8.1.5, Seller shall pay the costs and expenses incurred by it in connection with this Agreement, and Buyer (nor any of its officers, directors, employees, agents, representatives or stockholders) shall not be liable to Seller for any Losses hereunder.

8.2.2   In the event of a termination of this Agreement pursuant to Section 8.1.1 or Section 8.1.6, each party shall pay the costs and expenses incurred by it in connection with this Agreement, and no party (or any of its officers, directors, employees, agents, representatives or stockholders) shall be liable to any other party for any Losses hereunder.

8.2.3   In the event of a termination of this Agreement pursuant to either Section 8.1.2 or 8.1.4 and if Seller is in breach of this Agreement, Buyer shall have the right to pursue all legal or equitable remedies for breach of contract or otherwise.

8.2.4   In the event of a termination of this Agreement pursuant to either Section 8.1.3 or 8.1.4 and if Buyer is in breach of this Agreement, Seller shall have the right to pursue all legal or equitable remedies for breach of contract or otherwise.

8.3    Other Termination Provisions.

8.3.1    Notwithstanding the foregoing, a party may not rely on the failure of any condition set forth in Article 6 to be satisfied if such failure was caused by such party's breach of or failure to perform any of its representations, warranties, covenants or other obligations in accordance with the terms of this Agreement.

8.3.2    Nothing in this Article 8 shall diminish Buyer's or Seller's rights to specifically enforce the terms of this Agreement in connection with Buyer's or Seller's exercise of its rights under Section 10.15.

8.3.3    The obligations of the parties described in Section 10.21 (and all other provisions of this Agreement relating to expenses) will survive any termination of this Agreement.

9.    SURVIVAL    OF    REPRESENTATIONS    AND    WARRANTIES    AND INDEMNIFICATION

9.1    Representations, Warranties and Covenants.    All of the representations, warranties, covenants and agreements contained in this Agreement shall be deemed continuing representations, warranties, covenants and agreements, and shall survive the Closing and continue in full force and effect until 11:59 p.m., Eastern Daylight Savings Time, on June 30, 2011.

9.2    Indemnification by Seller.    After the Closing, Seller shall indemnify and hold Buyer harmless against and with respect to, and shall reimburse Buyer for:

9.2.1    Losses resulting from any breach by Seller of any representation, warranty or covenant contained in this Agreement or in the certificate delivered pursuant to Section 7.2.6; and

9.2.2    Any liability of Seller that is not an Assumed Liability.

9.3    Indemnification by Buyer.    After the Closing, Buyer shall indemnify and hold Seller harmless against and with respect to, and shall reimburse Seller for:

9.3.1    Losses resulting from any breach by Buyer of any representation, warranty or covenant contained in this Agreement or in the certificate delivered pursuant to Section 7.3.4; and

9.3.2    Any liability resulting or arising from the conduct of the Business from and after the Closing Date.

9.4    Procedure for Indemnification.    The procedure for indemnification shall be as follows:

9.4.1    The party claiming indemnification (the "**Claimant**") shall promptly give notice to the party from whom indemnification is claimed (the "**Indemnifying Party**") of any

- 35 -

claim, whether between the parties or brought by a third party, specifying (a) the factual basis for such claim and (b) the estimated amount of the claim. If the claim relates to an action, suit or proceeding filed by a third party against Claimant, such notice shall be given promptly by Claimant to the Indemnifying Party after written notice of such action, suit or proceeding is received by Claimant; provided, however, that the failure of the Claimant to give timely notice hereunder shall not relieve the Indemnifying Party of its obligations under this Article 9 unless, and only to the extent that, the Indemnifying Party has been materially prejudiced thereby.

9.4.2  With respect to claims solely between the parties, following receipt of notice from the Claimant of a claim, the Indemnifying Party shall have thirty (30) days to make such investigation of the claim as the Indemnifying Party deems necessary or desirable. For the purposes of such investigation, the Claimant agrees to make available to the Indemnifying Party and its representatives the information relied upon by the Claimant to substantiate the claim. If the Claimant and the Indemnifying Party agree at or prior to the expiration of such thirty (30) day period (or any mutually agreed upon extension thereof) to the validity and amount of such claim, the Indemnifying Party shall immediately pay to the Claimant the recoverable amount of the claim, subject to the terms hereof (including Section 9.5). If the Claimant and the Indemnifying Party do not agree to the validity and amount of such claim within such thirty (30) day period (or any mutually agreed upon extension thereof), the Claimant may seek appropriate remedies at law or equity, as applicable, subject to the limitations of Section 9.5.

9.4.3  With respect to any claim by a third party as to which the Claimant is entitled to indemnification under this Agreement, the Indemnifying Party shall have the right, at its own expense, to participate in or assume control of the defense of such claim, and the Claimant shall cooperate fully with the Indemnifying Party, subject to reimbursement for reasonable out-of-pocket expenses incurred by the Claimant as the result of a request by the Indemnifying Party. If the Indemnifying Party elects to assume control of the defense of any third-party claim, the Claimant shall have the right to participate in the defense of such claim at its own expense. If the Indemnifying Party does not elect to assume control or otherwise participate in the defense of any third-party claim, then the Claimant may defend through counsel of its own choosing, subject to the right of the Indemnifying Party to assume control of or otherwise participate in the defense thereof at any time prior to the settlement, compromise or final determination thereof. No party shall compromise or settle any third party claim, action or suit without the prior written consent of the other party; provided, however, if such compromise or settlement relates only to monetary amounts and provides for the full and unconditional release of the Claimant from all Liability in connection with such claim, then the Indemnifying Party may settle such claim without the Claimant's consent as long as the Indemnifying Party is responsible for the recoverable amount of such claim (subject to the limitations of Section 9.5) and the settlement of such claim does not contain an admission of wrongdoing on the part of the Claimant.

9.5    Limitation on Indemnification; Exclusive Remedy; Time Period.

9.5.1  No Indemnifying Party shall have an obligation to indemnify the Claimant under Section 9.2.1, Section 9.2.2, Section 9.3.1 or Section 9.3.2, and no Claimant shall make any claim under Section 9.2.1, Section 9.2.2, Section 9.3.1 or Section 9.3.2, unless and until the

- 36 -

aggregate amount of such other party's Losses exceeds $200,000 (the "**Deductible**"), and then the Indemnifying Party shall be liable for only such Losses exceeding the Deductible.

9.5.2   Notwithstanding anything to the contrary contained in this Agreement, the aggregate maximum liability of either party to the other party under Section 9.2.1, Section 9.2.2, Section 9.3.1 or Section 9.3.2, shall be limited to (in the aggregate) an amount equal to 10 percent (10%) of the Purchase Price.

9.5.3   The amount payable by either party with respect to Article 9 shall be reduced by the amount of any insurance proceeds received by the Claimant with respect to Losses, and each of the parties hereby agrees to use reasonable efforts to collect any and all insurance proceeds to which it may be entitled in respect to any such Losses.  Such amount payable shall be further reduced by the amount of any Tax benefit actually realized (including by refund or by reduction or offset against Taxes otherwise payable had the Losses not been sustained) by the Claimant by reason of the payment or incurrence by the Claimant of the Losses for which indemnity is sought or the occurrence of the event giving rise to such Losses.  To the extent that insurance proceeds are received or a Tax benefit is realized after payment has been made by either party, the Claimant shall promptly pay an amount equal to such proceeds or benefit to the Indemnifying Party.

9.5.4   After the Closing, and subject to Section 10.15, the sole and exclusive remedy of any party for any claim (whether such claim is framed in tort, contract or otherwise) arising out of a breach of any representation, warranty, covenant or agreement set forth in or made pursuant to this Agreement shall be a claim for indemnification under and pursuant to this Article 9.  Buyer's sole and exclusive remedy for indemnification under and pursuant to this Article 9 shall be to make a claim for indemnification against the funds held by Escrow Agent pursuant to and in accordance with the Escrow Agreement.  Notwithstanding any provision contained herein to the contrary, neither Buyer nor Seller shall be liable to the other under Article 9 of this Agreement for any lost profits, punitive, incidental, consequential or special damages of any nature whatsoever.

9.5.5   Any claim for indemnification pursuant to Section 9.2.1, Section 9.2.2, Section 9.3.1 or Section 9.3.2 must be brought on or before 11:59 p.m., Eastern Daylight Savings Time on June 30, 2011; provided, however, if prior to 11:59 p.m., Eastern Daylight Savings Time on June 30, 2011, an Indemnifying Party shall have been properly notified of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, such claim shall continue to survive and shall remain a basis for indemnity hereunder until such claim is finally resolved or disposed of in accordance with the terms hereof.

10.   MISCELLANEOUS

10.1   No Other Representations or Warranties.

10.1.1 Buyer acknowledges and agrees that it (a) has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning, the Transferred Assets, the Assumed Liabilities and the Business and (b) has been furnished with or has been given adequate access to such information about the Transferred Assets, the Assumed

Liabilities and the Business as it has requested. In connection with Buyer's investigation of the Transferred Assets, the Assumed Liabilities and the Business, Buyer may have received and may hereafter receive from Seller or its representatives estimates, projections and other forecasts relating to the Transferred Assets, the Assumed Liabilities and the Business, and plan and budget information with respect thereto (collectively, "**Projections**"). Buyer acknowledges that there are uncertainties inherent in attempting to make Projections, that Buyer is familiar with such uncertainties, and that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of any Projections and Seller and its Affiliates shall have no Liability with respect thereto.

10.1.2 Buyer acknowledges and agrees that, except for the representations and warranties made by Seller and expressly set forth in Article 3 of this Agreement, neither Seller nor any of its Affiliates or representatives have made and shall not be construed as having made to Buyer or any of its Affiliates or representatives, and neither Buyer nor any of its Affiliates or representatives has relied upon, any representation or warranty of any kind. Without limiting the generality of the foregoing, and notwithstanding any express representation and warranty made by Seller in Article 3, Buyer agrees that neither Seller nor any of its Affiliates or representatives has made any representation or warranty to Buyer or to any of its Affiliates or representatives with respect to any Projections or, except to the extent and as expressly covered by a representation and warranty of Seller contained in Article 3, with respect to any other statements, documents or other information heretofore or hereafter delivered to or made available to Buyer or to any of its Affiliates or representatives (including the Confidential Information Memorandum prepared by Seller, its Affiliates and Dirks, Van Essen & Murray (the "**CIM**") dated July 2009, as amended and updated), and that Buyer shall not assert and hereby waives any claim against Seller or its Affiliates or any of their directors, officers, employees, agents, stockholders, or representatives, or hold Seller or any such Persons liable with respect to any such Projections or other statements, documents or other information heretofore or hereafter delivered to or made available to Buyer or to any of its Affiliates or representatives (including the CIM) except to the extent and as expressly covered by a representation and warranty of Seller contained in Article 3.

10.2 <u>Disclosure</u>. Disclosure of information included on any disclosure schedule (or portion of disclosure schedule) shall be considered disclosures for all other disclosure schedules (or other portions of disclosure schedules) to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other disclosure schedules (or other portions of disclosure schedules). In addition, (a) the fact that any disclosure on any schedule is not required to be disclosed in order to render the applicable representation or warranty to which it relates true, or that the absence of such disclosure on any schedule would not constitute a breach of such representation or warranty, shall not be deemed or construed to expand the scope of any representation or warranty hereunder or to establish a standard of disclosure in respect of any representation or warranty and (b) disclosure of a particular matter on any schedule shall not be construed to mean that such matter is material or would reasonably be expected to have a Material Adverse Effect.

10.3 <u>Notices</u>. All notices, demands and requests which may be or are required or permitted to be given, served, sent or delivered under the provisions of this Agreement shall be (a) in writing, (b) delivered by personal delivery, facsimile transmission (to be followed

2967748_1

promptly by written confirmation mailed by certified mail as provided below) or sent by overnight courier service or certified mail, return receipt requested, (c) deemed to have been given on the earliest of: the date of personal delivery, the date of transmission and receipt of facsimile transmissions, or the date set forth in the records of the delivery service or on the return receipt and (d) addressed as follows:

| | |
|---|---|
| If to Seller: | News-Journal Corporation<br>901 Sixth Street<br>Daytona Beach, Florida 32117<br>Attn: Receiver<br>Facsimile No.: (386) 258-8515 |
| If to Buyer: | Halifax Media Acquisition LLC<br>c/o Stephens Capital Partners LLC<br>111 Center Street, Suite 2500<br>Little Rock, Arkansas 72201<br>Attention: Jackson Farrow Jr.,<br>General Counsel<br>Facsimile: (501) 210-4615 |

or to any such other persons or addresses as the parties may from time to time designate in a writing delivered in accordance with this Section 10.3. Rejection or other refusal to accept or inability to deliver because of a change of address of which no notice was given shall be deemed to be receipt of the notice.

10.4   <u>No Assignment; Benefit and Binding Effect</u>.   Neither Seller nor Buyer shall assign this Agreement (or its rights or obligations hereunder) without the prior written consent of the other, which consent may be withheld in such other party's sole discretion; provided, however, Buyer may collaterally assign (in whole or in part) its rights under this Agreement to any bank or other financing institution in connection with Buyer's financing arrangements and Buyer shall provide Seller with prompt notice of any such assignment. This Agreement and the Related Agreements shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

10.5   <u>Bulk Transfer</u>.   Buyer acknowledges that Seller has not filed, and shall not file, any bulk transfer notice or otherwise comply with applicable bulk transfer laws, and the parties agree to waive compliance with same.

10.6   <u>Governing Law</u>.   This Agreement shall be governed, construed and enforced in accordance with the internal laws of the State of Delaware, without regard to the choice of law provisions or conflicts of law principles of such state.

10.7   <u>Waiver of Jury Trial</u>.   Each of the parties hereto hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the actions of any party in the negotiation, performance or enforcement hereof.

10.8    Submission to Jurisdiction; Venue.  Each of the parties hereto agrees to submit to the jurisdiction of the United States District Court, Middle District of Florida, Orlando Division, in any action or proceeding arising out of or relating to this Agreement or any of the matters contemplated hereby.  Each party hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in such federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Legal Rules, the defense of an inconvenient forum to the maintenance of such action or proceeding in such court.  Each of the parties hereto agrees not to bring any action arising out of this Agreement other than in the United States District Court, Middle District of Florida, Orlando Division.

10.9    Heading; Interpretation.  The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.  References to Sections or Articles (whether or not capitalized), unless otherwise indicated, are references to Sections and Articles of this Agreement.  References to Schedules and Exhibits (whether or not capitalized), unless otherwise indicated, are references to the disclosure schedules and exhibits to this Agreement.  The word "including" means including without limitation.  The terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the schedules and exhibits hereto) and not to any particular provision of this Agreement unless otherwise specified.

10.10    Gender and Number.  Words used herein, regardless of the gender and number specifically used, shall be deemed and construed to include any other gender, masculine, feminine or neuter, and any other number, singular or plural, as the context requires.

10.11    Entire Agreement.  This Agreement and the Related Agreements, along with the NDA which has been incorporated herein pursuant to Section 5.6, represent the entire understanding and agreement between Buyer and Seller with respect to the subject matter hereof.  All schedules and exhibits attached to this Agreement shall be deemed part of this Agreement and incorporated herein, as if fully set forth herein.  This Agreement supersedes all prior negotiations between Buyer and Seller with respect to the transactions contemplated hereby, and all letters of intent and other writings relating to such negotiations, and cannot be amended, supplemented or modified except by an agreement in writing which makes specific reference to this Agreement or an agreement delivered pursuant hereto, as the case may be, and which is executed by the party against which enforcement of any such amendment, supplement or modification is sought.

10.12    Further Assurances.  From time to time after the Closing Date, Buyer or Seller shall execute or deliver or cause to be executed or delivered such further instruments of conveyance, assignment, transfer and assumption, as may reasonably be requested by the other party in order to more effectively carry out the purposes and intent of this Agreement.

10.13    Waiver of Compliance.  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, representation, warranty, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof, but

- 40 -

such waiver or failure to insist upon strict compliance with such obligation, representation, warranty, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure not so specifically waived.

10.14   Severability.  Any provision of this Agreement that is held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof; provided, however, that the parties will attempt in good faith to reform this Agreement in a manner consistent with the intent of any such ineffective provision for the purpose of carrying out such intent.

10.15   Enforcement of Agreement.  The parties acknowledge and agree that in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur for which there would not be an adequate remedy at law.  Each party agrees that, in the event of any breach or threatened breach by any other party of any covenant or obligation contained in this Agreement, the non-breaching party shall be entitled (in addition to any other remedy that may be available to it whether in law or equity, including monetary damages) to seek and obtain (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation, and (b) an injunction restraining such breach or threatened breach.  Each party further agrees that no other party hereto or any other Person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 10.15, and each party hereto irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

10.16   Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were upon the same instrument, and a facsimile or portable document format (pdf) transmission shall be deemed to be an original signature for all purposes under this Agreement.

10.17   No Third Party Beneficiaries.  This Agreement constitutes an agreement solely among the parties hereto, and, except as otherwise provided herein, is not intended to and shall not confer any rights, remedies, obligations or liabilities, legal or equitable on any Person other than the parties hereto and their respective successors or assigns, or otherwise constitute any Person a third party beneficiary under or by reason of this Agreement.

10.18   Construction.  This Agreement has been negotiated by Buyer and Seller and their respective legal counsel, and legal or equitable principles that might require the construction of this Agreement or any provision of this Agreement against the party drafting this Agreement shall not apply in any construction or interpretation of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

10.19   Public Announcements.  Each party shall consult with the other before issuing any press release or otherwise making any public statements with respect to this Agreement and shall not issue any such press release or make any such public statement without the prior written

- 41 -

approval of the other. Notwithstanding the foregoing, the parties hereto acknowledge and agree that they may, without each other's prior consent, issue such press releases or make such public statements as may be compelled by Legal Rules, in which case the issuing party shall consult with the other party and use all commercially reasonable efforts to agree upon the nature, content and form of such press release or public statement.

10.20  No Personal Liability.  Notwithstanding any other provision set forth in this Agreement, no director, officer, employee or individual representative of Seller or any of its Affiliates, on the one hand, or of Buyer or any of its Affiliates, on the other hand, shall have any personal liability as a result of any breach by Seller or any of its Affiliates, on the one hand, or by Buyer or any of its Affiliates, on the other hand, of their respective representations, warranties, covenants or agreements contained herein.

10.21  Expenses.  Except as expressly set forth elsewhere in this Agreement, Seller and Buyer shall bear their own costs and expenses incurred in connection with the negotiation, preparation or execution of this Agreement (including, but not limited to, fees and expenses of attorneys, accountants, consultants, finders and investment bankers) whether or not the Closing occurs.

10.22  Buyer Guarantee.

10.22.1 Subject to the provisions of this Section 10.22.1, Buyer Guarantor hereby fully, unconditionally and irrevocably guarantees to Seller the due and punctual payment of the Purchase Price and any other monetary obligations due and the due and punctual performance of all other obligations to be performed by Buyer, all in accordance with the terms of this Agreement.  Buyer Guarantor hereby acknowledges that, with respect to all of Buyer's obligations, this guaranty shall be a guaranty of payment and performance and not of collection and shall not be conditioned or contingent upon the pursuit of any remedies against Buyer. Buyer Guarantor hereby waives diligence, demand of payment, filing of claims with a court in the event of a merger or bankruptcy of Buyer, any right to require a proceeding first against Buyer, the benefit of discussion, protest or notice and all demands whatsoever, and covenants that this guaranty will not be discharged as to any obligation except by satisfaction of such obligation in full. Buyer Guarantor hereby irrevocably waives any claim or other rights which it may now or hereafter acquire against Buyer that arise from the existence, payment, performance or enforcement of its obligations under this guaranty and this Agreement, including any right of reimbursement, exoneration, contribution, indemnification, any right to participate in any claim or remedy of Seller against Buyer or any collateral which Seller hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including the right to take or receive from Buyer, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim or other rights.  To the fullest extent permitted by Legal Rules, the obligations of Buyer Guarantor hereunder shall not be affected by (a) the failure of a party to assert any claim or demand or to enforce any right or remedy against Buyer Guarantor pursuant to the provisions of this Agreement or otherwise, (b) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of this Agreement or the invalidity or unenforceability (in whole or in part) of this Agreement, unless consented to in writing by Seller and (c) any change in the existence (corporate or otherwise) of Buyer or Buyer Guarantor or any

- 42 -

insolvency, bankruptcy, reorganization or similar proceeding affecting any of them or their assets. The obligations of Buyer Guarantor under this Section 10.22 shall not exceed an amount equal to the greater of (y) $10,000,000 or (z) an amount equal to the Purchase Price minus the amount funded at Closing pursuant to Buyer's Loan Agreement. Buyer Guarantor acknowledges that it will receive direct and indirect benefits from the consummation of the transactions contemplated by this Agreement and that the waivers set forth in this Section 10.22 are knowingly made in contemplation of such benefits. The obligations of Buyer Guarantor under this Section 10.22.1 shall automatically terminate and be of no further force or effect from and after the Closing.

10.22.2 Buyer Guarantor hereby represents and warrants to Seller as follows: (a) Buyer Guarantor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Arkansas and has the requisite limited liability company authority to execute, deliver and perform this Agreement according to its terms; (b) the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Buyer Guarantor have been duly authorized by all necessary limited liability company action on the part of Buyer Guarantor; (c) this Agreement has been duly executed and delivered by Buyer Guarantor and constitutes the legal, valid and binding obligation of Buyer Guarantor enforceable against Buyer Guarantor in accordance with its terms, except as the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance or transfer, reorganization moratorium and similar Legal Rules affecting creditors' rights and remedies generally and by general principles of equity; and (d) the execution, delivery and performance of this Agreement by Buyer Guarantor: (1) do not require the consent of any Person, (2) do not conflict with the organizational documents of Buyer Guarantor, and (3) do not conflict in any material respect with, result in a material breach of, or constitute a material default under any Legal Rule applicable to Buyer Guarantor or any material Contract to which Buyer Guarantor is a party or by which Buyer Guarantor may be bound.

[Signatures on the following page]

2967748_1

IN WITNESS WHEREOF, this Agreement has been executed by Buyer and Seller, and by Buyer Guarantor, solely for purposes of Section 10.22, as of the date first above written.

**SELLER:**

**NEWS-JOURNAL CORPORATION**

By:_____

Name: James W. Hopson

Title: Receiver

**SELLER:**

**VOLUSIA PENNYSAVER, INC.**

By:_____

Name: James W. Hopson

Title: Receiver

**BUYER**:

**HALIFAX MEDIA ACQUISITION LLC**

By:_____

Name:  Noel Strauss

Title:  Manager

Solely for purposes of Section 10.22:

**BUYER GUARANTOR:**

**STEPHENS INVESTMENTS HOLDINGS LLC**

By:_____

Name:  Jackson Farrow Jr.

Title:  Senior Vice-President

IN WITNESS WHEREOF, this Agreement has been executed by Buyer and Seller, and by Buyer Guarantor, solely for purposes of Section 10.22, as of the date first above written.

**SELLER:**

**NEWS-JOURNAL CORPORATION**

By:_____
Name: James W. Hopson
Title: Receiver

**SELLER:**

**VOLUSIA PENNYSAVER, INC.**

By:_____
Name: James W. Hopson
Title: Receiver

**BUYER:**

**HALIFAX MEDIA ACQUISITION LLC**

By:_____
Name: Noel Strauss
Title: Manager

Solely for purposes of Section 10.22:

**BUYER GUARANTOR:**

**STEPHENS INVESTMENTS HOLDINGS LLC**

By:_____
Name: Jackson Farrow Jr.
Title: Senior Vice-President

Exhibits

Exhibit A  Newspapers

Exhibit B  Pennysavers

Exhibit C  Directories

Exhibit D  Reference Working Capital Statement; Working Capital Procedures

Exhibit E  Form of Sale Approval Order

Exhibit F  Bill of Sale

Exhibit G  Assignment of Business Intellectual Property

Exhibit H  Assumption Agreement

Exhibit I  Escrow Agreement

A

## **Newspapers**

The Daytona Beach News-Journal
901 Sixth Street
Daytona Beach, FL  32117

B

## Pennysavers

Volusia/Flagler Pennysaver
454 South Yonge Street
Ormond Beach, FL  32174


Flagler Pennysaver
2729 E Moody Blvd.
Bunnell, FL 32110


New Smyrna Beach Pennysaver
223A Canal Street
News Smyrna Beach, FL 32168


Putnam Pennysaver
930 Highway 19 South
P.O. Box 220
Palatka, FL 32178


St. Johns Pennysaver
2729 E Moody Blvd.
Bunnell, FL 32110


West Volusia Pennysaver
1422 N. Woodland Boulevard
DeLand, FL 32720

C

**Exhibit C**

## Directories

The Complete Phone Book – Volusia/Flagler
454 South Yonge Street
Ormond Beach, FL  32174

The Complete Phone Book – St. Augustine
454 South Yonge Street
Ormond Beach, FL  32174



## WORKING CAPITAL GUIDELINES AND PROCEDURES

1. Working Capital will include the following line items, calculated as of the Adjustment Time, set forth on the unaudited consolidated balance sheets of Seller attached hereto as part of **Exhibit D**:

    a. accounts receivable less allowance for doubtful accounts;

    b. other receivables (other than the receivables from C.F.C.E. and the receivable from SMT);

    c. inventories;

    d. prepaid expenses and other (other than litigation fees and expenses related to the Cox Case;

    e. accounts payable;

    f. accrued expenses;

    g. other liabilities;

    h. unearned subscription liability; and

    i. unearned advertising revenue.

2. The cash balance in the carrier trust account and the related liability will be included in Working Capital.

3. Accounts receivable related to the Directory Business are accounted for based on the 12-month contractual commitment of advertisers notwithstanding the fact that only one-twelfth of such commitment is billed on a monthly basis.

4. All rights and claims related to Excluded Assets, including, without limitation, refunds or dividend checks related to general liability, property, casualty, worker's compensation and other insurance of Seller, shall be the property of Seller and shall not be treated as an account receivable constituting part of the Working Capital.

5. Except as otherwise provided in this **Exhibit D**, current assets and current liabilities of Seller shall be calculated in accordance with GAAP applied on a basis consistent with past practices; provided, however, that to the extent this **Exhibit D** is inconsistent with GAAP or past practices, this **Exhibit D** shall control. Without limiting the generality of the foregoing, the calculation of Working Capital shall be determined in accordance with the same accounting methods, policies, practices and procedures, with consistent classifications, judgments and estimation methodology, as were used in preparing the Financial Statements. Notwithstanding anything contained herein to the contrary, any liabilities incurred by or at the direction of Buyer shall be disregarded for purposes of the calculation of Working Capital.

Attached hereto is an example of the calculation of Working Capital as of September 30, 2009 using the guidelines as set forth in this **Exhibit D**:

30-Sep-09

| | N-J | PS | Total |
|---|---|---|---|
| **Current Assets** | | | |
| Accounts Receivable | 4,438,098 | 4,021,607 | 8,459,706 |
| Allowance for Doubtful Accounts | (915,703) | (531,459) | (1,447,162) |
| Other Receivables | 58,232 | 1,649 | 59,881 |
| Inventories | 1,228,155 | 24,680 | 1,252,835 |
| Prepaid Expenses | 1,594 | 271,395 | 272,989 |
| Carrier Bond | 185,972 | - | 185,972 |
| Equipment Deposits | 12,281 | - | 12,281 |
| Total Current Assets | 5,008,629 | 3,787,872 | 8,796,502 |
| | | | |
| **Current Liabilities** | | | |
| Accounts Payable | 1,111,009 | 32,823 | 1,143,831 |
| Accrued Expenses | 1,730,777 | 206,622 | 1,937,399 |
| Other Liabilities | 163,777 | - | 163,777 |
| Carrier Bond | 185,972 | - | 185,972 |
| Unearned Advertising Revenue | - | 193,994 | 193,994 |
| Unearned Subscription Income | 2,040,798 | - | 2,040,798 |
| Total Current Liabilities | 5,232,332 | 433,438 | 5,665,770 |
| | | | |
| Net Working Capital | (223,703) | 3,354,434 | 3,130,732 |

N-J Accounts Payable includes Phonebook printing bill of $704,961 which has now been paid

Attached hereto are the unaudited consolidated balance sheets of Seller as of September 30, 2009.

**NEWS-JOURNAL CORPORATION**
**BALANCE SHEET**
For the Nine Months Ending September 30, 2009

| | CURRENT September YTD AMT | Adjustment |
|---|---:|---:|
| **CURRENT ASSETS** | | |
| | | |
| **CASH AND CASH EQUIVALENTS:** | | |
| 00-1111001-00 CHECKING - OPERATING ACCOUNTS | 7,720,163.86 | |
| 00-1111007-00 CHECKING - RETURN CHECK ACCT | 20,183.79 | |
| 00-1111010-00 CHECKING - FLEX SPENDING ACCT | 49,331.42 | |
| 00-1111013-00 CHECKING - PAYROLL ACCOUNT | (213,181.44) | |
| 00-1111016-00 CHECKING - VOL/FLG BUSINESS REPORT | 19,048.38 | |
| 00-1111020-00 CK-HEALTH TRUST | 0.00 | |
| 00-1113004-00 M MKT - WACHOVIA - INVESTMENT | 4,046,513.18 | |
| 00-1113010-00 M MKT - NATIONS BANK-DELAND | 0.00 | |
| 00-1114101-00 PC - CUST ATG AND003 | 400.00 | |
| 00-1114105-00 PC - CASHIER AND003 | 200.00 | |
| 00-1114107-00 PC - CIRC SALES MIL004 | 200.00 | |
| 00-1114110-00 PC - TALLAHASSEE SAU002 | 200.00 | |
| 00-1114115-00 PC - GEN ATG GOI001 | 250.00 | |
| 00-1114119-00 PC - DISPLAY LON001 | 300.00 | |
| 00-1114121-00 PC - PURCHASING WES002 | 300.00 | |
| 00-1114122-00 PC - CITY DEPOT SMI011 | 200.00 | |
| 00-1114213-00 PC - DELAND 21 PRI016 | 0.00 | |
| 00-1114241-00 PC - NSB EDIT FRE004 | 0.00 | |
| 00-1116010-00 INVEST - WACHOVIA - BONDS | 0.00 | |
| 00-1117001-00 MASTERCARD (CIRC) | 98,993.26 | |
| 00-1117005-00 MASTERCARD (CLASS) | 46,455.53 | |
| | | |
| Total CASH AND CASH EQUIVALENTS | 11,789,557.98 | |
| | | |
| **ACCOUNTS RECEIVABLE, NET:** | | |
| 00-1121004-00 ACCOUNTS RECEIVABLE - MACTIVE | 4,438,098.35 | 4,438,098.35 |
| 00-1123000-00 ALLOWANCE-DOUBT ACCTS-ADVERT | (915,703.21) | (915,703.21) |
| | | |
| Total ACCOUNTS RECEIVABLE, NET | 3,522,395.14 | 3,522,395.14 |
| | | |
| **OTHER RECEIVABLES:** | | |
| 00-1131001-00 ACCOUNTS REC - CIRC DEALERS | (30,766.99) | (30,766.99) |
| 00-1131004-00 ACCOUNTS REC - CIRC ADVANCE | (37,074.60) | (37,074.60) |
| 00-1131005-00 ACCOUNTS REC - CIRC ACCRUALS | 64,855.67 | 64,855.67 |
| 00-1131010-00 ACCOUNTS REC - EMPLOYEES | 85.52 | 85.52 |
| 00-1134004-00 A/R - HOME SHOW | 30,225.31 | 30,225.31 |
| 00-1134007-00 A/R - C.F.C.E. | 0.00 | 0.00 |

| | | |
|---|---|---|
| 00-1134019-00 A/R - SMT | 0.00 | 0.00 |
| 00-1134021-00 A/R - EVENT 1 FAMILY FAIRE 08/09 | 0.00 | 0.00 |
| 00-1134022-00 A/R - EVENT 2 - LOVIN LIFE SR EXPO 10/09 | 1,084.17 | 1,084.17 |
| 00-1134024-00 A/R - EVENT 4 TOWN OF PONCE INLET 12/09 | 48.86 | 48.86 |
| 00-1134026-00 A/R - EVENT 6 SHORES WINE FEST 9/09 | 929.22 | 929.22 |
| 00-1134027-00 A/R - EVENT 7 CORPORATE | 276.90 | 276.90 |
| 00-1137000-00 A/R - MISCELLANEOUS | 28,567.95 | 28,567.95 |
| Total OTHER RECEIVABLES | 58,232.11 | 58,232.11 |

INTERCOMPANY RECEIVABLES:

| | |
|---|---|
| 00-1132001-00 A/R - DAYTONA PENNYSAVER | (575,760.93) |
| 00-1132004-00 A/R - W.V. PENNYSAVER | (4,030.82) |
| 00-1132007-00 A/R - NEW SMYRNA PENNYSAVER | (61.94) |
| 00-1132010-00 A/R - PUTNAM PENNYSAVER | (2,894.08) |
| 00-1132013-00 A/R - FLAGLER PENNYSAVER | (768.23) |
| 00-1132016-00 A/R - St JOHNS PENNYSAVER | (1,056.16) |
| 00-1132022-00 A/R - P/S ADMINISTRATIVE MISC | (26,830,085.60) |
| 00-1132025-00 A/R - COMPLETE PHONE BOOK | (3,493.20) |
| 00-1132030-00 A/R - PHONE BOOK/ST AUGUSTINE | (402.04) |
| 00-1132032-00 A/R - PHONE BOOK/LAKE COUNTY | 0.00 |
| 00-1133001-00 A/R - PRINTING - DAYTONA PS | (2,788.29) |
| 00-1133004-00 A/R - PRINTING - W.V. PS | (1,172.96) |
| 00-1133007-00 A/R - PRINTING - NEW SMYRNA PS | (2,524.07) |
| 00-1133010-00 A/R - PRINTING - PUTNAM PS | (1,343.72) |
| 00-1133013-00 A/R - PRINTING - FLAGLER PS | (3,582.14) |
| 00-1133016-00 A/R - PRINTING - St JOHNS PS | (1,164.96) |
| Total INTERCOMPANY RECEIVABLES | (27,431,109.14) |

| | |
|---|---|
| NET OTHER RECEIVABLES | (27,372,877.03) |

INVENTORIES:

| | | |
|---|---|---|
| 00-1141100-00 INVENTORY - NEWSPRINT 27 LB | 35,750.10 | 35,750.10 |
| 00-1141102-00 INVENTORY - OTHER ROLL PAPER | 245,901.61 | 245,901.61 |
| 00-1141103-00 INVENTORY - NEWSPRINT 30# | 32,068.37 | 32,068.37 |
| 00-1141104-00 INVENTORY - NEWSPRINT 26 LB | 409,258.84 | 409,258.84 |
| 00-1141200-00 INVENTORY - JOB SHEET PAPER | 8,225.01 | 8,225.01 |
| 00-1142005-00 INVENTORY - GOSS PRESS-INK TANK | 11,161.53 | 11,161.53 |
| 00-1142007-00 INVENTORY - GOSS PRESS-COLOR INK | 70,984.37 | 70,984.37 |
| 00-1142009-00 INVENTORY - JOB PRINTING INK | 0.00 | 0.00 |
| 00-1143000-00 POSTAGE | 19,899.99 | 19,899.99 |
| 00-1143003-00 POSTAGE- #150 | 14,963.72 | 14,963.72 |
| 00-1143005-00 POSTAGE - TMC | 5,916.11 | 5,916.11 |
| 00-1144001-00 INVENTORY - STOCK SUPPLY | 176,719.41 | 176,719.41 |
| 00-1144004-00 INVENTORY - GARAGE SUPPLIES | 26,279.82 | 26,279.82 |
| 00-1144006-00 INV-GIFT CARDS | 0.00 | 0.00 |

| | | |
|---|---|---|
| 00-1145000-00 MERCHANDISE FOR RESALE | 156,756.00 | 156,756.00 |
| 00-1146001-00 INVENTORY - UNLEADED GAS | 14,290.11 | 14,290.11 |
| Total INVENTORIES | 1,228,154.99 | 1,228,154.99 |

PREPAID EXPENSES AND OTHERS:

| | | |
|---|---|---|
| 00-1151001-00 PPD PROPERTY, AUTO & ETC. INS | 232,657.92 | |
| 00-1151003-00 PREPAID WORKERS COMP INSURANCE | 49,949.00 | |
| 00-1151006-00 PREPAID - MISC. | 1,594.00 | 1,594.00 |
| 00-1152000-00 PREPAID SALES TAX | 24,352.73 | |
| Total PREPAID EXPENSES AND OTHERS | 308,553.65 | 0.00 |

CURRENT DEFERRED TAXES:

| | |
|---|---|
| 00-1161000-00 CURRENT DEFERRED TAXES | 1,639,714.00 |
| Total CURRENT DEFERRED TAXES | 1,639,714.00 |

| | |
|---|---|
| TOTAL CURRENT ASSETS | (6,884,501.27) |

PROPERTY, PLANT & EQUIPMENT

LAND & IMPROVEMENTS:

| | |
|---|---|
| 00-1211001-00 LAND - 901 6TH STREET | 157,018.17 |
| 00-1211003-00 LAND - 6TH STREET ON RAILROAD | 139,816.91 |
| 00-1211005-00 LAND - 6TH STREET, LOTS 4 & 5 | 30,465.10 |
| 00-1211007-00 LAND - 659 SIXTH STREET | 30,000.00 |
| 00-1211009-00 LAND - 818 SIXTH STREET | 40,400.00 |
| 00-1211010-00 LAND - 732 SIXTH STREET | 52,461.88 |
| 00-1211011-00 LAND - 538 CEDAR STREET | 140,937.69 |
| 00-1211012-00 LAND - NOVA ROAD | 137,233.19 |
| 00-1211013-00 LAND - BUNNELL-MCCORMICK DRIVE | 191,774.90 |
| 00-1211015-00 LAND - 111 S. ALABAMA AVE | 185,000.00 |
| 00-1211017-00 LAND - 114 S. ALABAMA | 64,168.01 |
| 00-1211019-00 LAND - 239 CANAL ST - NSB | 150,000.00 |
| 00-1211101-00 LAND IMP-901 6TH ST | 339,901.10 |
| 00-1211103-00 LAND IMP-901 6TH & RR | 113,957.70 |
| 00-1211115-00 L IMP-111 S ALABAMA | 4,882.20 |
| 00-1211119-00 LAND IMPROVEMENTS-BUNNELL, MCCORMICK I | 10,265.70 |
| Total LAND & IMPROVEMENTS | 1,768,282.55 |

BUILDINGS:

| | |
|---|---|
| 00-1213101-00 BUILDING - 901 6TH STREET | 1,343,409.72 |
| 00-1213103-00 BUILDING IMP- 901 6TH ST | 2,875,567.52 |
| 00-1213105-00 PRESS ROOM ADDITIONS | 1,371,069.82 |
| 00-1213126-00 BUILDING - 111 S. ALABAMA | 601,341.46 |
| 00-1213200-00 JOB SALES BUILDING-B | 2,998,671.55 |
| 00-1213300-00 PAPER BALING BUILDING | 98,098.36 |

| | | |
|---|---|---|
| 00-1213400-00 SERVICE FACILITY GARAGE | 84,709.60 | |
| 00-1213500-00 PAPER STORAGE WAREHOUSE-CARSWELL | 611,137.19 | |
| 00-1213600-00 HOUSE - 663 6TH STREET | 26,300.00 | |
| 00-1213704-00 BUILDING - BUNNELL-MCCORMICK | 727,384.35 | |
| 00-1213707-00 BUILDING IMP. - 111 S. ALABAMA | 180,553.87 | |
| 00-1213709-00 BUILDING - 114 S. ALABAMA | 219,914.47 | |
| 00-1213710-00 BUILDING IMP. - 114 S ALABAMA | 15,270.87 | |
| 00-1213711-00 BUILDING - 239 CANAL ST-NSB | 276,570.94 | |
| 00-1213712-00 BUILDING IMP - 239 CANAL - NSB | 153,023.84 | |
| 00-1213805-00 LEASE IMP - 2400 S RIDGEWOOD S DAYTONA | 12,215.00 | |
| 00-1213808-00 LEASEHOLD IMPROV-341 SKYWAY, EDGEWATEI | 18,323.76 | |
| 00-1213809-00 LEASE IMP-3083 ENTERPRISE DEBARY | 0.00 | |
| 00-1213810-00 LEASE IMP-1851 PATTERSON AVE DELAND | 33,778.00 | |
| | ---------------- | |
| Total BUILDINGS | 11,646,940.32 | |
| | ================ | |

MACHINERY AND EQUIPMENT:

| | | |
|---|---|---|
| 00-1221000-00 MISCELLANEOUS EQUIPMENT | 1,274,569.87 | |
| 00-1221110-00 TWO WAY RADIO EQUIPMENT | 42,339.58 | |
| 00-1221121-00 TELEPHONE - MERLIN SYSTEM | 10,873.38 | |
| 00-1221122-00 TELEPHONE - NEC SYSTEM-DELAND | 11,342.00 | |
| 00-1221123-00 TELEPHONE - T1 PHONE EQUIPMENT | 74,416.26 | |
| 00-1221125-00 TELEPHONE - AT&T PARTNER II | 23,620.44 | |
| 00-1221129-00 TELEPHONE - GENERIC 3I | 128,391.36 | |
| 00-1221131-00 TELEPHONE - MERLIN PLUS | 3,445.00 | |
| 00-1221135-00 TELEPHONE-INTUITY AUDIX/VOICE | 594,918.82 | |
| 00-1221200-00 PLANT MACHINERY | 7,279,129.15 | |
| 00-1221201-00 PLANT MACHINERY-DELAND SUN NEW | 12,170.00 | |
| 00-1221300-00 NEWSPAPER VENDING MACHINES | 322,709.26 | |
| 00-1221400-00 PHOTO EQUIPMENT | 478,656.35 | |
| 00-1221401-00 GRAPHICS EQUIPMENT | 1,246,922.78 | |
| 00-1221503-00 COMPUTER SYSTEM HARDWARE | 33,295.66 | |
| 00-1221505-00 ROTMAN CLASSIFIED SYSTEM | 3,565.00 | |
| 00-1221508-00 MACTIVE CLASSIFIED SYSTEM | 1,384,958.62 | |
| 00-1221511-00 D.P. COMPUTER HRDW/SFTW | 1,380,986.53 | |
| 00-1221513-00 PERSONAL COMPUTER HDW/SFTW | 2,696,068.70 | |
| 00-1221514-00 ELECTRONIC MEDIA EQUIPMENT | 12,810.36 | |
| 00-1221515-00 COMPOSING COMPUTER SYSTEMS | 41,167.51 | |
| 00-1221516-00 INTERNET NETWORK | 181,338.94 | |
| 00-1221518-00 EDITORIAL COMPUTER SYSTEM | 1,811,430.11 | |
| 00-1221519-00 MACINTOSH DISPLAY ADV SYSTEM | 33,174.62 | |
| 00-1221520-00 CIRC TELEMARKETING SYSTEM | 196,681.95 | |
| 00-1221600-00 COMPUTER POWER SYSTEM | 0.00 | |
| 00-1221701-00 GOSS PRESS | 21,860,571.72 | |
| 00-1221705-00 INK RECOVERY SYSTEM | 39,602.00 | |
| 00-1221709-00 SHEETFED PRESS | 6,761.00 | |
| 00-1221801-00 A/C - GOSS PRESS BUILDING | 127,124.29 | |
| 00-1221803-00 A/C - AERATION COMM PRESS BLDG | 55,507.42 | |
| 00-1221805-00 COMPRESSED NATURAL GAS SYSTEM | 102,546.51 | |
| 00-1221900-00 SERVICE FACILITY EQUIPMENT | 106,350.55 | |
| | ---------------- | |
| Total MACHINERY AND EQUIPMENT | 41,577,443.73 | |
| | ================ | |

FURNITURE AND FIXTURES:

| | | |
|---|---|---|
| 00-1222100-00 OFFICE FURNITURE AND FIXTURES | 1,037,730.28 | |
| 00-1222403-00 BUREAU - FLAGLER F&F | 30,040.95 | |
| 00-1222405-00 OFFICE FURNITURE AND FIX-VOL | 29,290.27 | |
| | ---------------- | |
| Total FURNITURE AND FIXTURES | 1,097,061.50 | |
| | ================ | |

TRANSPORTATION EQUIPMENT:

| | | |
|---|---|---|
| 00-1223000-00 TRANSPORTATION EQUIPMENT | 19,262.37 | |
| 00-1223100-00 AUTOS & TRUCKS | 911,741.87 | |
| | ---------------- | |
| Total TRANSPORTATION EQUIPMENT | 931,004.24 | |
| | ================ | |

| | |
|---|---|
| **TOTAL PROPERTY, PLANT & EQUIP** | 57,020,732.34 |

**A/D LAND IMPROVEMENTS:**

| | |
|---|---|
| 00-1311101-00 A/D LAND IMP-901 6TH ST | (298,526.04) |
| 00-1311103-00 A/D LAND IMP-901 6TH ST & RR | (113,957.70) |
| 00-1311115-00 A/D LAND IMP-111 S ALABAMA | (2,549.59) |
| 00-1311119-00 A/D LAND IMP-BUNNELL, MCCORMICK | (124.56) |
| Total A/D LAND IMPROVEMENTS | (415,157.89) |

**A/D BUILDINGS:**

| | |
|---|---|
| 00-1313101-00 A/D - BUILDING - 901 6TH ST | (1,343,409.72) |
| 00-1313103-00 A/D - BUILDING IMPROV-901 6TH | (1,978,277.50) |
| 00-1313105-00 A/D - PRESS ROOM ADDITION | (1,274,007.07) |
| 00-1313125-00 A/D - BUILDING-111 S. ALABAMA | (525,187.85) |
| 00-1313200-00 A/D - JOB SALES BUILDING | (2,499,525.50) |
| 00-1313300-00 A/D - PAPER BALING BUILDING | (94,849.33) |
| 00-1313400-00 A/D - SERVICE FACILITY GARAGE | (62,969.64) |
| 00-1313500-00 A/D - PAPER STORAGE WAREHOUSEQ | (585,845.32) |
| 00-1313600-00 A/D - 663 6TH STREET HOUSE | (28,300.00) |
| 00-1313704-00 A/D-BUILDING-BUNNELL-MCCORMICK | (531,892.38) |
| 00-1313707-00 A/D - BUILD IMP-111 S.ALABAMA | (123,187.43) |
| 00-1313709-00 A/D - BUILD -114 S.ALABAMA | (161,245.28) |
| 00-1313710-00 A/D- BUILD IMP-114 S. ALABAMA (CIRC) | (2,509.37) |
| 00-1313711-00 A/D - BUILDING-238 CANAL-NSB | (154,995.01) |
| 00-1313712-00 A/D-BUILDING IMP-239 CANAL-NSB | (90,204.09) |
| 00-1313805-00 A/D - LEASEHOLD IMP-NSB PO BLD | (25.46) |
| 00-1313808-00 A/D - LEASEHOLD IMP-341 SKYWAY EDGEWATE | (101.81) |
| 00-1313809-00 A/D - LEASEHOLD IMP-DEBARY ENTERPRISE | 0.00 |
| Total A/D BUILDINGS | (9,454,532.76) |

**A/D MACHINERY AND EQUIPMENT:**

| | |
|---|---|
| 00-1321000-00 A/D MISCELLANEOUS EQUIPMENT | (1,080,244.38) |
| 00-1321110-00 A/D - TWO WAY RADIO EQUIPMENT | (42,339.58) |
| 00-1321121-00 A/D - PHONE - MERLIN SYSTEM | (9,851.62) |
| 00-1321122-00 A/D - PHONE - NEC - DELAND | (11,342.00) |
| 00-1321123-00 A/D - PHONE - T1 PHONE EQUIP | (74,416.26) |
| 00-1321125-00 A/D - PHONE - AT&T PARTNER II | (23,620.44) |
| 00-1321129-00 A/D - TELEPHONE GENERIC 3I | (128,391.35) |
| 00-1321131-00 A/D - MERLIN PLUS | (3,445.00) |
| 00-1321135-00 A/D-PHONE-INTUITY AUDIX/VOICE | (594,918.82) |
| 00-1321200-00 A/D - PLANT MACHINERY | (6,992,430.73) |
| 00-1321201-00 A/D - PLANT MACHINERY - DSN | (12,170.00) |
| 00-1321300-00 A/D - NEWSPAPER VEND MACHINES | (302,647.94) |
| 00-1321400-00 A/D - PHOTO EQUIPMENT | (447,033.66) |
| 00-1321401-00 A/D - GRAPHICS EQUIPMENT | (869,522.55) |
| 00-1321503-00 A/D - COMPUTER SYSTEM HARDWARE | (33,295.66) |
| 00-1321505-00 A/D - ROTMAN CLASSIFIED SYSTEM | (3,565.00) |
| 00-1321508-00 A/D - MACTIVE CLASSIFIED SYSTEM | (995,510.31) |
| 00-1321511-00 A/D - D.P. COMPUTER HARDWARE | (1,108,895.02) |
| 00-1321513-00 A/D - P.C. HARDWARE | (2,231,559.91) |
| 00-1321514-00 A/D - ELECTRONIC MEDIA EQUIP | (11,110.64) |
| 00-1321515-00 A/D - COMPOSING COMPUTERS | (27,655.08) |
| 00-1321516-00 A/D - INTERNET NETWORK | (157,677.00) |
| 00-1321518-00 A/D - EDITORIAL COMPUTER SYSTM | (1,779,114.49) |
| 00-1321519-00 A/D - MACINTOSH DISPLY ADV SYS | (14,299.62) |
| 00-1321520-00 A/D - CIRC TELEMARKETING SYST | (136,441.33) |
| 00-1321600-00 A/D - COMPUTER POWER SYSTEM | 0.00 |
| 00-1321701-00 A/D - GOSS PRESS | (19,464,425.30) |
| 00-1321705-00 A/D - INK RECOVERY SYSTEM | (39,602.00) |
| 00-1321709-00 A/D - SHEETFED PRESS | (6,761.00) |
| 00-1321801-00 A/D - A/C GOSS PRESS ROOM | (127,124.29) |
| 00-1321803-00 A/D - A/C AERATION COM PRT BLD | (55,507.42) |
| 00-1321805-00 A/D - COMPRESSED NATL GAS SYST | (102,546.51) |
| 00-1321900-00 A/D - SERVICE FACILITY EQUIP | (108,350.55) |

|  |  |  |  |  |
|---|---|---|---|---|
| Total A/D MACHINERY AND EQUIPMENT | (38,973,815.44) | | | |

**A/D FURNITURE AND FIXTURES:**

| | | |
|---|---|---|
| 00-1322100-00 A/D - OFFICE FURNITURE & FIXTU | (991,539.73) | |
| 00-1322403-00 A/D - FLAGLER FURNITURE & FIXT | (30,040.95) | |
| 00-1322405-00 A/D - DSN - FURNITURE & FIXT | (29,290.27) | |
| Total A/D FURNITURE AND FIXTURES | (1,050,870.95) | |

**A/D TRANSPORTATION EQUIPMENT:**

| | | |
|---|---|---|
| 00-1323000-00 A/D - TRANSPORTATION EQUIP | (15,604.17) | |
| 00-1323100-00 A/D - AUTOS & TRUCKS | (796,755.47) | |
| Total A/D TRANSPORTATION EQUIPMENT | (812,359.64) | |

**ESTIMATED DEPRECIATION:**

| | | |
|---|---|---|
| 00-1340000-00 ESTIMATED DEPRECIATION | (1,429,713.00) | |
| Total ESTIMATED DEPRECIATION | (1,429,713.00) | |

| | | |
|---|---|---|
| ACCUMULATED DEPRECIATION | (50,136,449.68) | |
| TOTAL FIXED ASSETS | 6,864,282.66 | |

**INTANGIBLE ASSETS:**

| | | |
|---|---|---|
| 00-1411001-00 GOODWILL - FLAGLER TRIBUNE | 42,845.27 | |
| 00-1411003-00 ACCUM AMORT - GOODWILL FPC N-T | (21,595.46) | |
| 00-1411005-00 GOODWILL - DELAND SUN NEWS | 791,670.92 | |
| 00-1411007-00 ACCUM AMORT - GOODWILL-SUN NEW | (238,129.78) | |
| 00-1411009-00 GOODWILL - CHILDREN'S EXPO | 31,594.00 | |
| 00-1411011-00 ACCUM AMORT - GOODWILL-CHILDEX | (31,593.94) | |
| 00-1412001-00 NAMING RIGHTS AGREEMENT | 13,000,000.00 | |
| 00-1412003-00 ACCUM AMORT - NAMING RIGHTS | (2,874,994.00) | |
| Total INTANGIBLE ASSETS | 10,699,797.01 | |

**OTHER ASSETS:**

| | | | |
|---|---|---|---|
| 00-1421003-00 STOCK - DELAND PENNYSAVER | 100,000.00 | | |
| 00-1422007-00 DEPOSITS - UTILITIES/RENTALS | 31,998.38 | (31,998.38) | 0.00 |
| 00-1423003-00 ANTIQUE PRINTING EQUIPMENT | 13,921.88 | | |
| 00-1423005-00 PAINTINGS AND ART | 24,135.75 | | |
| 00-1424001-00 DEFERRED COMP INVEST | 154,597.10 | | 0.00 |
| 00-1424007-00 CARRIER TRUST FUND - M MKT ACC | 185,971.69 | | 0.00 Carrier/dealer bond |
| 00-1425001-00 ASSOCIATED PRESS - BOND | 500.00 | | 0.00 |
| Total OTHER ASSETS | 511,124.80 | | 0.00 |

**PURCHASE DEPOSITS-EQUIPMENT:**

| | | | |
|---|---|---|---|
| 00-1431000-00 EQUIPMENT DEPOSITS | 12,281.40 | 0.00 | 12,281.40 |
| Total PURCHASE DEPOSITS-EQUIPMENT | 12,281.40 | | |

| | | |
|---|---|---|
| TOTAL ASSETS | 9,222,984.80 | |

LIABILITIES & SHAREHOLDER EQUITY

**ACCOUNTS PAYABLE:**

| | | | |
|---|---|---|---|
| 00-2111101-00 ACCTS PAY - TRADE | 1,193,004.77 | (81,996.11) | 1,111,008.66 |
| 00-2111300-00 ACCTS PAY - MISC | 0.00 | | |
| 00-2111501-00 ACCTS PAY - OPTIONAL LIFE INS | 1,727.56 | | |
| 00-2111502-00 ACCTS PAY - AFLAC | (106.16) | | |

| | | |
|---|---|---|
| 00-2111505-00 ACCTS PAY - F.H.C.P. | 72,990.57 | |
| Total ACCOUNTS PAYABLE | 1,267,616.74 | 1,111,008.66 |

ACCRUED EXPENSES:

| | | |
|---|---|---|
| 00-2112108-00 EMPL WITHHOLD - HALIFAX FITNESS | 0.00 | |
| 00-2112110-00 EMPL WITHHOLD - YMCA | 104.00 | |
| 00-2112113-00 EMPL WITHHOLD - FLEX SPENDING | 6,284.03 | |
| 00-2112114-00 EMPL WITHHOLD - DELTA DENTAL | 6,512.17 | |
| 00-2112116-00 EMPL WITHHOLD - EYE MED | 596.21 | |
| 00-2112301-00 ACC TX PYBL - VOLUSIA SUR (NJ) | 412.75 | |
| 00-2112303-00 ACC TX PYBL - FLAGLER SUR (CIRC) | 0.00 | |
| 00-2112305-00 ACC TX PYBL - PROPERTY TAX | 373,383.00 | |
| 00-2112307-00 ACC TX PYBL - ST SALES (NJ) | 6,630.84 | |
| 00-2112310-00 ACC TX PYBL - ST SALES (CIRC) | 40,118.09 | |
| 00-2112312-00 ACC TX PYBL - VOLUSIA SUR (CIRC) | 4.41 | |
| 00-2112401-00 ACCRUED SALARIES | 514,332.77 | |
| 00-2112403-00 ACCRUED VACATIONS | 1,730,776.55 | 1,730,776.55 |
| 00-2112405-00 ACCRUED ADMIN BONUSES | 59,640.01 | |
| 00-2112407-00 ACCRUED PENSION CONTRIBUTIONS | 0.00 | |
| 00-2112409-00 ACCRUED CHRISTMAS BONUS | 51,149.00 | |
| 00-2112505-00 ESTIMATED HEALTH CLAIMS | 0.00 | |
| 00-2112700-00 ACCRUED SALES COMMISSIONS | 97,128.08 | |
| 00-2112900-00 ACCRUED EARLY RETIRE PENSION | 261,433.91 | |
| 00-2131200-00 ACCRUED AUDIT ADJUSTMENT | 0.00 | |
| Total ACCRUED EXPENSES | 3,148,485.82 | 1,730,776.55 |

OTHER LIABILITIES:

| | | |
|---|---|---|
| 00-2114001-00 ACCTS PAY CARR TRUST | 185,826.18 | |
| 00-2114002-00 DEFERRED COMP LIABILITY | 154,597.10 | |
| 00-2114100-00 HOME SHOW - DEPOSITS | 140,575.00 | 140,575.00 |
| 00-2114700-00 REFUND ACCOUNT - CASHIER | 15.25 | 15.25 |
| 00-2115000-00 EVENT 1 - DEP FAMILY FAIRE 8/09 | 2,600.00 | 2,600.00 |
| 00-2115010-00 EVENT 2 - DEP LOVIN LIFE SR EXPO 10/09 | 7,890.00 | 7,890.00 |
| 00-2115011-00 EVENT 3 - DEP SMR CRAFT BLAST  EXPO 8/09 | 437.00 | 437.00 |

| | | |
|---|---|---|
| 00-2115012-00 EVENT 4 - DEP TOWN OF PONCE INLET 12/09 | 0.00 | 0.00 |
| 00-2115013-00 EVENT 5 - DEP NJ VIRT JOB FAIR 9/09 | 8,725.00 | 8,725.00 |
| 00-2115014-00 EVENT 6 DEPOSITS - SHORES WINE FEST 9/09 | 135.00 | 135.00 |
| 00-2115015-00 EVENT 7 - DEPOSITS CORPORATE | 3,400.00 | 3,400.00 |
| Total OTHER LIABILITIES | 504,200.53 | 163,777.25 |

**ADDITIONAL MINIMUM PENSION LIABILITY:**

| | |
|---|---|
| 00-2114400-00 ADDITIONAL MINIMUM PENSION LIABILITY | 14,369,584.72 |
| Total ADDITIONAL MINIMUM PENSION LIABILITY | 14,369,584.72 |

**UNEARNED SUBSCRIPTION INCOME:**

| | | |
|---|---|---|
| 00-2115100-00 SUBSCRIPTIONS | 1,858,381.29 | 1,858,381.29 |
| 00-2115200-00 CIRC - TAX DIFF (SAPP) | 95,430.88 | 95,430.88 |
| 00-2115300-00 DUE TO SUBSCRIBERS | (889.74) | (889.74) |
| 00-2115400-00 ACCTS PAY - CIRC CARRIERS | 87,875.46 | 87,875.46 |
| Total UNEARNED SUBSCRIPTION INCOME | 2,040,797.89 | 2,040,797.89 |

**INCOME TAXES PAYABLE:**

| | |
|---|---|
| 00-2116100-00 TAXES PAYABLE - FEDERAL INCOME | (1,207,431.56) |
| 00-2116200-00 TAXES PAYABLE - FLORIDA CORP | (353,703.63) |
| Total INCOME TAXES PAYABLE | (1,561,135.19) |

| | |
|---|---|
| TOTAL CURRENT LIABILITIES | 19,769,550.51 |

**DEFERRED INCOME TAXES:**

| | |
|---|---|
| 00-2131000-00 DEFERRED FEDERAL INCOME TAXES | (5,421,665.81) |
| Total DEFERRED INCOME TAXES | (5,421,665.81) |

| | |
|---|---|
| TOTAL LIABILITIES | 14,347,884.70 |

TOTAL SHAREHOLDERS EQUITY

**SHAREHOLDERS EQUITY:**

| | |
|---|---|
| 00-2220000-00 COMMON STOCK | 4,000.00 |
| 00-2230000-00 PAID IN SURPLUS | 19,253.58 |
| Total SHAREHOLDERS EQUITY | 23,253.58 |

**RETAINED EARNINGS:**

| | |
|---|---|
| 00-2240000-00 CURRENT YEAR EARNINGS | (1,207,393.76) |
| 00-2241000-00 RETAINED EARNINGS | 18,078,024.48 |

| | |
|---|---:|
| Total RETAINED EARNINGS | 16,870,630.72 |
| | |
| ACCUMULATED OTHER COMPREHENSIVE INCOME: | |
| 00-2243000-00 ACCUM OTHER COMPREHENSIVE INC | (9,497,568.00) |
| Total ACCUMULATED OTHER COMPREHENSIVE INCOME | (9,497,568.00) |
| | |
| COMMITMENT TO ACQUIRE COMMON STOCK: | |
| 00-2245000-00 COMMITMENT TO ACQUIRE COMMON STOCK | (12,521,216.41) |
| Total COMMITMENT TO ACQUIRE COMMON STOCK | (12,521,216.41) |
| | |
| TOTAL SHAREHOLDERS EQUITY | (5,124,900.11) |
| TOTAL LIABILITIES AND EQUITY | 9,222,984.59 |

## VOLUSIA PENNYSAVER, INC.
## BALANCE SHEET

| | Y-T-D SEPTEMBER 2009 | ADJUSTMENT | WORKING CAPITAL |
|---|---|---|---|
| **CURRENT ASSETS** | | | |
| Cash | $600,617.93 | | |
| Accounts Receivable | 4,021,607.16 | | 4,021,607.16 |
| Allowance For Uncollectables | (531,458.81) | | (531,458.81) |
| Other Receivables | 1,649.00 | 0.00 | 1,649.00 |
| Inventories | 24,679.66 | | 24,679.66 |
| Prepaid Expenses | 271,395.38 | 0.00 | 271,395.38 |
| | | | |
| **TOTAL CURRENT ASSETS** | 4,388,490.32 | | 3,787,872.39 |
| | | | |
| **FIXED ASSETS** | | | |
| Land | 367,549.06 | | |
| Buildings | 2,071,634.89 | | |
| Machinery & Equipment | 2,326,370.51 | | |
| Furniture & Fixtures | 219,750.55 | | |
| Auto & Trucks | 66,257.78 | | |
| Accumulated Depreciation | (3,833,268.08) | | |
| | | | |
| **TOTAL FIXED ASSETS** | 1,218,294.71 | | |
| | | | |
| **OTHER ASSETS** | | | |
| Goodwill | 1,247,502.50 | | |
| Amortization-Goodwill | (564,617.46) | | |
| Organization Expense | 0.00 | | |
| Amort. Organization Exp. | 0.00 | | |

| | | |
|---|---|---|
| Deposits | 24,622.52 | 0.00 |
| **TOTAL OTHER ASSETS** | 707,507.56 | |
| **TOTAL ASSETS** | 6,314,292.59 | |

## VOLUSIA PENNYSAVER, INC.
## BALANCE SHEET

| | Y-T-D SEPTEMBER 2009 | | |
|---|---|---|---|
| **CURRENT LIABILITIES** | | | |
| Accounts Payable | $32,822.53 | 0.00 | 32,822.53 |
| Due to News-Journal Corporation | (27,431,109.14) | | |
| Accrued Expenses | 372,588.80 | (165,966.71) | 206,622.09 |
| **TOTAL CURRENT LIABILITIES** | (27,025,697.81) | | |
| **LONG TERM DEBT** | | | |
| Notes Payable | 0.00 | | |
| **TOTAL LONG TERM DEBT** | 0.00 | | |
| **OTHER LIABILITIES** | | | |
| Subsidiary Tax Transfer | 0.00 | | |
| Deferred Fed. & State Inc Tax | 0.00 | | |
| Other Liabilities | 193,993.53 | 0.00 | 193,993.53 |
| **TOTAL OTHER LIABILITIES** | 193,993.53 | | |
| **TOTAL LIABILITIES** | (26,831,704.28) | | |
| **EQUITY** | | | |

| | |
|---|---|
| Common Stock | 47,000.00 |
| Additional Paid-In Capital | 53,000.00 |
| Current Earnings | 1,945,555.52 |
| Retained Earnings | 31,100,441.35 |

**TOTAL STOCKHOLDERS EQUITY**     33,145,996.87

**TOTAL LIABILITY & EQUITY**     6,314,292.59