REVOLVING CREDIT, TERM LOAN

AND

SECURITY AGREEMENT


PNC BANK, NATIONAL ASSOCIATION

(AS AGENT AND LENDER)


WITH


HALIFAX MEDIA ACQUISITION LLC

(AS BORROWER)


DECEMBER 30, 2009

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I | DEFINITIONS | | 1 |
| | 1.1. | Accounting Terms | 1 |
| | 1.2. | General Terms | 1 |
| | 1.3. | Uniform Commercial Code Terms | 25 |
| | 1.4. | Certain Matters of Construction | 25 |
| II | ADVANCES, PAYMENTS | | 26 |
| | 2.1. | Revolving Advances | 26 |
| | 2.2. | Procedure for Revolving Advances Borrowing | 27 |
| | 2.3. | Disbursement of Advance Proceeds | 29 |
| | 2.4. | Loans | 29 |
| | 2.5. | Maximum Advances | 30 |
| | 2.6. | Repayment of Advances | 30 |
| | 2.7. | Repayment of Excess Advances | 31 |
| | 2.8. | Statement of Account | 31 |
| | 2.9. | Letters of Credit | 31 |
| | 2.10. | Issuance of Letters of Credit | 31 |
| | 2.11. | Requirements For Issuance of Letters of Credit | 32 |
| | 2.12. | Disbursements, Reimbursement | 33 |
| | 2.13. | Repayment of Participation Advances | 34 |
| | 2.14. | Documentation | 34 |
| | 2.15. | Determination to Honor Drawing Request | 35 |
| | 2.16. | Nature of Participation and Reimbursement Obligations | 35 |
| | 2.17. | Indemnity | 36 |
| | 2.18. | Liability for Acts and Omissions | 37 |
| | 2.19. | Additional Payments | 38 |
| | 2.20. | Manner of Borrowing and Payment | 38 |
| | 2.21. | Mandatory Prepayments | 40 |
| | 2.22. | Use of Proceeds | 41 |
| | 2.23. | Defaulting Lender | 41 |
| III | INTEREST AND FEES | | 42 |
| | 3.1. | Interest | 42 |
| | 3.2. | Letter of Credit Fees | 43 |
| | 3.3. | Closing Fee and Facility Fee | 44 |
| | 3.4. | Collateral Evaluation Fee, Collateral Monitoring Fee and Fee Letter | 44 |
| | 3.5. | Computation of Interest and Fees | 44 |
| | 3.6. | Maximum Charges | 45 |
| | 3.7. | Increased Costs | 45 |
| | 3.8. | Basis For Determining Interest Rate Inadequate or Unfair | 46 |
| | 3.9. | Capital Adequacy | 47 |
| | 3.10. | Gross Up for Taxes | 47 |
| | 3.11. | Withholding Tax Exemption | 47 |

i

| IV | COLLATERAL: GENERAL TERMS | 48 |
|----|---------------------------|----|
| | 4.1. Security Interest in the Collateral | 48 |
| | 4.2. Perfection of Security Interest | 49 |
| | 4.3. Disposition of Collateral | 49 |
| | 4.4. Preservation of Collateral | 50 |
| | 4.5. Ownership of Collateral | 50 |
| | 4.6. Defense of Agent's and Lenders' Interests | 51 |
| | 4.7. Books and Records | 51 |
| | 4.8. Financial Disclosure | 51 |
| | 4.9. Compliance with Laws | 52 |
| | 4.10. Inspection of Premises | 52 |
| | 4.11. Insurance | 52 |
| | 4.12. Failure to Pay Insurance | 53 |
| | 4.13. Payment of Taxes | 53 |
| | 4.14. Payment of Leasehold Obligations | 54 |
| | 4.15. Receivables | 54 |
| | 4.16. Inventory | 57 |
| | 4.17. Maintenance of Equipment | 57 |
| | 4.18. Exculpation of Liability | 57 |
| | 4.19. Environmental Matters | 57 |
| | 4.20. Financing Statements | 59 |
| V | REPRESENTATIONS AND WARRANTIES | 59 |
| | 5.1. Authority | 59 |
| | 5.2. Formation and Qualification | 60 |
| | 5.3. Survival of Representations and Warranties | 60 |
| | 5.4. Tax Returns | 60 |
| | 5.5. Financial Statements | 60 |
| | 5.6. Entity Names | 61 |
| | 5.7. O.S.H.A. and Environmental Compliance | 61 |
| | 5.8. Solvency; No Litigation, Violation, Indebtedness or Default | 62 |
| | 5.9. Patents, Trademarks, Copyrights and Licenses | 63 |
| | 5.10. Licenses and Permits | 64 |
| | 5.11. Default of Indebtedness | 64 |
| | 5.12. No Default | 64 |
| | 5.13. No Burdensome Restrictions | 64 |
| | 5.14. No Labor Disputes | 64 |
| | 5.15. Margin Regulations | 65 |
| | 5.16. Investment Company Act | 65 |
| | 5.17. Disclosure | 65 |
| | 5.18. Delivery of Acquisition Agreement | 65 |
| | 5.19. Swaps | 65 |
| | 5.20. Conflicting Agreements | 65 |
| | 5.21. Application of Certain Laws and Regulations | 65 |
| | 5.22. Business and Property of Borrower | 66 |
| | 5.23. Section 20 Subsidiaries | 66 |

| | 5.24. | Anti-Terrorism Laws. | 66 |
|---|---|---|---|
| | 5.25. | Trading with the Enemy. | 67 |
| | 5.26. | Federal Securities Laws | 67 |
| VI | | AFFIRMATIVE COVENANTS. | 67 |
| | 6.1. | Payment of Fees | 67 |
| | 6.2. | Conduct of Business and Maintenance of Existence and Assets | 67 |
| | 6.3. | Violations | 67 |
| | 6.4. | Government Receivables | 67 |
| | 6.5. | Financial Covenants. | 68 |
| | 6.6. | Execution of Supplemental Instruments | 69 |
| | 6.7. | Payment of Indebtedness | 69 |
| | 6.8. | Standards of Financial Statements | 69 |
| | 6.9. | Federal Securities Laws | 69 |
| | 6.10. | Exercise of Rights | 69 |
| | 6.11. | Collective Bargaining Agreements | 69 |
| | 6.12. | Approved Incentive Plan | 69 |
| VII | | NEGATIVE COVENANTS. | 70 |
| | 7.1. | Merger, Consolidation, Acquisition and Sale of Assets. | 70 |
| | 7.2. | Creation of Liens | 70 |
| | 7.3. | Guarantees | 70 |
| | 7.4. | Investments | 70 |
| | 7.5. | Loans | 70 |
| | 7.6. | Capital Expenditures | 70 |
| | 7.7. | Distributions | 70 |
| | 7.8. | Indebtedness | 71 |
| | 7.9. | Nature of Business | 71 |
| | 7.10. | Transactions with Affiliates | 71 |
| | 7.11. | Leases | 71 |
| | 7.12. | Subsidiaries. | 72 |
| | 7.13. | Fiscal Year and Accounting Changes | 72 |
| | 7.14. | Pledge of Credit | 72 |
| | 7.15. | Amendment of Certificate of Formation, Operating Agreement | 72 |
| | 7.16. | Compliance with ERISA | 72 |
| | 7.17. | Prepayment of Indebtedness | 73 |
| | 7.18. | Anti-Terrorism Laws | 73 |
| | 7.19. | Membership/Partnership Interests | 73 |
| | 7.20. | Trading with the Enemy Act | 73 |
| | 7.21. | Other Agreements | 73 |
| VIII | | CONDITIONS PRECEDENT. | 73 |
| | 8.1. | Conditions to Initial Advances | 73 |
| | 8.2. | Conditions to Each Advance | 79 |
| IX | | INFORMATION AS TO BORROWER. | 80 |
| | 9.1. | Disclosure of Material Matters | 80 |
| | 9.2. | Schedules. | 80 |

|        | 9.3.  | Environmental Reports | 80 |
|        | 9.4.  | Litigation | 81 |
|        | 9.5.  | Material Occurrences | 81 |
|        | 9.6.  | Government Receivables | 81 |
|        | 9.7.  | Annual Financial Statements | 81 |
|        | 9.8.  | [Reserved] | 82 |
|        | 9.9.  | Monthly Financial Statements | 82 |
|        | 9.10. | Other Reports | 82 |
|        | 9.11. | Additional Information | 82 |
|        | 9.12. | Projected Operating Budget | 82 |
|        | 9.13. | Variances From Operating Budget | 82 |
|        | 9.14. | Notice of Suits, Adverse Events | 82 |
|        | 9.15. | ERISA Notices and Requests | 83 |
|        | 9.16. | Additional Documents | 83 |
|        | 9.17. | Appraisals and Field Examinations | 83 |
| X      |       | EVENTS OF DEFAULT | 84 |
|        | 10.1. | Nonpayment | 84 |
|        | 10.2. | Breach of Representation | 84 |
|        | 10.3. | Financial Information | 84 |
|        | 10.4. | Judicial Actions | 84 |
|        | 10.5. | Noncompliance | 84 |
|        | 10.6. | Judgments | 84 |
|        | 10.7. | Bankruptcy | 85 |
|        | 10.8. | Inability to Pay | 85 |
|        | 10.9. | Bankruptcy of Certain Affiliates | 85 |
|        | 10.10.| Material Adverse Effect | 85 |
|        | 10.11.| Lien Priority | 85 |
|        | 10.12.| Cross Default | 85 |
|        | 10.13.| Breach of Guaranty | 86 |
|        | 10.14.| Activities of Holdings | 86 |
|        | 10.15.| Change of Control | 86 |
|        | 10.16.| Invalidity | 86 |
|        | 10.17.| Licenses | 86 |
|        | 10.18.| Seizures | 86 |
|        | 10.19.| Operations | 86 |
|        | 10.20.| Pension Plans | 87 |
|        | 10.21.| Challenge to Court Approval of the Transactions | 87 |
| XI     |       | LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT. | 87 |
|        | 11.1. | Rights and Remedies | 87 |
|        | 11.2. | Agent's Discretion | 89 |
|        | 11.3. | Setoff | 89 |
|        | 11.4. | Rights and Remedies not Exclusive | 89 |
|        | 11.5. | Allocation of Payments After Event of Default | 89 |
| XII    |       | WAIVERS AND JUDICIAL PROCEEDINGS. | 90 |

|  | 12.1. | Waiver of Notice | 90 |
|  | 12.2. | Delay | 90 |
|  | 12.3. | Jury Waiver | 90 |
| XIII | | EFFECTIVE DATE AND TERMINATION. | 91 |
|  | 13.1. | Term | 91 |
|  | 13.2. | Termination | 91 |
| XIV | | REGARDING AGENT. | 91 |
|  | 14.1. | Appointment | 91 |
|  | 14.2. | Nature of Duties | 92 |
|  | 14.3. | Lack of Reliance on Agent and Resignation | 92 |
|  | 14.4. | Certain Rights of Agent | 93 |
|  | 14.5. | Reliance | 93 |
|  | 14.6. | Notice of Default | 93 |
|  | 14.7. | Indemnification | 93 |
|  | 14.8. | Agent in its Individual Capacity | 94 |
|  | 14.9. | Delivery of Documents | 94 |
|  | 14.10. | Borrower's Undertaking to Agent | 94 |
|  | 14.11. | No Reliance on Agent's Customer Identification Program | 94 |
|  | 14.12. | Other Agreements | 94 |
| XV | | MISCELLANEOUS | 95 |
|  | 15.1. | Governing Law | 95 |
|  | 15.2. | Entire Understanding. | 95 |
|  | 15.3. | Successors and Assigns; Participations; New Lenders. | 98 |
|  | 15.4. | Application of Payments | 100 |
|  | 15.5. | Indemnity | 100 |
|  | 15.6. | Notice | 101 |
|  | 15.7. | Survival | 103 |
|  | 15.8. | Severability | 103 |
|  | 15.9. | Expenses | 103 |
|  | 15.10. | Injunctive Relief | 103 |
|  | 15.11. | Consequential Damages | 103 |
|  | 15.12. | Captions | 103 |
|  | 15.13. | Counterparts; Facsimile Signatures | 103 |
|  | 15.14. | Construction | 104 |
|  | 15.15. | Confidentiality; Sharing Information | 104 |
|  | 15.16. | Publicity | 104 |
|  | 15.17. | Certifications From Banks and Participants; US PATRIOT Act | 104 |
|  | 15.18. | Non-Applicability of Chapter 346 | 105 |
|  | 15.19. | Borrower's Waiver of Rights Under Texas Deceptive Trade Practices Act | 105 |

Halifax Media Credit Agreement
009125.0158/537556.18

# LIST OF EXHIBITS AND SCHEDULES

Exhibits

| | |
|---|---|
| Exhibit 1.2 | Borrowing Base Certificate |
| Exhibit 2.1(a) | Revolving Credit Note |
| Exhibit 2.4(a) | Term Note |
| Exhibit 5.5(b) | Financial Projections |
| Exhibit 8.1 | Financial Condition Certificate |
| Exhibit 15.3 | Commitment Transfer Supplement |

Schedules

| | |
|---|---|
| Schedule 1.1(a) | Excluded Real Property |
| Schedule 1.1(b) | Lender's Commitments |
| Schedule 1.2 | Permitted Encumbrances |
| Schedule 4.5(a) | Equipment and Inventory Locations |
| Schedule 4.5(b) | Location of Executive Offices |
| Schedule 4.5(c) | Real Property |
| Schedule 4.15(h) | Deposit and Investment Accounts |
| Schedule 5.1 | Consents |
| Schedule 5.2(a) | States of Qualification and Good Standing |
| Schedule 5.2(b) | Subsidiaries |
| Schedule 5.4 | Federal Tax Identification Number |
| Schedule 5.6 | Prior Names |
| Schedule 5.8(b) | Litigation; Indebtedness |
| Schedule 5.8(d) | Plans |
| Schedule 5.9 | Intellectual Property, Source Code Escrow Agreements |
| Schedule 5.10 | Licenses and Permits |
| Schedule 5.14 | Labor Disputes |

# REVOLVING CREDIT, TERM LOAN
# AND
# SECURITY AGREEMENT

Revolving Credit, Term Loan and Security Agreement dated as of December 30, 2009 among Halifax Media Acquisition LLC, a limited liability company formed under the laws of the State of Delaware ("Borrower"), the financial institutions which are now or which hereafter become a party hereto (collectively, the "Lenders" and individually a "Lender") and PNC BANK, NATIONAL ASSOCIATION ("PNC"), as agent for Lenders (PNC, in such capacity, the "Agent").

IN CONSIDERATION of the mutual covenants and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Lenders and Agent hereby agree as follows:

I    DEFINITIONS.

1.1.    Accounting Terms. As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined, shall have the respective meanings given to them under GAAP; provided, however, whenever such accounting terms are used for the purposes of determining compliance with financial covenants in this Agreement, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the audited financial statements of Sellers for the fiscal year ended December 31, 2008.

1.2.    General Terms. For purposes of this Agreement the following terms shall have the following meanings:

"Accountants" shall have the meaning set forth in Section 9.7 hereof.

"Acquisition Agreement" shall mean the Asset Purchase Agreement including all exhibits and schedules thereto dated as of the Closing Date between Sellers and Borrower, as buyer.

"Advance Rates" shall mean, collectively, the Receivables Advance Rate and the Inventory Advance Rate.

"Advances" shall mean collectively, the Revolving Advances, Letters of Credit and the Term Loan.

"Affiliate" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, managing member, general partner or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote five percent (5%) or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or

(y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

"Agent" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Agreement" shall mean this Revolving Credit, Term Loan and Security Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the higher of (i) the Base Rate in effect on such day, (ii) the Federal Funds Open Rate in effect on such day plus 1/2 of 1% and (iii) the Daily LIBOR Rate plus 1%. For purposes of this definition, "Daily LIBOR Rate" shall mean, for any day, the rate per annum determined by Agent by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the Reserve Percentage. For the purposes of this definition, "Published Rate" shall mean the rate of interest published each Business Day in The Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one calendar month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the eurodollar rate for a one calendar month period as published in another publication determined by Agent).

"Anti-Terrorism Laws" shall mean any Applicable Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA PATRIOT Act, the Applicable Laws comprising or implementing the Bank Secrecy Act, and the Applicable Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Applicable Laws may from time to time be amended, renewed, extended, or replaced).

"Applicable Law" shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations, treaties, directives and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

"Approved Incentive Plan" shall have the meaning assigned to it in the definition of "Change of Control" set forth herein.

"Authority" shall have the meaning set forth in Section 4.19(d).

"Base Rate" shall mean the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate. This rate of interest is determined from time to time by PNC as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

"Blocked Accounts" shall have the meaning set forth in Section 4.15(h).

"Blocked Account Bank" shall have the meaning set forth in Section 4.15(h).

"Blocked Person" shall have the meaning set forth in Section 5.24(b) hereof.

"Borrower" shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns of such Person.

"Borrower's Account" shall have the meaning set forth in Section 2.8.

"Borrowing Base Certificate" shall mean a certificate in substantially the form of Exhibit 1.2 duly executed by the President, Chief Financial Officer, Chief Executive Officer or Controller of the Borrower and delivered to the Agent, appropriately completed, by which such officer shall certify to Agent the Formula Amount and calculation thereof as of the date of such certificate.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in East Brunswick, New Jersey and, if the applicable Business Day relates to any Eurodollar Rate Loans, such day must also be a day on which dealings are carried on in the London interbank market.

"Capital Expenditures" shall mean expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, including the total principal portion of Capitalized Lease Obligations, which, in accordance with GAAP, would be classified as capital expenditures.

"Capitalized Lease Obligation" shall mean any Indebtedness of any Borrower represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Change of Control" means (a) any (i) merger, consolidation, sale or other combination to which the Borrower or any of its Subsidiaries is a party or (ii) liquidation, winding up or dissolution of the Borrower (other than (A) those transactions permitted by, or not prohibited by, the terms of this Agreement, (B) the merger of the Borrower with an Affiliate organized solely for the purpose of reorganizing such Borrower in another jurisdiction to realize tax or other benefits and (C) those transactions expressly consented to in writing by the Required Lenders); (b) the failure of the Sponsor to maintain beneficial ownership of at least fifty-one percent (51%) of the Equity Interests of Holdings on a fully diluted basis; (c) Holdings ceases to own, directly or indirectly, and control one hundred percent (100%) of the outstanding Equity Interests of Borrower; (d) the Sponsor shall fail, directly or indirectly, to control the board of directors or manages or similar governing body of Borrower; (e) Sponsor ceases to direct or cause the direction of the management and policies of Borrower, by contract or otherwise or (f) the Chief Executive Officer of Borrower shall be replaced and/or succeeded by a Person not acceptable to Agent in its Permitted Discretion; provided, however that, notwithstanding the foregoing, a Change of Control shall not be deemed to have occurred if it occurs solely as a result of the issuances of Equity Interests to management pursuant to any equity incentive plan of Borrower

3

approved by Agent in its Permitted Discretion (in each case, an "Approved Incentive Plan") provided that (i) any Person receiving Equity Interests pursuant to an Approved Incentive Plan shall have executed a pledge agreement in favor of Agent with respect to the Equity Interests of Borrower, and (ii) the aggregate amount of such Equity Interests does not exceed ten percent (10%) of the Equity Interests of Borrower.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, Borrower or any of its Affiliates.

"Closing Date" shall mean December 30, 2009 or such other date as may be agreed to in writing by the parties hereto.

"Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Collateral" shall mean and include all assets of Borrower, whether now owned or hereafter acquired and wherever located, including, without limitation:

(a)     all Receivables;

(b)     all Equipment;

(c)     all General Intangibles;

(d)     all Inventory;

(e)     all Investment Property;

(f)     all Eligible Real Property;

(g)     all Subsidiary Stock;

(h)     all of Borrower's right, title and interest in and to, whether now owned or hereafter acquired and wherever located, (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to Borrower from any Customer relating to the Receivables; (iv) other property, including warranty claims, relating to any goods securing the Obligations; (v) all of Borrower's contract rights, rights of payment which have

4

been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money; (vi) all commercial tort claims (whether now existing or hereafter arising); (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (viii) all letter of credit rights (whether or not the respective letter of credit is evidenced by a writing); (ix) all supporting obligations; and (x) any other goods, personal property or real property now owned or hereafter acquired in which Borrower has expressly granted a security interest or may in the future grant a security interest to Agent hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and Borrower;

(i)     all of Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g) or (h) of this Paragraph; and

(j)     all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h), and (i) in whatever form, including, but not limited to:  cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

"Collateral Assignment of Acquisition Agreement" shall mean that certain Collateral Assignment of Acquisition Agreement, dated as of the Funding Date between Borrower and Agent, the terms and conditions of which shall be satisfactory to Agent in its sole discretion.

"Collateral Assignment of Escrow Agreement and Accounts" shall mean that certain Collateral Assignment of Escrow Agreement and Accounts, dated as of the Funding Date between Borrower and Agent the terms and conditions of which shall be satisfactory to Agent in its sole discretion.

"Commitment Percentage" of any Lender shall mean the sum of such Lender's Revolving Advance Commitment Percentage and Term Loan Commitment Percentage.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 15.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent by which the Purchasing Lender purchases and assumes a portion of the obligation of Lenders to make Advances under this Agreement.

"Compliance Certificate" shall mean a compliance certificate to be signed by the Chief Financial Officer, Chief Executive Officer or Controller of Borrower, which shall state that, based on an examination sufficient to permit such officer to make an informed statement, no Default or Event of Default exists, or if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrower with respect to such default and, such certificate shall have appended thereto

calculations which set forth Borrower's compliance with the requirements or restrictions imposed by Sections 6.5, 7.4, 7.5, 7.6, 7.7, 7.8, 7.10 and 7.11.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on Borrower's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement, the Other Documents, or the Acquisition Agreement, including any Consents required under all applicable federal, state or other Applicable Law.

"Consigned Inventory" shall mean Inventory of Borrower that is in the possession of another Person on a consignment, sale or return, or other basis that does not constitute a final sale and acceptance of such Inventory.

"Contract Rate" shall mean, as applicable, the Revolving Interest Rate or the Term Loan Rate.

"Controlled Group" shall mean, at any time, the Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with Borrower, are treated as a single employer under Section 414 of the Code.

"Cox Side Letter" shall mean that certain side letter between Cox Enterprises, Inc. and Borrower, dated on or about the Closing Date.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with Borrower, pursuant to which Borrower is to deliver any personal property or perform any services.

"Customs" shall have the meaning set forth in Section 2.11(b) hereof.

"Default" shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1 hereof.

"Defaulting Lender" shall have the meaning set forth in Section 2.23(a) hereof.

"Depository Accounts" shall have the meaning set forth in Section 4.15(h) hereof.

"Designated Lender" shall have the meaning set forth in Section 15.2(b) hereof.

"Documents" shall have the meaning set forth in Section 8.1(c) hereof.

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

6

"Domestic Rate Loan" shall mean any Advance that bears interest based upon the Alternate Base Rate.

"Drawing Date" shall have the meaning set forth in Section 2.12(b) hereof.

"Early Termination Date" shall have the meaning set forth in Section 13.1 hereof.

"Earnings Before Interest and Taxes" shall mean for any period the sum of (i) net income (or loss) of Borrower for such period (excluding extraordinary gains or losses, to the extent included in net income), plus (ii) all interest expense of Borrower for such period, plus (iii) all charges against income of Borrower for such period for federal, state and local taxes actually paid.

"EBITDA" shall mean for any period the sum of (i) Earnings Before Interest and Taxes for such period plus (ii) depreciation expenses for such period, plus (iii) amortization expenses for such period.

"Eligible Inventory" shall mean and include Inventory consisting solely of ink and rolled, un-printed paper, excluding work in process, printed goods, scrap materials or Inventory used for display, valued at the lower of cost or market value, determined on a last-in-first-out basis, which is not, in Agent's Permitted Discretion, obsolete, slow moving, damaged, defective or otherwise unmerchantable and which Agent, in its sole discretion, shall not deem ineligible Inventory, based on such considerations as Agent may from time to time deem appropriate including whether such Inventory is subject to a perfected, first priority security interest in favor of Agent and no other Lien (other than a Permitted Encumbrance). Without limiting Agent's discretion as provided herein, such Inventory shall not be Eligible Inventory if it (i) does not conform to all standards imposed by any Governmental Body which has regulatory authority over such goods or the use or sale thereof, (ii) is in transit, (iii) is located outside the continental United States or at a location that is not otherwise in compliance with this Agreement, (iv) constitutes Consigned Inventory, (v) is the subject of an Intellectual Property Claim; (vi) is subject to a License Agreement or other agreement that limits, conditions or restricts Borrower's or Agent's right to sell or otherwise dispose of such Inventory, unless Agent is a party to a Licensor/Agent Agreement with the Licensor under such License Agreement; (vii) is situated at a location not owned by Borrower unless the owner or occupier of such location has executed in favor of Agent a Lien Waiver Agreement or (viii) consists of paper that has been unrolled, cut, folded, bound in a manner such that removal of the paper causes damage to such paper or printed in any way.

"Eligible Real Property" shall mean all Real Property other than Excluded Real Property.

"Eligible Receivables" shall mean and include with respect to Borrower, each Receivable of Borrower (other than Eligible Unbilled Receivables) arising in the Ordinary Course of Business and which Agent, in its sole credit judgment, shall deem to be an Eligible Receivable, based on such considerations as Agent may from time to time deem appropriate. A Receivable shall not be deemed eligible unless such Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances), and is evidenced by an invoice or other documentary evidence reasonably satisfactory to Agent. In addition, no Receivable shall be an Eligible Receivable if:

7

(a)     it arises out of a sale made by Borrower to an Affiliate of Borrower or to a Person controlled by an Affiliate of Borrower;

(b)     it is due or unpaid more than (i) sixty (60) days after the original due date or (ii) ninety (90) days after the original invoice date;

(c)     twenty-five percent (25%) or more of the Receivables from such Customer are not deemed Eligible Receivables hereunder;

(d)     any covenant, representation or warranty contained in this Agreement with respect to such Receivable has been breached;

(e)     the Customer shall (i) apply for, suffer, or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or call a meeting of its creditors, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, any petition which is filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

(f)     the sale is to a Customer outside the continental United States of America, unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to Agent in its sole discretion;

(g)     the sale to the Customer is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

(h)     Agent believes, in its Permitted Discretion, that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the Customer's financial inability to pay;

(i)     the Customer is the United States of America, any state or any department, agency or instrumentality of any of them, unless the Borrower assigns its right to payment of such Receivable to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sub-Section 3727 et seq. and 41 U.S.C. Sub-Section 15 et seq.) or has otherwise complied with other applicable statutes or ordinances;

(j)     the goods giving rise to such Receivable have not been delivered to and accepted by the Customer or the services giving rise to such Receivable have not been performed by Borrower and accepted by the Customer or the Receivable otherwise does not represent a final sale;

8

(k)     the Receivables of the Customer exceed a credit limit determined by Agent, in its Permitted Discretion, to the extent such Receivable exceeds such limit;

(l)     the Receivable is subject to any offset, deduction, deferred revenue, defense, dispute, or counterclaim, the Customer is also a creditor or supplier of Borrower or the Receivable is contingent in any respect or for any reason;

(m)    Borrower has made any agreement with any Customer for any deduction therefrom, to the extent of the reduction, except for discounts or allowances made in the Ordinary Course of Business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(n)     any return, rejection or repossession of the merchandise has occurred or the rendition of services has been disputed;

(o)     such Receivable is not payable to Borrower;

(p)     such Receivable arises out of a sale of anything other than advertising in publications printed by Borrower, such as any subscription, circulation or other sale of any such publication, to the extent the aggregate amount of Receivables exceeds the Subscription Receivables Sublimit; or

(q)     such Receivable is not otherwise satisfactory to Agent as determined reasonably in good faith by Agent in the exercise of its discretion in a reasonable manner.

"Eligible Receivables Advance Rate" shall have the meaning set forth in Section 2.1(a)(i) hereof.

"Eligible Unbilled Receivables" shall mean and include with respect to Borrower, that portion of each Phonebook Receivable of Borrower (i) representing services previously performed by Borrower and accepted by the Customer, (ii) which in accordance with Borrower's written agreement with the Customer, has not yet been fully invoiced and billed to the Customer and (iii) which would otherwise constitute an Eligible Receivable but for the fact that the full amount of such Receivable has not been invoiced and billed to the Customer. A Phonebook Receivable shall not be deemed an Eligible Unbilled Receivable unless such Phonebook Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances), and is evidenced by documentation satisfactory to Agent. In addition, no Phonebook Receivable shall be an Eligible Unbilled Receivable if:

(a)     any billed portion of such Phonebook Receivable is due or unpaid more than (i) thirty (30) days after the original due date or (ii) sixty (60) days after the original invoice date;

(b)     any portion of such Phonebook Receivable has not been invoiced and billed to the Customer on a timely basis, as and when contemplated in accordance with Borrower's written Agreement with the Customer;

(c)     the written agreement between Borrower and Customer in respect of such Phonebook Receivable provides for payments less frequently than monthly or in amounts less than one-twelfth of the original total amount of such Phonebook Receivable or otherwise does not require the payment in full of such Phonebook Receivable within one (1) year from the date of such agreement; or

(d)     with respect to any Phonebook Receivable generated after the Closing Date, Agent shall not have received, upon request, a true, correct and complete copy of the written agreement between Borrower and Customer in respect thereof upon Agent's request, or such agreement shall fail to include a statement that upon the Customer's failure to timely pay Borrower any amounts due under such written agreement, Borrower may automatically accelerate all amounts outstanding thereunder.

"Eligible Unbilled Receivable Advance Rate" shall have the meaning set forth in Section 2.1(a)(ii) hereof.

"Environmental Complaint" shall have the meaning set forth in Section 4.19(d) hereof.

"Environmental Laws" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include all of Borrower's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including all equipment, machinery, apparatus, motor vehicles, fittings, furniture, furnishings, fixtures, parts, accessories and all replacements and substitutions therefor or accessions thereto.

"Equity Interests" of any Person shall mean any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"Eurodollar Rate" shall mean for any Eurodollar Rate Loan for the then current Interest Period relating thereto the interest rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) determined by Agent by dividing (i) the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which US dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by Agent which has been approved by the British Bankers' Association as an authorized information vendor for the purpose of displaying rates at which US

10

dollar deposits are offered by leading banks in the London interbank deposit market (an "Alternative Source"), at approximately 11:00 a.m., London time two (2) Business Days prior to the first day of such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any Alternate Source, a comparable replacement rate determined by the Agent at such time (which determination shall be conclusive absent manifest error)) for an amount comparable to such Eurodollar Rate Loan and having a borrowing date and a maturity comparable to such Interest Period by (ii) a number equal to 1.00 minus the Reserve Percentage; provided, however, that, notwithstanding anything to the contrary contained herein, for purposes of this Agreement and Eurodollar Rate Loans, at no time shall the Eurodollar Rate be less than one and one-half percent (1.50%) per annum. The Eurodollar Rate shall be adjusted with respect to any Eurodollar Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date. The Agent shall give prompt notice to Borrower of the Eurodollar Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

"Eurodollar Rate Loan" shall mean an Advance at any time that bears interest based on the Eurodollar Rate.

"Event of Default" shall have the meaning set forth in Article X hereof.

"Excess Cash Flow" for any fiscal period shall mean EBITDA of Borrower for such fiscal period minus Unfinanced Capital Expenditures made by Borrower during such fiscal period, minus mandatory prepayments paid in cash during such fiscal period pursuant to Section 2.21(a) hereof, minus scheduled principal payments paid in cash in respect of the Term Loan by Borrower, minus interest payments paid in cash in respect of the Advances, minus distributions made by Borrower in cash to holders of Equity Interests of Borrower in respect of the Increased Tax Burden during such fiscal period, plus decreases in working capital of Borrower for such fiscal period, minus increases in working capital of Borrower for such fiscal period.

"Excluded Real Property" shall mean each Real Property identified on Schedule 1.1(a) hereof.

"Exchange Act" shall have the mean the Securities Exchange Act of 1934, as amended.

"Executive Order No. 13224" shall mean the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Federal Funds Effective Rate" for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does

not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

"Federal Funds Open Rate" for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by PNC (an "Alternate Source") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Alternate Source, a comparable replacement rate determined by the PNC at such time (which determination shall be conclusive absent manifest error); provided however, that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day. If and when the Federal Funds Open Rate changes, the rate of interest with respect to any advance to which the Federal Funds Open Rate applies will change automatically without notice to the Borrower, effective on the date of any such change.

"Fixed Charge Coverage Ratio" shall mean and include, with respect to any fiscal period, the ratio of (a) EBITDA (excluding extraordinary gains or losses), *minus* Unfinanced Capital Expenditures made during such period, *minus* distributions paid in cash to holders of Equity Interests in respect of the Increased Tax Burden paid during such period to (b) all Senior Debt Payments made during such period.

"Foreign Subsidiary" of any Person, shall mean any Subsidiary of such Person that is not organized or incorporated in the United States or any State or territory thereof.

"Formula Amount" shall have the meaning set forth in Section 2.1(a).

"Funding Date" shall mean the date upon which all of the conditions set forth in the Prefunding Letter and in Section 8.01 hereof are satisfied.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" shall mean and include all of Borrower's general intangibles, whether now owned or hereafter acquired, including all payment intangibles, all choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control procedures, trademarks, trademark applications, service marks, service mark applications, domain names, domain name applications, trade names, trade name applications, trade secrets, goodwill, copyrights, design rights, software, computer information, source codes, codes, records and updates, registrations, licenses, franchises, customer lists, tax refunds, tax refund claims, computer programs, all claims under guaranties, security interests or other security held by or granted to Borrower to secure payment of any of the Receivables by a Customer (other than to

12

the extent covered by Receivables) all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governmental Acts" shall have the meaning set forth in Section 2.17.

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity, authority, agency, division or department exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Guarantor" shall mean collectively (i) Holdings and all future direct or indirect Subsidiaries or parent companies of Borrower (other than another Borrower) and (ii) any other Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations and "Guarantors" means collectively all such Persons.

"Guarantor Security Agreement" shall mean any Security Agreement executed by any Guarantor in favor of Agent securing the Guaranty of such Guarantor, in form and substance satisfactory to the Agent.

"Guaranty" shall mean collectively (i) that certain Guaranty executed on the Funding Date by Holdings, as Guarantor in favor of Agent and (ii) any other guaranty of the obligations of Borrower executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders, in form and substance satisfactory to the Agent.

"Hazardous Discharge" shall have the meaning set forth in Section 4.19(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"Hedge Liabilities" shall have the meaning provided in the definition of "Lender-Provided Interest Rate Hedge".

"Holdings" shall mean Halifax Media Holdings LLC, a Delaware limited liability company.

"Increased Tax Burden" shall mean the additional federal, state or local taxes assumed to be payable by a member of Borrower or a member of Holdings as a result of Borrower's status as a limited liability company as evidenced and substantiated by (and adjusted, if and to the extent required by Section 7.7 hereof, based upon) the tax returns filed by Borrower or Holdings as a

limited liability company (and after giving effect to any deductions generated at the Borrower) and without reference to the tax returns filed by such member, with such taxes being calculated for all members at the highest marginal rate applicable to any member.

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities (except capital stock and surplus earned or otherwise) and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Ineligible Security" shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

"Intellectual Property" shall mean property constituting under any Applicable Law a patent, patent application, copyright, trademark, trademark application, service mark, trade name, trade name application, domain name, domain name application, mask work, trade secret or license or other right to use any of the foregoing.

"Intellectual Property Claim" shall mean the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that Borrower's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

"Intellectual Property Security Agreement" shall mean that certain Intellectual Property Security Agreement, dated as of the Funding Date between Borrower and Agent, the terms and conditions of which shall be satisfactory to Agent in its sole discretion.

"Interest Period" shall mean the period provided for any Eurodollar Rate Loan pursuant to Section 2.2(b).

"Interest Rate Hedge" shall mean an interest rate exchange, collar, cap, swap, adjustable strike cap, adjustable strike corridor or similar agreements entered into by Borrower or its Subsidiaries in order to provide protection to, or minimize the impact upon, Borrower, any Guarantor and/or their respective Subsidiaries of increasing floating rates of interest applicable to Indebtedness.

"Inventory" shall mean and include all of Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in

14

process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them.

"Inventory Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(iii) hereof.

"Investment Property" shall mean and include as to Borrower, all of Borrower's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts.

"Issuer" shall mean any Person who issues a Letter of Credit and/or accepts a draft pursuant to the terms hereof.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender.

"Lender-Provided Interest Rate Hedge" shall mean an Interest Rate Hedge which is provided by any Lender and with respect to which the Agent confirms meets the following requirements: such Interest Rate Hedge (i) is documented in a standard International Swap Dealer Association Agreement, (ii) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner, and (iii) is entered into for hedging (rather than speculative) purposes. The liabilities of Borrower to the provider of any Lender-Provided Interest Rate Hedge (the "Hedge Liabilities") shall be "Obligations" hereunder, guaranteed obligations under any Guaranty and secured obligations under any Guarantor Security Agreement and otherwise treated as Obligations for purposes of each of the Other Documents. The Liens securing the Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2.

"Letter of Credit Borrowing" shall have the meaning set forth in Section 2.12(d).

"Letter of Credit Sublimit" shall mean $500,000.

"Letters of Credit" shall have the meaning set forth in Section 2.9.

"License Agreement" shall mean any agreement between Borrower and a Licensor pursuant to which Borrower is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of Borrower or otherwise in connection with Borrower's business operations.

"Licensor" shall mean any Person from whom Borrower obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with Borrower's

manufacture, marketing, sale or other distribution of any Inventory or otherwise in connection with Borrower's business operations.

"Licensor/Agent Agreement" shall mean an agreement between Agent and a Licensor, in form and content satisfactory to Agent, by which Agent is given the unqualified right, vis-a-vis such Licensor, to enforce Agent's Liens with respect to and to dispose of Borrower's Inventory with the benefit of any Intellectual Property applicable thereto, irrespective of Borrower's default under any License Agreement with such Licensor.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Waiver Agreement" shall mean an agreement which is executed in favor of Agent by a Person who owns or occupies premises at which any Collateral may be located from time to time and by which such Person shall waive any Lien that such Person may ever have with respect to any of the Collateral and shall, among other things, authorize Agent from time to time to enter upon the premises to inspect or remove the Collateral from such premises or to use such premises to store or dispose of such Inventory and which agreement shall be in form and substance satisfactory to Agent in its sole discretion.

"Material Adverse Effect" shall mean a material adverse effect on (A) for periods prior to the Closing Date, (i) the condition (financial or otherwise), results of operations, assets, business, properties to be acquired by Borrower or any Guarantor pursuant to the transactions contemplated by the Acquisition Agreement or (ii) the value of the Collateral to be acquired by Borrower or any Guarantor pursuant to the transactions contemplated by the Acquisition Agreement and (B) thereafter, (i) the condition (financial or otherwise), results of operations, assets, business, properties to be acquired by Borrower or any Guarantor pursuant to the transactions contemplated by the Acquisition Agreement, (ii) the value of the Collateral to be acquired by Borrower pursuant to the transactions contemplated by the Acquisition Agreement, Borrower's ability to duly and punctually pay or perform the Obligations in accordance with the terms thereof, (iii) the value of the Collateral, or Agent's Liens on the Collateral or the priority of any such Lien or (iv) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents.

"Maximum Face Amount" shall mean, with respect to any outstanding Letter of Credit, the face amount of such Letter of Credit including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Maximum Loan Amount" shall mean $14,694,600 less repayments of the Term Loan.

"Maximum Revolving Advance Amount" shall mean $8,000,000.

"Maximum Undrawn Amount" shall mean with respect to any outstanding Letter of Credit, the amount of such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Modified Commitment Transfer Supplement" shall have the meaning set forth in Section 15.3(d).

"Mortgages" shall mean collectively, each of the mortgages on the Eligible Real Property securing the Obligations, in each case, together with all extensions, renewals, amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Mortgage Reserve" shall mean an amount equal to the sum of six (6) regularly scheduled monthly payments of principal in respect of the Term Loan pursuant to Section 2.4 hereof; provided, however, that such amount shall be reduced to an amount equal to the sum of three (3) regularly scheduled monthly payments of principal in respect of the Term Loan pursuant to Section 2.4 hereof at such time as (a) the unpaid principal amount of the Term Loan is less than (i) $5,000,000 and (ii) fifty percent (50%) of the appraised fair market value of the Collateral constituting Eligible Real Property, based on the most recent appraisal accepted by Agent. "Multiemployer Plan" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Multiple Employer Plan" shall mean a Plan which has two or more contributing sponsors (including Borrower or any member of the Controlled Group) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Naming Rights" shall mean collectively, all of the naming rights and other general intangibles granted to Borrower by virtue of the Acquisition Agreement and that certain Naming Agreement between the New-Journal Center and the Lively Arts Center, Inc., dated as of January 1, 2004, as the same may be amended, restated, extended, supplemented or otherwise modified from time to time.

"Negative Pledge" shall mean that certain Negative Pledge, dated as of the Funding Date, executed by Borrower in favor of Agent with respect to all Real Property Owned by Borrower and not constituting Eligible Real Property, in form and substance satisfactory to Agent.

"Note" shall mean each of the Term Note and the Revolving Credit Note and "Notes" shall mean collectively, the Term Note and the Revolving Credit Note, each as amended, restated, extended, supplemented or otherwise modified from time to time.

"Obligations" shall mean and include any and all loans, advances, debts, liabilities, obligations, covenants and duties owing by Borrower to Lenders or Agent or to any other direct or indirect subsidiary or affiliate of Agent or any Lender of any kind or nature, present or future (including any interest or other amounts accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to Borrower, whether or not a claim for post-filing or post-petition interest or other amounts is allowed in such proceeding), whether or not evidenced by any note, guaranty or

17

EXECUTION VERSION

other instrument, whether arising under any agreement, instrument or document, (including this Agreement and the Other Documents) whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, under any interest or currency swap, future, option or other similar agreement, or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Agent's or any Lenders non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, including, but not limited to, any and all of Borrower's Indebtedness and/or liabilities under this Agreement, the Other Documents or under any other agreement between Agent or Lenders and Borrower and any amendments, extensions, renewals or increases and all costs and expenses of Agent and any Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to reasonable attorneys' fees and expenses and all obligations of Borrower to Agent or Lenders to perform acts or refrain from taking any action.

"Order" shall mean any order, judgment or decree of any court issued under or in connection with the proceedings captioned Cox Enterprises, Inc. vs. News-Journal Corporation, *et al.* that authorizes, approves or otherwise affects the transactions contemplated by the Acquisition Agreement or the distribution of any amounts paid thereunder.

"Ordinary Course of Business" shall mean with respect to Borrower, the ordinary course of such Borrower's business as conducted on the Funding Date.

"Other Documents" shall mean any Mortgage, the Notes, the Questionnaire, the Collateral Assignment of Acquisition Agreement, the Collateral Assignment of Escrow Agreement and Accounts, the Pledge Agreements, the Negative Pledge, the Intellectual Property Security Agreement, any Guaranty, any Guarantor Security Agreement, any Lender-Provided Interest Rate Hedge and any and all other agreements, instruments and documents, including guaranties, pledges, powers of attorney, consents, interest or currency swap agreements or other similar agreements and all other writings heretofore, now or hereafter executed by Borrower or any Guarantor and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement.

"Out-of-Formula Loans" shall have the meaning set forth in Section 15.2(b).

"Parent" of any Person shall mean a corporation or other entity owning, directly or indirectly at least 50% of the shares of stock or other ownership interests having ordinary voting power to elect a majority of the directors of the Person, or other Persons performing similar functions for any such Person.

Halifax Media Credit Agreement
009125.0158/537556.18

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender.

"Participation Advance" shall have the meaning set forth in Section 2.12(d).

"Participation Commitment" shall mean each Lender's obligation to buy a participation of the Letters of Credit issued hereunder.

"Payee" shall have the meaning set forth in Section 3.10.

"Payment Office" shall mean initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

"Pension Benefit Plan" shall mean at any time any employee pension benefit plan (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code and either (i) is maintained by any member of the Controlled Group for employees of any member of the Controlled Group; or (ii) has at any time within the preceding five years been maintained by any entity which was at such time a member of the Controlled Group for employees of any entity which was at such time a member of the Controlled Group.

"Permitted Discretion" shall mean, with respect to any Person, a determination or judgment made by such Person in the exercise of reasonable (in the business of secured asset based lending) credit or business judgment and in good faith.

"Permitted Encumbrances" shall mean:

(a)     Liens in favor of Agent for the benefit of Agent and Lenders;

(b)     Liens for taxes, assessments or other governmental charges not delinquent or being Properly Contested;

(c)     Liens disclosed in the financial statements referred to in Section 5.5, the existence of which Agent has consented to in writing;

(d)     deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance;

(e)     deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business;

(f)     Liens arising by virtue of the rendition, entry or issuance against Borrower or any Subsidiary, or any property of Borrower or any Subsidiary, of any judgment, writ, order, or decree for so long as each such Lien (x) is in existence for less than twenty (20) consecutive days after it first arises or is being Properly Contested and (y) is at all times junior in priority to any Liens in favor of Agent;

(g)     mechanics', workers', materialmen's or other like Liens arising in the Ordinary Course of Business with respect to obligations which are not due or which are being Properly Contested;

(h)     Liens placed upon fixed assets hereafter acquired to secure a portion of the purchase price thereof, provided that (x) any such lien shall not encumber any other property of Borrower and (y) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 7.6; and

(j)     Liens disclosed on Schedule 1.2; provided that such Liens shall secure only those obligations which they secure on the Funding Date and shall not subsequently apply to any other property or assets of Borrower.

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Phonebook Receivable" shall mean and include with respect to Borrower, each Receivable of Borrower arising out of the sale in the Ordinary Course of Business of advertisements in the St. Augustine Phonebook and Volusia and Flagler Counties Phonebook, in each case, published and distributed semi-annually by Borrower.

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Benefit Plan), maintained for employees of Borrower or any member of the Controlled Group or any such Plan to which Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Pledge Agreements" shall mean collectively (i) that certain Pledge Agreement entered into by Holdings on or about the Funding Date in favor of Agent with respect to the Equity Interests of Borrower, (ii) that certain Pledge Agreement entered into by Borrower on the Funding Date in favor of Agent with respect to the Equity Interests of its subsidiaries and (iii) any other pledge agreement executed in favor of Agent after the Funding Date, in each case, in form and substance satisfactory to Agent in its sole discretion.

"Pre-Funding Letter" shall mean that certain letter agreement dated as of the Closing Date between Borrower and Agent, the form and substance of which shall be satisfactory to Agent in its sole discretion.

20

"PNC" shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

"Pro Forma Balance Sheet" shall have the meaning set forth in Section 5.5(a) hereof.

"Pro Forma Financial Statements" shall have the meaning set forth in Section 5.5(b) hereof.

"Properly Contested" shall mean, in the case of any Indebtedness or Lien, as applicable, of any Person (including any taxes) that is not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Indebtedness or Lien, as applicable, is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Person has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in the forfeiture of any assets of such Person; (iv) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if such Indebtedness or Lien, as applicable, results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Person, such Person forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"Projections" shall have the meaning set forth in Section 5.5(b) hereof.

"Purchasing CLO" shall have the meaning set forth in Section 15.3(d) hereof.

"Purchasing Lender" shall have the meaning set forth in Section 15.3(c) hereof.

"Questionnaire" shall mean that certain Questionnaire and Perfection Certificate and the responses thereto provided by Borrowing Agent and delivered to Agent, and all amendments, supplements and modifications to the foregoing.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of Borrower's right, title and interest in and to the owned and leased premises identified on Schedule 4.5(c) hereto or which is hereafter owned or leased by Borrower.

"Receivables" shall mean and include, as to Borrower, all of Borrower's accounts, contract rights, instruments (including those evidencing indebtedness owed to Borrower by its Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles

21

relating to accounts, drafts and acceptances, credit card receivables and all other forms of obligations owing to Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Receivables Advance Rates" shall have the meaning set forth in Section 2.1(a)(y)(iii) hereof.

"Register" shall have the meaning set forth in Section 15.3(e).

"Reimbursement Obligation" shall have the meaning set forth in Section 2.12(b)hereof.

"Release" shall have the meaning set forth in Section 5.7(c)(i) hereof.

"Reportable Event" shall mean a reportable event described in Section 4043(c) of ERISA or the regulations promulgated thereunder.

"Required Lenders" shall mean Lenders holding at least fifty-one percent (51%) of the Advances and, if no Advances are outstanding, shall mean Lenders holding at least fifty-one percent (51%) of the Commitment Percentages; provided, however, if there are fewer than three (3) Lenders, Required Lenders shall mean all Lenders.

"Reserve Percentage" shall mean as of any day the maximum percentage in effect on such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities").

"Revolving Advances" shall mean Advances made other than Letters of Credit and the Term Loan.

"Revolving Advance Commitment Percentage" of any Lender shall mean the applicable percentage set forth opposite such Lender's name on the Schedule 1.1(b) as to the Revolving Advances, and, as the same may be adjusted upon any assignment by a Lender pursuant to Section 15.3(c) or Section 15.3(d) hereof.

"Revolving Credit Note" shall mean the promissory note referred to in Section 2.1(a) hereof.

"Revolving Interest Rate" shall mean an interest rate per annum equal to (a) the sum of the Alternate Base Rate plus two percent (2%) with respect to Domestic Rate Loans and (b) the sum of the Eurodollar Rate plus three percent (3%) with respect to Eurodollar Rate Loans.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Section 20 Subsidiary" shall mean the Subsidiary of the bank holding company controlling PNC, which Subsidiary has been granted authority by the Federal Reserve Board to underwrite and deal in certain Ineligible Securities.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Sellers" shall mean collectively, News-Journal Corporation and Volusia Pennysaver, Inc.

"Senior Debt Payments" shall mean and include all cash actually expended by Borrower to make (a) interest payments on any Advances hereunder, plus (b) scheduled principal payments on the Term Loan, plus (c) payments for all fees, commissions and charges set forth herein and with respect to any Advances, plus (d) capitalized lease payments, plus (e) payments with respect to any other Indebtedness for borrowed money.

"Settlement Date" shall mean the Funding Date and thereafter Wednesday or Thursday of each week or more frequently if Agent deems appropriate unless such day is not a Business Day in which case it shall be the next succeeding Business Day.

"Sponsor" shall mean any one or more of Warren A. Stephens, members of the family of Warren A. Stephens, entities controlled by Warren A. Stephens and trusts for the benefit of any of the foregoing individuals. For purposes of this definition, "controlled by" shall mean the power, direct or indirect (x) to vote 50% or more of the Equity Interests having ordinary voting power for the election of directors (or the individuals performing similar functions) of Borrower or (y) to direct or cause the direction of the management and policies of Borrower, by contract or otherwise.

"Subscription Receivables Sublimit" shall mean $100,000.

"Subsidiary" of any Person shall mean a corporation or other entity of whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"Subsidiary Stock" shall mean all of the issued and outstanding Equity Interests of any Subsidiary owned by Borrower (not to exceed 65% of the Equity Interests of any Foreign Subsidiary).

"Tangible Net Worth" shall mean, at a particular date, (a) the aggregate amount of all assets of Borrower as may be properly classified as such in accordance with GAAP consistently applied excluding such other assets as are properly classified as intangible assets under GAAP, less (b) the aggregate amount of all liabilities of Borrower.

"Term" shall have the meaning set forth in Section 13.1 hereof.

"Term Loan" shall mean the Advances made pursuant to Section 2.4 hereof.

23

"Term Loan Commitment Percentage" of any Lender shall mean the applicable percentage set forth opposite such Lender's name on Schedule 1.1(b) as to the Term Loan and, as the same may be adjusted upon any assignment by a Lender pursuant to Sections 15.3(c) or Section 15.3(d) hereof.

"Term Loan Rate" shall mean an interest rate per annum equal to (a) the sum of the Alternate Base Rate plus three and three-quarters percent (3.75%) with respect to Domestic Rate Loans and (b) the sum of the Eurodollar Rate plus four and three-quarters percent (4.75%) with respect to Eurodollar Rate Loans.

"Term Note" shall mean, the promissory note described in Section 2.4 hereof.

"Termination Event" shall mean (i) a Reportable Event with respect to any Plan or Multiemployer Plan; (ii) the withdrawal of Borrower or any member of the Controlled Group from a Plan or Multiemployer Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iii) the providing of notice of intent to terminate a Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan; (v) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vi) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA, of Borrower or any member of the Controlled Group from a Multiemployer Plan.

"Texas Finance Code" shall have the meaning set forth in Section 3.6 hereof.

"Toxic Substance" shall mean and include any material present on the Real Property which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Trading with the Enemy Act" shall mean the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any enabling legislation or executive order relating thereto.

"Transactions" shall have the meaning set forth in Section 5.5 hereof.

"Transferee" shall have the meaning set forth in Section 15.3(d) hereof.

"Undrawn Availability" at a particular date shall mean an amount equal to (a) the lesser of (i) the Formula Amount or (ii) the Maximum Revolving Advance Amount, minus (b) the sum of (i) the outstanding amount of Advances (other than the Term Loan) plus (ii) all amounts due and owing to Borrower's trade creditors which are sixty (60) days past the original due date, plus (iii) fees and expenses for which Borrower is liable but which have not been paid or charged to Borrower's Account.

"Unfinanced Capital Expenditures" shall mean all Capital Expenditures of Borrower other than those made utilizing financing provided by the applicable seller or third party lenders. For the avoidance of doubt, Capital Expenditures made by Borrower utilizing Revolving Advances shall be deemed Unfinanced Capital Expenditures.

"Uniform Commercial Code" shall have the meaning set forth in Section 1.3 hereof.

"USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Week" shall mean the time period commencing with the opening of business on a Wednesday and ending on the end of business the following Tuesday.

"Yonge Street Property" shall mean that certain Excluded Real Property located at 454 South Yonge Street, Ormond Beach, Florida 32174.

1.3.    Uniform Commercial Code Terms.  All terms used herein and defined in the Uniform Commercial Code as adopted in the State of Texas from time to time (the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein. Without limiting the foregoing, the terms "accounts", "chattel paper", "commercial tort claims", "instruments", "general intangibles", "goods", "payment intangibles", "proceeds", "supporting obligations", "securities", "investment property", "documents", "deposit accounts", "software", "letter of credit rights", "inventory", "equipment" and "fixtures", as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code.  To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4.    Certain Matters of Construction.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.  Any pronoun used shall be deemed to cover all genders.  Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.  All references herein to the time of day shall mean the time in Dallas, Texas. Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a last-in, first-out basis.  Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation".  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in

the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders. Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders. Wherever the phrase "to the best of Borrower's knowledge" or words of similar import relating to the knowledge or the awareness of Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of Borrower or (ii) the knowledge that a senior officer would have obtained if he had engaged in good faith and diligent performance of his duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of Borrower or Seller and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

II     ADVANCES; PAYMENTS.

    2.1.    Revolving Advances.

        (a)    Amount of Revolving Advances. Subject to the terms and conditions set forth in this Agreement including Section 2.1(b), each Lender, severally and not jointly, will make Revolving Advances to Borrower in aggregate amounts outstanding at any time equal to such Lender's Revolving Advance Commitment Percentage of the lesser of (x) the Maximum Revolving Advance Amount, less the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit or (y) an amount equal to the sum of:

            (i)    up to eighty-five percent (85%), subject to the provisions of Section 2.1(b) hereof of Eligible Receivables ("Eligible Receivables Advance Rate"), plus

            (ii)    the lesser of (A) $2,0000,000 or (B) up to 50%, subject to the provisions of Section 2.1(b) hereof, of Eligible Unbilled Receivables (the "Eligible Unbilled Receivables Advance Rate" and together with the Eligible Receivables Advance Rate, collectively, the "Receivables Advance Rates").

            (iii)    up to the lesser of (A) $2,000,000 in the aggregate at any one time or (B) the lesser of (x) sixty-five percent (65%), subject to the provisions of Section 2.1(b) hereof, of the cost of the Eligible Inventory (based on an invoice or other statement approved by

Agent in its sole discretion, but excluding sales taxes and other soft costs) or (y) eighty-five percent (85%), subject to the provisions of Section 2.1(b) hereof, of the appraised net orderly liquidation value of Eligible Inventory (as evidenced by an Inventory appraisal satisfactory to Agent in its Permitted Discretion) (the "Inventory Advance Rate" and together with the Receivables Advance Rates, collectively, the "Advance Rates"), minus

(iv)    the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit, minus

(v)    the Mortgage Reserve, minus

(vi)    such reserves as Agent may, in its Permitted Discretion, deem proper and necessary from time to time.

The amount derived from the sum of (x) Sections 2.1(a)(y)(i), (ii) and (iii) minus (y) Sections 2.1 (a)(y)(v) and (vi) at any time and from time to time shall be referred to as the "Formula Amount". The Revolving Advances shall be evidenced by one or more secured promissory notes (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "Revolving Credit Note") substantially in the form attached hereto as Exhibit 2.1(a).

(b)    Discretionary Rights. The Advance Rates may be increased or decreased by Agent at any time and from time to time in the exercise of its reasonable discretion. Borrower consents to any such increases or decreases and acknowledges that decreasing the Advance Rates or increasing or imposing reserves may limit or restrict Advances requested by Borrowing Agent. The rights of Agent under this subsection are subject to the provisions of Section 15.2(b).

2.2.    Procedure for Revolving Advances Borrowing.

(a)    Borrower may notify Agent prior to 10:00 a.m. on a Business Day of Borrower's request to incur, on that day, a Revolving Advance hereunder. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or Lenders, or with respect to any other Obligation, become due, same shall be deemed a request for a Revolving Advance maintained as a Domestic Rate Loan as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any other agreement with Agent or Lenders, and such request shall be irrevocable.

(b)    Notwithstanding the provisions of subsection (a) above, in the event Borrower desires to obtain a Eurodollar Rate Loan, Borrower shall give Agent written notice by no later than 10:00 a.m. on the day which is three (3) Business Days prior to the date such Eurodollar Rate Loan is to be borrowed, specifying (i) the date of the proposed borrowing (which shall be a Business Day), (ii) the type of borrowing and the amount on the date of such Advance to be borrowed, which amount shall be in an aggregate principal amount that is not less than $500,000 and integral multiples of $200,000 in excess thereof, and (iii) the duration of the first Interest Period therefor. Interest Periods for Eurodollar Rate Loans shall be for one, two, three; provided, if an Interest Period would end on a day that is not a Business Day, it shall end

on the next succeeding Business Day unless such day falls in the next succeeding calendar month in which case the Interest Period shall end on the next preceding Business Day. No Eurodollar Rate Loan shall be made available to Borrower during the continuance of a Default or an Event of Default. After giving effect to each requested Eurodollar Rate Loan, including those which are converted from a Domestic Rate Loan under Section 2.2(d), there shall not be outstanding more than four (4) Eurodollar Rate Loans, in the aggregate.

(c)     Each Interest Period of a Eurodollar Rate Loan shall commence on the date such Eurodollar Rate Loan is made and shall end on such date as Borrower may elect as set forth in subsection (b)(iii) above provided that the exact length of each Interest Period shall be determined in accordance with the practice of the interbank market for offshore Dollar deposits and no Interest Period shall end after the last day of the Term.

Borrower shall elect the initial Interest Period applicable to a Eurodollar Rate Loan by its notice of borrowing given to Agent pursuant to Section 2.2(b) or by its notice of conversion given to Agent pursuant to Section 2.2(d), as the case may be. Borrower shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 10:00 a.m. on the day which is three (3) Business Days prior to the last day of the then current Interest Period applicable to such Eurodollar Rate Loan. If Agent does not receive timely notice of the Interest Period elected by Borrower, Borrower shall be deemed to have elected to convert to a Domestic Rate Loan subject to Section 2.2(d) hereinbelow.

(d)     Provided that no Default or Event of Default shall have occurred and be continuing, Borrower may, on the last Business Day of the then current Interest Period applicable to any outstanding Eurodollar Rate Loan, or on any Business Day with respect to Domestic Rate Loans, convert any such loan into a loan of another type in the same aggregate principal amount provided that any conversion of a Eurodollar Rate Loan shall be made only on the last Business Day of the then current Interest Period applicable to such Eurodollar Rate Loan. If Borrower desires to convert a loan, Borrower shall give Agent written notice by no later than 10:00 a.m. (i) on the day which is three (3) Business Days' prior to the date on which such conversion is to occur with respect to a conversion from a Domestic Rate Loan to a Eurodollar Rate Loan, or (ii) on the day which is one (1) Business Day prior to the date on which such conversion is to occur with respect to a conversion from a Eurodollar Rate Loan to a Domestic Rate Loan, specifying, in each case, the date of such conversion, the loans to be converted and if the conversion is from a Domestic Rate Loan to any other type of loan, the duration of the first Interest Period therefor.

(e)     At its option and upon written notice given prior to 9:00 a.m. (Dallas, Texas time) at least three (3) Business Days' prior to the date of such prepayment, Borrower may prepay the Eurodollar Rate Loans in whole at any time or in part from time to time with accrued interest on the principal being prepaid to the date of such repayment. Borrower shall specify the date of prepayment of Advances which are Eurodollar Rate Loans and the amount of such prepayment. In the event that any prepayment of a Eurodollar Rate Loan is required or permitted on a date other than the last Business Day of the then current Interest Period with respect thereto, Borrower shall indemnify Agent and Lenders therefor in accordance with Section 2.2(f) hereof.

(f)    Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by Borrower in the payment of the principal of or interest on any Eurodollar Rate Loan or failure by Borrower to complete a borrowing of, a prepayment of or conversion of or to a Eurodollar Rate Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its Eurodollar Rate Loans hereunder. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Borrower shall be conclusive absent manifest error.

(g)    Notwithstanding any other provision hereof, if any Applicable Law, or any change therein or in the interpretation or application thereof, shall make it unlawful for any Lender (for purposes of this subsection (g), the term "Lender" shall include any Lender and the office or branch where any Lender or any corporation or bank controlling such Lender makes or maintains any Eurodollar Rate Loans) to make or maintain its Eurodollar Rate Loans, the obligation of Lenders to make Eurodollar Rate Loans hereunder shall forthwith be cancelled and Borrower shall, if any affected Eurodollar Rate Loans are then outstanding, promptly upon request from Agent, either pay all such affected Eurodollar Rate Loans or convert such affected Eurodollar Rate Loans into loans of another type. If any such payment or conversion of any Eurodollar Rate Loan is made on a day that is not the last day of the Interest Period applicable to such Eurodollar Rate Loan, Borrower shall pay Agent, upon Agent's request, such amount or amounts as may be necessary to compensate Lenders for any loss or expense sustained or incurred by Lenders in respect of such Eurodollar Rate Loan as a result of such payment or conversion, including (but not limited to) any interest or other amounts payable by Lenders to lenders of funds obtained by Lenders in order to make or maintain such Eurodollar Rate Loan. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Lenders to Borrower shall be conclusive absent manifest error.

2.3.    <u>Disbursement of Advance Proceeds</u>. All Advances shall be disbursed from whichever office or other place place Agent may designate from time to time and, together with any and all other Obligations of Borrower to Agent or Lenders, shall be charged to Borrower's Account on Agent's books. During the Term, Borrower may use the Revolving Advances by borrowing, prepaying and reborrowing, all in accordance with the terms and conditions hereof. The proceeds of each Revolving Advance requested by Borrower or deemed to have been requested by Borrower under <u>Section 2.2(a)</u> hereof shall, with respect to requested Revolving Advances to the extent Lenders make such Revolving Advances, be made available to Borrower on the day so requested by way of credit to Borrower's operating account at PNC, or such other bank as Borrower may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, with respect to Revolving Advances deemed to have been requested by Borrower, be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.4.    <u>Loans</u>.

(a)    <u>Term Loan</u>. Subject to the terms and conditions of this Agreement, each Lender, severally and not jointly, will make a Term Loan to Borrower in the sum equal to such

Lender's Commitment Percentage of $6,694,600. The Term Loan shall be advanced on the Funding Date and shall be, with respect to principal, payable as follows, subject to acceleration upon the occurrence of an Event of Default under this Agreement or termination of this Agreement: (a) commencing February 1, 2010, and continuing on the first Business Day of each and every calendar month thereafter, Borrower shall pay to Agent equal monthly payments of principal in the aggregate amount of $64,521.67 and (b) the entire outstanding principal balance of the Term Loan shall be due and payable in full on the last day of the Term, if not sooner paid by Borrower; provided, however, if the principal amount of the Term Loan at any time outstanding exceeds an amount equal to the sum of (x) eighty-five percent (85%) of the appraised net orderly liquidation value of Borrower's Equipment, *plus* (y) sixty-one percent (61%) of the appraised fair market value of Borrower's owned Eligible Real Property (in each case based on the most recent appraisal accepted by Agent), Borrower shall immediately prepay upon the request of Agent the Term Loan in an amount sufficient to eliminate such excess. The Term Loan shall be evidenced by one or more secured promissory notes (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "Term Note") in substantially the form attached hereto as Exhibit 2.4(a). The Term Loan may consist of Domestic Rate Loans or Eurodollar Rate Loans, or a combination thereof, as Borrower may request. In the event that Borrower desires to obtain or extend a Eurodollar Rate Loan or to convert a Domestic Rate Loan to a Eurodollar Rate Loan, Borrower shall comply with the notification requirements set forth in Sections 2.2(b) and (d) and the provisions of Sections 2.2(b) through (g) shall apply.

2.5.  Maximum Advances. The aggregate balance of Revolving Advances outstanding at any time shall not exceed the lesser of (a) the Maximum Revolving Advance Amount or (b) the Formula Amount less, in each case, the aggregate Maximum Undrawn Amount of all issued and outstanding Letters of Credit.

2.6.  Repayment of Advances.

(a)  The Revolving Advances shall be due and payable in full on the last day of the Term subject to earlier prepayment as herein provided. The Term Loan shall be due and payable as provided in Section 2.4(a) hereof and in the Term Note, subject to mandatory prepayments as herein provided.

(b)  Borrower recognizes that the amounts evidenced by checks, notes, drafts or any other items of payment relating to and/or proceeds of Collateral may not be collectible by Agent on the date received. In consideration of Agent's agreement to conditionally credit Borrower's Account as of the next Business Day following the Agent's receipt of those items of payment, Borrower agrees that, in computing the charges under this Agreement, all items of payment shall be deemed applied by Agent on account of the Obligations one (1) Business Day after (i) the Business Day following the Agent's receipt of such payments via wire transfer or electronic depository check or (ii) in the case of payments received by Agent in any other form, the Business Day such payments constitute good funds in Agent's account. Agent is not, however, required to credit Borrower's Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge Borrower's Account for the amount of any item of payment which is returned to Agent unpaid.

(c)     All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Agent at the Payment Office not later than 12:00 P.M. (Dallas, Texas time) on the due date therefor in lawful money of the United States of America in federal funds or other funds immediately available to Agent. Agent shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging Borrower's Account or by making Advances as provided in Section 2.2 hereof.

(d)     Borrower shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

2.7.   Repayment of Excess Advances. The aggregate balance of Advances outstanding at any time in excess of the maximum amount of Advances permitted hereunder shall be immediately due and payable without the necessity of any demand, at the Payment Office, whether or not a Default or Event of Default has occurred.

2.8.   Statement of Account. Agent shall maintain, in accordance with its customary procedures, a loan account ("Borrower's Account") in the name of Borrower in which shall be recorded the date and amount of each Advance made by Agent and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender. Each calendar month, Agent shall send to Borrower a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Agent and Borrower during such calendar month. The monthly statements shall be deemed correct and binding upon Borrower in the absence of manifest error and shall constitute an account stated between Lenders and Borrower unless Agent receives a written statement of Borrower's specific exceptions thereto within thirty (30) days after such statement is received by Borrower. The records of Agent with respect to the loan account shall be conclusive evidence absent manifest error of the amounts of Advances and other charges thereto and of payments applicable thereto.

2.9.   Letters of Credit. Subject to the terms and conditions hereof, Agent shall issue or cause the issuance of standby letters of credit ("Letters of Credit") for the account of Borrower; provided, however, that Agent will not be required to issue or cause to be issued any Letters of Credit to the extent that the issuance thereof would then cause the sum of (i) the outstanding Revolving Advances plus (ii) the Maximum Undrawn Amount of all outstanding Letters of Credit to exceed the lesser of (x) the Maximum Revolving Advance Amount or (y) the Formula Amount. The Maximum Undrawn Amount of outstanding Letters of Credit shall not exceed in the aggregate at any time the Letter of Credit Sublimit. All disbursements or payments related to Letters of Credit shall be deemed to be Domestic Rate Loans consisting of Revolving Advances and shall bear interest at the Revolving Interest Rate for Domestic Rate Loans; Letters of Credit that have not been drawn upon shall not bear interest.

2.10.  Issuance of Letters of Credit.

(a)     Borrower may request Agent to issue or cause the issuance of a Letter of Credit by delivering to Agent at the Payment Office, prior to 9:00 a.m. (Dallas, Texas time), at

31

least five (5) Business Days' prior to the proposed date of issuance, Agent's form of Letter of Credit Application (the "Letter of Credit Application") completed to the satisfaction of Agent; and, such other certificates, documents and other papers and information as Agent may reasonably request. Borrower also has the right to give instructions and make agreements with respect to any application, any applicable letter of credit and security agreement, any applicable letter of credit reimbursement agreement and/or any other applicable agreement, any letter of credit and the disposition of documents, disposition of any unutilized funds, and to agree with Agent upon any amendment, extension or renewal of any Letter of Credit.

(b)     Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, other written demands for payment, or acceptances of usance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twenty-four (24) calendar months after such Letter of Credit's date of issuance and in no event later than the last day of the Term. Each standby Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time a Letter of Credit is issued (the "UCP") or the International Standby Practices (ISP98 International Chamber of Commerce Publication Number 590) (the "ISP98 Rules")), and any subsequent revision thereof at the time a standby Letter of Credit is issued, as determined by Agent, and each trade Letter of Credit shall be subject to the UCP.

(c)     Agent shall use its reasonable efforts to notify Lenders of the request by Borrower for a Letter of Credit hereunder.

2.11.   Requirements For Issuance of Letters of Credit.

(a)     Borrower shall authorize and direct any Issuer to name Borrower as the "Applicant" or "Account Party" of each Letter of Credit. If Agent is not the Issuer of any Letter of Credit, Borrower shall authorize and direct the Issuer to deliver to Agent all instruments, documents, and other writings and property received by the Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit, the application therefor or any acceptance therefor.

(b)     In connection with all Letters of Credit issued or caused to be issued by Agent under this Agreement, Borrower hereby appoints Agent, or its designee, as its attorney, with full power and authority if a Default or an Event of Default shall have occurred, (i) to sign and/or endorse Borrower's name upon any warehouse or other receipts, letter of credit applications and acceptances, (ii) to sign Borrower's name on bills of lading; (iii) to clear Inventory through the United States of America Customs Department ("Customs") in the name of Borrower or Agent or Agent's designee, and to sign and deliver to Customs officials powers of attorney in the name of Borrower for such purpose; and (iv) to complete in Borrower's name or Agent's, or in the name of Agent's designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof. Neither Agent nor its attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes

32

of fact or law, except for Agent's or its attorney's willful misconduct. This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

2.12. Disbursements, Reimbursement.

(a)     Immediately upon the issuance of each Letter of Credit, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from Agent a participation in such Letter of Credit and each drawing thereunder in an amount equal to such Lender's Commitment Percentage of the Maximum Face Amount of such Letter of Credit and the amount of such drawing, respectively.

(b)     In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, Agent will promptly notify Borrower. Provided that Borrower shall have received such notice, the Borrower shall reimburse (such obligation to reimburse Agent shall sometimes be referred to as a "Reimbursement Obligation") Agent prior to 11:00 a.m., Dallas, Texas time on each date that an amount is paid by Agent under any Letter of Credit (each such date, a "Drawing Date") in an amount equal to the amount so paid by Agent. In the event Borrower fails to reimburse Agent for the full amount of any drawing under any Letter of Credit by 11:00 a.m., Dallas, Texas time, on the Drawing Date, Agent will promptly notify each Lender thereof, and Borrower shall be deemed to have requested that a Revolving Advance maintained as a Domestic Rate Loan be made by the Lenders to be disbursed on the Drawing Date under such Letter of Credit, subject to the amount of the unutilized portion of the lesser of Maximum Revolving Advance Amount or the Formula Amount and subject to Section 8.2 hereof. Any notice given by Agent pursuant to this Section 2.12(b) may be oral if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(c)     Each Lender shall upon any notice pursuant to Section 2.12(b) make available to Agent an amount in immediately available funds equal to its Commitment Percentage of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.12(d)) each be deemed to have made a Revolving Advance maintained as a Domestic Rate Loan to Borrower in that amount. If any Lender so notified fails to make available to Agent the amount of such Lender's Commitment Percentage of such amount by no later than 1:00 p.m., Dallas, Texas time on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the Federal Funds Effective Rate during the first three days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Revolving Advances maintained as a Domestic Rate Loans on and after the fourth day following the Drawing Date. Agent will promptly give notice of the occurrence of the Drawing Date, but failure of Agent to give any such notice on the Drawing Date or in sufficient time to enable any Lender to effect such payment on such date shall not relieve such Lender from its obligation under this Section 2.12(c), provided that such Lender shall not be obligated to pay interest as provided in Section 2.12(c) (i) and (ii) until and commencing from the date of receipt of notice from Agent of a drawing.

Halifax Media Credit Agreement
009125.0158/537556.18