(d)     With respect to any unreimbursed drawing that is not converted into a Revolving Advance maintained as a Domestic Rate Loan to Borrower in whole or in part as contemplated by Section 2.12(b), because of Borrower's failure to satisfy the conditions set forth in Section 8.2 (other than any notice requirements) or for any other reason, Borrower shall be deemed to have incurred from Agent a borrowing (each a "Letter of Credit Borrowing") in the amount of such drawing. Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Revolving Advance maintained as a Domestic Rate Loan. Each Lender's payment to Agent pursuant to Section 2.12(c) shall be deemed to be a payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a "Participation Advance" from such Lender in satisfaction of its Participation Commitment under this Section 2.12.

(e)     Each Lender's Participation Commitment shall continue until the last to occur of any of the following events:  (x) Agent ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncancelled and (z) all Persons (other than the Borrower) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.13.  Repayment of Participation Advances.

(a)     Upon (and only upon) receipt by Agent for its account of immediately available funds from Borrower (i) in reimbursement of any payment made by the Agent under the Letter of Credit with respect to which any Lender has made a Participation Advance to Agent, or (ii) in payment of interest on such a payment made by Agent under such a Letter of Credit, Agent will pay to each Lender, in the same funds as those received by Agent, the amount of such Lender's Commitment Percentage of such funds, except Agent shall retain the amount of the Commitment Percentage of such funds of any Lender that did not make a Participation Advance in respect of such payment by Agent.

(b)     If Agent is required at any time to return to Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion of the payments made by Borrower to Agent pursuant to Section 2.13(a) in reimbursement of a payment made under the Letter of Credit or interest or fee thereon, each Lender shall, on demand of Agent, forthwith return to Agent the amount of its Commitment Percentage of any amounts so returned by Agent plus interest at the Federal Funds Effective Rate.

2.14.  Documentation.  Borrower agrees to be bound by the terms of the Letter of Credit Application and by Agent's interpretations of any Letter of Credit issued on behalf of Borrower and by Agent's written regulations and customary practices relating to letters of credit, though Agent's interpretations may be different from Borrower's own.  In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern.  It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), Agent shall not be liable for any error, negligence and/or mistakes, whether of omission or commission **(INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACT OR INACTION ARISING FROM AGENT'S OR LENDERS' NEGLIGENCE OR STRICT**

**LIABILITY**), in following Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.

2.15. <u>Determination to Honor Drawing Request</u>. In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, Agent shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth.

2.16. <u>Nature of Participation and Reimbursement Obligations</u>. Each Lender's obligation in accordance with this Agreement to make the Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of Borrower to reimburse Agent upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this <u>Section 2.16</u> under all circumstances, including the following circumstances:

(i) any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Agent, Borrower or any other Person for any reason whatsoever;

(ii) the failure of Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Advance, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of the Lenders to make Participation Advances under <u>Section 2.12</u>;

(iii) any lack of validity or enforceability of any Letter of Credit;

(iv) any claim of breach of warranty that might be made by Borrower or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, cross-claim, defense or other right which Borrower or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit or the proceeds thereof (or any Persons for whom any such transferee may be acting), Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between Borrower or any Subsidiaries of Borrower and the beneficiary for which any Letter of Credit was procured);

(v) the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provisions of services relating to a Letter of Credit, in each case even if Agent or any of Agent's Affiliates has been notified thereof;

(vi)     payment by Agent under any Letter of Credit against presentation of a demand, draft or certificate or other document which does not comply with the terms of such Letter of Credit;

(vii)    the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(viii)   any failure by the Agent or any of Agent's Affiliates to issue any Letter of Credit in the form requested by Borrower, unless the Agent has received written notice from Borrower of such failure within three (3) Business Days after the Agent shall have furnished Borrower a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix)     any Material Adverse Effect on Borrower or any Guarantor;

(x)      any breach of this Agreement or any Other Document by any party thereto;

(xi)     the occurrence or continuance of an insolvency proceeding with respect to Borrower or any Guarantor;

(xii)    the fact that a Default or Event of Default shall have occurred and be continuing;

(xiii)   the fact that the Term shall have expired or this Agreement or the Obligations hereunder shall have been terminated; and

(xiv)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

2.17.   Indemnity.  In addition to amounts payable as provided in Section 15.5, Borrower hereby agrees to protect, indemnify, pay and save harmless Agent and any of Agent's Affiliates that have issued a Letter of Credit from and against any and all claims, demands, liabilities, damages, taxes, penalties, interest, judgments, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which the Agent or any of Agent's Affiliates may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit, other than as a result of (A) the gross negligence or willful misconduct of the Agent as determined by a final and non-appealable judgment of a court of competent jurisdiction or (b) the wrongful dishonor by the Agent or any of Agent's Affiliates of a proper demand for payment made under any Letter of Credit, **(INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY OTHERWISE INDEMNIFIED MATTER ARISING FROM AGENT'S OR LENDERS' NEGLIGENCE OR STRICT LIABILITY)**, except if such dishonor resulted from any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Body (all such acts or omissions herein called "Governmental Acts").

2.18. <u>Liability for Acts and Omissions</u>. As between Borrower and Agent and Lenders, Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit **(INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY OTHERWISE INDEMNIFIED MATTER ARISING FROM AGENT'S OR LENDERS' NEGLIGENCE OR STRICT LIABILITY)**. In furtherance and not in limitation of the respective foregoing, Agent shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if Agent shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among Borrower and any beneficiary of any Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, facsimile, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Agent, including any governmental acts, and none of the above shall affect or impair, or prevent the vesting of, any of Agent's rights or powers hereunder. Nothing in the preceding sentence shall relieve Agent from liability for Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment) in connection with actions or omissions described in such clauses (i) through (viii) of such sentence. In no event shall Agent or Agent's Affiliates be liable to Borrower for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

Without limiting the generality of the foregoing, Agent and each of its Affiliates (i) may rely on any oral or other communication believed in good faith by Agent or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit, (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by Agent or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank

claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on Agent or its Affiliate in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a carrier or any similar document (each an "LC Order") and honor any drawing in connection with any Letter of Credit that is the subject of such LC Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by Agent under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment), shall not put Agent under any resulting liability to Borrower or any Lender.

2.19. Additional Payments. After all required notice and cure periods, any sums actually and reasonably expended by Agent or any Lender due to Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document including Borrower's obligations under Sections 4.2, 4.4, 4.12, 4.13, 4.14 and 6.1 hereof, may be charged to Borrower's Account as a Revolving Advance and added to the Obligations.

2.20. Manner of Borrowing and Payment.

(a)     Each borrowing of Revolving Advances shall be advanced according to the applicable Revolving Advance Commitment Percentages of Lenders. The Term Loan shall be advanced according to the Term Loan Commitment Percentages of Lenders.

(b)     Each payment (including each prepayment) by Borrower on account of the principal of and interest on the Revolving Advances, shall be applied to the Revolving Advances pro rata according to the applicable Commitment Percentages of Lenders. Each payment (including each prepayment) by Borrower on account of the principal of and interest on the Term Note, shall be made from or to, or applied to that portion of the Term Loan evidenced by the Term Note pro rata according to the Term Loan Commitment Percentages of Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made to Agent on behalf of the Lenders to the Payment Office, in each case on or prior to 12:00 p.m., Dallas, Texas time, in Dollars and in immediately available funds.

(c)     (i)     Notwithstanding anything to the contrary contained in Sections 2.20(a) and (b) hereof, commencing with the first Business Day following the Funding Date, each borrowing of Revolving Advances shall be advanced by Agent and each payment by Borrower on account of Revolving Advances shall be applied first to those Revolving Advances advanced by Agent. On or before 12:00 p.m., Dallas, Texas time, on each Settlement Date commencing with the first Settlement Date following the Funding Date, Agent and Lenders shall make certain payments as follows: (I) if the aggregate amount of new Revolving Advances made by Agent during the preceding Week (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Advances during such preceding Week, then each Lender shall

provide Agent with funds in an amount equal to its applicable Revolving Advance Commitment Percentage of the difference between (w) such Revolving Advances and (x) such repayments and (II) if the aggregate amount of repayments applied to outstanding Revolving Advances during such Week exceeds the aggregate amount of new Revolving Advances made during such Week, then Agent shall provide each Lender with funds in an amount equal to its applicable Revolving Advance Commitment Percentage of the difference between (y) such repayments and (z) such Revolving Advances.

(ii)     Each Lender shall be entitled to earn interest at the applicable Contract Rate on outstanding Advances which it has funded.

(iii)     Promptly following each Settlement Date, Agent shall submit to each Lender a certificate with respect to payments received and Advances made during the Week immediately preceding such Settlement Date. Such certificate of Agent shall be conclusive in the absence of manifest error.

(d)     If any Lender or Participant (a "benefited Lender") shall at any time receive any payment of all or part of its Advances, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other Lender's Advances, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Lender so purchasing a portion of another Lender's Advances may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

(e)     Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment Percentage of the Advances available to Agent, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrower a corresponding amount. Agent will promptly notify Borrower of its receipt of any such notice from a Lender. If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the daily average Federal Funds Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, times (ii) such amount, times (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be conclusive, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three (3) Business Days after such Settlement

Halifax Media Credit Agreement
009125.0158/537556.18

Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to such Revolving Advances hereunder, on demand from Borrower; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrower's rights (if any) against such Lender.

2.21. Mandatory Prepayments.

(a)    Subject to Section 4.3 hereof, when Borrower sells or otherwise disposes of any assets other than Inventory in the Ordinary Course of Business, Borrower shall repay the Advances in an amount equal to the net proceeds of such sale (i.e., gross proceeds less the reasonable costs of such sales or other dispositions), such repayments to be made promptly but in no event more than one (1) Business Day following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Agent; provided, however, that Borrower shall not be required to repay the Advances with the net proceeds (x) from the sale of Excluded Real Property or (y) the sale of the Naming Rights, in each case, to the extent such proceeds are distributed to the holders of Equity Interests of Borrower in accordance with Section 7.7 hereof. The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof. Such repayments shall be applied in the case of a disposition of Collateral not comprising part of the Formula Amount, (i) *first*, to the outstanding principal installments of the Term Loan, in the inverse order of the maturities thereof and (ii) *second*, to the remaining Advances in such order as Agent may determine, subject to Borrower's ability to reborrow Revolving Advances in accordance with the terms hereof and (b) in the case of a disposition of any Collateral comprising part of the Formula Amount, (i) *first* to the Revolving Advances, up to an amount equal to the portion of the Formula Amount arising from such Collateral immediately prior to the disposition thereof, then outstanding and (ii) *second*, to Term Loan in the inverse order of Maturities thereof; provided, that, upon the occurrence of a Default or an Event of Default, such payments may be applied in such order as Agent may determine in its sole discretion.

(b)    In the event of any issuance or other incurrence of Indebtedness or Equity Interests (including any capital contribution by Holdings, Borrower or any of their respective Subsidiaries, Borrower shall, no later than one (1) Business Day after the receipt by Borrower, Holdings or any of their respective Subsidiaries of (a) the cash proceeds from any such issuance or incurrence of Indebtedness and (b) the net cash proceeds of any issuance of Equity Interests, as the case may be, repay the Advances in an amount equal to such cash proceeds or net cash proceeds, as applicable. Such repayments will be applied (x) *first*, to the outstanding principal installments of the Term Loan, in inverse order of the maturities thereof and (y) *second*, to the remaining Advances in such order as Agent may determine, subject to Borrower's ability to reborrow Revolving Advances in accordance with the terms hereof; provided, that, upon the occurrence of a Default or an Event of Default, such repayments may be applied in such order as Agent may determine in its sole discretion. The foregoing shall not be deemed to be implied consent to any such issuance or incurrence of Indebtedness or Equity Interest prohibited by the terms and conditions hereof.

(c)    Borrower shall prepay the outstanding principal installments of the Term Loan in the inverse of their maturities in an amount equal to fifty percent (50%) of Excess Cash

40

Flow for each fiscal year commencing on or after January 1, 2010, payable within thirty (30) days after Agent's receipt of the annual financial statements referred to in and required by Section 9.7 for such fiscal year but in any event not later than one hundred and fifty (150) days after the end of each such fiscal year, which amount shall be applied to the outstanding principal installments of the Term Loan in the inverse order of the maturities thereof. In the event that the financial statement is not so delivered, then a calculation based upon estimated amounts shall be made by Agent upon which calculation Borrower shall make the prepayment required by this Section 2.21(b), subject to adjustment when the financial statement is delivered to Agent as required hereby. The calculation made by Agent shall not be deemed a waiver of any rights Agent or Lenders may have as a result of the failure by Borrower to deliver such financial statement.

(d) In the event that Borrower, Holdings or any of their respective Affiliates receives or is entitled to any refund, return or other repayment of the purchase consideration paid under the Acquisition Agreement (or any portion thereof), Borrower shall cause all such amounts to be remitted directly to Agent (or, if such amounts are nonetheless received by Borrower, Holdings or any such Affiliate, Borrower shall, no later than one (1) Business Day after such receipt, cause all such amounts to be remitted to Agent) for repayment of the Obligations, until all Obligations have been indefeasibly paid in full. Such repayments shall be applied in such order as Agent may determine in its sole discretion. Notwithstanding the foregoing, payments received by Borrower pursuant to the Escrow Agreement (as defined in the Acquisition Agreement) in respect of a breach by Sellers of any representation, warranty, covenant or agreement set forth in or made by Sellers pursuant to the Acquisition Agreement, shall be remitted to Agent and applied by Agent to the Revolving Advances, subject to Borrower's ability to reborrow Revolving Advances in accordance with the terms hereof.

2.22. Use of Proceeds.

(a) Borrower shall apply the proceeds of Advances to (i) finance a portion of the consideration payable under the Acquisition Agreement, (ii) pay fees and expenses relating to the Transactions, and (iii) provide for its working capital needs and reimburse drawings under Letters of Credit.

(b) Without limiting the generality of Section 2.22(a) above, neither the Borrower, the Guarantors nor any other Person which may in the future become party to this Agreement or the Other Documents as Borrower or any Guarantor intends to use nor shall they use any portion of the proceeds of the Advances, directly or indirectly, for any purpose in violation of the Trading with the Enemy Act.

2.23. Defaulting Lender.

(a) Notwithstanding anything to the contrary contained herein, in the event any Lender (x) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Advance or (y) notifies either Agent or Borrower that it does not intend to make available its portion of any Advance (if the actual refusal would constitute a breach by such Lender of its obligations under this Agreement) (each, a "Lender Default"), all rights and obligations hereunder of such Lender (a "Defaulting Lender")

41

as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.23 while such Lender Default remains in effect.

(b)     Advances shall be incurred pro rata from Lenders (the "Non-Defaulting Lenders") which are not Defaulting Lenders based on their respective Revolving Advance Commitment Percentages, Term Loan Commitment Percentages, and no Revolving Commitment Percentage or Term Loan Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of such Lender Default. Amounts received in respect of principal of any type of Advances shall be applied to reduce the applicable Advances of each Lender (other than any Defaulting Lender) pro rata based on the aggregate of the outstanding Advances of that type of all Lenders at the time of such application; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for the Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees). Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent. Agent may hold and, in its discretion, re-lend to Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender.

(c)     A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Other Documents. All amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have either Advances outstanding or a Commitment Percentage.

(d)     Other than as expressly set forth in this Section 2.23, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged. Nothing in this Section 2.23 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)     In the event a Defaulting Lender retroactively cures to the satisfaction of Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement.

III     INTEREST AND FEES.

3.1.     Interest. Interest on Advances shall be payable in arrears on the first day of each calendar month with respect to Domestic Rate Loans and, with respect to Eurodollar Rate Loans, at the end of each Interest Period. Interest charges shall be computed on the actual principal amount of Advances outstanding during the calendar month at a rate per annum equal to (i) with respect to Revolving Advances, the Revolving Interest Rate and (ii) with respect to the Term Loan, the Term Loan Rate (as applicable, the "Contract Rate"). Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the applicable Contract Rate for Domestic Rate Loans shall be similarly changed without notice or

demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect. The Eurodollar Rate shall be adjusted with respect to Eurodollar Rate Loans without notice or demand of any kind on the effective date of any change in the Reserve Percentage as of such effective date. Upon and after the occurrence of any Event of Default (other than the occurrence of any Event of Default set forth in Section 10.21 of this Agreement), and during the continuation thereof, at the option of Agent or at the direction of Required Lenders, the Obligations shall bear interest at the applicable Contract Rate for Domestic Rate Loans plus two (2%) percent per annum (as applicable, the "Default Rate").

    3.2.   <u>Letter of Credit Fees</u>.

       (a)    Borrower shall pay (x) to Agent, for the ratable benefit of Lenders, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Letter of Credit multiplied by two and three-quarters percent (2.75%) per annum, such fees to be calculated on the basis of a 360-day year for the actual number of days elapsed and to be payable quarterly in arrears on the first day of each fiscal quarter and on the last day of the Term, and (y) to the Issuer, a fronting fee of one quarter of one percent (0.25%) per annum, together with any and all administrative, issuance, amendment, payment and negotiation charges with respect to Letters of Credit and all fees and expenses as agreed upon by the Issuer and the Borrower in connection with any Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder and shall reimburse Agent for any and all fees and expenses, if any, paid by Agent to the Issuer (all of the foregoing fees, the "<u>Letter of Credit Fees</u>"). All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason. Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in the Issuer's prevailing charges for that type of transaction. All Letter of Credit Fees and Acceptance Fees payable hereunder shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason. Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of Required Lenders, the Letter of Credit Fees described in clause (x) of this <u>Section 3.2(a)</u> shall be increased by an additional two percent (2%) per annum.

    On demand after the occurrence and during the continuance of a Default or Event of Default, Borrower will cause cash to be deposited and maintained in an account with Agent, as cash collateral, in an amount equal to one hundred and five percent (105%) of the Maximum Undrawn Amount of all outstanding Letters of Credit, and Borrower hereby irrevocably authorizes Agent, in its discretion, on Borrower's behalf and in Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by Borrower, in the amounts required to be made by Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of Borrower coming into any Lender's possession at any time. Agent will invest such cash collateral (less applicable reserves) in such short-term money-market items as to which Agent and Borrower mutually agree and the net return on such

investments shall be credited to such account and constitute additional cash collateral. Borrower may not withdraw amounts credited to any such account except upon the occurrence of all of the following: (x) payment and performance in full of all Obligations, (y) expiration of all Letters of Credit and (z) termination of this Agreement.

3.3. <u>Closing Fee and Facility Fee.</u>

(a) <u>Closing Fee.</u> Upon the execution of this Agreement, Borrower shall pay to Agent for the ratable benefit of Lenders a closing fee of $147,000 less that portion of the commitment fee of $50,000 heretofore paid by Borrower to Agent remaining after application of such fee to out of pocket expenses.

(b) <u>Facility Fee.</u> If, for any calendar month during the Term, the average daily unpaid balance of the Revolving Advances and undrawn amount of any outstanding Letters of Credit for each day of such calendar month does not equal the Maximum Revolving Advance Amount, then Borrower shall pay to Agent for the ratable benefit of Lenders a fee at a rate equal to one-half of one percent (0.50%) per annum on the amount by which the Maximum Revolving Advance Amount exceeds such average daily unpaid balance. Such fee shall be payable to Agent in arrears on the first day of each calendar month with respect to the previous calendar month.

3.4. <u>Collateral Evaluation Fee, Collateral Monitoring Fee and Fee Letter.</u>

(a) <u>Collateral Evaluation Fee.</u> Borrower shall pay Agent a collateral evaluation fee equal to $1,500 per month commencing on the first day of the month following the Funding Date and on the first day of each month thereafter during the Term. The collateral evaluation fee shall be deemed earned in full on the date when same is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason.

(b) <u>Collateral Monitoring Fee.</u> Borrower shall pay to Agent on the first day of each month following any month in which Agent performs any collateral monitoring - namely any field examination, collateral analysis or other business analysis, the need for which is to be determined by Agent and which monitoring is undertaken by Agent or for Agent's benefit - a collateral monitoring fee in an amount equal to $850 per day for each person employed to perform such monitoring, plus all reasonable costs and disbursements incurred by Agent in the performance of such examination or analysis.

The fees set forth in <u>Sections 3.3</u> and <u>3.4</u> shall be in addition to any other fees, costs or expenses payable pursuant to any Other Document; and each of the fees described in <u>Sections 3.3</u> and <u>3.4</u> constitute part of the Obligations.

3.5. <u>Computation of Interest and Fees.</u> Interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the applicable Contract Rate for Domestic Rate Loans during such extension.

3.6. <u>Maximum Charges</u>. is the intention of the parties to comply strictly with applicable usury laws. Accordingly, no rate change shall be put into effect that would result in a rate greater than the highest rate permitted by law. Notwithstanding anything to the contrary contained in this Agreement or in any Other Document, all agreements which either now are or which shall become agreements between Borrower, Agent and the Lenders are hereby limited so that in no contingency or event whatsoever shall the total liability for payments in the nature of interest, additional interest and other charges exceed the applicable limits imposed by any applicable usury laws. If any payments in the nature of interest, additional interest and other charges made under this Agreement or any Other Document are held to be in excess of the limits imposed by any applicable usury laws, it is agreed that any such amount held to be in excess shall be considered payment of principal hereunder, and the indebtedness evidenced hereby shall be reduced by such amount so that the total liability for payments in the nature of interest, additional interest and other charges shall not exceed the applicable limits imposed by any applicable usury laws, in compliance with the desires of Borrower and Agent. This provision shall never be superseded or waived and shall control every other provision of this Agreement or any Other Document and all agreements between Borrower and Agent and the Lenders, or their respective successors and assigns. Unless preempted by federal law or as permitted under the sentence immediately following this sentence, the applicable Revolving Interest Rate, or Term Loan Interest Rate, from time to time in effect under this Agreement may not exceed the "weekly ceiling" from time to time in effect under Chapter 303 of the Texas Finance Code, as amended from time to time (the "<u>Texas Finance Code</u>"). If the applicable state or federal law is amended in the future to allow a greater rate of interest to be charged under this Agreement than is presently allowed by applicable state or federal law, then the limitation of interest hereunder shall be increased to the maximum rate of interest allowed by applicable state or federal law as amended, which increase shall be effective hereunder on the effective date of such amendment, and all interest charges owing to Lender by reason thereof shall be payable in accordance with <u>Section 2.6</u> hereof. If by operation of this provision, Borrower would be entitled to a refund of interest paid pursuant to this Agreement, each Lender agrees that it shall pay to Borrower upon Agent's request such Lender's Revolving Advance Commitment Percentage or Term Loan Commitment Percentage, as applicable, of such interest to be refunded, as determined by Agent

3.7. <u>Increased Costs</u>. In the event that any Applicable Law, or any change therein or in the interpretation or application thereof, or compliance by any Lender (for purposes of this <u>Section 3.7</u>, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender) and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)     subject Agent or any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to Agent or any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Documents (except for changes in the rate of tax on the overall net income of Agent or any Lender by the jurisdiction in which it maintains its principal office);

(b)     impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of Agent or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)     impose on Agent or any Lender or the London interbank Eurodollar market any other condition with respect to this Agreement or any Other Document;

and the result of any of the foregoing is to increase the cost to Agent or any Lender of making, renewing or maintaining its Advances hereunder by an amount that Agent or such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Advances by an amount that Agent or such Lender deems to be material, then, in any case Borrower shall promptly pay Agent or such Lender, upon its demand, such additional amount as will compensate Agent or such Lender for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs which are reflected in the Eurodollar Rate, as the case may be.  Agent or such Lender shall certify the amount of such additional cost or reduced amount to Borrower, and such certification shall be conclusive absent manifest error.

3.8.    Basis For Determining Interest Rate Inadequate or Unfair.  In the event that Agent or any Lender shall have determined that:

(a)     reasonable means do not exist for ascertaining the Eurodollar Rate applicable pursuant to Section 2.2 hereof for any Interest Period; or

(b)     Dollar deposits in the relevant amount and for the relevant maturity are not available in the London interbank Eurodollar market, with respect to an outstanding Eurodollar Rate Loan, a proposed Eurodollar Rate Loan, or a proposed conversion of a Domestic Rate Loan into a Eurodollar Rate Loan,

then Agent shall give Borrower prompt written or telephonic of such determination.  If such notice is given, (i) any such requested Eurodollar Rate Loan shall be made as a Domestic Rate Loan, unless Borrower shall notify Agent no later than 9:00 a.m. (Dallas, Texas time) two (2) Business Days prior to the date of such proposed borrowing, that its request for such borrowing shall be cancelled or made as an unaffected type of Eurodollar Rate Loan, (ii) any Domestic Rate Loan or Eurodollar Rate Loan which was to have been converted to an affected type of Eurodollar Rate Loan shall be continued as or converted into a Domestic Rate Loan, or, if Borrower shall notify Agent, no later than 9:00 a.m. (Dallas, Texas time) two (2) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of Eurodollar Rate Loan, and (iii) any outstanding affected Eurodollar Rate Loans shall be converted into a Domestic Rate Loan, or, if Borrower shall notify Agent, no later than 9:00 a.m. (Dallas, Texas time) two (2) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected Eurodollar Rate Loan, shall be converted into an unaffected type of Eurodollar Rate Loan, on the last Business Day of the then current Interest Period for such affected Eurodollar Rate Loans.  Until such notice has been withdrawn, Lenders shall have no obligation to make an affected type of Eurodollar Rate Loan or maintain outstanding affected

Eurodollar Rate Loans and Borrower shall not have the right to convert a Domestic Rate Loan or an unaffected type of Eurodollar Rate Loan into an affected type of Eurodollar Rate Loan.

3.9. <u>Capital Adequacy</u>.

(a) In the event that Agent or any Lender shall have determined that any Applicable Law or guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent or any Lender (for purposes of this <u>Section 3.9</u>, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender) and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Agent or any Lender's capital as a consequence of its obligations hereunder to a level below that which Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's and each Lender's policies with respect to capital adequacy) by an amount deemed by Agent or any Lender to be material, then, from time to time, Borrower shall pay upon demand to Agent or such Lender such additional amount or amounts as will compensate Agent or such Lender for such reduction. In determining such amount or amounts, Agent or such Lender may use any reasonable averaging or attribution methods. The protection of this <u>Section 3.9</u> shall be available to Agent and each Lender regardless of any possible contention of invalidity or inapplicability with respect to the Applicable Law or condition.

(b) A certificate of Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate Agent or such Lender with respect to <u>Section 3.9(a)</u> hereof when delivered to Borrower shall be conclusive absent manifest error.

3.10. <u>Gross Up for Taxes</u>. If Borrower shall be required by Applicable Law to withhold or deduct any taxes from or in respect of any sum payable under this Agreement or any of the Other Documents to Agent, or any Lender, assignee of any Lender, or Participant (each, individually, a "<u>Payee</u>" and collectively, the "<u>Payees</u>"), (a) the sum payable to such Payee or Payees, as the case may be, shall be increased as may be necessary so that, after making all required withholding or deductions, the applicable Payee or Payees receives an amount equal to the sum it would have received had no such withholding or deductions been made (the "<u>Gross-Up Payment</u>"), (b) Borrower shall make such withholding or deductions, and (c) Borrower shall pay the full amount withheld or deducted to the relevant taxation authority or other authority in accordance with Applicable Law. Notwithstanding the foregoing, Borrower shall not be obligated to make any portion of the Gross-Up Payment that is attributable to any withholding or deductions that would not have been paid or claimed had the applicable Payee or Payees properly claimed a complete exemption with respect thereto pursuant to <u>Section 3.11</u> hereof.

3.11. <u>Withholding Tax Exemption</u>.

(a)     Each Payee that is not incorporated under the Laws of the United States of America or a state thereof (and, upon the written request of Agent, each other Payee) agrees that it will deliver to Borrower and Agent two (2) duly completed appropriate valid Withholding Certificates (as defined under §1.1441-1(c)(16) of the Income Tax Regulations ("Regulations")) certifying its status (i.e., U.S. or foreign person) and, if appropriate, making a claim of reduced, or exemption from, U.S. withholding tax on the basis of an income tax treaty or an exemption provided by the Code.  The term "Withholding Certificate" means a Form W-9; a Form W-8BEN; a Form W-8ECI; a Form W-8IMY and the related statements and certifications as required under §1.1441-1(e)(2) and/or (3) of the Regulations; a statement described in §1.871-14(c)(2)(v) of the Regulations; or any other certificates under the Code or Regulations that certify or establish the status of a payee or beneficial owner as a U.S. or foreign person.

(b)     Each Payee required to deliver to Borrower and Agent a valid Withholding Certificate pursuant to Section 3.11(a) hereof shall deliver such valid Withholding Certificate as follows:  (A) each Payee which is a party hereto on the Closing Date shall deliver such valid Withholding Certificate at least five (5) Business Days prior to the first date on which any interest or fees are payable by Borrower hereunder for the account of such Payee; (B) each Payee shall deliver such valid Withholding Certificate at least five (5) Business Days before the effective date of such assignment or participation (unless Agent in its sole discretion shall permit such Payee to deliver such Withholding Certificate less than five (5) Business Days before such date in which case it shall be due on the date specified by Agent).  Each Payee which so delivers a valid Withholding Certificate further undertakes to deliver to Borrower and Agent two (2) additional copies of such Withholding Certificate (or a successor form) on or before the date that such Withholding Certificate expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent Withholding Certificate so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by Borrower or Agent.

(c)     Notwithstanding the submission of a Withholding Certificate claiming a reduced rate of or exemption from U.S. withholding tax required under Section 3.11(b) hereof, Agent shall be entitled to withhold United States federal income taxes at the full thirty percent (30%) withholding rate if in its reasonable judgment it is required to do so under the due diligence requirements imposed upon a withholding agent under §1.1441-7(b) of the Regulations.  Further, Agent is indemnified under §1.1461-1(e) of the Regulations against any claims and demands of any Payee for the amount of any tax it deducts and withholds in accordance with regulations under §1441 of the Code.

IV     COLLATERAL: GENERAL TERMS

4.1.     Security Interest in the Collateral.     To secure the prompt payment and performance to Agent and each Lender of the Obligations, Borrower hereby assigns, pledges and grants to Agent for its benefit and for the ratable benefit of each Lender a continuing security interest in and to and Lien on all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.  Borrower shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest.  Borrower shall

48

promptly provide Agent with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s). Upon delivery of each such notice, Borrower shall be deemed to hereby grant to Agent a security interest and lien in and to such commercial tort claims and all proceeds thereof.

4.2. <u>Perfection of Security Interest</u>. Borrower shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in and Lien on the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens other than Permitted Encumbrances, (ii) obtaining Lien Waiver Agreements, (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, lockbox and other custodial arrangements satisfactory to Agent, and (v) executing and delivering financing statements, control agreements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code or other Applicable Law. By its signature hereto, Borrower hereby authorizes Agent to file against Borrower, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code in form and substance satisfactory to Agent (which statements may have a description of collateral which is broader than that set forth herein). All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrower's Account as a Revolving Advance of a Domestic Rate Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent for its benefit and for the ratable benefit of Lenders immediately upon demand.

4.3. <u>Disposition of Collateral</u>. Borrower will safeguard and protect all Collateral assets for Agent's general account and make no disposition thereof whether by sale, lease or otherwise except (a) the sale of Inventory in the Ordinary Course of Business as permitted herein, (b) the sale of Excluded Real Property but only to the extent that (i) the proceeds of such sale are permitted to be distributed by Borrower to its members pursuant to and in accordance with <u>Section 7.7</u> hereof or (ii) such sale is for the fair market value of such Excluded Real Property in an arm's length transaction with a Person not an Affiliate of Borrower with equal bargaining power, on terms and conditions acceptable to Agent in its sole discretion, or (c) the sale or donation by Borrower of the Naming Rights but only to the extent that (A) with respect to a sale of the Naming Rights, (i) the proceeds of such sale are permitted to be distributed by Borrower and retained by its members pursuant to and in accordance with Section 7.7 hereof or (ii) such sale is for the fair market value of such Naming Rights in an arm's length transaction with a Person not an Affiliate of Borrower with equal bargaining power, on terms and conditions acceptable to Agent in its sole discretion and (B) with respect to a donation of the Naming Rights, such donation is classified as a 'charitable contribution' pursuant to Section 170(c) of the Code and is deductible by the members for federal income tax purposes pursuant to Section 170(a) of the Code.

Halifax Media Credit Agreement
009125.0158/537556.18

4.4. <u>Preservation of Collateral.</u> In addition to the rights and remedies set forth in Section 11.1 hereof, Agent: (a) may at any time upon the occurrence of a Default or an Event of Default take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including, without limitation, the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any of Borrower's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrower's owned or leased property. Borrower shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may direct. All of Agent's expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrower's Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations.

4.5. <u>Ownership of Collateral.</u>

(a) With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (i) Borrower shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of the its respective Collateral to Agent; and, except for Permitted Encumbrances the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by Borrower or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all respects; (iii) all signatures and endorsements of Borrower that appear on such documents and agreements shall be genuine and Borrower shall have full capacity to execute same; and (iv) Borrower's Equipment and Inventory shall be located as set forth on <u>Schedule 4.5(a)</u> (other than office Equipment in an aggregate amount not to exceed $25,000 at any location) and shall not be removed from such location(s) without the prior written consent of Agent except with respect to the sale of Inventory in the Ordinary Course of Business.

(b) (i) There is no location at which Borrower has any Inventory (except for Inventory in transit) other than those locations listed on <u>Schedule 4.5(a)</u>; (ii) <u>Schedule 4.5(a)</u> hereto contains a correct and complete list, as of the Closing Date, of the legal names and addresses of each warehouse at which Inventory of Borrower is stored; none of the receipts received by Borrower from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns; (iii) <u>Schedule 4.5(b)</u> hereto sets forth a correct and complete list as of the Closing Date of (A) each place of business of Borrower and (B) the chief executive office of Borrower; and (iv) <u>Schedule 4.5(c)</u> hereto sets forth a correct and complete list as of the Closing Date of the location, by state and street address, of all Real Property owned or leased by Borrower, together with the names and addresses of any landlords.

4.6.   Defense of Agent's and Lenders' Interests.  Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's interests in the Collateral shall continue in full force and effect.  During such period Borrower shall not, without Agent's prior written consent, pledge, sell (except Inventory in the Ordinary Course of Business or as permitted hereby), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, any part of the Collateral.  Borrower shall defend Agent's interests in the Collateral against any and all Persons whatsoever.  At any time following demand by Agent for payment of all Obligations, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including:  labels, stationery, documents, instruments and advertising materials.  If Agent exercises this right to take possession of the Collateral, Borrower shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place reasonably convenient to Agent.  In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law.  Borrower shall, and Agent may upon the occurrence of a Default or an Event of Default, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into Borrower's possession, they, and each of them, shall be held by Borrower in trust as Agent's trustee, and such Borrower will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.7.   Books and Records. Borrower shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business; and (d) obtain Lien Waiver Agreements with respect to all premises leased by Borrower where books and records are stored. All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrower.

4.8.   Financial Disclosure.  Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by Borrower at any time during the Term to exhibit and deliver to Agent and each Lender copies of any of Borrower's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning Borrower's financial status and business operations. Borrower hereby authorizes all Governmental Bodies to furnish to Agent and each Lender copies of reports or examinations relating to Borrower, whether made by Borrower or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from Borrower prior to obtaining such information or materials from such accountants or Governmental Bodies.

4.9. <u>Compliance with Laws</u>. Borrower shall comply with all Applicable Laws with respect to the Collateral or any part thereof or to the operation of Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect. The Collateral assets of Borrower at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the Collateral assets of Borrower so that such insurance shall remain in full force and effect.

4.10. <u>Inspection of Premises</u>. At all reasonable times Agent and each Lender shall have full access to and the right to audit, check, inspect and make abstracts and copies from Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of Borrower's business. Agent, any Lender and their agents may enter upon any premises of Borrower at any time during business hours and at any other reasonable time after providing reasonable notice (if no Default or Event of Default has occurred and is continuing, and otherwise without notice), and from time to time, for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of Borrower's business.

4.11. <u>Insurance</u>. The assets and properties of Borrower at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the assets and properties of Borrower so that such insurance shall remain in full force and effect. Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. At Borrower's own cost and expense in amounts and with carriers reasonably acceptable to Agent, Borrower shall (a) keep all its insurable properties and properties in which Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Borrower's including business interruption insurance; (b) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business; (f) furnish Agent with (i) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (ii) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured and loss payee as its interests may appear with respect to all insurance coverage referred to in clauses (a) and (c) above, and providing (A) that all proceeds thereunder shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent. In the event of any loss thereunder, the carriers named therein hereby are directed by Agent and Borrower to make payment for such loss to Agent and not to Borrower and Agent jointly. If any insurance losses are paid by check, draft or other negotiable instrument payable to any Borrower and

Agent jointly, Agent may endorse Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Agent is hereby authorized to adjust and compromise claims under insurance coverage referred to in clauses (a) and (b) above. Subject to the provisions below, all loss recoveries received by Agent upon any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall determine (and any surplus shall be paid by Agent to Borrower or applied as may otherwise be required by law and any deficiency thereon shall be paid by Borrower to Agent, on demand); provided, however, that, with respect to loss recoveries less than $500,000, if Borrower has delivered written notice to Agent that Borrower is in good faith contemplating using the insurance proceeds to repair, replace or restore the insured property which was the subject of the insurable loss to a condition better than or at least as good as the condition of such insured property immediately prior to such loss (a "Restoration"), then such insurance proceeds shall be applied by Agent to the Revolving Advances and Agent shall implement a reserve equal to the amount of such insurance proceeds pursuant to Section 2.1(a)(vi). The agreement of Agent to apply insurance proceeds in the manner above provided shall be subject in each instance to satisfaction of each of the following conditions: (x) No Event of Default or Default shall then have occurred, and (y) Borrower shall use such insurance proceeds for such Restoration for no other purpose. Borrower may request Revolving Advances in the amount of the insurance proceeds (or such portion thereof) to pay the actual cost of the Restoration and the reserve with respect to such amount shall be released and shall be available to Borrower as a Revolving Advance, provided that Borrower has sufficient borrowing availability under Section 2.1 (after giving effect to the release of the reserve for such amount) and that all conditions to funding set forth in Section 8.2 have been satisfied. If (a) Borrower does not commence such Restoration within six (6) months after the date of such proceeds were received, or (b) if Borrower commences, but does not complete, such Restoration within such six (6) month period and Agent thereafter ceases to be satisfied that Borrower is pursuing such Restoration diligently and in good faith, then the remaining amount of insurance proceeds that were applied to the Revolving Advances shall be promptly disbursed to Agent as a Revolving Advance deemed requested by Borrower and shall be applied to the unpaid balance of the Term Loans. In addition, in the event such insurance proceeds exceed $500,000.00, Borrower may request that Agent allow all such proceeds to be used for Restoration pursuant to the foregoing procedure and subject to the foregoing conditions, and prior to any application of proceeds to the Term Loan, Agent will reasonably consider such request in its Permitted Discretion. Notwithstanding any damage to, or destruction of, or injury to, the Collateral or any portion thereof by fire or other casualty, Borrower shall continue to make all payments due under this Agreement and the Other Documents in accordance with the provisions hereof and thereof.

4.12. Failure to Pay Insurance. If Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of Borrower, and charge Borrower's Account therefor as a Revolving Advance of a Domestic Rate Loan and such expenses so paid shall be part of the Obligations.

4.13. Payment of Taxes. Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon Borrower or any of the Collateral including, without limitation real and personal property taxes, assessments and charges and all franchise, income,

employment, social security benefits, withholding, and sales taxes. If any tax by any Governmental Body is or may be imposed on or as a result of any transaction between Borrower and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in Agent's or any Lender's opinion, may possibly create a valid Lien on the Collateral, unless such charges are being Properly Contested Agent may, with three (3) days' notice to Borrower if no Default or Event of Default has occurred and is continuing and, otherwise, without notice to Borrower, pay the taxes, assessments or other Charges and Borrower hereby indemnifies and holds Agent and each Lender harmless in respect thereof. The amount of any payment by Agent under this Section 4.13 shall be charged to Borrower's Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations and, until Borrower shall furnish Agent with an indemnity therefor (or supply Agent with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent may hold without interest any balance standing to Borrower's credit and Agent shall retain its security interest in and Lien on any and all Collateral held by Agent.

4.14. Payment of Leasehold Obligations. Borrower shall at all times pay, when and as due, its rental obligations under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect and, at Agent's request will provide evidence of having done so.

4.15. Receivables.

(a) Nature of Receivables. Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named, for a fixed sum as set forth in the invoice relating thereto (provided immaterial or unintentional invoice errors shall not be deemed to be a breach hereof) with respect to an absolute sale or lease and delivery of goods upon stated terms of Borrower (or, for Receivables acquired pursuant to the Acquisition Agreement, Sellers), or work, labor or services theretofore rendered by Borrower (or, for Receivables acquired pursuant to the Acquisition Agreement, Sellers) as of the date each Receivable is created. Same shall be due and owing in accordance with Borrower's standard terms of sale without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by Borrower to Agent.

(b) Solvency of Customers. Each Customer, to the best of Borrower's knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due or with respect to such Customers of Borrower who are not solvent Borrower has set up on its books and in its financial records bad debt reserves adequate to cover such Receivables.

(c) Location of Borrower. Borrower's chief executive office is located at 901 Sixth Street, Daytona Beach, Florida 32177. Until written notice is given to Agent by Borrower of any other office at which Borrower keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d) Collection of Receivables. Until Borrower's authority to do so is terminated by Agent (which notice Agent may give at any time following the occurrence of an

Event of Default or a Default), Borrower will, at Borrower's sole cost and expense, but on Agent's behalf and for Agent's account, collect as Agent's property and in trust for Agent all amounts received on Receivables, and shall not commingle such collections with Borrower's funds or use the same except to pay Obligations. Borrower shall (i) deposit in the Blocked Account or the Depository Account or, upon request by Agent, deliver to Agent, in original form and on the date of receipt thereof, all checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness and (ii) shall direct all Customers to remit all amounts payable to or for the account of Borrower directly to the Blocked Account or the Depository Account; provided, however, that, notwithstanding the foregoing, Borrower shall be permitted to continue receiving checks and other payments from Customers, consistent with Borrower's past practices, provided that Borrower hold such checks and other payments in trust for the benefit of Agent, and immediately sight-scan such checks or payments received directly to the Blocked Account or Depository Account.

(e)     Notification of Assignment of Receivables.  At any time, Agent shall have the right to send notice of the assignment of, and Agent's security interest in and Lien on, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral.  Thereafter, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both.  Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telegraph, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may be charged to Borrower's Account and added to the Obligations.

(f)     Power of Agent to Act on Borrower's Behalf.  Upon the occurrence and during the continuance of a Default or an Event of Default, Agent shall have the right to receive, endorse, assign and/or deliver in the name of Agent or Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables, and Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power (i) to endorse Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (iii) to send verifications of Receivables to any Customer; (iv) to sign Borrower's name on all financing statements or any other documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same; (v) to demand payment of the Receivables; (vi) to enforce payment of the Receivables by legal proceedings or otherwise; (vii) to exercise all of Borrower's rights and remedies with respect to the collection of the Receivables and any other Collateral; (viii) to settle, adjust, compromise, extend or renew the Receivables; (ix) to settle, adjust or compromise any legal proceedings brought to collect Receivables; (x) to prepare, file and sign Borrower's name on a proof of claim in bankruptcy or similar document against any Customer; (xi) to prepare, file and sign Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables; and (xii) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, (**INCLUDING,**

**WITHOUT LIMITATION, WITH RESPECT TO AN ACT OR INACTION FROM AGENT'S OR LENDERS' NEGLIGENCE OR STRICT LIABILITY)** unless done maliciously or with gross (not mere) negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment); this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time to change the address for delivery of mail addressed to Borrower to such address as Agent may designate and to receive, open and dispose of all mail addressed to Borrower.

(g)     No Liability.     Neither Agent nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind **(INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO AN ACT OR INACTION FROM AGENT'S OR LENDERS' NEGLIGENCE OR STRICT LIABILITY)** occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom. Agent may, without notice or consent from Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. Agent is authorized and empowered to accept the return of the goods represented by any of the Receivables, without notice to or consent by Borrower, all without discharging or in any way affecting Borrower's liability hereunder.

(h)     Establishment of a Lockbox Account, Dominion Account.     All proceeds of Collateral shall be deposited by or on behalf of Borrower into either (i) a lockbox account, dominion account or such other "blocked account" ("Blocked Accounts") established at a bank or banks (each such bank, a "Blocked Account Bank") pursuant to an arrangement with such Blocked Account Bank as may be selected by Borrower and be acceptable to Agent or (ii) depository accounts ("Depository Accounts") established at the Agent for the deposit of such proceeds. Borrower, Agent and each Blocked Account Bank shall enter into a deposit account control agreement in form and substance satisfactory to Agent directing such Blocked Account Bank to transfer such funds so deposited to Agent, either to any account maintained by Agent at said Blocked Account Bank or by wire transfer to appropriate account(s) of Agent. All funds deposited in such Blocked Accounts shall immediately become the property of Agent and Borrower shall obtain the agreement by such Blocked Account Bank to waive any offset rights against the funds so deposited if Blocked Account Bank is not the Agent. Neither Agent nor any Lender assumes any responsibility for such blocked account arrangement, including any claim of accord and satisfaction or release with respect to deposits accepted by any Blocked Account Bank thereunder. All deposit accounts and investment accounts of Borrower and its Subsidiaries are set forth on Schedule 4.15(h).

(i)     Adjustments.     Borrower will not, without Agent's consent, compromise or adjust any Receivables (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the business of Borrower.

4.16. <u>Inventory</u>. To the extent Inventory held for sale or lease has been produced by Borrower, it has been and will be produced by Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.17. <u>Maintenance of Equipment</u>. The Equipment shall be maintained in good operating condition and repair (reasonable wear and tear excepted) and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the Equipment shall be maintained and preserved. Borrower shall not use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation.

4.18. <u>Exculpation of Liability</u>. Nothing herein contained shall be construed to constitute Agent or any Lender as Borrower's agent for any purpose whatsoever, nor shall Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. Neither Agent nor any Lender, whether by anything herein or in any assignment or otherwise, assume any of Borrower's obligations under any contract or agreement assigned to Agent or such Lender, and neither Agent nor any Lender shall be responsible in any way for the performance by Borrower of any of the terms and conditions thereof.

4.19. <u>Environmental Matters</u>.

(a) Borrower shall ensure that the Real Property and all operations and businesses conducted thereon remains in compliance with all Environmental Laws and they shall not place or permit to be placed any Hazardous Substances on any Real Property except as permitted by Applicable Law or appropriate governmental authorities.

(b) Borrower shall establish and maintain a system to assure and monitor continued compliance with all applicable Environmental Laws which system shall include periodic reviews of such compliance.

(c) Borrower shall (i) employ in connection with the use of the Real Property appropriate technology necessary to maintain compliance with any applicable Environmental Laws and (ii) dispose of any and all Hazardous Waste generated at the Real Property only at facilities and with carriers that maintain valid permits under RCRA and any other applicable Environmental Laws. Borrower shall use its best efforts to obtain certificates of disposal, such as hazardous waste manifest receipts, from all treatment, transport, storage or disposal facilities or operators employed by Borrower in connection with the transport or disposal of any Hazardous Waste generated at the Real Property.

(d) In the event Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Substances at the Real Property (any such event being hereinafter referred to as a "<u>Hazardous Discharge</u>") or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or Borrower's interest therein (any of the foregoing is referred to herein as an "<u>Environmental Complaint</u>") from any Person, including any

state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (any such person or entity hereinafter the "Authority"), then Borrower shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which Borrower is aware giving rise to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in and Lien on the Real Property and the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(e)     Borrower shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by Borrower to dispose of Hazardous Substances and shall continue to forward copies of correspondence between Borrower and the Authority regarding such claims to Agent until the claim is settled. Borrower shall promptly forward to Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that Borrower is required to file under any Environmental Laws. Such information is to be provided solely to allow Agent to protect Agent's security interest in and Lien on the Real Property and the Collateral.

(f)     Borrower shall respond promptly to any Hazardous Discharge or Environmental Complaint and take all necessary action in order to safeguard the health of any Person and to avoid subjecting the Collateral or Real Property to any Lien. If Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or Borrower shall fail to comply with any of the requirements of any Environmental Laws, Agent on behalf of Lenders may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral:  (A) give such notices or (B) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deem reasonably necessary or advisable, to clean up, remove, mitigate or otherwise deal with any such Hazardous Discharge or Environmental Complaint. All reasonable costs and expenses incurred by Agent and Lenders (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, together with interest thereon from the date expended at the Default Rate for Domestic Rate Loans constituting Revolving Advances shall be paid upon demand by Borrower, and until paid shall be added to and become a part of the Obligations secured by the Liens created by the terms of this Agreement or any other agreement between Agent, any Lender and Borrower.

(g)     Promptly upon the written request of Agent after (i) the occurrence of a Default or Event of Default, (ii) Agent or Borrower obtaining knowledge of a fact or circumstance that could reasonably be expected to have an adverse effect on the environmental condition of any Real Property or (iii) such an assessment becoming required under any Applicable Law or the internal policies or procedures of general applicability of Agent or any Lender, Borrower shall provide Agent, at Borrower's expense, with an environmental site assessment or environmental audit report prepared by an environmental engineering firm acceptable in the reasonable opinion of Agent, to assess with a reasonable degree of certainty the existence of a Hazardous Discharge and the potential costs in connection with abatement,

58

cleanup and removal of any Hazardous Substances found on, under, at or within the Real Property. Any report or investigation of such Hazardous Discharge proposed and acceptable to an appropriate Authority that is charged to oversee the clean-up of such Hazardous Discharge shall be acceptable to Agent. If such estimates, individually or in the aggregate, exceed $100,000, Agent shall have the right to require Borrower to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs and expenses.

(h)     Borrower shall defend and indemnify Agent and Lenders and hold Agent, Lenders and their respective employees, agents, directors and officers harmless from and against all loss, liability, **(INCLUDING, WITHOUT LIMITATION, ANY STRICT LIABILITY)** damage and expense, claims, costs, fines and penalties, including attorney's fees, suffered or incurred by Agent or Lenders under or on account of any Environmental Laws, including the assertion of any Lien thereunder, with respect to any Hazardous Discharge, the presence of any Hazardous Substances affecting the Real Property, whether or not the same originates or emerges from the Real Property or any contiguous real estate, including any loss of value of the Real Property as a result of the foregoing **(INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO AN ACT OR INACTION FROM AGENT'S OR LENDERS' NEGLIGENCE OR STRICT LIABILITY)** except to the extent such loss, liability, damage and expense is attributable to any Hazardous Discharge resulting from actions on the part of Agent or any Lender. Borrower's obligations under this Section 4.19 shall arise upon the discovery of the presence of any Hazardous Substances at the Real Property, whether or not any federal, state, or local environmental agency has taken or threatened any action in connection with the presence of any Hazardous Substances. Borrower's obligation and the indemnifications hereunder shall survive the termination of this Agreement.

(i)     For purposes of Section 4.19 and 5.7, all references to Real Property shall be deemed to include all of Borrower's right, title and interest in and to its owned and leased premises.

4.20.   Financing Statements. Except as respects the financing statements filed by Agent and the financing statements described on Schedule 1.2 and Permitted Encumbrances, no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

V     REPRESENTATIONS AND WARRANTIES.

References in this Article V to "Borrower" shall refer to Borrower and/or the business to be acquired by Borrower pursuant to the transactions contemplated by the Acquisition Agreement, as context shall require for periods prior to the Closing Date. Borrower represents and warrants that the following statements are, and after giving effect to the transactions contemplated by the Acquisition Agreement will be, true, correct and complete:

5.1.   Authority. Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents and to perform all its respective Obligations hereunder and thereunder. This Agreement and the Other Documents have been duly executed and delivered by Borrower, and this Agreement and the Other Documents constitute the legal, valid and binding obligation of Borrower enforceable in accordance with their terms, except as such

enforceability may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally. The execution, delivery and performance of this Agreement and of the Other Documents (a) are within Borrower's limited liability company powers, have been duly authorized by all necessary company action, are not in contravention of law or the terms of Borrower's operating agreement, certificate of formation or other applicable documents relating to Borrower's formation or to the conduct of Borrower's business or of any material agreement or undertaking to which Borrower is a party or by which Borrower is bound, including the Acquisition Agreement (b) will not conflict with or violate any law or regulation, or any judgment, order or decree of any Governmental Body, (c) will not require the Consent of any Governmental Body or any other Person, except those Consents set forth on <u>Schedule 5.1</u> hereto, all of which will have been duly obtained, made or compiled prior to the Closing Date and which are in full force and effect and (d) will not conflict with, nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of Borrower under the provisions of any agreement, charter document, instrument, operating agreement or other instrument to which Borrower is a party or by which it or its property is a party or by which it may be bound, including under the provisions of the Acquisition Agreement.

5.2. <u>Formation and Qualification</u>.

(a) Borrower is duly formed and in good standing under the laws of the state listed on <u>Schedule 5.2(a)</u> and is qualified to do business and is in good standing in the states listed on <u>Schedule 5.2(a)</u> which constitute all states in which qualification and good standing are necessary for Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect on Borrower. Borrower has delivered to Agent true and complete copies of its certificate of formation and operating agreement and will promptly notify Agent of any amendment or changes thereto.

(b) The only Subsidiaries of Borrower are listed on <u>Schedule 5.2(b)</u>.

5.3. <u>Survival of Representations and Warranties</u>. All representations and warranties of Borrower contained in this Agreement and the Other Documents shall be true at the time of Borrower's execution of this Agreement and the Other Documents, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

5.4. <u>Tax Returns</u>. Borrower's federal tax identification number is set forth on <u>Schedule 5.4</u>. Borrower has filed all federal, state and local tax returns and other reports each is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable.

5.5. <u>Financial Statements</u>.

(a) The estimated pro forma balance sheet of Borrower (the "<u>Pro Forma Balance Sheet</u>") furnished to Agent on the Closing Date reflects the consummation of the transactions contemplated by the Acquisition Agreement and under this Agreement (collectively, the "<u>Transactions</u>") and is based on reasonable, good faith estimates and, to the extent available

60

as of the Closing Date, accurate, complete and correct information and fairly reflects the financial condition of Borrower as of the Closing Date after giving effect to the Transactions, and has been prepared in accordance with GAAP consistently applied (other than by virtue of being an estimate). The President, the Chief Executive Officer and Chief Financial Officer of Borrower have each certified that, to the best of his or her knowledge, the preceding sentence is true, correct and complete in all material respects.

(b)     The twelve-month cash flow projections of Borrower and its projected balance sheets as of the Closing Date, copies of which are annexed hereto as Exhibit 5.5(b) (the "Projections") were prepared by the Borrower, are based on underlying assumptions which provide a reasonable basis for the projections contained therein and reflect Borrower's judgment based on present circumstances of the most likely set of conditions and course of action for the projected period. The cash flow Projections together with the Pro Forma Balance Sheet, are referred to as the "Pro Forma Financial Statements".

(c)     To the best of Borrower's knowledge, the consolidated and consolidating balance sheets of Sellers, their respective Subsidiaries and such other Persons described therein (including the accounts of all Subsidiaries for the respective periods during which a subsidiary relationship existed) as of December 31, 2008, and the related statements of income, changes in stockholder's equity, and changes in cash flow for the period ended on such date, all accompanied by reports thereon containing opinions without qualification by independent certified public accountants, copies of which have been delivered to Agent, have been prepared in accordance with GAAP, consistently applied (except for changes in application in which such accountants concur) and present fairly the financial position of Sellers and their respective Subsidiaries at such date and the results of their operations for such period. To the best of Borrower's knowledge, since December 31, 2008 there has been no change in the condition, financial or otherwise, of Sellers or their respective Subsidiaries as shown on the consolidated balance sheet as of such date and no change in the aggregate value of machinery, equipment and Real Property owned by Sellers or their respective Subsidiaries, except changes in the Ordinary Course of Business, none of which individually or in the aggregate has been materially adverse.

5.6.     Entity Names. Borrower has not been known by any other corporate name in the past five years and does not sell Inventory under any other name except as set forth on Schedule 5.6, nor has Borrower been the surviving company of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years, except pursuant to the Acquisition Agreement.

5.7.     O.S.H.A. and Environmental Compliance.

(a)     Borrower has duly complied with, and its facilities, business, assets, property, leaseholds, Real Property and Equipment are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws; there have been no outstanding citations, notices or orders of non-compliance issued to Borrower or relating to its business, assets, property, leaseholds or Equipment under any such laws, rules or regulations.

(b)     Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws.

(c)     (i) There are no visible signs of releases, spills, discharges, leaks or disposal (collectively referred to as "Releases") of Hazardous Substances at, upon, under or within any Real Property or any premises leased by Borrower; (ii) there are no underground storage tanks or polychlorinated biphenyls on the Real Property or any premises leased by Borrower; (iii) neither the Real Property nor any premises leased by Borrower has ever been used as a treatment, storage or disposal facility of Hazardous Waste; and (iv) no Hazardous Substances are present on the Real Property or any premises leased by Borrower, excepting such quantities as are handled in accordance with all applicable manufacturer's instructions and governmental regulations and in proper storage containers and as are necessary for the operation of the commercial business of Borrower or of its tenants.

5.8.     Solvency; No Litigation, Violation, Indebtedness or Default.

(a)     Borrower and Guarantor are, and after giving effect to the Transactions, Borrower and Guarantor will be solvent, able to pay their respective debts as they mature and has, and after giving effect to the Transactions, will have capital sufficient to carry on its business and all businesses in which they are about to engage, and (i) as of the Closing Date, the fair present saleable value of the assets of Borrower and Guarantor, calculated on a going concern basis, is in excess of the amount of its liabilities and (ii) subsequent to the Closing Date, the fair saleable value of the assets of Borrower and Guarantor (calculated on a going concern basis) will be in excess of the amount of their respective liabilities.

(b)     Except as disclosed in Schedule 5.8(b), Borrower has no (i) pending or threatened litigation, arbitration, actions or proceedings which involve the possibility of having a Material Adverse Effect, and (ii) liabilities or indebtedness for borrowed money other than the Obligations.

(c)     Borrower is not in violation of any applicable statute, law, rule, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is Borrower in violation of any order of any court, Governmental Body or arbitration board or tribunal.

(d)     Neither Borrower nor any member of the Controlled Group maintains or contributes to any Plan other than (i) as of the Closing Date, those listed on Schedule 5.8(d) hereto and (ii) thereafter, as permitted under this Agreement. (i) No Plan has incurred any "accumulated funding deficiency," as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived, and Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA in respect of each Plan; (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code; (iii) neither Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid; (iv) no Plan has been

terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence which would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan; (v) at this time, the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan and neither Borrower nor any member of the Controlled Group knows of any facts or circumstances which would materially change the value of such assets and accrued benefits and other liabilities; (vi) neither Borrower nor any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan; (vii) neither Borrower nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section 4972 or 4980B of the Code, and no fact exists which could give rise to any such liability; (viii) neither Borrower nor any member of the Controlled Group nor any fiduciary of, nor any trustee to, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action which would constitute or result in a Termination Event with respect to any such Plan which is subject to ERISA; (ix) Borrower and each member of the Controlled Group has made all contributions due and payable with respect to each Plan; (x) there exists no event described in Section 4043(b) of ERISA, for which the thirty (30) day notice period has not been waived; (xi) neither Borrower nor any member of the Controlled Group has any fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than employees or former employees of Borrower and any member of the Controlled Group; (xii) neither Borrower nor any member of the Controlled Group maintains or contributes to any Plan which provides health, accident or life insurance benefits to former employees, their spouses or dependents, other than in accordance with Section 4980B of the Code; (xiii) neither Borrower nor any member of the Controlled Group has withdrawn, completely or partially, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980 and there exists no fact which would reasonably be expected to result in any such liability; and (xiv) no Plan fiduciary (as defined in Section 3(21) of ERISA) has any liability for breach of fiduciary duty or for any failure in connection with the administration or investment of the assets of a Plan.

5.9. <u>Patents, Trademarks, Copyrights and Licenses</u>. All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, trade names, trade name applications, domain names, domain name applications, assumed names, trade secrets and licenses (except for 'shrink wrap' licenses in respect of mass-marketed software licenses generally commercially available) owned or utilized by Borrower are set forth on <u>Schedule 5.9</u>, are valid and have been duly registered or filed with all appropriate Governmental Bodies and constitute all of the intellectual property rights which are necessary for the operation of its business; there is no objection to or pending challenge to the validity of any such patent, trademark, copyright, design rights, trade name, trade name application, trade secret, domain name, domain name applications or license (except for 'shrink wrap' licenses in respect of mass-marketed software licenses generally commercially available) and Borrower is not aware of any grounds for any challenge, except as set forth in <u>Schedule 5.9</u> hereto. Each patent, patent application, patent license, trademark, trademark application, trademark license, service mark, service mark application, service mark license, trade name, trade name application, domain name, domain name application, design rights, copyright, copyright application and copyright license owned or held by Borrower and all trade secrets used by Borrower consist of original material or property developed by Borrower or was

lawfully acquired by Borrower from the proper and lawful owner thereof. Each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof. With respect to all software used by Borrower, Borrower is in possession of all source and object codes related to each piece of software or is the beneficiary of a source code escrow agreement, each such source code escrow agreement being listed on Schedule 5.9 hereto.

5.10. Licenses and Permits. Except as set forth in Schedule 5.10, Borrower (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state or local law, rule or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to procure such licenses or permits could have a Material Adverse Effect.

5.11. Default of Indebtedness. Borrower is not in default in the payment of the principal of or interest on any Indebtedness or under any instrument or agreement under or subject to which any Indebtedness has been issued and no event has occurred under the provisions of any such instrument or agreement which with or without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

5.12. No Default. Borrower is not in default in the payment or performance of any of its material contractual obligations and no Default has occurred.

5.13. No Burdensome Restrictions. Borrower is not party to any contract or agreement the performance of which could have a Material Adverse Effect. Borrower has heretofore made available to Agent true and complete copies of all material contracts being assumed or acquired by Borrower in pursuant to the Acquisition Agreement. Borrower has not agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not a Permitted Encumbrance.

5.14. No Labor Disputes. Schedule 5.14 lists each (i) labor union that represents employees of Borrower or any of its Subsidiaries and (ii) collective bargaining agreement or other labor union contract or agreement to which Borrower or any Subsidiary thereof is a party, or which is being assumed or acquired by Borrower in pursuant to the Acquisition Agreement with respect to any employee. Except as set forth on Schedule 5.14, the consent of any labor union which is a party to one or more of the collective bargaining or labor agreements listed on Schedule 5.14 is not required in connection with the Transactions contemplated hereby or by the Acquisition Agreement. Neither Borrower nor, to Borrower's knowledge, the Sellers have materially breached or otherwise failed to comply with any provision of any collective bargaining agreement or other labor agreement listed on Schedule 5.14 and there are no significant grievances outstanding against Borrower, or any of its Subsidiaries or, to Borrower's knowledge, any Seller under such agreement. Neither Borrower nor, to Borrower's knowledge, the Sellers is involved in any labor dispute and there are no activities or of any labor union (or representative thereof) to organize any unorganized employees of the Borrower, or any of its Subsidiaries or, to Borrower's knowledge, any Seller, or any strikes, slowdowns, work stoppages, lockouts or threats thereof, by or with respect to any of the employees of the

Borrower or any Subsidiary and no labor contract is scheduled to expire during the Term other than as set forth on Schedule 5.14 hereto.

5.15. Margin Regulations. Borrower is not engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advance will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

5.16. Investment Company Act. Borrower is not an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.17. Disclosure. No representation or warranty made by Borrower in this Agreement in the Acquisition Agreement, or in any financial statement, report, certificate or any other document furnished in connection herewith or therewith contains any untrue statement of fact or omits to state any fact necessary to make the statements herein or therein not misleading. There is no fact known to Borrower or which reasonably should be known to Borrower which Borrower has not disclosed to Agent in writing with respect to the transactions contemplated by the Acquisition Agreement, or this Agreement which could reasonably be expected to have a Material Adverse Effect.

5.18. Delivery of Acquisition Agreement. Agent has received complete copies of the Acquisition Agreement (including all exhibits, schedules and disclosure letters referred to therein or delivered pursuant thereto, if any) and all amendments thereto, waivers relating thereto and other side letters or agreements affecting the terms thereof. None of such documents and agreements has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or instrument which has heretofore been delivered to Agent. To the best of Borrower's knowledge, the representations made in Sections 3.3 and 3.7 of the Acquisition Agreement are true, correct and complete.

5.19. Swaps. Borrower is not a party to, nor will it be a party to, any swap agreement whereby Borrower has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

5.20. Conflicting Agreements. No provision of any mortgage, indenture, contract, agreement, judgment, decree or order binding on Borrower or affecting the Collateral conflicts with, or requires any Consent which has not already been obtained to, or would in any way prevent the execution, delivery or performance of, the terms of this Agreement or the Other Documents.

5.21. Application of Certain Laws and Regulations. Neither Borrower nor any Affiliate of Borrower is subject to any law, statute, rule or regulation which regulates the incurrence of any Indebtedness, including laws, statutes, rules or regulations relative to common or interstate

carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.22. <u>Business and Property of Borrower</u>. Borrower did not engage in any business prior to the Funding Date. Upon and after the Funding Date, Borrower does not propose to engage in any business other than the operation and distribution of a daily newspaper in Volusia County and Flagler County, Florida, and activities necessary to conduct the foregoing. On the Funding Date, Borrower will own all the property and possess all of the rights and Consents necessary for the conduct of the business of Borrower.

5.23. <u>Section 20 Subsidiaries</u>. Borrower does not intend to use and shall not use any portion of the proceeds of the Advances, directly or indirectly, to purchase during the underwriting period, or for 30 days thereafter, Ineligible Securities being underwritten by a Section 20 Subsidiary.

5.24. <u>Anti-Terrorism Laws</u>.

(a) <u>General</u>. Neither Borrower nor any Affiliate of Borrower is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b) <u>Executive Order No. 13224</u>. Neither Borrower nor any Affiliate of Borrower or their respective agents acting or benefiting in any capacity in connection with the Advances or other transactions hereunder, is any of the following (each a "<u>Blocked Person</u>"):

(i) a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(ii) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(iii) a Person or entity with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv) a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

(v) a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or

(vi) a Person or entity who is affiliated or associated with a Person or entity listed above.

66

Neither Borrower nor to the knowledge of Borrower, any of its agents acting in any capacity in connection with the Advances or other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

     5.25. <u>Trading with the Enemy</u>. Borrower has not engaged, nor does it intend to engage, in any business or activity prohibited by the Trading with the Enemy Act.

     5.26. <u>Federal Securities Laws</u>. Neither Holdings, Borrower nor any of their respective Subsidiaries (i) is required to file periodic reports under the Exchange Act, (ii) has any securities registered under the Exchange Act or (iii) has filed a registration statement that has not yet become effective under the Securities Act.

VI     AFFIRMATIVE COVENANTS.

     Borrower shall, until payment in full of the Obligations and termination of this Agreement:

     6.1. <u>Payment of Fees</u>. Pay to Agent on demand all usual and customary fees and expenses which Agent incurs in connection with (a) the forwarding of Advance proceeds and (b) the establishment and maintenance of any Blocked Accounts or Depository Accounts as provided for in <u>Section 4.15(h)</u>. Agent may, without making demand, charge Borrower's Account for all such fees and expenses.

     6.2. <u>Conduct of Business and Maintenance of Existence and Assets</u>. (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including all licenses (except for 'shrink wrap' licenses in respect of mass-marketed software licenses generally commercially available), patents, copyrights, design rights, trade names, trade secrets, domain names and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral; (b) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (c) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof.

     6.3. <u>Violations</u>. Promptly notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to Borrower which could reasonably be expected to have a Material Adverse Effect.

     6.4. <u>Government Receivables</u>. Take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act, the Uniform Commercial Code and all other applicable state or local statutes or ordinances and deliver to Agent appropriately

endorsed, any instrument or chattel paper connected with any Receivable arising out of contracts between Borrower and the United States, any state or any department, agency or instrumentality of any of them.

6.5. Financial Covenants.

(a) Minimum Tangible Net Worth. Maintain at all times a Tangible Net Worth in an amount not less than the amount set forth below for the corresponding period, to be measured as of the last Business Day of each fiscal quarter commencing March 31, 2010:

| From January 1, 2010 through December 31, 2010 | The sum of (i) Tangible Net Worth as of the last day of the month in which the Funding Date occurs (determined on the basis of Borrower's unaudited financial statements as of such date), plus (ii) fifty percent (50%) of (a) Borrower's net income after distributions for taxes for the period from January 1 of such year through the date of determination, if such net income is greater that $0, or (b) $0, if such net income after distributions for taxes is less than $0 ((a) or (b), as applicable, the "Year-to-Date Net Income"). |
| From January 1 of each year thereafter through December 31 of such year | The sum of (i) the minimum Tangible Net Worth required pursuant to this Section 6.5(a) as of December 31 of the immediately preceding year, plus (ii) fifty percent (50%) of Borrower's Year-to-Date Net Income. |

(b) Fixed Charge Coverage Ratio. Cause to be maintained a Fixed Charge Coverage Ratio of not less than the ratio set forth in the table below for the corresponding period:

| Period | Ratio |
|---|---|
| As of March 31, 2010, for the fiscal quarter then most recently ended | 2.0 to 1.0 |
| As of June 30, 2010, for the two fiscal quarters then most recently ended | 2.0 to 1.0 |
| As of September 30, 2010 for the three fiscal quarters then most recently ended. | 2.0 to 1.0 |

| As of December 31, 2010 and as of the last day of each fiscal quarter thereafter, for the four fiscal quarters then most recently ended | 2.0 to 1.0 |
|---|---|

6.6.  Execution of Supplemental Instruments.  Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may reasonably request, in order that the full intent of this Agreement may be carried into effect.

6.7.  Payment of Indebtedness.  Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its obligations and liabilities of whatever nature, except when the failure to do so could not reasonably be expected to have a Material Adverse Effect or when the amount or validity thereof is currently being contested in good faith by appropriate proceedings and Borrower shall have provided for such reserves as Agent may reasonably deem proper and necessary, subject at all times to any applicable subordination arrangement in favor of Lenders.

6.8.  Standards of Financial Statements.  Cause all financial statements referred to in Sections 9.7, 9.8, 9.9, 9.10, 9.11, 9.12 and 9.13 as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by such reporting accountants or officer, as the case may be, and disclosed therein).

6.9.  Federal Securities Laws.  Promptly notify Agent in writing if Holdings or any of its Subsidiaries (i) is required to file periodic reports under the Exchange Act, (ii) registers any securities under the Exchange Act or (iii) files a registration statement under the Securities Act.

6.10.  Exercise of Rights.  Reasonably enforce all of its rights under the Acquisition Agreement and all other documents executed in connection therewith including, but not limited to, all indemnification rights and pursue all remedies available to it with diligence and in good faith in connection with the enforcement of any such rights.

6.11.  Collective Bargaining Agreements.  Maintain all collective bargaining agreement or other labor union contract or agreement to which Borrower or any Subsidiary is a party with respect to any employee and promptly notify Agent in writing of any material violation thereof.

6.12.  Approved Incentive Plan.  Cause all Equity Interests issued in respect of any Approved Incentive Plan to be subject to a pledge agreement in favor of Agent.

VII    NEGATIVE COVENANTS.

Borrower shall not, until satisfaction in full of the Obligations and termination of this Agreement:

7.1.   Merger, Consolidation, Acquisition and Sale of Assets.

(a)    Enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or Equity Interests of any Person or permit any other Person to consolidate with or merge with it.

(b)    Sell, lease, transfer or otherwise dispose of any of its properties or assets, except (i) dispositions of Inventory and Equipment to the extent expressly permitted by Section 4.3 and (ii) any other sales or dispositions expressly permitted by this Agreement.

7.2.   Creation of Liens.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

7.3.   Guarantees.  Become liable upon the obligations or liabilities of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lenders) except the endorsement of checks in the Ordinary Course of Business.

7.4.   Investments.  Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, except (a) obligations issued or guaranteed by the United States of America or any agency thereof, (b) commercial paper with maturities of not more than 180 days and a published rating of not less than A-1 or P-1 (or the equivalent rating), (c) certificates of time deposit and bankers' acceptances having maturities of not more than 180 days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, and (d) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof.

7.5.   Loans.  Make advances, loans or extensions of credit to any Person, including any Parent, Subsidiary or Affiliate.

7.6.   Capital Expenditures.  Contract for, purchase or make any expenditure or commitments for Capital Expenditures in an aggregate amount for Borrower in excess of (a) $2,500,000 during fiscal year 2010, (b) $4,300,000 in the aggregate during fiscal years 2010 and 2011 and (c) $1,300,000 in any fiscal year thereafter.

7.7.   Distributions.  Pay or make any distribution on any membership interests of Borrower or apply any of its funds, property or assets to the purchase, redemption or other retirement of any membership interests, or of any options to purchase or acquire any such membership interests of Borrower except that Borrower shall be permitted to make payments and distributions to its members (a) in an aggregate amount equal to fifty percent (50%) of the

70

net cash proceeds of the sale of any Excluded Real Property or the sale of the Naming Rights, so long as (i) a notice of termination with regard to this Agreement shall not be outstanding, (ii) no Default or Event of Default shall have occurred or will result from any such payment, (iii) as of the most recent fiscal quarter occurring prior to the applicable date of any such payment, Borrower shall have been (and shall be on a pro forma basis, assuming the applicable payment was outstanding or had occurred on such most recent fiscal quarter) in compliance with the Fixed Charge Coverage Ratio set forth in Section 6.5(a) and (iv) Borrower shall have delivered to Agent five (5) days prior to such payment, a Compliance Certificate demonstrating compliance with the foregoing subsections (a)(ii) and (a)(iii) of this Section 7.7, (b) in an aggregate amount equal to the Increased Tax Burden of its members, so long as, in the case of any distributions under clause (b) hereof (i) a notice of termination with regard to this Agreement shall not be outstanding, (ii) no Event of Default or Default shall have occurred and be continuing, and (iii) the purpose for such purchase, redemption or distribution shall be as set forth in writing to Agent at least ten (10) days prior to such purchase, redemption or distribution and such purchase, redemption or distribution shall in fact be used for such purpose (each, a "Permitted Distribution"). Permitted Distributions to members shall be made so as to be available when the tax is due, including in respect of estimated tax payments. In the event Borrower's actual income is less than the estimated income upon which tax distributions were made to members, then Borrower shall recover the amount by which the tax distribution to any member based on estimated income exceeds the amount of tax distribution that would have been made to such member based on actual income (the "Overpayment"). Borrower shall recover the Overpayment by (a) reducing the amount of the next tax distribution(s) until the amount of the Overpayment is recovered, or (b) in the event future tax distributions are not permitted, receipt of the Overpayment from such member.

7.8. **Indebtedness.** Create, incur, assume or suffer to exist any Indebtedness (exclusive of trade debt) except in respect of (i) Indebtedness to Lenders; (ii) Indebtedness incurred for Capital Expenditures permitted under Section 7.6 hereof; (iii) assumed under the Acquisition Agreement.

7.9. **Nature of Business.** Substantially change the nature of the business in which it is presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the Ordinary Course of Business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted.

7.10. **Transactions with Affiliates.** Directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal with, any Affiliate, except transactions disclosed to the Agent, which are in the Ordinary Course of Business, on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate.

7.11. **Leases.** Enter as lessee into any lease arrangement for real or personal property (unless capitalized and permitted under Section 7.6 hereof) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $850,000 in any one fiscal year in the aggregate for Borrower.

7.12. Subsidiaries.

(a)   Form any Subsidiary unless (i) such Subsidiary expressly joins in this Agreement as a borrower and becomes jointly and severally liable for the obligations of Borrower hereunder, under the Notes, and under any other agreement between Borrower and Lenders and (ii) Agent shall have received all documents, including, without limitation, legal opinions, and Uniform Commercial Code financing statements, it may reasonably require to establish compliance with each of the foregoing conditions.

(b)   Enter into any partnership, joint venture or similar arrangement.

7.13. Fiscal Year and Accounting Changes.   Change its fiscal year from December 31 or make any change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by law.

7.14. Pledge of Credit.   Now or hereafter pledge Agent's or any Lender's credit on any purchases or for any purpose whatsoever or use any portion of any Advance in or for any business other than Borrower's business as conducted on the date of this Agreement.

7.15. Amendment of Certificate of Formation, Operating Agreement.   Amend, modify or waive any term or provision of its applicable Certificate of Formation or Operating Agreement unless required by law.

7.16. Compliance with ERISA.   (i) (x) Maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans disclosed on Schedule 5.8(d) or any other Plan for which Agent has provided its prior written consent, (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in section 406 of ERISA and Section 4975 of the Code, (iii) incur, or permit any member of the Controlled Group to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (iv) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of Borrower or any member of the Controlled Group or the imposition of a lien on the property of Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (v) assume, or permit any member of the Controlled Group to assume, any obligation to contribute to any Multiemployer Plan not disclosed on Schedule 5.8(d), (vi) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (vii) fail promptly to notify Agent of the occurrence of any Termination Event, (viii) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other Applicable Laws in respect of any Plan, (ix) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA or the Code or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan.

7.17. <u>Prepayment of Indebtedness</u>.  At any time, directly or indirectly, prepay any Indebtedness (other than to Lenders), or repurchase, redeem, retire or otherwise acquire any Indebtedness of Borrower.

7.18. <u>Anti-Terrorism Laws</u>. Borrower shall not, until satisfaction in full of the Obligations and termination of this Agreement, nor shall it permit any Affiliate or agent to:

     (a)    Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person.

     (b)    Deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

     (c)    Engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order No. 13224, the USA PATRIOT Act or any other Anti-Terrorism Law. Borrower shall deliver to Lenders any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming Borrower's compliance with this Section.

7.19. <u>Membership/Partnership Interests</u>. Elect to treat or permit any of its Subsidiaries to (x) treat its limited liability company membership interests or partnership interests, as the case may be, as securities as contemplated by the definition of "security" in Section 8-102(15) and by Section 8-103 of Article 8 of Uniform Commercial Code or (y) certificate its limited liability company membership interests or partnership interests, as the case may be.

7.20. <u>Trading with the Enemy Act</u>.  Engage in any business or activity in violation of the Trading with the Enemy Act.

7.21. <u>Other Agreements</u>. Enter into any material amendment, waiver or modification of the Acquisition Agreement, or any related agreements.

VIII   CONDITIONS PRECEDENT.

8.1. <u>Conditions to Initial Advances</u>.  The agreement of Lenders to make the initial Advances requested to be made on the Funding Date is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the making of such Advances, of the following conditions precedent:

     (a)    <u>This Agreement</u>.  Agent shall have received this Agreement, duly executed by Borrower;

     (b)    <u>Pledge Agreements</u>.  Agent shall have received the Pledge Agreements, each in form and substance satisfactory to Agent and duly executed by the parties named therein;

     (c)    <u>Pledged Membership Interests; Unit Powers; Pledged Notes</u>.  Receipt by Agent of (i) any certificates representing the membership interests of Equity Interests pledged

pursuant to the Pledge Agreements, together with an undated unit (or analogous) power for each such membership interest executed in blank by a duly authorized officer of the pledgor thereof, and (iii) each promissory note (if any) pledged to Agent pursuant to the Pledge Agreements endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

    (d)    <u>Negative Pledge</u>. Agent shall have received the Negative Pledge, in recordable form and otherwise in form and substance satisfactory to Agent, duly executed by Borrower.

    (e)    <u>Note</u>. Agent shall have received the Notes duly executed and delivered by an authorized officer of Borrower;

    (f)    <u>Intellectual Property Security Agreement</u>. Agent shall have received the Intellectual Property Security Agreement, in form and substance satisfactory to Agent and duly executed by the parties named therein;

    (g)    <u>Pre-Funding Letter</u>. On the Closing Date, Agent shall have received the Pre-Funding Letter, in form and substance satisfactory to Agent and duly executed by the parties named therein;

    (h)    <u>Questionnaire</u>. (i) On the Closing Date, Agent shall have received the Questionnaire and (ii) on the Funding Date, Agent shall have received a modified Questionnaire, which shall include the assets of Borrower acquired pursuant to the Acquisition Agreement, in each case, in form and substance satisfactory to Agent and duly executed by the parties named therein;

    (i)    <u>Filings, Registrations and Recordings</u>. Each document (including any Uniform Commercial Code financing statement) required by this Agreement, any related agreement or under law or reasonably requested by the Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or lien upon the Collateral shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and Agent shall have received an acknowledgment copy, or other evidence satisfactory to it, of each such filing, registration or recordation and satisfactory evidence of the payment of any necessary fee, tax or expense relating thereto;

    (j)    <u>Company Proceedings of Borrower</u>. Agent shall have received a copy of the resolutions in form and substance reasonably satisfactory to Agent, of the Managing Member of Borrower authorizing (i) the execution, delivery and performance of this Agreement and the Pre-Funding Letter;

    (k)    <u>Company Proceedings of Guarantor</u>. Agent shall have received a copy of the resolutions in form and substance reasonably satisfactory to Agent of the Managing Member of Guarantor, authorizing the execution, delivery and performance of the Guaranty, the Guarantor Security Agreement and each Other Document to which it is a party

(l)   Incumbency Certificates of Borrower.   Agent shall have received a certificate of the Secretary or an Assistant Secretary of Borrower, dated the Closing Date, as to the incumbency and signature of the officers of Borrower executing this Agreement, the Other Documents, any certificate or other documents to be delivered by it pursuant hereto, together with evidence of the incumbency of such Secretary or Assistant Secretary;

(m)   Incumbency Certificates of Guarantor.   Agent shall have received a certificate of the Secretary or an Assistant Secretary of Guarantor, dated the Closing Date, as to the incumbency and signature of the officers of Guarantor executing the Guaranty, the Guarantor Security Agreement, the Other Documents to which it is a party, any certificate or other documents to be delivered by it pursuant hereto, together with evidence of the incumbency of such Secretary or Assistant Secretary;

(n)   Certificates.   Agent shall have received a copy of the Articles or Certificate of Formation of Borrower and each Guarantor and all amendments thereto, certified by the Secretary of State or other appropriate official of its jurisdiction of Formation together with copies of the Operating Agreements of Borrower and each Guarantor and all agreements of Borrower's and each Guarantor's members certified as accurate and complete by the Secretary of Borrower and each Guarantor, as applicable;

(o)   Good Standing Certificates.   Agent shall have received good standing certificates for Borrower and each Guarantor dated not more than ten (10) days prior to the Closing Date, issued by the Secretary of State or other appropriate official of Borrower's and each Guarantor's jurisdiction of formation and each jurisdiction where the conduct of each business activities or the ownership of its properties necessitates qualification;

(p)   Legal Opinion.   Agent shall have received the executed legal opinion of (i) Rose Law Firm in form and substance satisfactory to Agent which shall cover such matters incident to the transactions contemplated by this Agreement, the Notes, the Pledges, the Collateral Assignment of Acquisition Agreement, the Collateral Assignment of Escrow Agreement and Accounts, the Guaranty, any Other Documents and related agreements as Agent may reasonably require and Borrower hereby authorizes and directs such counsel to deliver such opinions to Agent and the Lenders and (ii) received the executed legal opinion of Foley & Lardner LLP in form and substance satisfactory to Agent which shall cover the Mortgages and Negative Pledge and Borrower hereby authorizes and directs such counsel to deliver such opinions to Agent and Lenders.

(q)   No Litigation.   (i) No litigation, investigation or proceeding before or by any arbitrator or Governmental Body or material contingent obligations shall be continuing or threatened against Borrower, Guarantor, Sellers (with respect to the business and assets of Sellers being purchased by Borrower pursuant to the Acquisition Agreement) or against the officers or directors of Borrower, Guarantor or Sellers (A) in connection with this Agreement, the Other Documents or any of the transactions contemplated thereby and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the reasonable opinion of Agent, have a Material Adverse Effect; (ii) no injunction, writ, restraining order or other order of any nature materially adverse to Borrower or the conduct of its business or inconsistent with the

due consummation of the Transactions shall have been issued by any Governmental Body and (iii) no material contingent obligations shall exist or have been asserted against Borrower or against the officer or directors of Borrower, Guarantor or Sellers which could, in the reasonable opinion of Agent, have a Material Adverse Effect;

(r)     Financial Condition Certificates.  On the Funding Date, Agent shall have received an executed Financial Condition Certificate in the form of Exhibit 8.1.

(s)     Collateral Examination.     Agent shall have completed Collateral examinations and received appraisals, the results of which shall be satisfactory in form and substance to Lenders, of the Receivables, Inventory, General Intangibles, Real Property and Equipment of Borrower and all books and records in connection therewith;

(t)     Fees.  Agent shall have received all fees payable to Agent and Lenders on or prior to the Closing Date hereunder, including pursuant to Article III hereof;

(u)     Pro Forma Financial Statements.  Agent shall have received a copy of the Pro Forma Financial Statements which shall be satisfactory in all respects to Lenders;

(v)     Acquisition Documents.  Agent shall have received final, executed copies of the Acquisition Agreement and all related agreements, documents and instruments to be executed in connection therewith, including, without limitation, a power-of-attorney executed by Sellers in favor Borrower authorizing Borrower to endorse Seller's name on any checks or other negotiable instruments payable to Seller and received by Borrower from its Customers and the Cox Side Letter, all of which shall be (i) in the form provided to Agent on the date hereof, (ii) certified as true, correct and complete by a duly authorized officer of Borrower and (iii) the transactions contemplated by such documentation shall be consummated prior to or simultaneously with the making of the initial Advance including, without limitation, the receipt by Holdings from Sponsor, of a cash capital contribution in the sum of at least $10,000,000, and Borrower's capital structure, after giving effect to the Acquisition and the Transactions shall be satisfactory to Agent in its sole discretion.  Agent shall have received evidence satisfactory to it that one hundred percent of the purchase consideration payable thereunder shall be segregated and held by Seller (and shall not be expended by Seller or distributed to any of its creditors or shareholders) until the later of (x) 30 days following the entry of the Order approving and authorizing the transactions contemplated by the Acquisition Agreement, (y) 30 days following the entry of an order by the court authorizing distribution of the proceeds of such transactions, such order to be sought by motion with an opportunity for Sellers' creditors and other interested Persons to be heard; provided that,  in the event a motion, notice of appeal or other challenge is filed with the court within either of the said thirty-day periods that seeks to reverse, vacate, set aside or annul the Order in a manner that would be reasonably expected to negatively affect Borrower's title to the Transferred Assets (as defined in the Acquisition Agreement), no proceeds shall be distributed until such motion, appeal or other challenge has been finally resolved or disposed of.

(w)     Insurance.  On the Funding Date, Agent shall have received in form and substance satisfactory to Agent, (x) certified copies of Borrower's casualty, insurance policies, together with loss payable endorsements on Agent's standard form of loss payee endorsement

naming Agent as loss payee, (y) certified copies of Borrower's liability insurance policies, together with endorsements naming Agent as a co-insured and (z) certified copies of Borrower's flood insurance with respect to all Real Property located in any area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968, which flood insurance shall be duly endorsed to Agent naming Agent as loss payee and additional insured thereunder;

(x)     Payment Instructions. Agent shall have received written instructions from Borrower directing the application of proceeds of the initial Advances made pursuant to this Agreement;

(y)     Blocked Accounts.     (i) Agent shall have received duly executed agreements establishing the Blocked Accounts or Depository Accounts with financial institutions acceptable to Agent for the collection or servicing of the Receivables and proceeds of the Collateral; and (ii) Borrower shall have directed each of its Customers (other than those Customers who, consistent with Borrower's past practices, remit payment by check to Borrower for sight-scanning) to remit all amounts payable to or for the account of Borrower directly to the Blocked Account.

(z)     Consents. Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement, the Other Documents and the Acquisition Agreement; and, Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem necessary;

(aa) - No Adverse Material Change. (i) since December 31, 2008, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect and (ii) no representations made or information supplied to Agent or Lenders shall have been proven to be inaccurate or misleading in any material respect;

(bb)     Lien Waiver Agreements.     Agent shall have received Lien Waiver Agreements satisfactory to Agent with respect to all premises leased by Borrower at which any Eligible Inventory or books and records is located, including, without limitation, the Yonge Street Property;

(cc)     Mortgages. Agent shall have received in form and substance satisfactory to Lenders an executed Mortgage for each Real Property;

(dd)     Title Insurance. Agent shall have received fully paid mortgagee title insurance policies (or binding commitments to issue title insurance policies, marked to Agent's satisfaction to evidence the form of such policies to be delivered with respect to each Mortgage), in standard ALTA form, issued by a title insurance company satisfactory to Agent, each in an amount equal to not less than the fair market value of the Real Property subject to each Mortgage, insuring each Mortgage to create a valid Lien on the Real Property with no exceptions which Agent shall not have approved in writing and no survey exceptions;

(ee)  Survey.  Agent shall have received in form and substance satisfactory to Lenders an ALTA-ACSM survey of each parcel or tract of the Eligible Real Property, certifying to Agent, the Lenders and the title company that (A) such survey was made (1) in accordance with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and ACSM in 2005, and includes Items 1-4, 6, 7(a), 7(b)(1), 7(c), 8-10, 11(a), 13 and 14 of Table A thereof, and (2) pursuant to the Accuracy Standards (as adopted by ALTA and ACSM and in effect on the date of said certificate) of an "Urban" survey; (B) such survey accurately reflects the locations of all building lines, easements and areas affected by any recorded documents affecting such Eligible Real Property as disclosed in the applicable title commitment (identified by issuer, commitment number, and an effective date after the date hereof) as well as any encroachments onto the Eligible Real Property or by any improvements onto any easement area or adjoining property; and (C) such survey is sufficient to permit the title company to delete the standard printed exceptions in each mortgagee title policy (each, a "Survey");

(ff)  Environmental Reports.  Agent shall have received all environmental studies and reports prepared by independent environmental engineering firms with respect to all Real Property owned or leased by Borrower and Agent and its legal counsel shall be satisfied with such reports;

(gg)  Other Documents.  Agent shall have received the executed Other Documents, all in form and substance satisfactory to Agent;

(hh)  Guarantees and Other Documents.  Agent shall have received (i) the executed Guaranty, (ii) the executed Guarantor Security Agreement and (iii) the executed Other Documents, all in form and substance satisfactory to Agent.

(ii)  Document and Diligence Review.  Agent and its counsel shall have (i) reviewed all books and records, material contracts of Borrower and the business to be acquired by Borrower pursuant to the Transactions, including without limitation, organizational documents, leases, union contracts, third party financing agreements, labor contracts, collective bargaining agreements and other agreements with labor unions, vendor supply contracts, customer agreements, license agreements and distributorship agreements and (ii) reviewed Borrower's corporate and legal structure, such contracts, agreements, references and structure shall be satisfactory in all respects to Agent and its counsel;

(jj)  Closing Certificate.  On the Funding Date, Agent shall have received a closing certificate signed by the Chief Financial Officer or Chief Executive Officer of Borrower dated as of the Funding Date stating that (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date, (ii) Borrower is on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents and (iii) on such date no Default or Event of Default has occurred or is continuing;

(kk)  Borrowing Base.  Agent shall have received evidence from Borrower that, as of the Funding Date, the aggregate amount of Eligible Receivables and Eligible Inventory is

sufficient in value to support Advances in the amount requested by Borrower on the Funding Date;

(ll)  Undrawn Availability.  After giving effect to the initial Advances hereunder, Borrower shall have Undrawn Availability of at least $1,500,000;

(mm)  Compliance with Laws.  Agent shall be reasonably satisfied that Borrower is in compliance with all pertinent federal, state, local or territorial regulations, including those with respect to the Federal Occupational Safety and Health Act, the Environmental Protection Act, ERISA and the Trading with the Enemy Act;

(nn)  Quality of Earnings Report.  Agent shall have received a quality of earnings report with respect to Sellers, in form and substance satisfactory to Agent in its sole discretion;

(oo)  Court Approval of the Transaction.  Agent shall have received a certified copy of a duly entered Order approving the Proposed Transactions in form and substance consistent with the Order attached as Exhibit E to the Acquisition Agreement and such Order shall have been entered by the Court and shall not have been reversed, stayed, materially modified or materially amended.  There shall be no pending or overtly threatened contest or appeal and no court of competent jurisdiction shall have issued or been requested to issue any stay, injunction or other order with respect to such sale.  Agent shall have received evidence satisfactory to it that appropriate notice has been given to all Persons entitled to notice of such order.

(pp)  Other.  All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the Transactions shall be satisfactory in form and substance to Agent and its counsel.

8.2.  Conditions to Each Advance.  The agreement of Lenders to make any Advance requested to be made on any date (including the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a)  Representations and Warranties.  Each of the representations and warranties made by Borrower in or pursuant to this Agreement, the Other Documents and any related agreements to which it is a party, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement, the Other Documents or any related agreement shall be true and correct in all material respects on and as of such date as if made on and as of such date;

(b)  No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date and, in the case of the initial Advance, after giving effect to the consummation of the transactions contemplated by the Acquisition Agreement; provided, however that Agent, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default; and

(c)    Maximum Advances. In the case of any type of Advance requested to be made, after giving effect thereto, the aggregate amount of such type of Advance shall not exceed the maximum amount of such type of Advance permitted under this Agreement.

Each request for an Advance by Borrower hereunder shall constitute a representation and warranty by Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

IX    INFORMATION AS TO BORROWER.

Borrower shall, until satisfaction in full of the Obligations and the termination of this Agreement:

9.1.    Disclosure of Material Matters. Immediately upon learning thereof, report to Agent all matters materially affecting the value, enforceability or collectability of any portion of the Collateral, including Borrower's reclamation or repossession of, or the return to Borrower of, a material amount of goods or claims or disputes asserted by any Customer or other obligor.

9.2.    Schedules. Deliver to Agent on or before the fifteenth (15th) day of each month as and for the prior month (a) accounts receivable agings (including from the applicable due date and invoice date of such receivable) inclusive of reconciliations to the general ledger, (b) accounts payable schedules inclusive of reconciliations to the general ledger, (c) Inventory reports, (d) a Borrowing Base Certificate in form and substance satisfactory to Agent (which shall be calculated as of the last day of the prior month and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement) and (e) a sales report including credit memos and collection assignments with respect to each Customer, in form and substance satisfactory to Agent. In addition, Borrower will deliver to Agent at such intervals as Agent may require: (i) confirmatory assignment schedules, (ii) copies of Customer's invoices, (iii) evidence of shipment or delivery, and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including trial balances and test verifications. Agent shall have the right to confirm and verify all Receivables by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder. The items to be provided under this Section are to be in form satisfactory to Agent and executed by Borrower and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and Borrower's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

9.3.    Environmental Reports. Furnish Agent, concurrently with the delivery of the financial statements referred to in Sections 9.7 and 9.8, with a Compliance Certificate signed by the President of Borrower stating, to the best of his knowledge, that Borrower is in compliance in all material respects with all federal, state and local Environmental Laws. To the extent Borrower is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action Borrower will implement in order to achieve full compliance.

9.4. <u>Litigation</u>. Promptly notify Agent in writing of (i) any claim, litigation, suit or administrative proceeding affecting Borrower or any Guarantor, whether or not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case materially affects the Collateral or which could reasonably be expected to have a Material Adverse Effect, or (ii) any claim, litigation, suit or administrative proceeding (in each case, whether asserted or overtly threatened) in any way appealing, contesting, challenging, collaterally attacking or otherwise attempting to affect Borrower's purchase of or title to assets pursuant to the Acquisition Agreement or any Order (including any request for a stay or injunction affecting Borrower, its assets or the transactions pursuant to the Acquisition Agreement), or alleging that a Person entitled to notice thereof did not receive such notice.

9.5. <u>Material Occurrences</u>. Promptly notify Agent in writing upon the occurrence of (a) any Event of Default or Default; (b) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Borrower as of the date of such statements; (c) any accumulated retirement plan funding deficiency which, if such deficiency continued for two plan years and was not corrected as provided in Section 4971 of the Code, could subject Borrower to a tax imposed by Section 4971 of the Code; (d) each and every default by Borrower which might result in the acceleration of the maturity of any material Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (g) any other development in the business or affairs of Borrower any Guarantor, which could reasonably be expected to have a Material Adverse Effect; in each case describing the nature thereof and the action Borrower propose to take with respect thereto.

9.6. <u>Government Receivables</u>. Notify Agent immediately if any of its Receivables arise out of contracts between Borrower and the United States, any state, or any department, agency or instrumentality of any of them.

9.7. <u>Annual Financial Statements</u>. Beginning with the Fiscal Year ending December 31, 2010, furnish Agent within one hundred and twenty (120) days after the end of each fiscal year of Borrower, financial statements of Borrower s and consolidating basis including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification by an independent certified public accounting firm selected by Borrower and satisfactory to Agent (the "<u>Accountants</u>"). The report of the Accountants shall be accompanied by a statement of the Accountants certifying that (i) they have caused this Agreement to be reviewed, (ii) in making the examination upon which such report was based either no information came to their attention which to their knowledge constituted an Event of Default or a Default under this Agreement or any related agreement or, if such information came to their attention, specifying any such Default or Event of Default, its nature, when it occurred and whether it is continuing, and such report shall contain or have appended thereto calculations which set forth Borrower's

81

compliance with the requirements or restrictions imposed by Sections 6.5, 7.4, 7.5, 7.6, 7.7, 7.8 and 7.11 hereof. In addition, the reports shall be accompanied by a Compliance Certificate.

9.8.    [Reserved].

9.9.    Monthly Financial Statements. Furnish Agent within thirty (30) days after the end of each month, an unaudited balance sheet of Borrower and unaudited statements of income and stockholders' equity and cash flow of Borrower reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year end adjustments that individually and in the aggregate are not material to Borrower's business.    The reports shall be accompanied by a Compliance Certificate.

9.10.   Other Reports. Provide Agent with any financial statements, reports and returns as Borrowers shall send to its members that are reasonably requested by Agent.

9.11.   Additional Information. Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Borrower including, without the necessity of any request by Agent, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of Borrower's opening of any new office or place of business or Borrower's closing of any existing office or place of business, and (c) promptly upon Borrower's learning thereof, notice of any labor dispute to which Borrower may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which Borrower is a party or by which Borrower is bound.

9.12.   Projected Operating Budget. Furnish Agent, no later than thirty (30) days prior to the beginning of Borrower's fiscal years commencing with fiscal year 2010, a month by month projected operating budget and cash flow of Borrower for such fiscal year (including an income statement for each month and a balance sheet as at the end of the last month in each fiscal quarter), such projections to be accompanied by a certificate signed by the President, the Chief Executive Officer or Chief Financial Officer of Borrower to the effect that such projections have been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared.

9.13.   Variances From Operating Budget. Upon request, furnish Agent, concurrently with the delivery of the financial statements referred to in Section 9.7 and each monthly report, a written report summarizing all material variances from budgets submitted by Borrower pursuant to Section 9.12 and a discussion and analysis by management with respect to such variances.

9.14.   Notice of Suits, Adverse Events. Furnish Agent with prompt written notice of (i) any lapse or other termination of any Consent issued to Borrower by any Governmental Body or any other Person that is material to the operation of Borrower's business, (ii) any refusal by any

Governmental Body or any other Person to renew or extend any such Consent; and (iii) copies of any periodic or special reports filed by Borrower or any Guarantor with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of Borrower or any Guarantor, or if copies thereof are requested by Lender, and (iv) copies of any material notices and other communications from any Governmental Body or Person which specifically relate to Borrower or any Guarantor.

9.15. ERISA Notices and Requests. Furnish Agent with immediate written notice in the event that (i) Borrower or any member of the Controlled Group knows or has reason to know that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which Borrower or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action which Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by Borrower or any member of the Controlled Group with respect to such request, (iv) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which Borrower or any member of the Controlled Group was not previously contributing shall occur, (v) Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (vi) Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with copies of each such letter; (vii) Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with copies of each such notice; (viii) Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment; or (ix) Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, or (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

9.16. Additional Documents. Execute and deliver to Agent, upon request, such documents and agreements as Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

9.17. Appraisals and Field Examinations. Permit Agent or Agent's representatives to (a) perform desktop Collateral appraisals in form and substance satisfactory to Agent at Borrower's cost and expense as Agent deems appropriate in Agent's sole discretion, but (unless a Default or Event of Default shall have occurred) in no event more frequently than once a year for each asset to determine, among other things, the net orderly liquidation value and/or fair market value of the Collateral, (b) perform full Collateral appraisals in form and substance

83

satisfactory to Agent at Borrower's cost and expense as Agent deems appropriate in Agent's sole discretion, and (unless a Default or Event of Default has occurred) in no event more frequently than once a year for each asset, to determine, among other things, the net orderly liquidation value and/or fair market value of the Collateral, and (c) conduct field examinations at Borrower's cost and expense as Agent reasonably deems appropriate in Agent's sole discretion.

X      EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

10.1. Nonpayment.  Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or by notice of intention to prepay, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document;

10.2. Breach of Representation.  Any representation or warranty made or deemed made by Borrower or any Guarantor in this Agreement, any Other Document or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

10.3. Financial Information.  Failure by Borrower to (i)(x) furnish financial information required by Sections 9.2, 9.7, 9.9 and 9.11 when due, or (y) within five (5) Business Days following the date Agent requested any other financial information, provided that Borrower may request an additional five (5) Business Days to furnish such other financial information and Agent will not unreasonably refuse such request, or (ii) permit the inspection of its books or records in accordance with this Agreement;

10.4. Judicial Actions.  Issuance of a notice of Lien, levy, assessment, injunction or attachment against Borrower's Inventory, Receivables, an Eligible Real Property or against a material portion of Borrower's other property which (in the case of such other property) is not being Properly Contested;

10.5. Noncompliance.  Except as otherwise provided for in Sections 10.1, 10.3 and 10.5(ii), (i) failure or neglect of Borrower or any Guarantor to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document or any other agreement or arrangement, now or hereafter entered into between Borrower or any Guarantor, and Agent or any Lender, or (ii) failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant, contained in Sections 4.6, 4.7, 4.9, 6.1, 6.3, 6.4, 9.4 or 9.6 hereof which is not cured within twenty (20) days from the occurrence of such failure or neglect;

10.6. Judgments.  Any judgment or judgments are rendered against Borrower or any Guarantor for an aggregate amount in excess of $500,000 and (i) enforcement proceedings shall

84

EXECUTION VERSION

have been commenced by a creditor upon such judgment, (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, shall not be in effect, or (iii) any such judgment results in the creation of a Lien upon any of the Collateral (other than a Permitted Encumbrance);

10.7.  **Bankruptcy.** Borrower or any Guarantor shall (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (iv) be adjudicated a bankrupt or insolvent, (v) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vi) acquiesce to, or fail to have dismissed, within sixty (60) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (vii) take any action for the purpose of effecting any of the foregoing;

10.8.  **Inability to Pay.** Borrower or any Guarantor shall admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business;

10.9.  **Bankruptcy of Certain Affiliates.**  Holdings, any Person described in the definition of "Sponsor" set forth herein who then directly or indirectly owns or controls twenty-five percent (25%) Equity Interests of Borrower or any other Person who directly or indirectly owns or controls twenty-five percent (25%) of the Equity Interest of Borrower, or any Subsidiary of Borrower, or any Guarantor, shall (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

10.10.  **Material Adverse Effect.** Any change in Borrower's or any Guarantor's results of operations or condition (financial or otherwise) which in Agent's opinion has a Material Adverse Effect;

10.11.  **Lien Priority.** Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest (except as expressly permitted hereby);

10.12.  **Cross Default.** A default of the obligations of Borrower under any other material agreement to which it is a party shall occur which adversely affects its condition, affairs or prospects (financial or otherwise) which default is not cured within any applicable grace period;

85

Halifax Media Credit Agreement
009125.0158/537556.18

10.13. <u>Breach of Guaranty</u>. Termination or breach of any Guaranty or Guaranty Security Agreement or similar agreement executed and delivered to Agent in connection with the Obligations of Borrower, or if any Guarantor attempts to terminate, challenges the validity of, or its liability under, any such Guaranty or Guaranty Security Agreement or similar agreement;

10.14. <u>Activities of Holdings</u>. Holdings shall at any time (i) own any material asset (other than the Equity Interests of Borrower), (ii) incur or suffer to exist any material liabilities, or (iii) engage in any business activity other than the ownership of Borrower.

10.15. <u>Change of Control</u>. Any Change of Control shall occur;

10.16. <u>Invalidity</u>. Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on Borrower or any Guarantor, or Borrower or any Guarantor shall so claim in writing to Agent or any Lender;

10.17. <u>Licenses</u>. (i) Any Governmental Body shall (A) revoke, terminate, suspend or adversely modify any license (except for 'shrink wrap' licenses in respect of mass-marketed software licenses generally commercially available), permit, patent, trademark, domain name or trade name of Borrower or any Guarantor, or (B) commence proceedings to suspend, revoke, terminate or adversely modify any such license, permit, trademark, trade name, domain name or patent and such proceedings shall not be dismissed or discharged within sixty (60) days, or (C) schedule or conduct a hearing on the renewal of any license (except for 'shrink wrap' licenses in respect of mass-marketed software licenses generally commercially available), permit, trademark, trade name, domain name or patent necessary for the continuation of Borrower's or any Guarantor's business and the staff of such Governmental Body issues a report recommending the termination, revocation, suspension or material, adverse modification of such license, permit, trademark, trade name, domain name or patent; (ii) any agreement which is necessary or material to the operation of Borrower's or any Guarantor's business shall be revoked or terminated and not replaced by a substitute acceptable to Agent within thirty (30) days after the date of such revocation or termination, and such revocation or termination and non-replacement would reasonably be expected to have a Material Adverse Effect;

10.18. <u>Seizures</u>. Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or any Guarantor or the title and rights of Borrower, any Guarantor which is the owner of any material portion of the Collateral shall have become the subject matter of claim, litigation, suit or other proceeding which might, in the opinion of Agent, upon final determination, result in impairment or loss of the security provided by this Agreement or the Other Documents;

10.19. <u>Operations</u>. The operations of Borrower's or any Guarantor's manufacturing facility are interrupted at any time for more than seventy-two (72) consecutive hours, unless (x) Borrower or Guarantor shall (i) be entitled to receive for such period of interruption, proceeds of business interruption insurance sufficient to assure that its per diem cash needs during such period is at least equal to its average per diem cash needs for the consecutive three month period immediately preceding the initial date of interruption and (ii) receive such proceeds in the amount described in clause (i) preceding not later than thirty (30) days following the initial date of any such interruption; provided, however, that notwithstanding the provisions of clauses (i)