and (ii) of this section, an Event of Default shall be deemed to have occurred if Borrower or Guarantor shall be receiving the proceeds of business interruption insurance for a period of thirty (30) consecutive days or (y) Borrower or Guarantor, as applicable, has successfully outsourced its production and manufacturing to another facility within forty-eight (48) hours of the occurrence of such at a cost not materially greater than the applicable ordinary production cost;

10.20. Pension Plans. An event or condition specified in Sections 7.16 or 9.15 hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) which, in the reasonable judgment of Agent, would have a Material Adverse Effect; or

10.21. Challenge to Court Approval of the Transactions. The filing of an appeal, motion, petition or other pleading (each, a "Challenge") which, if determined adversely to Borrower, could be reasonably expected to affect Borrower's right, title to and interests in the assets subject to the Acquisition Agreement or the validity, enforceability, perfection or priority of Agent's and Lenders' Liens therein, and either (x) such Challenge is not dismissed within sixty (60) days or (y) a determination adverse to Borrower, Agent or Lenders is made with respect to such Challenge.

XI    LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

11.1. Rights and Remedies.

(a)    Upon the occurrence and during the continuance of (i) an Event of Default pursuant to Section 10.7 all Obligations shall be immediately due and payable and this Agreement and the obligation of Lenders to make Advances shall be deemed terminated; and, (ii) any of the other Events of Default and at any time thereafter (such default not having previously been cured), at the option of Required Lenders all Obligations shall be immediately due and payable and Lenders shall have the right to terminate this Agreement and to terminate the obligation of Lenders to make Advances and (iii) a filing of a petition against Borrower in any involuntary case under any state or federal bankruptcy laws, all Obligations shall be immediately due and payable and the obligation of Lenders to make Advances hereunder shall be terminated other than as may be required by an appropriate order of the bankruptcy court having jurisdiction over Borrower. Upon the occurrence of any Event of Default, Agent shall have the right to exercise any and all rights and remedies provided for herein, under the Other Documents, under the Uniform Commercial Code and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process. Agent may enter any of Borrower's premises or other premises without legal process and without incurring liability to Borrower therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Borrower to make the Collateral available to Agent at a convenient place. With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private

sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Borrower reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrower at least ten (10) days prior to such sale or sales is reasonable notification. At any public sale Agent or any Lender may bid for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and all such claims, rights and equities are hereby expressly waived and released by Borrower. In connection with the exercise of the foregoing remedies, including the sale of Inventory, Agent is granted a perpetual nonrevocable, royalty free, nonexclusive license and Agent is granted permission to use all of Borrower's (a) trademarks, trade styles, trade names, trade name applications, domain names, domain name applications, patents, patent applications, copyrights, service marks, licenses, franchises and other proprietary rights which are used or useful in connection with Inventory for the purpose of marketing, advertising for sale and selling or otherwise disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of unfinished goods. The cash proceeds realized from the sale of any Collateral shall be applied to the Obligations in the order set forth in Section 11.5 hereof. Noncash proceeds will only be applied to the Obligations as they are converted into cash. If any deficiency shall arise, Borrower shall remain liable to Agent and Lenders therefor.

(b) To the extent that Applicable Law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, Borrower acknowledges and agrees that it is not commercially unreasonable for the Agent (i) to fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Customers or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as Borrower, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of Collateral or to provide to the Agent a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the

Agent in the collection or disposition of any of the Collateral. Borrower acknowledges that the purpose of this Section 11.1(b) is to provide non-exhaustive indications of what actions or omissions by the Agent would not be commercially unreasonable in the Agent's exercise of remedies against the Collateral and that other actions or omissions by the Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 11.1(b). Without limitation upon the foregoing, nothing contained in this Section 11.1(b) shall be construed to grant any rights to Borrower or to impose any duties on Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 11.1(b).

11.2. <u>Agent's Discretion</u>. Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder.

11.3. <u>Setoff</u>. Subject to Section 14.12, in addition to any other rights which Agent or any Lender may have under Applicable Law, upon the occurrence of an Event of Default hereunder, Agent and such Lender shall have a right, immediately and without notice of any kind, to apply Borrower's property held by Agent and such Lender to reduce the Obligations.

11.4. <u>Rights and Remedies not Exclusive</u>. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

11.5. <u>Allocation of Payments After Event of Default</u>. Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent on account of the Obligations or any other amounts outstanding under any of the Other Documents or in respect of the Collateral may, at Agent's discretion, be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of the Agent in connection with enforcing its rights and the rights of the Lenders under this Agreement and the Other Documents and any protective advances made by the Agent with respect to the Collateral under or pursuant to the terms of this Agreement;

SECOND, to payment of any fees owed to the Agent;

THIRD, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of each of the Lenders to the extent owing to such Lender pursuant to the terms of this Agreement;

FOURTH, to the payment of all of the Obligations consisting of accrued fees and interest;

FIFTH, to the payment of the outstanding principal amount of the Obligations (including the payment or cash collateralization of any outstanding Letters of Credit);

SIXTH, to all other Obligations and other obligations which shall have become due and payable under the Other Documents or otherwise and not repaid pursuant to clauses "FIRST" through "FIFTH" above; and

SEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (ii) each of the Lenders shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that the then outstanding Advances held by such Lender bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "FOURTH", "FIFTH" and "SIXTH" above; and (iii) to the extent that any amounts available for distribution pursuant to clause "FIFTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by the Agent in a cash collateral account and applied (A) first, to reimburse the Issuer from time to time for any drawings under such Letters of Credit and (B) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "FIFTH" and "SIXTH" above in the manner provided in this Section 11.5.

XII   WAIVERS AND JUDICIAL PROCEEDINGS.

12.1.  Waiver of Notice.  Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

12.2.  Delay.  No delay or omission on Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

12.3.  Jury Waiver.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS

WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

## XIII    EFFECTIVE DATE AND TERMINATION.

13.1. <u>Term</u>. This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of Borrower, Agent and each Lender, shall become effective on the date hereof and shall continue in full force and effect until December 30, 2012 (the "<u>Term</u>") unless sooner terminated as herein provided. Borrower may terminate this Agreement at any time upon ninety (90) days' prior written notice upon payment in full of the Obligations. In the event the Obligations are prepaid in full prior to the last day of the Term (the date of such prepayment hereinafter referred to as the "<u>Early Termination Date</u>"), Borrower shall pay to Agent for the benefit of Lenders an early termination fee in an amount equal to $294,000 if the Early Termination Date occurs on or after the Closing Date to and including the date immediately preceding the first anniversary of the Closing Date.

13.2. <u>Termination</u>. The termination of the Agreement shall not affect Borrower's, Agent's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully and indefeasibly paid, disposed of, concluded or liquidated. The security interests, Liens and rights granted to Agent and Lenders hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrower's Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of Borrower have been indefeasibly paid and performed in full after the termination of this Agreement or Borrower has furnished Agent and Lenders with an indemnification satisfactory to Agent and Lenders with respect thereto. Accordingly, Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations have been indefeasibly paid in full in immediately available funds. All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are indefeasibly paid and performed in full.

## XIV    REGARDING AGENT.

14.1. <u>Appointment</u>. Each Lender hereby designates PNC to act as Agent for such Lender under this Agreement and the Other Documents. Each Lender hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in <u>Sections 3.3(a)</u> and <u>3.4</u>), charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of Lenders. Agent may perform any of its duties hereunder

by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including collection of the Note) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which exposes Agent to liability or which is contrary to this Agreement or the Other Documents or Applicable Law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto.

14.2. <u>Nature of Duties</u>. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents. Neither Agent nor any of its officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), or (ii) responsible in any manner for any recitals, statements, representations or warranties made by Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of Borrower to perform its obligations hereunder. Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of Borrower. The duties of Agent as respects the Advances to Borrower shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement except as expressly set forth herein.

14.3. <u>Lack of Reliance on Agent and Resignation</u>. Independently and without reliance upon Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Borrower and each Guarantor in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of Borrower and each Guarantor. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by Borrower pursuant to the terms hereof. Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any Other Document, or of the financial condition of Borrower or any Guarantor, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions

of this Agreement, the Note, the Other Documents or the financial condition of Borrower, or the existence of any Event of Default or any Default.

Agent may resign on sixty (60) days' written notice to each of Lenders and Borrower and upon such resignation, the Required Lenders will promptly designate a successor Agent reasonably satisfactory to Borrower.

Any such successor Agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After any Agent's resignation as Agent, the provisions of this Article XIV shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

14.4. <u>Certain Rights of Agent</u>. If Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

14.5. <u>Reliance</u>. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

14.6. <u>Notice of Default</u>. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless Agent has received notice from a Lender or Borrower referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.

14.7. <u>Indemnification</u>. To the extent Agent is not reimbursed and indemnified by Borrower, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the Advances (or, if no Advances are outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever

which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document **(INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY OTHERWISE INDEMNIFIED MATTER ARISING FROM AGENT'S OR LENDER'S NEGLIGENCE OR STRICT LIABILITY)**; provided that, Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).

14.8.  Agent in its Individual Capacity.  With respect to the obligation of Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender.  Agent may engage in business with Borrower as if it were not performing the duties specified herein, and may accept fees and other consideration from Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.9.  Delivery of Documents.  To the extent Agent receives financial statements required under Sections 9.7, 9.8, 9.9, 9.12 and 9.13 or Borrowing Base Certificates from Borrower pursuant to the terms of this Agreement which Borrower is not obligated to deliver to each Lender, Agent will promptly furnish such documents and information to Lenders.

14.10. Borrower's Undertaking to Agent.  Without prejudice to its obligations to Lenders under the other provisions of this Agreement, Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

14.11. No Reliance on Agent's Customer Identification Program.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with Borrower, its Affiliates or its agents, this Agreement, the Other Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any record-keeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or such other laws.

14.12. Other Agreements.  Each of the Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to

94

Borrower or any deposit accounts of Borrower now or hereafter maintained with such Lender. Anything in this Agreement to the contrary notwithstanding, each of the Lenders further agrees that it shall not, unless specifically requested to do so by Agent, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

## XV    MISCELLANEOUS

15.1. <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of Texas applied to contracts to be performed wholly within the State of Texas. Any judicial proceeding brought by or against Borrower with respect to any of the Obligations, this Agreement, the Other Documents or any related agreement may be brought in any court of competent jurisdiction in the State of Texas, United States of America, and, by execution and delivery of this Agreement, Borrower accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to Borrower at its address set forth in <u>Section 15.6</u> and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America. Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent or any Lender to bring proceedings against Borrower in the courts of any other jurisdiction. Borrower waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Borrower waives the right to remove any judicial proceeding brought against Borrower in any state court to any federal court.    Any judicial proceeding by Borrower against Agent or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the County of Dallas, State of Texas.

15.2. <u>Entire Understanding</u>.

(a)    **THIS AGREEMENT AND THE DOCUMENTS EXECUTED CONCURRENTLY HEREWITH CONTAIN THE ENTIRE UNDERSTANDING BETWEEN BORROWER, AGENT AND EACH LENDER AND SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDINGS, IF ANY, RELATING TO THE SUBJECT MATTER HEREOF.** Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by Borrower's, Agent's and each Lender's respective officers. Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged. Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other

Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b)     The Required Lenders, Agent with the consent in writing of the Required Lenders, and Borrower may, subject to the provisions of this Section 15.2 (b), from time to time enter into written supplemental agreements to this Agreement or the Other Documents executed by Borrower, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent or Borrower thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, that no such supplemental agreement shall, without the consent of all Lenders affected thereby:

(i)     increase the Revolving Advance Commitment Percentage, Term Loan Commitment Percentage, the maximum dollar commitment of any Lender or the Maximum Loan Amount.

(ii)     extend the maturity of any Note or the due date for any amount payable hereunder, or decrease the rate of interest or reduce any fee payable by Borrower to Lenders pursuant to this Agreement.

(iii)     alter the definition of the term Required Lenders or alter, amend or modify this Section 15.2(b).

(iv)     release any Collateral during any calendar year (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of $1,000,000.

(v)     change the rights and duties of Agent.

(vi)     permit any Revolving Advance to be made if after giving effect thereto the total of Revolving Advances outstanding hereunder would exceed the Formula Amount for more than sixty (60) consecutive Business Days or exceed one hundred and ten percent (110%) of the Formula Amount or exceed the total Revolving Advance Commitment Percentage.

(vii)     increase the Advance Rates above the Advance Rates in effect on the Funding Date.

(viii)     release any Guarantor.

Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Borrower, Lenders and Agent and all future holders of the Obligations. In the case of any waiver, Borrower, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

In the event that Agent requests the consent of a Lender pursuant to this Section 15.2 and such consent is denied, then PNC may, at its option, require such Lender to assign its interest in the Advances to PNC or to another Lender or to any other Person designated by the Agent (the "Designated Lender"), for a price equal to (i) the then outstanding principal amount thereof plus (ii) accrued and unpaid interest and fees due such Lender, which interest and fees shall be paid when collected from Borrower. In the event PNC elects to require any Lender to assign its interest to PNC or to the Designated Lender, PNC will so notify such Lender in writing within forty five (45) days following such Lender's denial, and such Lender will assign its interest to PNC or the Designated Lender no later than five (5) days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, PNC or the Designated Lender, as appropriate, and Agent.

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or (c) any other provision of this Agreement, Agent may at its discretion and without the consent of the Required Lenders, voluntarily permit the outstanding Revolving Advances at any time to exceed the Formula Amount by up to ten percent (10%) of the Formula Amount for up to sixty (60) consecutive Business Days (the "Out-of-Formula Loans"); provided, that, such outstanding Advances do not exceed the Maximum Revolving Advance Amount. If Agent is willing in its sole and absolute discretion to make such Out-of-Formula Loans, such Out-of-Formula Loans shall be payable on demand and shall bear interest at the Default Rate for Revolving Advances consisting of Domestic Rate Loans; provided that, if Lenders do make Out-of-Formula Loans, neither Agent nor Lenders shall be deemed thereby to have changed the limits of Section 2.1(a). For purposes of this paragraph, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Formula Amount was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be either "Eligible Receivables" or "Eligible Inventory", as applicable, becomes ineligible, collections of Receivables applied to reduce outstanding Revolving Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event Agent involuntarily permits the outstanding Revolving Advances to exceed the Formula Amount by more than ten percent (10%), Agent shall use its efforts to have Borrower decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Revolving Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

In addition to (and not in substitution of) the discretionary Revolving Advances permitted above in this Section 15.2, the Agent is hereby authorized by Borrower and the Lenders, from time to time in the Agent's sole discretion, (A) after the occurrence and during the continuation of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied, to make Revolving Advances to Borrower on behalf of the Lenders which the Agent, in its reasonable business judgment, deems necessary or desirable (a) to preserve or protect the Collateral, or any portion thereof, (b) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (c) to pay any other amount chargeable to Borrower pursuant to the terms of this Agreement; provided, that at any time after giving effect to any such Revolving Advances the

Halifax Media Credit Agreement
009125.0158/537556.18

outstanding Revolving Advances do not exceed one hundred and ten percent (110%) of the Formula Amount.

15.3. <u>Successors and Assigns; Participations; New Lenders</u>.

(a)     This Agreement shall be binding upon and inure to the benefit of Borrower, Agent, each Lender, all future holders of the Obligations and their respective successors and permitted assigns, except that Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)     Borrower acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to other financial institutions (each such transferee or purchaser of a participating interest, a "<u>Participant</u>"). Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof provided that Borrower shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in its Advances or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances hereunder or other Obligations payable hereunder and in no event shall Borrower be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant. Borrower hereby grants to any Participant a continuing security interest in any deposits, moneys or other property actually or constructively held by such Participant as security for the Participant's interest in the Advances.

(c)     Any Lender, with the consent of Agent which shall not be unreasonably withheld or delayed, may sell, assign or transfer all or any part of its rights and obligations under or relating to Revolving Advances and/or Term Loan under this Agreement and the Other Documents to one or more additional banks or financial institutions and one or more additional banks or financial institutions may commit to make Advances hereunder (each a "<u>Purchasing Lender</u>"), in minimum amounts of not less than $1,000,000, pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording. Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Revolving Advance Commitment Percentage and/or Term Loan Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a novation for that purpose. Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Revolving Advance Commitment Percentages and/or Term Loan Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights

and obligations of such transferor Lender under this Agreement and the Other Documents. Borrower hereby consents to the addition of such Purchasing Lender and the resulting adjustment of the Revolving Advance Commitment Percentages and/or Term Loan Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Borrower shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(d)     Any Lender, with the consent of Agent which shall not be unreasonably withheld or delayed, may directly or indirectly sell, assign or transfer all or any portion of its rights and obligations under or relating to Revolving Advances and/or Term Loan under this Agreement and the Other Documents to an entity, whether a corporation, partnership, trust, limited liability company or other entity that (i) is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and (ii) is administered, serviced or managed by the assigning Lender or an Affiliate of such Lender (a "Purchasing CLO" and together with each Participant and Purchasing Lender, each a "Transferee" and collectively the "Transferees"), pursuant to a Commitment Transfer Supplement modified as appropriate to reflect the interest being assigned ("Modified Commitment Transfer Supplement"), executed by any intermediate purchaser, the Purchasing CLO, the transferor Lender, and Agent as appropriate and delivered to Agent for recording. Upon such execution and delivery, from and after the transfer effective date determined pursuant to such Modified Commitment Transfer Supplement, (i) Purchasing CLO thereunder shall be a party hereto and, to the extent provided in such Modified Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder and (ii) the transferor Lender thereunder shall, to the extent provided in such Modified Commitment Transfer Supplement, be released from its obligations under this Agreement, the Modified Commitment Transfer Supplement creating a novation for that purpose. Such Modified Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing CLO. Borrower hereby consents to the addition of such Purchasing CLO. Borrower shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(e)     Agent shall maintain at its address a copy of each Commitment Transfer Supplement and Modified Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of each Lender and the outstanding principal, accrued and unpaid interest and other fees due hereunder. The entries in the Register shall be conclusive, in the absence of manifest error, and Borrower, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Advance recorded therein for the purposes of this Agreement. The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall receive a fee in the amount of $3,500 payable by the applicable Purchasing Lender and/or Purchasing CLO upon the effective date of each transfer or assignment (other than to an intermediate purchaser) to such Purchasing Lender and/or Purchasing CLO.

(f)     Borrower authorizes each Lender to disclose to any Transferee and any prospective Transferee any and all financial information in such Lender's possession concerning

Borrower which has been delivered to such Lender by or on behalf of Borrower pursuant to this Agreement or in connection with such Lender's credit evaluation of Borrower.

15.4. <u>Application of Payments</u>. Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations. To the extent that Borrower makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent or such Lender.

15.5. <u>Indemnity</u>. Borrower shall indemnify Agent, each Lender and each of their respective officers, directors, Affiliates, attorneys, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto, except to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified (as determined by a court of competent jurisdiction in a final and non-appealable judgment). **WITHOUT LIMITATION THE FOREGOING, (i) IT IS THE INTENTION OF BORROWER, AND BORROWER AGREES, THAT THE INDEMNITY PROVISIONS AND EXCULPATORY PROVISIONS CONTAINED IN THIS AGREEMENT SHALL APPLY WITH RESPECT TO LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SETTLEMENTS, SUITS, COSTS, EXPENSES AND DISBURSEMENTS OF ANY KIND WHATSOEVER (INCLUDING, WITHOUT LIMITATION, FEES AND DISBURSEMENTS OF COUNSEL), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF ANY PARTY TO BE INDEMNIFIED AND (ii)** the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) asserted against or incurred by any of the indemnitees described above in this <u>Section 15.5</u> by any Person under any Environmental Laws or similar laws by reason of Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Substances and Hazardous Waste, or other Toxic Substances. Additionally, if any taxes (excluding taxes imposed upon or measured solely by the net income of Agent and Lenders, but including any intangibles taxes, stamp tax, recording tax or franchise tax) shall be payable by Agent, Lenders or Borrower on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Borrower will pay (or will promptly reimburse Agent and Lenders for payment of) all such taxes, including interest and penalties thereon, and

will indemnify and hold the indemnitees described above in this Section 15.5 harmless from and against all liability in connection therewith.

15.6.  Notice.  Any notice or request hereunder may be given to Borrower or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section. Any notice, request, demand, direction or other communication (for purposes of this Section 15.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Loan Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission or by setting forth such Notice on a site on the World Wide Web (a "Website Posting") if Notice of such Website Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 15.6) in accordance with this Section 15.6.  Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 15.6 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 15.6.  Any Notice shall be effective:

(a)  In the case of hand-delivery, when delivered;

(b)  If given by mail, four days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c)  In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission, a Website Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d)  In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(e)  In the case of electronic transmission, when actually received;

(f)  In the case of a Website Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 15.6; and

(g)  If given by any other means (including by overnight courier), when actually received.

Any Lender giving a Notice to Borrower shall concurrently send a copy thereof to the Agent, and the Agent shall promptly notify the other Lenders of its receipt of such Notice.

(A)  If to Agent or PNC at:

PNC Bank, National Association

2100 Ross Avenue, Suite 1850
Dallas, Texas 75201
Attention:    Relationship Manager (Daytona Beach)
Telephone:   (214) 871-1273
Facsimile:    (214) 871-2015

with a copy to:

PNC Bank, National Association
PNC Agency Services
PNC Firstside Center
500 First Avenue, 4th Floor
Pittsburgh, Pennsylvania 15219
Attention:    Lisa Pierce
Telephone:   (412) 762-6442
Facsimile:    (412) 762-8672

with an additional copy to:

Patton Boggs LLP
2001 Ross Avenue, Suite 3000
Dallas, Texas 75201
Attention:    Michelle Suarez
Telephone:   (214) 758-1500
Facsimile:    (214) 758-1550

(B)    If to a Lender other than Agent, as specified on the signature pages hereof.

(C)    If to Borrower:

c/o Stephens Capital Partners LLC
111 Center Street
Little Rock, Arkansas 72201
Attention:    Jackson Farrow, Jr.
Telephone:   501-377-2261
Facsimile:    501-210-4615

with a copy to:

Rose Law Firm, a Professional Association
20 E. Fourth Street
Little Rock, Arkansas 72201
Attention:    Gary Garrett
Telephone:   501-377-0343
Facsimile:    501-375-1309

15.7. <u>Survival</u>. The obligations of Borrower under <u>Sections 2.2(f)</u>, <u>3.7</u>, <u>3.8</u>, <u>3.9</u>, <u>4.19(h)</u>, and <u>15.5</u> and the obligations of Lenders under <u>Section 14.7</u>, shall survive termination of this Agreement and the Other Documents and payment in full of the Obligations.

15.8. <u>Severability</u>. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

15.9. <u>Expenses</u>. All costs and expenses including reasonable attorneys' fees (including the allocated costs of in house counsel) and disbursements incurred by Agent on its behalf or on behalf of Lenders (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with the entering into, modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder or thereunder and all related agreements, documents and instruments, or (c) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's security interest in or Lien on any of the Collateral, or maintaining, preserving or enforcing any of Agent's or any Lender's rights hereunder and under all related agreements, documents and instruments, whether through judicial proceedings or otherwise, or (d) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's or any Lender's transactions with Borrower, any Guarantor or (e) in connection with any advice given to Agent or any Lender with respect to its rights and obligations under this Agreement and all related agreements, documents and instruments, may be charged to Borrower's Account and shall be part of the Obligations.

15.10. <u>Injunctive Relief</u>. Borrower recognizes that, in the event Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

15.11. <u>Consequential Damages</u>. Neither Agent nor any Lender, nor any agent or attorney for any of them, shall be liable to Borrower or any Guarantor (or any Affiliate of any such Person) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations or as a result of any transaction contemplated under this Agreement or any Other Document.

15.12. <u>Captions</u>. The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

15.13. <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

15.14. Construction.   The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

15.15. Confidentiality; Sharing Information.   Agent, each Lender and each Transferee shall hold all non-public information obtained by Agent, such Lender or such Transferee pursuant to the requirements of this Agreement in accordance with Agent's, such Lender's and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender and each Transferee may disclose such confidential information (a) to its examiners, Affiliates, outside auditors, counsel and other professional advisors, (b) to Agent, any Lender or to any prospective Transferees, and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by Applicable Law, Agent, each Lender and each Transferee shall use its reasonable best efforts prior to disclosure thereof, to notify the Borrower of the applicable request for disclosure of such non-public information (A) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a Transferee by such Governmental Body) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender or any Transferee be obligated to return any materials furnished by Borrower other than those documents and instruments in possession of Agent or any Lender in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated.  Borrower acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to Borrower or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and Borrower hereby authorizes each Lender to share any information delivered to such Lender by Borrower and its Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or Affiliate of any Lender receiving such information shall be bound by the provisions of this Section 15.15 as if it were a Lender hereunder.  Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.

15.16. Publicity.   Borrower and each Lender hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among Borrower, Agent and Lenders, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent shall in its sole and absolute discretion deem appropriate.

15.17. Certifications From Banks and Participants; US PATRIOT Act.   Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Agent the

104

certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations: (1) within 10 days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

15.18. Non-Applicability of Chapter 346. Borrower and Agent hereby agree that, except for the opt-out provisions of Section 346.004 thereof, the provisions of Chapter 346 of the Texas Finance Code (regulating certain revolving credit loans and revolving tri-party accounts) shall not apply to this Agreement or any of the Other Documents.

15.19. Borrower's Waiver of Rights Under Texas Deceptive Trade Practices Act. BORROWER HEREBY WAIVES ANY RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION § 17.41 ET SEQ. TEXAS BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF THE BORROWERS OWN SELECTION, EACH BORROWER VOLUNTARILY CONSENTS TO THIS WAIVER. BORROWERS EXPRESSLY WARRANT AND REPRESENT THAT EACH PERSON (A) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION RELATIVE TO AGENT, AND (B) HAS BEEN REPRESENTED BY LEGAL COUNSEL IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT .

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY; SIGNATURE PAGES FOLLOW]**

Halifax Media Credit Agreement
009125.0158/537556.18

Each of the parties has signed this Agreement as of the day and year first above written.

BORROWER:

HALIFAX MEDIA ACQUISITION LLC

By: _____
Name: Noel Strauss
Title: Manager

[ADDITIONAL SIGNATURES FOLLOW]

**AGENT:**

**PNC BANK, NATIONAL ASSOCIATION**

By: _____
Name:  Ronald Eckhoff
Title:   Vice President

**[ADDITIONAL SIGNATURES FOLLOW]**

STATE OF _Arkansas_ )

                              ) ss.

COUNTY OF _Pulaski_ )

On this _30th_ day of December, 2009, before me personally came Noel Strauss, to me known, who, being by me duly sworn, did depose and say that he is the Manager of HALIFAX MEDIA ACQUISITION LLC, the limited liability company described in and which executed the foregoing instrument and that he signed his name thereto by order of the management committee or analogous body of said limited liability company.

                                      _Mary Tackett_
                                      Notary Public

MARY TACKETT
NOTARY PUBLIC-STATE OF ARKANSAS
FAULKNER COUNTY
My Commission Expires 10-01-2016
Commission # 12350938

STATE OF TEXAS　　) 　　TEXAS

　　　　　　　　　　) ss.

COUNTY OF TEXAS　　) DALLAS


On this _17_ day of December, 2009, before me personally came Ronald Eckhoff, to me known, who, being by me duly sworn, did depose and say that he is the Vice President of PNC BANK, NATIONAL ASSOCIATION, and that he was authorized to sign his name thereto.



Notary Public

NANCY J. WESTMORELAND
Notary Public
State of Texas
Comm. Exp. 03-13-13

Exhibit 1.2

# Form of Borrowing Base Certificate

# PNCBANK

| Report No. |
| --- |
| |

Halifax Media Acquisition LLC

| Collateral Status | A/R | Unbilled A/R | Inventory | Total |
| --- | --- | --- | --- | --- |
| 1. Beginning Collateral (Line 4 prior report) | | | | |
| 2. Additions to Collateral | | | | |
| 3. Deductions to Collateral | | | | |
| 4. Total Collateral | | | | |
| 5. Less Ineligible Collateral | | | | |
| 6. Total Eligible Collateral | | | | |
| **Loan Status** | **A/R** | **Unbilled A/R** | **Inventory** | **Total** |
| 7. Advance Percentage or Credit Limit | | | | |
| 8. Collateral Value (Elg. Coll. X Adv %) | | | | |
| 9. Sublimits | | | | |
| 10. Collateral Value after Sublimit | | | | |
| 11. Previous Loan Balance (Prior Line 15) | | | | |
| 12. Less: A) Net Collections | | | | |
| B) Adjustments | | | | |
| C) Other | | | | |
| | | | | |
| 13. Subtotal for Loan Balance | | | | |
| 14. **Additional** A) Request for Funds | | | | |
| **Loan** B) Return Items | | | | |
| **Increases** C) Other | | | | |
| 15. New Loan Balance | | | | |
| 16. Mortgage Reserve | | | | |
| 17. Letters of Credit Outstanding | | | | |
| 18. Collateral Available for Loan | | | | |

To induce PNC Bank, National Association ("PNC Bank") to grant advances or other financial accomodations to us pursuant to the terms of that certain Revolving Credit, Term Loan and Security Agreement dated as of December 30, 2009, with PNC Bank, as the same may be extended, amended, and/or restated from time to time ("Credit Agreement"), we hereby certify, represent and warrant the following to PNC Bank, all as of the date hereof: (1) the foregoing statements of our accounts receivable and/or inventory collateral described above are true and complete; (2) the Formula Amount and the calculation thereof as set forth above are true, correct and complete; (3) we are in compliance with all of the terms and provisions of the Credit Agreement; and (4) there exists no Default or Event of Default under the Credit Agreement.

| For PNC Bank Use | DATE _____ |
| --- | --- |
| Checked By_____ Date_____ | BORROWER Halifax Media Acquisition LLC |
| Approved By _____ Date_____ | BY |

**EXHIBIT 2.1(a)**
**to**
**REVOLVING CREDIT, TERM LOAN AND SECURITY AGREEMENT**

**FORM OF REVOLVING CREDIT NOTE**

$8,000,000                                    Date: _____, 20__

This Revolving Credit Note (this "Note") is executed and delivered under and pursuant to the terms of that certain Revolving Credit, Term Loan and Security Agreement dated as of December __, 2009 (as hereafter amended, modified, supplemented, extended, joined and/or restated from time to time, the "Credit Agreement") by and among Halifax Media Acquisition LLC, a limited liability company formed under the laws of the State of Delaware ("Borrower"), the financial institutions which are now or which hereafter become a party thereto (collectively, the "Lenders" and individually, each a "Lender") and PNC BANK, NATIONAL ASSOCIATION ("PNC"), as agent for Lenders (PNC, in such capacity, "Agent"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement.

FOR VALUE RECEIVED, Borrower hereby promises to pay to the order of PNC, at the office of Agent located at Two Tower Center Boulevard, East Brunswick, New Jersey 08816, or at such other place as Agent may from time to time designate to Borrowing Agent in writing:

(i)      the principal sum of EIGHT MILLION AND NO/00 DOLLARS ($8,000,000) or, if different from such amount, the unpaid principal balance of PNC's Revolving Advance Commitment Percentage as may be due and owing under the Credit Agreement, payable in accordance with the provisions of the Credit Agreement, subject to acceleration upon the occurrence and continuance of an Event of Default under the Credit Agreement or earlier termination of the Credit Agreement pursuant to the terms thereof; and

(ii)      interest on the principal amount of this Note from time to time outstanding until such principal amount is paid in full at the applicable Revolving Interest Rate in accordance with the provisions of the Credit Agreement. In no event, however, shall interest exceed the maximum interest rate permitted by law. Upon and after the occurrence of an Event of Default, and during the continuation thereof, interest shall be payable at the Default Rate.

This Note is a Revolving Credit Note referred to in the Credit Agreement and is secured by the liens granted pursuant to the Credit Agreement and the Other Documents, is entitled to the benefits of the Credit Agreement and the Other Documents and is subject to all of the agreements, terms and conditions therein contained.

This Note is subject to mandatory prepayment and may be voluntarily prepaid, in whole or in part, on the terms and conditions set forth in the Credit Agreement.

If an Event of Default under Article X of the Credit Agreement shall occur, or upon the election of Required Lenders, as applicable, then this Note shall immediately, in accordance with the Credit Agreement, become due and payable, without notice, together with reasonable and actual attorneys' fees if the collection hereof is placed in the hands of an attorney to obtain or

enforce payment hereof. If any other Event of Default shall occur under the Credit Agreement or any of the Other Documents, which is not cured within any applicable grace period, then this

Note may, as provided in the Credit Agreement, be declared to be immediately due and payable, without notice, together with reasonable and actual attorneys' fees, if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof.

This Note shall be construed and enforced in accordance with the laws of the State of Texas.

Borrower expressly waives any presentment, demand, protest, notice of protest, notice of intent to accelerate, notice of acceleration or notice of any kind except as expressly provided in the Credit Agreement.

[REMAINDER OF PAGE INTENTIONALLY BLANK; SIGNATURES FOLLOW]

**BORROWER:**

**HALIFAX MEDIA ACQUISITION LLC**

By:_____
Name: _____
Title: _____

**EXHIBIT 2.4(a)**
**to**
**REVOLVING CREDIT, TERM LOAN AND SECURITY AGREEMENT**

**FORM OF TERM NOTE**

$8,000,000.00                                                  Date: _____, 20__

     This Term Note (this "Note") is executed and delivered under and pursuant to the terms of that certain Revolving Credit, Term Loan and Security Agreement dated as of December __, 2009 (as hereafter amended, modified, supplemented, extended, joined and/or restated from time to time, the "Credit Agreement") by and among Halifax Media Acquisition LLC, a limited liability company formed under the laws of the State of Delaware ("Borrower"), the financial institutions which are now or which hereafter become a party thereto (collectively, the "Lenders" and individually, each a "Lender") and PNC BANK, NATIONAL ASSOCIATION ("PNC"), as agent for Lenders (in such capacity, "Agent"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement.

     FOR VALUE RECEIVED, Borrower hereby promises to pay to the order of PNC, at the office of Agent located at Two Tower Center Boulevard, East Brunswick, New Jersey 08816, or at such other place as Agent may from time to time designate to Borrower in writing:

     (i)    the principal sum of EIGHT MILLION AND NO/100 DOLLARS ($8,000,000.00), payable in accordance with the provisions of the Credit Agreement and subject to acceleration upon the occurrence of an Event of Default under the Credit Agreement or earlier termination of the Credit Agreement pursuant to the terms thereof; and

     (ii)    interest on the principal amount of this Note from time to time outstanding until such principal amount is paid in full at the applicable Term Loan Rate in accordance with the provisions of the Credit Agreement. In no event, however, shall interest exceed the maximum interest rate permitted by law. Upon and after the occurrence of an Event of Default, and during the continuation thereof, interest shall be payable at the Default Rate.

     This Note is a Term Note referred to in the Credit Agreement and is secured, inter alia, by the liens granted pursuant to the Credit Agreement and the Other Documents, is entitled to the benefits of the Credit Agreement and the Other Documents and is subject to all of the agreements, terms and conditions therein contained.

     This Note is subject to mandatory prepayment and may be voluntarily prepaid, in whole or in part, on the terms and conditions set forth in the Credit Agreement.

     If an Event of Default under Article X of the Credit Agreement shall occur, then this Note shall immediately, or upon the election of Required Lenders, as applicable, in accordance with the Credit Agreement, become due and payable, without notice, together with reasonable and actual

attorneys' fees if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof. If any other Event of Default shall occur under the Credit Agreement or any of the Other Documents, which is not cured within any applicable grace period, then this Note may, as provided in the Credit Agreement, be declared to be immediately due and payable, without notice, together with reasonable attorneys' fees, if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof.

This Note shall be construed and enforced in accordance with the laws of the State of Texas.

Borrower expressly waives any presentment, demand, protest, notice of protest, notice of intent to accelerate, notice of acceleration or notice of any kind except as expressly provided in the Credit Agreement.

**[Remainder of Page Intentionally Blank, Signature Page Follows]**

**BORROWER:**

**HALIFAX MEDIA ACQUISITION LLC**

By:_____
Name:_____
Title:_____

# Exhibit 5.5(b)

**NEWS-JOURNAL CORPORATION**
Transaction Assumptions
*(Dollars in Thousands)*

Base Case

## VALUATION ASSUMPTIONS

| | |
|---|---:|
| Adjusted 2009 EBITDA | $ 8,291 |
| EV / EBITDA Multiple | 2.7x |
| Enterprise Value | $ 22,000 |

## TRANSACTION VALUATIONS

| | Data | | Multiples | | |
|---|---|---|---|---|---|
| | 12/31/09E | 12/31/10E | 12/31/09 | 12/31/09 | 12/31/10 |
| **Enterprise Value /** | | | | | |
| Revenue | $ 59,782 | $ 54,763 | 0.4x | 0.4x | |
| Adjusted EBITDA | 8,291 | 7,966 | 2.7 | 2.8 | |
| EBIT | 5,618 | 5,450 | 3.9 | 4.0 | |

## REVOLVER AVAILABILITY CALCULATION (a)

| | Balance 9/30/09 | Borrowing Percentage | Borrowing Availability |
|---|---:|---:|---:|
| Accounts Receivable – Non-Phone Book | $ 3,616 | 85.0% | $ 3,073 |
| Accounts Receivable – Phone Book | 2,211 | 70.0% | 1,548 |
| Inventories | 1,491 | 65.0% | 969 |
| Revolver Capacity at Transaction | | | $ 5,590 |

## TERM LOAN AVAILABILITY CALCULATION (a)

| | Balance 9/30/09 | Borrowing Percentage | Borrowing Availability |
|---|---:|---:|---:|
| Appraised Value of RE | $ 11,940 | 70.0% | $ 8,358 |
| BLV of Equipment, Net | 1,233 | 85.0% | 1,048 |
| Term Loan Availability | | | $ 9,406 |

## ALLOCATION OF PURCHASE PRICE – BOOK

| | |
|---|---:|
| Value of Assets Purchased | $ 22,000 |
| Less: Working Capital Assets | (8,845) |
| Less: PP&E | (12,948) |
| Plus: Liabilities Assumed | 6,862 |
| Plus: Capitalized Transaction Expenses | 720 |
| Goodwill & Other Intangibles | $ 7,789 |

## SOURCES & USES

| Sources: | '09 EBITDA Mult. | |
|---|---:|---:|
| | | $ |
| Equity Investor A | 1.0x | $ 8,004 |
| Equity Investor B | 0.3 | 2,126 |
| Management Equity Investment | 0.1 | 500 |
| Revolver @ LIBOR + 300 bps | 0.5 | 4,090 |
| Term Loan @ LIBOR + 475 bps | 1.0 | 8,000 |
| Total Sources | 2.7x | $ 22,720 |

| Uses: | |
|---|---:|
| Purchase of NEWS-JOURNAL CORPORATION Assets | $ 22,000 |
| Cash Reserve | - |
| One-Time Transaction Expenses | 250 |
| Other Closing Fees | 250 |
| Financing Fees | 220 |
| Total Uses | $ 22,720 |

## PRO FORMA LEVERAGE

| | Pro Forma Capitalization | For the FYE December 31, | | |
|---|---:|---:|---:|---:|
| | | 2010 | 2011 | 2012 |
| Revolver | $ 4,090 | $ 776 | $ - | $ - |
| Term Loan | 8,000 | 6,571 | 3,673 | - |
| Total Debt | $ 12,090 | $ 7,347 | $ 3,673 | $ - |

## ALLOCATION OF PURCHASE PRICE – TAX

| | |
|---|---:|
| Value of Assets Purchased | $ 22,000 |
| Less: Working Capital Assets | (8,845) |
| Less: PP&E Write-up | (4,397) |
| Plus: Liabilities Assumed | 6,862 |
| Plus: Capitalized Transaction Expenses | 720 |
| Goodwill | $ 16,340 |

| | |
|---|---:|
| PV of Potential Tax Benefit @ 8.0% Discount Rate | $ 3,916 |

(a) Maximum amount capped at $8.0mm.
(b) Defined as EBITDA/(interest + required principal payments next 12 months + taxes paid).

# NEWS-JOURNAL CORPORATION
## Pro Forma Balance Sheet
*(Dollars in Thousands)*

Base Case

| | Actual 9/30/09 | Adjustments — Transaction | Adjustments — Financing | Pro Forma 9/30/09 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Cash and cash equivalents | $ 12,390 | $ (12,390) | $ - | $ - |
| Investment securities | 7,013 | - | - | 7,013 |
| Accounts receivable | 60 | (60) | - | - |
| Other receivables | 1,253 | - | - | 1,253 |
| Inventories | 580 | - | - | 580 |
| Prepaid expenses and other | 1,301 | (1,301) | - | - |
| Income tax receivable | 1,640 | (1,640) | - | - |
| Deferred income taxes | | | | |
| Total Current Assets | 24,236 | (15,391) | - | 8,845 |
| Property, plant, and equipment | 8,103 | 4,397 | - | 12,500 |
| Goodwill | 1,258 | (1,258) | - | - |
| Intangibles | 10,125 | (10,125) | - | - |
| Transaction goodwill | - | 7,789 | - | 7,789 |
| Transaction identifiable intangibles | - | - | - | - |
| Deferred financing fees | - | - | - | - |
| Deferred tax asset | - | - | - | - |
| Purchase deposits for equipment | 37 | - | - | 37 |
| Other assets | 411 | - | - | 411 |
| Deferred income taxes | 5,422 | (5,422) | - | - |
| Total assets | $ 49,591 | $ (20,009) | $ - | $ 29,582 |
| **Total Liabilities and Shareholders' Deficit:** | | | | |
| Accounts payable | $ 1,300 | $ - | $ - | $ 1,300 |
| Accrued expenses | 3,521 | - | - | 3,521 |
| Other liabilities | 698 | (698) | - | - |
| Income tax payable | 14,370 | (14,370) | - | - |
| Pension liability | 2,041 | - | - | 2,041 |
| Unearned subscription income | 129,200 | (129,200) | - | - |
| Commitment to acquire common stock of minority shareholder | - | - | - | - |
| Total Current Liabilities | 151,130 | (144,268) | - | 6,862 |
| Revolver | | 4,090 | | 4,090 |
| Term Loan | | 8,000 | | 8,000 |
| Other liabilities | | | 10,630 | 10,630 |
| Shareholders' equity / (deficit) | (101,539) | 101,539 | - | - |
| Total liabilities and shareholders' deficit | $ 49,591 | $ (30,638) | $ 10,630 | $ 29,582 |

| Leverage Ratios: | | | | |
|---|---|---|---|---|
| Total Debt | $ - | | | $ 12,090 |
| Net Debt | (12,390) | | | 12,090 |
| Total Capitalization | (101,539) | | | 22,720 |
| Total Debt / 2009E EBITDA | 0.0x | | | 1.3x |

**NEWS-JOURNAL CORPORATION**
Income Statement
*(Dollars in Thousands)*

Base Case

| | FYE 12/31 2007 | January Actual | February Actual | March Actual | April Actual | May Actual | June Actual | July Actual | August Actual | September Actual | October Actual | November Actual | December Actual | FYE 12/31 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Newspaper Operating Revenues:** | | | | | | | | | | | | | | |
| Display | $ 1,577 | $ 1,715 | 1,715 | 2,215 | 1,467 | 1,793 | 1,564 | 1,282 | 1,510 | 1,308 | 1,279 | 1,473 | 1,021 | $ 16,704 |
| National | 353 | 453 | 370 | 189 | 244 | 194 | 150 | 213 | 173 | 262 | 216 | 170 | 2,207 |
| Classified | 911 | 1,001 | 999 | 850 | 689 | 846 | 718 | 698 | 620 | 613 | 550 | 416 | 9,111 |
| Legal | 88 | 87 | 125 | 86 | 130 | 94 | 111 | 114 | 109 | 99 | 87 | 1,220 |
| Political | 4 | 0 | 12 | 14 | 17 | 47 |
| Preprints | 788 | 938 | 1,055 | 507 | 972 | 511 | 666 | 930 | 645 | 790 | 1,272 | 673 | 10,587 |
| TMC/Nie Plus | 149 | 146 | 116 | 202 | 149 | 127 | 122 | 124 | 108 | 158 | 140 | 160 | 1,711 |
| Direct Mail | 60 | 29 | 40 | 65 | 72 | 62 | 41 | 52 | 30 | 24 | 58 | 32 | 568 |
| **Total Advertising** | 56,741 | 3,910 | 4,570 | 4,029 | 3,786 | 4,249 | 3,853 | 4,113 | 3,600 | 3,399 | 3,322 | 3,871 | 2,294 | 45,165 |
| Circulation | 6,373 | 562 | 584 | 606 | 529 | 478 | 366 | 533 | 610 | 556 | 629 | 704 | 666 | 5,984 |
| Commercial | 4,585 | 356 | 343 | 331 | 339 | 133 | 298 | 233 | 211 | 207 | 348 | 248 | 244 | 3,333 |
| Other | 574 | 25 | 55 | (55) | 49 | 86 | 53 | (40) | 42 | (16) | 31 | 34 | 72 | 434 |
| **Newspaper Total Revenues** | 68,273 | 4,852 | 5,552 | 5,011 | 4,715 | 5,126 | 4,661 | 4,899 | 4,500 | 4,231 | 4,907 | 3,387 | 55,076 |
| Niche store operating income | 13,274 | 1,177 | 1,054 | 1,109 | 1,188 | 1,102 | 1,050 | 1,150 | 1,073 | 1,054 | 891 | 935 | 12,677 |
| Phonebook Revenues | 6,496 | (8) | (8) | (497) | (0) | (4) | (0) | (53) | (14) | 5,311 |
| **Total Revenue** | 90,047 | 6,029 | 6,616 | 6,305 | 6,399 | 6,225 | 5,703 | 5,645 | 5,518 | 5,235 | 5,789 | 4,308 | 73,967 |
| **Operating Expenses:** | | | | | | | | | | | | | | |
| Newspaper | 65,990 | 5,211 | 4,901 | 5,122 | 5,202 | 5,006 | 4,244 | 5,188 | 4,150 | 4,417 | 3,645 | 2,642 | 53,827 |
| Penny Saver | 12,729 | 992 | 929 | 979 | 979 | 986 | 833 | 879 | 942 | 1,036 | 838 | 557 | 11,477 |
| Phonebook | 4,272 | 542 | 532 | 39 | 10 | 4 | 2,705 | 73 | 192 | 3,002 |
| **Total Operating Expenses** | 82,910 | 6,193 | 5,810 | 6,722 | 6,717 | 6,800 | 5,317 | 6,392 | 5,066 | 7,217 | 4,555 | 3,799 | 64,106 |
| Management fees & added salaries | 7,137 | (164) | 785 | (327) | 145 | 346 | (1,346) | 422 | 467 | 556 | 1,109 | 4,061 |
| Other | 2,371 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 945 |
| **Adjusted EBITDA** | 9,588 | (89) | 854 | 1,642 | (239) | 124 | 465 | (1,467) | 925 | 946 | 634 | 1,319 | 1,168 | 5,406 |
| Depreciation and amortization | 2,878 | 253 | 253 | 253 | 253 | 253 | 253 | 233 | 253 | 293 | 382 | 253 | 393 | 3,033 |
| **EBIT** | 6,640 | (356) | 611 | 1,409 | (491) | (129) | 112 | (1,630) | 248 | 293 | 382 | 1,060 | 999 | 2,773 |
| Interest expense / income, net | (50) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (284) |
| Gain (loss) on disposal of PP&E | 44 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 142 |
| Deferred financing fees | 14 | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (270) |
| **Pre-Tax Income** | 6,747 | (327) | 622 | 1,418 | (480) | (18) | 223 | (1,639) | 255 | 304 | 393 | 1,071 | 946 | 2,904 |
| Provision for Income taxes | 1,558 | (47) | 90 | 204 | (69) | 92 | 32 | (217) | 37 | 44 | 57 | 154 | 136 | 418 |
| **Net Income** | $ 5,189 | (280) | 532 | $ 1,214 | (411) | 10 | 190 | (1,422) | 218 | 260 | 336 | 917 | 810 | $ 2,486 |
| **Effective Tax Rate** | 23.2% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% |
| **Margins:** | | | | | | | | | | | | | | |
| Adjusted Revenue | 10.0% | -1.4% | 13.1% | 20.0% | -3.7% | 3.6% | 8.2% | -25.1% | 9.3% | 9.3% | 12.1% | 22.2% | 24.2% | 7.8% |
| EBITDA | 7.5% | -2.7% | 11.9% | 15.1% | -5.0% | 2.3% | 6.8% | -26.7% | 7.1% | 5.7% | 10.6% | 21.3% | 22.6% | 6.0% |
| Adjusted EBITDA | 7.4% | -5.6% | 9.2% | 17.0% | -7.7% | -0.5% | 3.3% | -30.1% | 4.5% | 3.6% | 7.2% | 18.2% | 15.1% | 3.7% |
| Net Income | 5.8% | -4.0% | 8.1% | 14.6% | -6.4% | -0.2% | 3.3% | -25.5% | 4.0% | 3.2% | 6.4% | 15.8% | 15.8% | 3.4% |
| **Growth Rates:** | | | | | | | | | | | | | | |
| Advertising Revenue | | | | | | | | | | | | | | -20.4% |
| Circulation Revenue | | | | | | | | | | | | | | 9.5% |
| Total Revenue | | | | | | | | | | | | | | -17.9% |
| Adjusted EBITDA | | | | | | | | | | | | | | -38.9% |
| EBIT | | | | | | | | | | | | | | -58.2% |

NEWS-JOURNAL CORPORATION
Income Statement
(Dollars in Thousands)

| | January Actual | February Actual | March Actual | April Actual | May Actual | June Actual | July Actual | August Actual | September Actual | October Projected | November Projected | December Projected | Proj. FTE 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Newspaper Operating Revenues:** | | | | | | | | | | | | | |
| Display | $ 1,094 | $ 1,177 | $ 1,189 | $ 1,101 | $ 1,232 | $ 986 | $ 983 | $ 983 | $ 1,031 | $ 1,447 | $ 1,252 | $ 1,018 | $ 13,138 |
| National | 202 | 133 | 224 | 124 | 131 | 113 | 125 | 141 | 136 | 247 | 223 | 315 | 2,138 |
| Classified | 503 | 454 | 500 | 433 | 487 | 407 | 376 | 399 | 136 | 643 | 468 | 354 | 5,547 |
| Legals | 50 | 98 | 97 | 87 | 139 | 107 | 128 | 119 | 112 | 115 | 84 | 74 | 1,259 |
| Political | | | | | | | | | | 15 | 14 | 0 | 12 |
| Preprints | 711 | 736 | 851 | 675 | 786 | 558 | 557 | 705 | 620 | 830 | 1,081 | 572 | 8,654 |
| TMC/On Plus | 123 | 208 | 160 | 150 | 135 | 127 | 143 | 99 | 153 | 165 | 119 | 136 | 1,549 |
| Direct Mail | 18 | 16 | 24 | 22 | 4 | 2 | 22 | 32 | 51 | 25 | 49 | 48 | 280 |
| **Total Advertising** | 2,841 | 2,732 | 3,045 | 2,612 | 3,014 | 2,300 | 2,333 | 2,469 | 2,450 | 3,488 | 3,290 | 2,537 | 12,797 |
| Circulation | 787 | 810 | 962 | 816 | 878 | 738 | 724 | 814 | 778 | 881 | 985 | 960 | 10,150 |
| Gross CP | 219 | 239 | 232 | 225 | 227 | 191 | 182 | 148 | 167 | 53 | 53 | 13 | 2,153 |
| Other | 29 | 26 | 29 | 29 | 35 | 29 | 29 | 54 | 49 | 20 | 20 | 30 | 305 |
| **Newspaper Total Revenues** | 3,876 | 3,808 | 4,268 | 3,682 | 4,155 | 3,258 | 3,269 | 3,485 | 3,443 | 4,443 | 4,349 | 3,570 | 41,430 |
| Young Steer Revenues | 837 | 841 | 847 | 965 | 603 | 821 | 869 | 836 | 817 | 838 | 838 | 838 | 10,154 |
| Phonebook/Realproofed | | | 1,263 | | | | | | 2,895 | | | | 4,158 |
| **Total Revenue** | 4,713 | 4,649 | 6,378 | 4,647 | 4,998 | 4,028 | 4,275 | 4,323 | 7,156 | 5,281 | 5,187 | 4,409 | 55,742 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Newspaper | 3,841 | 3,918 | 3,948 | 3,695 | 3,304 | 2,797 | 3,202 | 3,062 | 3,655 | 3,240 | 3,674 | 3,121 | 42,070 |
| Young Steer | 907 | 760 | 781 | 755 | 795 | 623 | 694 | 702 | 691 | 748 | 735 | 625 | 8,817 |
| Phonebook | | | 818 | | | | | | 2,006 | | | | 3,024 |
| **Total Operating Expenses** | 4,750 | 4,678 | 5,548 | 4,450 | 4,099 | 3,420 | 3,896 | 3,764 | 6,542 | 4,489 | 4,409 | 3,747 | 53,911 |
| **EBITDA** | (37) | (30) | 830 | 197 | 900 | 658 | 279 | 559 | 594 | 792 | 778 | 662 | 5,871 |
| Adjustments / Add-Backs | 176 | 176 | 176 | 176 | 176 | 176 | 176 | 176 | 592 | 176 | 176 | 176 | 2,531 |
| Management fees & added salaries | | | | | | | | | | (27) | (27) | (37) | (311) |
| **Adjusted EBITDA** | 139 | 147 | 1,006 | 374 | 1,076 | 834 | 456 | 735 | 1,186 | 932 | 918 | 801 | 8,291 |
| Depreciation and amortization | 223 | 223 | 223 | 223 | 223 | 223 | 223 | 223 | 223 | 223 | 223 | 223 | 2,672 |
| **EBIT** | (83) | (76) | 784 | 151 | 853 | 611 | 233 | 513 | 963 | 709 | 695 | 578 | 5,618 |
| Interest expense / income, net | 32.4 | 32.4 | 32.4 | 32.4 | 32.4 | 32.4 | 32.4 | 32.4 | 32.4 | | | | 193 |
| Other non-operating income | | | | | | | | | | 57 | 0 | 54 | (189) |
| Gain/loss on disposal of FF&E | | | | | | | | | | | | | |
| Deferred leasing fees | | | | | | | | | | | | | |
| **Pre-Tax Income** | (81) | (44) | 836 | 183 | 885 | 644 | 266 | 545 | 995 | 652 | 641 | 549 | 5,372 |
| Provision for income taxes | (7) | (3) | 117 | 36 | 127 | 93 | 30 | 78 | 143 | 94 | 92 | 7 | 902 |
| **Net Income** | $ (64) | $ (37) | $ 699 | $ 137 | $ 758 | $ 551 | $ 227 | $ 467 | $ 852 | $ 558 | $ 549 | $ 44 | $ 4,469 |
| | | | | | | | | | | | | | |
| **Effective Tax Rate** | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% | 14.4% |
| | | | | | | | | | | | | | |
| **Margins** | | | | | | | | | | | | | |
| Adjusted EBITDA | 3.0% | 3.2% | 15.8% | 8.0% | 21.5% | 20.5% | 10.7% | 17.0% | 16.6% | 17.6% | 17.7% | 18.2% | 13.9% |
| EBITDA | -0.8% | -0.6% | 13.0% | 4.2% | 18.0% | 16.1% | 6.5% | 12.9% | 8.3% | 15.0% | 15.0% | 15.0% | 9.8% |
| EBIT | -1.8% | -1.6% | 12.3% | 3.3% | 17.1% | 15.2% | 5.4% | 11.9% | 13.5% | 13.4% | 13.4% | 13.1% | 9.4% |
| **Net Income** | -0.9% | -0.8% | 11.0% | 2.9% | 15.2% | 13.5% | 5.3% | 10.8% | 11.9% | 10.6% | 10.6% | 1.0% | 7.5% |
| | | | | | | | | | | | | | |
| **Growth Rates:** | | | | | | | | | | | | | |
| Advertising Revenue | -17.5% | -40.2% | -38.2% | -31.0% | -28.1% | -29.5% | -25.1% | -32.0% | -18.2% | 5.0% | -15.0% | -15.0% | -27.0% |
| Circulation Revenue | 39.0% | 43.0% | 58.9% | 54.3% | 60.3% | 45.6% | 35.1% | 33.5% | 30.9% | 40.0% | 40.0% | 40.0% | 45.3% |
| Total Revenue | -73.6% | -29.7% | -23.2% | -27.6% | -23.7% | -28.5% | -15.1% | -21.7% | -12.7% | 0.9% | -10.4% | -10.7% | -19.2% |
| Adjusted EBITDA | -284.2% | -83.0% | -39.4% | -256.6% | 180.1% | 79.6% | -136.6% | 46.6% | 46.6% | 32.1% | 32.1% | -32.6% | -18.9% |
| EBIT | N/M | N/M | -44.4% | N/M | N/M | 188.7% | N/M | N/M | 235.3% | 83.5% | -34.5% | N/M | 102.0% |

**NEWS-JOURNAL CORPORATION**
Income Statement
(Dollars in Thousands)

|  | January Projected | February Projected | March Projected | April Projected | May Projected | June Projected | July Projected | August Projected | September Projected | October Projected | November Projected | December Projected | 2010 | 2011 | Proj. FTE 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Newspaper Operating Revenues:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Display | $ 844 | $ 782 | $ 904 | $ 886 | $ 1,082 | $ 1,062 | $ 944 | $ 910 | $ 928 | $ 1,183 | $ 1,264 | $ 1,048 | $ 11,648 | $ 12,231 | $ 12,842 | $ 13,484 |
| National | 115 | 147 | 120 | 144 | 186 | 148 | 134 | 190 | 154 | 134 | 134 | 245 | 1,913 | 2,009 | 2,109 | 2,215 |
| Classified | 308 | 338 | 338 | 423 | 423 | 402 | 434 | 421 | 375 | 375 | 514 | 189 | 4,979 | 5,166 | 5,433 | 5,694 |
| Legals | 65 | 65 | 93 | 115 | 115 | 88 | 82 | 98 | 0 | 124 | 122 | 189 | 1,116 | 1,172 | 1,231 | 1,292 |
| Political | 2 | 2 | | | | | | 5 | 0 | 2 | 2 | | 15 | 11 | 12 | 13 |
| Preprints | 443 | 528 | 559 | 648 | 679 | 696 | 687 | 687 | 589 | 1,005 | 1,205 | 580 | 7,850 | 8,243 | 8,655 | 9,088 |
| TMC/Hi-5 Plus | 100 | 97 | 76 | 145 | 107 | 91 | 91 | 117 | 102 | 142 | 142 | 144 | 1,373 | 1,442 | 1,514 | 1,590 |
| Direct Mail | 18 | 13 | 18 | 20 | 22 | 21 | 19 | 21 | 15 | 31 | 31 | 31 | 245 | 261 | 274 | 287 |
| **Total Advertising** | 1,695 | 1,971 | 2,150 | 2,323 | 2,515 | 2,329 | 2,292 | 2,417 | 2,264 | 2,872 | 3,318 | 2,514 | 29,079 | 30,553 | 32,080 | 33,683 |
| Circulation | 606 | 629 | 652 | 835 | 745 | 769 | 760 | 772 | 772 | 882 | 887 | 862 | 9,437 | 9,660 | 8,698 | 8,850 |
| Gross CP | 145 | 140 | 136 | 191 | 177 | 158 | 177 | 177 | 172 | 212 | 212 | 208 | 2,105 | 2,136 | 2,116 | 2,116 |
| Other | 71 | 72 | (158) | 22 | 38 | 29 | 58 | (80) | (80) | 18 | 67 | 41 | 353 | 345 | 356 | 356 |
| **Newspaper Total Revenues** | 2,517 | 2,869 | 2,779 | 3,361 | 3,574 | 3,306 | 3,388 | 3,709 | 3,109 | 3,984 | 4,563 | 3,745 | 40,974 | 42,076 | 43,240 | 44,495 |
| Penny Saver Revenues | 779 | 584 | 584 | 866 | 601 | 766 | 974 | 974 | 730 | 1,169 | 877 | 977 | 9,739 | 9,642 | 9,642 | 9,642 |
| Phonebook Revenues | | | 1,252 | | | | | 1,880 | 1,800 | | | | 4,050 | 4,050 | 4,050 | 4,050 |
| **Total Revenues** | 3,296 | 3,453 | 4,614 | 4,227 | 4,377 | 4,072 | 4,342 | 4,440 | 6,700 | 5,153 | 5,440 | 4,622 | 54,763 | 55,768 | 56,932 | 58,187 |
| **Operating Expenses** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Newspaper | 2,414 | 2,270 | 3,173 | 3,143 | 3,073 | 3,635 | 3,094 | 3,094 | 3,632 | 3,898 | 3,874 | 2,951 | 35,161 | 36,068 | 36,790 | 37,525 |
| Penny Saver | 548 | 519 | 547 | 682 | 687 | 650 | 675 | 650 | 684 | 849 | 735 | 839 | 8,076 | 8,238 | 8,238 | 8,238 |
| Phonebook | | | 950 | | | | | 2,000 | 2,000 | | | | 2,846 | 1,055 | 1,055 | 1,115 |
| **Total Operating Expenses** | 2,963 | 2,790 | 3,820 | 3,815 | 3,760 | 3,275 | 3,769 | 3,744 | 5,380 | 4,747 | 4,609 | 3,670 | 46,383 | 47,310 | 48,080 | 48,889 |
| **EBITDA** | 334 | 693 | 785 | 412 | 617 | 797 | 572 | 695 | 1,317 | 405 | 831 | 932 | 8,340 | 8,458 | 8,840 | 9,289 |
| Adjustments / Add-Backs | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (27) | (27) | (27) | (414) | (310) | (310) | (310) |
| Management fees & added subsidies | | | | | | | | | | | | | | | | |
| Other | 297 | 686 | 748 | 865 | 580 | 760 | 535 | 658 | 1,280 | 378 | 804 | 905 | 7,946 | 8,148 | 8,320 | 8,908 |
| **Adjusted EBITDA** | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 2,516 | 2,498 | 2,336 | 2,139 |
| Depreciation and amortization | 51 | 52 | 52 | 52 | 51 | 49 | 47 | 46 | 46 | 46 | 44 | 42 | 5,430 | 5,649 | 5,984 | 6,770 |
| **EBIT** | | | | | | | | | | | | 9 | 577 | 378 | 151 | 9 |
| Interest expense / income, net | 16 | 52 | 52 | 52 | 51 | 49 | 47 | 46 | 46 | 46 | 44 | 42 | | | | |
| Other non-operating income | | | | | | | | | | | | | | | | |
| Gain (loss) on disposal of PP&E | | | 486 | 104 | 320 | 501 | 279 | 468 | 1,035 | 122 | 550 | 653 | 4,874 | 5,321 | 6,933 | 6,740 |
| **Pre-Tax Income** | 16 | 394 | 486 | 104 | 320 | 501 | 279 | 468 | 1,035 | 122 | 550 | 653 | 4,874 | 5,321 | 6,933 | 6,740 |
| Provision for income taxes | 14 | 166 | 22 | 44 | 134 | 210 | 117 | 169 | 430 | 51 | 231 | 274 | 2,017 | 2,235 | 2,514 | 2,833 |
| **Net Income** | $ 11 | $ 228 | $ 284 | $ 60 | $ 185 | $ 291 | $ 162 | $ 294 | $ 594 | $ 71 | $ 319 | $ 379 | $ 2,827 | $ 3,086 | $ 3,499 | $ 3,943 |
| **Effective Tax Rate** | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% | 42.0% |
| **Margins:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Adjusted EBITDA | 9.0% | 18.8% | 16.2% | 8.6% | 13.3% | 18.7% | 12.3% | 14.8% | 15.1% | 7.3% | 14.8% | 19.6% | 14.5% | 14.6% | 15.5% | 15.4% |
| EBITDA | 10.1% | 19.0% | 17.0% | 9.5% | 14.1% | 19.6% | 13.2% | 15.7% | 19.7% | 7.3% | 15.1% | 20.3% | 15.3% | 15.3% | 15.5% | 16.0% |
| EBIT | 2.6% | 12.8% | 11.7% | 3.7% | 8.5% | 13.5% | 7.5% | 10.5% | 16.0% | 1.4% | 15.0% | 15.0% | 10.0% | 10.2% | 10.0% | 11.6% |
| Net Income | 0.6% | 6.6% | 6.1% | 1.4% | 4.3% | 7.1% | 3.7% | 5.3% | 8.9% | 5.9% | 5.9% | 8.2% | 5.2% | 5.3% | 6.1% | 6.7% |
| **Growth Rates:** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Advertising Revenue | N/M | 27.9% | | -11.1% | | | 1.3% | 6.6% | 6.6% | -7.6% | -17.7% | -0.1% | 11.3% | | 5.0% | 5.0% |
| Circulation Revenue | N/M | -24.1% | | 1.1% | -13.2% | -14.9% | 6.9% | 4.1% | | -0.7% | 0.1% | 0.1% | -7.0% | 5.0% | -4.0% | -4.0% |
| Total Revenue | N/M | 19.0% | 16.2% | 1.8% | -14.9% | -4.2% | -1.2% | -2.3% | -6.4% | -2.4% | 4.9% | 4.8% | -8.4% | 1.6% | 2.1% | 2.1% |
| Adjusted EBITDA | N/M | -25.2% | 11.7% | 9.5% | -12.6% | -46.1% | 17.5% | 10.5% | 8.0% | -12.6% | -53.6% | 13.0% | -3.5% | -3.1% | 1.2% | 4.6% |
| EBIT | N/M | N/M | 3.7% | 3.3% | 56.0% | -10.0% | 30.9% | -12.5% | 11.2% | 76.2% | -14.5% | N/M | N/M | -3.0% | 4.4% | 8.5% | 9.5% |

NEWS-JOURNAL CORPORATION
Balance Sheet
(Dollars in Thousands)

| | 12/31/07 Actual | January Estimate | February Estimate | March Estimate | April Estimate | May Estimate | June Estimate | July Estimate | August Estimate | September Estimate | October Estimate | November Estimate | December Estimate | 12/31/08 Actual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | | | |
| Cash and cash equivalents | $ 2,851 | $ 1,333 | $ 3,815 | $ 4,297 | $ 4,778 | $ 5,260 | $ 5,742 | $ 6,224 | $ 6,706 | $ 7,187 | $ 7,669 | $ 8,151 | $ 8,633 | $ 8,633 |
| Investment securities | 5,500 | 5,042 | 4,581 | 4,335 | 3,667 | 3,208 | 2,750 | 2,292 | 1,833 | 1,375 | 917 | 458 | 0 | 0 |
| Accounts receivable | 10,751 | 10,632 | 10,512 | 10,392 | 10,273 | 10,153 | 10,033 | 9,914 | 9,794 | 9,674 | 9,555 | 9,435 | 9,315 | 9,315 |
| Other receivable | 1,825 | 1,754 | 1,683 | 1,612 | 1,541 | 1,471 | 1,400 | 1,329 | 1,258 | 1,187 | 1,117 | 1,046 | 975 | 975 |
| Inventories | 1,735 | 1,710 | 1,686 | 1,662 | 1,578 | 1,534 | 1,489 | 1,445 | 1,401 | 1,357 | 1,313 | 1,268 | 1,224 | 1,224 |
| Prepaid expenses and other | 1,038 | 1,002 | 986 | 950 | 919 | 914 | 842 | 806 | 770 | 734 | 697 | 661 | 625 | 625 |
| Income tax receivable | | 93 | 107 | 160 | 213 | 266 | 320 | 373 | 426 | 480 | 533 | 586 | 640 | 640 |
| Deferred income taxes | 1,450 | 1,593 | 1,515 | 1,528 | 1,540 | 1,553 | 1,565 | 1,577 | 1,590 | 1,602 | 1,615 | 1,427 | 1,440 | 1,440 |
| **Total Current Assets** | 25,120 | 25,048 | 24,867 | 24,685 | 24,504 | 24,322 | 24,141 | 23,959 | 23,778 | 23,596 | 23,415 | 23,233 | 23,052 | 23,052 |
| Property, plant and equipment | 11,627 | 11,446 | 11,265 | 11,084 | 10,903 | 10,721 | 10,540 | 10,359 | 10,178 | 9,996 | 9,815 | 9,634 | 9,453 | 9,453 |
| Goodwill | 1,279 | 1,272 | 1,271 | 1,270 | 1,268 | 1,267 | 1,266 | 1,264 | 1,263 | 1,282 | 1,280 | 1,259 | 1,258 | 1,258 |
| Intangibles | 11,000 | 10,958 | 10,917 | 10,875 | 10,833 | 10,792 | 10,750 | 10,708 | 10,667 | 10,625 | 10,583 | 10,542 | 10,500 | 10,500 |
| Transaction goodwill | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Transaction identifiable intangibles | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Deferred financing fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Deferred tax asset | 26 | 28 | 31 | 33 | 35 | 38 | 40 | 42 | 45 | 47 | 49 | 52 | 54 | 54 |
| Purchase deposits for equipment | 1,343 | 1,317 | 1,292 | 1,267 | 1,242 | 1,217 | 1,192 | 1,167 | 1,142 | 1,117 | 1,091 | 1,067 | 1,042 | 1,042 |
| Other assets | 916 | 1,011 | 1,313 | 1,313 | 1,313 | 2,616 | 3,016 | 3,617 | 3,818 | 4,219 | 4,620 | 5,021 | 5,422 | 5,422 |
| Deferred income taxes | | | | | | | | | | | | | | |
| **Total assets** | $ 51,199 | $ 51,081 | $ 51,084 | $ 51,027 | $ 50,899 | $ 50,972 | $ 50,945 | $ 50,917 | $ 50,890 | $ 50,862 | $ 50,835 | $ 50,808 | $ 50,780 | $ 50,780 |
| **Liabilities & Stockholders' Equity** | | | | | | | | | | | | | | |
| Accounts payable | $ 1,428 | $ 1,394 | $ 1,360 | $ 1,327 | $ 1,293 | $ 1,260 | $ 1,226 | $ 1,192 | $ 1,159 | $ 1,125 | $ 1,091 | $ 1,058 | $ 1,024 | $ 1,024 |
| Accrued expenses | 6,840 | 4,699 | 6,539 | 6,388 | 4,238 | 4,087 | 3,937 | 3,786 | 3,635 | 3,485 | 3,334 | 3,183 | 3,033 | 3,033 |
| Other liabilities | 1,517 | 1,485 | 1,453 | 1,421 | 1,389 | 1,357 | 1,325 | 1,293 | 1,261 | 1,229 | 1,197 | 1,166 | 1,133 | 1,133 |
| Income tax payable | 195 | 146 | 133 | 119 | 106 | 93 | 80 | 66 | 53 | 40 | 27 | 13 | - | - |
| Pension liability | 1,815 | 2,777 | 3,739 | 4,701 | 5,663 | 6,625 | 7,587 | 8,549 | 9,511 | 10,473 | 11,434 | 12,396 | 13,358 | 13,358 |
| Unearned subscription income | 2,204 | 2,209 | 2,215 | 2,220 | 2,226 | 2,231 | 2,236 | 2,241 | 2,247 | 2,257 | 2,263 | 2,269 | 2,268 | 2,268 |
| Commitment to acquire common stock of minority shareholder | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 |
| **Total Current Liabilities** | 143,184 | 141,303 | 142,659 | 143,374 | 144,114 | 144,852 | 145,590 | 146,328 | 147,056 | 147,800 | 148,541 | 149,279 | 150,017 | 150,017 |
| Revolver | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other liab | 338 | 322 | 315 | 310 | 303 | 296 | 290 | 284 | 278 | 271 | 265 | 259 | 253 | 253 |
| Stockholders' equity / (deficit) | (90,383) | (91,143) | (91,909) | (92,659) | (93,419) | (94,170) | (94,930) | (95,694) | (96,451) | (97,217) | (97,971) | (98,730) | (99,490) | (99,490) |
| **Total liabilities and shareholders' deficit** | $ 51,199 | $ 51,082 | $ 51,064 | $ 51,027 | $ 50,999 | $ 50,972 | $ 50,945 | $ 50,907 | $ 50,890 | $ 50,862 | $ 50,835 | $ 50,808 | $ 50,780 | $ 50,780 |

**Revolver Availability:**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounts Receivable - Non-Phone Book | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Accounts Receivable - Phone Book | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Inventories | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Availability | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

**Balance Sheet Metric**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance Sheet Net Worth | $ (101,342) | $ (102,099) | $ (102,816) | $ (103,534) | $ (104,251) | $ (104,568) | $ (105,685) | $ (106,403) | $ (107,120) | $ (107,837) | $ (108,555) | $ (109,272) | $ (109,989) | $ (109,989) |
| Net Working Capital | (118,784) | (120,186) | (121,587) | (122,988) | (124,389) | (125,790) | (127,191) | (128,593) | (129,994) | (131,396) | (132,796) | (134,195) | (135,597) | (135,597) |
| Change in Net Working Capital | N/A | (1,401) | (1,401) | (1,401) | (1,401) | (1,401) | (1,402) | (1,401) | (1,401) | (1,401) | (1,401) | (1,401) | (1,401) | (16,813) |
| Invested Capital | (92,905) | (94,152) | (95,399) | (96,646) | (97,893) | (99,160) | (100,387) | (101,634) | (102,881) | (104,128) | (105,375) | (106,622) | (107,869) | (107,869) |

**Leverage Ratios**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Debt | $ (2,851) | $ (3,331) | $ (3,815) | $ (4,297) | $ (4,778) | $ (5,260) | $ (5,742) | $ (6,224) | $ (6,706) | $ (7,187) | $ (7,669) | $ (8,151) | $ (8,633) | $ (8,633) |
| Net Debt | (90,383) | (91,341) | (91,909) | (92,659) | (93,419) | (94,170) | (94,930) | (95,694) | (96,451) | (97,211) | (97,971) | (98,730) | (99,490) | (99,490) |
| Total Capitalization | (90,383) | (91,341) | (91,909) | (92,659) | (93,419) | (94,170) | (94,930) | (95,694) | (96,451) | (97,211) | (97,971) | (98,730) | (99,490) | (99,490) |
| Total Debt / Total Capitalization | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

Stephens Inc.
00/16/2009 9:28 AM

# NEWS-JOURNAL CORPORATION
## Balance Sheet
(Dollars in Thousands)

| | January Estimate | February Estimate | March Estimate | April Estimate | May Estimate | June Estimate | July Estimate | August Estimate | September Actual | Pro Forma 09/30/09 | October Projected | November Projected | December Projected | 12/31/09 Estimate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | | | |
| Cash and cash equivalents | $ 9,053 | $ 9,674 | $ 9,895 | $ 10,318 | $ 10,796 | $ 11,157 | $ 11,578 | $ 12,567 | $ 12,390 | | $ 6,747 | $ 0 | $ 0 | $ 0 |
| Investment securities | 8,723 | 8,331 | 7,539 | 6,947 | 6,355 | 5,762 | 5,170 | 4,854 | 7,013 | 7,013 | | 6,446 | 5,529 | 5,529 |
| Accounts receivable | 978 | 981 | 984 | 986 | 989 | 992 | 995 | 1,048 | 60 | 60 | | | | |
| Other receivables | 1,264 | 1,303 | 1,342 | 1,382 | 1,421 | 1,461 | 1,500 | 1,588 | 1,253 | 1,253 | 1,328 | 1,304 | 1,109 | 1,109 |
| Inventories | 729 | 833 | 937 | 1,026 | 1,114 | 1,208 | 1,334 | 1,497 | 580 | 580 | 666 | 751 | 837 | 837 |
| Prepaid expenses and other | 769 | 878 | 997 | 1,116 | 1,235 | 1,354 | 1,473 | 1,609 | 1,301 | 1,301 | | | | |
| Deferred income taxes | 1,640 | 1,640 | 1,640 | 1,640 | 1,640 | 1,640 | 1,640 | 1,640 | 1,640 | 1,640 | | | | |
| **Total Current Assets** | 23,146 | 23,239 | 23,333 | 23,417 | 23,510 | 23,614 | 23,707 | 24,122 | 24,236 | 24,236 | 8,741 | 8,502 | 7,474 | 7,474 |
| Property, plant, and equipment | 9,304 | 9,154 | 9,005 | 8,856 | 8,707 | 8,558 | 8,409 | 8,224 | 8,393 | 8,393 | 12,277 | 12,254 | 12,132 | 12,132 |
| Goodwill | 1,258 | 1,258 | 1,258 | 1,258 | 1,258 | 1,258 | 1,258 | 1,258 | 1,258 | 1,258 | | | | |
| Intangibles | 10,458 | 10,417 | 10,375 | 10,333 | 10,292 | 10,250 | 10,208 | 10,167 | 10,125 | 10,125 | 7,289 | 7,289 | 7,289 | 7,789 |
| Transaction goodwill | | | | | | | | | | | | | | |
| Transaction identifiable intangibles | | | | | | | | | | | | | | |
| Deferred financing fees | | | | | | | | | | | | | | |
| Deferred tax asset | 55 | 56 | 57 | 58 | 60 | 61 | 62 | 80 | 37 | 37 | 37 | 37 | 37 | 37 |
| Purchase deposits for equipment | 960 | 879 | 797 | 716 | 634 | 552 | 471 | 471 | 411 | 411 | 411 | 411 | 411 | 411 |
| Other assets | 5,422 | 5,422 | 5,422 | 5,422 | 5,422 | 5,422 | 5,422 | 5,422 | 5,422 | 5,422 | | | | |
| **Total assets** | 50,602 | 50,425 | 50,247 | 50,060 | 49,892 | 49,714 | 49,536 | 49,744 | 49,591 | 49,591 | 29,335 | 28,393 | 27,843 | 27,843 |
| **Liabilities & Stockholders' Equity** | | | | | | | | | | | | | | |
| Accounts payable | $ 986 | 948 | 911 | 873 | 835 | 797 | 759 | 901 | 1,300 | 1,300 | 1,279 | 1,314 | 1,351 | 1,151 |
| Accrued expenses | 3,080 | 3,126 | 3,173 | 3,220 | 3,267 | 3,314 | 3,361 | 3,561 | 3,531 | 3,531 | 3,712 | 3,666 | 3,116 | 3,116 |
| Other liabilities | 971 | 810 | 648 | 486 | 324 | 162 | | | | | | | | |
| Income tax payable | 120 | 205 | 304 | 405 | 506 | 608 | 709 | 820 | 698 | | | | | |
| Pension liability | 13,467 | 13,575 | 13,683 | 13,792 | 13,900 | 14,008 | 14,117 | 14,243 | 14,170 | 14,170 | | | | |
| Unearned subscription income | 2,240 | 2,220 | 2,212 | 2,193 | 2,174 | 2,156 | 2,136 | 2,096 | 2,041 | 2,041 | 2,000 | 2,000 | 2,000 | 2,000 |
| Commitment to acquire common stock of minority ph | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,200 | 129,000 | | | | | |
| **Total Current Liabilities** | 150,055 | 150,092 | 150,130 | 150,168 | 150,206 | 150,244 | 150,282 | 150,821 | 151,130 | 6,862 | 7,111 | 7,010 | 6,247 | 6,247 |
| Revolver | | | | | | | | | | 4,000 | 3,056 | 2,235 | 2,081 | 2,081 |
| Term Loan | 217 | 180 | 144 | 108 | 72 | 36 | | | | 6,000 | 8,000 | 8,000 | 1,714 | 1,714 |
| Other | | | | | | | | | | | | | | |
| **Total Liabilities** | | | | | | | | | | 10,610 | 11,188 | 11,732 | 11,281 | 11,281 |
| Shareholders' equity / (deficit) | (99,669) | (99,848) | (100,027) | (100,207) | (100,385) | (100,566) | (100,745) | (101,078) | (101,539) | | | | | |
| **Total liabilities and shareholders' deficit** | $ 50,602 | $ 50,425 | $ 50,247 | $ 50,060 | $ 49,892 | $ 49,714 | $ 49,536 | $ 49,744 | $ 49,591 | | 29,335 | 28,393 | 27,843 | 27,843 |

| **Revolver Availability** | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounts Receivable - Non-Phone Book | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 1,616 | 4,759 | 4,668 | 3,968 | 3,968 |
| Accounts Receivable - Phone Book | | | | | | | | | | 2,711 | 1,994 | 1,778 | 1,561 | 1,561 |
| Inventories | | | | | | | | | | 1,691 | 1,328 | 1,394 | 1,109 | 1,109 |
| Availability | | | | | | | | | | 6,259 | 5,720 | 6,060 | 5,186 | 5,186 |

| **Balance Sheet Metrics** | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tangible Net Worth | $ (110,137) | $ (110,265) | $ (110,402) | $ (110,549) | $ (110,676) | $ (110,818) | $ (110,954) | $ (111,341) | $ (111,644) | $ (111,644) | 7,841 | 3,992 | 3,992 | 3,992 |
| Net Working Capital | (135,962) | (136,327) | (136,692) | (137,057) | (137,422) | (137,787) | (138,152) | (139,266) | (139,566) | 1,283 | 1,630 | 1,492 | 1,208 | 1,208 |
| Change in Net Working Capital | (365) | (365) | (365) | (365) | (365) | (365) | (365) | (1,114) | (39) | 137,550 | (353) | (148) | (274) | 136,805 |
| Invested Capital | (103,504) | (109,142) | (109,778) | (110,414) | (111,051) | (111,687) | (112,323) | (113,331) | (113,639) | 20,720 | 22,244 | 21,973 | 21,576 | 21,576 |

| **Leverage Ratios** | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Debt | $ (9,051) | (9,674) | (9,855) | (10,316) | (10,794) | (11,157) | (11,578) | (12,567) | (12,390) | 12,090 | 11,056 | 10,216 | 9,795 | 9,795 |
| Net Debt | (99,669) | (99,848) | (100,027) | (100,207) | (100,386) | (100,566) | (100,745) | (12,567) | (101,539) | 12,090 | 11,056 | 10,216 | 9,795 | 9,795 |
| Total Capitalization | | | | | | | | | | 22,700 | 22,244 | 21,973 | 21,576 | 21,576 |
| Total Debt / Total Capitalization | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 53.2% | 49.7% | 45.7% | 45.4% | 45.4% |

Stephen Inc.
101610/2009-10 AM

# NEWS-JOURNAL CORPORATION
## Balance Sheet
*(Dollars in Thousands)*

| | January Projected | February Projected | March Projected | April Projected | May Projected | June Projected | July Projected | August Projected | September Projected | October Projected | November Projected | December Projected | Proj-FYE 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | | | | | | | | | |
| Cash and cash equivalents | $ 4,311 | $ 4,262 | $ 5,188 | $ 0 | $ 0 | $ 0 | $ 4,715 | $ 4,490 | $ 5,721 | $ 6,632 | $ 6,673 | $ 5,720 | $ 5,720 | $ 5,744 | $ 5,831 | $ 5,447 |
| Investment receivables | | | | | | | | | | | | | | | | |
| Accounts receivable | 829 | 876 | 846 | 1,053 | 1,101 | 1,004 | 1,002 | 1,116 | 991 | 1,296 | 1,388 | 1,162 | 1,162 | 1,184 | 1,208 | 1,235 |
| Other receivables | 922 | 1,008 | 630 | 738 | 954 | | | 1,082 | 1,278 | 666 | 751 | 837 | 837 | 852 | 870 | 899 |
| Inventories | | | | | | | | | | | | | | | | |
| Prepaid expenses and other | | | | | | | | | | | | | | | | |
| Income tax receivable | | | | | | | | | | | | | | | | |
| Deferred income taxes | | | | | | | | | | | | | | | | |
| **Total Current Assets** | 6,052 | 6,346 | 6,664 | 7,459 | 7,360 | 6,800 | 6,489 | 6,376 | 7,979 | 8,593 | 8,292 | 7,320 | 7,320 | 7,379 | 8,654 | 13,496 |
| Property, plant, and equipment | 12,372 | 12,612 | 12,593 | 12,393 | 12,433 | 11,474 | 12,864 | 12,254 | 12,145 | 12,035 | 11,925 | 11,816 | 11,816 | 11,167 | 10,131 | 9,232 |
| Goodwill | | | | | | | | | | | | | | | | |
| Intangibles | | | | | | | | | | | | | | | | |
| Transaction goodwill | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 | 7,789 |
| Transaction identifiable intangibles | | | | | | | | | | | | | | | | |
| Deferred financing fees | | | | | | | | | | | | | | | | |
| Deferred tax asset | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 37 |
| Purchase deposits for equipment | | | | | | | | | | | | | | | | |
| Other assets | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 | 411 |
| Deferred income taxes | | | | | | | | | | | | | | | | |
| **Total assets** | $ 26,671 | $ 26,995 | $ 27,604 | $ 28,093 | $ 28,036 | $ 22,514 | $ 27,099 | $ 27,307 | $ 28,361 | $ 28,865 | $ 28,555 | $ 27,272 | $ 27,272 | $ 27,183 | $ 27,032 | $ 30,985 |
| **Liabilities & Shareholders' Equity:** | | | | | | | | | | | | | | | | |
| Accounts payable | $ 761 | $ 804 | $ 777 | $ 976 | $ 1,011 | $ 941 | $ 1,003 | $ 1,026 | $ 901 | $ 1,190 | $ 1,257 | $ 1,664 | $ 1,664 | $ 1,087 | $ 1,110 | $ 1,134 |
| Accrued expenses | 2,052 | 2,128 | 2,104 | 2,644 | 2,738 | 2,547 | 2,716 | 2,777 | 2,439 | 3,223 | 3,402 | 2,691 | 2,691 | 2,964 | 3,006 | 3,071 |
| Other liabilities | | | | | | | | | | | | | | | | |
| Income taxes payable | | | | | | | | | | | | | | | | |
| Pension liability | | | | | | | | | | | | | | | | |
| Unearned subscription income | 1,859 | 1,859 | 1,859 | 1,859 | 1,859 | 1,859 | 1,859 | 1,859 | 1,859 | 1,859 | 1,859 | 1,859 | 1,859 | 1,745 | 1,714 | 1,645 |
| Commitment to acquire common stock of minority ih | | | | | | | | | | | | | | | | |
| **Total Current Liabilities** | 4,683 | 4,842 | 4,740 | 5,480 | 5,608 | 5,447 | 5,578 | 5,692 | 5,199 | 6,273 | 6,538 | 5,818 | 5,818 | 5,816 | 5,679 | 5,651 |
| Revolver | 2,472 | 2,408 | 2,022 | 2,382 | 2,455 | 2,175 | 1,758 | 1,238 | 2,465 | 1,816 | 1,351 | 776 | 776 | | | |
| Term Loan | 7,214 | 7,214 | 7,429 | 7,429 | 7,429 | 7,243 | 7,243 | 7,143 | 6,857 | 6,857 | 6,857 | 6,571 | 6,571 | 6,571 | 3,673 | |
| Other liabilities | | | | | | | | | | | | | | | | |
| Shareholders' equity / (deficit) | 11,852 | 12,030 | 12,313 | 12,273 | 12,550 | 7,650 | 12,049 | 13,344 | 13,839 | 13,919 | 14,222 | 14,607 | 14,607 | 13,654 | 13,693 | 25,114 |
| **Total liabilities and shareholder' deficit** | $ 26,671 | $ 26,995 | $ 27,604 | $ 28,093 | $ 28,036 | $ 27,514 | $ 27,099 | $ 27,307 | $ 28,361 | $ 28,865 | $ 28,555 | $ 27,272 | $ 27,272 | $ 27,183 | $ 27,032 | $ 30,985 |
| **Revolver Availability:** | | | | | | | | | | | | | | | | |
| Accounts Receivable - Non-Phone Book | $ 2,567 | $ 3,128 | $ 3,037 | $ 3,804 | $ 3,839 | $ 3,665 | $ 3,508 | $ 3,595 | $ 3,510 | $ 4,637 | $ 4,896 | $ 4,159 | $ 4,159 | $ 4,183 | $ 4,170 | $ 4,364 |
| Accounts Receivable - Phone Book | 1,344 | 1,138 | 2,181 | 1,828 | 1,494 | 1,161 | 828 | 494 | 1,211 | 2,321 | 1,778 | 1,581 | 1,581 | 1,561 | 1,561 | 1,561 |
| Inventory | 829 | 876 | 846 | 1,083 | 1,101 | 1,004 | 1,002 | 1,116 | 981 | 1,296 | 1,188 | 1,162 | 1,162 | 1,162 | 1,208 | 1,235 |
| Availability | 4,040 | 4,033 | 4,046 | 5,204 | 5,100 | 4,503 | 4,611 | 4,468 | 5,103 | 6,180 | 8,255 | 5,284 | 5,384 | 5,417 | 5,109 | 5,665 |
| **Balance Sheet Metrics:** | | | | | | | | | | | | | | | | |
| Tangible Net Worth | $ 4,013 | $ 4,241 | $ 4,524 | $ 4,584 | $ 4,769 | $ 5,090 | $ 5,222 | $ 5,456 | $ 6,050 | $ 6,121 | $ 6,440 | $ 6,819 | $ 6,819 | $ 9,905 | $ 13,404 | $ 17,315 |
| Net Working Capital | 1,380 | 1,304 | 1,399 | 1,393 | 1,772 | 1,437 | 1,311 | 1,314 | 2,780 | 2,324 | 2,174 | 1,902 | 1,902 | 1,983 | 2,080 | 3,198 |
| (Increase) Decrease in Net Working Capital | | (79) | 620 | 28 | (81) | (115) | (146) | (197) | 1,655 | (459) | (46) | (372) | (372) | (81) | 61 | 117 |
| Invested Capital | 21,989 | 22,153 | 22,663 | 22,583 | 22,442 | 22,167 | 21,926 | 21,606 | 23,161 | 22,437 | 22,593 | 21,555 | 21,555 | 21,367 | 21,193 | 19,667 |
| **Leverage Ratios:** | | | | | | | | | | | | | | | | |
| Total Debt | $ 10,187 | $ 10,123 | $ 10,351 | $ 10,210 | $ 9,884 | $ 9,318 | $ 8,901 | $ 8,361 | $ 9,323 | $ 8,683 | $ 8,208 | $ 7,347 | $ 7,347 | $ 3,673 | $ (745) | $ (5,447) |
| Net Debt | 10,187 | 10,123 | 10,351 | 10,210 | 9,884 | 9,318 | 8,901 | 8,361 | 9,323 | 8,683 | 8,208 | 7,247 | 7,247 | 1,673 | 21,193 | 25,114 |
| Total Capitalization | 21,989 | 22,153 | 22,663 | 22,583 | 22,442 | 22,167 | 21,842 | 21,606 | 23,161 | 22,593 | 22,437 | 21,955 | 21,955 | 21,367 | 1,208 | 0.0% |
| Total Debt / Total Capitalization | 46.3% | 45.7% | 45.7% | 45.2% | 44.0% | 42.0% | 40.6% | 38.7% | 40.3% | 38.4% | 36.6% | 33.5% | 33.5% | 17.2% | 17.26% | 0.0% |

**NEWS-JOURNAL CORPORATION**
*Statement of Cash Flows*
*(Dollars in Thousands)*

Base Case

| | 12/31/07 Actual | January Estimate | February Estimate | March Estimate | April Estimate | May Estimate | June Estimate | July Estimate | August Estimate | September Estimate | October Estimate | November Estimate | December Estimate | 12/31/08 Actual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | $ | $ (280) | 533 | 1,215 | (411) | (15) | 191 | (1,292) | 221 | 260 | 336 | 911 | $ 840 | $ 2,466 |
| Depreciation and amortization | | 253 | 253 | 253 | 253 | 253 | 253 | 253 | 253 | 253 | 253 | 253 | 253 | 3,033 |
| | | | | | | | | | | | | | | |
| Cash Flows From Operating Activities | | | | | | | | | | | | | | |
| (Increase) / Decrease in Current Assets | | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 663 | 7,959 |
| (Increase) / Decrease in Other Assets | | (378) | (378) | (378) | (378) | (378) | (378) | (378) | (378) | (378) | (378) | (378) | (378) | (4,539) |
| Increase / (Decrease) in Current Liabilities | | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 8,854 |
| Increase / (Decrease) in Other Liabilities | | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (75) |
| Cash Flows After Operating Activities | | 990 | 1,802 | 2,485 | 858 | 1,254 | 1,460 | (23) | 1,491 | 1,530 | 1,605 | 2,186 | 2,079 | 17,717 |
| | | | | | | | | | | | | | | |
| Cash Flows From Investing Activities | | | | | | | | | | | | | | |
| Capital Expenditures | | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (125) | (1,501) |
| Fixed Asset Adjustment | | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 1,158 |
| Cash Flows After Investing Activities | | 961 | 1,773 | 2,456 | 829 | 1,226 | 1,431 | (51) | 1,463 | 1,501 | 1,577 | 2,158 | 2,051 | 17,174 |
| | | | | | | | | | | | | | | |
| Cash Flows From Financing Activities | | | | | | | | | | | | | | |
| Increase / (Decrease) in Revolver | | (479) | (1,291) | (1,974) | (347) | (744) | (950) | 533 | (981) | (1,019) | (1,095) | (1,676) | (1,569) | (11,593) |
| Increase / (Decrease) in Term Loan | | | | | | | | | | | | | | |
| Net Change in Stockholder's Equity | | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 5,781 |
| Cash Flows After Financing Activities | | 3,242 | 1,313 | 3,815 | 4,297 | 4,778 | 5,260 | 6,324 | 6,706 | 6,706 | 7,187 | 7,669 | 8,151 | 2,851 |
| | | | | | | | | | | | | | | |
| Beginning Cash Balance | | 2,851 | 3,333 | 3,815 | 4,297 | 4,778 | 5,260 | 6,324 | 6,706 | 6,706 | 7,187 | 7,669 | 8,151 | 2,851 |
| Ending Cash Balance | $ 2,851 | $ 3,333 | $ 3,815 | $ 4,297 | $ 4,778 | $ 5,260 | $ 5,742 | $ 6,324 | $ 6,706 | $ 7,187 | $ 7,669 | $ 8,151 | $ 8,633 | $ 8,633 |

Stephens Inc.
10/16/2009 9:28 AM