NEWS-JOURNAL CORPORATION
Statement of Cash Flows
(Dollars in Thousands)

| | January Estimate | February Estimate | March Estimate | April Estimate | May Estimate | June Estimate | July Estimate | August Estimate | September Projected | Pro Forma 09/30/09 | October Projected | November Projected | December Projected | FYE 12/31/09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | $ (44) | $ (37) | $ 699 | $ 357 | $ 758 | $ 551 | $ 227 | $ 467 | $ 653 | $ | $ 558 | $ 549 | $ 44 | $ 4,782 |
| Depreciation and amortization | 223 | 223 | 223 | 223 | 223 | 223 | 223 | 223 | 223 | | 223 | 223 | 223 | 2,673 |
| Cash Flows From Operating Activities | | | | | | | | | | | | | | |
| (Increase)/Decrease in Current Assets | 327 | 327 | 327 | 327 | 327 | 327 | 327 | 574 | (290) | 3,000 | 105 | 239 | 1,027 | 6,345 |
| (Increase) / Decrease in Other Assets | 80 | 80 | 80 | 80 | 80 | 80 | 80 | (19) | 102 | 5,422 | | | | 6,020 |
| (Increase) / (Decrease) in Current Liabilities | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 540 | 309 | (144,268) | 249 | (91) | (753) | (143,150) |
| Increase / (Decrease) in Other Liabilities | (56) | (38) | (56) | (56) | (56) | (56) | (56) | | (170) | (135,846) | | | (19) | (132,513) |
| Cash Flows After Operating Activities | 588 | 595 | 1,331 | 788 | 1,390 | 1,183 | 859 | 1,785 | 1,197 | | 1,134 | 920 | 541 | |
| Cash Flows From Investing Activities | | | | | | | | | | | | | | |
| Capital Expenditures | (221) | (221) | (221) | (221) | (221) | (221) | (221) | | (55) | (859) | (100) | (100) | (100) | (1,834) |
| Fixed Assets Adjustment | 199 | 199 | 199 | 199 | 199 | 199 | 199 | 3 | | | | | | 431 |
| Cash Flows After Investing Activities | 557 | 563 | 1,299 | 757 | 1,358 | 1,152 | 837 | 1,788 | 1,137 | (138,649) | 1,034 | 820 | 441 | (124,317) |
| Cash Flows From Financing Activities | | | | | | | | | | | | | | |
| Increase / (Decrease) in Revolver | | | | | | | | | | 4,090 | (1,034) | (820) | (155) | 2,081 |
| Increase / (Decrease) in Term Loan | | | | | | | | | | 8,000 | | | (286) | 7,714 |
| Net Change in Stockholder's Equity | (156) | (147) | (826) | (336) | (936) | (731) | (407) | (799) | (1,315) | 134,269 | 0 | 0 | 0 | 305,488 |
| Cash Flows After Financing Activities | 421 | 421 | 421 | 421 | 421 | 421 | 421 | 989 | (170) | (12,390) | 0 | 0 | 0 | (8,633) |
| Beginning Cash Balance | 8,631 | 9,053 | 9,474 | 9,895 | 10,316 | 10,736 | 11,157 | 11,578 | 12,567 | 12,395 | 0 | 0 | 0 | 8,631 |
| Ending Cash Balance | $ 9,053 | $ 9,474 | $ 9,895 | $ 10,316 | $ 10,736 | $ 11,157 | $ 11,578 | $ 12,567 | $ 12,393 | $ (0) | $ 0 | $ 0 | $ 0 | $ 0 |

**NEWS-JOURNAL CORPORATION**
**Statement of Cash Flows**
*(Dollars in Thousands)*

| | January Projected | February Projected | March Projected | April Projected | May Projected | June Projected | July Projected | August Projected | September Projected | October Projected | November Projected | December Projected | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net income | $ 21 | $ 279 | $ 282 | $ 60 | $ 195 | $ 161 | $ 162 | $ 234 | $ 594 | $ 71 | $ 110 | $ 379 | $ 2,837 | $ 3,086 | $ 3,499 | $ 3,921 |
| Depreciation and amortization | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 2,516 | 2,449 | 2,338 | 2,159 |
| **Cash Flows From Operating Activities** | | | | | | | | | | | | | | | | |
| (Increase) / Decrease in Current Assets | 1,612 | (83) | (518) | (768) | 53 | 577 | (96) | 113 | (1,203) | (644) | (199) | 3,073 | (285) | (66) | (130) | (140) |
| (Increase) / Decrease in Other Assets | (1,584) | 159 | (102) | 739 | 129 | (361) | 231 | 84 | (462) | 1,073 | 245 | (703) | (449) | (2) | 13 | 22 |
| Increase / (Decrease) in Current Liabilities | | | | | | | | | | | | | | | | |
| Increase / (Decrease) in Other Liabilities | | | | | | | | | | | | | | | | |
| Cash Flows After Operating Activities | 58 | 515 | (128) | 241 | 576 | 816 | 517 | 640 | (891) | 740 | 575 | 963 | 4,648 | 5,474 | 5,718 | 6,002 |
| **Cash Flows From Investing Activities** | | | | | | | | | | | | | | | | |
| Capital Expenditures | (450) | (450) | (100) | (100) | (150) | (150) | (100) | (100) | (100) | (100) | (100) | (100) | (1,200) | (1,800) | (1,200) | (1,300) |
| Fixed Asset Adjustment | | | | | | | | | | | | | | | | |
| Cash Flows After Investing Activities | (392) | 65 | (228) | 141 | 336 | 566 | 437 | 540 | (991) | 640 | 475 | 861 | 2,848 | 3,674 | 4,418 | 4,702 |
| **Cash Flows From Financing Activities** | | | | | | | | | | | | | | | | |
| Increase / (Decrease) in Revolver | 392 | (65) | 514 | (141) | (336) | (180) | (437) | (540) | 1,247 | (640) | (475) | (575) | (1,306) | (776) | (776) | (4,702) |
| Increase / (Decrease) in Term Loan | | | (286) | (286) | | (286) | | | (286) | | | (286) | (1,143) | (2,898) | (3,673) | |
| Net Change in Stockholders' Equity | (0) | 0 | (0) | (0) | 0 | 0 | (0) | 0 | 0 | (0) | (0) | 0 | (0) | (0) | (0) | (0) |
| Cash Flows After Financing Activities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Beginning Cash Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| Ending Cash Balance | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |

Stephen+ Inc.
10/16/2009 9:22 AM

Base Case

**NEWS-JOURNAL CORPORATION**
*Projected Fixed Asset Schedule & Debt Schedule*
*(Dollars in Thousands)*

| Property, Plant & Equipment | Pro Forma 09/30/09 | October Projected | November Projected | December Projected | Proj. FYE 2009 |
|---|---|---|---|---|---|
| Beginning Property, Plant & Equipment | $ 8,103 | $ 12,500 | $ 12,377 | $ 12,254 | 12,254 |
| Capital Expenditures | | 100 | 100 | 100 | 100 |
| Depreciation | | (223) | (223) | (223) | (223) |
| Transaction Adjustment | 4,397 | | | | |
| Ending Property, Plant & Equipment | $ 12,500 | $ 12,377 | $ 12,254 | $ 12,131 | $ 12,131 |
| | | | | | |
| Existing Depreciation & Amortization | | $ 223 | $ 223 | $ 223 | $ 2,673 |
| | | | | | |
| | | | | | |
| Total Depreciation & Amortization | | $ 223 | $ 223 | $ 223 | $ 2,673 |

2009
2010
2011
2012
2013

# NEWS-JOURNAL CORPORATION
## Projected Fixed Asset Schedule & Debt Schedule
(Dollars in Thousands)

| | January Projected | February Projected | March Projected | April Projected | May Projected | June Projected | July Projected | August Projected | September Projected | October Projected | November Projected | December Projected | 2010 | 2011 | 2012 (Proj. PTC) | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Property, Plant & Equipment** | | | | | | | | | | | | | | | | |
| Beginning Property, Plant & Equipment | $ 12,132 | $ 12,372 | $ 12,612 | $ 12,593 | $ 12,393 | $ 12,433 | $ 12,474 | $ 12,364 | $ 12,254 | $ 12,145 | $ 12,035 | $ 11,925 | $ 12,500 | $ 13,816 | $ 11,167 | $ 10,131 |
| Capital Expenditures | 650 | 450 | 100 | 100 | 250 | 350 | 100 | 100 | 100 | 100 | 100 | 100 | 2,200 | 1,500 | 1,300 | 1,500 |
| Depreciation | (210) | (210) | (210) | (210) | (210) | (210) | (210) | (210) | (210) | (210) | (210) | (210) | (2,514) | (2,449) | (2,336) | (2,199) |
| Transaction Adjustment | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Property, Plant & Equipment | $ 12,272 | $ 12,612 | $ 12,505 | $ 12,393 | $ 12,433 | $ 12,474 | $ 12,364 | $ 12,254 | $ 12,145 | $ 12,035 | $ 11,925 | $ 11,816 | $ 11,816 | $ 11,167 | $ 10,131 | $ 9,332 |
| | | | | | | | | | | | | | | | | |
| Existing Depreciation & Amortization | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 200 | $ 100 | $ 200 | $ 200 | 2,406 | 2,139 | 1,871 | 1,604 |
| 2009 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | | | | |
| 2010 | - | - | - | - | - | - | - | - | - | - | - | - | 110 | 220 | 220 | 220 |
| 2011 | - | - | - | - | - | - | - | - | - | - | - | - | | 90 | 160 | 180 |
| 2012 | - | - | - | - | - | - | - | - | - | - | - | - | | | 65 | 130 |
| 2013 | - | - | - | - | - | - | - | - | - | - | - | - | | | | 65 |
| Total | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | | | | |
| | | | | | | | | | | | | | | | | |
| Total Depreciation & Amortization | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 210 | $ 2,516 | $ 2,449 | $ 2,336 | $ 2,199 |

# NEWS-JOURNAL CORPORATION
## Projected Debt & Interest Schedules
*(Dollars in Thousands)*

Base Case

| | Pro Forma 09/30/09 | October Projected | November Projected | December Projected | Proj FYE 2009 |
|---|---|---|---|---|---|
| **Revolver** | | | | | |
| Beginning Balance | $ - | $ 4,090 | $ 3,056 | $ 2,236 | $ - |
| Less: Mandatory Amortization | - | - | - | - | - |
| Increase/(Decrease) | 4,090 | (1,034) | (820) | (155) | 2,081 |
| Ending Balance | $ 4,090 | $ 3,056 | $ 2,236 | $ 2,081 | $ 2,081 |
| | | | | | |
| Credit Facility Size | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 |
| Amount Undrawn | 3,910 | 4,944 | 5,764 | 5,919 | 5,919 |
| Undrawn Fee | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps |
| Undrawn Expense | $ 2 | $ 2 | $ 2 | $ 2 | $ 7 |
| | | | | | |
| Interest Expense @ LIBOR + 300 bps | $ 92 | $ 13 | $ 10 | $ 6 | $ 4 |
| | | | | | |
| **Term Loan** | | | | | |
| Beginning Balance | $ - | $ 8,000 | $ 8,000 | $ 8,000 | $ - |
| Less: Mandatory Amortization | - | - | - | - | - |
| Less: Additional Payoff | - | - | - | (286) | - |
| Ending Balance | $ 8,000 | $ 8,000 | $ 8,000 | $ 7,714 | $ 7,714 |
| | | | | | |
| Interest Expense @ LIBOR + 475 bps | $ 150 | $ 42 | $ 42 | $ 41 | $ 20 |
| | | | | | |
| **Cash** | | | | | |
| Beginning Cash | 12,390 | $ - | $ - | $ 0 | $ 0 |
| Increase / (Decrease) | (12,390) | - | 0 | 0 | 0 |
| Ending Cash | $ - | $ - | $ 0 | $ 0 | $ 0 |
| | | | | | |
| Interest Income @ 1.0% | $ 63 | $ - | $ 0 | $ 0 | $ 0 |
| | | | | | |
| **Interest Expense / (Income)** | $ - | $ 57 | $ 54 | $ 51 | $ 169 |

**NEWS-JOURNAL CORPORATION**
*Projected Debt & Interest Schedule*
[Dollars in Thousands]

| | January Projected | February Projected | March Projected | April Projected | May Projected | June Projected | July Projected | August Projected | September Projected | October Projected | November Projected | December Projected | Proj FYE 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revolver** | | | | | | | | | | | | | | | | |
| Beginning Balance | $ 2,091 | $ 2,473 | $ 2,408 | $ 2,922 | $ 2,782 | $ 2,455 | $ 2,175 | $ 1,758 | $ 1,218 | $ 2,465 | $ 1,826 | $ 1,351 | $ 2,091 | $ 776 | $ 776 | $ — |
| Less: Mandatory Amortization | | | | | | | | | | | | | | | | |
| Increase/(Decrease) | 382 | (65) | 514 | (141) | (285) | (280) | (417) | (540) | 1,247 | (640) | (475) | (575) | (1,306) | (770) | | |
| Ending Balance | $ 2,473 | $ 2,408 | $ 2,922 | $ 2,782 | $ 2,455 | $ 2,175 | $ 1,758 | $ 1,218 | $ 2,465 | $ 1,826 | $ 1,351 | $ 776 | $ 776 | $ — | $ — | $ — |
| | | | | | | | | | | | | | | | | |
| Credit Facility Size | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
| Amount Undrawn | 5,527 | 5,592 | 5,078 | 5,218 | 5,545 | 5,825 | 6,242 | 6,782 | 5,535 | 6,174 | 6,649 | 7,224 | 7,224 | 8,000 | 8,000 | 8,000 |
| Undrawn Fee | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps | 50 bps |
| Undrawn Expense | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 2 | 3 | 3 | 3 | 30 | 40 | 40 | 40 |
| | | | | | | | | | | | | | | | | |
| Interest Expense @ LIBOR + 300 bps | $ 9 | $ 9 | $ 10 | $ 11 | $ 10 | $ 9 | $ 7 | $ 6 | $ 7 | $ 8 | $ 6 | $ 4 | $ 95 | $ 17 | $ — | $ — |
| | | | | | | | | | | | | | | | | |
| **Term Loan** | | | | | | | | | | | | | | | | |
| Beginning Balance | $ 7,214 | $ 7,214 | $ 7,214 | $ 7,429 | $ 7,429 | $ 7,429 | $ 7,143 | $ 7,143 | $ 7,143 | $ 6,857 | $ 6,857 | $ 6,857 | $ 7,714 | $ 6,571 | $ 3,673 | |
| Less: Mandatory Amortization | | | (286) | | | (286) | | | (286) | | | (286) | (1,143) | (1,143) | (1,143) | |
| Less: Additional Payoff | | | | | | | | | | | | | | (1,755) | (2,531) | |
| Ending Balance | $ 7,214 | $ 7,214 | $ 7,429 | $ 7,429 | $ 7,429 | $ 7,143 | $ 7,143 | $ 7,143 | $ 6,857 | $ 6,857 | $ 6,857 | $ 6,571 | $ 6,571 | $ 3,673 | $ — | $ — |
| | | | | | | | | | | | | | | | | |
| Interest Expense @ LIBOR + 475 bps | $ 40 | $ 40 | $ 39 | $ 39 | $ 39 | $ 38 | $ 37 | $ 37 | $ 36 | $ 36 | $ 36 | $ 35 | $ 452 | $ 330 | $ 115 | $ — |
| | | | | | | | | | | | | | | | | |
| **Cash** | | | | | | | | | | | | | | | | |
| Beginning Cash | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 745 |
| Increase/(Decrease) | (0) | 0 | 0 | (0) | (0) | 0 | 0 | 0 | 0 | 0 | (0) | (0) | 0 | 0 | 745 | 4,702 |
| Ending Cash | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 745 | $ 5,447 |
| | | | | | | | | | | | | | | | | |
| Interest Income @ 3.0% | $ 0 | $ 0 | $ 0 | $ 0 | (0) | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | (0) | 0 | $ 0 | (0) | 4 | 31 |
| | | | | | | | | | | | | | | | | |
| **Interest Expense / (Income)** | $ 51 | $ 52 | $ 52 | $ 52 | $ 51 | $ 49 | $ 47 | $ 46 | $ 46 | $ 46 | $ 44 | $ 42 | $ 577 | $ 376 | $ 151 | $ 9 |

Stephens Inc.
10/21/2009 9:29 AM

**EXHIBIT 8.1**
**to**
**REVOLVING CREDIT, TERM LOAN AND SECURITY AGREEMENT**

**FORM OF FINANCIAL CONDITION CERTIFICATE**

The undersigned hereby certifies with respect to Borrower, as of the ___ day of _____, 20__, that to the best of my knowledge:

1.      I am the duly elected, qualified and acting Manager of Halifax Media Acquisition LLC, a limited liability company formed under the laws of the State of Delaware ("Borrower"). The Borrower is an entity duly formed, existing and in good standing under the laws of the state of organization listed above.

2.      I am fully familiar with all of the business and financial affairs of Borrower, including, without limiting the generality of the foregoing, all of the matters hereinafter described.

3.      This Certificate is made and delivered to PNC BANK, NATIONAL ASSOCIATION ("PNC") and each of the other financial institutions (collectively, "Lenders") named in or which hereafter becomes a party to the Credit Agreement (as hereinafter defined), and PNC, as agent for Lenders (in such capacity, "Agent"), pursuant to the terms of the Revolving Credit, Term Loan and Security Agreement, dated as of December ___, 2009, by and among Borrower, Agent, and Lenders (as hereafter amended, supplemented, modified, extended and/or restated from time to time, the "Credit Agreement"), for the purpose of inducing Agent and Lenders, now and from time to time hereafter, to advance monies and extend credit and other financial accommodations to the Borrower pursuant to the Credit Agreement and the Other Documents (as defined in the Credit Agreement) now and from time to time hereafter executed by the Borrower and delivered to Agent and Lenders (all hereinafter collectively referred to as the "Loan Documents"). I understand that you are relying on this Financial Condition Certificate. All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

4.      I have reviewed the following and am fully familiar with the process pursuant to which they were generated:

      a.      Pro Forma Balance Sheet of the Borrower attached hereto as Exhibit A (the "Balance Sheet").

      b.      The Projections for Borrower attached hereto as Exhibit B ("Projections").

The Balance Sheet is accurate, complete and correct in all material respects and fairly reflects the financial condition of Borrower as of the Funding Date after giving effect to the Transactions, and has been prepared in accordance with GAAP, consistently applied, except as otherwise indicated therein and subject to normal year end audit adjustments and the absence of footnotes. The Projections are based on underlying assumptions which provide a reasonable

basis for the projections contained therein, and which reflect the judgment based on present circumstances of the most likely set of conditions and course of action for the projected period of Borrower.

5. Immediately following the execution of the Credit Agreement and the consummation of the Transactions, the assets of Borrower (including reimbursement and contribution rights), at a fair valuation and at its present fair saleable value, will be in excess of the total amount of Borrower's liabilities (including contingent and unmatured liabilities), Borrower will be able to pay its debts as they become due and Borrower will not have an unreasonably small capital in order to carry on its business. All material undisputed debts owing to third parties by Borrower are current and not past due.

6. The Credit Agreement was and the Other Documents were and will be executed and delivered by Borrower (to the extent Borrower is a party to such Other Documents) to Agent and Lenders in good faith and in exchange for reasonably equivalent value and fair consideration.

7. I have reviewed the relevant terms of the Credit Agreement and any Other Document executed as of the date hereof and have made or have caused to be made under my supervision a review of the transactions and conditions of Borrower from the beginning of the accounting period covered by the documents set forth in Paragraph 4 hereof to the date of this Certificate and that such review has not disclosed the existence during such period of any condition or event which constitutes or would constitute a Default or Event of Default.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first set forth above, on behalf of Borrower.

**HALIFAX MEDIA ACQUISITION LLC**

By:_____

Name:_____

Title:_____

## EXHIBIT A

Balance Sheet

[See attached.]

## EXHIBIT B

Projections

[See attached.]

**Exhibit 15.3**
**to**
**Revolving Credit, Term Loan and Security Agreement**

**FORM OF**
**COMMITMENT TRANSFER SUPPLEMENT**

COMMITMENT TRANSFER SUPPLEMENT, dated as of _____ among
_____ (the "Transferor Lender"), each **[Purchasing Lender/Purchasing CLO]** executing this Commitment Transfer Supplement (**[each, a "Purchasing Lender" / each, a "Purchasing CLO"]**), and PNC Bank, National Association ("PNC") as agent for each of the financial institutions from time to time party to the Credit Agreement described below (individually, each a "Lender" and collectively, the "Lenders").

W I T N E S S E T H:

WHEREAS, this Commitment Transfer Supplement is being executed and delivered in accordance with Section 15.3 of the Revolving Credit, Term Loan and Security Agreement, dated as of December 30, 2009 (as from time to time amended, restated, extended, joined, supplemented or otherwise modified in accordance with the terms thereof, the "Credit Agreement"), by and among Halifax Media Acquisition LLC, a limited liability company formed under the laws of the State of Delaware ("Borrower"), the Lenders and PNC, as agent for Lenders (PNC, in such capacity, the "Agent");

WHEREAS, each **[Purchasing Lender/Purchasing CLO]** wishes to become a Lender party to the Credit Agreement; and

WHEREAS, the Transferor Lender is selling and assigning to each **[Purchasing Lender/Purchasing CLO]**, rights, obligations and commitments under the Credit Agreement;

NOW, THEREFORE, the parties hereto do hereby agree as follows:

1.     All capitalized terms used herein but otherwise not defined shall have the meanings ascribed to them in the Credit Agreement.

2.     Upon receipt by the Agent of four counterparts of this Commitment Transfer Supplement, to each of which is attached a fully completed Schedule I, and each of which has been executed by the Transferor Lender and Agent, Agent will transmit to Transferor Lender and each **[Purchasing Lender/Purchasing CLO]** a Transfer Effective Notice, substantially in the form of Schedule II to this Commitment Transfer Supplement (a "Transfer Effective Notice"). Such Transfer Effective Notice shall set forth, *inter alia*, the date on which the transfer effected by this Commitment Transfer Supplement shall become effective (the "Transfer Effective Date"), which date shall not be earlier than the first Business Day following the date such Transfer Effective Notice is received. From and after the Transfer Effective Date, each **[Purchasing Lender/Purchasing CLO]** shall be a Lender party to the Credit Agreement for all purposes thereof.

3.  At or before 12:00 noon (central-standard time) on the Transfer Effective Date each **[Purchasing Lender/Purchasing CLO]** shall pay to Transferor Lender, in immediately available funds, an amount equal to the purchase price, as agreed between Transferor Lender and such **[Purchasing Lender/Purchasing CLO]** (the "Purchase Price"), of the portion of the Advances being purchased by such **[Purchasing Lender/Purchasing CLO]** (such **[Purchasing Lender's/Purchasing CLO's]** "Purchased Percentage") of the outstanding Advances and other amounts owing to the Transferor Lender under the Credit Agreement and the Note. Effective upon receipt by Transferor Lender of the Purchase Price from a **[Purchasing Lender/Purchasing CLO]**, Transferor Lender hereby irrevocably sells assigns and transfers to such **[Purchasing Lender/Purchasing CLO]**, without recourse, representation or warranty, and each **[Purchasing Lender/Purchasing CLO]** hereby irrevocably purchases, takes and assumes from Transferor Lender, such **[Purchasing Lender's/Purchasing CLO's]** Purchased Percentage of the Advances and other amounts owing to the Transferor Lender under the Credit Agreement and the Note together with all instruments, documents and collateral security pertaining thereto.

4.  Transferor Lender has made arrangements with each **[Purchasing Lender/Purchasing CLO]** with respect to (i) the portion, if any, to be paid, and the date or dates for payment, by Transferor Lender to such **[Purchasing Lender/Purchasing CLO]** of any fees heretofore received by Transferor Lender pursuant to the Credit Agreement prior to the Transfer Effective Date and (ii) the portion, if any, to be paid, and the date or dates for payment, by such **[Purchasing Lender/Purchasing CLO]** to Transferor Lender of fees or interest received by such **[Purchasing Lender/Purchasing CLO]** pursuant to the Credit Agreement from and after the Transfer Effective Date.

5.  (a)  All principal payments that would otherwise be payable from and after the Transfer Effective Date to or for the account of Transferor Lender pursuant to the Credit Agreement and the Note shall, instead, be payable to or for the account of Transferor Lender and **[Purchasing Lender/Purchasing CLO]**, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement.

    (b)  All interest, fees and other amounts that would otherwise accrue for the account of Transferor Lender from and after the Transfer Effective Date pursuant to the Credit Agreement and the Note shall, instead, accrue for the account of, and be payable to, Transferor Lender and **[Purchasing Lender/Purchasing CLO]**, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement. In the event that any amount of interest, fees or other amounts accruing prior to the Transfer Effective Date was included in the Purchase Price paid by any **[Purchasing Lender/Purchasing CLO]**, Transferor Lender and each **[Purchasing Lender/Purchasing CLO]** will make appropriate arrangements for payment by Transferor Lender to such **[Purchasing Lender/Purchasing CLO]** of such amount upon receipt thereof from Borrower.

6.  Concurrently with the execution and delivery hereof, Transferor Lender will provide to each **[Purchasing Lender/Purchasing CLO]** conformed copies of the Credit Agreement and all related documents delivered to Transferor Lender.

7.      Each of the parties to this Commitment Transfer Supplement agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Commitment Transfer Supplement.

8.      By executing and delivering this Commitment Transfer Supplement, Transferor Lender and each **[Purchasing Lender/Purchasing CLO]** confirm to and agree with each other and Agent and Lenders as follows: (i) other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned hereby free and clear of any adverse claim, Transferor Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, the Notes or any other instrument or document furnished pursuant thereto; (ii) Transferor Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or the performance or observance Borrower of any of their Obligations under the Credit Agreement, the note or any other instrument or document furnished pursuant hereto; (iii) each **[Purchasing Lender/Purchasing CLO]** confirms that it has received a copy of the Credit Agreement, together with copies of such financial statements and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Commitment Transfer Supplement; (iv) each **[Purchasing Lender/Purchasing CLO]** will, independently and without reliance upon Agent, Transferor Lender or any other Lenders and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (v) each **[Purchasing Lender/Purchasing CLO]** appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement as are delegated to the Agent by the terms thereof; (vi) each **[Purchasing Lender/Purchasing CLO]** agrees that it will perform all of its respective obligations as set forth in the Credit Agreement to be performed by each as a Lender; and (vii) each **[Purchasing Lender/Purchasing CLO]** represents and warrants to Transferor Lender, Lenders, Agent and Borrower that it is either (x) entitled to the benefits of an income tax treaty with the United States of America that provides for an exemption from the United States withholding tax on interest and other payments made by Borrower under the Credit Agreement and the Other Documents or (y) is engaged in trade or business within the United States of America.

9.      Schedule I hereto sets forth the revised Commitment Percentages of Transferor Lender and the Commitment Percentage of each **[Purchasing Lender/Purchasing CLO]** as well as administrative information with respect to each **[Purchasing Lender/Purchasing CLO]**.

10.     This Commitment Transfer Supplement shall be governed by, and construed in accordance with, the laws of the State of Texas.

IN WITNESS WHEREOF, the parties hereto have caused this Commitment Transfer Supplement to be executed by their respective duly authorized officers on the date set forth above.

As Transferor Lender

By: _____
Name: _____
Title: _____


As a **[Purchasing Lender/Purchasing CLO]**

By: _____
Name: _____
Title: _____

**PNC BANK, NATIONAL ASSOCIATION**
**as Agent**


By: _____
Name:
Title:

SCHEDULE I TO COMMITMENT TRANSFER SUPPLEMENT

## LIST OF OFFICES, ADDRESSES FOR NOTICES AND COMMITMENT AMOUNTS

| | | |
|---|---|---|
| (Transferor Lender) | Revised Commitment Amount | _____ |
| | Revised Commitment Percentage | _____% |
| (Purchasing Lender) | Commitment Amount | $_____ |
| | Commitment Percentage | _____% |

## Addresses for Notices

_____

_____

_____

Attention:
Telephone:
Telecopier:

## SCHEDULE II TO COMMITMENT TRANSFER SUPPLEMENT

### (Form of Transfer Effective Notice)

To: _____, as Transferor Lender and
_____, as **[Purchasing Lender/Purchasing CLO]**:

The undersigned, as Agent under the Revolving Credit and Security Agreement dated as of October __, 2009, by and among Halifax Media Acquisition LLC a limited liability company formed under the laws of the State of Delaware ("Borrower"), the financial institutions named therein (individually, each "Lender" and collectively the "Lenders"), and PNC BANK, NATIONAL ASSOCIATION, as agent for Lenders (in such capacity, "Agent"), acknowledges receipt of four (4) executed counterparts of a completed Commitment Transfer Supplement in the form attached hereto. [Note: Attach copy of Commitment Transfer Supplement.]

Pursuant to such Commitment Transfer Supplement, you are advised that the Transfer Effective Date will be [insert date of Transfer Effective Notice].

PNC BANK, NATIONAL ASSOCIATION,
as Agent

By: _____
Name: _____
Title: _____

ACCEPTED FOR RECORDATION
IN REGISTER:

**Schedule 1.1(a)**
**Excluded Real Property**

**Excluded Owned Property:**

Nova Road, Holly Hill, FL  32117 (south footage) (Parcel E)
Nova Road, Holly Hill, FL  32117 (north footage) (Parcel F)
818 Sixth Street, Holly Hill, FL  32117 (Parcel G)
800 6th Street Holly Hill, FL  32117 (Parcel H)
732 Sixth Street, Holly Hill, FL  32117 (Parcel I)
661 Sixth Street, Holly Hill, FL  32117 (Parcel M)
659 6th Street Holly Hill, FL  32117 (Parcel N)
538 Cedar Street, Holly Hill, FL  32117 (Parcel O)

**All Leased Real Property set forth on Schedule 4.5(c)**

## Schedule 1.1(b)
## Lender's Commitments

| Lender | Percentage |
|---|---|
| PNC Bank, National Association | 100% |

**Schedule 1.2**
**Permitted Encumbrances**

Those matters set forth as items 2, 4, 6, 7, 8, 9, 10, 12, and 13 listed on Schedule B-II of that certain Commitment for Title Insurance from Fidelity National Title Insurance Company No. CD09-116286 with an effective date of December 17, 2009.

**Schedule 4.5(a)**
**Equipment and Inventory Locations**

**Equipment and Inventory Locations (other than locations with office Equipment in an aggregate amount not to exceed $25,000 at any location):**

901 Sixth Street, Holly Hill, FL 32117
454 South Yonge Street, Ormond Beach, FL 32174
540 Carswell Avenue, Holly Hill, FL 32117

## Schedule 4.5(b)
## Location of Executive Offices

**(A) Places of Business of Borrower:**
901 Sixth Street, Holly Hill, FL  32117
454 South Yonge Street, Ormond Beach, FL  32174
540 Carswell Avenue, Holly Hill, FL  32117
367 Hamilton Dr., Bldg 2-C, Deland, FL  32724
2729 E. Moody Blvd., Suite 201 and 202, Bldg. 2, Bunnell, FL  32110
223 Canal St., New Smyrna Beach, FL  32168
930 Highway 19 S, Unit A, Palatka, FL  32177
1422 North Woodland Blvd., Deland, FL  32724
4020-D S. Nova Rd, Port Orange, FL  32127
1851 Patterson Avenue, Space 2B, Deland, FL  32724
2400 South Ridgewood Ave, Unit 19, South Daytona, FL  32119
123 N Orchard St, Bldg. 5, Suite C/D, Ormond Beach, FL  32174
341 Skyway Dr, Bldg. 2, Unit J/G, Edgewater, FL  32132
4601 E Hwy 100, H-Building, Bunnell, FL  32110
1109 Saxon Boulevard, Suite C, Orange City, FL  32763
124 Inlet Drive, St. Augustine, FL  32080


**(B) Chief Executive Office of Borrower:**
901 Sixth Street, Holly Hill, FL  32117

## Schedule 4.5(c)

## Real Property

**Owned Real Property**
901 Sixth Street, Holly Hill, FL 32117 (Parcels A-1 through A-3, formerly known as Parcels A, B, C, D)
Nova Road, Holly Hill, FL 32117 (south footage) (Parcel E)
Nova Road, Holly Hill, FL 32117 (north footage) (Parcel F)
Sixth Street, Holly Hill, FL 32117 (woods east of garage) (Parcel A-4, also known as Parcel J)
731 6th Street, Holly Hill, FL 32117 (Parcel K)
663 6th Street, Holly Hill, FL 32117 (Parcel L)
818 Sixth Street, Holly Hill, FL 32117 (Parcel G)
800 6th Street Holly Hill, FL 32117 (Parcel H)
732 Sixth Street, Holly Hill, FL 32117 (Parcel I)
661 Sixth Street, Holly Hill, FL 32117 (Parcel M)
659 6th Street Holly Hill, FL 32117 (Parcel N)
538 Cedar Street, Holly Hill, FL 32117 (Parcel O)
540 Carswell Avenue, Holly Hill, FL 32117 (Parcel P)

**Leased Real Property**
367 Hamilton Dr., Bldg 2-C, Deland, FL 32724
Landlord: ACCIM-2 Corporation, 101 N. Woodland Blvd., Suite 100, Deland, FL 32720

2729 E. Moody Blvd., Suite 201 and 202, Bldg. 2, Bunnell, FL 32110
Landlord: TOC Enterprises, Inc., 2729 E. Moody Blvd., Bunnell, FL 32110

223 Canal St., New Smyrna Beach, FL 32168
Landlord: Robert Wiley, 100 East Circle, New Smyrna Beach, FL 32169

930 Highway 19 S, Unit A, Palatka, FL 32177
Landlord: John E. Spillers, III and Jennifer Sharon Spillers, P.O. Box 821, Palatka, FL 32178

1422 North Woodland Blvd., Deland, FL 32724
Landlord: Gateway Village Shopping Center Joint Venture, P.O. Box 160403, Mobile, AL 36616-1403

4020-D S. Nova Rd, Port Orange, FL 32127
Landlord: Louis L. Huntley Enterprises, Inc., c/o Marketmasters of the Southeast, Inc., 1890 Kingsley Ave., Suite 102, Orange Park, FL 32073

1851 Patterson Avenue, Space 2B, Deland, FL 32724
Landlord: ACCIM-2 Corporation, 101 N. Woodland Blvd., Suite 100, Deland, FL 32720

2400 South Ridgewood Ave, Unit 19, South Daytona, FL 32119

211408-5

Landlord: 2400 Ridgewood, LLC, 5111 Ridgewood Ave., Suite 201, Port Orange, FL 32127

123 N Orchard St, Bldg. 5, Suite C/D, Ormond Beach, FL 32174
Landlord: Ormond Business Park, LLC, 480 Fentress Blvd., Suite E, Daytona Beach, FL 32114

341 Skyway Dr, Bldg. 2, Unit J/G, Edgewater, FL 32132
Landlord: Skyway Drive Industrial Park, Inc., 341 Skyway Drive, Edgewater, FL 32132

4601 E Hwy 100, H-Building, Bunnell, FL 32110
Landlord: Marvin's Garden, Inc., P.O. Box 1487, Bunnell, FL 32110

1109 Saxon Boulevard, Suite C, Orange City, FL 32763
Landlord: Terry C. Williams and Deborah R. Williams, 1111 Saxon Blvd., Orange City, FL 32763

454 South Yonge Street, Ormond Beach, FL 32174
Landlord: Volusia Pennysaver, Inc.

124 Inlet Drive, St. Augustine, FL 32090
Landlord: Robert and Jane Thousand, 124 Inlet Drive, St. Augustine 32080

# Schedule 4.15(h)
## Deposit and Investment Accounts

**Deposit Accounts:**

PNC Bank Account Numbers:

8026262742 (News-Journal Collection Account, Deposit OnSite)
8026262734 (The Complete Phone Book Collection Account, Deposit OnSite)
8026262726 (Daytona Beach Pennysaver Collection Account, Deposit OnSite)
8026262718 (Greater St. Augustine Phone Book Collection Account, Deposit OnSite)
8026262689 (Classified Collection Account, Merchant Deposits)
8026262697 (Circulation Collection Account, Merchant Deposits)
8026262769 (The Complete Phone Book Disbursement Account)
8026262822 (Operating Account)
8026262662 (Return Check Account)
8026262777 (Daytona Beach Pennysaver Disbursement Account)
8026262814 (Greater St. Augustine PhoneBook Disbursement Account)
8026262785 (Flex Spending Account)
8026262793 (Payroll (ADP))
_____ (Carrier Trust Account)*

**Investment Accounts:**

None

*Schedule to be updated to provide account number by Funding Date.

**Schedule 5.1**
**Consents**

Order Authorizing and Approving the Receiver's Sale of Certain Assets of News-Journal Corporation, United States District Court for the Middle District of Florida, Orlando Division, *Cox Enterprises, Inc. v. News-Journal Corporation,* Case No. 6:04-CV-698-ORL-28-KRS

**Schedule 5.2(a)**
**States of Qualification and Good Standing**

<u>State of Organization</u>
Delaware

<u>States of Qualification</u>
Florida

**Schedule 5.2(b)**
**Subsidiaries**

None.

211408-5

**Schedule 5.4**
**Tax Identification Number**

The EIN of Halifax Media Holdings LLC, parent of the Borrower, is 27-1136347.
Borrower will be a disregarded entity for federal income tax purposes.

**Schedule 5.6
Prior Names**

None.

**Schedule 5.8(b)**
**Litigation; Indebtedness**

None.

## Schedule 5.8(d)
## Plans of Borrower as of the Closing Date

| Product Type | Insurance Provider | Policy # |
|---|---|---|
| Medical | Florida Health Care Plans | 022 |
| Dental | MetLife | KM05756264 |
| Vision | EyeMed | 9712985 |
| Basic Life/AD&D | SunLife | 93233 |
| Voluntary Life | SunLife | 93233 |
| Long Term Disability | MetLife | KM05756264 |
| FSA Administration | First Service Administrators | |

## Schedule 5.9
## Intellectual Property, Source Code Escrow Agreements

Borrower owns the following material intellectual property. Borrower likely has ownership rights in other intellectual property such as would be obtained in the ordinary course of operating in the publishing industry.

### Federal Trademark Registrations

| Mark | Status Int'l Class | Application Number | Registration Number/Date |
|------|--------------------|--------------------|--------------------------|
| CODE RED | Registered 16 | 78/895353 | 3348396 04-Dec-2007 |
| CODE RED | Registered 35 | 77/178415 | 3545814 16-Dec-2008 |
| COMPLETE PHONE BOOK | Registered 16 | 75/227080 | 2156440 12-May-1998 |
| Design only (computer & sun) | Renewed 38 | 74/548587 | 1915465 29-Aug-1995 |
| E.A.R.L. PRESS & Design | Registered 21 & 25 | 76/010796 | 2908914 07-Dec-2004 |
| EARL PRESS & Design | 8 & 15 accepted 41 | 75/981684 | 2638068 22-Oct-2002 |
| FLAGLER/PALM COAST NEWS-TRIBUNE | Registered 16 | 75/217516 | 2107429 21-Oct-1997 |
| FUNCOAST REAL ESTATE | 8 & 15 accepted 16, 35 & 42 | 76/145952 | 2593909 16-Jul-2002 |
| GREATER ST. AUGUSTINE COMPLETE PHONE BOOK | Registered 16 | 75/227081 | 2156441 12-May-1998 |
| HUNT FIND BUY | Registered 35 | 77/053713 | 3287695 04-Sep-2007 |
| MYTOPIA CAFÉ | Registered 42 | 77/377488 | 3504345 23-Sep-2008 |
| MYTOPIA CAFÉ | Registered 41 | 77/259557 | 3489926 19-Aug-2008 |
| NEIGHBORS | Registered 16 | 75/217513 | 2179722 04-Aug-1998 |
| NEWS-JOURNAL CENTER | Registered 43 | 78/324493 | 3117929 18-Jul-2006 |

| | | | |
|---|---|---|---|
| NEWS-JOURNAL CENTER | Registered<br>35 | 78/324491 | 3117927<br>18-Jul-2006 |
| NEWS-JOURNAL CENTER | Registered<br>41 | 78/324492 | 3117928<br>18-Jul-2006 |
| NIE WORLD | Registered<br>41 & 42 | 76/075847 | 2682257<br>04-Feb-2003 |
| NJ DIRECT MARKETING | Registered<br>35 | 76/308860 | 2714427<br>06-May-2003 |
| RAPID AD DELIVERY & Design | 8 & 15 accepted<br>35 | 75/563807 | 2378614<br>22-Aug-2000 |
| SPEED READING | Registered<br>16 | 75/981300 | 2786810<br>25-Nov-2003 |
| SPEED READING | Registered<br>41 | 76/123016<br>10-Feb-2004 | 2813386 |
| THE DAYTONA BEACH NEWS-JOURNAL (stylized) | Registered<br>16 (35 cancelled) | 77/059844 | 3290072<br>11-Sep-2007 |
| THE DAYTONA BEACH NEWS-JOURNAL | Registered<br>16 | 76/354994 | 2694251<br>04-Mar-2003 |
| THE INDEPENDENT VOICE OF VOLUSIA AND FLAGLER COUNTIES | Registered<br>16 & 42 | 78/100229 | 2654564<br>26-Nov-2002 |
| THREE8SIX | Registered<br>35, 41 & 45 | 77/549000 | 3610652<br>21-Apr-2009 |
| THREE8SIX.COM | Registered<br>35, 41 & 45 | 77/549001 | 3610653<br>21-Apr-2009 |
| VOLUSIA REVIEW | Registered<br>16 | 75/227079 | 2152073<br>21-Apr-1998 |
| VOLUSIA/FLAGLER BUSINESS REPORT | Registered<br>16 | 78/484709 | 2980345<br>26-Jul-2005 |

## State of Florida Trademark Registrations

| Mark | Status Int'l Class | Registration Number/Date |
|---|---|---|
| CODE RED | Registered 16 & 35 | T06000001619 15-Dec-2006 |
| COMPLETE PHONE BOOK | Registered 16 | T97000000111 03-Feb-1997 |
| E.A.R.L. & Design of a cartoon character computer with a tie, glasses, and hat with a tag on it with the word "Press" | Registered 9, 16 & 42 | T00000000338 24-Mar-2000 |
| FLAGLER/PALM COAST NEWS-TRIBUNE | Registered 16 | T97000000210 25-Feb-1997 |
| FUNCOASTING | Registered 16 & 35 | T01000000780 20-Jul-2001 |
| GREATER ST. AUGUSTINE COMPLETE PHONE BOOK | Registered 16 | T97000000203 25-Feb-1997 |
| NEIGHBORS | Registered 16 | T97000000572 23-May-1997 |
| NEWS-JOURNAL CENTER | Registered 35, 41 & 42 | T06000001624 15-Dec-2006 |
| NIEWORLD | Registered 9, 16, 41 & 42 | T00000000673 19-Jun-2000 |
| NJ DIRECT MARKETING | Registered 35 | T06000001623 15-Dec-2006 |
| PENNYSAVER (word together with a male figure with money on and about the figure) | Registered 16 | 924237 06-Apr-1981 |
| PENNYSAVER (written script and outlined) | Registered 16 | T97000000208 27-Feb-1997 |
| THE DAYTONA BEACH NEWS-JOURNAL & Design (2-line) | Registered 35 & 42 | T01000001222 04-Dec-2001 |
| THE DAYTONA BEACH NEWS-JOURNAL & Design (3-line) | Registered 16, 35 & 42 | T01000001221 04-Dec-2001 |
| THE INDEPENDENT VOICE OF VOLUSIA AND FLAGLER COUNTIES | Registered 16 & 42 | T01000001223 04-Dec-2001 |
| VOLUSIA REVIEW | Registered 16 | T97000000202 25-Feb-1997 |

## Domain Names

| Domain Name | Account No. | Expiration Date | Account Holder |
|---|---|---|---|
| completephonebook.com | 24711991 | 6/7/2010 | The Complete Phone Book |
| daytonabeachgardenshow.com | 24710891 | 10/13/2010 | NJC |
| daytonahomeshow.com | 30734301 | 4/25/2010 | NJC |
| dbnjshows.com | 30734301 | 1/31/2011 | NJC |
| floridapennysavers.biz | 30734301 | 12/14/2012 | NJC |
| floridapennysavers.com | 24707854 | 8/10/2010 | VPI |
| go386.com | 30734301 | 8/4/2012 | NJC |
| mytopiacafe.com | 30734301 | 7/24/2013 | NJC |
| n-jcenter.biz | 30734301 | 11/18/2012 | NJC |
| n-jcenter.com | 30734301 | 11/16/2012 | NJC |
| neighborhood-journal.com | 30734301 | 4/25/2010 | NJC |
| news-journalautos.com | 30734301 | 1/17/2012 | NJC |
| news-journalcoupons.com | 30734301 | 11/5/2011 | NJC |
| news-journalonline.biz | 30734301 | 11/18/2012 | NJC |
| news-journalonline.com | 24697451 | 5/17/2010 | NJC |
| news-journalrenewals.com | 30734301 | 2/25/2012 | NJC |
| news-jrnl.biz | 30734301 | 12/14/2012 | NJC |
| news-jrnl.com | 30734301 | 10/25/2010 | NJC |
| nieworld.biz | 30734301 | 11/18/2012 | NJC |
| nieworld.com | 30734301 | 9/11/2010 | NJC |
| njdirect.biz | 30734301 | 11/8/2011 | NJC |
| njdirectmarketing.com | 30734301 | 2/11/2010 | NJC |
| njonthego.com | 30734301 | 7/18/2013 | NJC |
| njrapidad.biz | 30734301 | 11/7/2011 | NJC |
| njrapidad.com | 24697296 | 2/23/2011 | NJC |
| psavers.biz | 30734301 | 12/14/2012 | NJC |
| psavers.com | 21329517 | 7/14/2011 | VPI |
| rapidad.com | 30734301 | 6/3/2012 | NJC |
| thepennysavers.com | 30734301 | 6/15/2012 | NJC |
| three8six.com | 30734301 | 7/31/2010 | NJC |
| threeeightsix.com | 30734301 | 1/7/2012 | NJC |
| vfbr.com | 30734301 | 7/27/2014 | NJC |
| volusiaflaglerbusinessreport.com | 30734301 | 7/27/2014 | NJC |

## State of Florida Fictitious Name Registrations

| Name | Registration Date | Registration Number |
|------|-------------------|---------------------|
| FLAGLER/PALM COAST NEWS-TRIBUNE | 06-Jan-1997 | G97006900057 |
| GREATER ST. AUGUSTINE PHONE BOOK | 04-Jan-2006 | G06004900742 |
| NEIGHBORS | 06-Jan-1997 | G97006900056 |
| NJ DIRECT MARKETING | 26-Dec-2001 | G01360900398 |
| PENNYSAVER | 06-Jan-1997 | G97006900055 |
| THE COMPLETE PHONE BOOK | 18-Dec-1992 | G92353000476 |
| VOLUSIA REVIEW | 31-Jan-2002 | G02031900098 |
| VOLUSIA/FLAGLER BUSINESS REPORT | 20-Sep-2004 | G04264900307 |
| WEST VOLUSIA PENNYSAVER | 04-Jan-2006 | G06004900753 |

211408-5

**Patent Applications or Registrations**

None.

**Subscriber and Advertising Lists**

NJC, VPI and Complete Phone Book Advertiser Lists, NJC Subscriber Lists, and Volusia Flagler Business Report Mailing List.

## Copyrights

Borrower owns the following copyright applications and registration. Borrower likely has protectable copyright interests in other original published and un-published works created by NJC or VPI and assigned to Borrower pursuant to the Acquisition Agreement.

| Copyright | Application Date | Registration No. | Registration Date | Date of Publication of First and Last Issues in Group |
|---|---|---|---|---|
| THE DAYTONA BEACH NEWS-JOURNAL | October 15, 2009 | TX 6-685-657 | October 15, 2009 | August 1, 2009 – August 31, 2009 |
| THE DAYTONA BEACH NEWS-JOURNAL | September 6, 2009 | TX 6-685-697 | September 6, 2009 | July 1, 2009 – July 31, 2009 |
| THE DAYTONA BEACH NEWS-JOURNAL | August 13, 2009 | TX 6-685-231 | August 13, 2009 | June 1, 2009 – June 30, 2009 |
| THE DAYTONA BEACH NEWS-JOURNAL | July 16, 2009 | TX 6-683-982 | July 16, 2009 | May 1, 2009 – May 31, 2009 |
| THE DAYTONA BEACH NEWS-JOURNAL | June 11, 2009 | TX 6-679-367 | June 11, 2009 | April 1, 2009 – April 30, 2009 |
| THE DAYTONA BEACH NEWS-JOURNAL | June 11, 2009 | TX 6-679-356 | June 11, 2009 | March 1, 2009 – March 31, 2009 |
| THE DAYTONA BEACH NEWS-JOURNAL | May 21, 2009 | TX 6-679-489 | May 21, 2009 | February 1, 2009 – February 28, 2009 |
| THE DAYTONA BEACH NEWS-JOURNAL | April 28, 2009 | TX 6-679-520 | April 28, 2009 | January 1, 2009 – January 31, 2009 |
| THE DAYTONA BEACH NEWS-JOURNAL | April 1, 2009 | TX 6-631-655 | April 1, 2009 | December 1, 2008 – December 31, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | February 9, 2009 | TX 6-631-825 | February 9, 2009 | November 1, 2008 – November 30, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | January 5, 2009 | TX 6-665-075 | January 5, 2009 | October 1, 2008 – October 31, 2008 |

| Copyright | Application Date | Registration No. | Registration Date | Date of Publication of First and Last Issues in Group |
|---|---|---|---|---|
| THE DAYTONA BEACH NEWS-JOURNAL | November 6, 2008 | TX 6-665-143 | November 6, 2008 | September 1, 2008 – September 30, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | September 29, 2009 | TX 6-685-289 | September 29, 2008 | August 1, 2008 – August 31, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | September 25, 2008 | TX 6-662-597 | September 25, 2008 | July 1, 2008 – July 31, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | August 15, 2008 | TX 6-662-651 | August 15, 2008 | June 1, 2008 – June 30, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | July 18, 2008 | TX 6-664-760 | July 18, 2008 | May 1, 2008– May 31, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | June 19, 2008 | TX 6-661-253 | June 19, 2008 | April 1, 2008– April 30, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | May 6, 2008 | TX 6-662-603 | May 6, 2008 | March 1, 2008 – March 31, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | May 6, 2008 | TX 6-662-453 | May 6, 2008 | February 1, 2008 – February 29, 2008 |
| THE DAYTONA BEACH NEWS-JOURNAL | March 3, 2008 | TX 6-648-699 | March 3, 2008 | January 1, 2008 – January 31, 2008, 2008 |

## Intellectual Property Used Under a License, Sublicense, Agreement, or Permission

The following intellectual property rights used under a license, sublicense, agreement or permission have been assigned to Borrower pursuant to the Acquisition Agreement:

Account Web Site Agreement, between Accu Weather, Inc. and NJC, dated September 14, 2000

Plain Language Newspaper Service Agreement, between Accu Weather, Inc. and NJC, dated June 26, 2008, as amended by that certain Addendum, dated June 9, 2009

Agreement, between The Associated Press and Daytona Beach News-Journal, dated December 29, 1947

AP Content Enrichment Agreement, between The Associated Press and Daytona Beach News-Journal, dated June 23, 2008

AP Newsmap Service Agreement, between The Associated Press and Daytona Beach News-Journal, dated June 23, 2008

Digital Use Agreement, between The Associated Press and Daytona Beach News-Journal, dated December 22, 2005

Supplemental Services Agreement, between The Associated Press and Daytona Beach News-Journal, dated January 1, 2007

Photostream Agreement, between The Associated Press and Daytona Beach News-Journal, dated December 31, 1991

Agreement, between Infodata AB and Daytona Beach News-Journal, dated April 9, 2006

License Agreement, between InfoUSA and Daytona Beach News-Journal, dated August 5, 2002

Agreement, between King Features Syndicate and NJC, dated March 6, 1972

Agreement, between King Features Syndicate and NJC, dated February 20, 2003, renewed December 15, 2004 and further renewed January 22, 2007

Change Order, between the Nielsen Company (US), Inc. and NJC, dated July 24, 2008

License Order, between the Nielsen Company (US), Inc. and NJC, dated July 24, 2008

Master License Agreement, between the Nielsen Company (US), Inc. and NJC, dated July 24, 2008

Agreement, between News America Syndicate and Daytona Beach News-Journal, dated March 17, 1986

Agreement, between Tribune Media Services, Inc. and Daytona Beach News-Journal, dated May 4, 2009

Agreement, between Tribune Media Services, Inc. and Daytona Beach News-Journal, dated July 29, 2009

Service Agreement, between United Feature Syndicate, Inc. and Daytona Beach News-Journal, dated January 5, 2003

Service Agreement, between Universal Press Syndicate and NJC, dated November 15, 1982, renewed August 1, 1986, October 10, 1989 and January 24, 2002

License Agreement, between Scarborough Research an NJC, dated October 27, 2009

Supplementary Services License Agreement (Prime Next), between Scarborough Research and NJC, dated November 20, 2009

## Software Program:
In addition to the intellectual property listed above:

RapidAd (software program to receive files from employees and customers) (RAPID AD DELIVERY & DESIGN, state and federal registrations are slated to expire.)

**Online Databases:**

Calendar application and database

Restaurant application and database

Inspection database

**Custom Programs:**

Custom Circulation programs

Sales tax program

**Complete Phone Book:**

Yellow Pages

**Schedule 5.10**
**Licenses and Permits**

None.

**Schedule 5.14**
**Labor Disputes**

**(i) Labor union that represents employees of Borrower or any of its Subsidiaries:**

      Graphic Communications International Union Local 444

**(ii) Collective bargaining agreement or other labor union contract or agreement to which Borrower or any Subsidiary thereof is a party, or which is being assumed or acquired by Borrower in pursuant to the Acquisition Agreement with respect to any employee:**

      Newspaper Contract Agreement between Graphic Communications International Union Local 444 and NJC, dated October 14, 2009

**(iii) Labor disputes of Seller NJC disclosed by Seller in Acquisition Agreement (which are not being assumed by Borrower):**

      *NJC v. Brigandi, (Case No.: 2008-34510-CICI).* NJC filed a lawsuit seeking to enforce a non-compete agreement against a former advertising sales employee, who resigned in November, 2008. Mediation was held in March, 2009, and following mediation, the parties entered into a Settlement Agreement, Stipulated Injunction and General Release. On August 14, 2009, the Court issued an Order Granting Permanent Injunction ratifying the terms of the parties' agreement.

      *Stephens and Saffer v. NJC, (Consolidated Cases, 2008-32207-CICI and 2008-33787-CICI).* These two lawsuits were brought separately (but later consolidated into one action by the Court) by former employees of NJC seeking to recover benefits under key manager severance agreements, which are Excluded Contracts. Stephens and Saffer filed their complaints on June 24, 2008 and October 17, 2008, respectively. In July 2009, NJC filed a Supplemental Motion for Summary Judgment asserting that because the severance agreements were entered into without the authority of NJC's board of directors, they were not valid and enforceable agreements. The Court denied the motion, but allowed NJC to amend its Answers to raise these defenses. NJC filed its Amended Answers and Affirmative Defenses to Plaintiffs' Complaints on August 10, 2009. Given the amendment, counsel for plaintiffs has threatened to name individually as defendants certain former NJC officers and its board of directors. The Court originally set the case for trial in July, 2009. The trial was later postponed, and a new trial date has not been set.