IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| COX ENTERPRISES, INC., a Delaware corporation, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| vs. | ) <br> ) |
| NEWS-JOURNAL CORPORATION, a Florida corporation, HERBERT M. DAVIDSON, JR., MARC L. DAVIDSON, JULIA DAVIDSON TRUILO, JONATHAN KANEY, JR., DAVID KENDALL, ROBERT TRUILO, GEORGIA KANEY, and PMV, INC., a Florida corporation, | ) <br> ) <br> ) <br> ) CIVIL ACTION <br> ) FILE NO. 6:04-CV-698-JA-DAB <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

## DECLARATION OF OWEN D. VAN ESSEN

1. I am the president of Dirks, Van Essen & Murray (DV&M), the leading merger-and-acquisition firm in the U.S. newspaper industry and have been involved in this litigation virtually since its inception. I was engaged by then-Plaintiff and now-judgment creditor Cox Enterprises, Inc. ("Cox") in 2004 to provide my opinion as to the value of defendant News-Journal Corporation ("NJC") and Cox's shares, an opinion on which the Court relied in reaching its 2006 decision on fair value. In 2008, my firm was engaged by NJC and its then-chief executive manager James W. Hopson to assist Mr. Hopson in preparing for the sale of NJC's publishing operations in connection with the parties' joint sale agreement. Upon the Court's termination of the joint sale agreement and the appointment of Mr. Hopson as Receiver, my firm was retained by the Receiver to continue its role as broker for the sale.

2. In my opinion the Court should afford the Receiver the requested approval and direction to close a sale of NJC's publishing operations pursuant to the terms of the Asset Purchase Agreement ("APA") entered into with Halifax Media Acquisition LLC, an affiliate of Stephens Capital Partners LLC and of Stephens Investments Holdings LLC ("Stephens") with financing to be provided by PNC Bank (see APA, Schedule 6.1.8).

3. I believe that the Stephens offer, as set forth in the APA, provides the highest and best available value for NJC's publishing operations and should be accepted.

4. I base this opinion on over 25 years of experience as a broker in the newspaper industry.

5. I also base this opinion on my extensive knowledge of NJC's publishing operations and on my and my firm's considerable efforts over the past 20 months preparing, marketing and negotiating for those operations' sale. The sale process has involved:

   a. Preparing in the spring and summer of last year and updating in July of this year an offering memorandum providing extensive information about NJC's finances and operations and the Daytona market.

   b. Contacting over 60 individuals and companies that we believed might have a serious interest in purchasing the operations.

   c. Negotiating nondisclosure agreements with over 25 of these prospective buyers.

2

d. Reviewing and analyzing expressions of interest by at least 10 prospective buyers and preparing for and conducting for these prospective buyers multiple tours of NJC and the market and visits with the Receiver and others in NJC management

e. Assisting certain of these prospective buyers with extensive due diligence requests and conducting exclusive negotiations as to a potential asset purchase agreement.

6. Stephens has distinguished itself in this process by offering, as set forth in the APA, the highest and best available value for NJC's publishing operations, considering price, terms and certainty of closing.

7. Beginning late last year, following months of intensive efforts to identify the highest and best available purchaser, NJC engaged in pointed and, for a considerable period, exclusive negotiations with one potential buyer. However, despite approximately seven months of discussion, these negotiations never resulted in any meaningful consensus on the parameters of an agreement. Frustration with that process led NJC to reach out broadly once again to other potential buyers this past July.

8. In August, Stephens expressed interest in a possible purchase and its subsequent evaluation of NJC's finances and operations and negotiation of an agreement have proceeded apace ever since. NJC and Stephens have now agreed on all material terms and, as evidenced by the APA, both parties are anxious to close. As the APA indicates, if and when the Court affords

3

the Receiver the requested authority and direction to proceed, the closing will occur within 5 business days thereafter.

9. Neither Stephens nor any of its affiliates is related to or affiliated in any way with me or my firm or, to my knowledge, the Receiver, Cox or any of the parties to this action, including the individual defendants and NJC's sole shareholder PMV Inc.

10. In my opinion it is in the best interests of all concerned to close the Stephens transaction pursuant to the APA at the earliest opportunity. As I noted in my declaration of April 13, 2009 (Doc. No. 506) and as the Court itself observed in the course of the April 16, 2009 hearing, the newspaper industry is struggling. The uncertainty of the industry's revenue performance coupled with a severe restriction of credit has made it difficult to complete newspaper transactions. In addition, the ownership of NJC's publishing operations has been unclear for much more than a year, and Stephens, with a proposed publisher standing by, is ready and eager to consummate the sale.

11. In the past two years my firm has been actively involved in the prospective sale, successful or not, of over 65 daily and weekly newspapers. In light of this active experience in the market, I believe that all reasonable steps have been taken to sell NJC's publishing operations. It is my opinion that consummation of the Stephens transaction, as set forth in the APA, would obtain for those operations their highest and best available value. I believe that the consideration provided by Stephens for the operations is fair and reasonable and will provide a greater recovery than would be provided by any other practical available alternative.

12. All of the real estate included in the sale of NJC's publishing operations contemplated by the APA is real estate devoted to those operations. In my opinion, procuring separate appraisals of the standalone value of this real estate would not assist the Court in its review of the proposed sale of the publishing operations to Stephens. This is because it would not be practical to sell this real estate separately from the publishing operations nor would such a sale, even if practical, result in greater value to NJC than the sale contemplated by the APA.

Executed under penalty of perjury this 30TH day of December, 2009.

*[signature]*
Owen D. Van Essen