UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

COX ENTERPRISES, INC.,
a Delaware corporation,

    Plaintiff,

v.                                               Case No. 6:04-cv-698-JA-DAB

NEWS-JOURNAL CORPORATION,
a Florida corporation, HERBERT M.
DAVIDSON, JR., MARC L. DAVIDSON,
JULIA DAVIDSON TRUILO, JONATHAN
KANEY, JR., DAVID KENDALL, ROBERT
TRUILO, GEORGIA KANEY, and
PMV, INC., a Florida corporation,

    Defendants.
_____/

## PMV, INC.'S OBJECTION TO PROPOSED SALE OF NEWS-JOURNAL CORPORATION'S PUBLISHING OPERATIONS TO STEPHENS AND SUPPORTING MEMORANDUM OF LAW

Defendant PMV, Inc. ("PMV") hereby submits its Objection to the Joint Motion of Receiver and Cox Enterprises, Inc. for Hearing and Approval of and Direction to Complete Sale of Publishing Operations to Halifax Media Acquisition LLC, an Affiliate of Stephens Capital Partners LLC and Stephens Investments Holdings LLC (Doc. 576) ("Motion to Approve Sale" or "Motion"), and states:

    1.    On January 6, 2010, Cox Enterprises, Inc. ("Cox") and Receiver James W. Hopson ("Mr. Hopson") filed the Motion to Approve Sale. As stated in the Court's Order of April 17, 2009, any party may file a response or objection to a proposed sale

within 11 days after a proposed sale is presented to the Court for approval.  (Doc. 507, p.3).

2. In the Motion, Cox and Mr. Hopson request this Court to approve the sale of News-Journal Corporation's ("NJC") publishing operations for $20.074 million (Doc. 576-2, p. 16).

3. This proposed purchase price is a mere 7.38% of the $272 million value that this Court concluded to be the fair market value of NJC in its Order of June 30, 2006.  (Doc. 251).  As a result of that Order, Cox now holds a judgment against NJC in the amount of $129.2 million (Doc. 263).

4. In fact, after making payments to creditors, paying out pensions, and satisfying other liabilities, Cox is likely to receive less than $5 million from the purchase price, leaving at least 96% or more of the judgment unsatisfied.

5. No deficiency can be pursued against PMV, as the Court has already determined that Cox "shall take nothing" from the other defendants in the case.[1]  (Doc. 263).  However, a sale of NJC for only a fraction of the judgment would leave nothing for PMV, which has always been the majority shareholder of NJC and is now the sole shareholder.  When the Court valued NJC at $272 million, PMV's 52.5% share was $142.8 million, more than seven times the current proposed sale price.

---

[1] Specifically, the Order of September 27, 2006 provides that "[t]he Clerk is directed to enter a judgment providing that Plaintiff Cox Enterprises, Inc. shall recover from Defendant News-Journal Corporation the sum of $129.2 million in accordance with the terms set forth in this Order" and that "[t]he judgment shall further provide that Plaintiff Cox Enterprises, Inc. shall take nothing from the other Defendants in this case -- Herbert M. Davidson, Jr., Marc L. Davidson, Julia Davidson Truilo, Jonathan Kaney, Jr., David Kendall, Robert Truilo, Georgia Kaney, PMV, Inc., and Lively Arts Center, Inc." (Doc. 262, p.8).  Judgment was entered on September 28, 2006 again stating that "Plaintiff, Cox Enterprises, Inc., shall take nothing from the other defendants, Herbert M. Davidson, Jr., Marc L. Davidson, Julia Davidson Truilo, Jonathan Kaney, Jr., David Kendall, Robert Truilo, Georgia Kaney, PMV, Inc., and Lively Arts Center, Inc." (Doc. 263).

6.  In addition to this substantial unfair prejudice to PMV, the proposed sale should not be approved by the Court because it is contrary to Florida law, as described in detail below.

WHEREFORE, Defendant PMV, Inc. respectfully requests that the Court deny the Motion to Approve Sale and for such further relief as deemed just and proper.

**Memorandum of Law**

"A sale by a receiver should be carefully watched by the court and not approved where the sale is for less than the property should reasonably be expected to sell, and then only when there is a showing of necessity."  See Fugazy Travel Bureau, Inc. v. State of Florida, 188 So. 2d 842, 844 (Fla. 4th DCA 1966).  Although a sale by a receiver "is ordinarily improper," a proper sale may be made "where the character of the property or the surrounding circumstances are such as to render a sale necessary for the adequate protection of the rights of the parties."  See id. (reversing that part of a decree authorizing a receiver's sale of a $900,000 promissory note for $200,000 over the objections of certain stockholders).  Indeed, a receiver "is not a party" but rather "an officer of the court" who is "subject to the supervision and control of the court."  See id.  The court "may require other safeguards in a proposed sale by the receiver such as public notice, sealed bids or public auction as may appear proper."  See id. at 845.

In the instant case, the Court should rely on all three rules of law to deny the Motion to Approve Sale.  First, the proposed sale to Halifax Media Acquisition, LLC, an affiliate of Stephens Capital Partners LLC and Stephens Investments Holdings LLC ("Stephens") should not be approved because the $20.074 million purchase price is far

less than the property should reasonably be expected to sell for, and there is no showing of necessity why NJC's publishing operations should be sold at such a low price without competitive bids during an economic recession where prospective purchasers are hesitant to make acquisitions and where banks are reluctant to lend.  Second, the character of the property and the surrounding circumstances of the proposed sale to Stephens do not render a sale necessary for the adequate protection of the rights of the parties; on the contrary, PMV would be severely prejudiced by the sale.  Finally, the Court should not approve any sale of NJC without ensuring several safeguards are in place, such as real estate appraisals, multiple competitive bids, and protecting NJC's long-standing pension plan.  For all these reasons, the Court should deny the Motion to Approve Sale.

A. <u>The Proposed Purchase Price Is Far Less Than The Property Should Reasonably Be Expected To Sell For, And There Is No Showing Of Necessity To Support Such A Sale</u>

A sale by a receiver should not be approved where the sale is for less than the property should reasonably be expected to sell for, and then only when there is a showing of necessity.  <u>See</u> <u>Fugazy</u>, 188 So. 2d at 844.  Here, the proposed sale is neither reasonable nor necessary.

　　　1.　*The Quarter-Billion-Dollar Discrepancy.*

The terms of the proposed sale to Stephens are patently unreasonable -- not because the current market could bring a better price -- but because the current proposed purchase price of $20.074 million bears so little relationship to the $272 million fair market valuation of NJC as of 2004.  The difference between these values creates a quarter-billion-dollar discrepancy that shocks the conscience, and the proposed sale

should be rejected on this ground alone.  See, e.g., Salaymeh v. Plaza Centro, LLC, 258 S.W.3d 236 (Tex. 1st DCA 2008) (citing the rule that in confirming a judicial sale of property in receivership to satisfy a judgment, the court must determine from all the facts and evidence whether the bid received was fair and reasonable, and the confirmation may be set aside based on inadequacy of price alone where the inadequacy is "so great as to shock the conscience of the court").  Obviously, this gaping disparity would unfairly prejudice PMV if the sale were approved.  To understand the reason for the quarter-billion-dollar difference in value requires a brief review how the initial value was calculated and what developments occurred subsequent to that valuation.

    2.    *The Steep Decline in Value*.

Beginning December 6, 2005, the Court held an eight-day bench trial to determine the fair market value of Cox's shares of NJC stock.  On June 30, 2006, the Court entered a very detailed, thorough and well written Order that appears to have incorporated a tremendous amount of the evidence presented at trial. (Doc. 251).  On pages 14-20 of the Order, the Court explained in great detail both experts' testimony.  Cox's expert, Owen D. Van Essen ("Mr. Van Essen"), used a "comparable sales analysis, which measure[d] the market value of a newspaper primarily in relation to the purchase prices of comparable newspapers."  (Id. at 15).  Mr. Van Essen began his analysis by comparing NJC's Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") margin to the average EBITDA margin of eleven publicly traded newspaper companies. (Id. at 15-16).

In comparison to NJC's actual EBITDA margin of 9.3%, the eleven publicly traded newspaper companies had an average EBITDA margin of 28.3%. (Id. at 16). Relying on this data, Mr. Van Essen "normalized" NJC's EBITDA margin to 28.3%. (Id.) This "normalization" more than tripled NJC's actual EBITDA, which is extremely significant because Mr. Van Essen's valuation formula then applied a multiplier of 14.1 against this super-inflated value. (Id.) After making some adjustments and including the value of Pennysaver, Mr. Van Essen concluded that the total fair market value of NJC was $306 million as of May 10, 2004. (Id. at 17).

It was believed that under new management, the newspaper might earn several times its actual revenues, even where the same families had successfully grown NJC into a booming newspaper organization from the 1920's.[2] (Id. at 3). Indeed, Cox has consistently argued that Mr. Hopson has performed admirably as the new Chief Executive Manager of NJC, and PMV has offered no evidence to the contrary. Mr. Hopson himself opined that "NJC would not have maintained profitability over this period if I had not been hired as Chief Executive Manager." (Doc. 505, p. 2). The fact that NJC's value has apparently plummeted during Mr. Hopson's tenure would appear to be based upon the current economic recession together with a changing business environment for printed news publications such as the advent of Internet-based and other electronic-based publications. Assuming a competent performance by Mr. Hopson as the new Chief Executive Manager of NJC, the proposed purchase price for the sale of NJC to Stephens amounts to a virtual "fire sale" of NJC.

---

[2] As noted by the Court in 2006, *The News-Journal* was the second largest independently owned newspaper in Florida; only the *St. Petersburg Times*, owned by a trust, was larger. (Id. at 15, n. 7).

3.    *The Proposed Asset Purchase Agreement*

The proposed Asset Purchase Agreement ("APA") is incomplete and unacceptable. In section 3.6 of the APA, NJC references various schedules that set forth each parcel of "Owned Real Property" and "Leased Real Property." (Doc. 576-2, pp. 12-14). Schedule 3.6(a) lists the Owned Real Property and includes twelve addresses under the title "News-Journal" and a thirteenth address under the title "News-Journal Paper Warehouse." (Doc. 576-5, p. 58). Schedule 3.6(b) lists the Leased Real Property and includes thirteen addresses and fourteen lease agreements (Doc. 576-5, pp. 59-60).

Nowhere does the APA, or any of its accompanying schedules, motions or declarations, disclose the value of these properties. In fact, Cox and Mr. Hopson do not even offer approximate, un-appraised values. According to county records of which this Court may take judicial notice under Federal Rule of Evidence 201, the 2009 tax-assessed value of the real property that would be included in the proposed sale was $9,135,749.[3] See attached Composite Exhibit "A." As the period for which an objection to the tax-assessed value has expired, PMV can only assume that no objection was made by Mr. Hopson on behalf of NJC to the tax-assessed values of the real property because Mr. Hopson believes the fair market value equals or exceeds the tax-assessed value. It is common knowledge that the tax-assessed value of property is often far lower than the fair market value of the real property, and this is particularly true for NJC's real property that would be included in the proposed sale, even in today's market.

---

[3] This total includes 12 of the 13 properties on Schedule 3.6(a) of the APA. Online records could not be printed for the property located at 800 6th Street, Holly Hill, FL 32117 ("Mead Property").

7

In addition, PMV notes that the terms and provisions of the proposed APA provide that 10% of the amount of the proposed purchase price will be withheld to satisfy any indemnification obligations of NJC following the proposed sale (the "Escrow Amount"). (Doc. 576-2, pp. 16, 42-44). Therefore, there is a real possibility that pursuant to the terms of the APA, some or all of the Escrow Amount will be returned to Stephens because of indemnification obligations of NJC.

The APA proposes that a portion of the cash or cash equivalents held by NJC at closing will remain in NJC and inure to the benefit of the buyer as "Working Capital," the exact amount of which cannot be calculated until a closing on the proposed sale has occurred. (Id. at pp. 16-17). This Working Capital amount will, in effect, reduce the net proceeds from the sale available for distribution to creditors and/or shareholders of NJC. In addition, depending on the date that the closing on the proposed APA would occur, Stephens will be entitled to a reduction to the purchase price with respect to the "Net Cash From the Operation of the Business" as defined in the APA, which would further reduce the net proceeds available following the proposed sale. (Id. at p. 17). In short, there is a strong likelihood that the terms of the APA would result in NJC receiving less than the $20.074 million purchase price that the Court is being asked to approve.

While it is not inappropriate for asset purchase agreements to contain escrows and working capital adjustments in general, given the extremely low proposed purchase price, the effect that these adjustments are likely to have on the net proceeds realized by NJC are significant. As it stands, the tax-assessed value of the real estate to be included in this sale alone would amount to nearly 50% of the proposed purchase price. After taking into

account the Escrow Amount and the other adjustments to the purchase price described above, the value of the real estate is likely to exceed 50% of the net purchase price at closing.  These facts alone should give this Court reason to pause and re-evaluate the merits of this proposed sale.  Indeed, the current proposed sale to Stephens should be rejected because the property should reasonably be expected to sell for a better price in the future, and there is no showing of necessity why it should be sold in haste, particularly where PMV would be unfairly prejudiced as described below.

B.  <u>The Character Of The Property And The Surrounding Circumstances Do Not Render The Sale Necessary For The Adequate Protection Of The Rights Of The Parties</u>

Although a sale by a receiver is ordinarily improper, a proper sale may be made where the character of the property or the surrounding circumstances are such as to render a sale necessary for the adequate protection of the rights of the parties.  <u>See</u> <u>Fugazy</u>, 188 So. 2d at 844.  Here, PMV would be severely prejudiced by the sale proposed by Cox and Mr. Hopson.

    1.    *Mr. Van Essen's April 13, 2009 Declaration.*

On April 13, 2009, Mr. Van Essen issued a Declaration stating that "[l]ast year, my firm was engaged by NJC and its new chief executive manager James W. Hopson to assist Mr. Hopson in preparing for the sale of NJC to a third party in connection with the parties' joint sale agreement." (Doc. 506, p. 1).  He acknowledged that in 2005 there were "factors why [he] believed NJC would sell for a higher EBITDA multiple than the average of the public companies." (<u>Id.</u> at 2).  In hindsight, those "factors" were

9

obviously wrong, and led to the entry of an enormous judgment against NJC.[4]  Even in Mr. Van Essen's discounted cash-flow analysis, which he offered as a check on the market approach, Mr. Van Essen projected NJC's revenue growth rate at 6%, which would have created a fair market value of $289 million.  (Doc. 251, p. 17).

The 2009 forecasted EBITDA of NJC released in January 2009 pegged EBITDA at $6.7 million, less than half of the prior value.  (Doc. 506, p. 3).  A few months later, the revised forecast estimated the EBITDA to be between $5 and $6 million.  (Id.).  According to Mr. Van Essen, this would equate to a total value for NJC of $25 to $30 million.  (Id.).  He stated that "early projections for 2009 do not show much relief."  (Id.).  Nevertheless, as the promoter of the newspaper, his Declaration stated that he had "seen in the course of the joint sale process considerable interest among potential purchasers in the sale of NJC's newspaper operations."  (Id. at 7).  PMV notes that at no time did Cox appear to have any concerns or objections with respect to the drastically falling valuations being proposed for NJC, despite the fact that Cox several times rejected offers for its stock that were many times in excess of the proposed purchase price for all of NJC's publishing operations as reflected in the APA.

2.  *Mr. Van Essen's December 31, 2009 Declaration.*

On December 30, 2009, Mr. Van Essen signed his most recent Declaration stating that "[u]pon the Court's termination of the joint sale agreement and the appointment of

---

[4] The factors also may have been too limited.  In this Declaration, Mr. Van Essen cited two main causes for the recent decline in newspaper advertising revenue: cyclical (macro-economic weakness) and secular (online advertising migration challenges).  Id. at 4.  However, Mr. Van Essen's method for valuing NJC as of May 10, 2004 apparently did not make any downward adjustments for online advertising migration challenges, where the Internet was clearly a growing source of daily news by 2004 and still is today.

Mr. Hopson as Receiver, my firm was retained by the Receiver to continue its role as broker for the sale."[5] (Doc. 577, p. 1). He stated that in his opinion "the Court should afford the Receiver the requested approval and direction to close a sale of NJC's publishing operations pursuant to the terms of the Asset Purchase Agreement ("APA") entered into with Halifax Media Acquisition LLC, an affiliate of Stephens Capital Partners LLC and of Stephens Investments Holdings LLC ("Stephens") with financing to be provided by PNC Bank." (Id. at 2). He believed that "the Stephens offer, as set forth in the APA, provide[d] the highest and best available value for NJC's publishing operations and should be accepted." (Id.).

He conceded that "[b]eginning late last year, following months of intensive efforts to identify the highest and best available purchaser, NJC engaged in pointed and, for a considerable period, exclusive negotiations with one potential buyer." (Id. at 3). He said that "despite approximately seven months of discussion, these negotiations never resulted in any meaningful consensus on the parameters of an agreement" and that "[f]rustration with that process led NJC to reach out broadly once again to other potential buyers this past July." "In August, Stephens expressed interest in a possible purchase and its subsequent evaluation of NJC's finances and operations and negotiation of an agreement have proceeded apace ever since." (Id.). Mr. Van Essen continued by stating that "NJC and Stephens have now agreed on all material terms and, as evidenced by the APA, both parties are anxious to close." (Id.).

---

[5] It is unknown whether Mr. Van Essen had any reason to believe, at the time of his December 2005 trial testimony, that he eventually would be selected as the broker to prepare NJC for the highest possible sale price.

First, Cox and Mr. Hopson dealt exclusively with one potential buyer for around seven months of 2009, which admittedly caused them "frustration." Apparently as a result of the frustration, Cox and Mr. Hopson again dealt exclusively with one potential buyer (Stephens) for around five additional months (August to December 2009) and are now "anxious" to close the sale. The Court has not set a deadline for the sale of NJC, and therefore Cox and Mr. Hopson should not be so anxious as to deal exclusively with a single potential buyer just to complete a fire sale. Note that the $20.074 million purchase price is even lower than Mr. Van Essen's last estimated value of NJC at $25-30 million. (Doc. 506, p. 3).

The fact that the sale of NJC's publishing operations is drawing only isolated bids is reason to postpone the sale until the economy rebounds and banks start lending again. If the reason for this proposed sale is that Cox (and Mr. Van Essen's firm) are desperate for cash, that would not satisfy the legal standard which is meant to protect the rights of all parties. Simply stated, a fire sale should not be approved without some immediate urgency. See, e.g., Cal-American Income Property Fund VII v. Brown Dev. Corp., 187 Cal. Rptr. 703 (Cal. 4th DCA 1982) (holding sale of shopping center by receiver was "manifestly unfair" to limited partnership, which entered agreements for sale and leaseback of center, because "the receiver did not present facts demonstrating the need for a sale, much less an immediate one," and thus trial court abused its discretion in confirming the sale). Likewise here, Cox and Mr. Hopson have not demonstrated the need for this proposed sale to Stephens, much less an immediate need.

3.      *There Is No Reliable Evidence to Justify the Proposed Sale.*

Cox and Mr. Hopson have not demonstrated that the terms of the proposed sale to Stephens are reasonable or that they protect the interests of all parties. In Mr. Van Essen's most recent Declaration, he admitted that the "newspaper industry is struggling" and that his "firm has been actively involved in the prospective sale, successful or not, of over 65 daily and weekly newspapers." (Doc. 577, p. 4). Mr. Van Essen, whose firm for the past two years has attempted, "whether successful or not," to sell newspaper companies in a "struggling" industry, is the broker on this proposed sale and therefore necessarily has extreme (and perhaps even disqualifying) bias in his current testimony. Cox and Mr. Hopson have not filed a single Declaration from an independent, unbiased expert regarding the reasonableness or unreasonableness of this proposed sale to Stephens. In short, there is no reliable evidence to support the Motion to Approve Sale.

In <u>Bailey v. Treasure</u>, 462 So. 2d 537 (Fla. 4th DCA 1985), a partner of a Florida limited partnership and a personal representative of the estate of a deceased partner brought an action to enjoin a third partner from continuing to handle the partnership's business, and a receiver was appointed. <u>See</u> <u>Bailey</u>, 462 So. 2d at 538. The trial court authorized the receiver to sell six orange groves owned by the partnership for $2,500 per acre, although they were appraised at more than $3,000 per acre. The receiver then filed a motion to authorize a sale of the groves to a buyer for $2,300 pursuant to a proposed sale contract. The trial court ruled that the receiver had "exclusive authority" to negotiate the sale of the partnership's property, that the receiver was authorized to accept $2,300 per acre for the groves so long as the offer contained substantially the same terms and

conditions as a prior offer, and that the receiver had the discretion to agree that the partnership would indemnify the purchaser from any claim for commissions on the sale. See id. at 539.

The defendant petitioned the court of appeals for a writ of certiorari seeking a determination that the trial court had departed from the essential requirements of law. The appellate court cited two other opinions -- one from the Florida Supreme Court -- holding that "[a] sale by a receiver should be carefully watched by the court and not approved where the sale is for less than the property should reasonably be expected to sell, and then only where there is a showing of necessity." See id. at 539-40 (citing Fugazy, 188 So. 2d at 844 and Robineau v. DeLong, 109 So. 636 (1926)).

The court of appeals held that the only evidence as to the reasonably expected sales price was that the parties had agreed the property was worth $2,500 per acre, and then the property was appraised for approximately $3,000 per acre. "Unaccepted offers to purchase ... may not be considered as evidence of value." See id. at 540 (citing Kalb v. Int'l Resorts, Inc., 396 So. 2d 199 (Fla. 2d DCA 1981)). Thus, the trial court had erred in approving a sale of the property for $2,300 per acre, "as there was no evidence of the reasonableness of that price." See id. at 540. Likewise here, Mr. Van Essen's Declarations about the history of the sale process and the newspaper industry in general do not constitute evidence as to the reasonableness of the proposed $20.074 million purchase price. Cox and Mr. Hopson fail to present any real evidence as to the value of the real estate, equipment, intellectual property, or other assets included in the proposed sale.

    4.    *PMV Does Not Have the Burden of Proof.*

PMV is not required to supply extrinsic evidence to this Court to prove the unreasonableness of the proposed sale. In <u>First National Bank of Cincinnati v. Flershem</u>, 290 U.S. 504 (1934), the U.S. Supreme Court questioned why the court of appeals had upheld a plan of reorganization by a receiver on the basis that the non-assenting creditors had not introduced evidence of their own. <u>See</u> <u>First National Bank</u>, 290 U.S. at 525. The Court stated that "[t]he failure to secure an adequate price seems to have been due, not to lack of opposing evidence, but to the mistaken belief that it was the duty of the court to aid in effectuating the plan of reorganization, since a very large majority of the debenture holders had assented to it." <u>See</u> <u>id.</u> In a receivership matter, "the court stood in a position different from that which it occupies in ordinary litigation, where issues are to be determined solely upon such evidence as the contending parties choose to introduce." <u>See</u> <u>id.</u> Here, "every important determination by the court calls for an informed, independent judgment; and special reasons exist for requiring adequate, trustworthy information where the jurisdiction rests wholly upon the consent of the defendant who joins in the prayers for relief." <u>See</u> <u>id.</u>

Next, the Supreme Court said "[i]t would be unreasonable to impose upon a few dissenting creditors the heavy financial burden of making an adequate appraisal supported by the testimony of competent experts, where, as here, the assets include extensive plants and equipment located in nine states." <u>See</u> <u>id.</u> at 525-26. The Supreme Court held the plan of reorganization was unacceptable in that "[i]t is clear from the evidence introduced by the reorganization committee and the receivers that the upset

15

price and the sale price were far below even the scrap value." See id. at 523.  Similarly here, the assets of NJC include extensive plants and equipment in Volusia, Flagler, Putnam and St. John's counties, and they are being offered for sale at or below scrap value.  Cox and Mr. Hopson should be required to provide credible evidence to justify this proposed sale.

C.      The Court Should Not Approve A Sale Without Requiring Certain Safeguards

A court may require safeguards in a proposed sale by the receiver such as public notice, sealed bids or public auction as may appear proper.  See Fugazy, 188 So. 2d at 845.  In the instant case, the Court should require real estate and asset appraisals, competitive bidding, and protection for employee pension plans.

1.      *Real Estate Appraisals.*

As recently as September 4, 2009, this Court denied Mr. Hopson's motion to approve a proposed sale of certain other parcels of real estate owned by NJC because Mr. Hopson had not yet obtained the necessary appraisals.  (Doc. 548, p. 1).  The Court cited 28 U.S.C. § 2001(b) which "requires that before confirmation of a private sale, the Court appoint three disinterested persons to appraise the property at issue."  (Id.)  Now, in the instant Motion to Approve Sale, Cox and Mr. Hopson again are asking the Court to approve a sale without any appraisals of the assets being sold.  Even more troubling is that the sale of NJC's publishing operations includes far more real estate than was subject to the previous motion.

In his latest Declaration, Mr. Van Essen stated that "[a]ll of the real estate included in the sale of NJC's publishing operations contemplated by the APA is real

16

estate devoted to those operations." (Doc. 577, p. 5). Based on that, Mr. Van Essen concludes, "[i]n my opinion, procuring separate appraisals of the standalone value of this real estate would not assist the Court in its review of the proposed sale of the publishing operations to Stephens ... because it would not be practical to sell this real estate separately from the publishing operations nor would such a sale, even if practical, result in greater value to NJC than the sale contemplated by the APA." (Id.).

This is not a logical argument. Even assuming Mr. Van Essen's premises -- that the real estate is devoted to the publishing operations and that it could not be sold separately from the operations -- it does not follow that the value of such real estate is unimportant. On the contrary, knowing the value of the real estate is vital to determining a sale price for the entire transaction, particularly given the considerable amount of real property at issue. In fact, the value of the real estate is vitally important to the transaction for the buyer's lender, as this real property will secure the buyer's loan to consummate the proposed sale. The APA provides that Stephens will obtain title insurance policies for the real estate that will be included in the sale and that those title insurance policies will insure the value of the property up to an amount which is not disclosed in the APA. (Doc. 576-2, pp. 35-36). Although the APA omits this amount, it is suspected to exceed the tax-assessed values referenced previously.

The Motion to Approve Sale even concedes that "[w]hen real property is the subject of a private judicial sale in federal court, multiple appraisals generally are required to support the proposed purchase price." (Doc. 576, p. 9). Cox and Mr. Hopson attempt to circumvent this rule based on a "consultation" between Mr. Hopson and Mr.

17

Van Essen, the details of which are not set out in the Motion or in the Declarations.  (Id.).  Furthermore, their legal arguments are not persuasive.

In support of their position, Cox and Mr. Hopson first argue that appraisals of real property would be "meaningless in evaluating the going concern value of the publishing operations to be sold pursuant to the APA."  (Id.).  The APA includes both the publishing operations and real estate, so this argument has no merit.  They also argue that real estate appraisals would be "misleading because a liquidation sale is not proposed."  (Id. at p. 10).  It is unclear why Cox and Mr. Hopson believe the value of real estate would be important in a liquidation sale but "misleading" in an asset purchase agreement.  Finally, they argue that real estate appraisals would be "a waste of the Receiver's limited resources."  (Id.).  Again, real estate appraisals are generally required in transactions of this type, and to now cut corners -- after all the parties have been through in this case -- by not hiring appraisers due to Mr. Hopson's "limited resources" is not acceptable under the law.

    2.    *Competitive Bidding*.

In addition to requiring real estate appraisals, the Court should require a competitive bidding process.  Generally, a proper sale out of receivership should bring multiple competing bids, particularly for such a large transaction.  This is not the typical asset sale where bids might be received within a 10% range from each other.  For NJC, a company whose value appears to have steeply plummeted to a shocking all-time low, competing bids would probably be exponentially higher in a different economic climate.  Again, during the course of legal proceedings, Cox several times rejected offers for its

47.5% share of stock that were many times in excess of the proposed purchase price for all of NJC's publishing operations as reflected in the APA.

    3.    *Pension Plan.*

Finally, the Court should ensure that pension plans are protected. On April 22, 2009, certain former employees of NJC petitioned this Court seeking that "specific instructions be given to the Receiver so that the Plan receives additional News-Journal Corp. assets to meet the full funding requirements mandated by the Employment Retirement Income Security Act of 1974 (ERISA) and the Internal Revenue tax code." (Doc. 509, p. 2). There is no evidence that Cox, Mr. Hopson or the APA has made any provision for protection of the pension plan as required by ERISA. This is a federal legal requirement that cannot be overlooked in an asset sale out of receivership.

For all of these reasons, the Court should require certain safeguards to ensure that the publishing operations of NJC are sold in a proper and lawful manner.

## **Conclusion**

In conclusion, PMV respectfully requests that the Motion to Approve be denied, and for such further relief as deemed just and proper.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on Tuesday, January 19, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

                                        s/David P. Hathaway
                                        David P. Hathaway
                                        Florida Bar No. 491411
                                        Dean, Mead, Egerton, Bloodworth,
                                          Capouano & Bozarth, P.A.
                                        P. O. Box 2346
                                        Orlando, FL  32802-2346
                                        Telephone:  (407) 841-1200
                                        Facsimile:  (407) 423-1831
                                        E-Mail:  dhathaway@deanmead.com