**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**COX ENTERPRISES, INC.,**

      **Plaintiff,**

**-vs-**                                        **Case No. 6:04-cv-698-Orl-28KRS**

**NEWS-JOURNAL CORPORATION,**
**HERBERT M. DAVIDSON, JR., MARC L.**
**DAVIDSON, JULIA DAVIDSON TRUILO,**
**JONATHAN KANEY, JR., DAVID**
**KENDALL, ROBERT TRUILO, GEORGIA**
**KANEY, and PMV, INC.,**

      **Defendants.**
_____

# ORDER

The latest matters to be considered in this protracted litigation are whether Plaintiff, Cox Enterprises, Inc. ("Cox"), and the Receiver for Defendant News-Journal Corporation ("NJC") are entitled to recoup attorneys' fees and expenses, including expert witness fees, relating to Cox's motion to set aside certain severance agreements from Defendants/Intervenors David Kendall ("Kendall") and Georgia Kaney ("Kaney") and whether Cox and the Receiver are entitled to disgorgement of fees from the law firm of Cobb Cole, which represented NJC in opposing Cox's motion to set aside.

The assigned Magistrate Judge has issued a Report and Recommendation ("R&R") (Doc. 614) on the Motion for Fees and Expenses in Connection with the Order Setting Aside Executive Severance Agreements (Doc. 552), recommending that the Court find that Cox and the Receiver are not entitled to recoup attorneys' fees and costs from Kendall and

Kaney. The Magistrate Judge also entered an Order (Doc. 597) denying without prejudice that part of the Motion for Fees and Expenses that pertained to disgorgement of fees from Cobb Cole. Cox filed a motion for clarification of the Magistrate Judge's Order, which was denied in part (Doc. 610).

Cox and the Receiver have filed Objections (Doc. 623) to the R&R, and Cox has appealed (Doc. 615) the Magistrate Judge's Order (Doc. 610) denying Cox's motion for clarification. The Court conducted a *de novo* review of the record[1] and has determined that the Objections to the R&R must be sustained in part and overruled in part. In addition, Cox's appeal of the Magistrate Judge's Order shall be denied as moot.

**I. Background**

In 2004, Cox, as the minority shareholder of NJC, brought a derivative action against NJC, its officers, and its majority shareholder, PMV, Inc. ("PMV"), alleging misuse of corporate funds and corporate waste. (Compl., Doc. 1). Cox also sought the dissolution of NJC pursuant to sections 607.1430 and 607.1434, Florida Statutes. (Id. at 14). In response, NJC elected to purchase Cox's shares of NJC pursuant to section 607.1436, Florida Statutes. (Doc. 51). Because the parties could not reach an agreement regarding the fair value of Cox's shares, this Court made a fair value determination, (see Doc. 251), which was affirmed by the Eleventh Circuit, Cox Enters., Inc. v. News-Journal Corp., 510 F.3d 1350 (11th Cir. 2007).

---

[1] The Court is required to conduct a *de novo* review of those portions of the Magistrate Judge's R&R to which objections have been timely filed. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b)(3).

NJC was required to either make the first installment payment of $29 million to Cox or file a notice of its intent to adopt articles of dissolution within ten days of the issuance of the Eleventh Circuit's opinion. (See Doc. 262 at 6); see also § 607.1436(7), Fla. Stat. At that time, it became apparent that NJC was unable to pay Cox for its shares, and the parties entered into a joint sales agreement, whereby NJC was to be sold so that Cox could be paid. Upon request of the parties, in order give them time to sell NJC, this Court extended the ten-day statutory deadline several times. (See Docs. 321, 323, 461, & 489). Eventually, however, the efforts to sell NJC pursuant to the joint sales agreement were not fruitful, and the joint sales agreement was terminated. This Court then appointed the Receiver, who ultimately arranged the sale of NJC's publishing operations, (see Doc. 625), and the disposition of all of NJC's remaining assets,[2] (see Doc. 674).

During the preparation for the sale of NJC, the Receiver discovered the existence of certain golden parachute agreements ("GPAs") that caused him concern, and he brought these GPAs to Cox's attention. It came to light that in November 2004—six months after Cox filed this suit against NJC and the Individual Defendants for corporate waste—Herbert M. "Tippen" Davidson ("Tippen Davidson"), the Chief Executive Officer of NJC and sole owner of PMV, had presented Kendall and Kaney with these GPAs. At the time, Kendall was NJC's Chief Financial Officer, and Kaney was the company's Vice-President, General

---

[2] Due to the recent Eleventh Circuit Opinion (Doc. 698-1) vacating this Court's August 9, 2010 Order (Doc. 674), the final disposition of NJC's remaining assets is still at issue.

Manager, and Publisher. Cox filed a motion to set aside these agreements,[3] (Doc. 333), which Kendall, Kaney, and NJC opposed. The Court granted Cox's motion, determining that Tippen Davidson lacked the authority to enter into the GPAs and that the GPAs constituted corporate waste. (Doc. 474 at 19).

Cox and the Receiver then moved for attorneys' fees and expenses, including expert witness fees, in connection with setting aside the agreements. (Doc. 552). Their motion was in three parts. Part one sought reimbursement from Kendall and Kaney to NJC for expert witness fees and expenses it advanced in opposing the motion; part two sought reimbursement from Kendall and Kaney to Cox for Cox's attorneys' fees and expenses incurred in connection with the motion; and part three sought disgorgement from the law firm of Cobb Cole–which represented NJC in opposing the motion–to NJC of all fees received by Cobb Cole in connection with opposing the motion. The Magistrate Judge issued an Order (Doc. 597) denying part three without prejudice to reassertion in an ancillary proceeding and an R&R (Doc. 614), recommending that parts one and two be denied.

**II. Discussion**

Cox and the Receiver object to the portion of the R&R that recommends that parts one and two be denied and assert that they are entitled to attorneys' fees and expert witness fees under both section 607.1436(5), Florida Statutes, and this Court's inherent authority. These arguments will be addressed in turn, and the Court will then address the disposition

---

[3] The original motion also sought to set aside severance agreements between NJC and twenty-seven of its key managers. (Doc. 333). However, Cox later withdrew that part of its motion. (Docs. 412 & 438).

of the disgorgement claim against Cobb Cole.

### A.  Section 607.1436(5), Florida Statutes

As discussed above, Cox originally demanded dissolution of NJC pursuant to sections 607.1430 and 607.1434, Florida Statutes, and faced with that demand, NJC elected to purchase Cox's shares of NJC pursuant to section 607.1436, Florida Statutes. By invoking this right, NJC also subjected itself to the fee-shifting provision of section 607.1436, which provides: "If the court finds that the petitioning shareholder had probable grounds for relief under s. 607.1430(3), it may award to the petitioning shareholder reasonable fees and expenses of counsel and of any experts employed by petitioner." § 607.1436(5), Fla. Stat.

In the R&R, the Magistrate Judge determined that Cox and the Receiver were not entitled to any fees or expenses under this provision because the statute only allows for recovery of fees against the corporation; Cox and the Receiver were seeking to recover fees from corporate officers–not the corporation itself.  Cox and the Receiver assert that this interpretation is too narrow and that it has already been rejected by this Court. Regardless of whether this interpretation is correct, however, Cox and the Receiver are not entitled to recover fees under section 607.1436(5) because the issue of setting aside the GPAs is beyond the scope of this fee-shifting provision.

When a corporation elects to purchase a shareholder's shares in the face of an underlying suit for dissolution, the underlying claims must be dismissed. § 607.1436(6), Fla. Stat. To offset this dismissal, the fee-shifting provision of section 607.1436(5) provides that if the petitioning shareholder had probable grounds for relief in the underlying suit for dissolution, the Court may award fees and expenses in connection with bringing the suit.

-5-

This provision, however, only contemplates an award of fees and expenses in connection with the underlying dissolution suit and the valuation action. While setting aside the GPAs in connection with selling NJC so that NJC would be able to pay Cox for its shares is obviously related to the underlying suit and valuation action, it is not actually part of either one.

Accordingly, Cox and the Receiver are not entitled to attorneys' fees and expenses related to setting aside the GPAs under section 607.1436(5). To decide otherwise would be contrary to Florida law, which provides that fee-shifting statutes must be construed narrowly because they are "in derogation of common law." See Pepper's Steel & Alloys, Inc. v. United States, 850 So. 2d 462, 465 (Fla. 2003).

### B.  Inherent Authority

"[T]he Supreme Court [has] expressed strong support for the 'American Rule,' which prohibits the imposition of the prevailing party's attorneys' fees on an opponent except when authorized by statute or when a traditionally recognized exception is applicable." Woods v. Barnett Bank of Ft. Lauderdale, 765 F.2d 1004, 1014 (11th Cir. 1985) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975)). One such recognized exception is the so-called "bad faith" exception. Under this exception, "[c]ourts have the 'inherent power' to assess attorney's fees as a fine . . . when a losing party has 'acted in bad faith, vexatiously, wantonly or for oppressive reasons.'" Kreager v. Solomon & Flanagan, P.A., 775 F.2d 1541, 1543 (11th Cir. 1985) (quoting Alyeska Pipeline, 421 U.S. at 258-59). While "the bad faith or vexatious conduct must be part of the litigation process itself," Woods, 765 F.2d at 1014, it "is not limited to suits that are filed in bad faith. The exception also

-6-

encompasses bad faith acts preceding and during litigation," Kreager, 775 F.2d at 1543.

In the R&R, the Magistrate Judge determined that Cox and the Receiver were not entitled to attorneys' fees under the bad faith exception because Kendall's and Kaney's decision to oppose the motion to set aside, while not admirable, did not rise to the level of bad faith.  The Magistrate Judge reasoned that Kendall and Kaney had, in opposing the motion, the support of the disinterested members of NJC's Board of Directors as well as their agreements signed by Tippen Davidson.  Cox and the Receiver assert that there were no "disinterested" members of NJC's board and cite for support this Court's previous statement that the NJC board could not be trusted to act in the best interests of NJC.  (Doc. 623 at 13 (citing April 16, 2009 Hr'g Tr., Doc. 516, at 41)).  Indeed, NJC's Board has made questionable decisions–including the one to oppose the motion to set aside the GPAs; however, the Court agrees with the Magistrate Judge that Kendall's and Kaney's reliance on such a decision does not amount to bad faith.

Nevertheless, while the initial decision to oppose the motion to set aside was not in bad faith, Kendall's and Kaney's actions during the litigation related to setting aside the GPAs was in bad faith.[4]  Prior to the Order granting Kendall's and Kaney's motion to intervene for the purpose of opposing the motion to set aside, NJC filed its Initial Opposition to the motion to set aside.[5]  (See Initial Opposition, Doc. 352; Mins., Doc. 410 (granting

---

[4] The Magistrate Judge did not address Kendall's and Kaney's actions during litigation.

[5] Although this motion was filed by NJC–not by Kendall or Kaney individually because they had not been allowed to intervene at the time–Kendall and Kaney were both intimately involved in the litigation and were represented by and directing the actions of Cobb Cole.

Kendall and Kaney's motion to intervene)). While the arguments in the Initial Opposition stop short of directly representing that the NJC Board approved the GPAs, such approval was certainly implied. For example, the Initial Opposition states that "[t]he Agreements[6] are subject to the business judgment rule unless it can be proven that the Agreements were the result of self-dealing." (Doc. 352 at 4). The backbone of the business judgment rule, however, is that a decision that is made by a corporate board should not be disrupted because a court merely disagrees with the judgment of the board. See F.D.I.C. v. Stahl, 89 F.3d 1510, 1517 (11th Cir. 1996) ("The [Business Judgment Rule] is a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges" (quotation omitted)). Thus, the argument that the GPAs were protected by the business judgment rule was essentially an argument that the GPAs were approved by the Board.

In and of itself, the Initial Opposition would not rise to the level of bad faith, but that was hardly the end of Kendall's and Kaney's misrepresentations. In addition, in response to Cox's request to produce documents pertaining to the GPAs, NJC provided a single page of handwritten notes prepared by Kendall titled "BOD Mtg." (Sept. 24, 2008 Hr'g, Pl.'s Ex. 3). The notes include the following entries:

NJC BOD discussed Tin and Golden Parachute plans.

BOD approved both types of parachute.

---

In addition, Kendall provided an affidavit to support NJC's motion. (Doc. 352-2).

[6] The term "Agreements" was used in the Initial Opposition to refer to both the GPAs and the other key-manager severance agreements.

(Id.).  These notes seemingly corroborate the position NJC took in the Initial Opposition, giving the distinct impression that there was a meeting of the NJC Board of Directors and that the Board had approved the GPAs.  However, these notes were clearly misleading, as was later revealed when Kendall finally admitted that the Board, in fact, never approved the GPAs and that the terms of the GPAs were not even disclosed at the meeting.  (Kendall Dep., Doc. 413-1, at 79-81).  Significantly, this admission only came after the deposition of Robert Truilo, a member of NJC's Board, was taken.  During that deposition, which Kendall attended, (Truilo Dep., Doc. 413-3, at 3), Truilo testified that at the time the Board did not know about or approve the GPAs, (id. at 39, 41-45).  Kendall's tenuous, after-the-fact explanation was that his notes were from a management meeting and that he titled his notes "BOD Mtg" because Board members were present.  Given the circumstances of the case, however, it was obvious that the notes–without further explanation–would mislead the Court and Cox into believing that there was a Board meeting during which the Board approved the GPAs. Kendall's explanation is even more dubious given the fact that no copies of the GPAs were even available for review at the time that Kendall's "management meeting" allegedly took place, (id. at 43-44), and Robert Truilo did not recall the meeting or any discussion of the GPAs, (id. at 44).  In fact, Truilo did not even know that Kaney had been given a GPA until 2007 when Tippen Davidson passed away and the Board was informed by Kaney that her GPA provided that she would become CEO of NJC upon Tippen Davidson's death, (id. at 36-37); Truilo did not know of Kendall's GPA until 2008 when he discovered it by reviewing court documents, (id. at 35).

Moreover, once Kendall and Kaney were allowed to intervene, they affirmatively

represented that the decision to enter into the GPAs was "based on a decision of disinterested members of the board of directors of NJC," and they continued to argue that the business judgment rule protected the GPAs. (Doc. 397). Kendall and Kaney made these representations even though they were fully aware of the fact that the NJC Board did not approve the GPAs.[7]

Furthermore, Kendall's and Kaney's actions cannot be viewed in a vacuum. Throughout this litigation, Kendall and Kaney have shown a disregard for the procedures of this Court by directing NJC to willfully defy Court Orders. (See Doc. 303 at 17("[T]he Court finds by clear and convincing evidence that NJC, through the actions of David Kendall, its CFO, has willfully violated the terms of [the September 27 Order] and subsequent Orders."); Doc. 490 at 5 ("Again, through the actions of Kendall, NJC is in willful contempt.")). While those actions have already been addressed and do not factor directly into this bad faith determination, they shed light on the motives of Kendall and Kaney. See Rothenberg v. Sec. Mgmt. Co., 736 F.2d 1470, 1472 (11th Cir. 1984) ("In determining the propriety of a bad faith fee award, the inquiry will focus primarily on the conduct and motive of a party." (quotation omitted)).

All of these circumstances taken together support a finding that Kendall and Kaney acted in bad faith during the period of litigation opposing Cox's motion to set aside. Thus, pursuant to this Court's inherent authority, Kendall and Kaney will be required to reimburse

---

[7] As noted in this Court's previous Order setting aside the GPAs (Doc. 474), this is in no way a negative reflection on counsel for Kendall and Kaney. Rather, the record is clear that as soon as he discovered that the representations that the NJC Board approved the GPAs were inaccurate, he promptly took action to correct the inaccuracy.

Cox for its attorneys' fees involved in litigating the motion to set aside. On the other hand, because NJC's decision to oppose the motion was supported by NJC's Board and because Kendall's and Kaney's reliance thereon was not in bad faith, Kendall and Kaney will not be required to reimburse NJC for its fees and expenses related to the motion. Additionally, because the initial decision to oppose Cox's motion to set aside was not in bad faith, Cox would have been required to retain experts to defend its motion regardless of Kendall's and Kaney's subsequent bad faith actions. Thus, Kendall and Kaney will only be required to reimburse Cox for its attorneys' fees as a sanction for their actions; Kendall and Kaney will not be required to reimburse Cox for its expert witness fees.

### C. Cobb Cole

Finally, in part three of the motion to set aside, Cox and the Receiver sought disgorgement of all fees paid by NJC to Cobb Cole in connection with opposing the motion to set aside. The Magistrate Judge denied this portion of the motion without prejudice, stating that the disgorgement issue was better resolved in an ancillary proceeding because it was ancillary to the Receivership, which was itself ancillary to the main claim in this suit. (Doc. 597 at 2, 4). The Magistrate Judge then instructed that if the Receiver wished to pursue the claim against Cobb Cole, he was required to file a separate complaint and that upon receipt of that pleading, the Clerk would open a new docket as a related case. (Id. at 4). The Magistrate Judge further limited the parties to the ancillary proceeding to the Receiver and Cobb Cole. (Id.). Cox filed a motion for clarification, seeking permission to join the ancillary proceeding in order to pursue its fraudulent transfer claim against Cobb Cole. (Doc. 603).

While awaiting a ruling on Cox's motion for clarification, the Receiver filed the ancillary complaint against Cobb Cole, and related Case No. 6:10-cv-00284-JA-DAB was opened. Thereafter, the Magistrate Judge denied Cox's motion for clarification insofar as it sought to join the ancillary proceeding to pursue its fraudulent transfer claim, (Doc. 610), and Cox appealed the Magistrate's Order, (Doc. 615).  Subsequently, however, the Receiver represented that the disgorgement issue had been resolved by all parties involved and that the ancillary case was dismissed with prejudice.  (Case No. 6:10-cv-00284-JA-DAB Docs. 10 & 11). Thus, Cox's appeal (Doc. 615) of the Magistrate Judge's Order (Doc. 610) denying Cox's motion for clarification is moot.

## IV. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The Objection to the R&R (Doc. 623) is sustained in part and overruled in part. It is sustained insofar as it objects to the Magistrate Judge's recommendation that Cox cannot recoup attorneys' fees from Kendall and Kaney related to litigating its motion to set aside; it is overruled in all other aspects;

2. The Motion for Fees and Expenses in Connection with the Order Setting Aside Executive Severance Agreements (Doc. 552) is **GRANTED in part** and **DENIED in part**; it is **GRANTED** insofar as Cox and the Receiver seek to recoup attorneys fees related to litigating the motion to set aside, it is **DENIED** in all other aspects;

3. **On or before July 27, 2012**, Cox shall file a motion, not to exceed seven pages, and supporting documents, detailing the amount of fees to which it is entitled to recoup from Kendall and Kaney pursuant to this Order.  Kendall and Kaney may file a Response, not to

exceed five pages, within seven days from the date that Cox files its motion; and

    4.  Cox's appeal (Doc. 615) of the Magistrate Judge's Order (Doc. 610) is **DENIED as moot**.

    **DONE** and **ORDERED** in Chambers, Orlando, Florida this 16th day of June, 2012.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party