```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     ORLANDO DIVISION

 3                 Docket No. 6:04-cv-698

 4  . . . . . . . . . . . . . .
    COX ENTERPRISES, INC.,      :
 5                              :        Orlando, Florida
            Plaintiff           :        January 14, 2014
 6                              :        9:30 a.m.
              v.                :
 7                              :
    NEWS-JOURNAL CORPORATION,   :
 8  et al                       :
                                :
 9          Defendants          :
    . . . . . . . . . . . . . .
10

11              TRANSCRIPT OF EVIDENTIARY HEARING
12          BEFORE THE HONORABLE DAVID A. BAKER
                UNITED STATES MAGISTRATE JUDGE
13

14  APPEARANCES:

15

16  For the Plaintiff:  Edward J. Meehan
                        John A. Devault, III
17

18

19  For the Defendant:  Colin Albaugh

20

21  Court Reporter:     Sandra K. Tremel, RMR/CRR

22

23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by computer-aided transcription.
```

```
 1                P R O C E E D I N G S

 2          THE DEPUTY CLERK:   The case number is

 3   6:04-CV-698-ORL-28DAB.   Cox Enterprises Incorporated vs.

 4   News-Journal Corp, et al.

 5       Counsel, please state your appearances for the record.

 6          MR. ALBAUGH:   Colin Albaugh on behalf of the

 7   Pension Benefit Guaranty Corporation.

 8          MS. BURGESS:   Katie Burgess on behalf of the

 9   Pension Benefit Guaranty Corporation.

10          MR. DEVAULT:   Your Honor, John Devault and my law

11   partner Courtney Grimm from the Bedell firm on behalf of

12   the respondent Cox together with Peter Canfield, counsel

13   for Cox from Jones Day in Atlanta, Gary Ford, Ed Meehan and

14   Ada Esedebe of the Groom Law Firm in Washington, D.C.,

15   specialized in pension plans in ERISA, Mr. Ford, the former

16   general counsel for PBGC, and finally, Roberta Colton of

17   Trenam Kemker in Tampa, who specializes in creditors'

18   rights.

19          THE COURT:   All right.   We're here for taking

20   evidence on the matter of the Pension Benefit Guarantee

21   Corporation's claim in the case.   Mr. Albaugh.

22          MR. ALBAUGH:   Good morning, Your Honor.   Colin

23   Albaugh on behalf of the PBGC.   I don't know if it makes

24   sense at this point to -- the parties have a number of

25   exhibits, including some joint exhibits.
```

```
 1            THE COURT:  Those that are not objected to are
 2    received.
 3            MR. ALBAUGH:  Okay.  Thank you, Your Honor.
 4       Would you like me to begin by opening?
 5            THE COURT:  I don't know that you need an opening.
 6    I just as soon get your first witness on.
 7            MR. DEVAULT:  Your Honor, if the Court would
 8    permit, I think we both would like to be able to set out
 9    briefly, if we could, what we see the issues, if Your Honor
10    would indulge us.
11            THE COURT:  Well, if you want, I have read
12    everything you submitted.
13            MR. DEVAULT:  I know you have.
14            THE COURT:  But go ahead.
15            MR. DEVAULT:  Thank you.
16            THE COURT:  Mr. Albaugh.
17            MR. ALBAUGH:  I'll be brief, Your Honor.
18       As Your Honor mentioned, we are here today to develop a
19    factual record concerning the amount of the claims of the
20    Pension Benefit Guaranty Corporation against News-Journal
21    Corporation and as Your Honor knows, News-Journal sponsored
22    a pension plan that was covered by Title IV of ERISA, and
23    during the course of this receivership proceeding,
24    News-Journal liquidated and that plan was terminated.  PBGC
25    became the statutory trustee of that plan in August of
```

1    2010.  Termination of a pension plan is a big deal.  Among

2    other things when the plan terminates certain claims arise

3    in favor of PBGC against among other entities, the former

4    plans sponsor, News-Journal.  Now, the evidence that PBGC

5    will put on during the course of this evidentiary hearing

6    will prove that the amount of PBGC's claim for the unfunded

7    benefit liabilities is about $13.8 million.

8        Now that liability was calculated in accordance with

9    Title IV of ERISA and with PBGC's regulations.  And to that

10   end, PBGC will present the testimony of Mr. Scott Young.

11   Mr. Young is the chief valuation actuary and he will offer

12   his expert opinion that that claim was calculated in

13   accordance with ERISA and PBGC's regulations thereunder.

14       Cox Enterprises will also present expert testimony,

15   they'll present the expert opinion of Mr. Adam Reese.  Now,

16   Mr. Reese calculated the plans under funding but he did not

17   use the assumptions provided and PBGC's regulations are

18   Title IV of ERISA.  And for that reason, we don't think

19   it's relevant to the issue.  But more importantly, perhaps,

20   Mr. Reese did calculate the liability using the PBGC

21   regulations and ended up with a number that was pretty

22   close as far as benefit liabilities in the $42 million

23   range, I think the difference in liabilities was about

24   $300,000.

25       During the course of the evidentiary hearing, the PBGC

1    will also present testimony about the process by which it

2    calculated the claims that were filed with the receiver and

3    to that end we will present the testimony of Miss Cynthia

4    Travia.  She's a senior actuary at PBGC and she will

5    provide testimony about the normal course of procedures by

6    which PBGC calculates its claims, and confirm that PBGC

7    calculated its claims against News-Journal in that normal

8    practice.

9        And to that end the PBGC will further provide evidence

10   showing that the claims were indeed sufficient and that

11   with respect to PBGC's separate claim for the due and

12   unpaid employer contribution that the amount of that claim

13   is $455,000 and that I think is the amount that was settled

14   back with the receiver in August of 2010.

15       Unless Your Honor has any questions, we're prepared to

16   proceed and we look forward to putting on our case.

17            THE COURT:  Let's hear from Mr. Devault.

18            MR. DEVAULT:  May it please the Court.  John

19   DeVault for the respondent Cox in this proceeding.  As Your

20   Honor's aware this case began about 10 years ago in 2004

21   when Cox, the 47-and-a-half percent minority stockholder in

22   News-Journal Corporation, filed a stockholder derivative

23   suit alleging misuse of funds and waste of corporate assets

24   by the majority owner and the directors and officers.  In

25   order to avoid personal liability, those officers and

1    directors made an election under the applicable Florida

2    statute to acquire the shares of Cox, and when the parties

3    could not agree on the value, the case went to trial in

4    2005 in a non-jury proceeding before Judge Antoon, who

5    found in September of 2006 that there had been a waste of

6    corporate assets and a misapplication of funds, and also

7    found that Cox stock was valued at as of the applicable

8    date at $129 million.

9        The -- because of the equitable nature of the case,

10   Judge Antoon entered certain covenants imposed on the

11   assets to prevent there being dissipated during the appeal

12   to the 11th Circuit.  In December of 2007, the 11th Circuit

13   affirmed in all respect Judge Antoon's findings.

14   Thereafter, there were sanctions and contempt orders

15   entered against the officers and directors.  And in April

16   of 2009 at Cox request the Court appointed a receiver,

17   James Hopson, to marshal the assets of the company and to

18   attempt to sell the operations.

19       In January of 2010 the receiver, Mr. Hopson and Cox,

20   presented a plan to the Court for the sale of the assets to

21   Halifax Media.  Unfortunately, during the six-year period

22   between the institution of the action and the sale, the

23   value of the shares of the operation had declined by about

24   90 percent from 300 million to just over 30 million.  At --

25   when the sale proceeds were brought before the Court, PBGC

1   appeared and took no position.  One of the important

2   factors in the sale that was negotiated by Cox and

3   Mr. Hopson, the receiver, was that Halifax would continue

4   to employ more than 75 percent of the current News-Journal

5   employees.  Most of the other bids had been to outsource

6   the operations and terminate most or all of the employees.

7       Halifax, however, would not undertake control of the

8   pension plan that News-Journal said, as Mr. Albaugh

9   indicated.

10      At a hearing on August 9, 2010, PBGC announced that

11  they had agreed with the receiver to undertake the pension

12  plan and take it on their behalf.  And at that time the --

13  it was -- the Court agreed with the receiver that Cox would

14  be awarded the sale of the assets of NJC.  When PBGC took

15  over the planned assets in August of 2010, the amount of

16  the liquid assets turned over to PBGC by NJC were

17  $28.6 million.  And that was, of course, in addition to the

18  premiums, the insurance premiums, that News-Journal had

19  been paying for over 30 years, which amounted with interest

20  to in excess of $1.2 million.

21      When the funds were eventually awarded from the sale to

22  Cox, it was approximately $33 million or about 20 cents on

23  the dollar for Cox judgment that it obtained and had been

24  affirmed.

25      The Court refused to -- declined to award any amount to

1  PBGC or the Davidsons and while those entities took an

2  appeal, they did not seek a stay of the distribution of

3  assets and the assets were distributed to Cox.  In April of

4  2012, the Court of Appeals reversed the order distribution

5  but held only that the District Court must reevaluate the

6  disposition of assets under the Florida distributor to

7  shareholder statute, which was 607.064018, including its

8  solvency test.

9       Now, as indicated in the pretrial stipulation which the

10  parties have filed, and the limited release attached

11  thereto, the Davidsons have now waived any claims to the

12  assets.

13      Following the remand in June of 2012, Judge Antoon

14  directed the parties to again submit their claims against

15  the assets and that was done by Cox, PBGC and others, and

16  Cox memorandum in advance of that hearing indicated the

17  legal positions that Cox had complied with the distribution

18  to shareholder statute, that they had a first priority

19  position and that if not, certain legal issues needed to be

20  presented, which, of course, Judge Antoon indicated Your

21  Honor would consider at this hearing.

22      Those included the timeliness of the PBGC claim, the

23  amount of the claim, whether they had taken reasonable

24  steps to mitigate the claim, and whether the equities favor

25  PBGC receiving the -- any portion of the claim.

1    And, of course, the relief that is being sought here by

2    PBGC is an equitable relief of an injunction to disgorge

3    the assets which were furnished to Cox.

4    As we understand from Mr. Albaugh's statement and from

5    the pretrial stipulation, PBGC's position is that the

6    district judge has no discretion, that he is bound to

7    accept PBGC's determination of what the unfunded benefits

8    are in its full amount.  Cox as we indicate disagrees.  We

9    believe that the Court can and should decide and take

10   testimony to determine whether PBGC, in fact, fulfilled its

11   regs and procedures, but in addition to that, whether those

12   claims should equitably presented to it.

13   The Court must develop a factual record, which we hope

14   to do today, so that Judge Antoon can consider whether to

15   exercise his equitable rights to distribute -- to

16   redistribute any of the monies previously awarded to Cox to

17   PBGC.

18   Certainly, as a matter of law, the district judge has

19   discretion to discount or eliminate in a federal proceeding

20   a receivership such as this and that is the position that

21   we will take when the matter is transferred back to Judge

22   Antoon following this hearing.

23   As explained by Your Honor's order of June 12, the

24   purely legal issues are reserved for the district court and

25   we're here to present limited factual disputes in order

1    that you can prepare a report and recommendation for the

2    district judge and, if necessary, for the 11th Circuit.

3        At the hearing the Cox as the respondent intends to

4    deduce evidence both from the PBGC witnesses and from Adam

5    Reese, our expert witness, to show, first, that PBGC has

6    not met its burden of demonstrating that it's calculated

7    its claims in a timely manner in accordance with its regs

8    and procedures.  We also intend to produce evidence to show

9    that the district court should exercise his discretion to

10   reject or discount the claims because it is unreliable,

11   overstated, and duplicative.

12       Mr. Reese will testify based on the reasonable value of

13   the benefit liabilities funded from assets from the pension

14   plans of NJC based on actual investments of PBGC's

15   performance, as well as other public and private funds.  He

16   will demonstrate how PBGC misstated the number of eligible

17   participants, the marital status, the benefit commencement

18   age and mortality tables in order to inflate its claim.

19   Finally, he will provide expert testimony of the benefits

20   payable to the eligible NJC plan participants is, in fact,

21   less than the final assets of $28.6 million and thus there

22   is no unfunded liability.

23       Thank you, Your Honor.

24            THE COURT:  All right.  First witness.

25            MR. ALBAUGH:  PBGC calls Cynthia Travia.

1              MR. MEEHAN:  Your Honor, if I may.  Ed Meehan on

2    behalf of Cox.  As a housekeeping matter while the witness

3    is approaching the stand, I'd like to make a motion in

4    limine to restrict and perhaps eliminate her testimony on

5    behalf of the government and here is the reason.  Of its

6    own initiative on January 8 the PBGC filed a prehearing

7    brief, and in footnote 36 it states, "PBGC will offer the

8    testimony of Cynthia Travia about how PBGC prepares claims

9    estimates," and if I follow PBGC's counsel this morning

10   when he described in his opening what Miss Travia would

11   say, he indicated she would testify about the process by

12   which PBGC calculated the claims, she would talk about the

13   normal course of procedures that they used to calculate

14   claims, and she would confirm that the PBGC calculated the

15   claims in this case according to its normal practice.  She

16   is not competent to testify on those topics, Your Honor, as

17   far as they apply to this case.

18        We deposed her in December and in brief she indicated

19   she had just gotten on to the case several weeks prior, so

20   on or about Thanksgiving of 2013.  She indicated under oath

21   that she had nothing whatsoever to do with the preparation

22   of any of the claims.  She indicated that under oath that

23   she had not gone back at that time to try to understand

24   what had been done to prepare those claims.  She is, I

25   believe, competent to talk about PBGC's general procedures

```
 1    for the preparation of claims and filing of claims.  So on

 2    that topic, she could testify that that topic has no

 3    relevance to this case.  We're focused on what the claims

 4    were here, how they were put together.  By her own

 5    admission, she does not have that knowledge, did not have

 6    that knowledge as of December 4th of 2013.  To the extent

 7    she has gained any knowledge from that date, it can only

 8    come from hearsay statements from others at the agency and

 9    they are not present and we do not waive our right to

10    cross-examine them.

11        So on that basis, Your Honor, we would ask you to

12    restrict her testimony and not permit her to explain how

13    PBGC prepared its claims estimates in this case or whether

14    they prepared them in accordance with their normal

15    procedures.

16            THE COURT:  Let her testify and after she's put in

17    whatever her foundation is, you can raise the objection

18    again.

19            MR. MEEHAN:  Thank you, Your Honor.

20                        (WITNESS SWORN)

21                      DIRECT EXAMINATION

22  BY MR. ALBAUGH:

23    Q    Good morning.  Could you please state your name for

24    the record?

25    A    Cynthia Travia.
```

1    Q    And what is your current occupation, Ms. Travia?

2    A    I'm a senior actuary at PBGC.

3    Q    How long have you been employed by the PBGC?

4    A    About 10 years.

5    Q    And what is your current position at PBGC?

6    A    I'm currently a senior actuary in the corporate

7    finance and restructuring department.

8    Q    Can you describe your job duties as senior actuary?

9    A    Yes.  I'm responsible for assigning the actuarial work

10   requests that come in, in our department.  I'm also

11   responsible for doing calculations, the actuarial

12   calculations that are requested in our department, and I

13   supervise employees, three employees in our department as

14   well.

15   Q    Over the course of your career at PBGC, how many cases

16   do you think that you've worked on?

17   A    I have worked on at least 300 cases.

18   Q    Of those 300 cases, how many involved federal

19   receiverships?

20   A    On my particular case as assigned to me, none of those

21   were in receivership.  In my supervisory role of reviewing

22   calculations, I have seen some in receivership.

23   Q    And in your experience, were those receivership cases

24   handled any differently from other PBGC cases?

25   A    No, they were not.

1   Q    You mentioned that you work in the corporate finance

2   and restructuring department, what is that department?

3   A    That's the department that monitors corporate events

4   and transactions to help mitigate the risk to the pension

5   program, and in the event that there are transactions of a

6   company in financial distress, we're the department that

7   will analyze the information and determine whether or not a

8   pension plan needs to terminate, and in the event that the

9   plan does need to be terminated, we're the group that will

10  do the financial analysis of the company to make that

11  decision and also do the actuarial analysis of the pension

12  plan, and we would put together the package of information

13  that's needed to make a recommendation to terminate the plan

14  if that's needed.

15      We're also the department that reviews the ERISA 43

16  reportable events that companies have to report to us when

17  they have certain events that may cause risk.  We also

18  review the ERISA 4010 filings that companies that have

19  certain -- meet certain criteria which is essentially less

20  than 80 percent funded for their plans.  They have to report

21  certain financial and actuarial information on the 4010.  We

22  review those filings.  We also will review and provide our

23  input when we're consulted by IRS on plans that have applied

24  for minimum funding waivers.

25  Q    And do you understand me if I refer to the

 1   abbreviation CFRD that that's the corporate finance and

 2   restructuring department?

 3   A     Yes, I do.

 4   Q     In your experience, what type of work does an actuary

 5   at CFRD perform?

 6   A     We perform any of the actuarial calculations that a

 7   case team would need to analyze a certain event.  So that

 8   can include doing the unfunded benefits liability

 9   calculations, determining the unfunded pension plan, also

10   determining the amount of minimum required contributions

11   that were supposed to be paid to a plan and haven't been

12   paid, which we call the due and unpaid employer

13   contributions.  We also calculate what's called the -- from

14   the Internal Revenue Code 430K a lien arises under the

15   situation where a company has missed more than a million

16   dollars in contributions and we will calculate those lien

17   amounts.  We will do funding projections to determine what

18   the future minimum funding is for a plan to determine

19   whether or not a company that's in distress can afford those

20   future required contributions.  We will calculate the claims

21   when a company files for bankruptcy and the claims need to

22   be filed.  I think that's most of the things we do.

23   Q     Are you familiar with the term "pension information

24   profile"?

25   A     Yes, I am.

1   Q     What is that?

2   A     That is a summary of the results of our calculations

3   when we do an unfunded benefit liability calculation.  So we

4   will calculate the underfunding of the plan, and there's a

5   program that calculates all that we use that's programmed to

6   do all the calculations, and then the PIP is what we call

7   the summary page, kind of like the report that presents the

8   results, the findings of the calculations.

9   Q     And have you ever prepared a PIP?

10  A     Yes, I have.

11  Q     Approximately how many have you prepared?

12  A     I would say at least 600.

13  Q     And have you ever supervised the preparation of a PIP?

14  A     Yes.

15  Q     Approximately how many?

16  A     I would say at least half of those I would be in the

17  role of the person that's reviewing the calculation, and

18  then in addition to when we see a PIP, you will see an

19  actuary that signs it, someone who does it, and then there

20  is a signature for someone who reviews it, and then when a

21  final determination package goes for recommendation there

22  is, essentially, a third review.  So I have also been in

23  that role of the third review when I acted in the -- I'm

24  acting chief negotiating actuary for five months last year,

25  and so I acted in that role of reviewing those, more of

 1  those.

 2  Q      And in your experience, how are pension information

 3  profiles calculated?

 4  A      We request actuarial valuation reports, certain

 5  actuarial information from the plans, actuary and we take

 6  that information that the plan actuary has provided for the

 7  liabilities of the plan, and we make certain adjustments as

 8  necessary to convert the liabilities over to the assumptions

 9  that are required under ERISA 4044 of the regulations.

10  Q      Could you just describe what you mean by adjust or

11  convert the assumptions?

12  A      So obviously when you're calculating benefit

13  liabilities there's lot of assumptions that have to go into

14  it since you happen to be taking benefits later, so many of

15  those assumptions are prescribed in ERISA 4044 and the

16  regulations, and so there's different assumptions that are

17  prescribed in the Internal Revenue Code 430 for purposes of

18  doing the minimum funding calculations.  So the plan

19  actuarial will do an actuarial evaluation report each year

20  using the assumptions under 430, and for our PIP purposes,

21  we take those assumptions that are prescribed in 430 and

22  we're converting it over, making an adjustment based on

23  average age using our ratio of present value factors to

24  determine the -- what the liabilities would be under the

25  4044 assumptions.

1    Q      Does CFRD ever revise a pension information profile?

2    A      Yes, we do.

3    Q      And in what situations, what does CFRD revise?

4    A      So most often the reason we would revise it is because

5    we get new data.  So, for example, we're going to be working

6    off the plan actuary's actuarial evaluation report which

7    they do once a year and to the extent the case continues, we

8    make it a new actuarial evaluation report because the

9    actuary may go into a new year and there may be another

10   report available.  There may be additional contributions

11   made to the plan and change in the assets, any other

12   additional demographic data that could be provided to us

13   would be a reason for us to update our calculations or a

14   change in when the estimated DOPT data plans are

15   internally -- that we would update it.

16   Q     I think you've spoken to this already, but are you

17   familiar with the process that CFRD uses to calculate a

18   pension plan unfunded benefit liabilities?

19   A      Yes, I am.

20   Q      And what is the process that CFRD uses?

21   A      We collect the -- certain actuarial information,

22   liabilities, demographic information, assets that we need

23   from the plan actuary and we put that information again in

24   what's called our UBL spreadsheet and conversions are made

25   to convert the major assumptions and we're making

1    adjustments for the mortality table, the interest rate, the
2    passage of time, and the expected retirement age, and
3    we're -- so we're adjusting those assumptions to determine
4    what would be the benefit liabilities as if the assumptions
5    of 4044 were used.
6    Q    And have you ever calculated a pension plan unfunded
7    benefit liabilities?
8    A    Yes.
9    Q    Approximately how many times?
10   A    Again, that's a -- easily 600 in the course of my
11   career.
12   Q    Have you ever supervised a calculation --
13   A    Yes.
14   Q    -- of a plan unfunded benefit liabilities?
15   A    Yes.
16   Q    Approximately how many times?
17   A    Half of those would be where I was playing in the
18   reviewer role and then additional ones where I was what I
19   call the third supervisor review.
20   Q    And in your experience, how does the CFRD obtain the
21   information that it needs to prepare these calculations?
22   A    We have a standard letter template that we put
23   together that the financial analyst that is on the case team
24   will send out a letter to the sponsor and ask for the
25   specific actuarial items that we have outlined that we would

1    need to do a UBL calculation.  So that letter gets that.  We

2    receive the information that way, and if we have any

3    follow-up questions or need additional data, I will make

4    additional requests after that.

5    Q     And what actuarial assumptions does the CFRD use to

6    prepare these calculations?

7    A     The assumptions outlined in ERISA 4044.

8    Q     Are you aware of any situation, in your experience,

9    where CFRD used actuarial assumptions that were different

10   from those?

11   A     No.

12   Q     In your experience, what type of participant data does

13   CFRD use to calculate the unfunded benefit liabilities?

14   A     The data we need is separated in the -- in the

15   actuarial evaluation report we get much of this information,

16   a breakdown of the liabilities by status: active,

17   terminated, vested, and retirees.  The assets, some

18   demographic data, some information about the total benefits

19   for the terminated, vested, and the retirees, I think that's

20   it.

21   Q     And in your experience, does CFRD ever use individual

22   planned participant data in these calculations?

23   A     In -- for the really small cases, if there's only a

24   few participants, and the actuarial valuation report may not

25   have been done for several years, you know, the last time a

1  report was done may have been several years ago, if we have

2  the individual participants and it's a small case, then we

3  will calculate benefits using that individual data.

4  Q    How about in the non-small case cases?

5  A    It's very rare that we will do participant by

6  participant calculations in any large case.  It's very

7  costly and very -- it takes a lot of time.  We don't usually

8  have the time to be able to do -- to either get that

9  information and/or do the calculations.

10  Q    And in your experience, what is the effect of using

11  aggregate participant data as opposed to individual

12  participant data for these calculations?

13  A    We have refined our UBL spreadsheet program so that we

14  are very comfortable that it does a very good job in most

15  cases for estimating the UBL, and when we ultimately compare

16  the results that we get and our UBL spreadsheet to the

17  results that are actually finalized when the calculations

18  are done, participant by participant, that we usually are

19  within a five percent range of being very close to those

20  numbers.

21  Q    And how do you check this range?

22  A    We -- we're looking at the benefit liability that's

23  shown on the PIP compared to the actual benefit liability

24  that ultimately gets calculated in another department.

25  Q    In your experience, how does CFRD account for any

```
 1  statutory premium payments in its calculation of a plan
 2  unfunded benefit liabilities?
 3   A    There's no connection or relation to premiums to --
 4  unfunded benefit liabilities are simply the benefit
 5  liabilities payable to the participants minus the assets in
 6  the plan, so, no connection or relation that we notice at
 7  all.
 8   Q    Do you know whether CFRD prepared a calculation of the
 9  unfunded benefit liabilities of the News-Journal pension
10  plan?
11   A    Yes.
12         MR. ALBAUGH:  Your Honor, may I approach the
13  witness?
14         THE COURT:  For what purpose?
15         MR. ALBAUGH:  I'd like to show her an exhibit.
16         THE COURT:  I prefer using the document camera,
17  but I'll note that notebook is two inches thick.  But okay.
18  How are you planning to use the exhibit with the witness?
19         MR. ALBAUGH:  Your Honor, I'd like to show
20  Miss Travia the calculations that PBGC -- CFRD prepared for
21  the News-Journal pension plan and ask her some questions
22  about that.
23         THE COURT:  All right.  How many pages is she
24  going to be needing to look at?
25         MR. ALBAUGH:  It's three exhibits total, I think,
```

```
 1   they are each approximately 20 pages.  They're excerpts of

 2   spreadsheets.

 3            THE COURT:  Well, I assumed that.  The advantage

 4   of the equipment is you don't need to move back and forth,

 5   she doesn't need to flip through, and everybody can see the

 6   same thing at the same time.  I'll be governed by your

 7   knowledge of what you want to show her.  If you think she

 8   needs to put her fingers on the paper, go ahead and

 9   approach.  But if you think you can do it by displaying it

10   on the exhibit cameras so everybody can see what she's

11   looking at.

12            MR. ALBAUGH:  I think that would be okay.  I

13   don't -- I don't have a separate disk with our --

14            THE COURT:  Just use the camera.

15   BY MR. ALBAUGH:

16   Q    I want to show you what's been marked as PBGC's

17   Exhibit No. 26.  It's a multi-page document.  And I'll

18   briefly... and while I'm showing it to you, Miss Travia,

19   have you seen this document before?

20   A    Yes, I have.

21   Q    What is it?  Approximately how many times have you

22   seen this document?

23   A    I reviewed it five or six times.

24   Q    And what is this document?

25   A    It is the UBL calculation of the News-Journal pension
```

1    plan.

2    Q    And I'd like to refer you back to the first page of

3    the document.  Could you explain what this is?

4    A    So this is the PIP I mentioned.  That's the -- we have

5    the two summary pages of the UBL calculation.  Behind the

6    first two pages is the rest of the UBL spreadsheet.  So this

7    is your summary that shows you the results of the

8    calculations that shows you the total liabilities and the

9    total unfunded liabilities, as well as the summary of

10   participants and the DUEC.

11   Q    And if looking at this first page, if I was looking

12   for the unfunded benefit liabilities, is that on this?

13   A    Yeah, we label UBL.  You will see in the middle of the

14   page estimated unfunded benefit liability.  And then down

15   below that in bold UBL is the 15.1 million.

16   Q    And if I could direct your attention to the third page

17   of the document.  Do you know what this -- this material,

18   this page and what follows?

19   A    Yes.  That starts the details of the UBL spreadsheet

20   that has all the details of the calculations.

21   Q    And from your review of this document, can you tell us

22   whether PBGC's -- the CFRD followed its normal procedures in

23   calculating the unfunded benefit liabilities?

24   A    Yes, we did.

25              MR. MEEHAN:  Your Honor, I suppose we could get

1    into this later, but there is no foundation here, and she's

2    now testifying as an expert.  She was put forth as a fact

3    witness.  She's giving opinion testimony based upon no

4    foundation.

5             THE COURT:  Overruled.  Go ahead.

6             THE WITNESS:  This is -- yes, this was done how we

7    do the UBL spreadsheets.  I have reviewed many UBL

8    spreadsheets and this does follow our process.

9    BY MR. ALBAUGH:

10   Q    And do you have any reason to believe from your review

11   that the normal process was not followed in this

12   calculation?

13   A    No.

14   Q    That's all for now with this exhibit.

15        Miss Travia, are you familiar with a process that PBGC

16   uses to calculate the amount of unpaid minimum funding

17   contributions?

18   A    Yes.

19   Q    What are unpaid minimum funding contributions?

20   A    So a pension plan is required to make annual

21   contributions and in some cases quarterly contributions to a

22   pension plan which is required under Internal Revenue Code

23   430, and so those -- the calculation of the unpaid is just

24   exactly as it sounds.  These are particular amounts of the

25   contributions were required under the law and then whatever

```
 1  was not actually paid is the unpaid amount of this.

 2  Q     Are you familiar with the term "due and unpaid

 3  contributions"?

 4  A     Yes.

 5  Q     What's the difference between due and unpaid

 6  contributions and missed minimum funding contributions?

 7  A     We use those interchangeably.  I mean, if you missed

 8  a contribution then it was unpaid.

 9  Q     And in your experience, what is the process that CFRD

10  uses to calculate the due and unpaid employer contributions?

11  A     We use the -- again, the plan actuarial valuation

12  report where they have calculated the amount of the

13  contributions due for the year, and in our case we're simply

14  just typically adjusting that for a partial plan year.  So

15  the actuarial will calculate it as the plan term for a full

16  plan year.  If the plan terminates before the full year has

17  ended, then we need to adjust it for a partial plan year.

18  Q     And in your experience, where does CFRD obtain the

19  information that it needs to prepare such calculations?

20  A     We're getting from the plan sponsor the actuarial

21  evaluation report to do those calculations.

22  Q     Have you ever calculated a due and unpaid employer

23  contribution claim?

24  A     Yes, I have.

25  Q     About how many times?
```

```
 1   A     I'd say approximately 100 times.

 2   Q     Have you ever supervised a calculation of such a

 3   claim?

 4   A     Yes.  The same explanation I gave about the UBL

 5   probably about half the time I -- we have, you know, the

 6   role of someone who enters the information in the

 7   spreadsheets as well as the reviewer who reviews it.  So I

 8   would say half the time I was, you know, the second person

 9   signing, and then as well in my supervisory role I may be a

10   third level of review on other cases.

11   Q     In your experience, what actuarial assumptions does

12   CFRD use to calculate the due and unpaid employer

13   contribution claim?

14   A     The assumptions are just basically coming from the

15   plan actuary and what is prescribed in 430.

16   Q     And when you say 430, what are you --

17   A     Internal Revenue Code that explains how -- what are

18   the -- how was the way you're supposed to calculate the

19   minimum required funding contributions for a pension plan.

20   Q     In your experience, will PBGC's recovery on its due

21   and unpaid employer contribution claim affect the

22   calculation of unfunded benefit liabilities?

23   A     Um, if -- I'm not sure.  Will it affect it?  There's a

24   claim for the amount -- we calculate the due and unpaid

25   contributions as an amount that the plan has missed, and
```

1  then is separate from the amount of the underfunding, which

2  is the UBL of the plan.

3           THE COURT:  Is it duplicative, though?

4           THE WITNESS:  It's not duplicative in terms of the

5  amounts, but if part of the DUEC is paid, so if --

6           THE COURT:  That's what I mean.  If you collect

7  both of them.

8           THE WITNESS:  If you actually paid the full missed

9  contributions, then the DUEC now becomes zero because your

10  missed contributions are zero, and then you would calculate

11  your UBL and when you calculate your UBL in your assets,

12  you would have those contributions.

13          THE COURT:  Right.  So it would help make up the

14  short fall?

15          THE WITNESS:  I think to the extent those

16  contributions are paid, yes.

17          THE COURT:  Paid?

18          THE WITNESS:  Right.

19          MR. ALBAUGH:  Thanks, Your Honor.  I think you put

20  it better than I was going to.

21  BY MR. ALBAUGH:

22  Q   Miss Travia, I want to show you what's been marked as

23  PBGC Exhibit 29.  And I'll just briefly -- have you seen

24  this document before?

25  A   Yes, I have.

1    Q    And what is this document?

2    A    This is our -- what we call our DUEC spreadsheets.

3   That does the calculations of the due unpaid employer

4   contributions.

5    Q    About how many times have you seen this document?

6    A    Probably five or six times as well.

7    Q    I'd like to zoom in a little bit on the second page.

8   Can you tell us when this document was prepared?

9    A    March 26, 2010.

10   Q    And if I wanted to find out the amount of the due and

11  unpaid employer contribution claim as reflected in this

12  calculation, where would I look?

13   A    Towards the back.  Keep going.  Keep going.  It's

14  zoomed in so, zoom out a little bit.  Yeah.  There we go.

15  Down three-fourths of the way down the page, calculation of

16  DUEC in bold.  It shows the DUEC 650,142.

17   Q    Let me just, okay.  Thank you.

18       And from your review of this document, do you know

19  whether PBGC followed its normal procedures for preparing

20  this calculation?

21   A    Yes.

22   Q    And from your review of the documents, did you see

23  anything which would cause you to believe that the normal

24  procedures were not followed?

25   A    The normal procedures were followed for that

```
 1  calculation.
 2  Q    If I could briefly show you another document that's
 3  been marked as PBGC Exhibit 40.  Zoom out.  Just briefly go
 4  through this document.  Miss Travia, have you seen this
 5  document before?
 6  A    Yes.
 7  Q    Maybe for your benefit, I will --
 8  A    First page.
 9  Q    -- zoom in on the second page.
10  A    This is an updated DUEC.
11  Q    And about how many times have you seen this document?
12  A    About five or six times.
13  Q    And do you know when this document was calculated?
14  A    July 27, 2010.
15  Q    And again, if I wanted to see where the due and unpaid
16  employer calculations is contained, where would I go?
17  A    Back to the back again.
18  Q    And I will --
19  A    There, it's 405,530, so this one was updated later
20  because there were additional contributions made to the plan
21  since the earlier one.
22  Q    And from your review of this document, PBGC Exhibit
23  40, can you tell us whether CFRD followed its normal
24  procedures?
25  A    Yes.
```

1    Q    And have you seen anything in your review that would

2    cause you to believe that those normal procedures were not

3    followed?

4    A    No.

5         MR. ALBAUGH:  I have no further questions at this

6    time.

7         THE COURT:  Cross-examination?

8                   CROSS-EXAMINATION

9    BY MR. MEEHAN:

10   Q    Good morning, Miss Travia.

11   A    Good morning.

12   Q    Ed Meehan.  Let's begin where you ended, PBGC Exhibit

13   40.  And I can put a page back up on the monitor for you,

14   it's marked PBGC NJC002992.  I do have the right one.  Okay.

15   Can you see that?

16   A    Yes.

17   Q    Okay.  Up towards the top of the page, do you see

18   where it says date of bankruptcy or receivership filing?

19   A    Yes.

20   Q    And do you see that it's marked bankruptcy?

21   A    Yes.

22   Q    Is it part of PBGC's normal procedure to misidentify

23   receiverships as bankruptcies?

24   A    It's not that particular field may not necessarily

25   need to be populated, but yes, it should have been checked

 1  receivership.

 2  Q    And you didn't notice that the five or six times you

 3  looked at it, right?

 4  A    I did not.

 5  Q    Okay.  Now, if I could show you the same thing with

 6  Exhibit 29.  And you will see the same thing happened.

 7  A    Yeah.

 8  Q    You didn't notice that either, right?

 9  A    No.  Because the calculations are the same no matter

10  if it's a bankruptcy or a receivership; it doesn't change

11  the calculations.  It doesn't change any of the numbers.

12  And I was focused on the numbers.

13  Q    Okay.  When you say you were focused on the numbers,

14  you didn't redo the calculations yourself, did you?

15  A    I did not redo them.

16  Q    Okay.  And, in fact, you had nothing to do with this

17  case whatsoever until sometime in November of 2013, correct?

18  A    That's correct.

19  Q    So you didn't perform any of the calculations on any

20  of the claims PBGC submitted in this case, right?

21  A    I did not do the calculations.

22  Q    And you didn't supervise any of those calculations,

23  right?

24  A    I did not supervise them.

25  Q    And you are aware that there were some negotiations

1    with the receiver here, correct?

2    A    Yes.

3    Q    And you had no role whatsoever in those negotiations,

4    correct?

5    A    That's correct.

6    Q    You were shown Exhibit PBGC 26 and you explained what

7    that was.  So that document was available at the time PBGC

8    filed its initial claims in this case, correct?

9    A    Are you talking about the --

10   Q    The PIP.

11   A    The PIP.  Yes.

12   Q    But it was not filed in this case at any time, was it?

13   A    I'm not familiar with that whether it was unattached.

14   It appeared.

15   Q    As part of the PBGC's normal process, these PIPs are

16   prepared, right?

17   A    Yes.

18   Q    And they are considered by PBGC supporting

19   documentation for the calculations of the UBL, right?

20   A    Yes.

21   Q    Okay.  So the Exhibit 26 and any other PIPs supporting

22   the claims here were available in PBGC's files and were not

23   created for your testimony here today, were they?

24   A    They were available, yes, at the time the calculations

25   were done.

1   Q   Okay.  You are a senior actuary at PBGC, right?

2   A   Yes.

3   Q   Okay.  But just because someone is called an actuary

4   at PBGC does not mean that they are certified as an actuary

5   according to the standards of the actuarial profession,

6   correct?

7   A   Correct.

8   Q   The five percent variance that you talked about in

9   terms of the calculation, that five percent variance that

10  you target to achieve concerns the unfunded benefit

11  liability number itself, right?

12  A   Concerns the benefit liability, not the unfunded.

13  Q   The benefit liability, thank you.  So it is not that

14  you are attempting to end up within five percent of the

15  ultimate claim amount, your focus is on the benefit

16  liability, the top number in the calculation, right?

17  A   Right.  To the extent there's a dispute in the assets,

18  we would get new assets.  That's the only other impact after

19  the benefit liabilities are done.

20  Q   You were asked questions about PBGC's recovery on its

21  claims.  Isn't it correct that PBGC typically recovers

22  pennies on the dollar for the claims that it files?

23  A   That's not my area, but I've heard that, yes.

24  Q   So you don't dispute that?

25  A   Right.

1  Q    Let me, if I can -- this document is not marked as an

2  exhibit, but it's the 2003 trial brief of the Pension

3  Benefit Guaranty Corporation that was filed on January 8th

4  of this year, and I'd like if I can put up on the screen

5  here, page 10 and page 11, and I'm going to read a

6  particular sentence and then see if I can ask you a question

7  or two.

8      Okay.  I'm putting up page 10, and as you can see

9  there's some highlighting.  That's my highlighting.  You see

10 the portion that's highlighted, ma'am?

11 A    Yes.

12 Q    Okay.  So I'll read it:  "PBGC's regulation seeks to

13 replicate the price that an employer would pay to close,"

14 next page, this is page 11, highlighting again, "out a

15 pension plan in a standard termination through the purchase

16 of annuities thereby ensuring that pension termination

17 liability will be measured in a fair, objective, and

18 consistent manner."  Okay.  Do you see what I have read?

19 A    Yes.

20 Q    Okay.  Do you agree with that statement, ma'am?

21 A    Yes.

22 Q    Okay.  Can you just explain briefly how PBGC attempts

23 to replicate the pricing for the purchase of annuities?

24 A    That's not my area.  It's not my department.  That

25 calculates that calculation.

1    Q    Well, you are familiar in general with how it's done,

2    are you not?

3    A    Yes.  In general, I know we receive surveys.

4    Q    Go ahead.

5    A    And from the surveys there are a set of calculations

6    done to determine what would be the PBGC rates to replicate

7    the results from the surveys.

8    Q    And the survey you're talking about is the survey that

9    is not conducted by PBGC itself, correct?

10   A    I'm not familiar with -- I'm pretty sure the PBGC does

11   not -- it's done for PBGC.  I don't know the specifics.

12   It's not my area.

13   Q    Well, you know it's done by an organization called the

14   American Council of Life Insurance, right?

15   A    Right.

16   Q    Isn't it correct that PBGC simply asks members of the

17   ACLI to fill out a form.  Right?

18   A    I have not seen copies of the survey.

19   Q    Well --

20   A    But that sounds reasonable.

21   Q    Okay.  And if I have to I can remind you of your

22   deposition, but you are aware that PBGC simply gets pricing

23   information from whoever chooses to participate and fill out

24   this form and that's how PBGC does what PBGC's brief calls

25   calculate the liability in a fair, objective and consistent

1   manner, right?

2    A     Yes.

3    Q     And you do know that you simply get a price and you

4   have no way of what you called looking behind it.  Right?

5    A     Um, I -- that's only what I've heard.  I don't -- I

6   can't say with certainty because I haven't seen those, but

7   yes, that's what I have heard.

8    Q     Okay.  So as far as you understand it, PBGC has no way

9   to determine whether the pricing information it is given is

10  accurate, right?

11   A     We have no reason to believe it's not accurate.

12   Q     And you have no way to know whether it is, right?

13   A     I guess, yeah.

14   Q     You are simply assuming that, correct?

15   A     Correct.

16   Q     And you don't test it, right?

17   A     I can't speak to what testing is done and what the

18  calculations are done because that's done in another

19  department.

20   Q     And you don't know if any testing was done, do you?

21   A     I wouldn't know because it's not in my department.

22   Q     Just a moment.

23         PBGC was aware of the risk of planned termination in

24  this case at least as early as 2009 by the filings of the

25  reportable events that you mentioned, right?

1    A    Correct.

2    Q    Just one moment, Your Honor.  Obviously, it's double

3    checking notes here.

4         It's highly unusual in your experience for PBGC to be

5    trying in an actual trial determining the amount of its

6    claims, isn't that correct?

7    A    I don't know.

8    Q    This is the only time in your knowledge it's ever

9    occurred, right?

10   A    My knowledge, yes.

11   Q    And that's so even though PBGC terminates or is

12   involved with terminated plans roughly 130 times a year on

13   average, right?

14   A    That's about how many we terminate per year.

15   Q    And so in your 10 years that's about 1300 times,

16   right?

17   A    Right.

18              MR. MEEHAN:  Your Honor, may I have just a moment.

19              THE COURT:  All right.

20              MR. MEEHAN:  Your Honor, I don't have any other

21   questions at this point.  Thank you.

22              THE COURT:  Let me ask a couple things just to --

23   some of what I hope are obvious, but just to make sure I'm

24   thinking clearly.

25        The -- calculating the unfunded benefit liability, the

1    main drivers of that are the number of participants, their

2    benefit levels as defined in the plan, their ages and

3    gender and some estimates as to the market interest rates?

4           THE WITNESS:  Yes.

5           THE COURT:  And then once you have made all -- are

6    there other big assumptions?  Is that the main things you

7    rely on?

8           THE WITNESS:  Right.  The big assumption is

9    obviously the interest rate.

10          THE COURT:  But you don't look at the health of

11    the individual members or, you know, whether they're in the

12    industry that people retire at 52 versus 82?

13          THE WITNESS:  No.  We're following the regulations

14    on the assumption regarding expected retirement age and

15    those are tables.

16          THE COURT:  Once you have made -- can I assume the

17    interest rate assumption changes over time as the economy

18    changes?

19          THE WITNESS:  Yes.

20          THE COURT:  And in part that's reflected in this

21    survey that you do for the cost of annuities?

22          THE WITNESS:  Correct.

23          THE COURT:  And once you got all these numbers,

24    most of which come from the planned provider or a fiduciary

25    or the actuary that's responsible for doing the day-to-day

```
 1   work, is it fair to say that you plug that into your
 2   spreadsheets and it's almost cookbook at that point?
 3          THE WITNESS:  Yes.  I think that's fair.
 4          THE COURT:  Is there anything about the
 5   calculations that you have testified about on the exhibits
 6   that was different in this case from what you do in your
 7   every day work?
 8          THE WITNESS:  No.
 9          THE COURT:  Any redirect?
10          MR. ALBAUGH:  I'll be brief.
11                     REDIRECT EXAMINATION
12   BY MR. ALBAUGH:
13   Q    Ms. Travia, are you involved in the preparation of the
14   ACLI annuity price survey?
15   A    No.
16   Q    Do you have any involvement in the preparation of the
17   interest rates that are in PBGC's regulations?
18   A    No.
19   Q    With respect to comparing -- let me rephrase.
20        Why would CFRD focus on benefit liabilities amount in
21   comparing its calculations with the final calculations?
22   A    Because the calculations that we're doing in the UBL
23   spreadsheets for the PIP is basically the programming part
24   of it that requires us to determine the -- you know, the
25   liability, the ages, and those things are -- that's the guts
```

1  of the calculation is doing the liability, and then we're

2  usually just taking market value of asset number off an

3  asset statement that's then provided to us.  So that's not

4  really technically a calculation that we're doing to check

5  the calculation because we're using the number that's

6  provided.  Sometimes it it's very small we might have to

7  project it to the middle of the month.  If we have an asset

8  statement from the end of the last month, we might project

9  it a little ways, but we're looking to see that our

10  programming is correct, so the liabilities are correct, and

11  then to the extent there's any dispute on the assets, we ask

12  them to provide a new asset statement so we can get the

13  actual amount of the UBL.

14  Q    Miss Travia, are you involved in the filing of PBGC's

15  claims in bankruptcy or other cases?

16  A    Not in the filing, no, only in the calculation.

17  Q    Do you have any knowledge about what PBGC typically

18  files in bankruptcy cases?

19  A    I do not know what papers they're filing, those forms

20  or the attachments.

21  Q    And are you involved in addressing PBGC's recovery on

22  its claims for terminated pension plans?

23  A    No.

24  Q    One last question.  Do you have any certifications as

25  an actuary?

1   A    I do.  I am an associate of the Society of Actuaries,

2   which I finished the series of exams for that in 2001, and

3   then I took the -- enrolled actuary exams and became an

4   enrolled actuary as well in 2004.

5           MR. ALBAUGH:  I have no further questions.

6           MR. MEEHAN:  Just a couple.

7           THE COURT:  All right.

8                    RECROSS EXAMINATION

9   BY MR. MEEHAN:

10  Q    Ma'am, have you ever calculated a PBGC claim where

11  like in this case the PBGC is seeking the equitable remedy

12  of disgorgement funds from another creditor?

13          MR. ALBAUGH:  I object to the extent that calls

14  for a legal conclusion.

15          THE COURT:  She can answer whether she's ever done

16  it.

17          THE WITNESS:  I'm not sure I understand the

18  question.

19  BY MR. MEEHAN:

20  Q    Have you ever calculated a claim where PBGC was trying

21  to get money back from another creditor in connection with a

22  termination?

23  A    I'm not sure I would know that because basically we

24  get an actuarial request that says calculate a UBL or

25  calculate a DUEC or calculate a lien, which I'm not always

1   given the information as to why or in what scenario they're

2   asking me to calculate it in.  I just know that I have been

3   asked -- you know, it's the same calculation, so...

4   Q    Okay.  Now, you were asked some questions by His Honor

5   that went to this notion that you basically plugged the

6   numbers in and it's almost sort of a cookie cutter notion

7   and you gave your answers about that.

8        Isn't it correct that PBGC's processes for calculating

9   liabilities and plan assets and getting to these claim

10  amounts has been criticized by outside auditors for the last

11  several years?

12  A    I'm not aware of what criticism.

13  Q    I can show you, let's look at Cox Exhibit 26.  And

14  I'll put up a page -- we're going to page 2029 and go over

15  to page 2030.  What is BAPD, ma'am?

16  A    Oh, that's the benefits administration and processing

17  department.

18  Q    Okay.  What's their role?

19  A    So they are the ones that actually calculate the

20  individual participant-by-participant calculation after the

21  plan is terminated.

22  Q    Okay.  Now, this is Cox Exhibit 26, which is the

23  PBGC's annual report for 2012, and PBGC follows a process

24  before it's published -- it publishes its annual reports to

25  be sure that they're true and correct, right?

1   A     Yes.

2   Q     And so if it's in here we can take confidence that

3   PBGC believes it to be true, right?

4   A     Yes.

5   Q     Okay.  So I'm going to show you on page -- it's marked

6   Cox 2029.  I guess it's the typed page 98.  And there's a

7   section here on internal controls, carries over to the next

8   page, and it's a long section but just to pick out a bit of

9   it, towards the middle, I'm going to point to it here, BAPD

10  continues that series of control of weaknesses throughout

11  the department, and it goes on to talk about issues with the

12  processes, calculating and valuing participant benefits in

13  the related liabilities, as well as plan assets.  You see

14  that reference, ma'am.

15  A     Yes.

16  Q     Okay.  So if that was in the 2012 annual report from

17  PBGC we can trust that that was correct, can we not?

18          MR. ALBAUGH:  I'm going to object to the

19   foundation for this line of questioning.

20          THE COURT:  Sustained.

21  BY MR. MEEHAN:

22  Q     All right.  Well, I'll try to finish it with just

23  this.  It is correct that these criticisms remain a part of

24  the PBGC annual report for 2013, do they not?

25          MR. ALBAUGH:  Same objection.

1              THE COURT:  Sustained.

2      BY MR. MEEHAN:

3      Q     Okay.  Have you, ma'am, considered whether these

4      criticisms affect your view that the calculation of the

5      liabilities is simply a cookie cutter process once you have

6      the underlying data?

7              MR. ALBAUGH:  Same objection.

8              THE COURT:  Overruled.  Go ahead and answer.

9              THE WITNESS:  In terms of the spreadsheets we use

10     to do the UBL, we have it programmed where there is some

11     set of input, you have to do an input correctly for the

12     program to do the various calculations and there's a

13     method -- that's the ratio of present value factors that I

14     mentioned that's kind of a, what I would sort of say that's

15     sort of the meat and guts of it is your ratioing present

16     value factors for that.  So I would not say that the same

17     answer that if you're doing an individual person by person

18     and using their entire employment history for purposes of

19     calculating their benefits that that's necessarily cookie

20     cutter, if that was your question.

21     BY MR. MEEHAN:

22     Q     And what is a seriatim evaluation?

23     A     When you look at the participant, each participant

24     individually and their entire history to calculate their

25     benefit and doing the individualized calculations, which is

1    what is not done until after the plan terminates.  What

2    we're doing is the whole -- we're taking the whole plan

3    actuary's liability coming up with the weighted age and some

4    present value factors to adjust some of the assumptions.

5    They're two different processes.

6    Q    Sorry.  So the claims that were filed were estimates,

7    but the claim that's at issue now in front of the Court is

8    the seriatim valuation, isn't that correct?

9    A    That's my understanding.

10   Q    Okay.  Thank you.

11              MR. MEEHAN:  No other questions, Your Honor.

12              THE COURT:  All right.  Let's take a short recess

13   for the morning.  For counsel's benefit, I'm -- I have a

14   meeting at noon, so we will break just before 12:00 for

15   lunch to 1:15 and reconvene.

16       What are your estimates as to how long we're going to

17   need to run tomorrow?

18              MR. ALBAUGH:  I would expect the direct for PBGC's

19   other witness to run about the same amount of time.  And --

20              THE COURT:  How about your case, Mr. Devault?

21              MR. DEVAULT:  I would say on Mr. Young, I would

22   guess the cross would be 30, 45 minutes.

23              THE COURT:  And how about your case?

24              MR. MEEHAN:  And then our presentation, I would

25   think from Mr. Reese, maybe about an hour on direct.

```
 1            THE COURT:  So we might finish today?  I have got
 2   tomorrow scheduled so it's not a problem, but Thursday is a
 3   problem, so I just trying to --
 4            MR. MEEHAN:  Well --
 5            THE COURT:  I don't want to curtail you.
 6            MR. MEEHAN:  Right.  It may be ambitious to finish
 7   today, but I would think we could make pretty substantial
 8   progress.
 9            THE COURT:  All right.  That's fine.
10      The powers that be have asked that we stop at 5:00, so
11   I will do that.  Don't get me started on some of the
12   factors that contribute to that.  It's much more Byzantine
13   than the issues that we're dealing with here.  It's
14   intricate as these may be.
15      We will take 10 minutes.
16                          (Recess)
17            THE COURT:  Next witness.
18            MR. ALBAUGH:  Your Honor, the PBGC calls Scott
19   Young.
20            THE WITNESS:  Yes.
21                      (WITNESS SWORN)
22                    DIRECT EXAMINATION
23   BY MR. ALBAUGH:
24   Q    Sir, please state your name for the record.
25   A    Scott Young.
```

```
 1   Q     And Mr. Young, what is your current occupation?
 2   A     I'm the chief evaluation actuary at the PBGC.
 3   Q     How long have you been the chief evaluation actuary?
 4   A     I have been the chief valuation actuary since April of
 5   2013.
 6   Q     And do you supervise any employees of PBGC?
 7   A     I supervise a staff of 10 actuaries.
 8   Q     Did you have any positions at PBGC prior to becoming
 9   the chief valuation actuary?
10   A     Yes.
11   Q     And what was that position?
12   A     I started at PBGC in August of 2010 as an actuary in
13   the actuarial services division of the benefits
14   administration and payment department.  I was an actuary
15   working on the liability for PBGC financial reporting
16   purposes.
17   Q     And what did that entail?
18   A     My role in that process was to track the inventory of
19   new plan terminations and add them to the calculation of
20   PBGC's liability for financial reporting.
21   Q     And today as the chief valuation actuary, what are
22   your job duties?
23   A     My job duties are twofold.  The first major
24   responsibility that I have is to direct the preparation of
25   PBGC's financial statement liability and the second major
```

```
 1  responsibility is to provide actuarial support and guidance
 2  to the actuaries in the benefits administration and payment
 3  department as they process cases.
 4  Q     Could you describe your employment before coming to
 5  PBGC?
 6  A     Yes.  In -- I was hired in 1993 by a small firm in
 7  Lancaster, Pennsylvania, called Markley Actuarial Services.
 8  I, essentially, started my career as an actuary there.  And
 9  for the period 1993 through approximately 2002 I performed
10  actuarial valuations under the direction of one of the
11  partners of that firm who was an actuary, and then for the
12  period from approximately 2002 through 2005 I, again,
13  performed actuarial valuations, and in addition, took on
14  increasing roles of responsibility with respect to
15  communicating and managing clients, and worked independently
16  with the oversight of the partner that was an actuary.  And
17  then in 2005 I became an enrolled actuary and was able to
18  certify pension liabilities for the pension plan valuations
19  for which I was responsible.  In 2006 I became a staff
20  manager for the actuarial side of Markley Actuarial, so the
21  actuarial staff reported to me.  And then in 2008 I became
22  manager of the entire staff of Markley Actuarial -- at least
23  the staff that's reported that -- had client-management
24  responsibilities.
25  Q     In your time at Markley, did you perform any services
```

1    concerning defined benefit pension plans?

2    A    Yes.  For the entire 17 years that I was there, I was

3    responsible for valuing pension plans that were covered

4    under Title IV of ERISA.

5    Q    And what kind of services did you provide for those

6    plans?

7    A    Those services included calculating minimum funding

8    requirements, consulting with clients on funding

9    requirements, performing actuarial valuations for both

10   funding and accounting purposes.  I also was involved with

11   several standard terminations of plans.  In addition, I

12   performed benefit calculations for individual participants.

13   I was involved with drafting planned documents, drafting,

14   planned amendments.

15   Q    As an actuary, do you have any professional

16   accreditations?

17   A    I do.  I became an enrolled actuary in 2005, and then

18   in 2007 I became an associate of the Society of Actuaries,

19   and then in 2011 I became a fellow of the Society Of

20   actuaries.

21   Q    So to break those down, what was required in order to

22   become an enrolled actuary?

23   A    An enrolled actuary is an actuary who has met the

24   requirements of the joint board for the enrollment actuaries

25   in order to practice the pension plan and in order to

1   pension plan matters before the IRS, that involves two

2   components.  There is a series of exams related to basic

3   actuarial mathematics and then pension actuarial

4   mathematics.  In addition to the exam requirements, there

5   are -- there is an experience requirement of 36 months -- at

6   least 36 months of responsible pension actuarial experience.

7   Q     And you also mentioned that you have become a fellow

8   of the Society of Actuary.  What did that entail?

9   A     Becoming a fellow of the Society of Actuaries involves

10  completing a series of examinations related to actuarial

11  practice and actuarial principals.  There, the examination

12  series has changed significantly over time.  But in general,

13  there is a series of preliminary examinations that are

14  focused on the fundamentals of actuarial practice, including

15  actuarial mathematics, and then the later exams encompassed

16  more practice areas, specific topics such as a pension plan

17  topics.

18  Q     Do you have any focused area as a fellow in the

19  Society of Actuaries?

20  A     Yes.  The Society of Actuaries has practice areas and

21  in fact, when completing the fellowship exams, actuaries do

22  choose among one of several practice areas under which to

23  complete those examination requirements, and I completed my

24  requirements under the pension practice area.

25           MR. ALBAUGH:  Your Honor, PBGC tenders Mr. Young

```
 1   as an expert witness in the field of actuarial science.

 2            MR. MEEHAN:  Your Honor, may I ask a few questions

 3   on voir dire?

 4            THE COURT:  All right.

 5                      VOIR DIRE EXAMINATION

 6   BY MR. MEEHAN:

 7   Q    Hello, Mr. Young.

 8   A    Hi.

 9   Q    Sir, I want to show you briefly, it's joint Exhibit

10   No. 3.  This is the actuarial case memo for this case and

11   let me -- I'll put it up on this projector.  Just putting up

12   the first page.  It's stamped 5307.  And you will see I have

13   got a number highlighted $42,479,118.  Do you see that?

14   A    Yes.

15   Q    Okay.  So just preliminaries.  The actuarial case

16   memo, that's the document that sets forth, in essence, a

17   summary of the calculation of the liabilities here, right?

18   A    Right.

19   Q    And this number I have highlighted, if we were to turn

20   to PBGC Exhibit 1, that's your expert report, and let me put

21   that up in a second.  Page No. 2, it's stamped 8723.  Okay.

22   Now, again, I highlighted it.  Is the same number from your

23   expert report.  Right?

24   A    Correct.

25   Q    Okay.  Now, sir, before you signed off on that number,
```

1   you did absolutely no work to check it, correct?

2    A    I did not sign off on that number when the actuarial

3   case report was prepared.

4    Q    Well, let me be clear about signing off.  Before you

5   adopted that number in your expert report you did no work to

6   check it, right?

7    A    I relied on the work of Milliman, the actuary at

8   Milliman.

9    Q    Milliman's an outside contractor retained by PBGC,

10   right?

11   A    Right.

12   Q    Okay.  There is an enrolled actuary -- well, I'm

13   sorry.  There's a person named Althea Schwartz who works for

14   Milliman, right?

15   A    Correct.

16   Q    She purportedly is an enrolled actuary, right?

17   A    Right.

18   Q    You have never met her?  Well, I'm sorry.  You did

19   meet her once in passing in a business meeting, right?

20   A    Correct.

21   Q    Okay.  If she walked in the room today, you couldn't

22   pick her out, right?

23   A    Right.

24   Q    And if she called in the courtroom, you couldn't

25   identify her voice, right?

```
 1  A    Correct.

 2  Q    So you have never worked with her?

 3  A    Correct.

 4  Q    And you didn't verify any of her work on this case,

 5  right?

 6  A    Correct.

 7  Q    Okay.  Now, let's look back at this actuarial case

 8  memo again at -- I'm going to take the page from your expert

 9  report away, and we're back at joint Exhibit 3 and I want to

10  highlight the names Patterson, Poliskey, Leibowitz, they are

11  all called actuaries at PBGC, right?

12  A    Right.

13  Q    None of them is actually an actuary according to the

14  standards of your profession, correct?

15  A    Correct.

16  Q    None of them is qualified to give opinions on

17  actuarial matters, correct?

18  A    Correct.

19  Q    So in essence, you are relying upon the work of

20  someone you met in passing that did not double check and

21  upon the work of several or more employees at PBGC who are

22  called but are not really actuaries in giving your opinions

23  here, correct?

24  A    I am relying on the work of the actuaries at Milliman

25  and the actuaries at PBGC.
```

1  Q    Okay.  The work that you didn't double check at any

2  time.  Right?

3  A    I -- I reviewed as part of preparing my expert report,

4  I reviewed the actuarial case memo and the actuarial case

5  report in order to develop my expert report.

6  Q    Okay.  Do you remember I deposed you, sir?

7  A    Yes.

8  Q    December 5, 2013?

9  A    Yes.

10  Q    I'd like to read a question and answer to you if it's

11  okay.

12  A    Okay.

13  Q    And then I'll have a follow-up question.

14      I asked you -- this is at page 81, beginning at line 7

15  I'm picking up.  It says, this is my question to you.

16  "Before you signed off on the number that came from Exhibit

17  16," and just parenthetically, Exhibit 16 is what we called

18  Joint Exhibit 3 in your deposition, "before you signed off

19  on the number that came from Exhibit 16, the actuarial case

20  memo, how much time did you spend, if any, in verifying the

21  number was correct?

22      Your answer:  "I didn't spend any time."

23      Did I ask you that question and did you give that

24  answer?

25  A    Yes.

1   Q    Okay.  Was your answer accurate when you gave it in

2   your deposition?

3   A    Yes.

4   Q    Okay.

5          MR. MEEHAN:  Your Honor, we don't quibble that

6   Mr. Young is an enrolled actuary.  But he is not competent

7   to give opinions in this case because he has now

8   acknowledged that he has relied upon the work of someone

9   that he didn't verify and the work of individuals who he

10  has acknowledged are not qualified to give opinions on

11  actuarial matters.  So his certification and his

12  qualifications cannot take the place of the fact that he

13  has no personal knowledge, played no role whatsoever, and

14  the people who did the work are not here and cannot speak

15  to the subject.  So we oppose his qualifications as an

16  expert to give opinions in this case.

17         THE COURT:  Mr. Young, are you routinely called

18  upon to give opinions, whether they're expert opinions for

19  court or otherwise, based on the review of work of other

20  people?

21         THE WITNESS:  Yes.

22         THE COURT:  And what sorts of people that input do

23  you rely on as an ordinary part of your performance of your

24  professional duties?

25         THE WITNESS:  The actuarial case report as it's

```
 1   written is routinely relied upon by me in providing

 2   opinions to others on actuarial matters.

 3              THE COURT:  In terms of the work, who actually

 4   does the work, then, that you're relying on as part of the

 5   input for your conclusions?

 6              THE WITNESS:  The actuaries in the benefits

 7   administration and payment department of PBGC, including

 8   the contract actuaries.

 9              THE COURT:  And that includes people who may or

10   may not be certified by the outside actuary professional

11   organization?

12              THE WITNESS:  Correct.  May or may not include.

13              THE COURT:  These are people with accounting

14   business degrees and various degrees or levels of training

15   after that?

16              THE WITNESS:  Correct.

17              THE COURT:  The objection is overruled.

18              MR. MEEHAN:  Your Honor, in light of your

19   questions, would you mind if I asked him one or two more

20   questions?  Because there is a disconnect between what he

21   just told you and what he testified about at his

22   deposition.  And maybe I'm the one who's missing it, but I

23   want to clarify it, if it's okay.

24              THE COURT:  Go ahead.

25
```

```
1   BY MR. MEEHAN:

2    Q    Sir, this actuarial case memo, it was Exhibit 16 at

3   your deposition, it's joint Exhibit 3 here, it's correct, is

4   it not, that you have never prepared one?

5    A    That is correct.

6    Q    It's correct, is it not, that you rarely, if ever,

7   have used one?

8    A    I -- it's rare to use one, but in the circumstances

9   where I would use one, it would be to give opinions about

10  certain matters.

11   Q    Well, sir, isn't it correct you have never testified

12  as an expert before in your life?

13   A    That is true.

14   Q    Isn't it correct, sir, that this is the first and only

15  expert opinion you have ever signed?

16   A    Correct.

17   Q    And isn't it correct that you didn't write it?

18   A    I had someone draft it for me to review.  I reviewed

19  it and edited it.  I consider that to be me writing it.

20        MR. MEEHAN:  Your Honor, under the circumstances,

21   I renew the objection.

22        THE COURT:  Overruled.

23        MR. MEEHAN:  Thank you, Your Honor.

24               CONTINUING DIRECT EXAMINATION

25
```

```
 1  BY MR. ALBAUGH:

 2  Q    Mr. Young, have you formed an opinion about the amount

 3  of unfunded benefit liabilities of the pension plan of

 4  News-Journal Corporation?

 5  A    Yes.

 6  Q    What is your opinion?

 7  A    My opinion is that PBGC followed its applicable laws

 8  and regulations and practice with respect to the calculation

 9  of the benefit -- unfunded benefit liabilities for

10  News-Journal.

11  Q    And have you formed an opinion about the amount of

12  those unfunded benefit liabilities?

13  A    Yes, I have.

14  Q    What is that amount?

15  A    That amount is the amount that's contained in my

16  expert report.

17  Q    At this time, I would like to show you what's been

18  marked as PBGC Exhibit 1.  Is this your expert report in

19  this matter?

20  A    Yes, it is.

21  Q    If I could direct your attention to page 2 of that

22  report.  At the bottom of the table, is that the amount of

23  unfunded benefit liabilities of the pension plan?

24  A    Yes, it is.

25  Q    Show you the last page of your report.  Is that your
```

```
1    current résumé, Mr. Young?

2    A     Yes, it is.

3    Q     And do you have any relevant employment experience

4    that's not reflected on this report or on this résumé?

5    A     No.  My -- yeah, everything that is relevant is there.

6    Q     Mr. Young, what are unfunded benefit liabilities as

7    defined in Title IV for ERISA?

8    A     Unfunded benefit liabilities as defined in Title IV

9    for ERISA for terminated defined benefit plans is the excess

10   of the plans benefit liabilities over the amount of assets

11   in the plan.

12   Q     And what does the term "unfunded benefit liabilities"

13   mean as you used it in your expert report?

14   A     That's what it means.

15   Q     I probably should have stayed over here, but turning

16   back to your report, could you tell me what are the total

17   amount of benefit liabilities with respect to the pension

18   plan?

19   A     For the News-Journal pension plan the total amount of

20   benefit liabilities is approximately 42.5 million.

21   Q     And the total assets of the News-Journal pension plan,

22   what are those?

23   A     Approximately 28.6 million.

24   Q     So in order to obtain the unfunded benefit liabilities

25   you subtract that --
```

1    A      Right.

2    Q      -- benefit liability amount from the assets, correct?

3    A      Well, it's the benefit liabilities minus the assets

4    results in the unfunded benefit liability in this case,

5    13-point almost $9 million.

6    Q      And thank you for that clarification.

7           What steps did you take to arrive at your opinion in

8    this case?

9    A      I reviewed the actuarial case report that was done by

10   Milliman for the benefit administration and payment

11   department, I reviewed the actuarial case report that goes

12   along with that memo and I drafted my expert report.

13   Q      And could you explain what you mean when you say you

14   reviewed the actuarial case memo and actuarial case report?

15   A      I reviewed in detail the actuarial case memo.  I

16   reviewed it against applicable PBGC law, regulation, and

17   policies, making sure that I was comfortable with the

18   application of those laws, regulations, and policies.

19   Q      And I know we've heard testimony to this already, but

20   did you rely on the work of any others in performing -- or

21   in forming your opinion?

22   A      I did.

23   Q      Who are those people?

24   A      I relied on the actuary at Milliman.  Milliman was the

25   actuarial contractor who was responsible for preparing the

1   actuarial case report, and I also relied on the work of the

2   trusteeship processing division within my department that

3   was responsible for reviewing and accepting the actuarial

4   case report.  And then, finally, I relied on the work of an

5   actuary in the actuarial services division who ultimately

6   reviewed and accepted the actuarial case report.

7   Q    So I'd like to talk with you a little bit about the

8   process for calculating unfunded benefit liabilities and you

9   had mentioned assumptions.  And what assumptions are needed

10  to calculate the amount of unfunded benefit liabilities for

11  a terminated pension plan?

12  A    There are several assumptions.  The assumptions

13  include the interest rate used to discount benefit payments,

14  the mortality rates used to measure the length of time over

15  which those benefit payments could be expected to be made,

16  there are four participants who have not yet begun receiving

17  a benefit.  There is expected retirement ages.  There are

18  also assumptions about what form of benefit participants may

19  elect and spouse information, if applicable, and also an

20  expense load that is added to those liabilities to reflect

21  future administrative costs for the plan.

22  Q    You mentioned an interest rate assumption, and what is

23  an interest rate assumption with respect to calculating the

24  UBL?

25  A    The interest rate assumption is set by PBGC

```
 1   regulations and for this case, I believe it was 4.89 percent
 2   was the interest rate for the first 20 years.
 3   Q    And from where did PBGC obtain the interest rate that
 4   it used in this calculation?
 5   A    The interest rates for valuing unfunded benefit
 6   liabilities for this plan come from the applicable rate from
 7   March of 2010, which is the date of plan termination for the
 8   plan, and is set through PBGC's regulations.
 9   Q    Does PBGC have any flexibility in selecting an
10   interest rate assumption for any given terminated pension
11   plan?
12   A    No.
13   Q    In your opinion, did PBGC use the correct interest
14   rate assumption to calculate the News-Journal pension plans
15   unfunded benefit liabilities?
16   A    Yes.
17        MR. MEEHAN:  Your Honor, just a clarification.
18   "Correct" with respect to what?
19        MR. ALBAUGH:  Correct with respect to the
20   requirements for calculating unfunded benefit liabilities.
21        MR. MEEHAN:  Under the PBGC rules?  I'm just
22   trying to make sure I understand whether this is a
23   reasonableness opinion or simply a compliance with
24   regulation opinion.
25        THE COURT:  Can you answer, Mr. Young?
```

```
 1              THE WITNESS:  Can you repeat the question?
 2    BY MR. ALBAUGH:
 3     Q     Yes.
 4          In your opinion, did PBGC use the correct interest
 5    rate assumption in calculating the pension plans you --
 6    unfunded benefit liabilities?
 7     A     Yes.
 8     Q     You also mentioned mortality assumptions, I think.
 9    What is a mortality table?
10     A     A mortality table is a table that reflects the
11    probability of death for each age in the table.  Those
12    tables usually run from ages zero through 120 usually.
13     Q     And when you say zero through 120, what are you
14    referring to?
15     A     So for each age in that table there's a probability of
16    death associated for that age and by using the table we can
17    project the future, the likelihood of future benefit
18    payments being made so that we can discount those future
19    benefits to come up with a present value of future benefits.
20     Q     And how does the mortality assumption relate to
21    calculating the unfunded benefit liabilities of a terminated
22    pension plan?
23     A     Well, the mortality table is used in conjunction with
24    the other assumptions to calculate the present value of
25    future benefits for the plan which is the total benefit
```

1    liabilities for that plan.

2    Q    Is there any correlation between the interest

3    assumption and mortality assumption?

4    A    For PBGC purposes, there is -- PBGC sets its interest

5    rate assumption based on a combination of interest and

6    mortality rates that would replicate prices of annuity

7    contracts.

8    Q    And what mortality table did PBGC use to calculate the

9    News-Journal pension plans unfunded benefit liabilities?

10   A    PBGC used the mortality tables that are required under

11   Section 4044 of ERISA for the News-Journal plan.  It was the

12   1994 group annuity mortality table projected to 2020.

13   Q    And could you explain what you mean by projected to

14   2020?

15   A    Mortality tables are often projected into the future

16   to reflect -- to reflect mortality improvements over time as

17   life expectancies get longer and longer, it's appropriate to

18   project a table into the future to reflect anticipated

19   improvements in mortality.

20   Q    From where did PBGC obtain the mortality assumptions

21   that it used to calculate the News-Journal plans unfunded

22   benefit liabilities?

23   A    The mortality assumptions for this plan were obtained

24   from appendix A of section or from PBGC's regulations, the

25   4044 regulations.

1  Q    Did PBGC have any flexibility in the mortality

2  assumptions that it used for the calculation?

3  A    No.

4  Q    And in your opinion, did PBGC use the correct

5  mortality table to calculate the News-Journal pension plans

6  unfunded benefit liabilities?

7  A    Yes.

8  Q    What is an expected retirement age assumption?

9  A    An expected retirement age assumption is the age at

10 which participants who are eligible for a benefit at some

11 point in the future, but have not yet begun receiving that

12 benefit are expected to retire.

13 Q    And how does an expected retirement age assumption

14 relate to calculating the unfunded benefit liabilities of a

15 terminated plan?

16 A    The expected retirement age assumptions are set in

17 PBGC's regulations and are used to calculate the future

18 benefit payments for participants who have not yet started

19 receiving benefits.

20 Q    What expected retirement assumption did PBGC use to

21 calculate the News-Journal pension plans unfunded benefit

22 liabilities?

23 A    PBGC used a couple different expected retirement age

24 assumptions based on the individual plan participant.  For

25 participants who are currently receiving a benefit, the

1   expected retirement age is, of course, the age of which they

2   actually retired, and for participants who have a deferred

3   benefit, PBGC used PBGC's regulations with respect to

4   expected retirement age, and what that means is that for

5   participants who retired more than one year prior to the

6   date of planned termination, PBGC used the expected

7   retirement age in Section 4044.56 of PBGC's regulations

8   which are the expected retirement ages for participants who

9   need not retire in order to receive a benefit because they

10  have already terminated employment, they don't need to

11  terminate employment in order to start benefits.

12      For participants who retired within one year of the

13  date of planned termination or who are actively employed at

14  the date of planned termination, PBGC used the earliest

15  retirement age under Section 4044.57 of PBGC's regulations

16  regarding a facility closing because the PBGC's practice is

17  to for this case apply the facility closing rules since

18  News-Journal was liquidated and sold through an asset sale.

19  Q    And in your opinion, did PBGC use the correct expected

20  retirement age assumptions to calculate the News-Journal

21  pension plans unfunded benefit liabilities?

22  A    Yes.

23  Q    Now that News-Journal's assets have been sold, do you

24  know whether planned participants need to stop working

25  before they can draw a benefit from PBGC?

1   A     Participants do not need to stop working before

2   drawing a benefit from PBGC because News-Journal no longer

3   exists.  All the participants in that plan have already

4   terminated employment from News-Journal Corporation, so they

5   are eligible to begin benefits when they become eligible

6   under the plan.

7   Q     Mr. Young, what is expense loading with respect to the

8   unfunded benefit liabilities calculation?

9   A     Expense loading is adding a load to the liability to

10  reflect anticipated administrative costs associated with

11  administering benefits, processing retirement applications

12  for the plan.

13  Q     And how does expense loading factor into the

14  calculation of unfunded benefit liabilities?

15  A     Expense loading factors in in that PBGC applied the

16  formula from our regulations.

17  Q     I want to, again, refer back to PBGC Exhibit 1.  I'll

18  retract that.

19      Okay.  And from where did PBGC obtain the assumptions

20  used to calculate the expense load for the News-Journal

21  pension plan?

22  A     The expense load assumption comes from appendix C to

23  Section 4044 of PBGC's regulations.

24  Q     And in your opinion, did PBGC use the correct expense

25  loading assumptions to calculate the News-Journal pension

 1  plans unfunded benefit liabilities?

 2  A    Yes.

 3  Q    Earlier in your testimony you referred to the

 4  actuarial case memorandum.  What is that?

 5  A    The actuarial case memorandum is a component of the

 6  actuarial case report.  That is prepared by the department

 7  to calculate benefits for participants in the plan and

 8  specifically the actuarial case memo describes the plan

 9  provisions that are applicable to the plan and PBGC's

10  interpretation of those planned provisions and some of the

11  other issues that PBGC may have -- make decisions regarding

12  during the processing of the case.

13  Q    What is an actuarial case memo for any given pension

14  plan, what is it used for at PBGC?

15  A    It's primarily used, you know, to document the

16  actuarial valuation of the plan, and is also used by the

17  field benefit administrators to assist with plan

18  administration.

19  Q    I'm going to show you what's been marked as joint

20  Exhibit 3.  Are you familiar with this document?

21  A    Yes.

22  Q    What is this document?

23  A    This is the actuarial case memo for the News-Journal

24  Corporation pension plan.

25  Q    And with respect to the News-Journal pension plan,

1  what is contained within this actuarial case memo?

2   A    It contains a summary of the liabilities, it contains

3  a summary of the data issues for the plan, it has in it

4  summary of plan provisions, it has a summary of PBGC

5  guarantee and who's affected by the guarantee, among other

6  things.

7   Q    Is the actuarial case memo part of a larger document

8  or other documents?

9   A    It is.  It's part of what's called the actuarial case

10 report which is a comprehensive document or set of documents

11 that describe the plan in detail.

12  Q    I want to show you just quickly what has been marked

13 as joint Exhibits 4 and 5.  Note that they have been

14 redacted.  And 6.  What are these documents?

15  A    That is the actuarial case report for the pension plan

16 for News-Journal.

17  Q    And with respect to the News-Journal pension plan,

18 what is contained in this full actuarial case report?

19  A    What's contained is an actuarial certification by

20 Milliman, there's an actuarial checklist that's completed by

21 both Milliman and the PBGC actuaries, the actuarial case

22 memo is part of that.  There is a planned summary that

23 describes the plan provisions, an historical look at the

24 plan provisions in fact.  There is also a set of tables that

25 are used for both early retirement factors and form

1  conversion factors that's used by the benefit administrators

2  when individuals apply for benefits.  And there are a set of

3  sample employee or benefit statements that go out to planned

4  participants, as well as a set of listings that list by

5  participant the participants' benefit and associated benefit

6  liability.

7  Q    And I know you earlier testified that you were not

8  involved in the preparation of the actuarial case report for

9  the News-Journal plan.  Are you generally familiar with the

10 process by which PBGC prepares such reports?

11 A    Generally.  Yes.

12 Q    Can you describe your general understanding?

13 A    Um --

14 Q    Of the process?

15 A    Yes, the process is that when PBGC becomes trustee of

16 a plan, the PBGC first obtains various information and data

17 and documents related to that plan, and the benefits

18 administration and payment department develops both a

19 participant data review and a plan asset evaluation and when

20 those two -- when those two items are completed, then the

21 actuaries will develop the actuarial case report for the

22 plan.

23 Q    And in your experience, how long does it take from

24 PBGC's trusteeship of a pension plan to the preparation of

25 the actuarial case report?

1   A    There's a wide range of timeframes but in general, I

2   would say three to four years.

3   Q    From your review, was PBGC's process for creating an

4   actuarial case report followed with respect to the

5   News-Journal pension plan?

6   A    It was.

7   Q    And how did you form that opinion?

8   A    I formed that opinion because I have -- I reviewed the

9   actuarial certification that was completed by Althea

10  Schwartz at Milliman, that certification certifies the

11  accuracy and completeness of the actuarial case report, and

12  then I looked at the actuarial valuation check list that is

13  a series of 20 different items that the actuaries review and

14  that was checked by both the Milliman actuary and by the

15  PBGC actuaries who are responsible for the valuation.

16  Q    Now, I want to direct your attention to a couple of

17  specific pages from the document that was marked joint

18  Exhibit 4.  What is this page?

19  A    This is the actuarial certification done by Althea

20  Schwartz at Milliman.

21  Q    And can anybody make this type of certification?

22  A    No.  PBGC requires an enrolled actuary to make this

23  certification.

24  Q    And if I could just direct your attention, if you

25  could read what it says at the bottom of the certification.

1   A     The "knowingly and willingly making false, fictitious,

2   or fraudulent statements to the Pension Benefit Guaranty

3   Corporation is punishable under Title 18, Section 1001,

4   United States Code."

5   Q     Thank you.

6         I want to show you another page from the same

7   document.  Can you take a look at that?  What is this page?

8   A     This is the actuarial case report checklist for

9   actuaries to complete when they are performing or completing

10  an actuarial case report.

11  Q     And what is signified in this checklist?

12  A     It signifies that the actuary has looked at each of

13  those 22 items to the extent that they are applicable and

14  has reviewed those items in the actuarial case report.

15  Q     Based on your review of the actuarial case report for

16  the News-Journal pension plan, do you have an opinion as to

17  whether that case report applies the correct assumptions for

18  calculating the unfunded benefit liabilities?

19  A     Yes.

20  Q     And what is your opinion?

21  A     My opinion is that PBGC followed its applicable laws,

22  regulations, and policies with respect to the valuation of

23  the News-Journal pension plan.

24  Q     And do you have an opinion about whether that

25  actuarial case report correctly calculated the News-Journal

1   pension plans unfunded benefit liabilities?

2   A    Yes.

3   Q    And what is that opinion?

4   A    My opinion is that the News-Journal Corporation or

5   that the actuarial case report does accurately reflect the

6   unfunded benefit liabilities of the News-Journal Corporation

7   pension plan.

8   Q    Mr. Young, are you familiar with the opinions that

9   have been formed by the plaintiff's expert witness

10  Mr. Reese?

11  A    Yes.

12  Q    Have you reviewed Mr. Reese's expert report in this

13  case?

14  A    Yes.

15  Q    Have you reviewed Mr. Reese's supplemental report in

16  this case?

17  A    Yes.

18  Q    Could you please explain your understanding of

19  Mr. Reese's opinions in this case?

20       MR. MEEHAN:  Your Honor, I object to this.  There

21  is no foundation.  When I deposed him, he said he had no

22  opinions about the points being made in Mr. Reese's report.

23  He had -- he was offering no opinions other than the one

24  I'll get to which we would happy for you to hear.  But if

25  this is going to go to criticism, he testified he has none.

```
 1          MR. ALBAUGH:  I think he testified that he had
 2    concerns about --
 3          MR. MEEHAN:  That is correct.  He used the word
 4    "concerns," and we can go through the deposition, but I
 5    asked him repeatedly and he said no opinions whatsoever.
 6    And I said -- and I can quote myself -- I could stop right
 7    now, but just educate me a little so I can understand what
 8    he meant by concerns.  He offered no opinions.  He can't
 9    come in with -- I mean, I'm objecting.  I'm asking that he
10    not be allowed to testify now about criticisms that he
11    declined and was unable to provide at his deposition.
12          MR. ALBAUGH:  I think Mr. Young will offer
13    rebuttal to the opinions that Mr. Reese has raised in this
14    report.  I agree that his expert report does not have any
15    opinions with respect to what Mr. Reese came up with.
16          MR. MEEHAN:  Your Honor, it was more than the
17    report.  I asked him at his deposition do you today have
18    opinions and he said no.  So if he spent the last few weeks
19    being fed opinions, that's not how this is done.  And so I
20    ask that he not be allowed now to criticize the report that
21    he had read, that he said he understood, and we discussed
22    to understand what he meant by the word concerns and he
23    offered no critique.  He only offered positive comments.
24          THE COURT:  I'm not going to allow it now.  In any
25    event, after Mr. Reese testifies, we can revisit the issue.
```

```
 1              MR. ALBAUGH:  At this point, I have no further
 2   questions.
 3              THE COURT:  All right.  We will take our lunch
 4   break and commence the cross-examination at 1:15.
 5              (luncheon recess at 11:54 a.m.)
 6              THE COURT:  You're still under oath, Mr. Young.
 7                     CROSS-EXAMINATION
 8   BY MR. MEEHAN:
 9   Q    Good afternoon, Mr. Young.
10   A    Good afternoon.
11   Q    Okay.  A number of times this morning in your direct
12   exam you indicated that some computation or assumption or
13   procedure or what have you was correct.  Do you remember
14   talking about that?
15   A    Yes.
16   Q    Okay.  Now, when you say it's correct what you mean is
17   you satisfied yourself that it was consistent with the PBGC
18   rules, right?
19   A    Correct.
20   Q    Because you're not offering an opinion one way or the
21   other on whether PBGC's approach to calculating these
22   liabilities is consistent with the actuarial standards of
23   practice, right?
24   A    Well, I believe that -- PBGC's approach is consistent
25   with the actuarial standards of practice.
```

1  Q    That wasn't in your report, was it, sir?

2  A    I do not believe that my report expressly stated that

3  opinion.

4  Q    Okay.  I took your deposition, right, December 5th,

5  2013.  Correct?

6  A    Correct.

7  Q    Okay.  I'm going to read from page 39, beginning at

8  line 8.  And I'm going to continue through line 16 and then

9  once I read it I'll ask you a question.  My question -- this

10 is in your deposition.

11     "So if I read your report and I'm trying to understand

12 what opinions, if any, you're offering, I must conclude that

13 you're offering no opinion with respect to whether PBGC's

14 approach to the calculation of liabilities is consistent

15 with the actuarial standards of practice.  Right?  Because

16 it's not in your report."

17     Your answer at line 16:  "Correct."

18     So I asked you that question, you gave that answer,

19 right?

20 A    Right.

21 Q    And you were under oath at the time.  Right?

22 A    Sure.  Yes.

23 Q    Okay.  And your answer at the deposition was accurate,

24 was it not?

25 A    Yes.

1  Q    Okay.  So your report did not disclose any opinion

2  with respect to whether PBGC's approach is or is not

3  consistent with the actuarial standards of practice,

4  correct?

5  A    Correct.

6  Q    Okay.

7       MR. MEEHAN:  Your Honor, I'll move to strike from

8  the record any opinion of Mr. Young on that topic for

9  failure to disclose as required by Rule 26.

10      THE COURT:  Well, I think you've gotten to a point

11 where -- to the extent it's an opinion, it's the -- goes to

12 a level of fundamental principals in what I understood to

13 be his approach to the issues that his agency confronts

14 that if you included every such one, the report -- the

15 opinions would be hundreds if not thousands of pages.  So I

16 don't think it's the sort of thing that needs to be -- I

17 mean, he assumes that the statutes were validly enacted,

18 you don't put that down.  He takes as a given that he's

19 operating under the regulations he's operating under.  I

20 understand your argument that there's false with that and

21 I'll hear your evidence on that, but I think he can offer

22 his opinion.  So your objection is overruled and the motion

23 to strike is denied.

24      MR. MEEHAN:  Your Honor, if I might flesh it out

25 just a little bit.

BY MR. MEEHAN:

Q    Let's pick right up on what the Court is saying.  Your opinion is that you have no flexibility in following PBGC's regulations to compute these liabilities, right?

A    My opinion is that PBGC followed its rules and regulations.

Q    Okay.  Now, this morning you said multiple times PBGC had no flexibility, right?

A    Right.

Q    Okay.  And PBGC sets the rules that you had to follow, right?

A    Correct.

Q    So when you say PBGC had no flexibility, that's an oxymoron, right?

A    I suppose you could say that.

Q    Okay.  You disagree with me in characterizing it as an oxymoron?

A    Well, once PBGC publishes a regulation, I think we're bound to it.

Q    And when you say --

A    I can't decide not to follow our existing regulations.

Q    And that is why you are offering an opinion today that was not in your report that following the regulation is consistent with the actuarial standards of practice because there's a reg -- I'm sorry -- there's an ASOP, number 27,

  1  that says when a government law prescribes a method the
  2  actuary must use it, right?
  3  A     Correct.
  4  Q     So that's all you mean when you say that PBGC's
  5  approach is consistent with the standards of practice,
  6  right?
  7  A     With regard to most of the assumptions, yes.
  8  Q     Okay.  Well, is there an exception?
  9  A     I argue that the interest assumption meets ASOP 27.
 10  Q     And so does Mr. Reese approach, Mr. Reese's approach,
 11  meet as ASOP 27 in computing the interest, does it not?
 12  A     It does.
 13  Q     In fact, PBGC's approach, in your opinion, is not the
 14  only reasonable way to calculate these liabilities according
 15  to the standards of practice of your profession, correct?
 16  A     Correct.
 17  Q     Okay.  The approach that PBGC uses with respect to the
 18  interest computation relates to the use of annuity pricing,
 19  correct?
 20  A     Correct.
 21  Q     Okay.  Can you just explain briefly how the connection
 22  is there?
 23  A     The connection works in that PBGC's surveys insurance
 24  companies to get annuity prices, annuity prices are set
 25  based on a combination of the interest rate assumption and

```
 1   mortality assumption, and so PBGC then takes those survey
 2   results and calculates an interest rate assumption based on
 3   using PBGC mortality rates.
 4   Q     And those rates for annuities come from this ACLI
 5   survey, correct?
 6   A     Correct.
 7   Q     And you don't have any insight as to how that survey
 8   is completed, right?
 9   A     Correct.
10   Q     You're offering no opinion on its reliability, right?
11   A     Right.
12   Q     You have no way of knowing one way or the other
13   whether it is or is not reliable, correct?
14   A     Correct.
15   Q     Mr. Reese's approach of selecting an interest rate
16   based upon the actual historical performance that PBGC has
17   experienced is reasonable in your opinion, is it not?
18   A     It is an acceptable approach under ASOP 27.
19   Q     Okay.  Let's talk a little bit about some of the other
20   assumptions that your employer's rules require you to use.
21   The expected retirement age assumption, PBGC is assuming a
22   single expected retirement age here, correct?
23   A     Correct.
24   Q     The earliest possible retirement of age 55, correct?
25   A     Well, for -- I think when you asked a single
```

1  retirement age, I would just add to that for each person.

2  And we used the -- in this case, we used the earliest

3  retirement age, which you're correct, age 55, for

4  participants who terminated employment in the -- during the

5  period one year prior to the date of planned termination or

6  later.

7  Q    And PBGC's treating the sale as a plant closing in

8  effect, correct?

9  A    Correct.

10 Q    And so PBGC is assuming that everybody who is eligible

11 actually will take the pension plan, correct?

12 A    That's our assumption, yes.

13 Q    At the earliest possible date.

14 A    Correct.

15 Q    And so PBGC's assumption does not comport with reality

16 in this case, does it?

17 A    I don't know what reality is in this case.

18 Q    And PBGC does not care what the reality is in this

19 case, do they?

20 A    No, we do not.

21 Q    Okay.  Isn't it correct that the overwhelming majority

22 of those eligible to take the retirement and have a pension

23 have not done so at this point?

24 A    I don't know whether they have or not.

25 Q    Okay.  And so you didn't take that into account one

1    way or the other in your computations?

2    A     Right.

3    Q     Okay.  Mortality, the mortality assumption, PBGC is

4    not using mortality expectation that relates to actual

5    experience on this plan, right?

6    A     Correct.

7    Q     So this is another instance where PBGC doesn't care

8    about what the reality is, right, in this case?

9    A     Correct.

10   Q     The effect of using PBGC's mortality assumption is to

11   increase the amount of the claim you're seeking, right?

12            MR. ALBAUGH:  Object as vague.

13            THE COURT:  Sustained.  Rephrase.

14   BY MR. MEEHAN:

15   Q     Using PBGC's assumption as opposed to using an

16   assumption based on actual experience causes PBGC's claim to

17   be higher, correct?

18            MR. ALBAUGH:  Objection.  Vague.

19            THE COURT:  Overruled.

20            THE WITNESS:  Well, remembering that PBGC sets its

21   interest factors so that the combination of interest rates

22   and mortality rates approximate annuity prices, any change

23   in the mortality table would have an effect on the interest

24   factors.  So in combination the two would approximate

25   annuity prices.

```
1   BY MR. MEEHAN:

2    Q    So the answer to my question is yes, it makes it go

3   higher, right?

4    A    Well, if -- if we changed -- if the mortality table

5   were changed, then you would like -- you would see a

6   corresponding change to the interest factors so that in

7   combination the ending result would be a liability that

8   replicated annuity prices.

9    Q    Help me out.  Higher or not?  I can't follow.

10   A    It would be approximately the same.  PBGC can't

11  separate the interest rate and the mortality because they go

12  together because the combination of the two results in

13  liabilities that approximate annuity prices.

14   Q    Okay.  Well, we can --

15   A    If you -- what you're getting at is if you fix the

16  interest rate, which PBGC can't do, then you're correct.

17   Q    Okay.  All right.  Thank you.

18        And I didn't ask you about the expected retirement

19  age, but let me do it for formality.  So PBGC's assumption

20  about the expected retirement age, the effect of it, is that

21  the amount of the claim here is higher than if you would

22  base it on actual experience, correct?

23   A    Correct.

24   Q    Marital status, PBGC makes an assumption with respect

25  to marital status of these eligible participants.  Correct?
```

1    A    Correct.

2    Q    And why don't you tell us what the assumption is?

3    A    PBGC'S regulation states that for the form of benefit,

4    we value the form benefit that the participant elected or in

5    the absence of a formal election, we value the benefit that

6    will be payable without that election, and for participants

7    in the News-Journal plan, that means we would value the

8    automatic married form of benefit, which is the form of

9    benefit that's payable to a participant if they're married,

10   or, alternatively, the normal single form if they're not

11   married.   PBGC frequently does not get complete marital

12   status data for plan participants and so for participants

13   whose marital status is unknown, we assume that they are

14   married.

15   Q    Okay.  And the effect of that assumption as opposed to

16   the reality of people's marital status in this case is that

17   it pushes the liability claim up, right?

18   A    In general, yes.

19   Q    Now, you're aware that Mr. Reese has attempted to

20   calculate the upward effect dollar-wise of each of these

21   assumptions we've talked about, the interest rate, the

22   marital status, the expected retirement age, and mortality,

23   right?

24   A    Correct.

25   Q    And you have no opinion on the accuracy of his

 1 │ computations on the dollar value of each of those upward

 2 │ effects, correct?

 3 │ A    That's correct.

 4 │ Q    All right.  So you can't say he's wrong in the numbers

 5 │ that he's going to be offering as to the upward impact of

 6 │ those assumptions, am I right in saying that?

 7 │ A    Yes.

 8 │ Q    Okay.  One of the points that Mr. Reese is going to

 9 │ make is that there were some participants who are ineligible

10 │ to be included on the roles here in terms of calculating the

11 │ liabilities.  You're aware of that, right?

12 │ A    Right.  Yes.

13 │ Q    Okay.  And do you still believe -- no.  Strike that.

14 │     You can't say that he is right or wrong in calculating

15 │ the dollar effect of including those participants if, in

16 │ fact, they are not -- if they have not been excluded

17 │ already.  I hope that wasn't too long and confusing.  I'll

18 │ try to do it again.

19 │ A    It was a little confusing.

20 │ Q    Sorry.  I realize that.

21 │     Okay.  So, Mr. Reese is going to point out that some

22 │ folks are included here in your calculations that don't

23 │ belong.  Right?  You're aware of that issue?

24 │ A    I'm aware of the issue, yes.

25 │ Q    Okay.  All right.  And you have not attempted to

```
 1  calculate whether his dollar value is accurate if it's true

 2  that there are ineligible participants in your calculation,

 3  correct?

 4  A    If it is true that there are ineligible participants,

 5  then you are correct.

 6  Q    Right.  If they don't belong in there, you can't

 7  quibble with his numbers of the dollar effect?  That's what

 8  I'm getting at.  Right?

 9  A    Right.

10  Q    Okay.  One thing you mentioned was insurance premiums,

11  just a little bit of background and then I will ask you a

12  follow-up.  NJC paid insurance premiums when this plan was

13  active, right?

14  A    As far as I know.

15  Q    Okay.  And the purpose of the -- these insurance

16  premiums is to provide funds so that PBGC will be able to

17  make payments on a plan that is terminated, right?

18  A    Right.

19  Q    So in calculating the unfunded benefit liabilities

20  PBGC by its rules gives no weight to the amount of premiums

21  that NJC has paid, correct?

22  A    Correct.

23  Q    And in setting the rules for calculating this unfunded

24  benefit liabilities, PBGC gives no weight to the purpose of

25  the insurance premiums, correct?
```

1   A    Correct.

2   Q    It is standard practice at PBGC to pursue every member

3   of the controlled group to recover when they're unfunded

4   benefit liabilities, right?

5   A    I'm not -- sorry.

6        MR. ALBAUGH:  I'm going to object to this line of

7   questioning on the basis of our prior briefs in discovery

8   about the relevance of controlled group members.

9        THE COURT:  I'm going to allow it for purposes of

10  this hearing.  Go ahead.

11       THE WITNESS:  I'm not aware of what the attorneys

12  pursue or don't pursue in legal cases.

13  BY MR. MEEHAN:

14  Q    Well, you do know that that has not been done in this

15  case, right?

16       MR. ALBAUGH:  Object to foundation.

17       THE COURT:  You can answer if you can.

18       THE WITNESS:  Repeat the question.

19  BY MR. MEEHAN:

20  Q    You do know that that approach of pursuing all the

21  members of the controlled group has not been followed in

22  this case, correct?

23  A    No.  I don't know what was followed in this case.

24  Q    Okay.

25       MR. MEEHAN:  Your Honor, if -- just for a

```
 1   housekeeping matter, I'll move off the subject with
 2   Mr. Young since he says he doesn't know, but we may want to
 3   recall Miss Travia for five minutes on this topic when we
 4   get to our case.
 5           THE COURT:  Well, I'll hear that when it comes up.
 6           MR. MEEHAN:  Okay.
 7   BY MR. MEEHAN:
 8   Q    Okay.  You were in private practice for a period of
 9   time.  You testified about that, right?
10   A    Yes.
11   Q    And the way that PBGC goes about computing the
12   unfunded benefit liabilities differs in many respects from
13   what you experienced when you were in private practice,
14   right?
15   A    Yes.
16   Q    Why don't you tell us what the differences are based
17   on your own experience?
18   A    For plans -- plans measure benefit liabilities for
19   different purposes.  So for planned funding purposes, the
20   different assumptions would be used based on what's
21   prescribed in the funding rules for accounting purposes, the
22   financial accounting standards would apply for selecting
23   actuarial assumptions for valuing liabilities for that
24   purpose, and for standard terminations, you know, different
25   rules would apply.
```

1  Q    Okay.  So in effect we can agree that PBGC's approach

2  departs in multiple ways from what you observed when you

3  were in private practice before joining the government,

4  right?

5  A    Yes.

6  Q    Okay.  ASOP 36, that's one of the guidelines or

7  standards for your profession?

8  A    Yes.

9  Q    And it deals with taking into account demographic

10 factors in situations like this?

11 A    Correct.

12 Q    Okay.  You're not saying that what PBGC does complies

13 with ASOP 35, right?

14 A    Wait a minute.  Didn't you just say 36?

15 Q    35.

16 A    35.

17 Q    I mean, I think it's 35.  It is 35.  Right?  That's

18 the one.

19 A    I don't have that instance recall, but I know there is

20 a selection of demographic.

21 Q    I can help you.  From your deposition page 27, line

22 18, "QUESTION:  Are there any ASOPs that apply to

23 demographic assumptions?

24     "ANSWER:  There is.

25     "And which one is that?

1       "It's ASOP 35."

2       That's 18 through 22 on page 27.  Does that refresh

3   you?

4   A    Yes.

5   Q    Okay.

6   A    Yes.

7   Q    So you are not suggesting that PBGC's approach is

8   compliant with ASOP 35, right?

9   A    My recollection is that ASOP 35 also has a provision

10  that says if an assumption is prescribed, the actuary is

11  bound to use it.  So in that case, PBGC can follow its

12  regulations.

13  Q    So PBGC can basically say anything it wants, right?

14  PBGC could just go ahead and say, whenever you terminate a

15  plan, the liabilities will be $100 million times the number

16  of participants and then say, oh, my, I have no choice but

17  to follow my rules, right?

18          MR. ALBAUGH:  Objection.  Argumentative.

19  BY MR. MEEHAN:

20  Q    That's all you're saying, isn't it?

21          THE COURT:  It is argumentative.  You can

22   rephrase.

23          MR. MEEHAN:  Sorry, Your Honor.  I just got ahead

24   of myself.  I'll withdraw that.

25  BY MR. MEEHAN:

1  Q    Okay.  Well, let's go back to your deposition because

2  I want to nail down what your opinions are.  Same page, 27,

3  beginning at line 23:  "Have you formed an opinion that

4  PBGC's use of the mortality table is consistent with ASOP

5  35.  I mean, have you ever undertaken to form that opinion?"

6       Answer on page 28, line 4:  "No."

7       So in your deposition you had no opinion on that

8  subject, right?

9  A    Correct.

10 Q    And you acknowledged in your deposition that you did

11 not reflect any such opinion in your report.  That's at

12 page 28, lines 15 through 17, right?

13 A    Right.

14 Q    Okay.  Isn't it correct that your report did not

15 disclose the documents you considered in forming your

16 opinions?

17 A    I believe that's correct.

18 Q    So we were given no notice of what documents you used,

19 right?

20 A    Right.

21 Q    Can you just very briefly -- you were shown PBGC

22 Exhibit 4.  That's the one where Miss Schwartz did this

23 certification and you were asked to read it, penalty of law,

24 et cetera.

25 A    Uh-huh.

1   Q    Do you know if Mrs. Schwartz can read?  I don't mean

2   to be pejorative, but you don't know, right?

3   A    Yeah, I don't know.

4   Q    And that's because you have no direct contact with

5   your actuarial contractors, correct?

6   A    I have no contact -- I have no direct contact with

7   Miss Schwartz.

8   Q    You have no direct contact with any of your actuarial

9   contractors, right?  In a working setting?

10  A    I do meet with a representative from each of the

11  contractors once a month.

12  Q    Okay.  Your deposition, page 42, I'm taking from your

13  answer, let's begin on line 4, line 5 and line 6, we were

14  talking about Miss Schwartz and Milliman, et cetera, and you

15  said, "I do not have a direct contact with our actuarial

16  contractors," right?

17  A    Each of our four contractors has one representative

18  with whom I meet on a monthly basis to discuss general

19  issues.  Sometimes we talk about when particular cases are

20  coming due, things of that nature.  I have not had direct

21  contact with Milliman with respect to the News-Journal case

22  prior to preparing my expert report.

23  Q    Okay.  So nothing on this case?

24  A    Prior to preparing my expert report.

25  Q    Your prior to reading what someone else wrote and

1   signing it?

2   A    Correct.

3   Q    Your expert report refers to you in the third person,

4   doesn't it?

5   A    I suppose it does, yes.

6   Q    Well, it does, right?

7   A    It does.

8   Q    Other than yourself and Miss Schwartz, no one who

9   touched this unfunded benefit liabilities calculation that's

10  at issue is actually an actuary, correct?

11  A    That is not correct.  Tom Wail (phonetic) at Milliman

12  is a credentialed actuary.

13  Q    Okay.  Nobody at PBGC, right?

14  A    Right.

15  Q    And this is just to confirm, but you're not offering

16  any opinion one way or the other as to whether the claims as

17  originally filed or as amended follow PBGC's rules, right?

18  A    Right.

19  Q    And so you're certainly not offering any opinion as to

20  whether those claims as originally filed or as amended are

21  compliant with the standards of the actuarial profession,

22  right?

23  A    Right.

24  Q    Isn't it true that PBGC's regulations does not

25  prescribe a marital status assumption?

1   A    That is true.

2   Q    So PBGC is not even following its own regs.  It's just

3   following a practice that it has, right, in respect to the

4   marital assumption, marital status assumption in this case?

5   A    Correct.

6   Q    Does a practice have a force of law in your

7   understanding?

8           MR. ALBAUGH:  Objection.  Calls for a legal

9   conclusion.

10          MR. MEEHAN:  I can rephrase.  I'm sorry.

11  BY MR. MEEHAN:

12  Q    So it's correct, then, that in following a practice

13  rather than something that you understand to have the force

14  of law, the marital status assumption cannot be compliant

15  with ASOP 27, correct?

16  A    I believe that the marital status assumption can be

17  compliant with ASOP 27.  Or 35, really.

18  Q    Okay.  I'll put it this way:  In this case, you formed

19  no such opinion, right?  Because I don't want to ask you to

20  form an opinion right here.  But you formed no such opinion

21  in connection with your work on the case, right?

22  A    Right.

23  Q    PBGC's interest rate assumption here does not -- is

24  not consistent with its actual historical performance over

25  the last 20 years, is it?

1    A    I don't know whether it is or not.

2    Q    Well, hasn't PBGC done much better in managing its

3    monies that your interest rate assumption presumes?

4              MR. ALBAUGH:  Object to the foundation.

5              THE WITNESS:  I don't know whether it has or not.

6    BY MR. MEEHAN:

7    Q    Well, I won't belabor it.  But we can just look at the

8    PBGC annual reports to look at the tables of historical

9    performance to know the answer to my question.  Right?

10   A    Not necessarily.  I think you can look at PBGC's

11   annual report to get historical investment returns.

12   Q    Okay.

13   A    Um...

14   Q    Okay.  So I can look there for PBGC's historical

15   investment returns.  Can we agree on that?

16   A    Yes.

17   Q    Okay.  And I can certainly do the arithmetic of

18   figuring out an average rate of return and comparing that to

19   the interest rate assumption, right?  That's simple

20   arithmetic?

21   A    Yes.

22   Q    In projecting liabilities on a plan that goes out 20

23   years, it's reasonable in your judgment to look back 20

24   years at historical performance, right?

25   A    If that is the method that is being used to determine

1    interest rates, then, yes.

2    Q    Okay.  All right.  I don't need to belabor it.  But

3    that's a method that you've already indicated you believe to

4    being reasonable, right?

5    A    Yes.

6    Q    If PBGC assumes an interest rate of, say, 4.6 here and

7    the actual return is 10 percent, PBGC keeps the money,

8    right?

9    A    Right.

10            MR. MEEHAN:  Your Honor, may I have just a few

11   moments to double check a few notes?

12       Your Honor, may I have 30 seconds to the consult with

13   Mr. Reese?

14            THE COURT:  All right.

15   BY MR. MEEHAN:

16   Q    It's correct that PBGC typically does not litigate

17   these claims, right?

18            MR. ALBAUGH:  Objection to foundation.

19   BY MR. MEEHAN:

20   Q    Do you know?

21   A    No, I don't know.

22   Q    You don't know one way or the other?

23   A    I don't know one way or the other.

24   Q    It's correct that PBGC typically recovers pennies on

25   the dollar for the claims that it files, right?

```
 1              MR. ALBAUGH:  Objection to foundation.

 2              THE WITNESS:  I -- similar to what Cynthia said

 3     this morning, that's what I heard.  I don't know factually

 4     one way or the other.

 5   BY MR. MEEHAN:

 6     Q    Okay.  If I can put back up what I asked Miss Travia

 7     about some pretrial brief.  I'm going to ask you the same

 8     question if I might.

 9     A    Okay.

10     Q    This is not marked as an exhibit, but it's the

11     pretrial brief that was filed on January 8, page 10 and 11.

12     I'll read the sentence that's highlighted:  "PBGC's

13     regulations seeks to replicate the price that an employer

14     would pay to close out a pension plan in a standard

15     termination through the purchase of annuities and thereby

16     ensuring that pension termination liability will be measured

17     in a fair, objective, and consistent manner."

18              Do you see that sentence?

19     A    Yes.

20     Q    Okay.  And the way PBGC does that is to rely on that

21     survey that you can't say is reliable, right?

22     A    Correct.

23     Q    You're concerned that if PBGC doesn't attempt to

24     replicate the market price for annuities, that plant

25     sponsors like NJC will just shut the plant down and push it
```

1   on to PBGC, right?

2   A     Right.

3   Q     But they can't do that, can they?

4   A     No.

5   Q     Okay.  Thank you.

6         Just to be really clear.  I don't want to be

7   misunderstood.  When I say they can't do it, I mean plant

8   sponsors, not just NJC.  These plant sponsors cannot shut a

9   plant down and just put it on PBGC's books, right?  That's

10  your opinion, correct?

11            MR. ALBAUGH:  Object to the extent it calls for a

12   legal conclusion.

13            THE COURT:  Sustained.

14            MR. MEEHAN:  Your Honor, can I give a proffer that

15   he answered that question in his deposition?  And --

16            THE COURT:  I don't see the pertinence of it.

17            MR. MEEHAN:  Okay.  All right.  Thank you.

18            THE COURT:  Redirect?

19                     REDIRECT EXAMINATION

20  BY MR. ALBAUGH:

21   Q    Mr. Young, with respect to your expert report, do you

22  know whether you referenced any documents within the report?

23   A     I believe that I did.  I referenced the actuarial case

24  memo.

25   Q     Did you reference anything else?

1  A     And the actuarial case report, as well as PBGC's rules

2  and regulations.

3  Q     I think on cross you were asked questions about the

4  opinions formed by Mr. Reese.  Is that correct?

5  A     That's correct.

6  Q     And have you read Mr. Reese's reports?

7  A     Yes, I have.

8  Q     And the opinions that you talked about, are those --

9  I'll rephrase.

10       And do you have any opinions about Mr. Reese's report?

11         MR. MEEHAN:  Your Honor, there's no foundation for

12  him to do that.  The same objection as earlier.

13         THE COURT:  I think you opened the door on this

14  one.

15         MR. MEEHAN:  May I explain to Your Honor why I

16  think I did not?

17         THE COURT:  Go ahead.

18         MR. MEEHAN:  I asked him, as I indicated I would,

19  about certain opinions he had given about the methodologies

20  that Mr. Reese had used and stuck very strictly to specific

21  topics.  I --

22         THE COURT:  Well, you can't put that tight a fence

23  around it.  You opened it up, as far as I'm concerned.

24         MR. MEEHAN:  All right.  Thank you, Your Honor.

25  BY MR. ALBAUGH:

1    Q    Could you explain your understanding of Mr. Reese's

2    opinions in this case?

3    A    Mr. Reese calculated the unfunded benefit liabilities

4    using assumptions that were different from PBGC assumptions,

5    the PBGC assumptions that are set by PBGC's regulations.  In

6    particular, he used an interest rate of 7.99 percent based

7    on historical PBGC investment returns.  He also used

8    slightly different data set based on ineligible participants

9    that he believed were -- are ineligible for a plan.  And he

10   also used different marital status assumption and different

11   assumed retirement age assumptions.

12   Q    I'll take it a little bit out of order, but in this

13   case do you know or -- what assumptions did PBGC apply with

14   respect to marital status?

15   A    As I mentioned before, PBGC assumes that for

16   participants where we do not know if they're married, we

17   assume that they are in fact married.  For the News-Journal

18   case, my understanding is that PBGC knew the actual marital

19   status for all but 39 participants in the plan.

20   Q    So PBGC applied its marital assumption only with

21   respect to those 39 participants?

22   A    Correct.

23   Q    Do you have an opinion about the investment return

24   assumption that Mr. Reese developed in his report?

25   A    I do.

```
 1   Q     What is your opinion?

 2   A     My opinion is that Mr. Reese's investment return

 3   assumption does not follow PBGC's regulation with respect to

 4   the interest rate for determining the unfunded benefit

 5   liabilities.  In addition, I believe it would be more

 6   appropriate to use rates implicit in insurance annuity

 7   contracts, which is consistent with PBGC's regulations.

 8   Q     What do you mean by more appropriate?

 9   A     More appropriate under the actuarial standard of

10   practice number 27 which provides guidance for actuaries in

11   selecting economic assumptions for valuing pension

12   obligations.  One of the primary factors for determining

13   pension liabilities is the purpose of the measurement, and

14   because News-Journal transferred its pension liabilities to

15   PBGC, I believe it is -- it is appropriate to use interest

16   rates that are consistent with annuity prices that would be

17   provided by insurance companies, which is consistent with

18   PBGC regulations.

19   Q     You also were asked a little bit about your experience

20   in private practice.  When you were in private practice, did

21   you ever calculate unfunded benefit liabilities with respect

22   to a terminated pension plan?

23   A     With -- only with respect to standard terminations,

24   which do not necessarily need to use the 4044 interest rate

25   assumption.
```

```
 1   Q    What is a standard termination?

 2   A    A standard termination is when a plan is fully funded

 3   and can purchase annuity for participants and/or distribute

 4   a participant's entire benefit as a lump sum distribution.

 5           MR. ALBAUGH:  Your Honor, could I have just a

 6   moment?

 7       No further questions.

 8           THE COURT:  Step down, Mr. Young.

 9           MR. MEEHAN:  Your Honor, can I get 30 seconds --

10           THE COURT:  No.  Any additional witnesses for the

11   claimant?

12           MR. ALBAUGH:  No, Your Honor.

13           THE COURT:  Mr. DeVault, any witnesses?

14           MR. MEEHAN:  Your Honor, we call Adam Reese.

15           THE COURT:  Mr. Reese.

16           MR. MEEHAN:  Well, as a housekeeping question,

17   Your Honor, I can call Ms. Travia at this point for five

18   minutes to -- so she can leave the courtroom if she wishes.

19           THE COURT:  What do you want to inquire of her

20   about?

21           MR. MEEHAN:  Well, the proffer, Your Honor, would

22   be that she would testify presumably consistent with her

23   deposition that it's standard practice at PBGC to pursue

24   all members of the controlled group and in this case she

25   cannot think of a reason why that is not being done.
```

 1            MR. HATHAWAY:  Your Honor, this is David Hathaway

 2     for PMV.  We believe this issue's already been briefed.

 3     PMV provided a brief.  PBGC did as well.  It's been ruled

 4     upon and that issue is -- it's been ruled on by Your Honor

 5     as not being relevant, and it's been approved by Judge

 6     Antoon.

 7            THE COURT:  Well, your proffer is on the record

 8     and we'll go with that.

 9            MR. MEEHAN:  Okay.  Thank you, Your Honor.

10                      **(WITNESS SWORN)**

11            THE WITNESS:  I do.

12                    DIRECT EXAMINATION

13   BY MR. MEEHAN:

14   Q    Okay.  Mr. Reese, let's start out with a little bit of

15   your background before we get to what your actual opinions

16   are in this case.

17         What do you do for a living, sir?

18   A    I am a consulting actuary.

19   Q    Okay.  And what does that mean?

20   A    I provide actuarial services to a range of employers,

21   private sector, public sector, and some governmental.

22   Q    And generally speaking, what do actuaries do?

23   A    I think the best term is they make financial sense of

24   the future.  We pull together a lot of information so that

25   people can make good decisions.

1    Q      Who's your current employer?

2    A      PRM Consulting Group.

3    Q      What is the nature of that business?

4    A      We are an employee benefits consulting firm focusing

5    on compensation, employee benefits, pensions and healthcare.

6    Q      Your title is?

7    A      I am the managing director of the actuarial services

8    division.  I'm also a principal of the firm, one of the

9    principals of the firm.

10   Q      For how long have you been there?

11   A      I joined them in January 2013.  I have been with them

12   for one year.

13   Q      Okay.  Sir, you have been in this business for quite

14   some time.  I'm just going to ask you to give an overview of

15   your professional experience as actuary applies.

16   A      Okay.  I qualified as actuary in the UK as sitting the

17   series of 10 actuarial exams that is provided by the

18   Institute of Actuaries.  Upon completion of that

19   qualification, I transferred with my employer at the time,

20   the Wyatt Company from their London office to their

21   Washington, D.C. office.  After arriving in the states, I

22   sat and passed the enrolled actuary exam so I could practice

23   in pensions for the clients I was working with at Wyatt at

24   the time, and they were principally a Fortune 500 private

25   sector companies, and we were doing similar to Mr. Young,

 1  the same type of calculations, what the maximum tax

 2  deductible contribution, what's the minimum, you know,

 3  what's the budget amount, how much can be expensed.

 4      I moved to another large actuarial consulting firm,

 5  Towers Perrin in 1996, and subsequently moved to the Hay

 6  Group in 2002, and then 11 years later moved to PRM

 7  Consulting.

 8  Q    Okay.  Sir, you have certain certifications within

 9  your profession, do you not?

10  A    I do.  So in addition to the Fellowship of the

11  Institute of Actuaries, I'm also a fellow of the Society of

12  Actuaries, I'm a member of the American Academy of

13  Actuaries, I'm an enrolled actuary.  I'm also a fellow of

14  the Conference of Consulting Actuaries, I'm a member of the

15  National Association of Social Insurance, and I'm a member

16  of the International Actuarial Association.

17  Q    Are these groups and organizations respected within

18  your profession?

19  A    Yes, they are.  The Society of Actuaries is the

20  largest and they are the -- they -- they are the

21  organizations that sets exams and for people to become an

22  actuary and serve and provide actuarial services.  The

23  American Academy of Actuaries is an umbrella organization

24  that serves the profession by public face and interface with

25  Congress and others.  I served on the Board of the American

1    Academy of Actuaries for two years, and I served as

2    president of the Conference of Consulting Actuaries in 2010

3    to 2011.

4    Q    What is your educational background, please?

5    A    I have a bachelor of science from the London School of

6    Economics and Political Science and the actuarial

7    credentials, which I obtained after graduating.

8    Q    Have you taught or do you teach actuarial courses or

9    seminars?

10   A    Frequently.  There are two three-day continuing

11   education meetings, one in Washington at the enrolled

12   actuaries meeting and the Conference of Consulting

13   Actuaries, which is at different places around the country

14   each year, and I have taught at those three-day sessions,

15   those three-day conferences many, many times.  I've also

16   served as a faculty for the Society of Actuaries for a

17   number of different topics over the years.

18   Q    Have you been an examiner for actuary examination?

19   A    I was.  And I had the pleasure of serving as a second

20   grader, something that normally is done by people who are

21   seven years old, maybe.

22   Q    And you said "second grader"?

23   A    Right.  So I sat, I created actuarial examination

24   questions, submitted them, they were accepted, when they

25   were administered, somebody graded them for the first time.

```
 1   I graded them for the second time and they averaged the
 2   scores to see whether people should pass that question or
 3   not.
 4   Q    Okay.  If I followed you, you have in excess of 35
 5   years as an actuary, correct?
 6   A    Certainly over 30.
 7   Q    Okay.
 8        MR. MEEHAN:  Your Honor, I'd like to move the
 9   qualification and initiative of Mr. Reese as an expert
10   actuary for the Court and to be able to offer opinion
11   testimony on that topic.
12        MR. ALBAUGH:  No objection.
13        THE COURT:  All right.
14        MR. MEEHAN:  Thank you.
15   BY MR. MEEHAN:
16   Q    Mr. Reese, obviously, we're here on a particular case.
17   Can you tell me how you came to be familiar with this
18   matter?
19   A    Certainly.  The law firms represented by the attorneys
20   here retained my services, gave me some of the background to
21   the case, and I initiated a set of requests for information.
22   They provided the actuarial case memo, the August 22nd, 2013
23   case memo, and after reading that I issued additional
24   requests and obtained additional information trying to
25   essentially understand what was done by the author of that
```

1   PBGC memo in coming up with a calculation of the benefit

2   liabilities, subtracting off the assets to get to an

3   unfunded benefit liability.

4       The work of actuaries to be respected in the United

5   States has a set of standards that the work has to adhere to

6   and one of those is that an actuarial opinion needs to be

7   properly documented so that another actuary practicing in

8   the same practice area can assess whether the results are

9   reasonable.

10      So I attempted to do that.  And to do that I needed

11  data.  The PBGC had this list of so many people who are

12  included in that calculation, and -- and I think we tried

13  several times to obtain that data and ended up having an

14  electronic record of 2008 census data and used that to

15  create a data set with accrued benefits for each of the 1100

16  or so individuals.  This is a case where a lot of the

17  actuarial science is condensed down to a very small amount

18  of work.  The benefit amount has already been determined and

19  in the case memo PBGC acknowledged that the data was pretty

20  clean on that perspective, the calculations that they did

21  matched the amounts that the administrator had done.  So the

22  accrued benefit amount that's payable to each person were

23  pretty accurate.

24      We had dates of birth for almost all of the individuals

25  so we were able to work out how old people were and

 1    therefore how long they are going to live and how many years
 2    they will be receiving their pension benefits.  There were
 3    two data items that were not included in that electronic
 4    record and one of those was whether people had -- what their
 5    date of hire was if they had terminated, so did they have 10
 6    years of service or not?  Were they eligible for the early
 7    retirement benefit?  I mentioned that everyone's accrued
 8    benefit had been calculated.  That certainly was a big part
 9    of the list, a big part of the calculation had been done.
10    For people who already retired, that amount has essentially
11    already been decided.  If they were married and there was a
12    joint survivor benefit, it already been adjusted to account
13    for the spouse and the spouse's age.  But for people who are
14    not yet retired, we have the question of when are they going
15    to retire.  And if they had, you know, less than 10 years of
16    service, they were not eligible for the subsidized early
17    retirement benefit.  So that was one of the data items that
18    we needed to obtain.
19        For those people who did have 10 years of service the
20    question is, you know, would they retire at age 55.  So as
21    part of this analysis, you know, I formed a good data set
22    that tried to match to the PBGC's and I had some differences
23    in there.  In addition, counsel had provided documents from
24    this case identifying records in that 2008 census data,
25    names, dates of birth of people who are not eligible for

1   pension benefits from the News-Journal Corporation because

2   they weren't employees of the News-Journal Corporation.

3   Q    And we're going to get to that topic in some detail,

4   so you can sort of footnote it for now.

5   A    So on the data side it essentially had a good data set

6   to attempt to do this calculation.  I read through the memo,

7   understood what the PBGC assumptions sets were and

8   programmed them in valuation software that essentially does

9   a seriatim valuation for every single individual and

10  discounts the future benefit payments down to a liability, a

11  benefit liability.

12      I also looked at PBGC annual reports to better

13  understand the program in which the News-Journal pension

14  plan is going to be administered, and there are two

15  programs.  PBGC has a single employer and a multi-employer.

16  This is going to be administered by the single-employer

17  fund.  The annual reports have a consistent structure.  It

18  was easy to pull out from the last 10, 15 years worth of

19  reports information on the administration and management of

20  the Single-Employer Program.  The Single-Employer Program

21  itself is split into a couple of pieces, there is a trust

22  fund which is the piece that administers, you know,

23  terminated pension plans, and there's a revolving fund

24  which, as I understand it, is the place where those premiums

25  go that employers of single-employer pension plans are

1  submitting the premiums to.

2  Q    Where is this plan now?

3  A    This plan is now trusteed in the single-employer trust

4  fund.

5  Q    Okay.  Now, I asked you for an overview so I want you

6  to complete that, but I want to make sure I cover a few

7  points after that.  Are you finished with your overview?

8  A    I would say one additional part of that review of the

9  PBGC experience over the last 20 plus years was the

10  investment returns.  I guess I was surprised when I studied

11  it and analyzed it and found out what a pretty substantial,

12  you know, strong investment performance the single-employer

13  trust fund had had over the last 20 plus years.

14  Q    Okay.  And we will talk about that in a little bit.

15  So let me step you back.  Was there any data information,

16  anything of that nature, that you asked Cox's counsel for

17  that was denied to you?

18      And by that I mean, you know, we said no, you can't

19  have it.

20  A    Cox did not say you can't have it.  It was -- I think

21  you requested information at the same level to match to the

22  data set that was used by PBGC and we weren't able to obtain

23  that.

24  Q    Okay.  And have you identified what was missing?

25  A    I have.

1    Q    All right.  Did you also review the PBGC expert report

2    prepared or signed by Mr. Young?

3    A    I did.

4    Q    All right.  In general terms, what did we ask you to

5    do?

6    A    Essentially, looking at the claim, look at the

7    unfunded benefit liability, I would say look at the benefit

8    liability calculation and assess whether it was reasonable,

9    and my conclusion was the approach and methodology that, you

10   know, prescribed assumption or not prescribed assumption,

11   you know, policy, piece or methodology, it did not tie to

12   reality.

13   Q    Okay.  We will talk about that.  Did you attempt to

14   calculate PBGC's claim?

15   A    I did.  The first thing to make sure I'm on the same

16   page is if this is the data set and we were plus or minus 20

17   records out of 1100, so it was close but not an exact match,

18   I came within a few percent of the stated liability in the

19   August 22nd, 2013 memo and that gave me some comfort that

20   we're dealing with the right data set.  But I was still a

21   little concerned because I'm using a standard software

22   package that is used by dozens of actuarial firms and my

23   liability was coming up higher than that with which was

24   stated in the report and I had not been able to identify

25   why.

1   Q     Well, let me make sure I put a sharper point on it.

2   Were you attempting to -- were you attempting to put

3   together a claim for PBGC?

4   A     No.  I was trying to verify that I had the right

5   building blocks for my calculation, did I have the right

6   data, did I have -- you know, if I tied the data to their

7   assumptions, would I come up with the same result, and I

8   wasn't able to come up with the same result.

9   Q     Okay.  And, sir, you indicated that in your view

10  PBGC's approach does not match reality.  Are your opinions

11  on that topic set forth in your report and supplemental

12  report?

13  A     Yes, they are.

14  Q     Okay.

15        MR. MEEHAN:  Your Honor, if it's all right at this

16  point for the witness to have those documents in front of

17  him, I'd like to sort of walk him through that.

18        THE COURT:  All right.

19        MR. MEEHAN:  I'm going to hand him Joint Exhibit 1

20  and Joint Exhibit 2.

21  BY MR. MEEHAN:

22  Q     Mr. Reese, what is Joint Exhibit 1, please?

23  A     Joint Exhibit 1 is my November 15 expert report, and

24  Joint Exhibit 2 is my supplemental dated December 2013.

25  Q     And does that Joint Exhibit No. 1 set forth at least

1  in general terms the approach you used here?

2  A     It does.

3  Q     And does it set forth the materials that you

4  considered in forming your opinions?

5  A     Yes.  They are listed in Exhibit B.

6  Q     And does it speak to the opinions that you had formed

7  as of that point?

8  A     Yes, it does.

9  Q     Joint Exhibit No. 2, what is that?

10  A     After issuing my report I was still troubled that I

11  wasn't able to identify this margin of difference between my

12  liability calculation and the PBGC memo.  I examined -- I

13  think if I can back up.  This memo is about 20 pages, and is

14  a summary of the work performed by Milliman, which is 900

15  pages.  I took a deeper dive into the 900-page document and

16  found that there was a description of what happens to

17  somebody who retires with a marriage -- who's married and

18  there was an actuarial reduction to their pension to account

19  for a survivor benefit that did not tie to the description

20  of the married benefit in the PBGC case memo.  I looked at

21  the News-Journal plan document and found that the normal

22  form for a married person is not an automatic joint

23  survivor, it's an actuarial equivalent joint survivor which

24  means that a single-life pension is a thousand dollars a

25  month and you're married, you have to give up some of that

1    thousand to pay for the survivor benefits.  So it might be

2    950 a month and then after the retiree dies the survivor

3    receives 475.  When I realized that was the normal form, I

4    needed to go back and recalculate the work that I had done,

5    and then I tied within a -- very well within a margin of

6    difference between two different valuation systems and that

7    led me to -- me to issue the supplement report.

8    Q     So was that an error in the actuary case memo?

9    A     I think I called it an error.  It was not properly

10   describing the benefits.

11   Q     Okay.  And just so the record is clear and to follow

12   along, did -- the actuarial case memo you're talking about,

13   that's joint Exhibit 3, and the three-volume Milliman

14   detailed report that's joint Exhibit 4, 5 and 6, right?

15   A     Correct.

16   Q     Okay, sir.  Now, in the interest of cutting to the

17   chase, can you explain to us what opinions you formed with

18   respect to the assumptions that were used by the PBGC and

19   what you believe a more reasonable computation of the

20   unfunded benefit liabilities here should be?

21   A     Certainly.  I had quantified in my expert report and

22   in the supplemental the reasonable interest rate that will

23   be used, in other words, the amount of asset billings rate

24   on the assets held by PBGC.  For those employees who have

25   not yet retired, a more reasonable age which they would

1  retire.  One reason why this is important and hasn't been

2  mentioned to date is the plan has a role that gives early

3  retirees a boost in their pension.  So if somebody was able

4  to receive $1,000 a month when they're retired at 65 or 55,

5  they'll take it at 55.  There's an actuarial reduction in a

6  lot of plans that would take that $1,000 a month down to

7  more like $400 a month.  For this plan the actuarial

8  reductions are not equivalent, but formulaic.  And because

9  of that the benefit was essentially $500 a month at age 55,

10  and so it was boosted by 15 to 18 percent for people that

11  took that early retirement subsidy.  That's only available

12  if people have 10 years of service.  And therefore, that's

13  one of the assumptions that was an important element in the

14  measurement, and I think the appropriate measurement of the

15  liabilities.

16       A third assumption that I looked at in great detail was

17  mortality, and there is one area where I was looking for

18  some more information and was not able to obtain it.  In

19  America life expectancy is very much determined by economic

20  status, blue-collar or white-collar, white-collar people

21  live longer than blue-collar, and I needed to understand

22  what's the mix of the employees in this organization and

23  that data was not available.

24  Q    Okay.  So let me bottom line here and then we will go

25  to these assumptions for more detail.  Have you formed, sir,

1 an opinion as to whether the assets available in this case,

2 roughly $28 million, are or are not sufficient to cover the

3 expected liabilities?

4  A      I have.

5  Q      What is your opinion?

6  A      In my supplemental report, table S1, I measured the

7 liabilities using a long-term interest rate, asset earnings

8 rate of just under 8 percent, I continued to use the PBGC

9 mortality table.  I'll get back to that.  I used early

10 retirement assumptions in line with the plans experience and

11 that liability was just under 28.1 million.  28.1 million is

12 less than the assets of 28.6 million and therefore there is

13 no unfunded liability.  That's actually a small surplus.

14  Q      So in your opinion the assets are more than enough to

15 cover the expected liabilities?

16  A      Correct.

17  Q      Okay.  We have had some conversation here today about

18 the ineligible participants.  I want to ask you about that.

19 So what did you determine with respect to this issue?

20  A      I identified the records -- 22 records of individuals

21 who had been included in the PBGC data set and I measured

22 them using the assumptions that the PBGC actuarial -- well,

23 Milliman actuary had used and the liability for those 22

24 ineligible record is $1 million.

25  Q      And so do you have an opinion as to whether those

1    ineligible participants belong in the data set?

2    A    I'm not a lawyer but a clear reading of what makes you

3    a participant in a plan is you have to be an employee of the

4    organization.

5    Q    Okay.  Well, you know, I'll do it the easier, I don't

6    want to ask you for a legal opinion, but assume for the

7    purposes of this question that as we called them the

8    ineligible participants are ineligible.  Are you saying your

9    calculation is that that represents about $1 million of the

10   liability?

11   A    Correct.

12   Q    And mathematically, then, what would I do with that

13   million dollars if I want to compute the change?

14   A    Take it off.

15   Q    So that would be subtracted from PBGC's computation?

16   A    Correct.

17   Q    And I want to hold the interest rate for a moment.

18   Marital status, what was your assumption there?

19   A    I thought this was important when reading the PBGC

20   case memo because it described the normal form for a married

21   participant as an automatic joint and 50 percent survivor.

22   So I thought that there was a boost in the value if people

23   were married.  That turned out not to be the case.  So

24   although this assumption of "if I don't have the data,

25   everyone's married," it can be important in other cases.

1  For this one, it's not.  It doesn't have an impact on the

2  liability.

3  Q    But now in this case, PBGC assumed that 39

4  participants for whom it had no data were married, right?

5  A    And it won't have an impact because if they -- if they

6  did it correctly, it would have reduced the benefit from a

7  single-life annuity to a reduced joint and survivor annuity.

8  Q    And has PBGC done that correctly?

9  A    I believe they have.  From the examination of 50 to

10  100 of the pages of the 900-page Milliman case memo, there

11  were examples of how they had made those calculations.

12  Q    Okay.  Because I want to walk through this in a way

13  that's very clear as to where your opinions are and where

14  they line up and they don't line up with the PBGC.

15      So now, with respect to the expected retirement age,

16  what was your assumption as to what is reasonable to use and

17  how does that differ from PBGC?

18  A    So I looked at the plan actuary, the actuary who had

19  been preparing the valuations for News-Journal Corporation

20  for several years, and that actuary was using a set of early

21  retirement assumptions probably built from experience, I

22  looked at the data on the retirees and there were over 300

23  retirees, and worked out at what ages did they retire.  And

24  in the interest of time, Mr. Meehan, if you could put

25  page 24 of my expert report up, it will help, I think, in

1 explaining the analysis that I did.

2 Q    Okay.  I'm putting page 24 of joint Exhibit No. 1,

3 your expert report, up on the projector.

4 A    So employees of the News-Journal pension plan can

5 retire as early as age 55.  What I found was only about

6 10 percent retired at age 55.  Of the small number retired

7 at ages 56 through 61, there was a jump at age 62 and that's

8 fairly common.  I see that in a lot of plans because

9 employees can start receiving social security benefits at

10 age 62.  After that bump at 62, a certain percentage five or

11 10 percent retired as 63 or 64, but the data showed that of

12 those eligible to retire at age 55, only 50 percent retired

13 before age 65.  And more importantly because the boost in

14 the benefit for retiring early, only 10 percent were

15 retiring early at age 55.  I, therefore, used the pattern of

16 retirement experience observed from the retirees and applied

17 that to the future retirees, the people who are currently,

18 you know, employees -- the terminated vested employees.

19 Q    So what is the impact on the computation of PBGC's

20 claim here of using actual data rather than the hypothetical

21 data from the regulation?

22 A    So in my supplemental report I quantified that as

23 about a $2.2 million increase in liability moving from a

24 pattern of retirement assumptions in line with experience to

25 either everybody retiring at age 55 or following the gray,

 1   green, and red lines depending on the size of the pension

 2   benefit.

 3   Q     Can you show us in your supplement report where you

 4   lay that out?

 5   A     So on page 3 of the supplement report.

 6   Q     Let me -- I'll put that up.

 7         This is your supplemental report.  If you can explain

 8   to us where we see that.

 9   A     So at the bottom I have --

10   Q     And quantify the impact, if you will.

11   A     So at the bottom I have all of the assumptions that I

12   have set up that are different from the calculations that

13   we're done by Milliman, and my liability is 28084.  The next

14   step up from that, the one thing that has changed is, I have

15   now replaced my retirement rates with PBGC's early

16   retirement assumption and the difference there is 2.2

17   million.

18   Q     And you're getting that 2.2 because you're subtracting

19   the 30.3 million -- you've subtracted from the 30.3 million

20   that's directly above that?

21   A     Correct.

22   Q     So if we were to follow your approach of the actual --

23   well, the reality, if you will, of the experience here --

24         THE COURT:  I think history might be better than

25   actual or reality.  The witness testified that the

1   occupation and professional judgment of an actuary is to

2   help entities deal with future based on assumptions, and by

3   its nature we're not talking about actuality in the future.

4   So in reality, we're talking about projections and he's

5   using history.

6           MR. MEEHAN:  Your Honor, I want argue that point

7   that I was adopting merely the terminology that Mr. Young

8   had used in calling it reality, but I can rephrase.

9           THE COURT:  Actually, that was your word.

10          MR. MEEHAN:  Your Honor --

11          THE COURT:  You asked him to agree to it.

12          MR. MEEHAN:  I think that's right.  And I think

13  the record will reflect that he did.  But I don't need to

14  frame the question that way.  I can do it a different way.

15          THE COURT:  I think it's misleading the way you're

16  using it.

17          MR. MEEHAN:  Well, then, Your Honor, I'll

18  certainly rephrase it.

19  BY MR. MEEHAN:

20  Q    So if we use the plan experience in this regard,

21  that's what you were attempting to compute comparing that to

22  the PBGC assumption?

23  A    That's correct.  And I mentioned I also took into

24  account the early retirement rates that the plan actuary who

25  had been, you know, managing this plan for several years had

 1  used, and that plan actuary, you know, had obviously

 2  obtained a lot of data and experience and the rates that I

 3  developed 10 percent at age 55, et cetera, were in line with

 4  and a little bit more conservative, in other words, more

 5  people retiring a little bit earlier than had been used in

 6  the past.

 7  Q    Okay.  Sir, mortality.  Did you have an opportunity to

 8  form an opinion with respect to the reasonableness of PBGC's

 9  mortality table?

10  A    I did.  And again --

11  Q    What's your opinion in that regard?

12  A    It's a very conservative mortality assumption.  If I

13  can ask you to, you know, for example, look on page 27 of my

14  report.

15  Q    Yes.  And please explain what you mean by very

16  conservative.

17  A    So the chart shows the life expectancy of females at

18  age 65 over time.  So back in 1990, the U.S. population life

19  expectancy for females was about 19 years.  So on average a

20  female age 65 would expect to live another 19 years.

21  Actually, it's about the same come 2000.  And then since

22  2000 there has been a gradual increase in life expectancy,

23  so that by 2010 a life expectancy of females is 20.5.  So

24  it's increased, you know, one and a half years over a period

25  of two decades, most of that in the last half of this

1  period.

2      The blue line at the top shows the life expectancy

3  based on the PBGC mortality table which includes a

4  projection of future improvements in immortality.  My

5  calculation is that the pattern of improvements that we're

6  seeing in the U.S., if it continued at the pace it has been

7  in the last, you know, 10, 20 years, it would not reach that

8  22.4 years for 26 years.  So anybody who is already 65,

9  they're not going to have that type of extended life

10  expectancy.  But somebody who is now 30 may be.  And because

11  90 percent of the liabilities –– 90 percent of the benefit

12  payments are going to be paid out over the next 26 years,

13  it's almost –– not all but almost all the majority of the

14  payments, this extended life expectancy projection is pretty

15  conservative.

16  Q    What's the effect on the computation of the claim?

17  A    And I measured that a couple of ways and it's between

18  a half a million and a million in terms of the use of the

19  kind of blue line mortality, a longer life expectancy

20  increases the liability between a half a million and a

21  million.

22  Q    So does that mean in your approach you would take that

23  half a million to a million off?

24  A    To get to best estimate expectation for life

25  expectancies, I would take that off.

1  Q    Okay.  Before I get to the interest rate assumption,

2  are there any other principal assumptions that you were

3  making in forming your opinions that differ in any way from

4  the PBGC?

5  A    No.  As I said, a lot of the pieces here are already

6  in place.  We know what the accrued benefits are, we've got

7  decent reconciliation of data after removing the

8  ineligibles.  The only real key variables or parameters or

9  assumptions are the ones that are laid out on this page.

10  Q    Okay.  Let's talk about the interest rate assumption.

11  How, in your opinion, should the interest rate assumption be

12  computed for this case?

13  A    So it's a really good question because I think we need

14  to look to what does the PBGC do.

15  Q    What do you mean by that?

16  A    It holds the assets, it invests the assets and it uses

17  the investment earnings on the assets and the assets

18  themselves to pay benefit payments.  I also say we have to

19  look at what it does not do.  It does not buy annuities, it

20  does not contact, you know, Metropolitan Life or Prudential

21  and say, how much would it cost to take care of these 100

22  individuals for rest of their lives and get a price and pay

23  that money over to them.  What it's doing is operating a

24  pension plan structure very much like, you know, IBM and GE

25  and the rest of the Fortune 500 who continue to have pension

1   plans.  It's investing the money and using the earnings from

2   that to pay the benefit payments.

3   Q    And how well has PBGC been doing with respect to its

4   investment management?

5   A    And that's, again, one of the surprises I got from

6   analyzing this.  Remarkably well.

7   Q    And the source for your data was?

8   A    The PBGC annual reports.

9   Q    Can you show us in your report, perhaps walk us

10  through how you approached this?

11  A    Table 7 is a, kind of a top line analysis and then I

12  will walk you way back.  Table 7 is on page 13.

13  Q    Let me put that up on the projector so everybody can

14  follow along.  Page 13, table 7.

15      Okay.  So, sir, can you explain to us what you're

16  attempting to show us there?

17  A    So in each year, the PBGC reports on the performance

18  of its funds, the single employer and the multi-employer

19  plans.  The investments are in different types of asset

20  classes, primarily fixed income and equity, and in order to

21  kind of judge how well the PBGC is doing in managing those

22  assets, it compares its investment performance to standard

23  benchmarks for each of the asset classes.

24      Table 7 shows that in the five years for 1992 to up

25  '97, they beat the fixed income benchmark by an average of

1   2 percent per year, '98 through 2002 in line with it.  Now,

2   2003 to 2007 an additional 0.3 percent return, and the last

3   five-year period 1.2 percent higher than the fixed income

4   benchmark.

5       For the equity portion of the portfolio, broadly in

6   line, I mean, plus or minus 0.1 percent, pretty much in line

7   with the market.  Another element to this is if you look

8   over the full 20-year period what was the single equivalent

9   long-term return on assets and that's disclosed in a couple

10  of charts in here.  But maybe the easiest one to look at is

11  on table 8, page 15.

12  Q    Okay.  Let me flip to that.

13      All right.  Could you explain to us what this table is

14  about and in particular touch upon the differences between

15  the real returns and the nominal returns?

16  A    So the first column looks at the total PBGC return

17  over the last five, 10, 15, 20, and I actually was able to

18  go back 22 years.  But if we just look at the last 20 years,

19  the return was 8.67 percent.  They had earned on average

20  each year 8.67 percent.

21      When actuaries and other advisers to pension plans

22  establish kind of forward-looking asset returns, they build

23  the -- they do it in a building block.  What do we think

24  inflation is going to be and what do we think the real

25  return on top of inflation is going to be.  As you can see

 1  over the different time periods inflation looked -- going

 2  back has ranged from 2.1 to 2.6 percent, so it's important

 3  to understand how much is the nominal return because there

 4  was high inflation in those years and how much was real

 5  return above inflation.

 6  Q    Nominal includes real turn and the expected

 7  inflationary --

 8  A    Correct.  Nominal is the actual, you know, amount that

 9  you would receive.

10      The real return, the last column, is mathematically by,

11  you know, subtracting out or geometrically removing the

12  inflationary component and we can see there that the real

13  return over the last 20 years was just over 6 percent.

14      So that's the history.  I then built the next part of

15  the --

16  Q    Before you move on can I ask you, you went back 22

17  years and the return there is higher.  6.74 percent, right?

18  The average for the 22?

19  A    Correct.

20  Q    Okay.  Why didn't you use that?

21  A    I think that there's some element of I want to have a

22  good sense of the future time period over which these

23  benefits are going to be paid.  I mentioned before that

24  90 percent are going to be paid over 26 years.  I think it's

25  something over 70 percent over the next 20 years.  I think a

```
 1   couple of those very early years were, you know, above
 2   average returns.  I didn't want to bias any analysis by
 3   including those, so I removed those from my calculations.
 4   Q     You were excluding certain periods to be more
 5   conservative?
 6   A     Correct.
 7   Q     Okay.  Please continue.
 8   A     So the forward inflation what do we think inflation is
 9   going to be.  There are better minds in mind.  In fact,
10   there are boards of actuaries that assess this.  One of
11   places I looked at was the social security trust fund.  It
12   has an economic assumptions board made up of economists and
13   actuaries, and their intermediate assumption, the kind of
14   middle assumption is 2.8 percent inflation.  But they have
15   something less than that in the short-term.  I think we're
16   seeing some low inflation currently.  So using their lower
17   shorter term inflation, I got to not 2.8 percent but
18   2.6 percent because I'm not looking at a 75-year horizon.
19   I'm looking at a 40-year horizon.
20   Q     Is that another instance of you using a more
21   conservative assumption?
22   A     A little bit, but I think appropriate for the
23   measurement.
24   Q     Please continue.
25   A     So I looked at some other sources, the largest
```

```
 1  retirement systems in the U.S. are the civil service
 2  retirement system.  They have a board of actuaries.  I was
 3  an actuary, signing actuary of the Commonwealth of
 4  Pennsylvania.  A lot of the state retirement systems have
 5  investment committees and they receive advice from actuaries
 6  and economists on setting those assumptions, so this wasn't
 7  just a single point, it was used in a lot of information and
 8  it was in line with the recommendations from those boards.
 9  So recommendation or the selection is 2.6 percent for the
10  discount rate.
11  Q    In using those recommendations, is that consistent
12  with the standards in your profession?
13  A    It is.
14  Q    Can you explain how so?
15  A    The -- we have touched on a number of actuarial
16  standards of practice.  There is one for setting economic
17  assumptions and the investment return assumption is one of
18  those.
19  Q    Is that the ASOP 27?
20  A    Correct.  And it sets out approaches that are to be
21  included in the selection of the asset return assumption,
22  and the approach of -- building block approach of what you
23  think future inflation is going to be, and what do you think
24  the real return is going to be, is one of those elements of
25  that methodology.
```

```
 1   Q    Let me hold you there for a moment because I'm sure
 2   you heard Mr. Young indicate that he felt that he is bound
 3   to follow the PBGC regulation in selecting the interest rate
 4   assumption.  You heard his testimony along this line?
 5   A    I did.
 6   Q    You don't seem to feel you're bound to use the PBGC
 7   interest rate assumption?
 8   A    Correct.
 9   Q    Okay.  Can you explain why you don't feel you're
10   bound?
11   A    I'm not signing as the chief valuation actuary on
12   their report.  I'm assessing what I think is the most likely
13   results from investing $28.6 million in the single-employer
14   trust fund and with its historically strong investment
15   management performance, continuing that performance with
16   expectations of the strong oversight and management what
17   would the -- what's a reasonable expectation for the
18   investment performance going forward.
19   Q    All right.  Okay.  So you were explaining how you were
20   proceeding.
21   A    If you could put page 17 up, I think it helps in the
22   next step of my analysis.
23   Q    Page 17 with tables?
24   A    10 and 11.
25        The table 10 shows the historical real return.  This
```

```
 1   is the return on top of inflation in the 10 years from '93
 2   to 2002 and the 10 years from 2003 to 2012.  And there is a
 3   range there.  One period was 4.75, one period was 7.31.
 4   Over the full 20-year period it was 6.02.  A reasonable
 5   range of real return would be in the 4.75 to 6, and again,
 6   this is where I'm -- the 7.3 has maybe got some one-time
 7   effects, you know, Internet, whatever, but some elements
 8   that have affected the investment performance over the last
 9   20 years that might view it as a one-time event and because
10   of that, the point I selected in that range, so it's 2
11   points.  The top end I didn't put 7.3.  I put 6.  I put
12   something substantially below what had been experienced in
13   the 10-year period from '93 to 2002.
14        And then secondly, I selected not the midpoint of the
15   range, but something below the midpoint.  So I get another
16   degree of conservatism in the selection of the real return
17   assumption.
18        And now, unfortunately, Your Honor, this is the hard
19   math piece, I have got 5 and a quarter as real return and
20   2.6 and you're going to say, well, then why isn't the answer
21   7.85?  Why am I using 7.99?
22   Q    Good question.  Please explain.
23   A    And it's because it's one plus 5 and a quarter times
24   one plus 2.6 and that gets to the 7.99.
25   Q    Okay.
```

```
1   A     But these are geometric and not arithmetic additions.

2   Q     So the formula you just gave comes from where?

3   A     It's on the page and it's the approach that's used

4   uniformly in developing real returns from nominal returns.

5   Q     So that's a standard --

6   A     Standard.

7   Q     -- statistical approach?

8   A     Yes.  It's a definition approach.

9   Q     Okay.

10  A     Table 11 shows a range of had I not selected the

11  midpoint, had I selected something lower or higher what

12  would have happened, and shows the bottom end of the real

13  return, nominal return, and therefore, you know, normal

14  return has a range of 7.37 to 8.92, but I feel more

15  comfortable that the appropriate rate would be the 7.99.

16  Q     In connection with your work on the interest rate

17  assumptions that you just walked us through, at any point

18  did you make a judgment to increase an estimate?

19  A     No.  I think in three places I purposefully thought

20  about the experience and took something off the table.  So I

21  didn't take into account the full, you know, very strong

22  performance in the first 10 years of the 20-year look back.

23  I didn't take the midpoint in the range, I took something

24  below the midpoint.  I didn't take the 2.8 percent inflation

25  assumption, intermediate assumption from the trustees; I
```

```
 1   took 2.6.  So I got three places where I've developed some
 2   measure of conservatism in the development of these
 3   assumptions.
 4   Q    All right.  And what is the overall effect on the
 5   computation of the claim of using the interest rate
 6   assumption that you are positing compared with the
 7   prescribed -- the number from the PBGC regulations.
 8   A    And if I can ask you to put table S-1 back up from the
 9   supplemental, I think that completes the picture.
10   Q    Yes.
11   A    So we have essentially walked up the page from the
12   28.1 to the 30.3 which was the retirement assumption and the
13   next step replaces the latter 4.89 percent for 20 years,
14   4.63 thereafter with 7.99, that's the 12, just under
15   12 million difference.
16   Q    Okay.  Just to round this out briefly.  PBGC's
17   reliance on the annuity rates, you've already given various
18   opinions that you have on that point.  Is the ACLI survey
19   reliable for what it attempts to replicate?
20   A    I think its methodology has got something to be asked
21   for given the importance of what it's being used for.
22   Q    What do you mean, sir?
23   A    These are not actual annuity quotes on a set of 1,000
24   lives, how much would you pay to take over this policy.
25   Q    What are they?
```

1  A    They are annuity rates for 15 spot ages.  So it's

2  using 15 data points and then my understanding of the

3  process takes off the highest and lowest and averages the

4  middle, averages to get to a number in the middle.  That

5  certainly wasn't the approach I took when I had a pension

6  plan that went through a standard termination and we needed

7  to annuitize it.  We got insurance quotes and we took the

8  best price.  We didn't say here's a price of 10 million,

9  here's a price of 12 million, I'll pay you $11 million.  We

10  took the 10 million.

11  Q    What is the effect on PBGC's calculation of its claim

12  by choosing this midpoint in the pricing?

13  A    I haven't quantified it.  But directionally it would

14  be up.

15  Q    So it makes the claim higher?

16  A    Yeah.

17  Q    And is there any data available that you were able to

18  look at in this case that could help quantify the exact

19  impact of picking that midpoint rather than the low point?

20  A    I haven't seen any data to be able to quantify that.

21  Q    So as far as you know that's not something that PBGC

22  can calculate?

23  A    They can calculate it because I believe the ACLI

24  survey provides them with all the information and not just

25  the average.

1   Q    I see.  But it's not something that's been made

2   available?

3   A    No.

4   Q    The PBGC insurance premium program, do you have an

5   understanding as to what that is, sir?

6   A    I do.

7   Q    What is your understanding?

8   A    It's a structure to obtain revenue from ongoing

9   pension plans to cover historical and future likely unfunded

10  liabilities managed by a trustee for single-employer plan.

11  Q    Were you able to determine approximately how much in

12  premiums NJC played -- paid here before the plan was

13  terminated?

14  A    I had data on the single employer per participant

15  premiums.  There were a few years where they paid a variable

16  premium, and based on that information and again I only went

17  back 15 years, I didn't go back the 30 years that the plan's

18  been in existence, the sum of the premiums paid, you know, I

19  believe they're adopted into the revolving fund.  I

20  cumulated them with interest at the revolving fund earnings

21  rate, it's about $1.2 million in today's terms.

22  Q    And that $1.2 million is not taken into account in

23  connection with the claim, correct?

24  A    No.

25  Q    Have you had an opportunity to study the payments that

1    have been made by PBGC on the plans since its termination?

2    A      Somewhat.

3    Q      Okay.

4    A      In my model I have a year-by-year projection of the

5    benefit payments being paid out of the fund.  I think it's a

6    very accurate model because a large portion of that -- of

7    the current retirees, it's the same data set that PBGC used

8    for the current retirees.

9    Q      And, sir, you're aware the data plan termination here

10   was in March of 2010?

11   A      Yes.

12   Q      Okay.  How has the PBGC done?  Is it ahead of the game

13   or behind the game since then?

14   A      So just looking at the single-employer trust fund,

15   kind of the place where these assets are sitting, the

16   four-year return for fiscal '10, '11, '12 and '13 is like

17   8.9 percent return for compound average for those four

18   years.

19   Q      And so what does that mean in terms of whether PBGC,

20   at this moment, on this snapshot, is a net gain or a net

21   loss in terms of administering the plan?

22   A      They're a net gain even against my 7.99 assumption.

23   They're a, you know, huge gain against, you know, the lower

24   rates that PBGC had used for measuring the liability.

25   Q      Okay.  So far PBGC has had more than enough assets to

1    pay out all of the claims that have come due under this

2    plan?

3    A    Yes.  I mean, at using the 7.99 percent they would

4    have -- they have -- the 28 million of assets is more than

5    sufficient.  The first four years of the program's

6    experience it's moved it to, you know, 30 -- $32 million in

7    assets relative to the liabilities.  So it certainly has

8    enhanced its funded status.

9    Q    Sir, the two exhibits in front of you, just to -- for

10   efficiency purposes, do you adopt them as part of your

11   testimony here today?

12   A    I do.

13   Q    Let me show you just as I showed the others, the

14   PBGC's pretrial memorandum from January 8th of this year.

15   I'll read that same sentence, page 10 and 11:  "PBGC's

16   regulation seeks to replicate the price to an employer who

17   would pay to close out a pension plan in a standard

18   termination through the purchase of annuities, thereby

19   ensuring that pension termination liability will be measured

20   in a fair, objective, and consistent manner."

21        You see that sentence, sir?

22   A    I do.

23   Q    Do you agree that PBGC's approach is fair, objective,

24   and consistent?

25   A    If you could put the second page back up again.  I

 1  would say not only is it not consistent because the

 2  methodology comes up with a different price between

 3  September 30 and October 1, I wouldn't even say it's

 4  objective because it's relying on unverifiable point

 5  estimate datas from annuity providers, but it's not

 6  purchasing annuities.  That's the real key to me is PBGC is

 7  not purchasing annuities.  If they were purchasing

 8  annuities, then it's like Freddie Mac, you know, packaging

 9  together a lot of mortgages and holding on to them,

10  equivalent to the banks holding on to them.  They're not

11  doing that.  They're investing the money in their plan,

12  doing a really good job of investing it.

13  Q    So are you implying it's unfair in some way?

14  A    It's probably unfair to many.

15  Q    In what sense?

16  A    It's over charging for the risk that they're holding.

17        MR. MEEHAN:  I have no other questions at this

18  point, Your Honor.  Thank you.

19        THE COURT:  We'll take our afternoon recess.

20  We'll reconvene in a few minutes.

21                    (Recess)

22        THE COURT:  Cross-examine.

23                 CROSS-EXAMINATION

24  BY MR. ALBAUGH:

25  Q    Good afternoon, Mr. Reese.

```
 1   A     Good afternoon.
 2   Q     You chose as an investment return rate of 7.99 percent
 3   to discount the News-Journal pension plans liabilities,
 4   correct?
 5   A     Correct.
 6   Q     For your proposed 7.99 percent investment return rate,
 7   you did not obtain that rate from either Title IV of ERISA
 8   or PBGC's regulations.  Is that right?
 9   A     Correct.
10   Q     And in developing your proposed investment return
11   assumption, you relied on guidance provided by the actuarial
12   standards board and ASOP 27?
13   A     Correct.
14   Q     If I could talk to you a little bit about that ASOP.
15   I'm going to use the screen over here.
16         I'm going to show you what's been marked as joint
17   Exhibit No. 7.  And do you recognize this to be the ASOP
18   that you used in preparing your report?
19   A     Yes.
20   Q     I'd like to direct your attention to section 1.2 of
21   the ASOP.  And in particular, I'll point out.  I'm reading
22   from the paragraph on the bottom of page 1, and it says and
23   I'll quote, "This standard does not apply to the selection
24   of an assumption where the actuary is precluded from
25   exercising independent judgment by an applicable law
```

 1  regulation or other binding authority."

 2      Do you see that?

 3  A    I do.

 4  Q    Mr. Reese, if a client came to you and asked you to

 5  prepare the, quote/unquote, unfunded benefit liabilities for

 6  a pension plan, from where would you obtain the assumptions

 7  that you used for that calculation?

 8  A    The determination of an unfunded benefit liability is

 9  the difference between a liability and an asset.  So the

10  first thing I would ask is as of what date are you looking

11  to make this measurement because the interest rates change

12  on a month-to-month basis.  Where would I go to identify the

13  interest rate, the PBGC website.

14  Q    And I think what I'm getting at is, you would look to

15  the PBGC regulations, correct?

16  A    Regulations and the results of calculations by PBGC's

17  staff as posted on their website.

18  Q    If I could direct your attention back to the ASOP 27

19  and in particular on page 7, I'd like to point out section

20  3.6.3, which is titled "Measurement Specific Factors."  Do

21  you see that?

22  A    I do.

23  Q    And now I want to quote from the -- start of

24  subsection A there, and it says, "Purpose of the

25  measurement:  The purpose of the measurement is a primary

1   factor, for example, an actuary measure of a plan's

2   determination liability may use an investment return rate

3   reflecting interest rates implicit in current or anticipated

4   future annuity purchase rates."

5        Do you see that.

6   A    I do.

7   Q    Mr. Reese, in preparing your proposed 7.99 percent

8   investment return assumption, that does not reflect interest

9   rates implicit in annuity prices.  Is that right?

10  A    Correct.

11  Q    So you chose not in calculating the termination

12  liabilities to -- for the News-Journal pension plan, to use

13  interest rates implicit in annuity prices?

14  A    If you could put that section back up again so I can

15  read it again.

16  Q    Of course.  Is that close enough?

17  A    This is interest rates implicit in annuity purchase

18  rates.  And I did not use those because the PBGC is not

19  purchasing annuities.

20  Q    So that -- that answer is no to my question?

21  A    Correct.

22  Q    Now I'd like to direct your attention to your report,

23  which is marked as joint Exhibit No. 1.  And in particular,

24  page 14.  In your report you discuss certain items that an

25  actuary should review in preparing an investment return

1  assumption, is that correct?

2  A      I did.   Correct.

3  Q      And in particular, your report notes among other

4  things that an actuary should review current yields to

5  maturity on fixed income securities, such as government

6  securities and corporate bonds, is that right?

7  A      Correct.

8  Q      In preparing your proposed 7.99 percent investment

9  return assumption, you did not review current yields to

10 maturity for fixed income securities, is that right?

11 A      Well, I couldn't because the information is not

12 available in the PBGC annual reports.  It doesn't list the

13 investment holdings to be able to prepare an analysis of the

14 current yields to maturity.

15 Q      For purposes of preparing your investment assumption,

16 you're assuming a future asset allocation that includes

17 70 percent fixed income security, right?

18 A      No.  I think the single-employer trust fund has more

19 like 50 percent fixed income.  The PBGC Single-Employer

20 Program as a whole has 70 percent fixed income, but the

21 trust fund in which these assets reside is more like

22 50 percent.

23 Q      And in developing your 7.99 percent proposed

24 investment return assumption, were you looking at the

25 Single-Employer Program as a total or as a trust fund?

1  A     I looked at both, but in developing the 7.99 percent

2  return, it's focusing on the single-employer trust fund.

3  Q     The trust fund and not the --

4  A     No.

5  Q     -- single employer?

6  A     The investment performance of the two is similar,

7  although the trust fund is slightly higher in part because

8  it has an equity portfolio.

9  Q     Turning back to your report, you also note that the

10 actuary should review forecast of total returns for each

11 asset class, is that correct?

12 A     Correct.

13 Q     Did you look at the forecasts for returns on any asset

14 classes in preparing your 7.99 percent investment return

15 assumption?

16 A     I looked at total returns for similarly situated trust

17 funds, funds that had similar to PBGC's trust fund of about

18 48 to 50 percent equities.

19 Q     You looked at forecasts of returns for those funds?

20 A     Correct.

21 Q     Is that reflected in your report?

22 A     Yes.

23 Q     And if you could direct my attention to where that is.

24 A     The investment return assumption's embedded in the

25 information that's reported by the Fortune 500, Fortune 1000

1  pension plans.  I think it's maybe -- it's one of the items

2  mentioned in my report here.

3  Q    If you could just bear with me for a minute.

4       Mr. Reese, in preparing your 7.99 percent investment

5  return assumption, did you look at forecasts for how

6  equities are expected to return?

7  A    Not directly, no.

8  Q    I think earlier in your report in reviewing historical

9  PBGC returns, you compare the returns with certain

10 benchmarks, correct?

11 A    Correct.

12 Q    And you did that because you wanted to get comfortable

13 with the PBGC's historical return against those benchmarks,

14 is that right?

15 A    That was one element of it, yes.

16 Q    And did you compare your proposed 7.99 percent

17 investment return assumption against any forecasts for how

18 fixed income securities or equities will do into the future?

19 A    Not directly.

20 Q    Your report also references certain studies that were

21 prepared by the Department of Labor and Towers Watson.  Is

22 that right?

23 A    Correct.

24 Q    And in particular, those studies concerned investment

25 returns by pension plans.  Is that right?

1   A   Correct.

2   Q   Were those studies looking at ongoing pension plans,

3   plans that have not terminated?

4   A   Correct.

5   Q   And with a ongoing pension plan, if during any given

6   year the investment returns turn out to be poor, there's a

7   chance that the plan sponsor will be required to contribute

8   additional money, is that right?

9   A   It depends on a number of factors, including whether

10  the plan has a large credit balance and doesn't need to

11  contribute additional monies, but it will be plan specific.

12  Q   But poor investment returns could be a reason why the

13  sponsor needed to increase its contribution?

14  A   Correct.

15  Q   The News-Journal pension plan that's terminated,

16  though, right?

17  A   Correct.

18  Q   And so News-Journal will not be making any future

19  contributions to the plan?

20  A   Correct.

21  Q   And your report you have also developed an assumption

22  about expected retirement age, is that correct?

23  A   Correct.

24  Q   And in preparing your assumption you looked at

25  historical retirement experience for the plan participants,

1  is that right?

2  A    As well as the retirement assumptions that were used

3  by the News-Journal plan actuaries for several years.

4  Q    News-Journal's assets, they were sold to a third

5  party, right?

6  A    That's a legal question.  Not an actuarial question.

7  But...

8  Q    Are you familiar with what happened in News-Journal's

9  operations?

10  A    I understand that they went through bankruptcy and

11  were -- I'll stop there.

12  Q    In developing your expected retirement age assumption,

13  did you do any research into the current business operations

14  of what was News-Journal?

15  A    No.

16  Q    So you didn't check whether the current operator has

17  conducted any layoffs after the sale?

18  A    I did not.

19  Q    And in the historical plan experience and the prior

20  actuary's assumptions on which you developed your expected

21  retirement age assumptions, the participants had to

22  terminate their employment with News-Journal before they

23  could draw a pension benefit, is that right?

24  A    Correct.

25  Q    Do you know at this point whether plan participants

1   need to terminate their employment to begin drawing a

2   benefit from the PBGC?

3   A    Whether they do or they don't, they're eligible to

4   receive a benefit immediately.

5   Q    Whether they retire or not?

6   A    Correct.

7   Q    Mr. Reese, in preparing your report, did you conduct

8   any research into the process by which PBGC establishes the

9   interest rate assumptions used to calculate terminated plan

10  benefit liabilities?

11  A    Yes.  I read a memorandum of the description of the

12  PBGC approach using ACLI to survey annuity providers.

13  Q    And what was that memorandum?

14  A    Oh, I think it's a, I think it's a publication.  I'm

15  going to say it's on the PBGC website because I think that's

16  where I obtained it.

17  Q    Did you look at anything else?

18  A    No.

19  Q    In preparing your assumption, did you look at what an

20  insurance company would have charged News-Journal if it

21  wanted to purchase annuities to conduct a standard

22  termination of the News-Journal plan back in March of 2010?

23  A    I did not.

24  Q    In developing your conclusion that the pension plan is

25  not underfunded, you did not use all of the assumptions

1  provided under Title IV of ERISA and PBGC's regulations,

2  correct?

3  A    Correct.

4  Q    But you also calculated the News-Journal pension plans

5  benefit liabilities using the assumptions from Title IV of

6  ERISA and PBGC's regulations?

7  A    I attempted to with some caveats on some of the data

8  sets that I had that was not necessarily 100 percent matched

9  to the PBGC case memo.

10  Q    And in using those assumptions you calculated a total

11  benefit liability in the amount of $42,218,066, correct?

12  A    Correct.

13        MR. ALBAUGH:  Your Honor, could I have just have a

14  minute.

15  BY MR. ALBAUGH:

16  Q    Mr. Reese, do you know what the current amount of

17  assets in the PBGC's single-employer fund is right now?

18  A    I know what it was as of September 30, 2013.

19  Q    And what was that?

20  A    I think was $79 billion.

21  Q    And do you know what the current liabilities of PBGC's

22  single-employer funds are?

23  A    I haven't calculated them, no.

24  Q    Do you know whether PBGC's Single-Employer Programs

25  currently has a deficit?

1    A    Yes.  I remember that chart on the red bar so it had a

2    deficit, yes.

3    Q    Do you know the amount of that deficit?

4    A    I think it might have been similar to last year's,

5    maybe 11 billion.

6              MR. ALBAUGH:  I have no further questions.

7              THE COURT:  Redirect?

8                        REDIRECT EXAMINATION

9    BY MR. MEEHAN:

10   Q    Mr. Reese, let's go to ASOP 27.  That's at Joint

11   Exhibit No. 7.  You were asked about the annuity -- use of

12   annuity rates and you answered -- the phrase was "may use"

13   in quotes.  What does that phrase mean, may use in your

14   business?

15   A    The actuarial standards of practice have a clear

16   distinction between "should" and "may."  May really is an

17   actuarial judgment, some practitioners will and some

18   practitioners won't and they're still, you know, performing

19   work appropriate in line with the actuarial standards of

20   practice.  When it says "should," if you don't, you better

21   describe why you have deviated.  So "may" has more

22   professional -- more avenues for professional judgment and,

23   you know, different approaches.

24   Q    Okay.  I'm going to put up Joint Exhibit 7.  That's

25   ASOP 27.  It's page number 3, section 3, it says analysis of

```
 1    issues and recommended practices.  3.1 overview.  I
 2    highlighted the first sentence which I'd like to read and
 3    then ask you, sentence says, "Because no one knows what the
 4    future holds with respect to economic and other
 5    contingencies, the best an actuary can do is use
 6    professional judgment to estimate possible future economic
 7    outcomes based on past experience and future expectations
 8    and to select assumptions based upon that application of
 9    professional judgment."
10         Do you see what I have read?
11    A    I do.
12    Q    Okay.  Is that what you did here?
13    A    I believe that's exactly what I did.
14    Q    The interest rate assumption 7.99 percent, is it
15    necessary for PBGC to return precisely 7.99 percent or
16    higher to have enough money on hand to meet the estimated
17    obligations?
18    A    No.  Based on the projected benefit payments, I think
19    it only needs to earn something close to 7.4 percent to
20    cover all future benefit payments.
21    Q    Okay.  And what's the historical experience been?
22    A    Going back.
23    Q    Going back 20 years at PBGC, what does the past
24    experience reflect?
25    A    It was 8.67 percent going back 20 years.
```

1   Q    You were asked a question to the effect something like

2   did you compare the 7.99 percent against any forecasts for

3   fixed income or equities in the future.  And you said not

4   directly.  Do you remember that?

5   A    I did.

6   Q    Did you do so indirectly?

7   A    Yes.  Because I was looking at portfolio projections,

8   not a fixed income portfolio and what do I see in the fixed

9   income portfolio is going to work and separately an equity

10  portfolio and what is that going to earn and part of that is

11  the amount of information included in the PBGC annual report

12  doesn't get down to the level of what precise fixed income

13  assets are held in the fixed income portion of the trust

14  fund.

15  Q    Does PBGC have the discretion as to how it chooses to

16  invest the assets in the single-employer trust fund in terms

17  of the equity and fixed income mix, for example?

18  A    It does.

19  Q    So nothing stops PBGC from loading up on equities or

20  fixed income, whatever their investment managers believe is

21  appropriate?

22  A    Correct.

23  Q    Why is it appropriate in your view to use the Towers

24  data and the other sources that you were using as part of

25  the forecasting?

1  A    Those are some of the largest pension plans mentioned

2  earlier.   There's the 75 to $80 billion in the

3  single-employer trust fund.   It's therefore appropriate to

4  look at what do other large pension plans do when they

5  invest money for a long-term for bank pension benefits.   And

6  the Towers Watson survey of, you know, Fortune 1000

7  companies has those very large pension plans in it.

8  Q    Just one second, if I may.

9      The Towers data and the other sources that you

10  mentioned and the social security projections of inflation,

11  things of that nature, is that one of the ways in which you

12  were taking into account the future expectations that ASOP

13  27 speaks of in section 3.1?

14  A    Correct.   And in particular the, you know, breakdown

15  of a real return into a nominal return into a real return

16  and an inflation re-component.   The social security trustees

17  is the place I went to to get a kind of what's the best mind

18  think about inflation and for the other part is kind of

19  putting the two together as to look at the universe of

20  pension plans, like the ones included in the Towers Watson

21  survey.

22  Q    Okay.

23          MR. MEEHAN:   Thank you.   I don't have any other

24  questions.

25          THE COURT:   I'm going to ask a few things.

1    Mr. Reese, in actuarial practice, is it a common part of

2    your judgment and duties to make aggregate estimates of

3    what individual decisions are going to be when there's

4    groups of people doing things?  I mean, some of these are

5    statistical based on mortality and health rates and all of

6    that, but other things you're making assumptions about what

7    people are going to do when they have choices and they're

8    all making individual decisions, but you're looking at the

9    aggregate in trying to make a reasonable estimate as to

10   what they're going to do going forward.  That's just to

11   your first answer to your first question when you started.

12             THE WITNESS:  That gets to credibility.  If it's a

13   small number of people you might --

14             THE COURT:  It's pretty -- it's less reliable.

15             THE WITNESS:  But as soon as you get to 1,000

16   lives, you're getting to pretty strong credibility.

17             THE COURT:  Depending on what kind of decision it

18   is?

19             THE WITNESS:  Right.

20             THE COURT:  I mean, whether you're trying to get

21   somebody who is going to go to Alaska on vacation, you

22   know, it's maybe too many variables to even think about.

23   But retirement decision, that's something you're used to

24   looking at.  So whether there is things you look at in

25   terms of the -- whether there is a discount for going early

```
 1    or a bonus, that doesn't -- that makes up for some of that
 2    discount, all those things, that's part of what you --
 3              THE WITNESS:  Correct.
 4              THE COURT:  -- do every day?
 5              THE WITNESS:  Right.
 6              THE COURT:  Now, you were looking back to the
 7    history of actual employee retirements at the journal
 8    company, right?
 9              THE WITNESS:  Yeah.  Correct.
10              THE COURT:  While it was a going concern?
11              THE WITNESS:  Correct.
12              THE COURT:  Do you think the fact they became
13    defunct make any difference in people's decision-making
14    process?
15              THE WITNESS:  I think the decision to retire is
16    really, you know, am I okay, do I have enough money, can I
17    afford to retire, and that's why there's a kind of a bump
18    hop when people decide to retire at age 62 because they can
19    commence their social security benefit.  Another element is
20    that's important for do I have healthcare.  You know, if I
21    have healthcare at a new job and I wouldn't have healthcare
22    if I left them and retired and just kind of lived off my
23    pension, I might defer my retirement because I need that
24    healthcare with the second job.  So a lot of it is
25    dependent on things other than just one source of income or
```

 1    one deferred pension benefit.  Do I have access to social

 2    security, am I 62 yet, and do I have healthcare coverage

 3    somewhere else?

 4         THE COURT:  But you don't think continuity in the

 5    workplace is much of a factor?

 6         THE WITNESS:  Less so.  Less so.

 7         THE COURT:  If the Pension Benefit Guarantee

 8    Corporation had either by choice or statute chosen to

 9    invest its assets in low return treasury bills, would that

10    mean that the unfunded liability should be much higher?

11         THE WITNESS:  If it had both invested in treasury

12    bills by statute or if it was not permitted to invest in

13    equities, for example, it would have had a lower return and

14    it would be reasonable to expect it to have a lower return

15    going forward.

16         THE COURT:  Well, why is their return pertinent to

17    what the liability is?

18         THE WITNESS:  Because the liability is the single

19    number that makes all of the future benefits being taken

20    care of.  So if you put $28 million into a trust fund and

21    you earn 7.4 percent for each year going forward, there's

22    enough return on the assets to pay all the benefits until

23    the last person dies.  So the liability is essentially

24    equal to the asset.

25         THE COURT:  No, I understand that.  But why are

1    you using that as the measure?

2        I mean, you don't use that for the measure of any of

3    your private clients.

4            THE WITNESS:  I don't -- I don't use --

5            THE COURT:  You don't use what PBGC can get or has

6    gotten.

7            THE WITNESS:  It's remarkably similar, though.  I

8    mean, you know, two, three years ago my recommendation to

9    the Commonwealth of Pennsylvania for their very large fund

10   was an asset return assumption of 8 percent and that's what

11   they adopted and used.  So it really is to kind of how

12   is -- how are the benefits going to be discharged?  They're

13   paid out of the trust fund, the trust fund is earning

14   interest, what's the expected earnings of the trust fund

15   and part of that is what's the portfolio mechanism, how

16   much is equity, how much is fixed income, what's the

17   history of the well-managed group, is it, you know, likely

18   to be in line with future expectations or is it, you know,

19   poorly managed and not going to, you know, do well in the

20   future.

21           THE COURT:  Is one way of thinking about what goes

22   on here is that PBGC by taking on this liability is in

23   effect selling annuities by guaranteeing the pension

24   payments?

25           THE WITNESS:  I think it's buying annuity rather

```
1    than selling one.

2            THE COURT:  Well, it's providing the funding.

3    It's taking the investment risk.

4            THE WITNESS:  It's taking the investment risk.

5    It's also taking longevity risk.  It's also taking the

6    retirement risk.

7            THE COURT:  So aren't they the provider of the

8    annuity?

9            THE WITNESS:  Yes.

10           THE COURT:  And they're getting paid the assets

11   that they take over as a trustee plus anybody -- anything

12   they can collect from somebody else for improper

13   termination, right?

14           THE WITNESS:  Correct.

15           THE COURT:  And nobody, not you, not me, not a

16   private employer or a plan can go knock on PBGC's door and

17   say, I'd like to invest $100 million because you get such a

18   great rate of return, and you can't do that, right?

19           THE WITNESS:  No.

20           THE COURT:  I'm not sure what point counsel was

21   making, but he did ask you about the insurance premiums.

22   What was the point of that?

23           THE WITNESS:  I think it's the kind of here is the

24   pool of money.

25           THE COURT:  Why is that a pool of money?  Those
```

```
 1   are insurance premiums that were paid over the years.
 2   Those aren't on an account for somebody, are they?
 3                THE WITNESS:  No.  But they're part of the overall
 4   Single-Employer Program.  So if --
 5                THE COURT:  But they're insurance.
 6                THE WITNESS:  Well, I wouldn't say they're not
 7   really insurance.  It's just, you know, it's a tax, it's a
 8   levy, it's the money that comes into the fund.  And --
 9                THE COURT:  But you're saying the individual --
10   well, are you saying that the individual amount of whatever
11   we want to call that, whether it's a premium or a tax or a
12   assessment, should accrue to the benefit of individual
13   plans?
14                THE WITNESS:  I'm not saying that.  I'm --
15                THE COURT:  Otherwise, I don't understand what the
16   pertinence is.
17                THE WITNESS:  Because it's revenue to the fund,
18   both single --
19                THE COURT:  That might be real important to the
20   trustees of the fund or the Congress or somebody, but I
21   don't understand how it affects the liability of a
22   particular pension plan.
23                THE WITNESS:  I agree.  Not for the narrow portion
24   of just looking at the News-Journal pension plan.  The only
25   point I would say is it's not taken into account.  It's not
```

1    like --

2          THE COURT:  Why should be it be?  Unless you're

3    looking at the corporation as a whole.

4          THE WITNESS:  Right.  I think that's what we're

5    looking at.

6          THE COURT:  And that's not the issue before the

7    Court.

8          THE WITNESS:  No.

9          THE COURT:  Mr. Reese, I've heard over the years a

10   lot of economists testify -- not usually actuaries --

11   usually economists, some of whom are academics and some of

12   whom are hired guns, frankly, and I couldn't tell you how

13   many different discount rates and real rates of return

14   rates and different time periods that they want to assess

15   them on and look-back periods and look-forward periods, and

16   I'll just say I have come to the conclusion that there's a

17   range of reasonableness on both of those things, and

18   frankly, I don't envy you and your colleagues, and you made

19   reference to the social security boards and all of those

20   folks.  I mean, beyond the timeframe of anything you

21   testified to, they project out 30, 40 years.  I think

22   that's just nonsense.  And the degree of error in the

23   assumptions they make to that are just in terms of the

24   workforce and income and rates of return and all of that

25   just -- just make it unuseful for policy-makers and anybody

```
 1   else or anybody in your profession.  You didn't go that far
 2   by any means.  You have to deal with specific pension plan
 3   here and you tried to tie it into the length of the bulk of
 4   payments under the pension plan.  That's -- so I'm trying
 5   to distinguish those two situations, but even within that,
 6   you were using a lot of different time periods, looking
 7   back and looking forward, and other than just your
 8   experience and rule of thumb, is there anything that
 9   controls your judgment in that?
10       I mean, we've had in the 20 years that you were looking
11   at mostly, we've had some periods of tremendous growth and
12   not a whole lot of inflation, but up and down, but in terms
13   of growth, it's been all over the place.  I mean, the past
14   year the S&P was up 30 percent.  That's unusual.  And other
15   years it's been down that much.
16       How do you reconcile all that in picking a time period?
17           THE WITNESS:  I actually put that in writing when
18   I completed my experience studies in the Commonwealth of
19   Pennsylvania and it was either something I read or it came
20   through the analyses.  The economic cycles from peak to
21   peak or bottom of the recession, the bottom of the
22   recession have ranged from 7 to 11 years since the Second
23   World War and we've had five of those cycles, I think, that
24   have been more than 10 years.  So we've had a 10 to 11 and
25   I think a 12 or a 13, two 12s and an 11 and a 10.  So we've
```

```
 1   had five very long cycles, which says to me you really need
 2   20 years to get two full economic cycles.
 3               THE COURT:  Yeah, but if you start in the middle
 4   here and go 20 years here, you get one and a half of this,
 5   and if you start here, you get one and a half of this.
 6               THE WITNESS:  No, 20 years should get two.  Those
 7   are the longest.  Of all the cycles, of all the economic
 8   cycles since the Second World War, the longest have been,
 9   you know, at 11 and 12 years.  So if you get 20 years, 22,
10   years, then you're getting at minimum two full cycles.  So
11   you're not getting a distortion really.  That's part of why
12   one looks at a long time period for this type of a program
13   which has a long pay out period, you know, I think 26
14   years, 90 percent of the benefits we paid out.  It
15   certainly needs to be more than a five-year look back or a
16   10-year look back because the look forward is really 25
17   years.
18               THE COURT:  Having asked as many questions as I
19   did, I'm going to allow each side to have another shot if
20   you want to.
21               MR. MEEHAN:  Your Honor, if I may, very briefly.
22   BY MR. MEEHAN:
23   Q    In light of the questions about annuities, Mr. Reese,
24   do annuity providers tend to have restrictions in terms of
25   the types of investments they make?
```

 1   A     They have got some restrictions and part of that is if

 2   they are for-profit, if they have shareholders, they're not

 3   going to put too much of their capital at risk.  That might

 4   limit the size of the contract they write.  I think there's

 5   some conservatism in the insurance marketplace and they

 6   wouldn't invest in a, you know, Internet stock up -- start

 7   up.  They're more likely to have a laddered portfolio of

 8   high quality corporate bonds.  So when they write the

 9   contract they kind of book a profit and know that they're

10   likely to book a profit.

11   Q     And PBGC does not have any such restriction.  Is that

12   right?

13   A     No.

14   Q     Private annuity providers, do they tend to have to pay

15   taxes?

16   A     Yes.

17   Q     And does PBGC have to pay taxes?

18   A     No.  I think they're dot gov.

19   Q     And the annuity providers, you indicated they tend to

20   want to create a profit for themselves, right?

21   A     Right.

22   Q     PBGC, that's not true of PBGC either, is it?

23   A     I think they're supposed to be self-funding, so

24   covering assets, assets to cover liabilities, not creating a

25   profit for the federal government, but no.  No profit.

1              MR. MEEHAN:  All right.  No other questions, Your

2     Honor.

3              MR. ALBAUGH:  I'll be brief.

4     BY MR. ALBAUGH:

5     Q     Mr. Reese, I think you just mentioned that PBGC has

6     absolute discretion in its investments.  What's the basis

7     for your knowledge on that subject?

8     A     The question was a little narrower than absolute

9     discretion, but the trust fund, to my knowledge, doesn't

10    have single-employer trust fund, does not have a limitation

11    on a certain asset class, whereas the revolving fund does,

12    the revolving fund is invested in U.S. Treasuries and maybe

13    I think that's either a policy role or a provision, but in

14    each of the annual reports I read, it stated that the

15    revolving fund must be invested in U.S. Treasuries but the

16    trust fund doesn't have to be.  And that's what I'm saying

17    it has discretion.

18    Q     And do you know if there are any restrictions on the

19    trust fund investments?

20    A     No.  I don't know of any restrictions.

21             MR. ALBAUGH:  No further questions.

22             THE COURT:  Finished with this witness?

23             MR. MEEHAN:  Your Honor, that's the only witness

24    that we're calling.

25             THE COURT:  Thank you, Mr. Reese.

1            MR. DEVAULT:  Your Honor, we have no further

2    testimony.  I would like to offer some exhibits.

3            THE COURT:  Fire away.

4            MR. DEVAULT:  From the joint exhibit list of the

5    parties attached to the pretrial stip, one through 15, and

6    from the Cox exhibit list attached to the pretrial Exhibits

7    1 through 78.

8            THE COURT:  Any objections?

9            MR. ALBAUGH:  I know that we noted when we

10   exchanged the exhibit lists that we -- the parties see

11   differently on the relevance of some of the documents and

12   how they fit into the calculation of the unfunded benefit

13   liabilities.  I think we had also raised some hearsay

14   objections with respect to certain actuarial reports.  But

15   I think, you know, subject to what we put and the exhibit

16   list, we don't have any objection.

17           THE COURT:  All right.  They're all received.  I

18   understand the relevance arguments that play out different

19   ways depending on which exhibit we're talking about, but

20   certainly for purposes of this record they're all received

21   and part of the record.

22       Any other witnesses for anybody?

23           MR. ALBAUGH:  We don't any other witnesses, but I

24   think I would also move, we have some PBGC specific

25   exhibits and I would move to admit exhibit numbers one

1    through 49.

2           MR. DEVAULT:  No objection, Your Honor.

3           THE COURT:  They're received and part of the

4    record.

5       What's counsel's preference with respect to argument

6    and possibility of submitting proposed findings and

7    conclusions?

8           MR. DEVAULT:  May I confer with my colleague?

9           THE COURT:  Sure.  Take a moment.

10          MR. DEVAULT:  Your Honor, the parties would

11   propose to submit proposed findings and any post trial

12   argument that they wish based on the record on

13   February 12th to Your Honor, and waive oral argument on

14   closing at this point if -- unless the Court wants to hear

15   argument at this point.

16          THE COURT:  I'm okay either way.  I would -- if

17   you could give me a short reaction to that notice I sent

18   out last week about that new case from the 11th Circuit, I

19   didn't think it was directly on point, but I thought it had

20   some bearing on some of the issues.  If I'm way off base on

21   that, I would glad to have you tell me so.

22          MR. DEVAULT:  I can give you our -- we were

23   interested --

24          THE COURT:  This is not prejudice to you

25   arguing --

1        MR. DEVAULT:  No, I understand.

2        THE COURT:  -- in more details.

3        MR. DEVAULT:  We don't plan to address it in post

4   trial.

5      Given the timeliness of it, particularly that it came

6   out.

7        THE COURT:  Well, I'll tell you, I was actually

8   lying on my couch in chambers and reading my advance sheets

9   on the iPad.  There's an RSS feed and that one popped up as

10  I was actually also had this stack of things for this

11  hearing and I said, well, it's the same party anyway, and

12  it did seem to have I mean a whole different history, but

13  it -- to me, it depicted a little attitude from the 11th

14  Circuit.  It might be pertinent.

15       MR. DEVAULT:  Yeah.  As we view it, it really

16  doesn't have any direct impact.  Your Honor is right.  Some

17  of the same issues came up.  That, of course, was an

18  involuntarily termination of the paper company based on

19  bankruptcy and PBGC was making a claim for 55 million in

20  unfunded benefits.  And the trustee said there were only

21  going to -- they could only achieve 8.5.  Trustee took it

22  upon himself to pursue the control group, the former owners

23  of the company, and the district judge, as we read the

24  opinion, dismissed because he said it was a money -- it was

25  based on a money judgment, not equitable.  Judge Tjoflat

 1   ignored that holding, but, nevertheless affirmed saying

 2   that the trustee did not have a cause of action under 1369

 3   on behalf of the bankruptcy estate, however, interestingly,

 4   he recognized in footnote 25 based on a brief, an amicus

 5   brief that the PBGC had filed in the case, that the trustee

 6   might have authority to bring a claim for equitable relief

 7   under 1369 with the proceeds going to PBGC.  And that was

 8   an interesting observation in that footnote.  So...

 9          THE COURT:  I couldn't tell how dubious he was

10   about that, though.

11          MR. DEVAULT:  I couldn't either, but we both know

12   Judge Tjoflat and if he said something, we know there's a

13   meaning there somewhere.

14          THE COURT:  Well, I couldn't tell because, you

15   know, he was somewhat critical of the pleadings, the way

16   the pleadings developed which -- and that looks like that

17   was maybe, I don't know, his way of saying it wouldn't have

18   mattered.  But maybe it would have mattered.

19          MR. DEVAULT:  Well, he actually -- we did get a

20   copy of PBGC's amicus brief and he's pretty much quoting

21   from their brief.  They say on page 4 of their amicus brief

22   that 29 U.S.C. 1370 authorizes the bankruptcy trustee to

23   use 1369 to seek equitable relief, but any monetary

24   recovery ultimately resulting from a successful assertion

25   of Section 1369 is payable solely to PBGC under 1362.  So

1    he was pretty much quoting from the position that PBGC had

2    taken.

3        We believe that since here the issue is whether PBGC

4    can demonstrate that there is a pension claim and that it

5    follows their rules and regulations and would be

6    applicable, we have not of course here pursuing under 1369

7    or anything else on behalf of PBGC, an action against the

8    control group.  The only basis for raising that as

9    previously indicated was whether the PBGC has followed its

10   ordinary practice of trying to recover all the assets from

11   all the parties.  But not a direct claim.  So therefore,

12   it's our belief that while interesting, it doesn't have a

13   direct bearing on where we are.

14           THE COURT:  Okay.

15           MR. DEVAULT:  Thank you, Your Honor.

16           THE COURT:  Do you want to add?

17           MR. ALBAUGH:  Just a little bit.

18       And I think we agree that the issues addressed in the

19   Durango case are not directly on point with the issues that

20   we're facing here.  I think I note the 11th Circuit does

21   provide some background about PBGC's claims in general

22   which may be helpful, but the actual cause of action that

23   the bankruptcy trustee was pursuing was under ERISA 29

24   U.S.C. 1369.  And essentially that provision provides for

25   if an entity engages in a transaction with a principal

1    purpose of evading pension liabilities and then the plan

2    terminates within five years, even though that entity is no

3    longer a member of the controlled group, PBGC can pursue

4    them and seek to hold them accountable as if they were

5    still a control group member and it's a different statutory

6    provision and different scenario than what we're addressing

7    here.

8        I think the 11th Circuit does reference some deference

9    to PBGC in that footnote 25, which obviously we're happy

10   about, but unless you have any other questions, Your Honor.

11           THE COURT:  That's consistent with my sense of it.

12   It just wasn't clear to me whether that sense of deference

13   that the 11th Circuit had any pertinence here.  And I agree

14   with both of you that it's not direct, but for what it's

15   worth, there it is.

16       All right.  So we're closed on the record.  I'll hear

17   more from you in mid February.  And then get something out

18   as quickly as I can after that.

19       I don't know that I have asked this collection of

20   parties before, I certainly have in the case, Mr. DeVault,

21   you will remember, whether there -- and I suspect I know

22   the answer, but maybe I don't, whether there's any interest

23   in trying to resolve this short of a final judgment.  I

24   don't know what discretion the PBGC has to negotiate.  I

25   know they under some circumstances, they're forced to

 1   negotiate in bankruptcy court and otherwise.  And you know,

 2   from one point of view, I know you think this a cut and

 3   dried and from another point of view, they think there's

 4   more than inequity here.

 5       Any thought that the parties should have a session to

 6   discuss that, or should I just remind you of any case can

 7   be settled and leave to you your own devices?

 8           MR. DEVAULT:  I do know in the past when we have

 9   talked about this there's been a pretty big gap between the

10   parties about the issues involved.  I don't know that

11   that's changed since we last talked about it.  I think as a

12   matter of course we're always willing to discuss settlement

13   and I don't know that anything has changed here that would

14   make a lot of sense.  But -- but I don't know.

15           THE COURT:  We've got a lot of smart people in

16   this room right now both on this side of the bar and the

17   back of the room, accomplished professionals.  Give you my

18   jury room if you want to use it right now or otherwise as I

19   say, I can leave you to your own devices.

20       Mr. DeVault, any thoughts?

21           MR. DEVAULT:  I think you've raised it before,

22   Your Honor, and we have explored it and at least at this

23   point we think there's not any imminent likelihood.  If

24   that should change, we would of course notify your clerk,

25   but I don't want to raise any expectations.

```
 1          THE COURT:  All right.  Well, I'm confident again
 2   given the personalities involved and the quality of
 3   professionalism that if there's something to be pursued,
 4   you will pursue it.  And if not, we don't need to waste
 5   time on it.
 6      So I will say for the record this one of my older
 7   cases.  It's -- I have got another one that is actually
 8   over 30 years old, so...
 9          MR. DEVAULT:  We hope not to match that, Your
10   Honor.
11          THE COURT:  Well, that one is technically closed,
12   but it involves prison overcrowding over in Brevard County,
13   a jail, and it pops itself up every couple of years as the
14   prison population goes up and down.  I think we need some
15   actuaries to talk about the prison population over in
16   Brevard County at the jail population.  In fact, we've had,
17   not actuaries, but criminologists give us opinions on that.
18   It's a completely different cut of exercise but the same
19   sort of forward thinking.  I think that's my oldest case.
20   But this one is pretty close.
21      We will get this one wrapped up as quickly as we can.
22   Thank you, counsel.
23                  (hearing adjourned)
24
25
```

```
 1              C E R T I F I C A T E

 2         I certify that the foregoing is a correct

 3  transcript from the record of proceedings in the

 4  above-entitled matter.

 5

 6  s\Sandra K. Tremel           January 21, 2014

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```