# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | | |
|---|---|---|
| COX ENTERPRISES, INC., a | ) | |
| Delaware corporation, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.: 6:04-CV-698-JA-DAB |
| | ) | |
| NEWS-JOURNAL CORPORATION, a | ) | |
| Florida corporation, HERBERT | ) | |
| M. DAVIDSON, JR., MARC L. | ) | |
| DAVIDSON, JULIA DAVIDSON | ) | |
| TRUILO, JONATHAN KANEY, JR., | ) | |
| DAVID KENDALL, ROBERT TRUILO, | ) | |
| GEORGIA KANEY, and PMV, INC., | ) | |
| a Florida corporation, | ) | |
| | ) | |
|     Defendants. | ) | |

## POST-TRIAL BRIEF OF THE
## PENSION BENEFIT GUARANTY CORPORATION

The Pension Benefit Guaranty Corporation ("PBGC") submits this Post-Trial Brief

following the evidentiary hearing held on January 14, 2014.[1]  Although the parties presented

evidence about complex actuarial calculations, the parties' dispute is simple.  PBGC asserts that

the Court should determine the amount of the agency's claim against News-Journal Corporation

("NJC") for the "unfunded benefit liabilities" of the Pension Plan of News-Journal Corporation

(the "Pension Plan") by applying the actuarial assumptions required under applicable law – Title

IV of the Employee Retirement Income Security Act of 1974 ("ERISA") and PBGC's

regulations thereunder.  Cox Enterprises, Inc. ("Cox") asserts that the Court should instead

ignore the law and apply its preferred actuarial assumptions, based on vague notions of equity.

Because equity cannot override the plain language of ERISA, the Court should determine that

---

[1]  PBGC incorporates its Proposed Findings of Fact and Conclusions of Law into this Brief.

PBGC properly calculated its claim for the Pension Plan's unfunded benefit liabilities in the amount of $13,887,822.

## BACKGROUND

**A. NJC's Receivership and Procedural History.**

On April 17, 2009, the Court appointed James Hopson as Receiver for NJC, with the power to operate NJC's business and sell its assets.[2]  In January 2010, the Receiver and Cox jointly moved to sell NJC's publishing assets to Halifax Media Acquisition LLC ("Halifax").  On March 23, 2010, the Court authorized the sale, which did not include Halifax's assumption of the Pension Plan.[3]

On April 5, 2010, the Receiver published notice of a fourteen-day deadline for making any claims against the sale proceeds or any other assets of NJC.[4]  On April 16, 2010, PBGC timely filed proofs of claim with the Receiver for, *inter alia*, the (1) unfunded benefit liabilities of the Pension Plan under 29 U.S.C. §§ 1362 and 1368 in the estimated amount of $15,102,012.00,[5] and (2) unpaid minimum funding contributions due to the Pension Plan under 26 U.S.C. §§ 412, 430, and 29 U.S.C. § 1082 in the estimated amount of $650,142.00.[6]  PBGC

---

[2]  *See* Order, April 17, 2009, (Doc. No. 507).

[3]  Order Authorizing and Directing the Receiver's Sale of the Publishing Operations of NJC, March 23, 2010, (Doc. No. 625).

[4]  Notice of 14 Day Deadline to Submit Claims, April 5, 2010, (Doc. No. 630).

[5]  PBGC calculated this estimate based on a potential plan termination date of March 31, 2010.

[6]  Joint Exhibit 10 (Doc. No. 652-5 at 96-112); PBGC Exhibit 31 at PBGC-NJC-000540.

calculated its estimated claims in accordance with ERISA and PBGC's regulations, following the process that PBGC routinely uses to calculate its claims.[7]

The Receiver reviewed all of the submitted claims and issued a report and recommendation on June 10, 2010.[8]  In the report, the Receiver acknowledged NJC's liability for the Pension Plan's unfunded benefit liabilities, but challenged PBGC's assertion of administrative priority for its other claims.[9]  Cox did not challenge PBGC's proofs of claim.[10]

Before the hearing on the Receiver's report and recommendation, PBGC and the Receiver negotiated a settlement of PBGC's claims.  PBGC's and the Receiver's respective estimates of PBGC's claims formed the basis for these extensive negotiations, leading to a settlement of PBGC's unfunded benefit liabilities claim ($14,272,500) and unpaid minimum funding contributions claim ($455,000).[11]  Although Cox's counsel stated at the August 9, 2010 hearing that Cox did not agree with the settlement, counsel did not raise any specific objection to the amount or sufficiency of PBGC's claims.[12]

The settled amount of PBGC's claim for the Pension Plan's unfunded benefit liabilities claim has now been superseded by PBGC's completion of its final valuation of the Pension

---

[7]  Travia testimony 23:16 to 25:13, 28:22 to 30:1; *see also In re Wolverine, Proctor & Schwartz, LLC*, 436 B.R. 253, 255-56 (D. Mass. 2010) (noting that PBGC filed estimated claims).

[8]  Receiver's Report & Recommendation, June 10, 2010, (Doc. No. 652).

[9]  *Id.* at 17-19.

[10]  *See generally* Cox's Resp. to Objections to Receiver's Report & Recommendation, Aug. 2, 2010, (Doc. No. 665).  Cox likewise never requested any information from PBGC relating to the calculation of PBGC's claims.

[11]  *See* Receiver's Resp. to Objections to Receiver's Report & Recommendation, Aug. 5, 2010, (Doc. No. 669 at 2-4).  As part of this settlement, PBGC agreed to withdraw its claims for statutory premiums and the 29 U.S.C. § 1362(c) shortfall and waiver amortization charge.

[12]  Tr. of Hr'g on Receiver's Report, Aug. 9, 2010, (Doc. No. 681, at 49-50).

Plan's benefit liabilities.  After the Pension Plan was terminated by agreement between PBGC and the Receiver, PBGC initiated the process of gathering the information necessary to calculate the final benefit amounts for each participant and beneficiary on a participant-by-participant (seriatim) basis in accordance with Title IV of ERISA and PBGC's regulations.[13]  On August 22, 2013, PBGC completed that seriatim valuation, and determined that the final amount of the Pension Plan's unfunded benefit liabilities was $13,887,822.[14]

After a hearing on August 9, 2010, the Court awarded virtually all of NJC's assets to Cox.  PBGC appealed the decision and in January 2012, the Eleventh Circuit vacated the award to Cox.  The Eleventh Circuit held that Cox was a shareholder of NJC for the purposes "of Fla. Stat. § 607.06401, which prohibits the distribution of corporate assets to a shareholder if it would render the corporation insolvent."[15]  Because the Eleventh Circuit considered "any payment to Cox a distribution to a shareholder within the meaning of § 607.06401," it held that the district court must determine whether any payment to Cox would comply with the statute's insolvency test.[16]  The Eleventh Circuit remanded the case to this Court to assess whether payment to Cox would render NJC insolvent.[17]

After the remand, the Court set a briefing schedule concerning the parties' claims against NJC.  In June 2013, the Court scheduled an evidentiary hearing to address questions about the

---

[13]  Young testimony 71:7 to 71:22.

[14]  PBGC Exhibit 1 at 2; Young testimony 59:17 to 59:24, 60:15 to 61:5; *see* Joint Exhibit 3 at PBGC-NJC-005307.

[15]  *Cox Enters., Inc. v. PBGC*, 666 F.3d 697, 699 (11th Cir. 2012).

[16]  *Id.*

[17]  *Id.* at 707-08.

amount of PBGC's claims.  The parties engaged in limited discovery and presented evidence at the hearing held on January 14, 2014.

**B.  Title IV of ERISA and PBGC's Valuation Regulation.**

Upon termination of an underfunded pension plan covered by Title IV of ERISA, certain liabilities arise.[18]  The plan sponsor becomes liable to PBGC for the plan's unfunded benefit liabilities as of its termination date, plus interest.[19]  Additionally, the plan sponsor is liable to PBGC for contributions owed to the plan pursuant to statutory minimum funding standards.[20] The plan sponsor is also liable to PBGC for any unpaid statutory premiums.[21]

In addition to providing PBGC with a claim for the pension plan's unfunded benefit liabilities, ERISA also mandates that the value of the plan's benefit liabilities be determined "on the basis of assumptions prescribed by [PBGC]."[22]  The value of the plan's assets is then subtracted from the benefit liabilities to determine the amount of unfunded benefit liabilities.[23]

PBGC first prescribed assumptions for valuing a plan's benefit liabilities in an interim regulation in 1976,[24] which was published in final form in 1981 (the "Valuation Regulation").[25]

---

[18]  *See Durango-Georgia Paper Co. v. H.G. Estate, LLC*, No. 11-15079, 2014 WL 46700, *1 (11th Cir. 2014) (discussing termination liabilities).

[19]  *See* 29 U.S.C. § 1362(a), (b)(1)(A).

[20]  *See* 29 U.S.C. § 1082(b); 26 U.S.C. § 412(b).  The contributions are due to the statutory trustee of the terminated plan, which is invariably PBGC.  29 U.S.C. §§ 1342(d), 1362(c).

[21]  *See* 29 U.S.C. §§ 1306, 1307(e).

[22]  29 U.S.C. § 1301(a)(18)(A).

[23]  29 U.S.C. § 1301(a)(18).

[24]  PBGC, *Interim Regulation on Valuation of Plan Benefits*, 41 Fed. Reg. 48,484 (Nov. 3, 1976) (Interim Rule).

For more than thirty-five years, the Valuation Regulation has been applied to determine the underfunding in every pension plan that has terminated and been trusteed by PBGC.

The Valuation Regulation's methodology reflects the fact that a terminated pension plan will receive no further funding contributions, and that all benefit obligations must therefore be satisfied at the time of termination.[26]  To measure the benefit liabilities, the Valuation Regulation prescribes assumptions about mortality and interest that are designed to approximate the market price of insurance company annuity contracts.[27]  These factors will, in combination, "accurately approximate the cost of private sector group annuity contracts."[28]  This resulting liability value is equivalent to what an employer would be required to pay for purchasing annuities in the marketplace to complete a standard termination.  The interest factor is periodically adjusted to reflect changes in annuity prices.[29]

The Valuation Regulation also prescribes assumptions for an employee's expected retirement age ("XRA") for plans that permit early retirement.[30]  The XRA assumptions are intended to produce early retirement costs "that are intermediate between the extremes that

_____

[25]  PBGC, *Valuation of Plan Benefits in Non-Multi-Employer Plans*, 46 Fed. Reg. 9492 (Jan. 28, 1981) (Final Rule).  Although PBGC revised the Valuation Regulation in 1993, see 58 Fed. Reg. 50,812 (Sept. 28, 1993) (Final Rule), it retained the basic methodology for determining the amount of benefit liabilities.  *See also* 29 C.F.R. §§ 4044.41-75 (current codification).

[26]  *In re US Airways Grp., Inc.*, 303 B.R. 784, 795-96 (Bankr. E.D. Va. 2003).

[27]  *See, e.g.,* PBGC, *Valuation of Plan Benefits in Single-Employer Plans; Valuation of Plan Benefits and Plan Assets Following Mass Withdrawal*, 58 Fed. Reg. 5128, 5128 (Jan. 19, 1993) (Proposed Rule); *US Airways*, 303 B.R. at 788.

[28]  58 Fed. Reg. at 5128; *see* 41 Fed. Reg. at 48,485 ("PBGC's interest assumptions have been designed so that, when coupled with the mortality assumptions found in the regulation, the benefit values . . . are in line with industry annuity prices.").

[29]  58 Fed. Reg. at 50,815.

[30]  29 C.F.R. §§ 4044.55-.57; *see* 46 Fed. Reg. at 9495.

would be obtained if it were assumed either that all participants retire at their normal retirement age or that all participants retire at the earliest retirement age possible."[31]  The rules for choosing XRA assumptions take into account the age of the employee, the adequacy of retirement income, provisions of the plan, and the circumstances surrounding the plan's termination.[32]

## ARGUMENT

**I.    PBGC Has a Claim against NJC for the Pension Plan's Unfunded Benefit Liabilities, Which Must Be Calculated in Accordance With Title IV of ERISA and PBGC's Regulations.**

**A.  PBGC has established that the amount of its claim against NJC for the Pension Plan's unfunded benefit liabilities is $13,887,822.**

Title IV of ERISA gives PBGC a claim against NJC for the Pension Plan's unfunded benefit liabilities.[33]  Congress has defined the "amount of unfunded benefit liabilities," as (for a given date):

> [T]he excess (if any) of–
>
> (A)    the value of the benefit liabilities under the plan (*determined as of such date on the basis of assumptions prescribed by [PBGC] for purposes of* [29 U.S.C. § 1344]), over
>
> (B)    the current value (as of such date) of the assets of the plan . . . .[34]

In accordance with the Administrative Procedure Act, PBGC promulgated the Valuation Regulation, which prescribes the required assumptions for calculating a pension plan's benefit liabilities for purposes of 29 U.S.C. § 1344.[35]

---

[31]  *Id.* at 9496.

[32]  *Id.*

[33]  29 U.S.C. § 1362(b)(1)(A).

[34]  29 U.S.C. § 1301(a)(18) (emphasis added).

7

After PBGC promulgated the Valuation Regulation, Congress effectively ratified it by amending 29 U.S.C. § 1301(a)(18) to explicitly refer to the "assumptions prescribed by [PBGC]" for valuing benefit liabilities.[36]  Congress's express delegation to PBGC has resulted in legislative rules with the "force and effect of law."[37]  Moreover, any challenge to the Valuation Regulation must meet the exacting standards of the Administrative Procedure Act, demonstrating that the regulation is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[38]

At the hearing, PBGC presented evidence establishing that the amount of its claim for the Pension Plan's unfunded benefit liabilities is $13,887,822.  PBGC's Chief Valuation Actuary, Scott Young presented his expert opinion that PBGC had calculated the Pension Plan's benefit liabilities in the amount of $42,532,061 using the actuarial assumptions prescribed by Title IV of ERISA and PBGC's regulations.  In offering his opinion, Mr. Young relied upon the three-volume actuarial case report that PBGC prepared after becoming the Pension Plan's statutory trustee.  The parties do not dispute that, as of its March 23, 2010 termination date, the Pension

---

[35]  *See, e.g.,* 46 Fed. Reg. 9492 (Jan. 28, 1981) (Final Rule); 58 Fed. Reg. 50,812 (Sept. 28, 1993) (Final Rule).

[36]  Pension Protection Act of 1987, Subtitle D of Title IX of the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 9313(a)(2)(F), 1987 U.S.C.C.A.N. (101. Stat.) 1330-365 (1987); *In re US Airways Grp., Inc.,* 303 B.R. 784, 796 (Bankr. E.D. Va. 2003); *see also Cottage Savs. Ass'n v. Comm'r*, 499 U.S. 554, 561 (1991); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381-82 (1969) ("Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation.").

[37]  *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979); *Batterton v. Francis*, 432 U.S. 416, 425 & n.9 (1977).

[38]  *See* 5 U.S.C. § 706; *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 842-44 (1984).

Plan had assets of $28,644,239.[39]  Subtracting the Pension Plan's assets from its total benefit

liabilities yields unfunded benefit liabilities of $13,887,822.

Cox sought to undermine the process by which PBGC calculated the Pension Plan's

unfunded benefit liabilities,[40] but PBGC's administrative actions are entitled to a presumption of

regularity.[41]  Cox failed to rebut that presumption.  Moreover, the reliability and accuracy of

those calculations are fully supported by the record.  As in every case where a pension plan

terminates and PBGC becomes its statutory trustee, PBGC collected the necessary records and

calculated the Pension Plan's benefit liabilities on a seriatim basis.[42]  PBGC's calculation is

documented in the actuarial case memorandum and three-volume actuarial case report prepared

by PBGC's staff and its actuarial contractors at Milliman, Inc.[43]

Additionally, the enrolled actuary at Milliman, Inc. certified the actuarial case report

under penalty of perjury.  Both the enrolled actuary at Milliman, Inc. and PBGC's staff reviewed

the actuarial case report to assess the accuracy of twenty-two separate actuarial issues.[44]

Furthermore, the reliability of PBGC's calculations was verified by Cox's own expert witness,

---

[39]  Joint Pretrial Statement, Uncontested Fact 38 (Doc. No. 778); *see* Joint Exhibit 3 at PBGC-NJC-005307.

[40]  *See* Young Testimony 92:21 to 94:14 (discussing who was involved in PBGC's preparation of the actuarial case report for the Pension Plan).

[41]  *See, e.g., U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("Although the fairness of the Board's own procedure is not before us, we note that a presumption of regularity attaches to the actions of Government agencies . . . ."); *cf. Aponte v. Astrue*, 6:11-cv-700-ORL-31MCR, 2012 WL 3231007, at *4 (M.D. Fla. July 12, 2012) (noting that "[a] presumption of honesty and integrity exists in those who serve as adjudicators for administrative agencies") (citing *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982)).

[42]  Young testimony 69:3 to 72:15.

[43]  *See generally* Joint Exhibits 4-6.

[44]  Joint Exhibit 4 at PBGC-NJC-006913, 006915; Young testimony 72:16 to 73:14.

Adam Reese.[45]  Even using a slightly different data set than PBGC, Mr. Reese calculated a very

similar benefit liability amount using the actuarial assumptions required by Title IV of ERISA

and PBGC's regulations.[46]

### B. Equity cannot override the plain language of ERISA and PBGC's regulations.

Because the amount of the Pension Plan's unfunded benefit liabilities is not subject to

legitimate dispute, Cox suggests that the Court should exercise its equitable discretion to

discount or reject PBGC's unfunded benefit liabilities claim.[47]  To support its position, Cox

presented the testimony of its expert, Adam Reese.  Mr. Reese opined that the Pension Plan's

assets are sufficient to satisfy its benefit liabilities,[48] by discounting those liabilities using

actuarial assumptions that conflict with Title IV of ERISA and PBGC's regulations.[49]

Cox ignores the principle that "[c]ourts of equity cannot, in their discretion, reject the

balance that Congress has struck in a statute."[50]  "Once Congress, exercising its delegated

---

[45]  In discussing PBGC's materials, Mr. Reese noted that "the accrued benefit amount that's payable to each [Pension Plan participant was] pretty accurate."  Reese testimony 109:10 to 109:23.  Mr. Reese later stated, in reviewing PBGC's application of a marital status assumption to certain Pension Plan participants, that he believed PBGC had correctly performed the calculations.  *Id.* at 119:17 to 120:11.

[46]  Mr. Reese calculated total benefit liabilities of $42,218,066, compared with PBGC's calculation of $42,532,061.  *Compare* Joint Exhibit 2 at 3 (Mr. Reese's calculation), *with* PBGC Exhibit 1 at 2; Joint Exhibit 3 at PBGC-NJC-005307 (PBGC's calculation).

[47]  *See* Joint Pretrial Statement, (Doc. No. 778 at 6-7) (asserting that even if PBGC establishes that its unfunded benefit liabilities claim was calculated in accordance with ERISA, the Court has discretion to discount or reject it).

[48]  Reese testimony 117:24 to 118:16.

[49]  *Id.* at 32:6 to 132:18, 141:6 to 141:9; 142:4 to 142:17.

[50]  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001); *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 217-18 (2002) ("It is, however, not our job to find reasons for what Congress has plainly done; and it *is* our job to avoid rendering what

powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce [the laws] when enforcement is sought."[51]  Here, "Congress, by statute, has expressly given the PBGC a *present* right to recover an amount determined in accordance with the valuation regulation."[52]  Because Cox's equitable approach to valuing the Pension Plan's unfunded benefit liabilities would "'ignore the judgment of Congress, deliberately expressed in legislation,'"[53] it must be rejected.[54]

### C. Even if Cox's proposed actuarial assumptions did not contravene ERISA and PBGC's regulations (which they do), those assumptions are less reasonable.

For the reasons discussed above, the Court should reject Mr. Reese's proposed approach for calculating the Pension Plan's unfunded benefit liabilities as contrary to law.  But even if the

---

Congress has plainly done . . . devoid of reason and effect."); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1238 (11th Cir. 2005) ("This rationale . . . ignores the vital principle that '[c]ourts are not authorized to rewrite a statute because they might deem its effects susceptible to improvement.'" (quoting *Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1552 (11th Cir. 1996))).

[51]  *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 194 (1978).

[52]  *In re US Airways Grp., Inc.*, 303 B.R. 784, 793 (Bankr. E.D. Va. 2003); *see also Dugan v. PBGC* (*In re Rhodes, Inc.*), 382 B.R. 550, 559-60 (Bankr. N.D. Ga. 2008); *cf. Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000) (explaining that "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation").

[53]  *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 497 (quoting *Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 551 (1937)); *see also Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1179 (11th Cir. 2006) (concluding that ERISA's plain language dictated rejection of the plaintiff's proposed interpretation of the term "established plan," because it "would effectively write the term out of [ERISA].").

[54]  Cox has asserted that the amount of statutory premiums that NJC paid to PBGC is relevant to the amount of PBGC's claim for the Pension Plan's unfunded benefit liabilities.  *See* Joint Pretrial Statement, (Doc. No. 778 at 20, ¶ 9).  But even Cox's expert witness conceded that such premium payments have no relationship to the amount of PBGC's claim.  Reese testimony 159:20 to 161:8; *see also* 29 U.S.C. § 1301(a)(18) (defining "amount of unfunded benefit liabilities"), 29 U.S.C. § 1307 (providing a separate liability for statutory premiums).

law did not control, PBGC's approach to calculating unfunded benefit liabilities is more reasonable, given the purpose and nature of the calculation.

Mr. Reese discounted the Pension Plan's liabilities using an interest rate assumption of 7.99% and an expected retirement age assumption based on historical plan experience.[55]  In developing the 7.99% investment return rate assumption, Mr. Reese cited the Actuarial Standards Board's Actuarial Standard of Practice No. 27, "Selection of Economic Assumptions for Measuring Pension Obligations" ("ASOP 27").[56]  But Mr. Reese departed from that ASOP in several ways.

As an initial matter, ASOP 27 expressly exempts "the selection of an assumption where the actuary is precluded from exercising independent judgment by an applicable law, regulation, or other binding authority."[57]  Despite this clear directive, Mr. Reese testified that he was not bound by the Valuation Regulation because he was not PBGC's "chief valuation actuary."[58]  Mr. Reese did not feel bound by ERISA and the Valuation Regulation for calculating the Pension Plan's unfunded benefit liabilities because he was not, in fact, calculating that liability at all.  Instead, Mr. Reese was calculating something entirely different – the "reasonable expectation for the investment performance of [the Pension Plan's assets in the PBGC's single-

---

[55]  *See generally* Joint Exhibit 1 at 7-20, 23-26.

[56]  *See* Joint Exhibit 1 at 13; Reese testimony 141:10 to 141:13.

[57]  Joint Exhibit 7 § 1.2, at 1; *see also id.* § 2.6, at 3 (defining prescribed assumptions), and § 3.11, at 13 ("When an assumption is prescribed, the actuary is obligated to use it.").

[58]  Reese testimony 132:6 to 132:12.

employer trust fund] going forward."[59]  This calculation ignores the entire purpose of the evidentiary hearing, which was to address the amount of PBGC's claims against NJC.

Mr. Reese's approach diverges from the guidance provided by the ASOP in other ways. ASOP 27 makes the purpose of the measurement a primary factor in an actuary's selection of an interest assumption.[60]  It provides as an exemplar of purpose-driven rate selection the use of "an investment return rate reflecting interest rates implicit in current or anticipated future annuity purchase rates," as opposed to an investment return assumption for an ongoing pension plan which "may reflect a longer time horizon and a diversified investment portfolio."[61]

Mr. Reese's proposed interest assumption rejects ASOP 27's suggested use of interest rates implicit in annuity purchase rates.  Mr. Reese opined that using such an interest rate would be inappropriate because "PBGC is not purchasing annuities, nor does it pay taxes, earn a profit, or conform to state investment regulations like an insurance company."[62]  That analysis ignores the fact that PBGC acts in a role similar to that of an annuity **provider**.  In fact, Mr. Reese conceded that PBGC is essentially providing an annuity for the Pension Plan's participants.[63]  He also conceded that the risk of the transaction rests on PBGC—the investment risk, the longevity risk, and the retirement risk, as it would with an annuity provider.[64]

---

[59]  *Id.* at 132:6 to 132:18.

[60]  Joint Exhibit 7 § 3.6.3.a at 7.

[61]  *Id.*

[62]  Joint Exhibit 1 at 35.

[63]  Reese testimony 158:21 to 159:9.

[64]  *Id.*

Mr. Reese's approach is further problematic because it ignores the difference between ongoing plans and terminated plans.  Whereas an ongoing pension plan's poor investment returns can be addressed by increased contributions from the plan sponsor,[65] a terminated plan will not receive any further contributions regardless of PBGC's investment performance.[66]  Mr. Reese's suggestion that PBGC fund any future shortfall in the Pension Plan's benefit liabilities using premiums paid by other plan sponsors ignores PBGC's mission to maintain premiums "at the lowest level consistent with carrying out its obligations under" Title IV.[67]  Moreover, Mr. Reese's valuation approach could result in a cost of terminating a pension plan in a distress or PBGC-initiated termination that would be less than the cost of purchasing annuities in a standard termination, thereby incentivizing sponsors to dump their plans on PBGC and burden other premium payers with the costs of supporting those plans.[68]

Similarly, Mr. Reese's application of historical plan experience to develop expected retirement age assumptions fails to account for changed circumstances occasioned by the termination of the Pension Plan.  During the hearing, Mr. Reese testified that a participant's decision to retire may be impacted by factors such as having sufficient income and access to

---

[65]  Mr. Reese compared his 7.99% investment return assumption with studies of investment returns for ongoing pension plans prepared by the Department of Labor and the actuarial firm Towers Watson.  *See* Joint Exhibit 1 at 18-20; Reese testimony 146:20 to 147:20.

[66]  Reese testimony 147:15 to 147:20.

[67]  29 U.S.C. § 1302(a)(3); *see* Joint Exhibit 1 at 34 (noting that should PBGC's investment return fall below Mr. Reese's assumptions, PBGC can fund the remaining benefits through premium income).

[68]  *Cf. In re UAL Corp.,* 468 F.3d 444, 452 (7th Cir. 2006) (allowing PBGC to take into consideration the "moral hazard" that results when the availability of a third party payor such as PBGC affects the behavior of insured parties).

healthcare.[69]  Nonetheless, Mr. Reese based his retirement assumption on historical experience at

NJC, without accounting for the fact that after the Halifax sale and the Pension Plan's

termination, participants were no longer required to terminate employment before drawing a

pension benefit.

PBGC's interpretation of ERISA and its regulations are entitled to great deference.[70]  In

the Valuation Regulation, PBGC has prescribed actuarial assumptions about participants' XRA

based on age, adequacy of retirement income, plan provisions, and the circumstances

surrounding the plan's termination.[71]  PBGC has further prescribed actuarial assumptions about

mortality and interest that "will accurately approximate the cost of private sector group annuity

contracts."[72]  The Pension Committee of the American Academy of Actuaries has concluded that

PBGC's approach "[in measuring its financial statement liabilities by using annuity assumptions]

produce[s] a reasonable representation of the PBGC's current obligation and deficit."[73]

Moreover, "[g]iven the strong societal interest in protecting pension benefits, a risk-free or

nearly risk-free rate to value the pension liability is more appropriate than a rate based on

---

[69]  Reese testimony 156:6 to 157:3.

[70]  *Blessitt v. Ret. Plan for Emps. of Dixie Engine Co.*, 848 F.2d 1164, 1167 (11th Cir. 1988) (en banc) ("As a preliminary matter, we note that we owe great deference to the interpretations and regulations of the Pension Benefit Guaranty Corporation . . . ."); *see also Durango-Georgia Paper Co. v. H.G. Estate, LLC*, No. 11-15079, 2014 WL 46700, at *4 n.25 (11th Cir. 2014) ("We give deference to PBGC's interpretation of ERISA.").

[71]  *See* PBGC, *Valuation of Plan Benefits in Non-Multi-Employer Plans*, 46 Fed. Reg. 9492, 9496 (Jan. 28, 1981) (Final Rule); *see also* 29 C.F.R. §§ 4044.55-.57.

[72]  *See, e.g.,* PBGC, *Valuation of Plan Benefits in Single-Employer Plans; Valuation of Plan Benefits and Plan Assets Following Mass Withdrawal*, 58 Fed. Reg. 5128, 5128 (Jan. 19, 1993) (Proposed Rule).

[73]  PBGC Exhibit 9 at 1 (PENSION COMMITTEE, AMERICAN ACADEMY OF ACTUARIES, ISSUE BRIEF, *Perspectives on the PBGC Single-Employer Deficit* (Aug. 2013)).

optimistic projections (even if . . . widely shared by fund managers) as to the stock market's future long-term performance."[74]

## II.     PBGC Has a Separate Claim against NJC for Unpaid Minimum Funding Contributions Owed to the Pension Plan.

Congress explicitly provided PBGC with separate claims for the Pension Plan's unfunded benefit liabilities,[75] and for any unpaid minimum funding contributions owed to the Pension Plan.[76]  To hold these claims as duplicative would render ERISA's statutory provisions superfluous, thereby rewriting the carefully crafted statutory scheme.  "'[A] cardinal principle of statutory construction [is] that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"[77]

As addressed at the evidentiary hearing, PBGC has a claim against NJC for unpaid minimum funding contributions owed to the Pension Plan in the amount of $455,000.[78]  This claim was incorporated into PBGC's settlement with the Receiver, and it reflects additional contributions made by the Receiver to the Pension Plan between the time PBGC filed its claims and when PBGC became the statutory trustee of the Pension Plan.[79]  Although any actual

---

[74] *In re US Airways Grp., Inc.*, 303 B.R. 784, 796 (Bankr. E.D. Va. 2003).

[75] 29 U.S.C. § 1362(a), (b)(1)(A).

[76] 29 U.S.C. §§ 1082(b), 1342(d)(1)(B)(ii), 1362(c); 26 U.S.C. § 412(b).

[77] *United States v Ballinger*, 395 F.3d 1218, 1236 (11th Cir 2005) (quoting *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001)); *accord Cox Enters., Inc., v. PBGC*, 666 F.3d 697, 704 (11th Cir. 2012) ("When interpreting a statute, we give effect to the Florida legislature's intent and accord meaning to all parts of a statute.") (citation omitted).

[78] *See* Receiver's Resp. to Objections to Receiver's Report & Recommendation, Aug. 5, 2010, (Doc. No. 669 at 3-4); PBGC Exhibit 48 (Doc. No. 675 at 7-10); *see also* Travia testimony 30:2 to 30:21.

[79] Travia testimony 30:2 to 31:4; PBGC Exhibit 40 at PBGC-NJC-002992, PBGC-NJC-003513.

recovery on PBGC's claim for the unpaid minimum funding contributions owed to the Pension Plan will reduce the amount of the Pension Plan's unfunded benefit liabilities, PBGC is entitled to assert the full amount of each claim against NJC.[80]

### III.   PBGC Timely Filed Sufficient Proofs of Claim with the Receiver.

### A.   PBGC's proofs of claim were adequate and timely.

Cox separately challenges the sufficiency of the proofs of claim that PBGC filed with the Receiver on April 16, 2010.  Although Cox concedes that PBGC submitted its proofs of claim to within the required deadline,[81] Cox appears to argue that PBGC's claim filing was inadequate.[82] Despite these assertions, the record reflects that PBGC timely filed sufficient proofs of claim with the Receiver.

As it does in every case, PBGC applied its standard procedures to calculate its claims for the Pension Plan's unfunded benefit liabilities and for the unpaid minimum funding contributions owed to the Pension Plan.[83]  PBGC calculated the Pension Plan's unfunded benefit liabilities in the estimated amount of $15,102,012, applying the actuarial assumptions prescribed by Title IV of ERISA and PBGC's regulations.[84]  PBGC calculated PBGC's claim for minimum funding

---

[80]  *See In re: CF&I Fabricators of Utah, Inc.*, 90B-6721, 1992 Bankr. LEXIS 2585, at *27-*28 (Bankr. D. Utah Dec. 31, 1992).

[81]  *See* Joint Pretrial Statement, Uncontested Fact 19, (Doc. No. 778); *see also* Joint Exhibit 10 (Doc. No. 652-5 at 96-112).

[82]  Cox's argument about the timeliness of PBGC's claims appears to relate to the adequacy of the documentation.  PBGC disputes that its documentation was inadequate.  Moreover, Cox cannot demonstrate any prejudice to itself or any other party.  *Cf. In re Parsons,* 135 B.R. 283, 285 (Bankr. S.D. Oh. 1991) (in allowing claims amendments, the court must examine whether prejudice to the creditors results).

[83]  Travia testimony 18:16 to 22:7, 25:14 to 27:19.

[84]  *Id.* at 23:16 to 25:13; PBGC Exhibit 26 at PBGC-NJC-001828-29, PBGC-NJC-001830-32.

contributions owed to the Pension Plan in the estimated amount of $650,142, applying the actuarial assumptions prescribed by ERISA.[85]  PBGC then filed proofs of claim with the Receiver that explained the basis for NJC's liability and referenced the documents in the Receiver's possession that supported the claim.[86]

The Receiver never disputed NJC's liability for the Pension Plan's unfunded benefit liabilities, or even contested the sufficiency of PBGC's claim filing.[87]  While the Receiver challenged the sufficiency of PBGC's claim for unpaid minimum funding contributions, the Receiver clarified that he was only challenging PBGC's assertion of priority.[88]  After filing its proofs of claim, PBGC continued to refine its calculations and discussed resolution of its claims with the Receiver.[89]  PBGC and the Receiver then settled the amount of PBGC's claims after considerable negotiation.[90]

As in the great majority of cases where PBGC files claims, the Pension Plan was not yet terminated, requiring PBGC to file estimated claims.  But certainty is not the standard for claim

---

[85]  Travia testimony 28:22 to 30:01; PBGC Exhibit 29 at PBGC-NJC-003548, PBGC-NJC-003878.

[86]  Joint Exhibit 10 (Doc. No. 652-5 at 96-112).

[87]  *See* Receiver's Report & Recommendation, June 10, 2010, (Doc. No. 652 at 16-18).

[88]  *See id.* at 18-20.

[89]  *See* Joint Exhibits 11-14; PBGC Exhibit 41 (all reflecting discussions between PBGC's actuary and NJC's actuary); *see also* Travia testimony 30:2 to 31:4; PBGC Exhibit 40 at PBGC-NJC-002992, PBGC-NJC-003513 (discussing PBGC's revised calculation of the unpaid minimum funding contributions owed to the Pension Plan).

[90]  Receiver's Resp. to Objections to Receiver's Report & Recommendation, Aug. 5, 2010, (Doc. No. 669 at 2-4).  PBGC presented evidence that the Receiver vigorously fulfilled his responsibilities to marshal and safeguard assets and to protect NJC's creditors in his diligent negotiation of a claims settlement with PBGC.  *See* Order, April 17, 2009, (Doc. No. 507).  Cox has presented no evidence that the Receiver's negotiations with PBGC failed in that regard.

amounts, and PBGC cannot "be barred from a fair recovery by impossible requirements."[91] Instead, PBGC's claims provided "a basis for a reasoned conclusion,"[92] as is amply demonstrated by comparing the amount of benefit liabilities used in PBGC's claim estimate to the final calculation of benefit liabilities – reflecting a difference of only 1.2%.[93]

### B. Cox has waived any arguments about the sufficiency of PBGC's claims.

Finally, Cox has waived any challenges to the timeliness or sufficiency of PBGC's proofs of claim against NJC.[94]   Between the time that PBGC's filed its proofs of claim with the Receiver and the August 9, 2010 hearing, Cox never challenged the timeliness or sufficiency of the claims.  Indeed, Cox's August 2, 2010 response to objections to the Receiver's report did dispute the sufficiency of PBGC's filing,[95] or the amount of PBGC's claims.[96]

Cox did make the general statement that "'[w]e do not accept or concur in [PBGC's] claim, the amount of the claims that [PBGC and the Receiver] worked out'" at the August 9, 2010 hearing on the Receiver's report.  But Cox never articulated any specific objection to the

---

[91]   *Palmer v. Conn. Ry. & Lighting Co.*, 311 U.S. 544, 559-60 (1941) ("To require proof of rental value approaching mathematical certitude would bar a recovery for an actual injury suffered.").

[92]   *Id.* at 561; *cf. Amcor, Inc. v. Brock*, 780 F.2d 897, 900-01 (11th Cir. 1986).

[93]   PBGC's proof of claim for the Pension Plan's unfunded benefit liabilities was based on a total estimated benefit liabilities amount of $43,051,525, while final calculation of the Pension Plan's benefit liabilities totaled $42,532,061.

[94]   Before the Court scheduled the evidentiary hearing, Cox never requested any information from PBGC about its claims.

[95]   *See* Cox's Resp. to Objections to Receiver's Report & Recommendation, Aug. 2, 2010, (Doc. No. 665 at 2 n.1) (specifically challenging certain other objector's standing).

[96]   *See generally id.*

timeliness or sufficiency of PBGC's claims, either as filed or as amended.[97]  And Cox's counsel

explicitly conceded that "[w]e haven't sought to go into that [the amount of PBGC's claims] and

don't today," instead content to rely on Cox's argument about priority.[98]

## CONCLUSION

Based on the record developed at the evidentiary hearing, and for the reasons presented in

this Brief, the Court should determine that PBGC has a valid claim against NJC for the Pension

Plan's unfunded benefit liabilities in the amount of $13,887,822.  Should PBGC not receive full

payment on its unfunded benefit liabilities claim, the Court should further determine that PBGC

has a valid claim against NJC for unpaid minimum funding contributions owed to the Pension

Plan in the amount of $455,000.


DATED:  February 12, 2014                    Respectfully submitted,
             Washington, D.C.


                                             /s/ Colin B. Albaugh
                                             Colin B. Albaugh (CA 3283)
                                             M. Katherine Burgess (MD 17810)
                                             Attorneys
                                             Pension Benefit Guaranty Corporation
                                             Office of the Chief Counsel
                                             1200 K Street, N.W., Suite 340
                                             Washington, D.C.  20005-4026
                                             Ph:  202-326-4020, ext. 3176
                                             Fax:  202-326-4112
                                             E-mails:  albaugh.colin@pbgc.gov *and*
                                                     efile@pbgc.gov

---

[97]  Tr. of Hr'g on Receiver's Report, Aug. 9, 2010, (Doc. No. 681, at 49-50); *see also Hamilton v. Southland Christian Sch.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it.") (citations omitted)).

[98]  Tr. of Hr'g on Receiver's Report, Aug. 9, 2010, (Doc. No. 681, at 50).

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 12th day of February 2014, the Pension Benefit Guaranty

Corporation's foregoing Post-Trial Brief, was served electronically through the Court's CM/ECF

system on all registered users.

<u>/s/ Colin B. Albaugh</u>
Colin B. Albaugh
Attorney

21