**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**COX ENTERPRISES, INC.,**

    **Plaintiff,**

-vs-                                              **Case No. 6:04-cv-698-Orl-28DAB**

**NEWS-JOURNAL CORPORATION,**
**HERBERT M. DAVIDSON, JR., MARC L.**
**DAVIDSON, JULIA DAVIDSON TRUILO,**
**JONATHAN KANEY, JR., DAVID**
**KENDALL, ROBERT TRUILO, GEORGIA**
**KANEY, and PMV, INC.,**

    **Defendants.**
_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

*I. Introduction*

This cause came on for consideration upon referral from the District Judge. By way of pertinent background,[1] in 2006, following extensive litigation between Plaintiff ("Cox"), Defendant News-Journal Corporation ("NJC"), and others, the District Court entered judgment, stating:

> IT IS ORDERED AND ADJUDGED that Plaintiff, Cox Enterprises, Inc., shall recover from the Defendant, News-Journal Corporation, the sum of $129.2 million, plus interest, in accordance with the terms of the order dated September 27, 2006. Plaintiff, Cox Enterprises, Inc., shall take nothing from the other defendants, Herbert M. Davidson, Jr., Marc L. Davidson, Julia Davidson Truilo, Jonathan Kaney, Jr., David Kendall, Robert Truilo, Georgia Kaney, PMV, Inc., and Lively Arts Center, Inc.

(Doc. 263). The judgment was affirmed in December 2007. *Cox Enterprises, Inc. v. News-Journal Corporation*, 510 F.3d 1350 (11th Cir. 2007).

Contrary to the usual course of events, significant post-judgment litigation continued and, in April 2009, the District Court appointed a Receiver to "administer and manage the business affairs,

---

[1] The case has an exceptionally long and complex history. For present purposes, the Court highlights only those matters material to the instant controversy.

funds, assets, choses in action and any other property of NJC; marshal and safeguard all of the assets of NJC; prepare NJC for sale; and take whatever actions are necessary for the protection of the creditors" (Doc. 507). Cox, the holder of the unpaid judgment, was actively involved in the litigation regarding the Receivership. In January 2010, the Receiver and Cox jointly moved the District Court to permit the Receiver to sell NJC's publishing operations (Doc. 576). The District Court conducted hearings on the motion, and, in March 2010, the motion was granted and the Receiver was authorized to proceed with the sale (Doc. 625). The sale did not include assumption of the NJC Pension Plan (Doc. 652).

In April 2010, the Receiver tendered administration and control of the Pension Plan to the Pension Benefit Guaranty Corporation ("PBGC"). PBGC submitted claims to the Receiver for: (1) the estimated unfunded benefit liabilities ("UBL") of the Pension Plan pursuant to 29 U.S.C. §§ 1362 and 1368, in the amount of $15,102,012.00; (2) unpaid premiums due to the PBGC under 29 U.S.C. § 1307, in the amount of $4,203,750.00; (3) unpaid minimum funding contributions due to the Pension Plan under 26 U.S.C. §§ 412, 430 and 29 U.S.C. § 1082, in the amount of $650,142.00, and (4) statutory liability for the shortfall and waiver amortization charge under 29 U.S.C. § 1362(c), in the amount of $6,504,080.00 (Doc. No. 652-5, Pages 96-112.). According to PBGC: "On August 5, 2010, following 'extensive consultation' and negotiations between PBGC, NJC's counsel and its actuary [footnote omitted], the Receiver and PBGC entered into a settlement with respect to PBGC's claims whereby PBGC would withdraw its claims for the shortfall and waiver amortization charges and pension insurance premiums; settle its unfunded benefit liabilities claim for $14,500,000.00; and settle its minimum contribution claim for $455,000.00." (Doc. No. 709, citing Doc. 669, p. 3).[2] As noted by the Receiver in its report to the Court:

---

[2] Note that the Receiver's Report quoted by PBGC asserts that the agreed value of PBGC's UBL claim was $14,272,500 (Doc. 669, p. 3).

> The Receiver's agreement with PBGC should not be viewed by the Court as a recommendation that PBGC receive a distribution in the amount of these two claims, or a comment on PBGC's priority relative to Cox; only that the Receiver agrees that these two claims are properly before the Court and that $14,272,500.00 is the agreed-upon amount of the plan's unfunded benefit liability and $455,000.00 is the agreed-upon amount of the required minimum funding contribution.

(Doc. 669, p. 4). The Receiver took the position that the PBGC claims were general unsecured claims (Doc. 669). Noting that "the amount of the legitimate claims against NJC's assets far exceeds the value of those assets – indeed, . . . the amount of the Cox judgment alone far exceeds the value of those assets . . ." (Doc. 652, p. 28), the Receiver recommended disposition of the NJC assets, wind-up of the company, and discharge of the receivership. *Id.*

Following hearing on the Recommendations of the Receiver and objections thereto, the District Court entered an Order providing for distribution of all of NJC's assets to Cox, in partial satisfaction of the judgment (Doc. 674). PBGC appealed (Doc. 684), but the Distribution Order was not stayed pending appeal. Thus, the Receiver distributed to Cox "real estate nominally valued at $8.29 million, an art poster collection nominally valued at $591,875.90 and funds totaling $33,094,192.56" (Doc. 765, citing Docs. 690, 692 and 694).

On January 4, 2012, the Eleventh Circuit vacated the August 13, 2010 Distribution Order and remanded the case to the District Court for further proceedings (Doc. 698, *Cox Enterprises, Inc. v. Pension Benefit Guaranty Corp. et al.,* 666 F.3d 697 (11th Cir. 2012).) In essence, the Court of Appeals concluded that Cox could not collect on its claim if a distribution to Cox rendered NJC insolvent, and remanded the case to this Court to apply the insolvency test contained in Fla. Stat. § 607.06401, noting: "If on remand the district court finds a distribution to Cox would violate this section, News–Journal's other creditors should receive payment before any distribution is made to Cox." 666 F.3d at 699.

Upon receipt of the mandate, the District Court issued an Order (Doc. 708) which provided for a procedure to "reevaluate the claims of all of News-Journal's creditors. . ." *Cox,* 666 F. 3d at 708. In pertinent part, the District Court stated:

> 1. The Court will reevaluate the claims of all of the News-Journal Corporation's (the "NJC") creditors consistent with the Eleventh Circuit's opinion. For that purpose, the Court directs each person or entity that filed a timely response to the Receiver's Notice of Claim Deadline (Doc. No. 630) and desires to have its claim or claims considered by the Court, to submit a memorandum that addresses how the claimant believes the Court should rule consistent with the Eleventh Circuit's opinion and that sets forth (I) the amount of the claim(s) and the bases for its claim(s), or that (ii) identifies previously-filed documents that set forth the amount and the bases for its claim(s).
>
> 2. Each party and each person or entity submitting a memorandum as set forth above may submit a response to any claim within forty (40) days after entry of this Order. If any party, person, or entity contends that an evidentiary hearing is necessary, the party, person, or entity should so state and identify, at least in general terms, the factual issues to be determined. Responses should identify objections to the validity and amount of claims.

(Doc. 708).

In its papers, Cox took the position that "as a matter of law no cause exists for the Court to order Cox to relinquish any previously-distributed NJC assets." (Doc. 714, 711). Cox also took the position that, "even were the Court to conclude at or after the argument scheduled for August 2 that there may be cause to order Cox to relinquish any previously-distributed NJC assets, no distribution to either the Davidsons[3] or PBGC would be appropriate on this record absent an evidentiary hearing, in preparation for which Cox would be entitled to discovery." (Doc. 714). Cox disputes the "validity and amount" of any claim of PBGC.

For its part, the PBGC stated:

> PBGC settled its claims after long and vigorous negotiations with the Receiver. The Receiver was represented by special pension counsel and an actuary, and negotiated only after requesting and receiving all the information he sought to reach a settlement. As support for its claims, PBGC relies on the information submitted to the Receiver, NJC, NJC's actuary and special counsel hired by the Receiver, as well as information

---

[3] The potential claim of the Davidsons has been completely resolved by action of the state court, and is not before this Court.

> PBGC conveyed in numerous telephone and email conversations that occurred between these parties. Any objections to the settlement of PBGC's claims are waived, as the time for objecting to that settlement expired long ago. To the extent that this Court now allows objections, however, PBGC reserves the right to fully respond and to reassert the full amount of its originally filed claims.

(Doc. 709, p.5).

The District Court held oral argument on August 2, 2013, and took the matter under advisement. As Cox had taken the position that certain factual issues required development and resolution, the District Court referred the matter to the undersigned Magistrate Judge, for the limited purpose of determining whether an evidentiary hearing was appropriate, and, if so, to hold such a hearing. The undersigned held a status conference (Doc. 750), and issued a subsequent Order which noted, in part:

> As discussed at conference, there are several issues remaining for resolution in the wake of the mandate issued by the Eleventh Circuit. Although certain of those issues are purely legal and will be resolved by the District Judge, there are limited factual disputes which, if reached [fn omitted] and not resolved through agreement, would require development and resolution. In view of the history of this dispute, the Court finds that an appropriate course is to allow the parties to develop the record through limited discovery, and then resolve the factual disputes through an evidentiary hearing. The District Judge may then determine all of the remaining issues with the benefit of a complete record.

(Doc. 751).

The parties commenced discovery, the parties conferred and submitted a Joint Pretrial Statement (Doc. 778), and the undersigned held an evidentiary hearing (Doc. 781, 786). At the January 14, 2014 hearing, PBGC called two witnesses: (1) a fact witness and (2) an expert witness to provide testimony on PBGC's regular practices in calculating its claims in bankruptcy and receivership cases and the amount of PBGC's claim against NJC for the Pension Plan's unfunded benefit liabilities (Transcript - Doc. 786). Cox called one witness, an expert who challenged the formulation of the claims. *Id.* Numerous exhibits were admitted into evidence (Docs. 782-784). The parties have since filed briefs and Proposed Findings of Fact and Conclusions of Law (Doc. 785, 788-

790). Having heard evidence and reviewed the briefs, the record and the applicable law, the Court identifies the issues and makes the limited findings of fact and conclusions of law set forth herein.

## II. *The Issues Presented*

As set forth in the Joint Pretrial Statement (Doc. 778), several issues remain with respect to the claim(s) asserted by PBGC. The issues are summarized as follows:

• Whether PBGC's claims were timely asserted to the Receiver

• Whether PBGC's claims were adequately asserted

• The appropriate amount of PBGC's claims for unfunded benefit liabilities, if any

• The appropriate amount of PBGC's claim for missed minimum funding contributions, if any

• Whether Cox has waived any objections to the claims

Including in these issues are various sub-issues regarding the appropriateness and adequacy of the calculation of the claims, and equitable arguments regarding the assertion of the claims at this point in the litigation. Some of these issues, such as the extent of discretion the Court may exercise in carrying out the mandate of the Eleventh Circuit, are beyond the scope of the current referral. Cox has identified several issues which it contends remain pending for the District Judge's sole determination. These issues include:

1. Whether the PBGC's claims are "legally in parity with or have priority over" the claim of Cox (Doc. 778, p. 22).

2. Whether the PBGC's claims may and should be rejected as a result of the PBGC's "failure to comply with the Court's orders in timely [sic] submitting and adequately supporting its claims to be [sic] Receiver and the Court" *Id*.

3. Whether in a federal receivership proceeding claims of the PBGC may and should be rejected if the PBGC fails to demonstrate that its calculations of its claims are accurate and reliable and do not overstate the pension plan's liabilities. *Id.*

4. Whether in a federal receivership proceeding claims of the PBGC may and should be rejected or discounted if on the factual record the district court believes that doing so is consistent with treating the PBGC and other claimants fairly. (Doc. 778, p. 23).

The matters addressed herein are limited to ascertaining the amount of the claims asserted by PBGC. Matters with respect to the priority of the PBGC claims, "waiver" of the claims due to alleged insufficiency of presentation to the Receiver and the District Judge, the application of "equitable" considerations governing receiverships which might prohibit the payment of the claims, and the question posed by the Eleventh Circuit (whether a distribution to Cox would violate Fla. Stat. § 607.06401), are all properly before the District Judge.

Against this background, the Court makes the following findings of fact and conclusions of law, with respect to the issues properly before it.

### *III. Findings*

*The Role of the PBGC*

PBGC is a wholly owned United States government corporation that administers the nation's pension insurance program established by Title IV of ERISA. (Joint Pretrial Statement, Statement of Uncontested Facts) (Doc. 778). PBGC is funded by insurance premiums paid by employers that sponsor PBGC-insured plans, earnings from investments, assets from terminated pension plans, and recoveries from companies formerly responsible for terminated pension plans. *Id.* When a pension plan covered by Title IV terminates without enough assets to pay all of its promised benefits, PBGC is both the guarantor of the plan benefits payable, up to statutory limits, and in virtually every case, becomes the statutory trustee of the plan. *Id.*

PBGC is responsible for determining and paying benefits due to a terminated plan's participants and beneficiaries according to the rules in Title IV of ERISA. *See* 29 U.S.C. §§ 1322, 1344; *see also* Joint Exhibit 15 at COX-PBGC 2179-81 (Doc. 782-23). If a pension plan terminates

in a distress or PBGC-initiated termination, certain liabilities arise pursuant to Title IV of ERISA. Among other liabilities, the pension plan's contributing sponsor becomes liable to PBGC for "the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan" with interest. 29 U.S.C. § 1362(a), (b). Title IV of ERISA defines "the amount of unfunded benefit liabilities" as:

> as of any given date, the excess (if any) of–
>
> (A) the value of the benefit liabilities under the plan (determined as of the termination date on the basis of assumptions provided by [PBGC] for purposes of [29 U.S.C. § 1344]), over
>
> (B) the current value (as of such date) of the assets of the plan.

29 U.S.C. § 1301(a)(18). The "assumptions provided" by PBGC for these purposes are contained in the Valuation Regulation, promulgated by PBGC. 29 C.F.R. § 4044.41-.75. Thus, "the statute defines "unfunded benefit liabilities" as being the amount determined by reference to the PBGC valuation regulation." *In re U.S. Airways Group, Inc*., 303 B.R. 784, 796-797 (Bankr. E.D. Va. 2003).

The pension plan's contributing sponsor is also liable for unpaid minimum funding contributions owed to a pension plan. 29 U.S.C. §§ 1082(b); 26 U.S.C. § 412(b). Upon plan termination, that liability is owed to PBGC as the statutory trustee of a pension plan. *See* 29 U.S.C. §§ 1342(d), 1362(c).

*PBGC's standard procedures in evaluation of a Plan*

When PBGC becomes trustee of a terminated plan, as part of the agency's standard procedures, PBGC sends to the plan sponsor an initial standard request letter in order to obtain various information, data, and documents related to that plan. When this information and data is returned to the agency, the benefits administration and payment department develops both a participant data review and a plan asset evaluation and when those two items are completed, then the actuaries will develop the Actuarial Case Report for the plan (Travia testimony, Doc. 786, pp. 19-25, 71).

PBGC's Corporate Finance & Restructuring Department ("CFRD") has a standard process for calculating estimates of PBGC's claim for a pension plan's unfunded benefit liabilities and PBGC's claim for unpaid minimum funding contributions owed to a pension plan. In that process, CFRD applies the actuarial assumptions prescribed by ERISA and PBGC's regulations. (*Id*.).

PBGC compiles a final valuation of the Pension Plan's benefit liabilities, using the actuarial assumptions provided in Title IV of ERISA and PBGC's regulations. This evaluation is based on a participant-by-participant (seriatim) valuation of benefit liabilities. Generally, it takes from three to four years to prepare the final Actuarial Case Report (Doc. 786, pp. 71-72).

*The NJC Plan*

Effective July 1, 1960, NJC established the Pension Plan, a defined benefit pension plan covered by Title IV of ERISA (Joint Pretrial Statement, Statement of Uncontested Facts) (Doc. 778). Until the Pension Plan's termination, NJC was the contributing sponsor of the Pension Plan. *Id.* As noted above, on April 17, 2009, the Court appointed James W. Hopson as Receiver for NJC (Doc. 507). On or about September 17, 2009, PBGC received the Post-Event Notice of Reportable Events (PBGC Form 10) from the attorney for the Receiver (Joint Pretrial Statement, Statement of Uncontested Facts) (Doc. 778).

*PBGC becomes statutory trustee of the NJC Pension Plan*

On May 14, 2010, PBGC issued its Notice of Determination to NJC that the Pension Plan should be terminated under 29 U.S.C. § 1342. In that notice, PBGC stated that the Pension Plan's termination date should be March 23, 2010. Along with the Notice of Determination, PBGC sent an Agreement for Appointment of Trustee and Termination of Plan, and requested that the Receiver sign the Agreement. *Id.* As detailed above, the Receiver and the PBGC initially disagreed as to the claims asserted by PBGC. In the summer 2010, PBGC and the Receiver conferred regarding resolution of PBGC's claims against NJC. This process included correspondence between PBGC's actuary and

NJC's actuary about the data and actuarial assumptions used to calculate PBGC's claims (Doc. 782-19 to 782-21 - Joint Exhibit 11; Joint Exhibit 12; Joint Exhibit 13; Doc. 783-33). On August 5, 2010, NJC's actuary completed an estimate of the Pension Plan's benefit liabilities using the assumptions prescribed in Title IV of ERISA and PBGC's regulations. NJC's actuary estimated that the Pension Plan's benefit liability was $42,465,742, although that figure did not include the required expense load assumption (Doc. 782-22 - Joint Exhibit 14).

On August 6, 2010, PBGC and the Receiver executed an Agreement for Appointment of Trustee and Termination of Plan that, *inter alia*, terminated the Pension Plan under 29 U.S.C. § 1342, established March 23, 2010 as the Pension Plan's termination date, and appointed PBGC as statutory trustee of the Pension Plan. Joint Pretrial Statement, Uncontested Fact 26 (Doc. No. 778). As of the Pension Plan's March 23, 2010 termination date, the Pension Plan had assets of $28,644,239. *Id.*

*PBGC calculates the estimated amounts*

On March 26, 2010, the CFRD completed its calculation of PBGC's claim for unpaid minimum funding contributions owed to the Pension Plan in the estimated amount of $650,142 (Doc. 786, pp. 28-29, citing PBGC Exhibit 29). CFRD prepared this calculation of the estimated amount of unpaid minimum funding contributions owed to the Pension Plan in accordance with its standard procedures. *Id.* Travia testimony pp. 29-30. On March 31, 2010, CFRD completed its calculation of the Pension Plan's unfunded benefit liabilities in the estimated amount of $15,102,012. (PBGC Exhibit 26; Doc. 786, pp. 23 to 24). CFRD prepared this calculation of the Pension Plan's estimated unfunded benefit liabilities in accordance with its standard procedures. *Id.* Travia testimony pp. 23-25.

On July 27, 2010, PBGC revised its calculation of the unpaid minimum funding contributions owed to the Pension Plan to reflect additional contributions that the Receiver had paid to the Pension Plan. The revised amount of PBGC's claim was calculated as $455,430. (PBGC Exhibit 40, *Id.,* Travia testimony pp. 30 to 31; Joint Exhibit 11). As noted above, the Receiver and PBGC negotiated

and the Receiver ultimately agreed that "[PBGC's unfunded benefit liabilities claim and unpaid minimum funding contribution claim] are properly before the Court and that $14,272,500.00 is the agreed-upon amount of the plan's unfunded benefit liability and $455,000.00 is the agreed-upon amount of the required minimum funding contribution" (Doc. No. 669 at 2-4).

*PBGC conducts a seriatim valuation*

After the Pension Plan was terminated and PBGC became the Pension Plan's statutory trustee, PBGC's Benefits Administration and Payments Department began the process of collecting all of the Pension Plan's records and calculating the Pension Plan's benefit liabilities on a participant-by-participant (seriatim) basis pursuant to the provisions of Title IV of ERISA and PBGC's regulations (Doc. 786, p.71; Joint Exhibit 15 at COX-PBGC 2179-80). On August 22, 2013, PBGC completed that seriatim valuation, and determined that the final amount of the Pension Plan's unfunded benefit liabilities was **$13,887,822** (Joint Pretrial Statement, Uncontested Fact 37, Doc. No. 778; PBGC Exhibit 1 at 2; Joint Exhibit 3 at PBGC-NJC-005307). This reflects PBGC's calculation of the Pension Plan's benefit liabilities on a seriatim basis using the actuarial assumptions prescribed in Title IV of ERISA and PBGC's regulations thereunder (Doc. 786, Young testimony at pp. 69-71; Doc. 782-5 to 782-12; Joint Exhibits 4-6). The actuarial case memorandum containing the seriatim valuation was certified by Althea Schwartz, an enrolled actuary at Milliman, Inc. (Joint Exhibit 4 at PBGC-NJC-006915; *Id.,* Young testimony p. 72).

In its papers and at hearing, PBGC has stipulated: "If PBGC fully recovers on its claim against NJC for the Pension Plan's unfunded benefit liabilities, then PBGC is not seeking any separate payment on its claim for the missed minimum funding contributions owed by NJC to the Pension Plan. To the extent that PBGC does not fully recovery on its claim for the Pension Plan's unfunded benefit liabilities, it intends to pursue recovery on both of its claims." (Doc. 778, n. 1).

*The Court calculates the claim*

-11-

As noted above, questions regarding the sufficiency of the presentation of the claim to the Receiver and the priority of the claims are to be resolved by the District Judge. With respect to the amount of the claim, the Court finds that the amount of PBGC's claim against NJC for the Pension Plan's unfunded benefit liabilities is **$13,887,822.00.** As this amount is consistent with full recovery, the Court finds PBGC's claim for unpaid minimum funding contributions in the amount of $455,000.00 is incorporated in the unfunded benefit liabilities claim, and no separate payment is owed.

### *IV. Discussion*

In reaching this conclusion, the Court has considered the foregoing findings of fact, the legal framework and applicable case law, and the contentions of the parties. In its papers and at hearing, Cox raises several objections to the "merit, priority, and amount" of the claim of PBGC. The majority of these objections and arguments are, as noted, reserved for the District Judge. Three of the objections, however, are properly before the undersigned and are discussed herein: 1) whether the assertion of any claim by PBGC is "fair;" 2) whether there is competent evidence supporting the claim; and 3) whether the greater weight of the evidence supports a conclusion that no award should be made.

*"Fairness"*

Cox frames the overriding issue before the Court as whether the District Court has discretion to approve a "fair" distribution of assets, or is required to "rubber stamp" PBGC's calculations of its claim. Claiming that it is the "wholly innocent" party, Cox urges the Court to find that "PBGC is due to receive nothing from Cox" (Doc. 790-2). This characterization is unpersuasive.

As set forth above, PBGC asserted its claims *against the assets of NJC.* Although the District Court determined that the assets of NJC were to be paid to Cox in partial satisfaction of its Judgment, that decision has been overturned. While Cox no doubt disagrees with the Eleventh Circuit, the effect

of the appellate decision is, in effect, to *return* those assets to the NJC estate. As such, the parties are at issue over the assets *of NJC* currently being held by Cox; there is no independent claim by PBGC against Cox and the NJC assets paid to Cox are no longer its own. To the extent Cox deems that to be unfair, the mandate of the Eleventh Circuit forecloses such discussion. Another way of looking at the circumstances is simply to note that Cox found itself as a shareholder/creditor of an entity that was subject to another large liability (unfunded pension obligations) and that therefore was worth even less than Cox thought.

Nor is it unfair that PBGC did not post a bond to stay the Court's Distribution Order, pending appeal. PBGC did not hide its disagreement with the Court's Distribution Order, and promptly appealed (Doc. 684). Cox took its distribution *after* the Notice of Appeal was filed; with full knowledge of the pending appeal and the risks involved (Docs. 690-692). In the interim, Cox enjoyed the benefit of the use of the funds and assets, and any interest on the NJC assets that were held by Cox has accrued to Cox's benefit. The Court does not find any unfairness to Cox in PBGC's conduct here.

Finally, the Court finds the concept of "innocence" to be irrelevant to the issues at hand. While there is no doubt that Cox did nothing "wrong" to warrant the unfortunate situation it finds itself in, neither did the beneficiaries of the NJC Pension Plan. Moreover, Cox cannot lay blame at the door of the PBGC, which must act in accordance with its statutory obligations to the Plan and its participants. The fact remains that none of the present players is any more or less deserving based on their relative "innocence." The moral high ground here is crowded, indeed.

*Whether there is sufficient competent evidence supporting the claim*

On the merits, Cox contends that the PBGC failed to demonstrate that it followed its own rules and procedures, in that 1) its fact witness, Ms. Travia, testified that she did not actually perform or supervise the performance of any of the calculations for the claims in this case; and 2) Mr. Young,

the expert witness, testified that he did not do anything personally to calculate the amount of the NJC's unfunded benefit liabilities, but relied on the work of others. The Court is unpersuaded.

As noted by Cox, Cynthia Travia has been employed by PBGC for ten years and currently holds the title of senior actuary in PBGC's Corporate Finance & Restructuring Department. (Trial Tr. Doc. 786, p. 13). She provided testimony on behalf of PBGC regarding PBGC's regular practices in calculating its claims in bankruptcy and receivership cases, noting that her department:

> perform[s] any of the actuarial calculations that a case team would need to analyze a certain event. So that can include doing the unfunded benefits liability calculations, determining the unfunded pension plan, also determining the amount of minimum required contributions that were supposed to be paid to a plan and haven't been paid, which we call the due and unpaid employer contributions.

(Doc 786, p. 15). Ms. Travia testified regarding pension information profiles ("the summary of the results of our calculations when we do an unfunded benefit liability calculation") and stated that she had prepared "at least 600" of these reports, and personally had calculated pension plan unfunded benefit liabilities "easily 600 [times] in the course of my career" *Id.*, pp. 16, 19. Ms. Tavia testified that she was familiar with the process used to calculate the amount of unpaid minimum funding contributions, as well, and had calculated due and unpaid employer contribution claims "approximately 100 times." *Id.*, pp. 25, 26-7.

Although Cox points out (correctly) that Ms. Tavia did not *personally* prepare or supervise the preparation of the calculations for PBGC's unfunded benefit liability claim (*Id.,* p. 32), the Court does not agree that this means "she was not able [to] confirm that PBGC calculated its claims against News-Journal in accordance with PBGC's normal practice" (Doc. 790-1, para. 82). In fact, Ms. Tavia testified that she was well familiar with the normal procedures for the calculations prepared by PBGC and, *from her review of the documents*, she concluded that the normal procedures were followed. *See* Doc. 786, pp. 24-25, 29, 30. This is credible evidence to support a finding that PBGC followed its usual and customary procedures in formulating the claims.

PBGC also called Scott Young, the Chief Valuation Actuary in PBGC's Benefits Administration and Payment Department, and tendered him as an expert in the field of actuarial science. *Id.*, pp. 48, 52. Mr. Young developed an expert opinion concerning the amount of the Pension Plan's unfunded benefit liabilities after reviewing PBGC's actuarial case memorandum and actuarial case report for the Pension Plan. *Id.,* pp. 55, 59-62. He testified that PBGC had properly applied the actuarial assumptions prescribed in Title IV of ERISA and PBGC's regulations to calculate the Pension Plan's total benefit liabilities in the amount of $42,532,061. *Id., also* pp. 62-69, 73-74; Doc. 782-3 - Joint Exhibit 3 at PBGC-NJC-005307. As the parties have stipulated that at termination, the Pension Plan had assets of $28,644,239.39, subtracting the Pension Plan's assets from its total benefit liabilities yields unfunded benefit liabilities of $13,887,822.

Cox contends that the expert witness did not offer competent evidence that the claims were calculated in accordance with PBGC's regulations and procedures because "Mr. Young did not do anything personally to calculate the amount of the NJC's unfunded benefit liabilities" (Doc. 786, pp. 52-53), but relied on the work of other individuals who are not employed by PBGC, but who are actuarial contractors hired by PBGC to calculate the NJC plan's unfunded benefits liability (*Id.*, p. 53). As the Court noted at hearing, however, Mr. Young is routinely called upon to give opinions based on the review of the work of other people, as an ordinary part of the performance of his professional duties (Doc. 786, pp. 57-58). Based upon his qualifications, his familiarity with the PBGC and its regulations, and his review of the documents, the Court finds his testimony to be competent evidence.

Moreover, the testimony of these witnesses is not the only evidence before the Court. In fact, several others also estimated the benefit liability. As noted above, NJC's actuary, using the assumptions prescribed in Title IV of ERISA and PBGC's regulations, estimated that the Pension Plan's benefit liability (Doc. 782-22 - Joint Exhibit 14). The Receiver also participated in extensive

negotiations with PBGC, and the Receiver eventually acknowledged that the claims were "properly before the Court and that $14,272,500.00 is the agreed-upon amount of the plan's unfunded benefit liability and $455,000.00 is the agreed-upon amount of the required minimum funding contribution" (Doc. No. 669 at 2-4). Importantly, *Cox's* expert witness, Adam Reese, Principal and Managing Director of Actuarial Services at PRM Consulting Group, calculated total benefit liabilities of $42,218,066, compared with PBGC's calculation of $42,532,061, using the assumptions prescribed in Title IV of ERISA and PBGC's regulations. Doc. 786, p. 150*; Compare* Joint Exhibit 2 at 3 (Mr. Reese's calculation), with PBGC Exhibit 1 at 2; Joint Exhibit 3 at PBGC-NJC-005307 (PBGC's calculation). Mr. Reese's calculations using these assumptions yields an UBL claim of approx. $13,573,827 ($42,218,066 minus $28,644,239).[4] The fact that all of the professionals who calculated or estimated the liability arrived at similar figures (with the differences explained by differing data sets) supports a finding that the PBGC did, in fact, prepare its claim consistent with the assumptions prescribed in Title IV of ERISA and PBGC's regulations. Coupled with the certification of the claim by the enrolled actuary at Milliman, Inc., all of the foregoing lead the Court to conclude that PBGC presented sufficient supporting evidence of its claim. The Court **finds** that the PBGC followed its own procedures in calculating its claim.

The larger issue raised by Cox is not whether the PBGC did, in fact, follow its own regulations, but whether they should have done so. This leads to Cox's next contention.

*Whether the greater weight of the evidence supports disallowance of the claim*

Cox's cross examination of the PBGC witnesses and direct examination of its own expert witness served to establish that calculating the UBL by using assumptions which are not contained in the valuation regulation renders a much different (and more favorable to Cox) result. The Court accepts the unremarkable proposition that using different assumptions yields a different result. It may

---

[4] Mr. Resse testified that he used an updated data set in calculating the liability. *See* generally, Doc. 786, pp. 150, 113-115.

well be that, in some situations, Cox's assumptions may be more "realistic" and may "make more sense." Ultimately, however, this contention is of no moment. ERISA mandates that the value of the plan's benefit liabilities be determined "on the basis of assumptions prescribed by [PBGC]." 29 U.S.C. § 1301(a)(18)(A). As Cox's calculation is not determined on the basis of these assumptions, it is not appropriate in determining the amount of the UBL claim.

In accordance with the Administrative Procedure Act, PBGC promulgated the Valuation Regulation, which prescribes the required assumptions for calculating a pension plan's benefit liabilities for purposes of 29 U.S.C. § 1344. *See, e.g.*, 46 Fed. Reg. 9492 (Jan. 28, 1981) (Final Rule); 58 Fed. Reg. 50,812 (Sept. 28, 1993) (Final Rule). After PBGC promulgated the Valuation Regulation, Congress amended 29 U.S.C. § 1301(a)(18) to explicitly refer to the "assumptions prescribed by [PBGC]" for valuing benefit liabilities. *Id.* Thus, "Congress, by statute, has expressly given the PBGC a present right to recover an amount determined in accordance with the valuation regulation." *In re U.S. Airways Group, Inc.*, supra, 303 B.R. at 793; *see also In re Rhodes, Inc.*, Nos. 04–78434, 04–78435, 04–78436, 2008 WL 7842106, *8 (Bankr. N.D. Ga. Jan. 25, 2008) ("PBGC is authorized by law to make a determination of the amount of its claim that is binding on Debtors and therefore on this Court.").

Although Cox and its expert actuary offer alternative interest rate assumptions, mortality rates, annuity pricing, and retirement age assumptions than those set forth pursuant to the Valuation Regulation, and contend that this results in "a more reasonable value of the benefit liabilities to be funded" (Doc. 790-1, para. 99), PBGC's interpretation of ERISA and its own regulation is entitled to deference. *Durango-Georgia Paper Co. v. H.G. Estate, LLC,* 739 F.3d 1263, 1273 (11th Cir. 2014) ("We give deference to PBGC's interpretation of ERISA"); *Lyons v. Georgia–Pacific Corp. Salaried Employees Retirement Plan*, 221 F.3d 1235, 1244–1245 (11th Cir. 2000)("... agency regulations, like the one at issue here, are to be given deference 'unless they are arbitrary, capricious,

or manifestly contrary to the statute'"). Whether the Valuation Regulation may or may not be susceptible to improvement and whether Cox's interpretation is "more reasonable" are not determinative. As the Eleventh Circuit has explained:

> As a preliminary matter, we note that we owe great deference to the interpretations and regulations of the Pension Benefit Guaranty Corporation ("PBGC"), the Internal Revenue Service ("IRS") and the Department of Labor, which are the administrative agencies responsible for enforcing and interpreting ERISA. As the Supreme Court stated, "a court that tries to chart a true course to the Act's purpose embarks on a voyage without a compass when it disregards the agency's views." *Ford Motor Co. v. Milhollin*, 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980). The Supreme Court has consistently advised that courts must adhere to the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong...." *Red Lion Broadcasting Co., Inc. v. F.C.C.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). Furthermore, we only must determine whether the agency's interpretation is reasonable. In making this determination, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding ... [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 11 and 844, 104 S.Ct. 2778, 2782 n. 11 and 2782, 81 L.Ed.2d 694 (1984).[FN omitted] Finally, we must defer not only to the regulations promulgated by administrative agencies charged with the enforcement and interpretation of ERISA and the Internal Revenue Code but also, when a regulation can be interpreted in more than one plausible way, we must recognize and defer to the agencies' interpretation of the regulation. *Ford Motor Co.*, 444 U.S. at 560, 100 S.Ct. at 794 (where statute and regulations in consumer credit area were susceptible to divergent interpretations, the court deferred to opinion letters and consumer advice publications which set forth the interpretation of the regulation by the appropriate administrative agency); *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 2274, 68 L.Ed.2d 783 (1981) ("absent some obvious repugnance to the statute, the [agencies'] regulation implementing this legislation should be accepted by the courts, as should the [agencies'] interpretation of its own regulation.").

*Blessitt v. Retirement Plan For Employees of Dixie Engine Co.,* 848 F.2d 1164, 1167-1168 (11th Cir. 1988) (en banc).

The PBGC represents that the Valuation Regulation has been applied to determine the underfunding in every pension plan that has terminated and been trusteed by PBGC, for more than thirty five years (Doc. 788, p. 6). Moreover, PBGC represents that "every court that has considered

the issue since 2003 has rejected efforts to depart from the Valuation Regulation." (Doc. 779, *citing US Airways*, 303 B.R. at 793; *Dugan v. PBGC (In re Rhodes, Inc.)*, 382 B.R. 550, 559-60 (Bankr. N.D. Ga. 2008); *In re High Voltage Eng'g Corp.*, No. 05-10787 (Bankr. Mass. July 26, 2006) (Order) (Doc. 779-2); *In re UAL Corp.*, Case No. 02 B 48191 (Bankr. N.D. Ill. Dec. 30, 2005) (Trans. of Hearing, Dec. 16, 2005, at 32-33) (Doc. 779-3); *accord In re Wolverine, Proctor & Schwartz, LLC*, 436 B.R. 253, 262-63 (D. Mass. 2010) (finding the reasoning of US Airways persuasive in affirming the bankruptcy trustee's settlement of PBGC's claim for unfunded benefit liabilities). While these authorities are not binding on the Court, and there is earlier, contrary authority in the context of bankruptcy,[5] the Court finds the great weight of authority supports application of the Valuation Regulation, consistent with the letter of the law.

As the showing made by Cox is not sufficient to find the Valuation Regulation to be arbitrary and capricious, and it is not contrary to ERISA, the Court must give it deference and must find that it controls the formulation of the claim at issue.

**Conclusion**

For the reasons stated, the Court concludes that the PBGC has followed its procedures and has calculated its UBL claim in accordance with the applicable regulation. As stated above, the Court finds that the amount of PBGC's claim against NJC for the Pension Plan's unfunded benefit liabilities is **$13,887,822.00.** As this amount is consistent with full recovery, the Court finds PBGC's claim for unpaid minimum funding contributions in the amount of $455,000.00 is incorporated in the unfunded benefit liabilities claim, and no separate payment is owed.

---

[5]*See In re CF & I Fabricators of Utah, Inc.,* 150 F. 3d 1293, 1301 (10th Cir. 1998) (PBGC was to apply prudent investor discount provided in the Bankruptcy Code, rather than its own valuation methodology); *In re CSC Indus., Inc.,* 232 F. 3d 505 (6th Cir. 2000) (same).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on March 21, 2014.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy