UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

COX ENTERPRISES, INC.,

Plaintiff,

-vs-                                                    Case No.  6:04-cv-698-Orl-28DAB

NEWS-JOURNAL CORPORATION,
HERBERT M. DAVIDSON, JR., MARC L.
DAVIDSON, JULIA DAVIDSON TRUILO,
JONATHAN KANEY, JR., DAVID
KENDALL, ROBERT TRUILO, GEORGIA
KANEY, and PMV, INC.,

Defendants.

_____

## ORDER

This case is before the Court on remand from the Court of Appeals for the Eleventh

Circuit.  This ruling is issued pursuant to the appellate court's mandate.

### I. Background

Invoking this Court's diversity jurisdiction, in May 2004 Cox Enterprises, Inc., filed this

suit against News-Journal Corporation ("NJC") and its officers, directors, and majority

shareholder, PMV, Inc. Cox, the minority shareholder of NJC,[1] alleged misuse of corporate

funds and waste of assets, and it sought damages or, alternatively, dissolution of NJC.

Pursuant to Florida's election-to-purchase statute, section 607.1436, Florida Statutes, NJC

_____

[1]PMV owned 52.5% of NJC stock, and Cox owned the remaining 47.5%.

then filed an irrevocable election to purchase Cox's shares at "fair value."[2] When the parties

could not agree as to the fair value of Cox's shares,[3] the task of valuing those shares fell to

this Court under subsection 607.1436(4).[4]

After conducting a bench trial, this Court determined the fair value of Cox's shares

to be $129.2 million, (see Order, Doc. 251), and then set the terms and conditions of NJC's

purchase of Cox's shares[5] and entered judgment (see Order, Doc. 262 ("the Repurchase

Order"); Judgment, Doc. 263).   The Repurchase Order directed that NJC pay Cox in

installments, with the first payment of $29.2 million due within ten days of issuance of the

appellate court's mandate if the Repurchase Order was appealed.[6]  Both Cox and NJC did

---

[2]Subsection 607.1436(1) provides: "In a proceeding under [section] 607.1430(2) or (3) to dissolve a corporation, the corporation may elect or, if it fails to elect, one or more shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares.  An election under this section shall be irrevocable unless the court determines that it is equitable to set aside or modify the election."

[3]Subsection 607.1436(3) provides:  "If, within 60 days after the filing of the first election, the parties reach agreement as to the fair value and terms of the purchase of the petitioner's shares, the court shall enter an order directing the purchase of petitioner's shares upon the terms and conditions agreed to by the parties."

[4]Subsection (4) provides that "[i]f the parties are unable to reach an agreement as provided for in subsection (3), the court, upon application of any party, shall stay the [section] 607.1430 proceedings and determine the fair value of the petitioner's shares as of the day before the date on which the petition under [section] 607.1430 was filed or as of such other date as the court deems appropriate under the circumstances."

[5]Subsection 607.1436(5) provides in part that "[u]pon determining the fair value of the shares, the court shall enter an order directing the purchase upon such terms and conditions as the court deems appropriate, which may include payment of the purchase price in installments, when necessary in the interests of equity, [and] provision for security to assure payment of the purchase price."

[6]Subsection 607.1436(7) provides in part that "[t]he purchase ordered pursuant to subsection (5) shall be made within 10 days after the date the order becomes final unless,

appeal, but the Court of Appeals for the Eleventh Circuit affirmed; the mandate issued on April 9, 2008. (Doc. 319). Although the statutory ten-day period within which the first payment was due would ordinarily have begun to run on that date, at the request of the parties this Court repeatedly extended that deadline so that the parties could attempt to settle and to possibly sell NJC so that the liability to Cox could be satisfied. (See Orders, Docs. 323, 461 & 489; Mots., Docs. 322, 460, & 488).

On April 17, 2009, however, upon motion of Cox and following a hearing, the Court terminated the parties' joint sale process and started the ten-day period under subsection 607.1436(7) during which NJC could elect to file notice of its intent to adopt articles of dissolution and thereby avoid its payment obligation under the Repurchase Order. (See Mot., Doc. 495; Hr'g Mins., Doc. 508; Order, Doc. 507). In that same order, the Court appointed a receiver to oversee NJC's business operations pending a sale of its publishing operations. (Doc. 507). NJC's Board of Directors did not elect to file notice of intent to adopt articles of dissolution within the ten-day period, nor was any payment made to Cox at that time.[7]

In early 2010, Cox and the Receiver sought the Court's approval to sell NJC's publishing operations, and over the objections of several parties and interested persons, that

---

before that time, the corporation files with the court a notice of its intention to adopt articles of dissolution pursuant to [sections] 607.1402 and 607.1403."

[7]The Order appointing the Receiver specified that the Receiver had the power "to exercise all of the powers and authority that would customarily be exercised by the officers and board of directors . . . EXCEPT [that] the determination of what action to take pursuant to section 607.1436(7), Florida Statutes, during the [ten-day] statutory period shall be made solely and exclusively by the Board of Directors of NJC." (Doc. 507 at 2-3).

approval was granted on March 23, 2010.  (See Mot., Doc. 576; Order, Doc. 625).  The

publishing operations were sold to a third-party buyer on March 31, 2010, and the proceeds

of the sale were placed in a segregated account.  (See Doc. 630).  The Order authorizing

the sale required the Receiver to send notice to those wishing to file claims against the sales

proceeds, (Doc. 625 at 12), and the Receiver did so on April 5, 2010, (Doc. 630).  Several

claims were made to the proceeds,[8] and on June 10, 2010, the Receiver filed a Report and

Recommendation for the Disposition of All Remaining NJC Assets (Doc. 652).

      In his Report and Recommendation, the Receiver found that Cox had priority over all

other claims, and he recommended that the sales proceeds and all other remaining NJC

assets—valued at approximately $36 million—be distributed to Cox except for $347,639.70,

which Cox had agreed to relinquish to be paid to seven other claimants.  Several claimants,

including the Pension Benefit Guaranty Corporation ("the PBGC"),[9] objected to the

---

[8]Not all of the claims were filed in the Court record at the time they were made; the claimants instead sent them to the Receiver.

[9]The sale of NJC's publishing operations did not include assumption by the buyer of NJC's pension plan. The PBGC is a United States government corporation that administers the nation's pension insurance program established by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"). (See Joint Pretrial Statement, Doc. 778, at 11). When a Title IV pension plan terminates without enough assets to pay all promised benefits, the PBGC is the guarantor of the plan and typically becomes the statutory trustee of the plan. (Id.). If a pension plan terminates through a distress termination or a PBGC-initiated termination, certain liabilities arise under Title IV of ERISA, including liability of the pension plan's contributing sponsor to the PBGC for "the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan," plus interest. 29 U.S.C. § 1362(a)-(b).
NJC had established an ERISA Title IV pension plan on July 1, 1960, and NJC was the contributing sponsor of the plan. The PBGC filed proofs of claim with the Receiver in April 2010, including a claim for unfunded benefit liabilities ("UBL") under 29 U.S.C. § 1362. (See Ex. E to Doc. 652, at 96-112). On May 14, 2010, the PBGC issued a Notice of

Receiver's Report and Recommendation. (See Doc. 660).  The PBGC, like some other

claimants, argued that payment to Cox ahead of other creditors would violate Florida's

distributions-to-shareholders statute—section 607.06401—which is referenced in subsection

(8) of the election-to-purchase statute and forbids a distribution to a shareholder if the

making of such a distribution would render the corporation insolvent.[10]  (See Doc. 660).  On

August 9, 2010, the Court held a hearing on the competing claims to NJC's assets, (Mins.,

---

Determination to NJC that the plan should be terminated under 29 U.S.C. § 1342, with a termination date of March 23, 2010. (See Doc. 778 at 14). In his June 10, 2010 Report and Recommendation, the Receiver noted that at that time the pension plan had assets of approximately $27 million and $41 million in projected liabilities, meaning that the PBGC had a UBL claim of approximately $14 million against NJC as the former contributing sponsor of the plan. (See Doc. 652 at 16-18). On August 6, 2010, the PBGC and the Receiver signed an Agreement acknowledging that the pension plan was terminated effective March 23, 2010, and that the PBGC was appointed trustee of the plan. (Doc. 675 at 11-13; see also Doc. 669 at 2-4 (describing negotiations and termination of pension plan)). All pension plan assets were to be transferred to the PBGC. (Doc. 675 at 12).

[10]Subsection 607.1436(8) provides that "[a]ny payment by the corporation pursuant to an order under subsection (3) or subsection (5), other than an award of fees and expenses pursuant to subsection (5), is subject to the provisions of [section] 607.06401." Section 607.06401 provides in part:

(1) A board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and the limitations in subsection (3).
. . . .
(3) No distribution may be made if, after giving it effect:
(a) The corporation would not be able to pay its debts as they become due in the usual course of business; or
(b) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

Doc. 673; Hr'g Tr., Doc. 681), and on August 13, 2010, the Court entered an Order ("the Distribution Order") adopting in large part the Receiver's Report, including his recommendation that all NJC assets except $347,639.70[11] be distributed to Cox, (Doc. 674). The PBGC and several other claimants appealed the Distribution Order. (See Notices of Appeal, Docs. 684 & 685).

On April 13, 2012, the Eleventh Circuit Court of Appeals issued its mandate vacating the Distribution Order and remanding the case for further proceedings. (Doc. 698). In its opinion vacating the Distribution Order, the appellate court concluded that any payment to Cox is considered "a distribution to a shareholder within the meaning of § 607.06401" and that therefore this Court "erred when it ordered the distribution of all of [NJC]'s assets to Cox without applying the insolvency test contained in § 607.06401." (11th Cir. Op., Doc. 698-1, at 3). The Eleventh Circuit explained that "[a]ny distribution to Cox must satisfy subsection (8) of . . . § 607.1436," (id. at 23), and that "[i]f on remand the district court finds a

---

[11]As noted earlier in the text, Cox had agreed that $347,639.70 could be distributed among seven other claimants. The Distribution Order explained:

> As to the $347,639.70, it has been represented to the Court that Cox has agreed to relinquish its claim to this amount to be distributed as follows: (1) $49,544.05 to Jerry Laurelli in settlement of his claims to the assets contained in a "rabbi trust"; (2) $221,111.00 in aggregate to Joe Brooks, Donald Dresser, and Richard Kearly for lump-sum settlements of their "Top Hat Plan" claims; (3) $65,788.00 in aggregate to Cora Russo and Katherine Pappas for lump-sum settlements of their Retiree Medical claims; and (4) $11,196.65 to PMV in payment for moneys expended in obtaining the Carpenter appraisal. (Doc. 652 at 30). The Court interprets Cox's agreement to relinquish its claims to this amount as Cox's intent to distribute these amounts from its own recovery from NJC's assets.

(Doc. 674 at 2 n.1) (citing the Receiver's Report and Recommendation).

distribution to Cox would violate [§ 607.06401], [NJC]'s other creditors should receive payment before any distribution is made to Cox," (id. at 2).  The appellate court instructed this Court on remand to "reevaluate the claims of all of [NJC]'s creditors consistent with [its] opinion," (id. at 24), and to "consider whether a payment to Cox would comply with the insolvency test of the distributions-to-shareholders statute [§ 607.06401] at the time of payment to Cox," (id. at 23).  Meanwhile, during the pendency of the appeal, the Receiver had distributed more than $41 million in NJC assets to Cox.  (See Docs. 690, 692, & 694).[12]

## II.  Post-Remand Proceedings

After issuance of the Eleventh Circuit's mandate, this Court held a status conference and established a schedule for the submission of claims so that the Court could reevaluate the claims of NJC's creditors as instructed.  (Mins., Doc. 703; Tr., Doc. 706; Order, Doc. 708).  Memoranda regarding claims were filed by (1) the PBGC; (2) Marc Davidson, Julia Davidson Truilo, and Robert Truilo ("the Davidsons"); and (3) Cox.[13]

The PBGC asserted claims related to the funding of the pension plan and argued that its claims should be paid in full prior to any payment to Cox because payment to Cox did not pass the insolvency test of section 607.06401.  (See Docs. 709, 712, & 720).  The

---

[12]No party requested a stay pending appeal.

[13]The seven claimants other than Cox who received payments under the Distribution Order did not submit claims.  As noted earlier, they were paid with Cox's consent.  No argument has been made that those claimants are not entitled to retain the payments they received under the Distribution Order, and indeed it is appropriate for them to do so under the terms of this Order and in light of Cox's prior agreement as to payment of their claims.

Davidsons asserted claims as officers, directors, and former employees of NJC.[14] (See Doc. 710). Like the PBGC, the Davidsons argued that all creditors other than Cox should be paid first, with Cox to retain the remaining distributable assets. (See Docs. 710 & 713). Cox, on the other hand, maintained that it was entitled to retain all of the NJC assets that had been distributed to it and that an evidentiary hearing would be required before any assets could be distributed to either the PBGC or the Davidsons because the amount of their claims had not been established. (See Docs. 711, 714, & 723). On August 2, 2012, the Court heard argument regarding the three sets of competing claims. (Mins., Docs. 724 & 726; Tr., Doc. 748).

The assigned magistrate judge then held an evidentiary hearing regarding the claim of the PBGC, (Mins., Doc. 781; Tr., Doc. 786), and issued a Report and Recommendation (Doc. 791) regarding that claim. On April 24, 2014, the Court adopted that Report over Cox's objection, thereby establishing the amount of the PBGC's claim for unfunded pension benefit liabilities at $13,887,822.00. (Order, Doc. 794). By that time, the claims of the Davidsons had been withdrawn,[15] leaving the PBGC and Cox as the only remaining claimants to the assets of NJC. The Court held another status conference on May 21, 2014, during which Cox and the PBGC presented argument regarding their views of the issues remaining for decision. (See Mins., Doc. 795).

---

[14]In their claim, the Davidsons asserted, inter alia, that the Court should set aside $1 million in cash from NJC's assets to cover NJC's potential indemnification liability based on state court lawsuits that had been filed against the Davidsons. (See Doc. 710 at 5).

[15](See, e.g., Doc. 791 at 4 n.3; Doc. 778 at 2 & Ex. D).

### III.  Discussion

As earlier noted, the court of appeals instructed this Court to "reevaluate the claims of all of [NJC]'s creditors," (11th Cir. Op. at 24), and to "consider whether a payment to Cox would comply with the insolvency test of the distributions-to-shareholders statute [§ 607.06401] at the time of payment to Cox," (id. at 23).  The appellate court further directed that "[i]f on remand [this Court] finds a distribution to Cox would violate this section, [NJC]'s other creditors should receive payment before any distribution is made to Cox."  (Id. at 2).  On remand, Cox and the PBGC have vigorously disagreed about the proper application of the Eleventh Circuit's mandate.  Cox has not argued that NJC was not insolvent at the time of payment to Cox, but it has nevertheless maintained that it is entitled to keep all of the NJC assets that were distributed to it pursuant to the Distribution Order.  As explained below, Cox's arguments for such entitlement are not well-taken.

### A.  Reevaluation of Creditor Claims

The only remaining creditors who are asserting claims to NJC's assets are Cox and the PBGC.  The amount and validity of Cox's claim have never been in dispute; Cox is owed $129.2 million plus interest that has been accruing since September 2006, when the Repurchase Order and judgment were entered.  And, the Court has now evaluated the PBGC's claim and has quantified it at $13,887,822.00.

Cox challenges the propriety of the PBGC's claim—based on the timeliness and sufficiency of presentation of the claim to the Receiver and otherwise—but to the extent these arguments have not already been disposed of by prior Order, the Court now rejects

them *in toto*. The PBGC submitted four claims[16] to the Receiver on April 16, 2010—prior to the April 19, 2010 deadline for doing so. (See Doc. 652 at 17 & Ex. E thereto at 96-112; Notice of Deadline, Doc. 630). Not long before the now-vacated Distribution Order was entered, the PBGC and the Receiver negotiated the PBGC's claims; the PBGC agreed to withdraw two of the claims and the Receiver agreed that it would not oppose the PBGC's pursuit of the other two claims. (See Doc. 669 at 2-3). The Receiver explained to the Court at that time that his agreement with the PBGC "should not be viewed . . . as a recommendation that [the] PBGC receive a distribution in the amount of these two claims, or a comment on [the] PBGC's priority relative to Cox; only that the Receiver agrees that these two claims are properly before the Court" in agreed-upon amounts. (Id. at 4).

The PBGC's claims initially were contingent on the termination of the NJC pension plan—which did not occur until August 6, 2010, with an effective date of March 23, 2010—but once the pension plan was terminated, the claims were no longer contingent. The PBGC properly submitted and supported its claims consistent with its ability to do so as events unfolded during the winding up of NJC. This Court did not quantify those claims in 2010 or comment on the amounts agreed to by the Receiver because the Court determined that all assets should first be distributed to Cox, leaving nothing for any other claimants and rendering unnecessary any such quantification. Since remand and vacatur of the Distribution Order, the PBGC has established the amount of its claims to the satisfaction of

---

[16]The four claims submitted by the PBGC were for: (1) unfunded benefit liabilities; (2) minimum funding contributions; (3) shortfall and waiver amortization charges; and (4) pension insurance premiums. (See Doc. 669 at 2; Ex. E to Doc. 652 at 96-112).

the Court.[17]  (See Docs. 791 & 794).  In sum, Cox's challenges to the procedural propriety and the amount of the PBGC's claim fail.  Thus, the remaining claims to NJC's assets are Cox's judgment—well in excess of $100 million—and the PBGC's claim of $13,887,822.00 for unfunded pension benefit liabilities.

### B.  Application of the Insolvency Test of Section 607.06401

Having evaluated the claims of Cox and the PBGC, the Court must, as instructed by the Eleventh Circuit, determine whether payment to Cox would comply with the insolvency test of the distributions-to-shareholders statute.  In its opinion, the appellate court instructed this Court to apply the insolvency test "at the time of payment to Cox." (11th Cir. Op. at 23).  Despite this clear directive, Cox has argued on remand that NJC's solvency should be assessed not at the time of payment but instead as of September 2006, when the Repurchase Order and judgment were entered.[18]  However, in making this argument, Cox urges this Court to proceed down a path that would violate the law of the case doctrine and the mandate rule. The Court declines to follow such a course.

"The law of the case doctrine and the mandate rule ban courts from revisiting matters decided expressly or by necessary implication in an earlier appeal of the same case." AIG

---

[17]After remand, the PBGC initially sought to be awarded the amounts to which the Receiver had agreed prior to entry of the Distribution Order.  (See Doc. 709).  As discussed in the text earlier, ultimately the magistrate judge held an evidentiary hearing regarding the amount of the PBGC's claims.

[18]In response to Cox's argument that NJC was solvent as of September 2006, the PBGC states that such solvency is "not germane" in light of the Eleventh Circuit's clear instruction that solvency should be assessed as of the date of payment.  (See Aug. 2, 2012 Hr'g Tr., Doc. 748, at 49).  Just as there is no dispute that NJC was not solvent at the time of payment, there is no question that NJC was solvent in September 2006.

Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc., 579 F.3d 1268, 1270-71 (11th Cir. 2009). "'Under the law of the case doctrine, both the district court and the court of appeals generally are bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case.'" Wheeler v. City of Pleasant Grove, 746 F.2d 1437, 1440 (11th Cir. 1984) (quoting United States v. Robinson, 690 F.2d 869, 872 (11th Cir. 1982)). "The doctrine's purpose is to bring an end to litigation. It also 'protects against the agitation of settled issues and assures obedience of lower courts to the decisions of appellate courts.'" Id. (citations omitted) (quoting United States v. Williams, 728 F.2d 1402, 1406 (11th Cir. 1984)). "[T]he law of the case doctrine extends to every issue the reviewing court has decided, both explicitly and by necessary implication." Piambino v. Bailey, 757 F.2d 1112, 1120 (11th Cir. 1985)).

   "The mandate rule is a 'specific application of the "law of the case doctrine" requiring that '[a] trial court, upon receiving the mandate of an appellate court, may not alter, amend, or examine the mandate, or give any further relief or review, but must enter an order in strict compliance with the mandate.'" Norelus v. Denny's, Inc., 628 F.3d 1270, 1288 (11th Cir. 2010) (quoting Piambino, 757 F.2d at 1119-20). "[A] district court is not free to deviate from the appellate court's mandate." Wheeler, 746 F.2d at 1440 n.2. "A district court when acting under an appellate court's mandate, 'cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.'" Litman v. Mass. Mut. Life Ins. Co., 825 F.2d 1506, 1510-11 (11th Cir. 1987) (quoting In re Sanford Fork & Tool Co., 160 U.S. 247, 255 (1895)). "'Although the trial court

-12-

is free to address, as a matter of first impression, those issues not disposed of on appeal, it is bound to follow the appellate court's holdings, both expressed and implied.'" Piambino, 757 F.2d at 1119 (internal citations omitted).

Cox's assertions regarding the time as of which NJC's solvency should be assessed are foreclosed by these principles. In its opinion, the Eleventh Circuit expressly agreed with the PBGC's contention that NJC's "solvency should be measured on the date of payment" and instructed this court that it "must consider whether a payment to Cox would comply with the insolvency test of the distributions-to-shareholders statute **at the time of payment** to Cox." (11th Cir. Op. at 23) (emphasis added). Cox argues that in reaching this conclusion, the appellate court only looked at the second sentence of subsection 607.06401(8) rather than all of subsection (8) or all of section 607.06401, and Cox exhorts this Court to construe section 607.06401 to reach the conclusion that September 2006—not the date of payment—is the date on which NJC's solvency should be measured. Cox maintains that the Eleventh Circuit left such a course open for this Court, but that position is not well-taken.[19]

As aptly noted by the PBGC,[20] not only is the Eleventh Circuit opinion plain and specific in its direction to this Court as to the appropriate date for solvency assessment, but

_____

[19]In its filings, Cox asserts that "[i]t would be a mistake and constitute plain error for this Court to now consider itself bound to misconstrue . . . subsection (8)." (Doc. 711 at 19; Doc. 701 at 14). This Court is not misconstruing subsection (8) or even construing subsection (8) at all; it is following the instructions in the mandate of the Eleventh Circuit Court of Appeals, in which the court specifically and clearly ruled regarding the date as of which insolvency was to be measured on remand.

[20](See, e.g., Tr., Doc. 748, at 27).

also an entire section of the opinion is devoted to this question.  In subpart IV.D. of the opinion—titled "Date to Measure News-Journal's Insolvency Under Fla. Stat. § 607.06401"—the appellate court noted that the parties "dispute when the court should evaluate [NJC's] insolvency," with Cox relying on subsection 607.06401(6) and the PBGC relying on subsection 607.06401(8).[21] (11th Cir. Op. at 22).  The appellate court then quoted the second sentence of subsection 607.06401(8), stated that it agreed with the PBGC's assertion of the "date of payment" as the correct assessment point, and specifically instructed this Court to measure solvency as of the date of payment.  This Court is not free to disregard these instructions or to look behind the Eleventh Circuit's explicit conclusion on this question.  It is clear that the appellate court addressed this issue, ruled on this issue, and specifically instructed this Court what to do with regard to this issue.  Cox's repeated attempts to have this Court revisit this question, which has already been squarely decided by the Eleventh Circuit, are rejected.  See, e.g., Litman, 825 F.2d at 1511 ("When an appellate court issues a specific mandate it is not subject to interpretation; the district court has an obligation to carry out the order.").

Turning, then, to application of the insolvency test at the time of payment, the test provides that payment may not be made if, after giving effect to such payment, either (a) NJC "would not be able to pay its debts as they become due in the usual course of business"; or (b) NJC's "total assets would be less than the sum of its total liabilities" plus

---

[21]Subsection (6) provides the dates on which the effect of a distribution should be measured under subsection 607.06401(3)'s insolvency test, "[e]xcept as provided in subsection (8)."

-14-

other amounts not at issue here.[22] § 607.06401(3), Fla. Stat. Under at least the second of these alternative tests, NJC plainly was insolvent "at the time of payment to Cox" because its liabilities far exceeded its assets.

As set forth in the Receiver's Report and Recommendation (Doc. 652) and the Receiver's Response to Objections (Doc. 669), as of August 5, 2010—before the original distribution was made pursuant to the August 13, 2010 Distribution Order—NJC's assets totaled less than $40 million and its liabilities exceeded $169 million. Cox ultimately received $41,976,068.46 in NJC assets, and distributions totaling $347,639.70 were, with Cox's consent, made to other creditors. (See Docs. 690, 692, & 694). Thus, NJC assets totalling $42,323,708.16 were distributed—an amount well below its total liabilities, which continued to increase beyond $169 million with the ongoing accrual of interest on the debt to Cox. NJC clearly was insolvent as of August 5, 2010, and thereafter, and a payment to Cox would not "comply with the insolvency test of the distributions-to-shareholders statute at the time of payment to Cox." (11th Cir. Op. at 23). Because a payment to Cox would violate the insolvency test, the Eleventh Circuit's mandate directs that NJC's "other creditors should receive payment before any distribution is made to Cox." (Id. at 2).

_____

[22]The second alternative of the insolvency test provides in full that "[n]o distribution may be made if, after giving it effect: . . . [t]he corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution." § 607.06401(3), Fla. Stat. The amount needed to satisfy preferential rights, if any, has not been at issue in this case and is not addressed in this Order. As discussed in the text, NJC's liabilities alone far exceeded its assets at the time of payment in any event.

## C.  Remaining Arguments

In addition to the arguments already discussed, Cox makes other assertions in support of its claim to all of NJC's assets.  These arguments are not viable under the law of the case doctrine and the mandate rule and are otherwise rejected.

Cox contends that its claim should be treated as "at parity" with the PBGC's claim rather than second to it.  For this point, Cox relies on subsection 607.06401(7), which provides that "[a] corporation's indebtedness to a shareholder incurred by reason of a distribution made in accordance with this section is at parity with the corporation's indebtedness to its general, unsecured creditors except to the extent subordinated by agreement."  Cox submits that this subsection was neither argued to nor addressed by the Eleventh Circuit and that this Court should rely on it to treat the two remaining creditor claims equally rather than ordering payment of the PBGC's claim ahead of Cox's claim.

This argument is foreclosed by the clear mandate of the Eleventh Circuit and application of the insolvency test of section 607.06401.  The appellate court explicitly stated that if this Court finds on remand that making a distribution to Cox would violate the insolvency test of section 607.06401, NJC's "other creditors should receive payment before any distribution is made to Cox." (11th Cir. Op. at 3).  This Court has indeed found that a distribution to Cox would violate the insolvency test, and therefore the PBGC should be paid before Cox receives any distribution.

The final position that Cox maintained on remand is that as a matter of equity it should be paid before the PBGC is paid.  To the extent this argument is based on notions of "fairness," it has already been rejected through this Court's adoption of the magistrate

judge's Report and Recommendation regarding the PBGC's claim, which considered and refuted Cox's protestations of unfairness.  (See Doc. 791 at 12-13).  And, insofar as Cox asserts, as it did at the May 21, 2014 status conference, that this Court has broad powers and discretion regarding how NJC's assets should be distributed, this Court either lacks such power and discretion or declines to exercise them in a manner favorable to Cox in the face of the Eleventh Circuit's mandate.  The appellate court expressly stated that "no distribution to Cox can violate [subsection 607.1436(8)], irrespective of security or of an equitable lien." (11th Cir. Op. at 18).  The appellate court has spoken, and it has instructed this Court on how to distribute the NJC assets.  Cox's arguments for favorable treatment in the name of equity are without merit.[23]

## IV. Conclusion

As set forth above, the Court has, as directed by the mandate of the Court of Appeals, reevaluated the claims of all NJC creditors and has considered whether payment to Cox would comply with the insolvency test of Florida's distributions-to-shareholders

---

[23]Cox relies heavily on the statement in the "Standard of Review" portion of the appellate court's opinion that "[t]he district court's distribution of assets in a receivership is an equitable decision that we review for abuse of discretion." (11th Cir. Op. at 7).  This Court does not, however, read the inclusion of this sentence in the appellate court opinion as a grant of permission to vary from the express legal conclusions and directives in that opinion.

Additionally, in its filings and at argument, Cox asserted that the PBGC has already received $28 million from NJC.  This assertion is misleading.  On the effective date of the termination of NJC's pension plan—March 23, 2010—the pension plan had assets of approximately $28 million, and this is apparently the amount to which Cox has frequently alluded.  However, the pension plan assets are distinct from NJC assets.  The PBGC's claim against NJC's assets arises, as discussed in a prior footnote, under Title IV of ERISA, which renders a pension plan's contributing sponsor liable, after a pension plan's termination, to the PBGC for, inter alia, unfunded benefit liabilities.

statute at the time of payment to Cox.  Because at the time of the payment to Cox the

payment violated that test, as set forth in the appellate court's mandate "[NJC]'s other

creditors should receive payment before any distribution is made to Cox." (11th Cir. Op. at

3).  The PBGC is NJC's only other unpaid creditor at this point, and it should have received

payment of $13,887,822.00 before Cox received any distribution of NJC's assets.[24]

Pursuant to this Court's now-vacated Distribution Order (Doc. 674), a distribution was

erroneously made to Cox before the PBGC received payment, and therefore Cox will be

ordered to submit the amount of the PBGC's claim into the registry of this Court.

Accordingly, it is **ORDERED** and **ADJUDGED** that Cox shall pay $13,887,822.00 into

the registry of this Court **no later than Friday, September 12, 2014.**  The Court retains

jurisdiction to effect the distribution of funds.

**DONE** and **ORDERED** in Orlando, Florida, this ⎯ 13 ⎯ day of August, 2014.

                                                  JOHN ANTOON II
                                                  United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party

---

[24]The other creditors that received payment with Cox's consent pursuant to the
Distribution Order are properly regarded as having been paid "before any distribution [wa]s
made to Cox." (11th Cir. Op. at 2; see Doc. 690).  Those claimants were paid out of Cox's
recovery, and they are entitled to keep the monies that they have received.