[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14115
_____

D.C. Docket No. 6:04-cv-00698-JA-DAB

COX ENTERPRISES, INC., a Delaware corporation,

Plaintiff - Appellant,

versus

NEWS-JOURNAL CORPORATION, a Florida corporation,
HERBERT M. DAVIDSON, JR.,
MARC L. DAVIDSON,
JULIA DAVIDSON TRUILO,
JONATHAN KANEY, JR., SERVICE, et al.

Defendants – Appellees,

PENSION BENEFIT GUARANTY CORPORATION,

Claimant – Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 22, 2015)

Before ED CARNES, Chief Judge, JILL PRYOR and HIGGINBOTHAM,[*] Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This litigation has a long history in the Eleventh Circuit. In this latest chapter Cox Enterprises and Pension Benefit Guaranty Corporation (PBGC) do battle for what remains of the now-defunct newspaper publisher News-Journal Corporation (NJC). This case arises at the intersection of Florida's election-to-purchase statute[1] and its distributions-to-shareholders statute.[2] The election-to-purchase statute affords a corporation faced with a derivative suit the option to purchase the shares of the complaining shareholder in order to cause dismissal of the suit. The distributions-to-shareholders statute generally forbids a corporation from reacquiring shares by distribution if such distribution would render the corporation insolvent. Cox brought a derivative suit against NJC. NJC, in turn, elected to purchase Cox's shares. But at no time could NJC reacquire Cox's shares without rendering itself insolvent. As a consequence, NJC never made a distribution to Cox and Cox never relinquished its shares. Although at all times a

---

[*] Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

[1] Florida Statutes § 607.1436.

[2] Florida Statutes § 607.06401.

shareholder, Cox attempts to prosecute its claim as a creditor of the now-defunct company.

A prior panel of this court instructed the district court to determine whether distribution of NJC corporate assets to Cox, a shareholder, would render NJC insolvent and, if so, to direct NJC to pay PBGC, a creditor, before distributing any assets to Cox. On remand, the district court heeded this court's instruction. We are now asked to reconsider the prior panel's holding and the district court's application of it.

I.

We relate facts aptly stated in this court's 2007[3] and 2012[4] decisions, supplementing as necessary. Eugene C. Pulliam organized NJC in 1925 when he acquired and consolidated two small Daytona Beach newspapers into a single newspaper, the *Daytona Beach News-Journal*. Pulliam paid cash for one of the acquired newspapers and granted a 40% interest in NJC for the other, owned by T. E. Fitzgerald. NJC had one class of common stock with 4,000 shares issued and outstanding. In 1927, Pulliam sold his 60% interest to Julius and Herbert Davidson, giving the Davidson family a majority of NJC's shares. Over the ensuing decades, Fitzgerald's minority 40% interest changed hands until, in 1963, the minority

_____

[3] *Cox Enters., Inc. v. News-Journal Corp. ("Cox I")*, 510 F.3d 1350 (11th Cir. 2007).

[4] *Cox Enters., Inc. v. Pension Ben. Guar. Corp. ("Cox II")*, 666 F.3d 697 (11th Cir. 2012).

interest holder, John H. Perry, Jr., purchased an additional 7.5% interest in NJC from a member of the Davidson family, leaving him with 47.5% of NJC's outstanding shares. In 1969, Perry sold his minority interest to Cox, a privately held media conglomerate. Cox has maintained the 47.5% interest comprising 1,900 shares in NJC. The remaining 2,100 shares, which comprise a controlling 52.5% interest in NJC, are now owned by a closely held corporation controlled by the Davidson family.

*Cox I* set out the more recent history of NJC's corporate activities:

[When this case began,] NJC's directors were Tippen Davidson, Marc Davidson, Julia Davidson Truilo, Robert Truilo, Georgia Kaney, Jonathan Kaney, Jr., and David Kendall. Tippen Davidson also served as the president and CEO of NJC until his death in January 2007. Tippen Davidson's grandfather, Julius, served as the *News–Journal*'s publisher from 1927 until 1962, when he relinquished control of the paper to his son Herbert M. Davidson. Herbert published the paper until his death in 1985. Under Julius and Herbert's leadership, NJC also owned and operated a radio station, WNDB–FM, from 1944 to 1972.

Although Tippen Davidson enjoyed a brief career as a professional musician, he eventually returned to Daytona Beach to work as a reporter and city editor for the *News–Journal*. Upon his father's death, he became the paper's general manager and publisher. Tippen's wife, Josephine, has also worked as a reporter and editor at the *News–Journal*. Their two children, Marc Davidson and Julia Davidson Truilo, are currently members of the *News–Journal* staff and the NJC board of directors. Julia's husband, Robert Truilo, serves on the board of directors and as the *News–Journal*'s business manager.

In his capacity as CEO of NJC, Tippen Davidson continued to pursue his interest in music and the performing arts. As early as 1966, he began to help create several non-profit organizations, including the

Florida International Festival ("FIF"), Central Florida Cultural
Endeavors ("CFCE"), Seaside Music Theater ("SMT"), and Lively
Arts Center, Inc. ("LACI") (collectively "Cultural Entities"). SMT, in
particular, has consistently depended on funding from NJC. After NJC
pledged $1.8 million to SMT in 1993, NJC management developed a
"spin-off strategy" according to which contributions to SMT would go
down by $180,000 annually until they totaled no more than $500,000
per year. The strategy was never effectively implemented, and, in fact,
in 1999, NJC's total contribution to SMT came to $1.4 million. By the
following year, this figure had risen to $1.8 million—triple what it
had been eight years before.

In 1996, NJC's directors organized LACI as a part of the SMT spin-
off strategy. Tippen, Georgia Kaney, Marc Davidson, and Julia Truilo
served as its original board of directors. Their goal was to build and
operate an independent and upscale performing arts center for SMT,
thereby enhancing the stature of SMT and increasing its revenue. The
projected cost for the center was $29 million. NJC provided $13
million of this amount as part of a naming rights agreement.[5]

In the beginning, NJC treated its contributions to the Cultural Entities
as charitable tax deductions. Over time, however, the donations began
to exceed the maximum allowed for charitable deductions.
Accordingly, in 1993, NJC began to classify its contributions as
business expenses for the purpose of corporate promotion. The district
court found these cultural expenditures to have been waste . . .

Cox first learned of the $13 million naming rights agreement on 10
March 2004. Unsatisfied with the explanations for this expenditure

---

[5] Per *Cox I*:

In addition to financial support, the Cultural Entities [were]
intertwined with NJC by common management . . . [O]ver the five-
year period leading up to the filing of this action, seventeen CFCE
employees, thirty-eight SMT employees, and three LACI employees
were on the NJC payroll. Many of the Cultural Entities employees
also worked in the *News–Journal* building and received the same
benefits as *News–Journal* employees. *Cox I*, 510 F.3d at 1353 n.2.

provided by NJC, Cox filed suit on 11 May 2004, alleging various acts of fraud, waste, and mismanagement.[6]

In response to Cox's suit, NJC elected to purchase all shares owned by Cox at fair value pursuant to Florida's election-to-purchase statute, which allows a corporation or one or more of its shareholders to purchase the shares of a petitioning shareholder at fair value in order to cause dismissal of the suit.[7]

Because the parties could not agree on the fair value of Cox's shares, the statute required the district court to determine their fair value "as of the day before the date on which [Cox's suit] was filed."[8] Along with the *News-Journal* newspaper, NJC had one wholly-owned subsidiary, Volusia Pennysaver, Inc. The district court held an eight-day bench trial during which both sides presented expert testimony regarding value and valuation methodology as to both entities. The district court accepted the valuation for Pennysaver proffered by Cox's

---

[6] *Id.* at 1352-54.

[7] Section 607.1436(1) provides:

> In a proceeding under [section] 607.1430(2) or (3) to dissolve a corporation, the corporation may elect or, if it fails to elect, one or more shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares. An election pursuant to this section shall be irrevocable unless the court determines that it is equitable to set aside or modify the election.

[8] Fla. Stat. § 607.1436(4).

valuation expert and valued Pennysaver at $36 million.[9] The district court also adopted the cash-flow analysis for the *News-Journal* proffered by Cox's valuation expert with minor modifications, premised on several conclusions: first, that NJC was a marketable corporation—that its shares would command an attractive price on the open market; second, that the *News-Journal* had experienced "abnormally poor performance relative to comparably situated newspapers" as a result of mismanagement; and third, that proper valuation of NJC as a going concern required normalization of "the financial data of a poorly operated corporation before determining what the corporation would sell for in an arm's-length transaction."[10] To this third point, related to normalization, although the *News-Journal* at that time had an actual EBITDA margin[11] of 9.3%, the district court applied a normalized EBITDA margin of 24.8% according to the EBITDA margins of similarly situated newspaper corporations not subject to mismanagement.[12] Based on the *News-Journal*'s 2004 gross revenue of approximately $66 million,

---

[9] *See Cox Enters., Inc. v. News-Journal Corp.*, 469 F. Supp. 2d 1094, 1103, 1108 (M.D. Fla. 2006).

[10] *See id.* at 1107-08.

[11] EBITDA stands for "Earnings Before Interest, Taxes, Depreciation, and Amortization." The EBITDA margin is calculated as the ratio of EBITDA to net revenue (*i.e.*, EBITDA is divided by net revenue). An EBITDA margin essentially provides a sense of a company's core profitability—a higher EBITDA margin tends to reflect a more profitable enterprise.

[12] *Cox Enters., Inc.*, 469 F. Supp. 2d at 1107-08.

the cash-flow analysis yielded a value of $236 million for the *News-Journal*[13] which, when combined with the $36 million valuation for Pennysaver, resulted in an overall valuation of $272 million for NJC. Correspondingly, the district court valued Cox's 47.5% interest in NJC at $129.2 million.[14]

At the end of its thorough memorandum and order setting the fair value of Cox's shares, the district court requested memoranda from the parties regarding "what would constitute reasonable terms of purchase"[15] given the valuation.[16] Both NJC and Cox abided the court's request. In its memorandum to the court, NJC indicated that "the amount necessary to complete the purchase [was] approximately twice the amount that NJC [could] finance and pay while continuing

---

[13] The math went as follows: $66,039,483 (gross revenue), multiplied by 24.8% (normalized EBIDTA margin), multiplied by 14.4 (purchase price-to-EBIDTA ratio derived from comparable newspaper corporation sales), equals $235,840,202 (normalized value of the *News-Journal*).

[14] *Cox Enters., Inc.*, 469 F. Supp. 2d at 1112.

[15] *Id.*

[16] The district court cited section 607.1436(5), which provides, in pertinent part:

> Upon determining the fair value of the shares, the court shall enter an order directing the purchase upon such terms and conditions as the court deems appropriate, which may include payment of the purchase price in installments, when necessary in the interests of equity, provision for security to assure payment of the purchase price and any additional costs, fees, and expenses as may have been awarded, and, if the shares are to be purchased by shareholders, the allocation of shares among such shareholders.

to operate its newspaper business [rather than liquidating]."[17] NJC urged that equity required the court to allow payment of the purchase price in installments—a possibility expressed in the statute.[18] In an earlier motion submitted in anticipation of the court's determination of value, NJC had also requested that the court "frame [the eventual purchase order] in such a way that NJC [would] not have to pay the valuation amount until Cox's ownership rights [over the shares were] fully terminated."[19] NJC sought unrestricted right to Cox's shares upon payment of the purchase price to "relieve [itself] of the risk of watching those shares lose value during an appeal."[20] NJC suggested that "Cox face[d] no similar risk [because] it [would be] entitled to 'fair value' unaffected by post-judgment fluctuations in share price."[21]

---

[17] Dist. Ct. Docket No. 6:04-cv-00698-JA-DAB, Doc. 252 at 2. Citations to "Doc." herein refer to docket entries in the district court record in this case.

[18] *See* Fla. Stat. § 607.1436(5) (providing that a purchase order "may include payment of the purchase price in installments, when necessary in the interests of equity"); *see also* Model Business Corporation Act § 14.34, Official Comment ("[M]any courts have hesitated to award dissolution . . . because of its effects on shareholders, employees, and others who may have an interest in the continuation of the business . . . [I]t is rarely necessary to dissolve the corporation and liquidate its assets in order to provide relief . . . .").

[19] Doc. 246 at 2-3.

[20] *Id.* at 9.

[21] *Id.*

In response, Cox requested "full and complete payment . . . immediately," with interest accruing on the purchase price from the valuation date until the date of payment, and the imposition of "conditions . . . by way of security in the interim."[22] Cox argued that based on its own valuation expert's forecast, NJC could finance immediate purchase consistent with newspaper industry lending standards.[23] Cox attached a sworn statement from the valuation expert that, in turn, included as exhibits excerpts from NJC's consolidated financial statements.[24] Finally, Cox asserted that "requiring [it] to accept payment in installments would plainly and unfairly subject [it] to considerable risk,"[25] presumably the risk of loss in share value pending payment of future installments. Characterizing itself as a creditor, Cox requested that, in the event the court were to order installment payments, the order include a number of security provisions, most notably a first priority security interest in all of NJC's assets.[26] Cox submitted a proposed order to this effect.[27]

---

[22] Doc. 253 at 3.

[23] *Id.* at 6-7.

[24] *See id.* at Ex. A–1-7.

[25] *Id.* at 4.

[26] Docs. 261, 261–1.

[27] Doc. 253–3.

10

Following a hearing on the terms of the transfer of Cox's interest and a second round of briefing, the court issued a purchase order in compliance with section 607.1436(5) and dismissed Cox's suit under section 607.1436(6).[28] Despite Cox's request for upfront payment of the purchase price in full, the district court determined that "[e]ven absent wasteful conduct, NJC would likely not have the means to be able to pay $129.2 million in one lump sum."[29] The district court found that based on industry lending standards NJC did "not have ready assets to finance a purchase of [Cox's] shares" to allow for immediate payment.[30] Counsel for NJC framed the issue well during the hearing:

> [NJC] has a historic EBITDA margin of around 12 percent. The company was valued [by the district court] on the basis [of a normalized] 24.8 percent EBITDA margin. Lenders lend on EBITDA multiples, so [NJC] has to find a way and it struggled mightily to find a way to buy a [hypothetical version of itself] that's outperforming it two times over. *It had to find a way for a 12 percent EBITDA company to buy the shares of a 24.8 percent EBITDA company*, and in doing that the result is what you would expect. The actual [NJC, a 12 percent EBITDA company,] trying to buy [the shares of] a hypothetical [NJC, a 24.8 percent EBITDA company,] . . . the finances don't mesh up. And no lender lends money based on [what the district court says NJC is worth or should be worth—lenders lend based on actual EBITDA].[31]

---

[28] Doc. 262.

[29] *Id.* at 5.

[30] *Id.*

[31] Doc. 259 at 17-18 (emphasis added).

In light of these limitations the purchase order directed NJC to pay the $129.2 million purchase price in installments. A first installment payment of $29.2 million was to be made within ten days of either the issuance of the Eleventh Circuit's mandate, in the event of an appeal, or the expiration of the time for the filing of a notice of appeal, in the event no appeal was taken. The remainder of the purchase price was to be paid in five annual installments of $20 million, plus accrued interest, each due on the one-year anniversary of the prior payment.

To safeguard Cox's position during the repayment period, the court ordered that Cox, upon receipt of the first installment payment, tender all of its shares of NJC common stock to NJC in exchange for $100 million in face value preferred stock with first priority dividends.[32] Thereafter, each payment by NJC of an installment, with accrued interest, was to constitute a redemption of that portion of Cox's preferred stock with a face value equal to the principal amount of the payment. The purchase order also included several affirmative and negative covenants curbing certain NJC corporate activities during the repayment period.

---

[32] This at Cox's request: "Cox suggests that it should retain possession of its NJC shares until such time as the [c]ourt's judgment and all related orders concerning payment therefor become final and are no longer subject to appeal and the judgment is paid, provided that, in the event the [c]ourt allows the purchase price to be paid in cash installments, Cox would surrender such shares for cancellation by NJC concurrently with the first payment therefore by NJC." Doc. 261 at 3 (Cox's Proposal Regarding Security and Return of Stock).

The purchase order did not grant Cox a security interest in any of NJC's assets. In short, despite its repeated requests, the district court did not afford Cox treatment as a first-priority secured creditor rather than as a shareholder.[33]

Although the district court did not refer to NJC's consolidated financial statements in the text of the purchase order, those documents were part of the record before the district court when it issued the purchase order on September 27, 2006. At that time the most recent available financial statements were those pertaining to NJC's fiscal year ending December 31, 2005. According to the 2005 balance sheet, NJC had approximately $57.9 million in total assets, $54.6 million in total liabilities, and $3.3 million in total shareholders' equity.[34] An accompanying note to the consolidated financial statements explains that NJC had

---

[33] *See* Docs. 253–3, 261 at 1-3.

[34] *See* Doc. 253–2 at 6. A simplified version of NJC's consolidated balance sheets from 2004 and 2005 states as follows:

### NJC Consolidated Balance Sheets
December 31, 2005 and 2004

|  | 2005 | 2004 |
|---|---|---|
| Total Assets | $ 57,942,798 | $ 51,304,042 |
| Total Liabilities | $ 54,597,839 | $ 48,126,392 |
| Total Shareholders' Equity | $ 3,344,959 | $ 3,177,650 |
| Total Liabilities and Shareholders' Equity | $ 57,942,798 | $ 51,304,042 |

13

at that time recorded as a liability its own "estimated cost to settle [the Cox] lawsuit through purchasing the common stock of Cox at $29,410,000"[35]—well short of the district court's later $129.2 million valuation of Cox's interest. Replacing NJC's $29.4 million estimate with the eventual $129.2 million purchase price would yield approximately $57.9 million in total assets, $154.4 million in total liabilities, and negative $96.4 million in shareholders' *deficit*—rather than equity—on NJC's 2005 balance sheet. The record also contains NJC's consolidated financial statements from 2006 through 2008,[36] which reflect an increased estimated liability of $129.2 million for NJC's potential repurchase of Cox's shares following the issuance of the purchase order,[37] along with a

---

[35] *Id.* at 4.

[36] Doc. 576–4 at 39-89.

[37] *See id.* at 55, 72, 88-89.

shareholders' deficit figure of between negative $80 million and negative $100 million in each year.[38]

Both Cox and NJC appealed the purchase order to this court in *Cox I*. Cox's arguments at that stage focused on defending the district court's valuation methodology, which favored Cox, and challenging the district court's exclusion of compensation for past director and officer misconduct, as well as its denial of prejudgment interest.[39] Cox did not challenge the district court's refusal to grant it a security interest in NJC assets. This court affirmed the purchase order as

---

[38] *See id.* at 42, 59, 76. A simplified version of NJC's consolidated balance sheets from 2006, 2007, and 2008 states as follows:

### NJC Consolidated Balance Sheets

December 31, 2008, 2007, and 2006

|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Total Assets | $ 50,780,113 | $ 59,103,143 | $ 60,280,992 |
| Total Liabilities | $ 150,269,279 | $ 141,490,729 | $ 154,130,171 |
| Total Shareholders' Deficit | $ (99,489,166) | $ (82,387,596) | $ (93,849,179) |
| Total Liabilities and Shareholders' Deficit | $ 50,780,113 | $ 59,103,133 | $ 60,280,992 |

[39] *See* Brief of Plaintiff-Appellee Cross-Appellant Cox Enterprises, Inc. (Appeal No. 06-16190); Reply Brief in Support of Cross-Appeal of Plaintiff-Appellee Cross-Appellant Cox Enterprises, Inc. (Appeal No. 06-16190); *see also Cox I*, 510 F.3d 1350, 1357-61 (11th Cir. 2007).

entered.[40] Notably, in rejecting Cox's request for prejudgment interest this court highlighted that "[d]uring the period in question, Cox continued actively to exercise its rights as a shareholder, including the receipt of $2.8 million in dividends, the receipt of annual audit reports, internal profit and loss reports, and participation in shareholder meetings."[41]

The mandate from *Cox I* issued on April 9, 2008,[42] triggering the ten-day period within which the first payment was due under the purchase order. Nevertheless, NJC was unable to make the first payment, and "at the [joint] request of the parties [the district court] repeatedly extended that deadline so that the parties could attempt to settle and to possibly sell NJC so that the liability to Cox could be satisfied."[43] During this period of repeated deadline extensions—spanning from April 2008 through January 2010—the going-concern value of NJC plummeted.

This period of deadline extensions merits explanation in more detail. In anticipation of the *Cox I* mandate Cox had filed an emergency motion to appoint a receiver to oversee NJC's assets because it "believe[d] that NJC [would] exercise

---

[40] *Cox I*, 510 F.3d at 1361.

[41] *Id.*

[42] Doc. 319.

[43] *Cox Enters., Inc. v. News-Journal Corp.*, No. 6:04-cv-698-Orl-28DAB, 2014 WL 3962694, at *1 (M.D. Fla. Aug. 13, 2014); *see* Doc. 497—1, 2.

its right under [Florida Statutes § 607.1436(7)] to file notice of its intent to adopt articles of dissolution so as to avoid payment to Cox of the 'fair value' of Cox's shares as determined by the [district court]."[44] In support of its belief, Cox noted that NJC had unilaterally terminated what appears to have been the only financing agreement with the potential to support payment according to the terms of the purchase order.[45] The district court denied Cox's motion as premature, reasoning that if NJC were to elect dissolution, appointment of a receiver might be appropriate—in light of NJC's track record of corporate waste and mismanagement—but that NJC could only file notice of its intent to adopt articles of dissolution *after* the issuance of the Eleventh Circuit's mandate, subsequent to which Cox could renew its motion.[46] The parties then filed a joint motion to set April 21, 2008, as the deadline for NJC to file any notice of intent to adopt articles of dissolution,[47] which the district court granted.[48]

On April 21—the deadline—the parties filed an emergency joint motion to extend the deadline "so as to permit the parties to attempt to resolve [the] case by

---

[44] Doc. 315 at 2.

[45] *See* Doc. 315 at 3 (Cox Emergency Motion to Appoint Receiver).

[46] Doc. 318.

[47] Doc. 320.

[48] Doc. 321.

settlement."[49] In their joint motion the parties indicated they had entered into a joint sale agreement on April 18 granting Cox exclusive management and control over a potential sale intended to satisfy, or partially satisfy, NJC's liability to Cox due under the purchase order.[50] The joint sale agreement provided for the terms, conditions, and covenants of the purchase order to remain in effect and for consideration to be paid to Cox along the following lines in the event of a successfully consummated sale:

> In Cox's capacity as a shareholder of [NJC] in connection with the [potential sale] and in consideration of Cox's management of the [s]ale process, and in settlement of any and all claims Cox may have arising out of or related to the [underlying lawsuit], in the event of a successfully consummated [s]ale, Cox shall be entitled to receive from the [s]ale [p]roceeds an amount equal to the sum of:
>
> (a) $22,500,000, increased by 20% of the excess of the [s]ale [p]roceeds over $100,000,000, plus
>
> (b) 47.5% of the [s]ale [p]roceeds.[51]

The joint sale agreement also gave Cox exclusive power and authority to terminate the joint sale process at any time and reinstate the statutory ten-day deadline within which NJC would have to either make the first installment payment due under the

---

[49] Doc. 322.

[50] *Id.*; *see* Doc. 495–2 (Joint Sale Agreement).

[51] Doc. 495–2 at 5.

purchase order or file notice of its intent to adopt articles of dissolution.[52] In their

emergency joint motion to extend the deadline the parties represented to the district

court that they had:

> . . . agreed to the potential sale of NJC . . . . It is anticipated that it
> could take several months to determine whether a sale meeting the
> terms and conditions of the joint sale agreement can be procured. If
> the sale takes place pursuant to the joint sale agreement, all issues
> would be resolved and the case dismissed. If the sale does not occur,
> the parties wish to be restored to their current position in the
> litigation.[53]

The district court granted the motion, extending the deadline to October 21, 2008,

to permit the parties to proceed with their joint sale agreement.[54] At the parties'

request, the district court instructed the parties to provide a joint report every thirty

days as to the status of the anticipated sale of NJC.[55]

The joint status reports filed over the ensuing months reflect that a formal

sale process for NJC was commenced on August 11, 2008, but was not completed

by the October 21 deadline.[56] On October 15 the parties filed a joint status report to

---

[52] *See id.* at 3, 8.

[53] Doc. 322 at 3-4.

[54] Doc. 323.

[55] *Id.*

[56] *See* Docs. 331, 354, 369, 411, 434.

19

this effect and requested a further extension to March 10, 2009,[57] which the district court granted.[58] Cox persisted in its role at the helm of the sale process. Although management presentations and site visits with potential purchasers apparently resulted in the submission of some bids,[59] no sale was consummated, and on February 24, 2009, Cox (alone) requested another extension of the deadline "to permit additional time for negotiation with prospective purchasers."[60] The district court extended the deadline until May 29, 2009.[61]

This carried on until March 18, 2009, when Cox moved to terminate the joint sale process and to appoint a receiver to oversee NJC's assets.[62] Following a hearing,[63] the district court granted Cox's motion on April 17, 2009,[64] again commencing the statutory ten-day period within which NJC was to either make the first installment payment due under the purchase order or file notice of its intent to

---

[57] Doc. 460.

[58] Doc. 461.

[59] Docs. 473, 476, 484.

[60] Doc. 488.

[61] Doc. 489.

[62] Doc. 495.

[63] Doc. 516 (Transcript from Hearing).

[64] Doc. 507.

adopt articles of dissolution. The district court appointed a receiver to manage NJC's business, safeguard its assets, and prepare it for sale. Despite the statutory ten-day deadline, "[a]fter entry of this order, [NJC] neither made a payment to Cox nor adopted articles of dissolution."[65]

Nor did Cox tender any shares. It remained a shareholder in possession of NJC common stock. In addition to referring to itself as a shareholder in the joint sale agreement,[66] Cox continued to receive dividends after the purchase order issued in 2006.[67] And in parallel sanction proceedings regarding charitable payments and dividends made by NJC in violation of the purchase order, Cox requested that the court order NJC to declare a constructive proportionate dividend payable to Cox as a shareholder of NJC[68]—a request the district court granted in part in April 2009.[69]

The sale process continued, now under the direction of the receiver, who provided the court with monthly status reports from May 2009 through November

---

[65] *Cox II*, 666 F.3d 697, 700 (11th Cir. 2012).

[66] *See* Doc. 495–2 at 5.

[67] *See* Doc. 292–1 (Notice of Dividends).

[68] *See* Doc. 312 at 12.

[69] *See* Doc. 503.

2009.[70] The receiver's status reports reflect that the receiver engaged a broker and that bids from potential purchasers were submitted and considered. The receiver's efforts culminated in a joint motion of the receiver and Cox in January 2010 requesting permission to sell the publishing operations of NJC for just over $20 million.[71] Following another round of briefing and a hearing, the district court granted the joint motion in March 2010 and directed the receiver to execute the sale.[72] The sale proceeds combined with all other remaining NJC assets totaled approximately $36 million.[73] In short, following the 2010 sale NJC was worth roughly one-eighth its estimated value per the district court's 2006 purchase order.

Relevant to this appeal, the purchaser did not assume liability for NJC's pension obligations and PBGC became the statutory trustee for NJC's terminated pension plans and guarantor of its unfunded pension obligations.[74] Cox filed a claim in the receivership for the $129.2 million due under the 2006 purchase order and PBGC filed a claim for unfunded pension obligations. The district court

---

[70] Docs. 523, 524, 528, 537, 569.

[71] Doc. 576; *see* Doc. 576–2 at 9 (Asset Purchase Agreement).

[72] Doc. 625.

[73] *See Cox Enters., Inc. v. News-Journal Corp.*, No. 6:04-cv-698-Orl-28DAB, 2014 WL 3962694, at *2 (M.D. Fla. Aug. 13, 2014).

[74] *See* Doc. 652 at 16-17; *see also* 29 U.S.C. § 1302 (establishing the Pension Benefit Guaranty Corporation).

characterized Cox as a first-priority, quasi-secured creditor and ordered the receiver to distribute all of NJC's assets to Cox in partial satisfaction of Cox's claim.[75] PBGC, along with other smaller creditors, appealed.

In *Cox II*, we rejected the conclusion that Cox had an equitable first priority claim to NJC's assets, vacated the district court's order, and remanded the case with specific instructions. We held, in accordance with section 607.1436(8), that the election-to-purchase statute "require[s] that *any payment* made as a result of a corporation's share repurchase decision [must] comply with the distribution requirements of [Florida Statutes § 607.06401], which prohibits the distribution of corporate assets to a shareholder if it would render the corporation insolvent."[76] We further held "that Cox qualifies as a shareholder for purposes of the distributions-to-shareholders statute," and mandated that the district court "must consider whether a payment to Cox would comply with the insolvency test [provided for at section 607.06401(3)] at the time of payment to Cox."[77] We directed that "[i]f on remand the district court finds a distribution to Cox would

---

[75] *Cox Enters., Inc. v. News-Journal Corp.*, No. 6:04-cv-698-Orl-28DAB, 2010 WL 3220198, at *3-*4 (M.D. Fla. Aug. 13, 2010) ("Cox has an equitable first priority claim to all of the assets to be distributed up to the extent of its judgment. Though not expressly stated in the [purchase order], the [c]ourt's intent in entering the positive and negative covenants was to provide security for Cox's award . . . .").

[76] *Cox II*, 666 F.3d at 699 (emphasis added).

[77] *Id.* at 706, 708.

violate [the insolvency test]," as assessed at the time of payment, "[NJC's] other creditors should receive payment before any distribution is made to Cox."[78]

On remand, in an effort to allow the parties to fully develop the record, the district court referred the case to a magistrate judge to hold an evidentiary hearing regarding the value of PBGC's claim. The district court adopted the magistrate judge's report and recommendation and valued PBGC's claim at $13,887,822.00.[79] The district court also found that "payment to Cox would violate the insolvency test" as assessed at the time of payment and, concluding that this court's mandate so required, ordered that PBGC's claim be paid in full first, before any distribution to Cox.[80]

Cox appeals.

## II.

The law of the case doctrine dictates that "an appellate decision is binding in all subsequent proceedings in the same case unless the presentation of new evidence or an intervening change in the controlling law dictates a different result, or the appellate decision is clearly erroneous and, if implemented, would work a

---

[78] *Id.* at 699.

[79] Doc. 794 (Order Adopting Magistrate's Report and Recommendation).

[80] *Cox Enters., Inc. v. News-Journal Corp.*, No. 6:04-cv-698-Orl-28DAB, 2014 WL 3962694, at *6–*8 (M.D. Fla. Aug. 13, 2014).

manifest injustice."[81] The mandate rule is "a specific application of the law of the case doctrine."[82] Subject to the three "narrow"[83] exceptions mentioned above, "when an appellate court issues a specific mandate it is not subject to interpretation; the district court has an obligation to carry out the order."[84] "The trial court must implement both the letter and the spirit of the mandate . . . taking into account the appellate court's opinion . . . and the circumstances it embraces."[85] "Although the trial court is free to address, as a matter of first impression, those issues not disposed of on appeal, it is bound to follow the appellate court's holdings, both expressed and implied."[86] Because "[a] mandate may be vague or precise" depending on the issues presented, where a mandate's scope is contested we must "determine the scope of the issues considered in [the prior] appeal."[87] We

---

[81] *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1510 (11th Cir. 1987) (en banc).

[82] *Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir. 1985) (alterations omitted).

[83] *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996).

[84] *Litman*, 825 F.2d at 1511.

[85] *Piambino*, 757 F.2d at 1119.

[86] *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1331 (11th Cir. 2005) (internal quotation marks and citation omitted).

[87] *United States v. Crape*, 603 F.3d 1237, 1241 (11th Cir. 2010).

review de novo the district court's interpretation and application of this court's mandate in *Cox II*.[88]

A.

Cox first argues that the district court was relieved of its obligation to assess the insolvency test as of the time of payment because the *Cox II* panel clearly erred in so mandating. Cox claims that the purchase order constituted a distribution of indebtedness from NJC to Cox, the effect of which must be assessed as of the time the purchase order issued. Cox also claims, as it must, that such a distribution would not have been prohibited under the insolvency test and therefore later repayment of the debt must be allowed, even if it would render NJC insolvent as of the time of payment. Cox also claims that the purchase order transformed it into a creditor of NJC, even though Cox at all times retained its shares.

The record before the *Cox II* panel—specifically, NJC's balance sheets— belies Cox's claims. At no point in time could NJC have reacquired Cox's shares by distribution without rendering itself insolvent. The record demonstrates conclusively that a distribution of indebtedness to Cox in the amount of $129.2 million would have rendered NJC insolvent in 2006. Cox's position is premised on construing the purchase order to have directed NJC to make a distribution prohibited by the statute in the first instance; it is therefore untenable. We cannot

---

[88] *Id.* (citing *Litman*, 825 F.2d at 1511).

conclude that the district court's order required this untoward result.[89] Nor can we conclude that Cox became a creditor when it never relinquished its shares.

1.

Turning to our holding in *Cox II*, we have emphasized that the "clear error" exception must be rarely invoked.[90] Accordingly, "in a close case, a court must defer to the legal conclusion of a coordinate court in the same case; only when the legal error is beyond the scope of reasonable debate should the court disregard the prior ruling."[91] Needless to say, this is a high bar.[92] We emphasize that our inquiry is focused on whether the prior panel's decision was so clearly erroneous that we cannot construe it as a reasoned outcome. We cannot hold under this exacting standard that the *Cox II* panel clearly erred in requiring assessment of the insolvency test as of the time of payment.

---

[89] *See Durr v. Shinseki*, 638 F.3d 1342, 1344 (11th Cir. 2011) ("[T]he law tries to avoid absurd results."); *cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

[90] *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1370 (11th Cir. 2003).

[91] *Id.* at 1370-71.

[92] *See, e.g.*, *Parts & Elec. Motors, Inc. v. Sterling Elec. Inc.*, 866 F.2d 228, 233 (7th Cir. 1988). ("To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.").

2.

The Florida Business Corporation Act, codified at Florida Statutes § 607 *et seq.*, largely tracks the language of the Model Business Corporation Act. Florida's election-to-purchase statute requires that "[a]ny payment by the corporation pursuant to an order under subsection (3) or subsection (5) . . . is subject to the provisions of [section] 607.06401," the distributions-to-shareholders statute.[93] It is undisputed that the purchase order in this case was issued under subsection (5) of the election-to-purchase statute. Correspondingly, "any payment" made pursuant to the purchase order is subject to the provisions of the distributions-to-shareholders statute.

As the *Cox II* panel identified, "the [distributions-to-shareholders] statute essentially provides that corporate assets may not be distributed to shareholders if the distribution would render the corporation insolvent."[94] The insolvency test contained in the distributions-to-shareholders statute generally forbids a distribution of indebtedness to a shareholder if such distribution: (a) would render the corporation unable to pay its debts as they become due in the usual course of business (so-called "equity insolvency"), or (b) would, when added as a debt to the liabilities column of the corporation's balance sheet, cause the corporation's total

---

[93] Fla. Stat. § 607.1436(8).

[94] *Cox II*, 666 F.3d at 703.

liabilities to exceed the corporation's total assets (so-called "balance sheet insolvency").[95]

The distributions-to-shareholders statute also contains default timing provisions for when the insolvency test must be assessed with regard to a particular distribution.[96] "In the case of distribution by purchase, redemption, or other acquisition of the corporation's shares," the default rule requires assessment of the insolvency test as of the earlier of:

1. The date money or other property is transferred or debt incurred by the corporation, or

2. The date the shareholder ceases to be a shareholder with respect to the acquired shares . . . .[97]

---

[95] *See* Fla. Stat. at § 607.06401(3) (treating senior liquidation preferences as liabilities unless the articles of incorporation provide otherwise). Subsection (3) provides in full:

No distribution may be made if, after giving it effect:

(a) The corporation would not be able to pay its debts as they become due in the usual course of business; or

(b) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

[96] *Id.* at § 607.06401(6).

[97] *Id.* at § 607.06401(6)(a).

29

In short, where the default timing provisions apply a corporation cannot purchase shares by making a distribution of indebtedness to a shareholder if such distribution would cause the corporation's total liabilities to exceed its total assets as of the time the debt is incurred.

Under the statutory scheme subsection (8) offers a workaround for corporations seeking to overcome this default rule. Subsection (8) provides that:

> . . . indebtedness . . . including indebtedness issued as a distribution, is not considered a liability for purposes of [the insolvency test] if its terms provide that payment of principal and interest are made only if and to the extent that payment of a distribution to shareholders could then be made under this section.[98]

A corporation can escape the statute's general prohibition by distributing indebtedness to a shareholder on the condition that any future payment of principal and interest is treated as a distribution that must comply with the distributions-to-shareholders statute. In essence, the statutory structure affords an alternative to a corporation, allowing it to make an otherwise forbidden distribution of indebtedness by kicking down the road assessment of the insolvency test, which operates as to each future payment on the debt.[99] The exception provides that

---

[98] *Id.* at § 607.06401(8).

[99] *See* Model Business Corporation Act § 6.40, Comment 8.B ("[I]t is anticipated that [the subsection (8) exception] will be applicable most frequently to permit the reacquisition of shares of the corporation at a time when the deferred purchase price exceeds the net worth of the corporation.").

"*each payment* of principal or interest is treated as a distribution, the effect of which is measured on the date the payment is actually made."[100] This plain language reading of the statute controls our decision. It is also faithful to the purpose claimed for the statute by the drafters of the Model Business Corporation Act adopted by Florida.

At issue here, the *Cox II* panel concluded that upon issuance of the purchase order NJC "had a debt of $129.2 million owed Cox to be paid in regular installments," that "[t]his indebtedness of [NJC] triggered the timing provision of [subsection (8)]," and that the insolvency test must be assessed "at the time of payment to Cox."[101]

3.

The circumstances of this case fit imperfectly with our plain language reading of the statutory scheme. This for several reasons. First, although the election-to-purchase statute provides that "[t]he purchase ordered . . . *shall be made within 10 days after the date the order becomes final* unless, before that time, the corporation files with the court a notice of its intention to adopt articles of dissolution,"[102] the parties in this case repeatedly—and jointly—requested and

---

[100] Fla. Stat. § 607.06401(8) (emphasis added).

[101] *Cox II*, 666 F.3d at 707-08.

[102] Fla. Stat. § 607.1436(7) (emphasis added).

received extensions of that deadline. By all accounts it appears that Cox initiated and sustained these requests in its effort to stave off the dissolution of NJC. After NJC terminated what appears to have been the only financing agreement with the potential to support payment according to the terms of the purchase order,[103] it became apparent that dissolution was imminent. At this juncture Cox faced two alternatives. On one hand, if NJC were to adopt articles of dissolution, Cox would revert to its position as a minority shareholder with a 47.5% equity interest in the actual value of the dissolved corporation and the right to "continue to pursue any claims previously asserted."[104] In this scenario Cox's reversionary position would have been much less valuable than its position as valued under the purchase order and the joint sale agreement—a position premised on normalized EBITDA figures per the district court's valuation methodology and the joint sale agreement's provision for ample consideration to Cox in the event of a consummated sale. The disparity between these two alternatives increased over time as the value of NJC declined precipitously. Seeking to avoid the reversionary fate it faced under dissolution, Cox endeavored alongside NJC to confect a joint sale of the corporation that would allow NJC to satisfy, or partially satisfy, its liability due

---

[103] *See* Doc. 315 at 3 (Cox Emergency Motion to Appoint Receiver).

[104] Fla. Stat. § 607.1436(7).

Cox as a shareholder as set out in the purchase order.[105] Cox in essence made a business judgment to bet on the prospect of a sale that could provide a greater return than dissolution.

Second, and as a result of the parties' joint requests to extend the deadline, Cox never relinquished its shares. Cox's theory of the case—that under the default timing rule insolvency must be assessed as of the time the purchase order issued—is in tension with the plain language of the distributions-to-shareholders statute, which provides that the default timing provisions apply "[i]n the case of distribution by *purchase, redemption, or other acquisition of the corporation's shares*."[106] This language appears to presuppose that the recipient of such a distribution relinquishes its shares when the corporation purchases, redeems, or otherwise acquires them.[107] That did not happen here. Cox retained its shares and, indeed, continued to receive dividends and constructive dividends as a shareholder long after the purchase order issued.

Third, and admittedly cutting somewhat against this court's reasoning in *Cox II*, the purchase order did not contain on its face terms explicitly invoking the

---

[105] *See Cox II*, 666 F.3d at 700.

[106] *Id.* at § 607.06401(6)(a) (emphasis added).

[107] *Cf.* Model Business Corporation Act § 6.40, Comment 8.B ("In an acquisition of its shares, a corporation may transfer property or incur debt to the *former* holder of the shares.") (emphasis added).

subsection (8) exception. As Cox and amici point out, the plain language of the statutory scheme appears to allow a corporation to invoke the subsection (8) exception as to a distribution of indebtedness only if "*its terms provide* that payment of principal and interest are made only if and to the extent that payment of a distribution to shareholders could then be made under this section."[108]

Finally, and key to this case, the record makes clear that, were the $129.2 million debt to have hit NJC's books as a liability at the time the purchase order issued, it would have caused NJC's total liabilities to exceed its total assets, resulting in a shareholders' *deficit* of nearly $100 million.[109] We cannot conclude that such a distribution would have been allowed under the distributions-to-shareholders statute if its effect were measured as of the time the purchase order issued. To the extent that the relevant distribution in this case constitutes a distribution of indebtedness from NJC to Cox at the time the purchase order issued, such a distribution would have been forbidden unless analyzed under the subsection (8) exception.

---

[108] Fla. Stat. § 607.06401(8) (emphasis added).

[109] *See* NJC Consolidated Balance Sheets for 2005, 2006, 2007, and 2008, *supra* notes 34 & 38.

4.

Given the unique circumstances of this case, the scope of reasonable debate allows for two constructions of the district court's purchase order. First, the purchase order can reasonably be construed to direct NJC to, in the future, make a series of payments to Cox in exchange for Cox's common-stock shares—distributions that have yet to occur, as it remains undisputed that NJC has made no payment and Cox has tendered no shares. Under this construction the relevant initial distribution for purposes of assessing the insolvency test is the inchoate first installment payment from NJC to Cox in the amount of $29.2 million. Along these lines it matters not whether the purchase order invoked the subsection (8) exception, because the purchase order would not have constituted a distribution of indebtedness at the time it was issued. It would not at that time have constituted a distribution at all. Although it traverses a different route than that taken in *Cox II*, this construction converges on the same result reached there: insolvency must be assessed as of the time of payment to Cox.

Second, the purchase order can reasonably be construed to have constituted a distribution of indebtedness from Cox to NJC at the time it was issued that invoked the subsection (8) exception. This second construction resists the conclusion that the district court directed NJC to make a distribution prohibited under the statute. Under this construction the relevant distribution for purposes of

assessing the insolvency test is any future payment made in satisfaction of the $129.2 million distribution of indebtedness from NJC to Cox incurred upon issuance of the purchase order. And again, under this construction insolvency must be assessed as of the time of repayment of the debt to Cox under the provisions of subsection (8). The *Cox II* panel adopted this second construction.

Cox cries foul at the *Cox II* panel's apparent reliance on subsection (8) viewed in isolation because the terms of the purchase order itself do not expressly invoke the subsection (8) exception. What Cox looks past is the prior panel's simultaneous emphasis on the "overall scheme" set forth in sections 607.1436 and 607.06401 and that scheme's interaction with the unique circumstances of this case.[110] Again, to our eyes, to the extent that the relevant distribution in this case constitutes a distribution of indebtedness from NJC to Cox at the time the purchase order issued, such a distribution would have been forbidden unless analyzed under the subsection (8) exception. We construe the holding of *Cox II* to be consistent with this reasoning.

As to whether the "terms" of the indebtedness at issue invoked the subsection (8) exception, Cox also steps past the prior panel's express focus on the "plain language" of the election-to-purchase statute,[111] which provides that "*[a]ny*

---

[110] *See Cox II*, 666 F.3d at 703.

[111] *Id.* at 705.

*payment* by the corporation pursuant to [a purchase] order" under that section is subject to the provisions of the distributions-to-shareholders statute.[112]   In discussing whether each installment payment under the purchase order would constitute a payment to a shareholder for purposes of invoking the distributions-to-shareholder statute, the panel identified an "arguable conflict" among the provisions of the election-to-purchase statute.[113] We understand that in its effort to resolve that conflict the prior panel sought to "give effect to the Florida legislature's intent and accord meaning to all parts of the statute" by interpreting a "payment" made pursuant to a purchase order under section 607.1436(5) to qualify as a "payment" under section 607.06401(8) that must undergo the insolvency test as assessed at the time of "payment."[114]

Acknowledging the purchase of alternative interpretations, in light of the imperfect fit between the unique circumstances of this case and our plain language reading of the statutory scheme we cannot hold that the panel clearly erred in

---

[112] Fla. Stat. § 607.1436(8) (emphasis added); *see Cox II*, 666 F.3d at 707.

[113] *See Cox II*, 666 F.3d at 706 (highlighting "an arguable conflict between [sections] 607.1436(6) and (8)").

[114] *See id.* at 704 (citing *Larimore v. State,* 2 So.3d 101, 106 (Fla.2008); *Forsythe v. Longboat Key Beach Erosion Control Dist.,* 604 So.2d 452, 455 (Fla.1992)), 707-08; *see also McGhee v. Volusia Cnty.*, 679 So.2d 729, 730 n.1 (Fla. 1996) ("The doctrine of in pari material requires the courts to construe related statutes together so that they illuminate each other and are harmonized.").

charting the reasonable course it chose. The district court was obligated to obey the mandate of *Cox II* and did so.

B.

Cox next argues that even if distribution according to the terms of the purchase order is barred by the insolvency test, its resulting claim in the assets of NJC held by the receiver must be treated "at parity" with that of PBGC. Cox relies on section 607.06401(7), which provides that "[a] corporation's indebtedness to a shareholder incurred by reason of a distribution made in accordance with this section is at parity with the corporation's indebtedness to its general, unsecured creditors except to the extent subordinated by agreement." The district court held that this argument was foreclosed by this court's clear mandate. We agree.

The matter of relative claim priority between Cox and PBGC was within the scope of issues considered and decided in *Cox II*[115]—indeed, it can be fairly said that relative claim priority comprised the essence of PBGC's appeal. Among the stated "issues on appeal" in *Cox II* was the following: "[W]hether the district court erred by granting Cox an equitable first priority claim to [NJC's] assets to the exclusion of other creditors."[116] Although the *Cox II* panel did not address section

---

[115] *See Transamerica Leasing*, 430 F.3d at 1332 ("The law of the case doctrine applies . . . if our prior opinion determined, explicitly or by necessary implication, [the relevant issue].").

[116] *Cox II*, 666 F.3d at 700-01.

607.06401(7) by name, it explicitly resolved the matter of relative claim priority when it directed that "[i]f on remand the district court finds a distribution to Cox would violate [the insolvency test], *NJC's other creditors should receive payment before any distribution is made to Cox*."[117] The district court fully heeded this instruction and properly held that this court's plain command foreclosed Cox's contrary argument.

III.

As a final matter, Cox mounts an equitable challenge to the district court's order directing NJC to pay PBGC's claim in full. As Cox's challenge pertains to the district court's distribution of assets in a receivership, we review for an abuse of discretion.[118] We, like the magistrate judge and district court below, reject this argument quickly. The   magistrate   judge   issued   a   thorough   report   and

---

[117] *Id.* at 699 (emphasis added). Cox avers that this statement is nonbinding dicta because in sequence it appears at the beginning of the opinion and, as Cox argues, was not necessary to the holding. We cannot agree. It is not the case that "[t]he remainder of the opinion never addresse[d]" relative claim priority. *See United States v. Seher*, 562 F.3d 1344, 1361 (11th Cir. 2009). As stated, relative claim priority was among the issues expressly designated for appeal. Moreover, the opinion contains numerous other consistent statements that reinforce the statement cited here. *Accord Cox II*, 666 F.3d at 707 ("If enforcing Cox's repurchase order would require a payment by [NJC] in violation of the distributions-to-shareholders statute, the statute forbids the payment.").

[118] *Godfrey v. BellSouth Telecomms., Inc.*, 89 F.3d 755, 757 (11th Cir. 1996).

recommendation as to the value of PBGC's claim.[119] This included an express finding that PBGC's proffered valuation was calculated in accordance with Title IV of ERISA[120] and PBGC's own regulations.[121] The district court adopted the magistrate's report and recommendation[122] and Cox does not now dispute its validity. Rather, Cox asserts that we should overturn the district court's order because "it would have been equally permissible" for the district court to have exercised its equitable discretion to reduce the amount awarded on PBGC's claim once valued. Even assuming, without deciding, that such an approach would have been permissible, Cox does not persuade that the district court abused its wide discretion in rejecting that approach in light of this court's mandate in *Cox II*.[123]

IV.

---

[119] Doc. 791.

[120] *See* 29 U.S.C. § 1301(a)(18).

[121] *See* 29 C.F.R. § 4044.41-.75.

[122] Doc. 794 (Order Adopting Magistrate's Report and Recommendation).

[123] Without citing authority from this Circuit, Cox persists that PBGC's claims are equitably moot because in order to obey the *Cox II* mandate on remand the district court had to unwind its prior order directing distribution to Cox. We disagree. "Central to a finding of mootness is a determination by an appellate court that it cannot grant effective judicial relief." *In re Club Associates*, 956 F.2d 1065, 1069 (11th Cir. 1992). Cox's argument is belied by the district court's valid and effective order on remand, which directed Cox to "pay $13,887,822.00 into the registry of [the] [c]ourt."

We AFFIRM the district court's order and judgment. In doing so we remind that finality and justness of result are not warring principles. There are limits to the ability of able counsel to rescue a client from a soured investment. Today we reach those limits.

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Douglas J. Mincher
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 22, 2015

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 14-14115-GG
Case Style: Cox Enterprises, Inc. v. News-Journal Corporation, et al
District Court Docket No: 6:04-cv-00698-JA-DAB

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against appellant.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Eleanor M. Dixon, GG at (404) 335-6172.

Sincerely,

DOUGLAS J. MINCHER, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs